UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**Judge Pauley**

------------------------------------

LEONARDO SEGATT,

              Plaintiff, **07 CV No.: 11413**

    - against -

GSI HOLDINGS CORP., WILLIAM J. BRANCH,
CHARLESBANK EQUITY FUND V, LIMITED
PARTNERSHIP, CB OFFSHORE EQUITY FUND V,
L.P., CHARLESBANK EQUITY COINVEST-
MENT FUND V, LIMITED PARTNERSHIP,
CHARLESBANK COINVESTMENT PARTNERS,
LIMITED PARTNERSHIP, CHARLESBANK
EQUITY FUND V GP, LIMITED PARTNERSHIP
and CHARLESBANK CAPITAL PARTNERS, LLC,

              Defendants.

<u>COMPLAINT</u>

------------------------------------



DEC 1 9 2007

U.S.D.C. S.D. N.Y.
CASHIERS

## <u>Introduction</u>

1.    Defendants deceived Plaintiff into rescinding his purchase of 3,072

Shares[1] of the Common Stock of Defendant GSI Holdings, Corp. ("GSI Holdings") at

$150 per share by misrepresenting to him that the Shares had not been issued, by not

disclosing to him their plans and activities to sell GSI Holdings at a substantially higher

price and by insinuating a threat that, if Plaintiff did not rescind his purchase of the 3,072

---

[1]Unless otherwise noted, capitalized terms have the meaning defined in either the
Stock Purchase and Management Equity Agreement ("Stock Purchase Agreement") dated
initially as of December __, 2006 and subsequently as of December 28, 2006 (a copy of
which is attached as Exhibit C and the terms of which are incorporated by reference), or
in the Agreement and Plan of Merger ("Merger Agreement") dated as of June 22, 2007
(a copy of which is attached as Exhibit F and the terms of which are incorporated by
reference), as the context requires.

Shares, there would be "problems" with the business done by Plaintiff's companies with an affiliate of Defendant GSI Holdings. Plaintiff demands compensatory damages of not less than $1,689,590.50 plus interest and punitive damages of not less than an additional $5,068,771.50.

### The Parties

2.    Plaintiff is a citizen of Brazil, residing in Marau, State of Rio Grande do Sul, Brazil.

3.    Upon information and belief, based on the Information Statement dated July 2, 2007, which is more fully described below, Defendant GSI Holdings is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1004 E. Illinois Street, Assumption, Illinois 62510.

4.    Upon information and belief, based on the Separation Agreement dated November 13, 2006[2], which is more fully described below, and on a recent internet search, Defendant William J. Branch is a citizen of the State of North Carolina, residing at 114 Old Camp Road, Wilmington, North Carolina 28409, and was at all relevant times a director, the Chairman and a controlling person of Defendant GSI Holdings.

5.    Upon information and belief, based on the Stock Purchase Agreement and the Merger Agreement, both of which agreements are more fully described below, and on public filings with the United States Securities and Exchange Commission, Defendant

---

[2]A copy of the Separation Agreement is attached as Exhibit A and its terms are incorporated by reference.

Charlesbank Equity Fund V, Limited Partnership is a limited partnership organized and existing under the laws of the State of Delaware with offices in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston, Massachusetts 02116, and was at all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

6.      Upon information and belief, based on the Stock Purchase Agreement, Defendant CB Offshore Equity Fund V, L.P. is a limited partnership with offices in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was at all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

7.      Upon information and belief, based on the Stock Purchase Agreement and public filings in the Commonwealth of Massachusetts, Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership is a domestic limited partnership under the laws of the Commonwealth of Massachusetts with offices in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

8.      Upon information and belief, based on the Stock Purchase Agreement and public filings in the Commonwealth of Massachusetts, Defendant Charlesbank Coinvestment Partners, Limited Partnership is a domestic limited partnership under the laws of the Commonwealth of Massachusetts with offices in care of Defendant

Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was at all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

9.      Upon information and belief, based on the Stock Purchase Agreement, Defendant Charlesbank Equity Fund V GP, Limited Partnership is a limited partnership with offices in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was at all relevant times the General Partner and controlling person of Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund V, L.P. and Charlesbank Equity Coinvestment Fund V, Limited Partnership and, therefore, an Affiliate of such Defendants within the meaning of the Stock Purchase Agreement and itself a Principal Stockholder and controlling person of Defendant GSI Holdings.

10.     Upon information and belief, based on the Information Statement dated December 6, 2006 of Defendant GSI Holdings and The GSI Group, Inc.[3], the Stock Purchase Agreement, the Information Statement dated July 2, 2007[4], and the Merger Agreement, all of which are more fully described below, and on an internet search, Defendant Charlesbank Capital Partners, LLC is a limited liability company organized

---

[3]A copy of the Information Statement dated December 6, 2006 is attached as Exhibit B and its terms are incorporated by reference.

[4]A copy of the Information Statement dated July 2, 2007 is attached as Exhibit G and its terms are incorporated by reference.

and existing under the laws of the State of Delaware with offices at 200 Clarendon Street, Boston, Massachusetts 02116, and at 70 East 55th Street, New York, New York 10022, and was at all relevant times the General Partner and controlling person of Defendant Charlesbank Coinvestment Partners, Limited Partnership and of Defendant Charlesbank Equity Fund V GP, Limited Partnership. Consequently, Defendant Charlesbank Capital Partners, LLC was an Affiliate of such Defendants and of Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund, V, L.P. and Charlesbank Equity Coinvestment Fund V, Limited Partnership within the meaning of the Stock Purchase Agreement and itself a Principal Stockholder and controlling person of Defendant GSI Holdings, which it formed and capitalized in 2005. In addition, as General Partner of Defendants Charlesbank Coinvestment Partners, Limited Partnership and Charlesbank Equity Fund V GP, Limited Partnership, as manager of all Defendant Principal Stockholders of Defendant GSI Holdings, other than itself, and  as the Stockholders Representative under the Merger Agreement with the full authority to act on behalf of and bind stockholders of Defendant GSI Holdings who so authorized it, Defendant Charlesbank Capital Partners, LLC is a controlling person of all other Defendant Principal Stockholders of Defendant GSI Holdings. Collectively, Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund V, L.P., Charlesbank Equity Coinvestment Fund V, Limited Partnership, Charlesbank Coinvestment Partners, Limited Partnership, Charlesbank Equity Fund V GP, Limited Partnership and Charlesbank Capital Partners, LLC are referred to herein as the

"Charlesbank Defendants".

<u>Jurisdiction</u>

11.    This Court has jurisdiction over the subject matter of this action as follows:

a.    Pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, in that this is an action at law to enforce  liabilities and duties created by the Exchange Act and the rules and regulations thereunder;

b.    Pursuant to 28 U.S.C. §1331 in that this action arises under the laws of the United States;

c.    Pursuant to 28 U.S.C. §1367, in that all claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution; and

d.    Additionally, pursuant to 28 U.S.C. §1332(a)(2), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and if it is between citizens of a state and a citizen of a foreign state.

12.    This Court has jurisdiction over the person of each Defendant pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa,  and Rule 4 of the Federal Rules

of Civil Procedure in that all Defendants transacted business in this district and Defendant Charlesbank Capital Partners, LLC is located in this district.  In addition, the Court has jurisdiction over the person of Defendant GSI Holdings and each of the Charlesbank Defendants based on their consent to jurisdiction as more fully described below.

<u>Venue</u>

13.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, in that all Defendants transacted business in this district and Defendant Charlesbank Capital Partners, LLC is located in this district, and pursuant to 28 U.S.C. §1391, in that a substantial part of the events or omissions giving rise the claims occurred and, alternatively, Defendant Charlesbank Capital Partners, LLC is located, in this district.   Venue in this district is also proper based on the consent of Defendant GSI Holdings and the Charlesbank Defendants as more fully described below.

<u>The Facts</u>

14.     On May 17, 2006, Plaintiff, then the General Manager of Agromarau Indústria e Comercio Ltd. ("Agromarau"), a Brazilian limited liability agricultural supply company located in Marau, State of Rio Grande do Sul, Brazil, informed Defendant Branch by email of his decision to leave the company.  Upon information and belief,

based on the Affirmative Pledge of Assignment of Quotas and Other Provisions dated January 1, 2002 and on the October 2005 Registration Rights Agreement dated as of October 6, 2005, The GSI Group, Inc. was then the majority owner of Agromarau, holding more than 90% of its capital stock (or quotas). The GSI Group, Inc. was then wholly owned by Defendant GSI Holdings. Upon information and belief, based on the October 2005 Registration Rights Agreement and on the Separation Agreement more fully described below, Defendant Branch was then a director and Chairman of both The GSI Group, Inc. and its parent company Defendant GSI Holdings.

15.    In connection with Plaintiff's announced departure from Agromarau, Plaintiff, Defendant GSI Holdings and others entered into, among other agreements, a Separation Agreement dated November 13, 2006, which provided, among other things, for certain payments to Plaintiff and for Plaintiff to exchange 661,725 quotas he owned in Agromarau, which the parties valued in the Separation Agreement at one million Brazilian Reals (R$), for 3,072 shares of the Common Stock of Defendant GSI Holdings.

16.    Also in November 2006, upon information and belief, based on the Information Statement more fully described below, Defendant GSI Holdings engaged UBS Securities LLC as financial advisor to assist its board in exploring a possible sale of Defendant GSI Holdings. Defendants never disclosed to Plaintiff the engagement of UBS Securities LLC.

17.    Among the other agreements entered into in connection with Plaintiff's

-8-

departure from Agromarau was the Stock Purchase Agreement dated initially as of December __, 2006 and subsequently as of December 28, 2006, among Plaintiff, Defendant GSI Holdings and the Charlesbank Defendants, all Principal Stockholders of Defendant GSI Holdings.

18.    The Stock Purchase Agreement was prepared by or on behalf of Defendant GSI Holdings and the Defendant Principal Stockholders.  Upon information and belief, base on its computer-generated document number "NY 529673-3," the Stock Purchase Agreement was prepared in New York.  It was transmitted to Plaintiff by email from Agromarau's lawyer.

19.    The Stock Purchase Agreement provides in Sections 2.1 and 2.2,  in relevant part:

> [Defendant GSI Holdings] hereby issues and sells to [Plaintiff], and [Plaintiff] hereby acquires from [Defendant GSI Holdings], on the date hereof, the Shares [3,072 shares of common stock of Defendant GSI Holdings] in exchange for delivery to [Defendant GSI Holdings] of original stock certificate(s) evidencing 661,725 quotas of Agromarau ....

> [Defendant GSI Holdings] is hereby issuing and selling the shares to [Plaintiff] by delivering to [Plaintiff] a duly executed certificate or certificates representing the Shares registered in the name of [Plaintiff], with appropriate issue stamps, if any, affixed at the expense of [Defendant GSI Holdings], free and clear....

20.    The Stock Purchase Agreement also provides to Plaintiff so-called tag-along rights described in Section 5.5, in relevant part, as follows:

In the event the Selling Principal Stockholders[5] propose to enter into a transaction or series of related transactions (collectively, the "Tag Along Transaction"), pursuant to

---

[5]The Share Purchase Agreement provides in Article I that "'*Selling Principal Stockholders*' is defined in Section 5.4(a)." Section 5.4(a) provides as follows:

> If any Principal Stockholder, acting singly or in combination with any other Principal Stockholder (collectively, the "Selling Principal Stockholders"), proposes to enter into a transaction or series of related transactions (collectively, the "Drag Along Transaction") pursuant to which the Selling Principal Stockholders shall transfer to any transferee a Controlling Interest, then the Selling Principal Stockholders may require the Purchaser to sell, or cause to be sold, and the Purchaser shall be obligated to sell or cause to be sold, and Purchaser shall be obligated to sell or cause to be sold, which obligation shall be enforceable by the Company, to the proposed transferee in the Drag Along Transaction any or all Shares owned by the Purchaser for the same relative consideration received by the Selling Principal Stockholders in the Drag Along Transaction and otherwise on the same terms and conditions obtained by the Selling Principal Stockholders in the Drag Along Transaction. The Selling Principal Stockholders shall provide a written notice of such sale to the Purchaser not less than 10 calendar days prior to the closing of such sale.

The Share Purchase Agreement provides in Article I that the term "'*Principal Stockholders*' means the Persons executing this Agreement as 'Principal Stockholders' on or after the date hereof and their respective Affiliates and direct and indirect transferees."

The Share Purchase Agreement provides in Article I that "'*Affiliate*' means with respect to any specified person, a limited or general partner or member of such Person or another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified, and with respect to a natural Person shall include any Family Member of such Person."

-10-

which the Selling Principal Stockholders shall transfer to any transferee shares of Common Stock[6] constituting more than 50% of the then outstanding shares of Capital Stock[7] held by all the Principal Stockholders[8], and the Selling Principal stockholders do not elect, or do not have the right to elect, to require the sale of the Shares[9] of the Purchaser[10] pursuant to Section 5.4(a),[11] such Selling Principal Stockholders shall notify the Purchaser in writing of such proposed Transfer and its terms and conditions: Within 10 calendar days after the date of such notice, the Purchaser shall notify the Selling Principal Stockholders in writing if the Purchaser elects to participate in such Transfer....If the Purchaser notifies the Selling Principal Stockholders that it intends to participate in the Tag Along Transaction, the Purchaser shall have the right to sell at the same price and on the same terms and conditions as the Selling Principal Stockholders, a number of shares of Common Stock equal to the shares of Common Stock the third party actually proposes to

---

[6]The Share Purchase Agreement provides in Article I that *"Common Stock"* is defined in the Share Purchase Agreement to mean Defendant GSI Holdings' Common Stock, $0.1 par value per share.

[7]The Share Purchase Agreement provides in Article I that *"'Capital Stock'* means all shares of common stock, preferred stock or other equity securities of the Company or securities, rights, options or warrants convertible into or exchangeable or exercisable therefor now held or hereafter acquired by the Stockholders, including without limitation upon the conversion, exercise or exchange of such securities or options or warrants or preemptive rights to acquire the same."

[8]The definition of "Principal Stockholders" is quoted in n. 5 above.

[9]"Shares" is defined in the Share Purchase Agreement Article I to mean the 3,072 shares of Common Stock acquired by Plaintiff.

[10]"Purchaser" is defined in the Share Purchase Agreement Article I to mean the Plaintiff.

[11]Section 5.4(a) of the Share Purchase Agreement describes the so-called "Drag Along Rights" and is quoted in n. 5 above.

purchase from the Selling Principal Stockholders multiplied by the Proportionate Percentage....[12]

21.    The Stock Purchase Agreement provides in Section 6.3 for Notices to Defendant GSI Holdings and its Defendant Principal Stockholders to be sent to Defendant Charlesbank Capital Partners LLC in Boston, Massachusetts with copies to their New York attorneys in Manhattan.

22.    The Stock Purchase Agreement provides in Section 6.9 that it is governed by, and to be construed in accordance with, the substantive law of New York, and further provides in Section 6.10 as follows:

> *CONSENT TO JURISDICTION.*    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK OR ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF NEW YORK IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE

---

[12]The Share Purchase Agreement provides in Article I that "'Proportionate Percentage' means with respect to the Purchaser, a percentage equal to the quotient of (a) the number of shares of Common Stock then owned by the Purchaser, including the Shares and any Option Shares (but excluding any unexercised vested or unvested stock options and the shares of Common Stock underlying such stock options) divided by (b) the sum of (i) the number of issued and outstanding shares of Common Stock plus (ii) the number of shares of Common Stock issuable upon conversion, exercise or exchange of all Capital Stock which is convertible into or exercisable or exchangeable for Common Stock held by all Stockholders, whether or not such Capital Stock is then convertible, exercisable or exchangeable, including any and all shares of Common Stock issuable upon the exercise of stock options granted under the 2005 Stock Plan."

-12-

SHARES OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(Emphasis in original).

23.    In a First Amendment of Separation Agreement ("First Amendment") dated December __, 2006[13], drafted by or on behalf of Defendant GSI Holdings and its affiliated parties, Plaintiff, Defendant GSI Holdings and others agreed that, instead of Plaintiff exchanging his 661,725 quotas in Agromarau for 3,072 shares of Defendant GSI Holdings' Common Stock, Agromarau will pay him for his quotas and within three business days following receipt of that payment, "he shall have the option to reinvest ... in 3,072 shares of [Defendant GSI] Holdings at a purchase price of $150 (U.S.) per share...." Defendant Branch signed the First Amendment on behalf of Defendant GSI Holdings and affiliated parties.

24.    Plaintiff accepted the Stock Purchase Agreement by executing it on or about December 13, 2006 and returning it to be executed on behalf of the other parties.

25.    The Defendants that are parties to the Stock Purchase Agreement accepted

---

[13]A copy of the First Amendment is attached as Exhibit D and its terms are incorporated by reference.

it possibly by their execution of it, if they did execute it, but certainly (i) by their performance of it in issuing a certificate for Plaintiff's 3,072 shares and receiving and keeping for six months Plaintiff's payment for such Shares as more fully described below, and (ii) by their admission in a subsequent signed written Second Amendment of Separation Agreement ("Second Amendment")[14] that is more fully described below that the Stock Purchase Agreement was, indeed, an agreement.

26.    On December 27, 2006, Plaintiff received payment for his Agromarau quotas.

27.    Plaintiff then caused a wire transfer to be made on December 28, 2006 in the amount of $460,829.50 to the account of Defendant GSI Holdings at Union Planters/Regions Bank in Taylorville, Illinois for 3,072 shares of Common Stock of Defendant GSI Holdings.

28.    Thereafter, Plaintiff inquired a number of times of Defendant Branch and of Claudio Moretti, a lawyer for Agromarau, as to the whereabouts of his copy of the fully executed Stock Purchase Agreement and his GSI Holdings Share certificate(s). Plaintiff made such inquiries to Defendant Branch by telephone on or about February 26, 2007 and by email on March 30, 2007 and on April 26, 2007. He made such inquiries to Moretti by telephone at various times and by email on March 22 and 28, 2007 and on April 30, 2007. Neither Defendant Branch, nor Moretti nor anyone else on behalf of any

---

[14] A copy of the Second Amendment is attached as Exhibit E and its terms are incorporated by reference.

-14-

Defendant informed Plaintiff as to what had happened to the Stock Purchase Agreement or Share certificate(s).

29.    On May 3, 2007, Plaintiff went to see Ingo Erhardt who had succeeded Plaintiff as General Manager of Agromarau.  Erhardt had requested in a phone call that Plaintiff visit him to discuss markets, production and other subjects concerning Agromarau business.  They met at Erhardt's office at Agromarau.

30.    To Plaintiff's surprise, Erhardt, acting on behalf of Defendants at the request of Defendant Branch,  gave to Plaintiff and asked him to sign a Second Amendment drafted by or on behalf of Defendant GSI Holdings and its affiliated parties, which provides for rescission of Plaintiff's purchase of the 3,072 shares of Defendant GSI Holdings' Common Stock.  Erhardt said the following:

    a.    Branch wanted Plaintiff to sign the Second Amendment;

    b.    The funds transferred by Plaintiff were in a segregated account that Branch had forgotten about and that it would be a problem now to issue the shares;

    c.    Plaintiff had made a lot of money from his relationship with Agromarau; more than executives at comparable companies; and

    d.    Plaintiff's companies did business with Agromarau which Erhardt was sure Plaintiff wanted to continue without problems.

31.    Plaintiff requested a copy of the Second Amendment so that he could consult his financial advisor about it.  Erhardt provided by email draft copies in

Portugese and in English.

32.    Following his meeting with Erhardt, Plaintiff tried to reach his financial advisor, but the advisor was out of town.

33.    Plaintiff returned to Erhardt's office the next day, May 4, 2007, and told him that he had not had an opportunity to consult with his advisor.  Erhardt said that

    a.    Plaintiff must sign the Second Amendment;

    b.    He (Erhardt) was flying to the United States the next day and wanted to take the signed Second Amendment with him; and

    c.    Again, the business Plaintiff's companies did with Agromarau could be jeopardized if Plaintiff did not sign.

34.    In reliance on what Erhardt had told him in their two meetings and on there being no other information material to his decision whether to sign the Second Amendment, Plaintiff signed the Second Amendment in Erhardt's office on May 4, 2007.

35.    Also on May 4, 2007, on information and belief, based on the notary's certificate to the Second Amendment, Erhardt signed the Second Amendment on behalf of Agromarau.  The other parties' execution of the Second Amendment is described below in paragraph 42.

36.    The Second Amendment provides in Section 2 as follows:

> The parties have mutually determined that [Plaintiff] Segatt will not invest in any shares of [Defendant GSI] Holdings, and in furtherance thereof, the Stock Purchase and Management Equity Agreement between [Defendant GSI] Holdings and [Plaintiff] Segatt dated as of

-16-

December 28, 2006, as amended by Amendment No. 1 thereto, dated December 28, 2006, between [Defendant GSI] Holdings and [Plaintiff] Segatt (the "Purchase Agreement"), together with any other documents or agreements entered into between them pursuant to such Purchase Agreement, including but not limited to the joinder by [Plaintiff] Segatt to the October 2005 Registration Rights Agreement, dated as of October 6, 2005, by and among [Defendant GSI] Holdings and the parties named therein, are hereby declared null, void, cancelled and without legal effect, and as if they have never been entered into, and the $460,800 (U.S.) which [Plaintiff] Segatt has deposited with [Defendant GSI] Holdings pursuant to the First Amendment and the Purchase Agreement will forthwith be promptly returned to [Plaintiff] Segatt in U.S. currency.    [Plaintiff] Segatt hereby agrees and authorizes the Company [Defendant GSI Holdings] to cancel stock certificate number 48, representing 3,072 shares of the Company [Defendant GSI Holdings].

37.    The Second Amendment further provides in Section 4 as follows:

SECTION 2 HERETO, RELATING TO THE PURCHASE AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE.

(Emphasis in original.)

38.    Following his signing of the Second Amendment, Plaintiff consulted his financial advisor who pointed out to him that, contrary to what Erhardt had told him, the certificate for the 3,072 shares had in fact been issued; it was "stock certificate number

48, representing 3,072 shares of the Company [Defendant GSI Holdings]" as described in Section 2 of the Second Amendment.

39.    On the evening of May 4, 2007, Plaintiff sent an email message to Defendant Branch stating that he (Plaintiff) had "signed the cancellation of my Stock according to your request.  Ingo will be taking for you the document.  I was a little surprise [*sic*] with this, because I believed that this transaction had already been made." Plaintiff added  that he would have preferred to hold his GSI Holdings shares "because ... our Stock be worth much more than when of [*sic*] the sale of GSI."  Branch never responded.

40.    Plaintiff sent an email message to Erhardt on May 8, 2007 pointing out that, contrary to what Erhardt had said, the Second Amendment indicated that a stock certificate had been issued.  He asked Erhardt to explain.  Erhardt, then in the U.S., responded by email that same day, stating that what he had told Plaintiff was correct and that (in Portuguese) "this is a horse that was played against the fence and you should look the ones that are in the pasture.  We will make much money with the other horses."

41.    On May 10, 2007, Plaintiff provided to Rafael Dalla Coleta at Agromarau the bank account details to arrange for the wire transfer back to his bank account of the funds he had transferred by wire to Defendant GSI Holdings on December 28, 2006.

42.    Upon information and belief, based on the notaries' certificates to the Second Amendment, on May 11, 2007, Defendant Branch signed the Second Amendment on behalf of The GSI Group, Inc., its majority and controlling shareholder

-18-

Defendant GSI Holdings Corp., and Assumption Leasing Company, Inc. which was then, on information and belief, based on the October 2005 Registration Rights Agreement, the owner of .01% of the shares of Agromarau.

43.    Plaintiff's payment was not promptly returned to him.

    a.    On information and belief, based on various bank wire transfer forms, on or about June 20, 2007, Defendant GSI Holdings wired to the Central Bank of Brazil to be credited to Plaintiff's bank $548,390.22, representing the amount Plaintiff had transferred by wire to Defendant GSI Holdings on December 28, 2006 plus interest and an additional amount due to an exchange rate fluctuation between U.S. Dollars and Brazilian Reals. Plaintiff requested his bank to open a segregated account to receive these funds, informing it that receipt of the funds did not constitute his acceptance of the cancellation of his subscription for the Shares. However, Plaintiff's bank never received the $548,390.22. Neither Defendant GSI Holdings nor its subsidiary Agromarau provided to the Central Bank of Brazil the documents it required, and which Plaintiff requested, in order to credit the funds to Plaintiff's bank. As a result, on information and belief, based on information Plaintiff received from his bank, on or about September 20, 2007, the Central Bank transferred the funds by

wire back to Defendant GSI Holdings' bank in the United States.

b.    Agromarau's attorney notified Plaintiff on or about November 7, 2007 that The GSI Group had ordered on October 26, 2007 that $460,809.50 be wired to Plaintiff's bank account.    Plaintiff replied that receipt of the funds does not mean the renunciation of his rights against GSI.    Plaintiff's bank received the funds and credited them to the segregated account on November 13, 2007.

44.    On June 25, 2007, The GSI Group announced that its parent company, Defendant GSI Holdings, controlled by Defendant Charlesbank Capital Partners, LLC had entered into an agreement by which affiliates of Centerbridge Partners, L.P. would acquire a majority stake in Defendant GSI Holdings.    Defendant Branch is quoted in the announcement.

45.    On June 29, 2007,  The GSI Group announced a cash tender offer to repurchase its 12% Senior Notes Due 2013.    According to the announcement, the tender offer was made in connection with the sale to Centerbridge Partners.    The deal manager for the tender offer was UBS Securities LLC.    According to its web site, UBS Securities LLC has offices in Stamford, Connecticut and in New York City.    The information agent was Mackenzie Partners, Inc. of New York City.    A corresponding Form 8-K filed with the U.S. Securities and Exchange Commission was signed by Defendant Branch as Chairman and Chief Executive Officer of The GSI Group  and by John W. Henderson, Chief Financial Officer.

46.     An Information Statement dated July 2, 2007 and issued on behalf of the board of directors of Defendant GSI Holdings to the company's shareholders as of the close of business on June 29, 2007, disclosed that in November 2006, Defendant GSI Holdings had engaged UBS Securities as its financial advisor to assist its board of directors and senior management to explore a possible sale of the company.

47.     The Information Statement further disclosed that Defendant GSI Holdings had engaged in a staged auction process that culminated in the receipt on June 12, 2007 of final offers from the remaining potential acquirers, including the ultimate buyer, CB/GSI Holdings Inc. (the "Buyer"), a newly-formed Delaware Corporation controlled by Centerbridge Capital Partners, L.P.

48.     The Information Statement also disclosed that a Merger Agreement dated as of June 22, 2007 was entered into among the Buyer and Defendants GSI Holdings, Charlesbank Equity Fund V, Limited Partnership and Charlesbank Capital Partners, LLC to effect the sale of Defendant GSI Holdings.   The Information Statement describes Defendant Charlesbank Equity Fund V, Limited Partnership as the Principal Stockholder of Defendant GSI Holdings, owning approximately 74% of its outstanding Common Stock, and together with its affiliates, owning approximately 86% of Defendant GSI Holdings' outstanding Common Stock.

49.     A copy of the executed Merger Agreement is attached to the Information Statement, but, upon information and belief, based on a copy of the Information Statement obtained by Plaintiff, the Merger Agreement's Annexes are incomplete and

its Exhibits and Schedules, including the so-called "Disclosure Schedule," are missing.

50.     In the Merger Agreement, Defendant GSI Holdings represented and warranted to the Buyer that, among other things, in Sections 3.5(b) and 3.8(a), respectively,

  a.     Neither it nor its subsidiaries had any undisclosed liabilities or obligations of any nature (whether absolute, accrued, contingent or otherwise, and whether due or to become due), which individually or in the aggregate exceed $100,000; and

  b.     It and its subsidiaries have no undisclosed agreement or commitment having a value in excess of $2 million or that is otherwise material to it and its subsidiaries, taken as a whole.

51.     The Merger Agreement provides that, among the conditions to the closing of the Merger, in Sections 6.12, 6.17 and 7.2(a), are the following:

  a.     Defendant GSI Holdings shall commence a cash tender offer to purchase its 12% Senior Notes Due 2013; and

  b.     Defendants GSI Holdings and Charlesbank Equity Fund V, Limited Partnership were obligated to obtain the termination of all Stock Purchase and Management Equity Agreements entered into between Defendant GSI Holdings and its employees, directors or Consultants since October 6, 2005.

52.     According to the Information Statement, the sale of Defendant GSI

-22-

Holdings will be made at an estimated price (the "Estimated Merger Consideration") of approximately $700 per share of the common stock of Defendant GSI Holdings plus the following additional consideration:

a. Adjustment Amount (if any) – the per share positive difference between the finally determined merger consideration, to be determined approximately 90 to 120 days after the closing of the merger of the Buyer with and into Defendant GSI Holdings (the "Merger"), and the Estimated Merger Consideration;

b. Escrow Surplus Amount (if any) – the per share amount escrowed at the closing of the Merger that is not paid to the surviving corporation because the finally determined amount of merger consideration is less than the Estimated Merger Consideration;

c. Special Tax Deduction Benefit (if any) – the per share amount of any income tax refund for the current or prior years and actually realized reduction in tax liability for any taxable period beginning after the closing of the Merger, which refund or liability is attributable to certain Merger costs and expenses; and

d. Contingent Consideration (if any) – the per share value of any benefit received as a result of the resolution of a lawsuit pending in the United States District Court for the Central District of Illinois against the Sukup Manufacturing Company, less

adjustments, if any, for certain taxes, after-tax costs and amounts owed on certain claims for indemnification.

53.    The Information Statement also disclosed that Defendant Charlesbank Equity Fund V, Limited Partnership and other investment funds managed by Defendant Charlesbank Capital Partners LLC will retain a portion of the shares they held of Defendant GSI Holdings' common stock having an aggregate value (based on the estimated per share merger consideration) of $30 million, subject to reduction pursuant to Section 6.16 of the Merger Agreement (providing for certain so-called tag-along rights). In addition, members of Defendant GSI Holdings' management team will retain a portion of their shares of GSI Holdings' common stock and will reinvest a portion of the proceeds payable to them to cash out their options for such common stock, having an estimated aggregate value of $15 - $20 million. None of the retained shares would entitle the holder thereof to receive the Estimated Merger Consideration, but such holders would nevertheless be entitled to receive the contingent payments described in subparagraphs 52a through 52d above. Also, certain unnamed executives of Defendant GSI Holdings will be entitled to receive cash bonuses upon closing or will be entitled to acquire restricted shares of Defendant GSI Holdings' Common Stock prior to the closing at a substantial discount to the Estimated Per Share Merger Consideration subject to the closing occurring before October 1, 2007 and to shareholder approval.

54.    On August 1, 2007, The GSI Group publicly announced that its parent company, Defendant GSI Holdings, completed its previously announced sale to affiliates

of Centerbridge Partners, L.P. The announcement stated: "Terms of the transaction were not disclosed."

55.    The announcement quoted Defendant Branch as follows:

> The sale of GSI to Centerbridge marks the beginning of the next chapter for GSI and will be beneficial for all of GSI's stakeholders, including our shareholders, employees, and customers. We are excited about partnering with Centerbridge and we are eager to pursue the numerous growth opportunities that lie ahead for the company.

56.    Defendant Branch signed the Merger Agreement on behalf of Defendant GSI Holdings.

57.    Upon information and belief, the Merger was done in New York in this district. The signed Merger Agreement bears a computer generated document number "NY: 549881-14." It provides in Section 1.2 for the closing of the Merger to take place in Manhattan. It provides in Section 10.3 for notices to the Buyer or to the surviving corporation to be sent to Centerbridge Capital Partners, L.P. at its offices in Manhattan with copies to its attorneys in Manhattan. It provides in Section 10.3 for notices to Defendants GSI Holdings, Charlesbank Equity Fund V, Limited Partnership and Charlesbank Capital Partners, LLC to be sent to the offices of Defendant Charlesbank Capital Partners, LLC in Boston with copies to their attorneys in Manhattan. Section 10.5 provides that the Merger Agreement is governed by New York law (except that the consummation and effectiveness of the Merger is governed by Delaware law). And, Section 10.5 further provides that each party consents to the jurisdiction of this Court and

-25-

of the Supreme Court of the State of New York as the only courts in which any action may be brought relating to the Merger Agreement or to the transactions contemplated by the Merger Agreement.

58.    Plaintiff had been told in early September 2006 by Richard Christman, then chief executive officer of The GSI Group, that the company was doing well, that it was a good time to sell it and that Defendant Charlesbank Capital Partners might sell it in 2007.  However, Plaintiff was not informed as of May 4, 2007, and did not learn until after the Merger was publicly announced, of any of the information set forth in paragraphs 44 through 57 above, or that any of the Defendants had engaged a financial advisor to assist with an auction or  sale of Defendant GSI Holdings, or of any plans or activities to auction or sell Defendant GSI Holdings or of any contemplated or actual terms of an auction or sale, including a sales price.  Upon information and belief, based on the timing of events that occurred shortly thereafter, as of May 4, 2007, such plans, activities and terms had advanced to the point at which they were material to Plaintiff's decision whether to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock.

First Claim Against
All Defendants for
Federal Securities Law
Fraud under Section 10(b)
Of the Exchange Act and
Rule 10b-5 Thereunder

59.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 58 above.

60.    In soliciting Plaintiff's agreement to rescind his purchase of 3,072 shares of its Common Stock, Defendant GSI Holdings, had a duty to disclose to Plaintiff all material information concerning the plans and activities to sell the company.

61.    In soliciting Plaintiff's agreement to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, Defendant Branch, had a duty to disclose to Plaintiff all material information concerning the plans and activities to sell the company.

62.    In soliciting Plaintiff's agreement to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, the Charlesbank Defendants, as Principal Stockholders of Defendant GSI Holdings, had a duty to disclose to Plaintiff all material information concerning the plans and activities to sell the company.

63.    Instead of disclosing to Plaintiff all material information concerning the plans and activities to sell Defendant GSI Holdings, Defendants withheld such information, misrepresented to him that his Shares had not been issued and implicitly threatened that, if Plaintiff did not agree to rescind his purchase of the 3,072 shares, his

companies' business with Agromarau would be jeopardized.

64.    Defendants acted with fraudulent intent, or at least in reckless disregard of the truth, which is manifestly evidenced by the following facts:

a.    Defendant GSI Holdings kept Plaintiff's $460,829.50 for six months, but did not return to him the countersigned Stock Purchase Agreement or the certificate for his 3,072 shares;

b.    In response to his repeated requests, Defendants did not explain why they had not returned to him the countersigned Stock Purchase Agreement and Share certificate;

c.    Erhardt, acting on behalf of Defendants, misrepresented to Plaintiff that his Share certificate had not been issued and implicitly threatened that, if he did not sign the Second Amendment agreeing to rescind his purchase of Shares, his companies' continued business with Agromarau would be jeopardized; and

d.    When Plaintiff wrote to Defendant Branch on May 4, 2007 expressing his surprise with the rescission of his purchase of Shares "because I believed that this transaction has already been made," and stating his desire to continue to hold his Shares, Defendant Branch did not respond.  And when Plaintiff followed up with an email on May 8, 2007 to Erhardt who, on information

-28-

and belief was then in the United States delivering the Second Amendment signed by Plaintiff, Erhardt replied with the fatuous response about a "horse ... played against the fence." Instead of giving Plaintiff any meaningful or informative response, Defendant Branch proceeded on May 11, 2007 to sign the Second Amendment to rescind Plaintiff's purchase.

65.    Defendants' fraudulent intent, or a least their reckless disregard of the truth, is further evidenced by their motive and opportunity to profit from the rescission of Plaintiff's purchase of 3,072 shares of Defendant GSI Holdings Common Stock.

a.    As a condition to the closing of the Merger, Defendants GSI Holdings and Charlesbank Equity Fund V, Limited Partnership were obligated to obtain the termination of all Stock Purchase and Management Equity Agreements entered into between Defendant GSI Holdings and its employees, directors or consultants since October 6, 2005.

b.    By inducing Plaintiff to agree to rescind the Stock Purchase Agreement, Defendant GSI Holdings benefitted in at least one or both of two ways. First, if it were obliged to honor Plaintiff's tag-along rights at a price of at least approximately $700 per share (without accounting for the additional consideration beyond the Estimated Merger Consideration), by inducing Plaintiff to agree

instead to rescind his purchase of the Shares at $150 per share, Defendant GSI Holdings profited by at least $1,689,600. Second, it benefitted by being able to accomplish the Merger that, according to its board of directors and management, was in its best interests.

c.     Defendants Branch and the Charlesbank Defendants benefitted by the rescission of Plaintiff's Share purchase at $150 per share prior to the close of business on June 29, 2007 by being able to receive additional consideration for their respective shares. If Defendant GSI Holdings would have had to pay Plaintiff at least approximately $700 per share to honor his tag-along rights, Defendant Branch and the Charlesbank Defendants were benefitted by the rescission in selling a company (Defendant GSI Holdings) with more cash on hand which, therefore, could command a higher price. If payment to Plaintiff in respect of his tag-along rights would have been made by the buyer of Defendant GSI Holdings instead of by Defendant GSI Holdings itself, still Defendant Branch and the Charlesbank Defendants profited by being able to keep for themselves the consideration that the buyer would otherwise have had to pay to Plaintiff for his Shares. And, either way, regardless whether it would have been Defendant GSI

Holdings or its Buyer that would have had to pay Plaintiff in respect of his tag-along rights, by rescinding Plaintiff's purchase of Shares before the close of business on June 29, 2007, there were fewer shares among which to apportion the Merger consideration.    Accordingly, Defendant Branch and the Charlesbank Defendants  were paid more for their shares of Defendant GSI Holdings.

d.    Defendant Branch further benefitted by the rescission of the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger, if he received the above-described bonus upon the closing of the Merger.

e.    Defendant Charlesbank Capital Partners also further benefitted by rescinding the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger in that, upon information and belief, it received fees in an amount  undisclosed by the Merger Agreement attached to the Information Statement, but referenced in Section 3.16 and Annex 3 to the Merger Agreement.

66.    In signing the Second Amendment agreeing to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, Plaintiff relied on what he was told by Erhardt, on May 3 and 4, 2007 and on there being no other information material to his decision whether to sign the Second Amendment.

-31-

67.    As a result of their conduct by which Defendants defrauded Plaintiff through the means and instrumentalities of interstate commerce or the mails or both as described above, Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendants are jointly and severally liable pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder.

Second Claim Against
Defendant Branch for
Federal Securities Law
Fraud Under Section 20(a)
of the Exchange Act

68.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

69.    As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant Branch is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder of such controlled Defendant to the same extent as such controlled Defendant.

70.    As a result, Defendant Branch is liable for the damage caused to Plaintiff by such controlled Defendant in an amount not less than $1,689,590.50 plus interest.

Third Claim Against
Defendant Charlesbank Equity
Fund V, Limited Partnership for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

71.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

72.     As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant Charlesbank Equity Fund V, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act ,15 U.S.C. §78j(b), and Rule 10b-5 , 17 C.F.R. §240.10b-5,  thereunder of such controlled Defendant to the same extent as such controlled Defendant.

73.     As a result, Defendant Charlesbank Equity Fund V, Limited Partnership is liable for the damage caused to Plaintiff by such controlled Defendant in an amount not less than $1,689,590.50 plus interest.

Fourth Claim Against
Defendant CB Offshore Equity Fund V, L.P. for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

74.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

75.     As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant CB OffShore Equity Fund V, L.P. is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder of such controlled Defendant to the same extent as such controlled Defendant.

76.     As a result, Defendant CB Offshore Equity Fund V, L.P. is liable for the damage caused to Plaintiff by such controlled Defendant in an amount not less than $1,689,590.50 plus interest.

### Fifth Claim Against
### Defendant Charlesbank Equity Coinvestment
### Fund V, Limited Partnership for
### Federal Securities Law Fraud Under
### Section 20(a) of the Exchange Act

77.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

78.     As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder of such controlled Defendant to the same extent as

-34-

such controlled Defendant.

79.    As a result, Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership is liable for the damage caused to Plaintiff by such controlled Defendant in an amount  not less than $1,689,590.50 plus interest.

Sixth Claim Against
Defendant Charlesbank Coinvestment
Partners, Limited Partnership for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

80.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

81.    As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant Charlesbank Coinvestment Partners, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a),  for the securities law fraud under Section 10(b) of the Exchange Act ,15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder of such controlled Defendant to the same extent as such controlled Defendant.

82.    As a result, Defendant Charlesbank Coinvestment Partners, Limited Partnership is liable for the damage caused to Plaintiff by such controlled Defendant in an amount  not less than $1,689,590.50 plus interest.

Seventh Claim Against
Defendant Charlesbank Equity
Fund V GP, Limited Partnership for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

83.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

84.    As a controlling person of Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund V, L.P., Charlesbank Equity Coinvestment Fund V, Limited Partnership and GSI Holdings, and based on the above facts, Defendant Charlesbank Equity Fund V GP, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5,  thereunder of each such controlled Defendant to the same extent as each such controlled Defendant.

85.    As a result, Defendant Charlesbank Equity Fund V GP, Limited Partnership is liable for the damage caused to Plaintiff by each such controlled Defendant in an amount not less than $1,689,590.50 plus interest.

Eighth Claim Against
Defendant Charlesbank Capital Partners, LLC for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

86.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

87.    As a controlling person of each other Charlesbank Defendant and of Defendant GSI Holdings, and based on the above facts, Defendant Charlesbank Capital Partners, LLC  is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5,  thereunder of each such controlled Defendant to the same extent as each such controlled Defendant.

88.    As a result, Defendant Charlesbank Capital Partners, LLC is liable for the damage caused to Plaintiff by each such controlled Defendant in an amount  not less than $1,689,590.50 plus interest.

Ninth Claim Against
All Defendants for
Common Law Fraud

89.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 63 and 66 above.

90.    Defendants acted with fraudulent intent, which is manifestly evidenced by the following facts:

a.    Defendant GSI Holdings kept Plaintiff's $460,829.50 for six

months, but did not return to him the countersigned Stock Purchase Agreement or the certificate for his 3,072 shares;

b.    In response to his repeated requests, Defendants did not explain why they had not returned to him the countersigned Stock Purchase Agreement and Share certificate;

c.    Erhardt, acting on behalf of Defendants, misrepresented to Plaintiff that his Share certificate had not been issued and implicitly threatened that, if he did not sign the Second Amendment agreeing to rescind his purchase of Shares, his companies' continued business with Agromarau would be jeopardized; and

d.    When Plaintiff wrote to Defendant Branch on May 4, 2007 expressing his surprise with the rescission of his purchase of Shares "because I believed that this transaction has already been made," and stating his desire to continue to hold his shares, Defendant Branch did not respond.  And when Plaintiff followed up with an email on May 8, 2007 to Erhardt who, on information and belief was then in the United States delivering the Second Amendment signed by Plaintiff, Erhardt replied with the fatuous response about a "horse ... played against the fence." Instead of giving Plaintiff any meaningful or informative response,

-38-

Defendant Branch proceeded on May 11, 2007 to sign the Second
Amendment to rescind Plaintiff's purchase.

91.    In fraudulently inducing Plaintiff to rescind his purchase of Shares,
Defendants not only damaged Plaintiff, but did so to benefit themselves.

a.    As a condition to the closing of the Merger, Defendants GSI
Holdings and Charlesbank Equity Fund V, Limited Partnership
were obligated to obtain the termination of all Stock Purchase and
Management Equity Agreements entered into between Defendant
GSI Holdings and its employees, directors or consultants since
October 6, 2005.

b.    By inducing Plaintiff to agree to rescind the Stock Purchase
Agreement, Defendant GSI Holdings benefitted in at least one or
both of two ways. First, if it were obliged to honor Plaintiff's tag-
along rights at a price of at least approximately $700 per share
(without accounting for the additional consideration beyond the
Estimated Merger Consideration), by inducing Plaintiff to agree
instead to rescind his purchase of the Shares at $150 per share,
Defendant GSI Holdings profited by at least $1,689,600. Second,
it benefitted by being able to accomplish the Merger that,
according to its board of directors and management, was in its
best interests.

-39-

c.    Defendants Branch and the Charlesbank Defendants benefitted by the rescission of Plaintiff's Share purchase at $150 per share prior to the close of business on June 29, 2007 by being able to receive additional consideration for their respective shares. If Defendant GSI Holdings would have had to pay Plaintiff at least approximately $700 per share to honor his tag-along rights, Defendant Branch and the Charlesbank Defendants were benefitted by the rescission in selling a company (Defendant GSI Holdings) with more cash on hand which, therefore, could command a higher price. If payment to Plaintiff in respect of his tag-along rights would have been made by the buyer of Defendant GSI Holdings instead of by Defendant GSI Holdings itself, still Defendant Branch and the Charlesbank Defendants profited by being able to keep for themselves the consideration that the buyer would otherwise have had to pay to Plaintiff for his Shares. And, either way, regardless whether it would have been Defendant GSI Holdings or its Buyer that would have had to pay Plaintiff in respect of his tag-along rights, by rescinding Plaintiff's purchase of Shares before the close of business on June 29, 2007, there were fewer shares among which to apportion the Merger consideration.    Accordingly, Defendant Branch and the

-40-

Charlesbank Defendants were paid more for their shares of Defendant GSI Holdings.

d.    Defendant Branch further benefitted by the rescission of the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger, if he received the above-described bonus upon the closing of the Merger.

e.    Defendant Charlesbank Capital Partners also further benefitted by rescinding the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger in that, upon information and belief, it received fees in an amount undisclosed by the Merger Agreement attached to the Information Statement, but referenced in Section 3.16 and Annex 3 to the Merger Agreement.

92.    As a result of their conduct, Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendants are jointly and severally liable.

93.    Defendants' misconduct was so grossly wanton and morally reprehensible as to demonstrate a criminal indifference to their obligations toward him for which they should be held liable, jointly and severally, for punitive damages in an amount not less than three times Plaintiff's actual losses, i.e., an additional amount not less than $5,068,771.50.

Tenth Claim Against
Defendant Branch for
Breach of Fiduciary Duty

94.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 and 89 through 93 above.

95.     As Chairman and a director of Defendant GSI Holdings, Defendant Branch owed fiduciary duties of care and loyalty to Plaintiff, a minority shareholder of Defendant GSI Holdings.

96.     Defendant Branch breached his fiduciary duties of care and loyalty to Plaintiff (i) by failing to disclose material information to Plaintiff about the plans and activities to sell Defendant GSI Holdings, (ii) by his calculated lack of response to Plaintiff's inquiries about the countersigned Stock Purchase Agreement and share certificate and about the reason for the Second Amendment rescinding Plaintiff's purchase and (iii) by his otherwise working through Erhardt to deceive Plaintiff into signing the Second Amendment.

97.     As a result of his breach of fiduciary duty, Defendant Branch not only damaged Plaintiff , but profited himself as described above.

98.     As a result of his conduct, Defendant Branch has caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendant Branch is liable.

99.     Defendant Branch's misconduct was so grossly wanton and morally reprehensible as to demonstrate a criminal indifference to his obligations toward Plaintiff

for which he should be held liable for punitive damages in an amount of not less than three times Plaintiff's actual losses, i.e., an additional amount not less than $5,068,771.50.

Eleventh Claim Against
the Charlesbank Defendants for
<u>Breach of Fiduciary Duty</u>

100.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 and 89 through 93 above.

101.    As controlling principal shareholders of Defendant GSI Holdings, the Charlesbank Defendants owed a fiduciary duty of disclosure to Plaintiff, a minority shareholder, when his agreement to rescind his purchase of shares was solicited.

102.    The Charlesbank Defendants were signatories to, the Stock Purchase Agreement.  Consequently, they knew about Plaintiff's purchase of 3,072 shares of Defendant GSI Holdings' Common Stock and his tag-along rights.

103.    Nevertheless, they withheld from Plaintiff, in breach of their fiduciary duty of disclosure, material information about the plans and activities to sell Defendant GSI Holdings.

104.    As a result of their breach of fiduciary duty, the Charlesbank Defendants not only damaged Plaintiff, but profited themselves as described above.

105.    As a result of their conduct, the Charlesbank Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which

-43-

the Charlesbank Defendants are jointly and severally liable.

106.    The Charlesbank Defendants' misconduct was so grossly wanton and morally reprehensible as to demonstrate a criminal indifference to their obligation toward him for which each of them should be held liable, jointly and severally,  for punitive damages in an amount of not less than three times Plaintiff's actual losses, i.e., an additional amount not less than $5,068,771.50.

### Twelfth Claim Against
### Defendant GSI Holdings for
### Breach of Contract

107.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 and 89 through 93 above.

108.    Defendant GSI Holdings breached the Stock Purchase Agreement by not delivering to Plaintiff as required by Sections 2.1 and 2.2 the duly executed certificate or certificates representing the 3,072 shares Plaintiff purchased, registered in the name of Plaintiff, with appropriate issue stamps, if any, affixed at the expense of Defendant GSI Holdings, free and clear of all security interests, liens, pledges, charges, options, rights of first refusal, mortgages, indentures, security agreements or other claims, encumbrances, agreements, arrangements or commitments of any kind or character, other than the transfer and other restrictions set forth in the Stock Purchase Agreement and restrictions imposed by Federal and State securities laws.

109.    Defendant GSI Holdings further breached the Stock Purchase Agreement

-44-

by failing to make sufficient provision as required by Section 5.5(a) to permit Plaintiff to complete the sale of his Shares as provided in Section 5.5(a).

110.    Plaintiff had performed his own obligations to be performed under the Stock Purchase Agreement and all conditions precedent to Defendant GSI Holdings' performance had occurred.

111.    As a result of its conduct, Defendant GSI Holdings has caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendant GSI Holdings is liable.

Thirteenth Claim Against
the Charlesbank Defendants for
Breach of Contract

112.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67, 90 through 93 and 100 through 106 above.

113.    The Charlesbank Defendants breached the Stock Purchase Agreement by failing to give Plaintiff written notice as required by Section 5.5(a) of the proposed transfer of more than 50% of their shares of Defendant GSI Holdings' Common Stock and the terms and conditions of such transfer.

114.    The Charlesbank Defendants further breached the Stock Purchase Agreement by failing to make sufficient provision as required by Section 5.5(a) to permit Plaintiff to complete the sale of his Shares as provided in Section 5.5(a).

115.    Plaintiff had performed his own obligations to be performed under the

Stock Purchase Agreement and all conditions precedent to the Charlesbank Defendants' performance had occurred.

116.    As a result of their conduct, the Charlesbank Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which the Charlesbank Defendants are jointly and severally liable.

Fourteen Claim Against
All Defendants for
Unjust Enrichment

117.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 116 above.

118.    Benefitting as they did by their misconduct in deceiving Plaintiff into agreeing to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, Defendants have been unjustly enriched at Plaintiff's expense for which they should be held liable, jointly and severally, to Plaintiff in an amount not less than $1,689,590.50 plus interest.

Fifteenth Claim Against
Defendant Charlesbank Equity
Fund V GP, Limited Partnership for
Liability as a General Partner

119.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 118 above.

120.    As General Partner of Defendants Charlesbank Equity Fund V, Limited

Partnership, CB Offshore Equity Fund V, L.P., and Charlesbank Equity Coinvestment

Fund V, Limited Partnership, Defendant Charlesbank Equity Fund V GP, Limited

Partnership is jointly and severally liable for the liabilities of each such Defendant.

121.    As a result, Defendant Charlesbank Equity Fund V GP, Limited

Partnership is liable for the damage caused to Plaintiff by each such Defendant in an

amount not less than $1,689,590.50 plus interest and for such punitive damages for

which each such Defendant may be liable of not less than an additional amount of

$5,068.771.50.


                            Sixteenth Claim Against
                            Defendant Charlesbank
                            Capital Partners, LLC for
                            Liability as a General Partner

122.    Plaintiff repeats and realleges each and every allegation in paragraphs 1

through 121 above.

123.    As a General Partner of Defendants Charlesbank Coinvestment Partners,

Limited Partnership and Charlesbank Equity Fund V GP, Limited Partnership, Defendant

Charlesbank Capital Partners, LLC is jointly and severally liable for the liabilities of each

such Defendant.

124.    As a result, Defendant Charlesbank Capital Partners LLC is liable for the

damage caused to Plaintiff by each such Defendant in an amount not less than

-47-

$1,689,590.50 plus interest and for such punitive damages for which each such Defendant may be liable of not less than an additional amount of $5,068,771.50.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.    On the first claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest and costs;

2.    On the second claim against Defendant Branch for damages in an amount not less than $1,689,590.50 plus interest and costs;

3.    On the third claim against Defendant Charlesbank Equity Fund V, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

4.    On the fourth claim against Defendant CB Offshore Equity Fund V, L.P. for damages in an amount not less than $1,689,590.50 plus interest and costs;

5.    On the fifth claim against Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

6.    On the sixth claim against Defendant Charlesbank Coinvestment Partners, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

7.    On the seventh claim against Defendant Charlesbank Equity Fund V GP, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

8.    On the eighth claim against Defendant Charlesbank Capital Partners, LLC

for damages in an amount not less than $1,689,590.50 plus interest and costs;

9. On the ninth claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

10. On the tenth claim against Defendant Branch for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

11. On the eleventh claim against the Charlesbank Defendants for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

12. On the twelfth claim against Defendant GSI Holdings for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

13. On the thirteenth claim against the Charlesbank Defendants for damages in an amount not less than $1,689,590.50 plus interest, punitive damages of not less than an additional amount of $5,068,771.50 and costs;

14. On the fourteenth claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest and costs;

15. On the fifteenth claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest, such punitive damages in an amount not less than $5,068,771.50 as may be awarded and costs;

-49-

16.  On the sixteenth claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest, such punitive damages in an amount not less than $5,068,771.50 as may be awarded and costs; and

for such other and further relief as may be appropriate.

Dated: New York, New York
       December 19, 2007

LAW OFFICES OF MARK P. ZIMMETT

By:_____
       Mark P. Zimmett (MZ 8735)

Attorneys for Plaintiff
126 East 56th Street
New York, New York 10022
(212) 755-0808

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.:

LEONARDO SEGATT,

Plaintiff,

-against-

GSI HOLDINGS CORP., WILLIAM J. BRANCH,
CHARLESBANK EQUITY FUND V, LIMITED
PARTNERSHIP, CB OFFSHORE EQUITY FUND V,
L.P., CHARLESBANK EQUITY COINVESTMENT
FUND V, LIMITED PARTNERSHIP, CHARLESBANK
COINVESTMENT PARTNERS, LIMITED PARTNER-
SHIP, CHARLESBANK EQUITY FUND V GP,
LIMITED PARTNERSHIP and CHARLESBANK
CAPITAL PARTNERS, LLC,

Defendants.

COMPLAINT

LAW OFFICES OF

MARK P. ZIMMETT

ATTORNEY FOR

Plaintiff

126 EAST 56TH STREET
NEW YORK 10022
(212) 755-0808

SEGATT v. GSI HOLDINGS CORP et al.

No. _____ (S.D.N.Y.)

Schedule of Exhibits to Complaint
(in Chronological Order)

| Document | Tab |
|---|---|
| Separation Agreement dated November 13, 2006 | A |
| Information Statement of GSI Holdings Corp. and The GSI Group, Inc. dated December 6, 2006 | B |
| Stock Purchase and Management Equity Agreement dated initially as of December __, 2006 and subsequently as of December 28, 2006 | C |
| First Amendment of Separation Agreement dated December ___, 2006 | D |
| Second Amendment of Separation Agreement dated May 4, 2007 | E |
| Agreement and Plan of Merger dated as of June 22, 2007 | F |
| Information Statement of GSI Holdings Corp. dated July 2, 2007 | G |

**Exhibit A**

SEPARATION AGREEMENT

THIS AGREEMENT, dated November 13, 2006, by and among **Agromarau Industria e Comercio Ltda.**, a Brazilian limited liability quota company having its principal address at the City of Marau, state of Rio Grande do Sul, Brazil, at Rodovia RS 324, Km 80,13, CEP 99150-000 ("Agromarau"); **The GSI Group, Inc.**, a company organized and existing under the laws of the state of Delaware, United States of America, and the majority quotaholder in Agromarau, having its principal address at 1004 E. Illinois St., Assumption, IL 62510 ("GSI"), in this Agreement acknowledged by itself and also represented by its Chairman, William J. Branch, an American citizen, resident in the United States of America, at the city of Wilmington, State of North Carolina, 114 Old Camp Road; **GSI Holdings Corp.**, a company organized and existing under the laws of the state of Delaware, United States of America, and the parent company of GSI, having its principal address at 1004 E. Illinois Street, Assumption IL 62510, ("Holdings") in this Agreement acknowledged by itself and also represented by one of its directors, William J. Branch, (same as above); **Assumption Leasing Company, Inc.**, a company organized and existing under the laws of the State of Illinois, United States of America, a subsidiary of GSI, having its principal address of 1004 E. Illinois St., Assumption, IL 62510 ("Assumption") in this agreement acknowledged by itself and also represented by one of its directors, William J. Branch (same as above); and **Leonardo Segatt**, ("Segatt"), a Brazilian citizen and businessman, married, registered with the SSP under No. 2021837899 and at the Taxpayer's Registry (CPF/MF) under No. 374.013.430-53, and resident at Marau, State of Rio Grande do Sul, at Rua Duque de Caxias, No. 444-ZIP 99.150-000.

#1965390 v3

WHEREAS, Segatt has voluntarily resigned from his duties as General Manager of Agromarau, effective on November 14, 2006 (the "Effective Date"); and has expressed his will to liquidate his participation as a quota holder in Agromarau; and

WHEREAS, GSI, Segatt and Assumption are parties to that certain Affirmative Pledge of Assignment of Quotas and Other Provisions dated January 1, 2002; and providing for certain rights to the parties regarding Agromarau (the "Outstanding Agreement"); and

WHEREAS, under the Outstanding Agreement, Segatt is required under Section 10 thereof, to assign and transfer all of the quotas in Agromarau which have been issued to him to GSI should he resign from Agromarau, within seven business days of the effective date of that resignation, and in exchange therefore, GSI is obligated to pay to Segatt for his quotas certain amounts determined under that section of the Outstanding Agreement; and

WHEREAS, the provisions of this Agreement will, in some respects, amend the Outstanding Agreement; and

WHEREAS, the parties have determined that there have been issued to Segatt 2,005,868 quotas in Agromarau, and

WHEREAS Segatt is entitled, by reason of accruals of interest on net equity on the books of Agromarau, and which accrued interest, net of tax, totals $646,676 (Brazilian Reals); and

WHEREAS, the parties have determined that Segatt shall be paid his accrued interest on equity and for his quotas in Agromarau in the manner and at the times set forth in this Agreement.

NOW THEREFORE, in consideration of the respective promises and agreements contained herein, the parties hereto agree as follows:

-2-

#1965390 v3

1.    Agromarau will pay to Segatt, accrued, but unpaid, interest on his equity, less withholding taxes at a rate of 15%, which is a net amount of $646,676 (Brazilian Reals).

2.    Agromarau will pay Segatt dividends on his equity capital, which will be in a total amount of $2,823,354 (Brazilian Reals);

3.    Agromarau will redeem 1,344,143 quotas from Segatt as a capital refund in exchange for $1,344,143 (Brazilian Reals).

4.    Agromarau will pay Segatt $217,000 (Brazilian Reals) for the limited two-year non-compete obligations under that separate Non-Compete and Consulting Agreement entered into between the parties hereto on the same date as this Agreement (the "Non-Compete and Consulting Agreement").

5.    Segatt will exchange his remaining 661,725 quotas in Agromarau for 3,072 shares of Holdings.  Segatt and Holdings each agree to file with the proper Brazilian authorities appraisals of the 661,725 quotas in Agromarau and the 3,072 shares in Holdings, which are valued for purposes of this agreement at $1 million (Brazilian Reals) for the quotas in Agromarau and at $460,829.50 (U.S.) for the shares in Holdings.

6.    In addition to these amounts which fully discharge all obligations of Agromarau, GSI, Holdings and Assumption under the Outstanding Agreement, Segatt will also receive additional sums of money from GSI and/or Agromarau for his consulting obligations under the Non-Compete and Consulting Agreement.

7.    The payments to Segatt called for under Sections 1, 2 and 4 will be paid upon the due execution by the parties of this Agreement and of the Non-Compete and Consulting

-3-

#1965390 v3

Agreement. The payment called for under Section 3 will take place upon the earlier of disbursement of certain loans to Agromarau by Banco do Brasil, S.A. or December 20, 2006, and the exchange contemplated by Section 5 will take place upon the approval by all necessary Brazilian authorities.

8.    Upon the payment of all amounts due to Segatt as set forth in sections 1 through 4 hereunder, and the exchange contemplated by Section 5 hereunder, all obligations of Agromarau, GSI, Holdings and Assumption to Segatt under the Outstanding Agreement or pursuant to Brazilian law with respect to his relationship with Agromarau shall have been satisfied, and the Outstanding Agreement shall then be void, cancelled and of no further effect.

9.    The parties hereto agree to execute all amendments to Agromarau's Articles of Organization authorized by GSI, which shall then be duly registered before the appropriate Commercial Board to the extent required (as in the case of formalizing the transfer and assignment of the quotas by Segatt to Agromarau or Holdings, as the case may be, pursuant to the terms of this Agreement or otherwise, as well as any other provision agreed upon herein).

10.    This Agreement shall be governed by the laws of Republica Federative do Brasil.

11.    The parties elect and designate the Central Court of the City Porto Alegre, Brasil, as the competent venue for any disputes that may arise under this Agreement, and waive the right to claim any other venue irrespective of how privileged it may be.

12.    This Agreement may not be amended except by an instrument in writing signed by each of the parties hereto. This Agreement and its provision shall be binding upon and

-4-

#1965390 v3

inure to the benefit of the parties hereto and their respective heirs, successors and permitted

assigns, but neither this Agreement nor any of the rights, interests or obligations of the parties

hereto shall be assigned without the prior written consent of all of the parties hereto.

      13.   This Agreement may be executed by the parties hereto in any number of

counterparts, each of which when so executed shall be deemed an original, but all which together

shall constitute one and the same instrument.

      14.   This Agreement constitutes the entire Agreement between and among the

parties hereto and supersedes all prior agreements, documents or instruments with respect to the

matters covered hereby.

      IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of

the date and year first above written.

WITNESS:              AGROMARAU INDUSTRIA E COMERCIO LTDA.

Name: _____

Title: _____      By _____

                          Name: _____

                          Title: _____

WITNESS:              THE GSI GROUP, INC.

Name: _____

Title: _____      By _____

                          Name: W. T. BRANCH

                          Title: CEO

WITNESS:              GSI HOLDINGS CORP.

Name: _____

Title: _____      By _____

                          Name: W. T. BRANCH

                          Title: CEO

WITNESS:              ASSUMPTION LEASING COMPANY, INC.

Name: _____      By _____

§1965390 v3

Title: _____     Name: _____
                             Title: _____

WITNESS:                     LEONARDO SEGATT

Name: _____      By _____

Title: _____     Name: _____
                             Title: _____

**TABELIONATO DE NOTAS - TRENTIN**
Av.    Borella, 894 - Marau/RS
RECONHEÇO verdadeira(s) a(s) firma(s)

_supra de Leonardo Segatt_
_cominada perante mim_
_e dele fe_

Marau (R.S.), 22 de _____ de 200 6
Em teste. _____                da verdade

☐ Bel. Helsi Maria Trentin Pilatti - Tabeliã
☐ Helena abrahão Trentin - Substituto
☐ Francisco Scandolara - Substituto
☐ Fabrice Bergamim Trentin - Substituto
☐ Matheus ___ in S___ eira - Substituto
☐ Genill Trentin - Substituto • Emolumento R$ 3,10

-6-

#1965390 v3

STATE OF ILLINOIS )

Christian County, )

I, ~~Amanda R. Curtis~~ County Clerk in and for said County, do hereby certify that

Jack L. Lewellyn is a Notary in said county, duly commissioned and sworn, and whose acts as

such are entitled to credit; that his commission bears date of August 29 A.D., 2004 and will

expire August 29 A.D., 2008.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court at

Taylorville, in said County, this 30th day of November A.D. 2006.

_____
County Clerk

#1965390-v3

State of Rio Grande do Sul, Brasil

I, _Nelci Maria Trentin Pilatti_ do hereby certify that _Leonardo Legat_

_____ of Agromarau Industria e Comercio Ltda., personally known to me to be the

same person whose name is subscribed to the foregoing instrument, appeared before me this day

in person and acknowledged that he signed and delivered the said instrument as his voluntary act,

for the uses and purposes, therein set forth.

Given under my hand and official seal, this 23 day of _Novembro_, 2006.

> TABELIONATO DE NOTAS E REGISTRO
> CIVIL DAS PESSOAS NATURAIS
> Nelci Maria Trentin Pilatti   Titular
> Helder Abrahão Trentin   Substituto
> Francisco Scandolara   Substituto
> Fabiana Bergamini Trentin   Substituta
> Matheus Trentin Silveira   Substituto
> Genili Trentin   Substituto
> Av. Júlio Borella, 894
> CEP: 99-150-000 - MARAU - RS

#1965390.V3                          -8-

State of Illinois

County of Christian

I, Jack L. Lewellyn do hereby certify that William J. Branch, Chairman of The GSI Group, Inc., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this _____ day of _____, 2006.

OFFICIAL SEAL
JACK L LEWELLYN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/23/08

-9-

#1965390 v3

State of Illinois

County of Christian

I, Jack L. Lewellyn do hereby certify that William J. Branch, Chairman and Director of GSI Holdings Corp., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this ____ day of ___Nov___, 2006.

*Jack L. Lewellyn*

```
╔═══════════════════════════════════════╗
║          OFFICIAL SEAL                ║
║        JACK L LEWELLYN                ║
║  NOTARY PUBLIC - STATE OF ILLINOIS    ║
║  MY COMMISSION EXPIRES:08/29/08       ║
╚═══════════════════════════════════════╝
```

-10-

#1965390 v3

State of Illinois

County of Christian

I, Jack L. Lewellyn do hereby certify that William J. Branch for Assumption Leasing Company, Inc., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this _29th_ day of ___Nov___, 2006.

OFFICIAL SEAL
JACK L LEWELLYN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/29/08

-11-

#1965390 v3

State of Rio Grande do Sul, Brasil

I, _Nelci Maria Trentin Pilatti_ do hereby certify that Leonardo Segatt, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this _22_ day of _Novembro_, 2006.

> TABELIONATO DE NOTAS E REGISTRO
> CIVIL DAS PESSOAS NATURAIS
> Nelci Maria Trentin Pilatti  Titular
> Helder Abrahão Trentin  Substituto
> Francisco Scandolara  Substituto
> Fabiana Bergamini Trentin  Substituta
> Matheus Trentin Silveira  Substituto
> Gentil Trentin  Substituto
> Av. Júlio Boralia, 694
> CEP: 99-150-000 – MARAU – RS

#1965390 v3

-12-

STATE OF ILLINOIS                    )

Christian County,                    )

_N_____ _K___ _C____,_ County Clerk in and for said County, do hereby certify that

Jack L. Lewellyn is a Notary in said county, duly commissioned and sworn, and whose acts as

such are entitled to credit; that his commission bears date of August 29 A.D., 2004 and will

expire August 29 A.D., 2008.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court at

Taylorville, in said County, this _30th_ day of _November_ A.D. 2006.

                                        _____

                                        County Clerk

-13-

#1924013.v5

Exhibit B

# GSI HOLDINGS CORP.
# THE GSI GROUP, INC.

### DECEMBER 6, 2006

### INFORMATION STATEMENT

The purpose of this Information Statement is to inform you of an opportunity for you and certain other employees, directors and consultants of The GSI Group, Inc. ("*GSI*"), its parent corporation, GSI Holdings Corp. (the "*Company*"), and certain of its subsidiaries to purchase shares of common stock (the "*Common Stock*") of the Company, through a direct purchase of Common Stock from the Company. All currency references in this Information Statement are reflected in U.S. Dollars.

The following documents are included with this Information Statement:

| | |
|---|---|
| *Exhibit A* | Certificate of Incorporation and By-laws of the Company |
| *Exhibit B* | Annual Report on Form 10-K of GSI |
| *Exhibit C* | Quarterly Report on Form 10-Q of GSI |
| *Exhibit D* | Balance sheet for the Company, as of December 31, 2005 |
| | |
| *Annex 1* | Stock Purchase and Management Equity Agreement |
| *Annex 2* | Joinder to the October 2005 Registration Rights Agreement, together with a copy of the October 2005 Registration Rights Agreement |
| *Annex 3* | Stock Transfer Power |

**PLEASE CAREFULLY REVIEW THIS INFORMATION STATEMENT AND ALL OF THE ENCLOSED MATERIALS BEFORE MAKING A DECISION ABOUT THE INVESTMENT OPPORTUNITY.**

### The Acquisition Transaction

On May 16, 2005, the stockholders of GSI closed an acquisition transaction with Charlesbank Capital Partners ("*Charlesbank*"), a private equity firm, based in Boston, Massachusetts. Charlesbank formed and capitalized the Company, which then purchased all of the voting and non-voting shares of GSI's common stock. GSI is now a wholly-owned subsidiary of the Company. The majority of the shares of the Company's Common Stock are owned by investment funds affiliated with Charlesbank. A small portion of the Company's shares are

owned by unrelated investment funds and individuals as well as employees, directors and consultants of GSI.

## Confidentiality

In connection with your consideration of whether to participate in this investment opportunity, you will receive and have access to information, including the enclosed materials, that is proprietary to the Company, GSI, and their affiliates that you must keep confidential, as disclosure of this sensitive information could damage GSI's business. By your acceptance of this Information Statement and the enclosed materials, you agree to keep all information of this kind confidential and not to disclose it to anyone — even to other GSI employees. You may disclose this information to your legal, tax and financial advisors so long as they agree to keep the information confidential.

## The Co-Investment

*Overview*

As part of the discussions regarding the sale of GSI, GSI's management team worked with Charlesbank to come up with an arrangement whereby GSI's key employees and certain other individuals could retain or obtain an ownership stake in the Company. Charlesbank and management agreed upon a structure in which the key employees and certain other individuals would be offered the opportunity to purchase shares of Common Stock of the Company, which is the same series of stock that is held by Charlesbank.

Please note that the minimum co-investment amount is $25,000, but you may, however, elect to invest more than $25,000.

Assuming that all of the shares of Common Stock offered in this co-investment opportunity are purchased, the Common Stock of the Company will be held as follows:

| Stockholder | Shares |
|---|---|
| Charlesbank-affiliated investment funds | 486,250 |
| Investment funds not affiliated with Charlesbank | 17,500 |
| Other investors and consultants | 8,500 |
| GSI executives and management as a group (including board members not affiliated with Charlesbank and excluding shares issuable upon exercise of options) | 56,206 |
| Total | 568,456 |

In addition, we have allocated 100,000 shares of Common Stock to the GSI Holdings Corp. 2005 Management Stock Incentive Plan for the grant of options and other forms of incentive equity.

*The Common Stock*

As briefly described above, you have the opportunity to purchase shares of Common Stock of the Company, which is the same series of stock that has already been purchased by Charlesbank. Your purchase price for each share of Common Stock will be $150.00 per share, the current fair market value.

Each holder of our Common Stock is entitled to one vote for each share on all matters to be voted upon by the stockholders and there are no cumulative voting rights. Holders of Common Stock are entitled to receive ratably those dividends, if any, that may be declared from time to time by our board of directors out of funds legally available for the payment of dividends. In the event of a liquidation, dissolution or winding up of us, holders of our Common Stock would be entitled to share in our assets remaining after the payment of liabilities. All outstanding shares of Common Stock are, and the shares of Common Stock offered by us in this offering, when issued and paid for will be, fully paid and nonassessable. A copy of our certificate of incorporation and our by-laws, as amended to date, is included as Exhibit A.

### The 2005 Management Stock Incentive Plan

The Company has adopted the 2005 Management Stock Incentive Plan (the "*Plan*") pursuant to which it has allocated 100,000 shares of Common Stock (as adjusted for any stock split, subdivision, recapitalization or combination of stock) from its treasury for issuance pursuant to the Plan. There are currently 89,200 options to purchase shares of Common Stock granted pursuant to the Plan.

### Stock Purchase and Management Equity Agreement

Enclosed with this Information Statement, as Annex 1, is a Stock Purchase and Management Equity Agreement. Pursuant to this agreement, the shares of Common Stock that you purchase through your co-investment will be subject to restrictions on transfer, rights to repurchase by the Company upon termination of your consulting arrangement and other rights and obligations regarding ownership of the shares of Common Stock, all as more particularly described below.

*Restrictions on Transfer.* You will not be permitted to sell, assign or otherwise transfer your shares until 180 days after an initial public offering by the Company. Transfers at your death under a will, through laws of inheritance, with the Company's consent to certain members of your family and entities connected with your family, to the Company in connection with the exercise of its repurchase rights or pursuant to the "drag along" and "tag along" rights described below are not subject to the restriction.

*Repurchase Rights.* Prior to the expiration of 180 calendar days following an initial public offering by the Company, in the event you cease to serve as a consultant to GSI Group or any affiliate thereof, the Company has the right to repurchase your shares. In general, the Company's repurchase right shall continue for 180 days after the date of your termination of service. However, if on your termination date, you own shares that you have not owned for at least six months, the 180 day repurchase period shall not start until the first date on which you have owned shares for six months and a day. If the Company exercises its repurchase right, it will repurchase your shares at fair market value, which shall be determined in good faith by the Company's Board of Directors as of the termination date. However if you fail to comply with your non-competition or non-solicitation obligations, the Company shall have the right to purchase your shares at the lower of (1) $150.00 per share (as such may be adjusted as set forth in the Stock Purchase and Management Equity Agreement), or (2) the fair market value of the shares at the time of repurchase. If the Company elects to repurchase your shares, (a) if the total repurchase price of all shares being repurchased from an individual is no more than $250,000, the Company will pay the total amount in cash within

30 days of exercise of the repurchase right or (b) if the total repurchase price of all shares being repurchased from an individual is more than $250,000, the Company has the option to pay the total amount (i) in cash within 30 days of exercise of the repurchase right or (ii) in three equal installments, with the first installment payable within 30 days of exercise of the repurchase right and the second and third installments payable on the first and second anniversaries of such initial payment date. The Company has the right to defer the exercise of its repurchase right or assign its repurchase right to an affiliate under certain circumstances. In connection with the Company's repurchase right described above, the Company will hold your share certificates in escrow until the shares are no longer subject to the repurchase right. Accordingly, you must sign in blank the Stock Transfer Power attached as Annex 3.

*Drag Along.* The principal stockholders of the Company (who are affiliated investment funds of Charlesbank) have the right to cause you to sell any or all of your shares to a third party in the event such stockholders sell 50% or more of the outstanding shares of the Company's stock.

*Tag Along.* You will have the right to tag along the shares on a pro rata basis on any sale by the principal stockholders to a third party of more than 50% of their shares of the Company's stock.

*Subscription Rights.* You will have a pro rata right, based on the percentage that your shares (without giving effect to any unexercised vested or unvested options) represent of the total outstanding equity in the Company (on a fully diluted basis) to participate in subsequent issuances of equity securities of the Company (excluding issuances under any equity incentive plan or upon the exercise of options and certain other standard excluded issuances). You will not have the right to subscribe for future debt or convertible debt offerings by the Company.

*Information Rights.* You will have the right to receive quarterly unaudited and annual audited financial statements for the Company. For so long as GSI files reports with the Securities and Exchange Commission, the Company may satisfy this information requirement by providing you with the filed reports of GSI.

*Lock-Up.* Until the Company goes public, there will be no readily available market for the sale of Common Stock. After the Company goes public, a number of rules will govern the sale of the shares. However, in the event of an underwritten public offering of Common Stock of the Company, you will agree not to sell or transfer any shares (other than shares being registered in the offering) without the consent of the underwriters for a period of at least (a) 180 calendar days following the effective date of the registration statement relating to the initial public offering, and (b) 90 calendar days following the effective date of the registration statement relating to any other underwritten public offering.

*Registration Rights Agreement*

If you decide to participate in this co-investment opportunity, you are required to become a party to the October 2005 Registration Rights Agreement by signing a copy of the Joinder to the October 2005 Registration Rights Agreement attached as Annex 2. Pursuant to such agreement,

if at any time the Company proposes to register shares of Common Stock for sale to the public other than in connection with the Company's initial public offering, following such initial public offering, you will have "piggy-back" registration rights entitling you to request that your shares of Common Stock be included in the registration statement. Your rights under the October 2005 Registration Rights Agreement are subject to various limitations, which are set forth in the agreement itself, a copy of which will be delivered to you with this Information Statement, as Annex 2, unless you are already party to such an agreement.

*Financial Statements*

The balance sheet for the Company as of December 31, 2005 is attached as Exhibit D. The Company was formed on April 1, 2005 and had no prior operations. On May 16, 2005, the Company purchased all of the outstanding stock of The GSI Group, Inc. and its sole activity is to act as a holding company for the issued and outstanding stock of The GSI Group, Inc. The Company's only asset is the shares of GSI.

The Annual Report on Form 10-K, which is attached as Exhibit B, contains, beginning on page 31, GSI's Financial Statements for the year ended December 31, 2005.

The Quarterly Report on Form 10-Q is attached as Exhibit C.

*Risks Factors*

You should understand that being a stockholder of a private company carries with it numerous risks that, if they were to materialize, could seriously impair or completely erode the value of your investment. Please consider the following risks, which are just a few examples of the investment risks you should weigh as part of your decision.

- There is no public trading market for the shares of the Common Stock. The Company is a private company and shares of its stock are not listed on any national securities exchange or quoted on NASDAQ. This fact, coupled with the contractual restrictions under the enclosed Stock Purchase and Management Equity Agreement that apply to your ability to transfer the shares, makes your investment illiquid and volatile. Even if your shares of Common Stock were to substantially appreciate in value, you could have difficulty realizing that appreciation.

- You could lose the entire value of your investment in the shares, including losses resulting from factors beyond the control of the Company and GSI. For example, economic conditions could impair GSI's ability to service its debt obligations and force GSI into bankruptcy or a restructuring. In a case like that, it is possible that you would lose the entire value of your investment in the shares of Common Stock. Accordingly, you should consider whether you can bear the economic risk of losing the entire value of your investment before choosing to invest.

Investing in shares of the Company's Common Stock involves a number of additional risks, some of which are described on pages 10 through 15 of the Company's Annual Report on Form 10-K, which is attached as Exhibit B.

The Company and GSI urge you to read the documents that are attached as Exhibits and Annexes to this Information Statement and to consult with your tax and legal advisors before you decide whether to make the investment that is described in this Information Statement.

### How to participate

If, after reviewing all of the enclosed materials, you decide to participate in the co-investment opportunity that is described in this Information Statement, you will need to return the following documents to Emily Mason at Covington & Burling LLP, One Front Street, San Francisco, CA 94111 or to Bill Branch, by no later than 12 p.m., central time, on December 18, 2006.

(1) 2 signed copies of the Stock Purchase and Management Equity Agreement that is enclosed as Annex 1;

(2) 2 signed copies of the Joinder to the October 2005 Registration Rights Agreement that is enclosed as Annex 2;

(3) 1 copy of the Stock Transfer Power that is enclosed as Annex 3, signed in blank; and

(4) Original Stock Certificate(s) evidencing 661,725 quotas of Agromarau Industria e Comercio Ltda., in properly executed and transferable form, assigned to the Company.

If the Company does not receive these materials from you by 12 p.m., central time, on December 18, 2006 your failure to respond will be deemed to be an election on your part not to participate.

### Further Information

If you have any questions about the matters discussed in this Information Statement or about any of the enclosed materials, you should contact Bill Branch at the Company or Andrew Janower of Charlesbank Capital Partners. Andrew Janower can be reached (617) 619-5489 or via e-mail at ajanower@charlesbank.com. Alternatively, you may contact Emily Mason at Covington & Burling at (415) 591-7062 or emason@cov.com.

Exhibit C

STOCK PURCHASE AND MANAGEMENT EQUITY AGREEMENT, dated as of December ___, 2006, between GSI HOLDINGS CORP., a Delaware corporation (the "*Company*"), and LEONARDO SEGATT (the "*Purchaser*").

### INTRODUCTION

The Purchaser is a consultant to The GSI Group, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("*GSI Group*"), or a wholly-owned subsidiary of GSI Group, and desires to acquire an equity interest in the Company.

The Company desires to issue and sell to the Purchaser, and the Purchaser desires to purchase from the Company, 3,072 shares (the shares of Common Stock now or hereafter acquired by the Purchaser, the "*Shares*") of the Company's Common Stock, $.01 par value per share (the "*Common Stock*").

In addition to the terms of the issuance, sale and purchase of the Shares, the Company and the Purchaser desire to set forth herein certain matters regarding the ownership of the Shares by the Purchaser.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

"*2005 Stock Plan*" means the GSI Holdings Corp. 2005 Management Stock Incentive Plan.

"*Affiliate*" means, with respect to any specified person, a limited or general partner or member of such Person or another Person that, directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified, and with respect to a natural Person shall include any Family Member of such Person.

"*Agreement*" means this Stock Purchase and Management Equity Agreement.

"*Board*" means the Board of Directors of the Company.

"*Capital Stock*" means all shares of common stock, preferred stock or other equity securities of the Company or securities, rights, options or warrants convertible into or exchangeable or exercisable therefor now held or hereafter acquired by the Stockholders, including without limitation upon the conversion, exercise or exchange of such securities or options or warrants or preemptive rights to acquire the same.

"*Claims*" is defined in Section 2.2.

"*Closing*" means the closing for the consummation of the transactions contemplated by this Agreement.

"*Combined Voting Power*" with respect to Capital Stock of the Company means the number of votes such stock is normally entitled (without regard to the occurrence of any contingency) to vote in an election of directors of the Company.

"*Common Stock*" is defined in the Introduction.

"*Company*" is defined in the preamble.

"*Consulting Agreement*" means the Non-Competition and Consulting Agreement, dated November 13, 2006, by and among Agromarau Industria e Comercio Ltda., GSI Group, the Company, the Purchaser and Colloni Participações Ltda.

"*control*" (including, with its correlative meanings, "*controlled by*" and "*under common control with*") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"*Controlling Interest*" means shares of Capital Stock of the Company representing at least 50% of the Combined Voting Power of the then outstanding shares of Capital Stock of the Company.

"*Cost*" equals $150.00 per share (subject to adjustment pursuant to Section 6.1), with respect to the Shares, and the exercise price per share, with respect to any Option Shares.

"*Disability*" has the meaning ascribed to such term in the Executive Severance and Restrictive Covenant Agreement or if the Purchaser is not party to such an agreement, means the Purchaser becoming unable to substantially perform services for 30 consecutive days, or for shorter periods aggregating 90 days in any 12-month period, due to a physical or mental disability, whether resulting from illness, accident or otherwise.

"*Drag Along Transaction*" is defined in Section 5.4(a).

"*Executive Severance and Restrictive Covenant Agreement*" means any Executive Severance and Restrictive Covenant Agreement entered into by and between GSI Group and the Purchaser, whether on, before or after the date hereof.

"*Fair Market Value*" means the value of a Share calculated pursuant to Section 5.2(c) as of the applicable date of determination.

"*Family Member*," with respect to the Purchaser, means (x) the Purchaser's spouse, children, grandchildren, parents, grandparents (natural, step, adopted or in-laws), siblings, nieces and nephews or (y) a trust, corporation, limited liability company, partnership or other entity, all of the beneficial interests in which shall be held directly or indirectly by the Purchaser or one or more persons described in clause (x); *provided, however,* that during the period any such trust, corporation, limited liability company, partnership or other entity holds any right, title or interest in any Common Stock, no person or entity other than the Purchaser or one or more Family Members of the Purchaser of the type listed in clause (x) may be or become beneficiaries, stockholders, members or limited or general partners or owners thereof.

2

"*Fully Diluted Basis*" means (i) when referring to the computation of a percentage of the shares of Common Stock that would be held by a Stockholder, the ratio, after giving effect to the full conversion or exercise, as the case may be, of (A) all outstanding Capital Stock of the Company held by such Stockholder whether or not such Capital Stock is then convertible or exercisable, as the case may be, to (B) the aggregate number of shares of Common Stock that would be outstanding after giving effect to the full exercise and conversion, as the case may be, of any outstanding Capital Stock of the Company held by all security holders, whether or not such Capital Stock is then exercisable or convertible and (ii) when referring to the number of shares of Common Stock held by a Stockholder, the number of shares of Common Stock that would be held by such Stockholder after giving effect to the full conversion or exercise, as the case may be, of all outstanding Capital Stock of the Company held by such Stockholder and all other security holders, whether or not such Capital Stock is then exercisable or convertible.

"*GSI Group*" is defined in the Introduction.

"*Initial Public Offering*" means the sale of any shares of the Common Stock of the Company pursuant to a registration statement that has been declared effective under the Act, if as a result of such sale (i) the issuer becomes a reporting company under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, and (ii) such stock is traded on the New York Stock Exchange or the American Stock Exchange, or is quoted on the NASDAQ National Market System or is traded or quoted on any other national stock exchange or national securities system.

"*Option Shares*" means any shares of Common Stock issued to the Purchaser pursuant to the exercise of stock options under the 2005 Stock Plan or any other equity incentive program, arrangement or agreement approved by the Board.

"*Permitted Transferee*" means (a) any person to whom the Shares are transferred by will or the laws of descent and distribution or (b) with the approval of the Company in its sole discretion and provided that the transfer is for no consideration, any Family Member of the Purchaser.

"*Person*" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, governmental authority or other entity, and shall include any successor (by merger or otherwise) of such entity.

"*Principal Stockholders*" means the Persons executing this Agreement as "Principal Stockholders" on or after the date hereof and their respective Affiliates and direct and indirect transferees.

"*Proportionate Percentage*" means, with respect to the Purchaser, a percentage equal to the quotient of (a) the number of shares of Common Stock then owned by the Purchaser, including the Shares and any Option Shares (but excluding any unexercised vested or unvested stock options and the shares of Common Stock underlying such stock options) divided by (b) the sum of (i) the number of issued and outstanding shares of Common Stock plus (ii) the number of shares of Common Stock issuable upon conversion, exercise or exchange of all Capital Stock which is convertible into or exercisable or exchangeable for Common Stock held by all Stockholders, whether or not such Capital Stock is then convertible, exercisable or exchangeable,

3

including any and all shares of Common Stock issuable upon the exercise of stock options granted under the 2005 Stock Plan.

"*Purchaser*" is defined in the preamble.

"*Registration Rights Agreement*" means the October 2005 Registration Rights Agreement, dated as of October 6, 2005, among the Company, the Purchaser and others.

"*Repurchase Period*" and "*Repurchase Right*" are defined in Section 5.2(a).

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Selling Principal Stockholders*" is defined in Section 5.4(a).

"*Shares*" is defined in the Introduction.

"*Stock Certificates*" is defined in Section 2.1.

"*Stockholder*" means any current or future holder of Capital Stock of the Company, including without limitation the Principal Stockholders and the Purchaser.

"*Stockholders Agreement*" means the Stockholders Agreement, dated as of May 16, 2005, among the Company, the Principal Stockholders and certain other stockholders party thereto.

"*Stockholder Transferee*" is defined in Section 5.5.

"*Subscription Rights Offer*" is defined in Section 5.6(a).

"*Subsidiary*" means any joint venture, corporation, partnership, limited liability company or other entity, as to which the Company, either directly or indirectly, has more than fifty percent (50%) of the voting power or rights to capital or profits.

"*Tag-Along Notice*" is defined in Section 5.4(b).

"*Tag-Along Transaction*" is defined in Section 5.5(a).

"*Termination Date*" means the date on which the Purchaser ceases to serve as a consultant to GSI Group or any Affiliate thereof for any reason.

"*Transfer*" means any sale, transfer, assignment, or other disposition.

## ARTICLE II

### PURCHASE AND SALE

SECTION 2.1. *Purchase and Sale of Common Stock.* Subject to the terms and conditions of this Agreement, the Company hereby issues and sells to the Purchaser, and the

4

Purchaser hereby acquires from the Company, on the date hereof, the Shares in exchange for delivery to the Company of original stock certificate(s) evidencing 661,725 quotas of Agromarau Industria e Comercio Ltda., in properly executed and transferable form, assigned to the Company (the "*Stock Certificates*"), such quotas determined by the Board of Directors to have an aggregate value of $460,800.

SECTION 2.2. *Delivery of Certificates.* The Company is hereby issuing and selling the Shares to the Purchaser by delivering to the Purchaser a duly executed certificate or certificates representing the Shares registered in the name of the Purchaser, with appropriate issue stamps, if any, affixed at the expense of the Company, free and clear of all security interests, liens, pledges, charges, options, rights of first refusal, mortgages, indentures, security agreements or other claims, encumbrances, agreements, arrangements or commitments of any kind or character, whether written or oral and whether or not relating in any way to credit or the borrowing of money ("*Claims*"), other than the transfer and other restrictions set forth in this Agreement and restrictions imposed by Federal and state securities laws, and the Purchaser is hereby purchasing the Shares in exchange for delivery of the Stock Certificates.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Purchaser as follows:

SECTION 3.1. *Organization, Good Standing and Qualification.* The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly qualified as a foreign corporation in each jurisdiction in which the nature of its activities and/or of its properties makes such qualification necessary, except for those jurisdictions in which failure to be so qualified would not have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the condition (financial or otherwise), assets, liabilities, operations, earnings or business of the Company. The Company has all requisite corporate power and authority to execute and deliver this Agreement, to issue and sell the Shares, and to carry out the other provisions of this Agreement.

SECTION 3.2. *Capitalization.* The authorized capital of the Company as of the date hereof and immediately prior to the purchase and sale of the Shares contemplated hereby consists of 700,000 shares of Common Stock, $.01 par value per share. Immediately after giving effect to the purchase and sale of the Shares contemplated hereby and by any other agreements to purchase capital stock of the Company as of the date hereof, the authorized Capital Stock of the Company will consist of 700,000 shares of Common Stock, of which 568,456 shares will be issued and outstanding as of the date hereof, all of which will be owned as set forth on Schedule I hereto, and all of which is or will be duly authorized, validly issued, fully paid and nonassessable. The Shares have been duly authorized and, when issued in accordance with this Agreement, will be duly issued, fully paid and nonassessable and will not have been issued in violation of, and will not be subject to, any preemptive or subscription rights other than pursuant to this Agreement. The Shares, when issued and delivered in accordance with this Agreement, will be free and clear of any Claims and the Purchaser will have good title to such Shares; *provided, however,* that the Shares may be subject to restrictions on transfer under this Agreement and under applicable state and/or federal securities laws. The Company has no

5

outstanding rights (either preemptive or other) or options to subscribe for or purchase from the Company and no warrants or other agreements providing for or requiring the issuance by the Company, of any of its Capital Stock or any securities convertible into or exchangeable for its Capital Stock, other than (i) the 100,000 shares of Common Stock reserved for issuance under the 2005 Stock Incentive Plan, (ii) pursuant to the Stockholders Agreement and (iii) pursuant to this Agreement.

SECTION 3.3. *Authority; Binding Agreements.* The Company has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of the Company. This Agreement has been duly executed and delivered by the Company, and constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, or (b) general principles of equity.

SECTION 3.4. *Consents and Approvals.* No filings with, notices to, or approvals of any governmental or regulatory body are required to be obtained or made by the Company in connection with the consummation of the transactions contemplated by this Agreement.

SECTION 3.5. *No Violations.* The execution and delivery of this Agreement and the performance by the Company of its obligations hereunder (i) do not and will not conflict with or violate any provision of the Certificate of Incorporation or Bylaws of the Company, and (ii) do not and will not (a) conflict with or result in a breach of the terms, conditions or provisions of, (b) constitute a default under, (c) result in the creation of any Claim upon the Capital Stock or assets of the Company pursuant to; (d) give any third party the right to modify, terminate or accelerate any obligation under, (e) result in a violation of, or (f) require any authorization, consent, approval, exemption or other action by or notice to any court or administrative or governmental body or other third party pursuant to, any law, statute, rule or regulation or any agreement or instrument or any order, judgment or decree to which the Company is subject or by which any of its assets are bound.

SECTION 3.6. *Use of Proceeds.* The proceeds of the sale of the Shares shall be used to prepay or repay a portion of the Notes and for working capital for purposes of conducting the business of GSI Group and its subsidiaries.

SECTION 3.7. *Charter Documents.* The Company has made available to each Purchaser true and complete copies of the Company's Certificate of Incorporation and Bylaws as in effect on the date hereof.

Except for the representations and warranties expressly set forth in this Article III, the Company is not making any other express or implied representations or warranties with respect to the Shares or the transactions contemplated by this Agreement.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

6

The Purchaser represents and warrants to the Company as follows:

SECTION 4.1. *Capacity; Binding Agreements.* The Purchaser has all requisite capacity to execute and deliver this Agreement and the Joinder to the Registration Rights Agreement and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Joinder to the Registration Rights Agreement, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary action on the part of the Purchaser. This Agreement and the Joinder to the Registration Rights Agreement have been duly executed and delivered by the Purchaser, and constitute the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, or (b) general principles of equity.

SECTION 4.2. *Residence.* The residence of the Purchaser in which its investment decision was made is located at the address set forth on the signature page hereto.

SECTION 4.3. *Investment Representations.*

(a) If the Purchaser is an *"Accredited Investor"* as defined under Regulation D of the Securities Act and applicable counterpart state statutes, the Purchaser has completed and signed the accredited investor questionnaire, attached as Exhibit A hereto, and represents and warrants to the Company as set forth therein and such representations and warranties are hereby incorporated into this Agreement. If the Purchaser is not an "Accredited Investor" as defined under Regulation D of the Securities Act, the Purchaser has not completed or signed the accredited investor questionnaire attached as Exhibit A hereto.

(b) The Purchaser understands that participation in the offering is the Purchaser's decision and will have no impact, positive, negative or otherwise, on Purchaser's employment or other relationship with GSI Group. The Purchaser acknowledges that the Purchaser's decision to participate in the offering is voluntary and not the product of coercion by the Company or any of its Affiliates.

(c) The Purchaser recognizes that an investment in the Shares involves substantial risk and has taken full cognizance of and understands all of the risks related to the purchase of the Shares. The Purchaser represents that there have been no representations, guarantees, or warranties made to the Purchaser by the Company, GSI Group, their respective agents or employees, or by any other person, expressly or by implication, solely with respect to: (i) the approximate length of time that the Purchaser will be required to remain as owner of the Shares and (ii) the percentage of profit and/or amount or type of consideration, profit or loss (including tax benefits) to be realized, if any, as a result of an investment in the Shares.

(d) The Purchaser has reached the age of majority in the state or country in which the Purchaser resides, is a bona fide resident and domiciliary (not a temporary or transient resident) of that state or country of residence, is a citizen of Brazil, has adequate means of providing for the Purchaser's current needs and personal contingencies, is able to bear the substantial economic risks of an investment in the Company, has no need for liquidity in such investment, could afford a complete loss of such investment and represents that the amount of

7

the investment is not unreasonably large when compared with the Purchaser's total financial capability.

(e) The Purchaser is acquiring the Shares for investment and not with a view toward resale or distribution, and the Purchaser does not anticipate any change in circumstances that would cause the Purchaser to desire to sell the Shares or any part thereof. The Purchaser is acquiring the Shares for its own account and not as nominee or agent for any third party.

(f) The Purchaser understands that: (a) the Shares have not been registered under the Securities Act, or state securities laws; (b) the Purchaser has no right to require such registration other than such rights as may be granted to the Purchaser pursuant to this Agreement or the Registration Rights Agreement; (c) state securities administrators and the Securities and Exchange Commission have not reviewed, approved or disapproved the Shares or passed on the merits of the offering; and (d) a legend restricting transferability will be placed on all certificates representing the Shares.

(g) The Purchaser understands that the Company may accept or reject this subscription in whole or in part for any reason.

(h) The Purchaser understands that (a) there might not ever be a market for the Shares and (b) the Purchaser may be unable to liquidate the Shares in the case of an emergency or otherwise.

(i) The Purchaser acknowledges that the Company is not providing Purchaser with legal, tax or investment advice and understands that Purchaser should consult his own advisers as to legal, tax, business and related matters concerning investment in the Shares. Purchaser represents and warrants that the Purchaser has, either alone or with a professional representative, such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of this investment.

(j) The Purchaser acknowledges that (i) the Shares do not carry any rights of cumulative voting, or any other rights to assure that the Purchaser may designate any one or more directors on the Board and (ii) nothing herein shall limit the ability of the Company to issue Shares and Purchaser's ownership percentage of the Company's Capital Stock may be diluted in certain circumstances, including, without limitation, in the event that the Company issues additional securities to fund an acquisition, raise capital or for any other purposes.

(k) All representations and warranties set forth above, on Exhibit A hereto or in any other written statements or documents delivered by the Purchaser in connection with the transactions contemplated hereby are true and correct as of the date of this Agreement and shall survive that date.

(l) The Purchaser agrees to the imprinting of a legend on certificates representing all of the Shares to the following effect:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED, QUALIFIED, APPROVED OR DISAPPROVED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF EXCEPT PURSUANT

8

TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR AN APPLICABLE EXEMPTION TO THE REGISTRATION REQUIREMENTS OF SUCH ACT OR SUCH LAWS AND NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY HAS PASSED ON OR ENDORSED THE MERITS OF THESE SECURITIES. THE TRANSFER OF ANY SECURITIES REPRESENTED BY THIS CERTIFICATE IS FURTHER LIMITED BY THE PROVISIONS OF THE STOCK PURCHASE AND MANAGEMENT EQUITY AGREEMENT BETWEEN GSI HOLDINGS CORP. AND THE PURCHASER IDENTIFIED THEREIN, A COPY OF WHICH IS ON FILE AT THE EXECUTIVE OFFICE OF THE COMPANY."

(m)     The Purchaser acknowledges and understands that the Shares have not been registered under the Securities Act and agrees that the Shares may not be offered, sold or transferred except (i) pursuant to a registration statement under the Securities Act that has become effective and is current with respect to the Shares or (ii) pursuant to a specific exemption from registration under the Securities Act.

SECTION 4.4. *Nature of Purchaser.* The Purchaser acknowledges that the offer and sale of the Shares is intended to be exempt from registration under the Securities Act. The Purchaser is a consultant to the Company or an Affiliate, has had full opportunity to ask questions of and has received satisfactory answers from the Company or its representatives concerning the terms and conditions of their investment and has been given access to all information necessary to make an investment decision as to the Shares, including without limitation the Information Statement.

SECTION 4.5. The Purchaser understands the meaning and legal consequences of the representations and warranties, and agrees to indemnify, defend and hold harmless the Company, GSI Group and each director, officer and shareholder of each of them from and against any and all loss, damage or liability (including without limitation attorneys' fees) due to or arising out of a breach of any representation or warranty of the Purchaser, except that the Purchaser does not waive any rights granted to the Purchaser under federal or state securities laws.

Except for the representations and warranties expressly set forth in this Article IV, the Purchaser is not making any other express or implied representations or warranties with respect to the Shares or the transactions contemplated by this Agreement.

## ARTICLE V

### TRANSFERABILITY OF SHARES

SECTION 5.1. *Restrictions on Transfers of Shares; Permitted Transferees.* Prior to the expiration of 180 calendar days following an Initial Public Offering, the Shares shall not be transferable or transferred, assigned, pledged or hypothecated in any way (whether by operation of law or otherwise) except that the Purchaser may transfer the Shares (a) to a Permitted Transferee, (b) to the Company in accordance with Section 5.2 of this Agreement, or (c) as provided for in Sections 5.4 and 5.5 of this Agreement. This Agreement shall be binding on and enforceable against any person who is a Permitted Transferee of the Shares but not a

9

person who acquires the Shares pursuant to Section 5.2, 5.4 or 5.5 of this Agreement or as part of the Initial Public Offering. Each Permitted Transferee shall, as a condition to the transfer thereof to such Permitted Transferee, execute an agreement pursuant to which it shall become a party to this Agreement.

SECTION 5.2. *Repurchase Rights.*

(a)    In the event that the Purchaser ceases to serve as a consultant to GSI Group or any of its Affiliates for any reason prior to an Initial Public Offering, the Company, during, in the case of termination due to death or Disability, the period from the Termination Date until 90 calendar days following the 12 month anniversary of the Termination Date, and in all other cases, the 180 calendar days following the Termination Date (as applicable, the "*Repurchase Period*"), shall, subject to Section 5.2(e), have the right to purchase all or any portion of the Shares (the "*Repurchase Right*"). The purchase price for each Share purchased under this Section 5.2(a) shall equal Fair Market Value; provided, however, that, if the Purchaser fails to comply with Section 2 or Section 3 of the Consulting Agreement in accordance with the terms thereof, the purchase price shall equal the lower of Fair Market Value or Cost. If the Company elects to purchase some or all of the Shares, it shall notify the Purchaser at or before the end of the Repurchase Period of such election and the purchase price for the Shares to be purchased shall be paid in cash to the Purchaser at the following times: (i) if the total repurchase price of all Shares being repurchased from an individual is no more than $250,000, at a time set by the Company within 30 calendar days after the date notice is given to the Purchaser of the Company's election to exercise the Repurchase Right or (ii) if the total repurchase price of all Shares being repurchased from an individual is more than $250,000, at the Company's election, as to which it shall notify the Purchaser, either (1) at a time set by the Company within 30 calendar days after the date notice is given to the Purchaser of the Company's election to exercise the Repurchase Right or (2) in three equal installments, with the first installment payable within 30 calendar days after the date notice is given to the Purchaser of the Company's election to exercise the Repurchase Right, and the second and third installments payable on the first and second anniversaries of such initial payment date, provided in all cases that the Purchaser has presented to the Company a stock certificate or certificates evidencing the Shares to be purchased (or an affidavit of loss with respect thereto) duly endorsed for transfer. If the Purchaser fails to deliver such stock certificate or certificates (or an affidavit of loss with respect thereto) duly endorsed for transfer, the Shares represented thereby shall be deemed to have been purchased upon (i) the payment by the Company of the total purchase price or the first installment thereof, as elected by the Company, for the purchased Shares to the Purchaser or (ii) notice to the Purchaser that the Company is holding the total purchase price or the first installment thereof, as elected by the Company, for the purchased Shares for the account of the Purchaser, and upon such payment or notice, the Purchaser will have no further rights in or to such Shares. In the event that the Company elects to pay the repurchase price in three installments, upon receipt of the stock certificate or certificates for the Shares, or payment or notice as described in the preceding sentence, the Company shall deliver to the Purchaser a non-negotiable promissory note with a principal amount equal to the unpaid installments and bearing interest on the unpaid amount at a per annum rate equal to the prime rate as of the Termination Date, where the "prime rate" means the rate published as the prime rate for such day (or if such day is not a business day, for the immediately preceding business day) by the *Wall Street Journal* or, if the *Wall Street Journal* does not publish the prime rate, by any publication or other source reasonably selected by the Company. Accrued and unpaid interest under such note shall be

10

payable on each installment payment date. Notwithstanding the foregoing, to the extent that applicable law or regulation or any of the credit facilities provided to the Company or GSI Group prohibits or restricts the Company or GSI Group from making any payments of or in respect of the purchase price for the purchased Shares, or the Board determines in good faith that it would not be prudent business judgment for the Company or GSI Group to make any payments of or in respect of the purchase price for the purchased Shares, the Company may (x) defer its exercise of the Repurchase Right or any installment thereof for so long as such restriction or condition pertains or (y) assign its rights under this Section 5.2(a) to any one or more of the Principal Stockholders.

(b)    In order to carry out the provisions of this Section 5.2 more effectively, the Company shall hold the Shares in escrow together with separate stock powers executed by the Purchaser in blank for transfer. The Company shall not dispose of the Shares except as otherwise provided in this Agreement. In the event of any repurchase by the Company (or any of its assigns), the Company is hereby authorized by the Purchaser, as the Purchaser's attorney-in-fact, to date and complete the stock powers necessary for the transfer of the Shares being purchased and to transfer such Shares in accordance with the terms hereof. At such time as any Shares are no longer subject to the Company's repurchase right, the Company shall, at the written request of the Purchaser, deliver to the Purchaser (or the relevant Permitted Transferee) a certificate representing such Shares with the balance of the Shares (if any) to be held in escrow pursuant to this Section 5.2(b).

(c)    The Fair Market Value of Shares to be purchased hereunder by the Company or any of the Principal Stockholders, as the case may be, shall be determined in good faith by the Company's Board of Directors as of the Termination Date.

(d)    The Purchaser shall not be considered to have ceased to be engaged as a consultant by GSI Group for purposes of this Agreement if the Purchaser continues to be engaged as a consultant by GSI Group or an Affiliate thereof.

(e)    In the event that, on the Termination Date, the Purchaser owns Shares, including Option Shares that have not been owned by the Purchaser for a period of at least six months, except in the case of termination due to death or Disability, with respect to all such Shares, the Repurchase Period will not commence on the Termination Date but rather will commence on the first date on which all such Shares have been owned by the Purchaser for six months and a day. In the event that following the Termination Date, the Purchaser exercises any then outstanding vested stock options, with respect to such Option Shares, except in the case of termination due to death or Disability the Repurchase Period will not commence on the Termination Date but rather will commence on the first date on which all such Option Shares have been owned by the Purchaser for six months and a day.

SECTION 5.3.  *Lock-up Arrangements.*    If requested in writing by the underwriters for an underwritten public offering of Common Stock of the Company, the Purchaser shall agree not to sell or transfer any Shares (other than Shares being registered in such offering) without the consent of such underwriters for a period of at least (a) 180 calendar days following the effective date of the registration statement relating to the Initial Public Offering, and (b) 90 calendar days following the effective date of the registration statement relating to any other underwritten public offering, and to execute and deliver any form of agreement requested

11

by such underwriter reasonably and in good faith to evidence the agreements of the Purchaser set forth herein.

SECTION 5.4. *Drag Along Rights.* (a) If any Principal Stockholder, acting singly or in combination with any other Principal Stockholder (collectively, the *"Selling Principal Stockholders"*), proposes to enter into a transaction or series of related transactions (collectively, the *"Drag Along Transaction"*) pursuant to which the Selling Principal Stockholders shall transfer to any transferee a Controlling Interest, then the Selling Principal Stockholders may require the Purchaser to sell, or cause to be sold, and the Purchaser shall be obligated to sell or cause to be sold, which obligation shall be enforceable by the Company, to the proposed transferee in the Drag Along Transaction any or all Shares owned by the Purchaser for the same relative consideration received by the Selling Principal Stockholders in the Drag Along Transaction and otherwise on the same terms and conditions obtained by the Selling Principal Stockholders in the Drag Along Transaction. The Selling Principal Stockholders shall provide a written notice of such sale to the Purchaser not less than 10 calendar days prior to the closing of such sale.

(b) At the closing of any sale of Common Stock contemplated in Section 5.4(a), the Purchaser agrees to take all actions in connection with the consummation of the proposed Transfer as may reasonably be requested by the Principal Stockholders, including the delivery of a certificate or certificates representing the Purchaser's Shares, duly endorsed in blank or otherwise in suitable form for transfer, against payment in full of the purchase price therefor. The Purchaser agrees to take all reasonable and necessary action to cause the consummation of any Transfers to which Section 5.4(a) applies, including voting its Common Stock (whether at an annual or special meeting of the Company, whether by written consent, proxy or otherwise, and whether or not at an adjourned meeting) in favor of such Transfer and not exercising any appraisal rights in connection therewith. The Company shall take all actions necessary within its control to cooperate with and give effect to any Transfers to which Section 5.4(a) applies.

SECTION 5.5. *Tag-Along Right.* (a) In the event that the Selling Principal Stockholders propose to enter into a transaction or series of related transactions (collectively, the *"Tag Along Transaction"*), pursuant to which the Selling Principal Stockholders shall transfer to any transferee shares of Common Stock constituting more than 50% of the then outstanding shares of Capital Stock held by all the Principal Stockholders, and the Selling Principal Stockholders do not elect, or do not have the right to elect, to require the sale of the Shares of the Purchaser pursuant to Section 5.4(a), such Selling Principal Stockholders shall notify the Purchaser in writing of such proposed Transfer and its terms and conditions. Within 10 calendar days after the date of such notice, the Purchaser shall notify the Selling Principal Stockholders in writing if the Purchaser elects to participate in such Transfer. If the Purchaser fails to notify the Selling Principal Stockholders within such 10 calendar day period, the Purchaser shall be deemed to have waived its rights hereunder. If the Purchaser notifies the Selling Principal Stockholders that it intends to participate in the Tag Along Transaction, the Purchaser shall have the right to sell at the same price and on the same terms and conditions as the Selling Principal Stockholders, a number of shares of Common Stock equal to the shares of Common Stock the third party actually proposes to purchase from the Selling Principal Stockholders multiplied by the Proportionate Percentage. Nothing in this Section 5.5 shall be construed to limit the ability of the Selling Principal Stockholders to complete the Transfer prior to the passage of 15 calendar

days, provided that sufficient provision is made to permit the Purchaser to complete the sale of his or her stock hereunder within 10 calendar days of the election by the Purchaser to exercise such rights.

(b)    This Section 5.5 will not apply to any Transfer of Common Stock by any Principal Stockholder to an Affiliate of any Principal Stockholder.

SECTION 5.6. *Subscription Rights*.    (a) Subject to the provisions of Section 5.6(b), the Company will not issue, sell, or enter into any agreements or commitments pursuant to which it becomes obligated to issue or sell, any shares of its Common Stock, or any warrants, options or other securities convertible or exchangeable into such shares of Common Stock, excluding any debt securities convertible or exchangeable into shares of Common Stock, unless the Company first offers (the "*Subscription Rights Offer*") in writing to sell to the Purchaser, at the same price and on the same terms and conditions, the Purchaser's Proportionate Percentage of such securities proposed to be offered by the Company. Such Subscription Rights Offer will remain outstanding for at least 10 calendar days from the date of such notice and will be exercised by the Purchaser by giving written notice to the Company within such period.

(b)    The Subscription Rights Offer shall not apply to: (i) the issuance of any shares of Capital Stock or by any of the Company's subsidiaries other equity securities, or any warrants, options or other securities convertible or exchangeable into such shares, to directors, officers, employees, advisors or consultants of the Company or any of its subsidiaries pursuant to an incentive compensation, bonus, stock option, stock grant, stock purchase or other similar plan or arrangement approved by the Company's Board of Directors (provided that the foregoing shall not include issuances to directors or officers who are employees of the Principal Stockholders), (ii) issuances to third party equipment lessors, banks, financial institutions, manufacturers, vendors, suppliers, consultants or similar Persons in arm's-length transactions approved by the Company's Board of Directors, the principal purpose of which is other than the raising of capital, (iii) issuances as consideration in connection with an acquisition of a third party on an arm's-length basis by the Company or one of its subsidiaries, (iv) issuances in a merger with a third party on an arm's-length basis involving the Company or one of its subsidiaries that is approved by the Company's Board of Directors, the principal purpose of which is other than the raising of capital, (v) any arm's-length borrowing, direct or indirect, from financial institutions or other Persons by the Company, including any type of loan or payment evidenced by any type of debt instrument, including borrowings that have equity features, including warrants, options or other rights to purchase Capital Stock, or are convertible into or exchangeable for Capital Stock, (vi) the issuance of any securities by the Company in a firmly underwritten public offering, or (vii) issuances pursuant to a stock split, stock dividend, reclassification or other distribution made on a pro rata basis to all holders of Capital Stock.

SECTION 5.7. *Information Rights*. The Company shall deliver the following to the Purchaser:

(a)    at any time when the Company is not required pursuant to applicable law, rule or regulation or the terms of any outstanding indenture or security to file reports under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), not later than 120 days after the end of each fiscal year of the Company, a full copy of the audit report containing a copy of the consolidated balance sheet of the Company and its subsidiaries as of the end of such year and

13

the related consolidated statements of income and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail with footnotes and accompanied by the opinion of the Company's independent public accounting firm;

(b)   at any time when the Company is not required pursuant to applicable law, rule or regulation or the terms of any outstanding indenture or security to file reports under the Exchange Act, as soon as available, but not later than 45 days after the end of each of the first three fiscal quarters of each year the unaudited consolidated balance sheet of the Company and its subsidiaries, and the related consolidated statements of income and cash flow for such quarter and for the period commencing on the first day of the fiscal year and ending on the last day of such quarter, all certified by an appropriate officer of the Company; and

(c)   at any time when the Company is required pursuant to applicable law, rule or regulation or the terms of any outstanding indenture or security to file reports under the Exchange Act, promptly after the same are filed, copies of all reports, statements and other documents filed with the Securities and Exchange Commission at which point Section 5.7(a) and (b) shall expire and no longer be binding upon the Company.

(d)   Notwithstanding the terms and conditions of Section 5.7(a), (b) and (c), as long as the Company or any Subsidiary of the Company files regular reports under the Securities Exchange Act of 1934, as amended, the delivery to the Purchaser of each Annual Report on Form 10-K and Quarterly Report on Form 10-Q filed with the SEC will satisfy the Company's obligations under this Section 5.7.

## ARTICLE VI

### MISCELLANEOUS

SECTION 6.1. *Option Shares; Recapitalizations, Exchanges, Etc. Affecting Shares; Adjustment of Cost.*

(a)   If, subsequent to the date hereof, any additional shares of Common Stock are issued to the Purchaser or any Permitted Transferee, including any shares of Common Stock issued pursuant to the exercise of any option (including options granted under the 2005 Stock Plan), warrant or other security convertible into or exercisable for shares of Common Stock, such shares of Common Stock will be deemed to be Shares for all purposes of Article V (and any applicable provisions of Article VI) of this Agreement.

(b)   The provisions of this Agreement shall apply to any and all shares of capital stock of the Company or any successor or assign of the Company that may be issued in respect of, in exchange for, or in substitution of, the Shares by reason of any stock dividend, stock split, stock issuance, reverse stock split, combination, recapitalization, reclassification, merger, consolidation or otherwise. Nothing herein shall prohibit or restrict the Company from taking any corporate action or engaging in any corporation transaction of any kind, including, without limitation, any merger, consolidation, liquidation or sale of assets.

(c)   In the event of any stock dividend, stock split, stock issuance, reverse stock split, combination, recapitalization, reclassification, merger, consolidation or similar event

14

as a result of which the Purchaser holds a lesser or greater number of Shares and/or other securities, the Cost shall be appropriately adjusted as determined in good faith by the Board.

SECTION 6.2. *Survival of Provisions; Termination.*   This Agreement will terminate upon the earliest to occur of (i) an Initial Public Offering and (ii) written consent of the Purchaser and the Company.   Upon such a termination, all rights and obligations under this Agreement will terminate, except the Purchaser's obligations under Section 5.3 with respect to lock-up arrangements in connection with an Initial Public Offering or any subsequent underwritten public offering.

SECTION 6.3. *Notices.*   All notices, demands and other communications provided for or permitted hereunder will be made in writing and will be by registered or certified first-class mail, return receipt requested, telecopier, courier services or personal delivery to the following addresses, or to such other addresses as will be designated from time to time by a party in accordance with this Section 6.3:

If to the Company:

GSI Holdings Corp.
c/o Charlesbank Capital Partners LLC
200 Clarendon Street, 54th Floor
Boston, Massachusetts 02216
Attention: General Counsel
Facsimile: (617) 619-5402

with a copy to:

Covington & Burling LLP
1330 Avenue of the Americas
New York, New York 10019
Attention: Scott F. Smith
Facsimile: (212) 841-1010

If to the Purchaser, to the address set forth below the Purchaser's signature below.

If to the Principal Stockholders:

Charlesbank Capital Partners LLC
200 Clarendon Street, 54th Floor
Boston, Massachusetts 02116
Attention: General Counsel
Facsimile: (617) 619-5402

with a copy to:

Covington & Burling LLP
1330 Avenue of the Americas

15

New York, New York 10019
Attention: Scott F. Smith
Facsimile: (212) 841-1010

or at such other address as the party to whom notice is to be given may have furnished to the other party in writing in accordance herewith. If such notice or communication is mailed, such communication shall be deemed to have been given on the fifth business day following the date on which such communication is posted.

SECTION 6.4. *Successors and Assigns.* This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns, including any Permitted Transferees. The provisions of Article V also will inure to the benefit of and be enforceable by the Principal Stockholders.

SECTION 6.5. *Amendment and Waiver.* (a) No failure or delay on the part of the Company or the Purchaser in exercising any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver of or consent to any departure by the Company or the Purchaser from any provision of this Agreement will be effective unless signed in writing by the party entitled to the benefit thereof; *provided* that notice of any such waiver will be given to each party hereto as set forth herein. Except as otherwise provided herein, no amendment, modification or termination of any provision of this Agreement will be effective unless signed in writing by or on behalf of the Company and the Purchaser.

(b)    Any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure by the Company or the Purchaser from the terms of any provision of this Agreement, will be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or the Purchaser in any case will entitle the Company or the Purchaser to any other or further notice or demand in similar or other circumstances.

SECTION 6.6. *Counterparts.* This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed will be deemed to be an original and all of which taken together will constitute one and the same agreement.

SECTION 6.7. *Headings.* The headings in this Agreement are for convenience of reference only and will not limit or otherwise affect the meaning hereof.

SECTION 6.8. *WAIVER OF JURY TRIAL.* EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

SECTION 6.9. *GOVERNING LAW.* THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE

STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE.

SECTION 6.10. *CONSENT TO JURISDICTION.* EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK OR ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF NEW YORK IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE SHARES OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

SECTION 6.11. *Severability.* If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof will not be in any way impaired, unless the provisions held invalid, illegal or unenforceable will substantially impair the benefits of the remaining provisions hereof.

SECTION 6.12. *Entire Agreement.* This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein. This Agreement supersedes all prior agreements and understandings among the parties with respect to such subject matter hereof.

SECTION 6.13. *Expenses.* Each party to this Agreement will each bear its or his or her own costs incurred in connection with the negotiation, execution and delivery and enforcement of this Agreement, including the fees and expenses of lawyers, financial advisors and accountants.

SECTION 6.14. *Certain Definitions and Rules of Interpretation.* Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "any" are not exclusive and "include" and "including" are not limiting; (iii) all currency is reflected in U.S. Dollars; (iv) a reference to any agreement or other contract includes permitted supplements and amendments; (v) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; (vi) a reference to a person includes its permitted successors and assigns; (vii) a reference to GAAP or generally accepted accounting principles refers to United States generally accepted accounting principles; and (viii) a reference in this Agreement to an Article, Section or Exhibit is to the Article, Section or Exhibit of this Agreement.

17

SECTION 6.15. *Remedies.* In the event of a breach by any party to this Agreement of its obligations under this Agreement, any party injured by such breach, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement. The parties agree that the provisions of this Agreement shall be specifically enforceable, it being agreed by the parties that the remedy at law, including monetary damages, for breach of any such provision, will be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is hereby waived.

SECTION 6.16. *Not an Employment Contract.* Nothing in this Agreement or any other instrument executed pursuant hereto shall confer upon the Purchaser any right to continue in the employ or service of the Company or any Subsidiary or Affiliate thereof or limit the right of the Company or any Subsidiary or Affiliate thereof to terminate the employment or service of the Purchaser at any time with or without cause.

SECTION 6.17. *Further Assurances.* Each party shall cooperate and take such action as may be reasonably requested by another party in order to carry out the provisions and purposes of this Agreement.

[Signature Page Follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

THE COMPANY:

GSI HOLDINGS CORP.

By: _____
Name:  William Branch
Title:    Chairman

[Signature Page To Stock Purchase and Management Equity Agreement]

PURCHASER:

Name:     Leonardo Segatt

Address:


Facsimile:

[Signature Page To Stock Purchase and Management Equity Agreement]

Accepted and agreed to for purposes of Sections 5.2, 5.4 and 5.5 only:

PRINCIPAL STOCKHOLDERS:

CHARLESBANK EQUITY FUND V, LIMITED PARTNERSHIP

By:  Charlesbank Equity Fund V GP,
       Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
       its General Partner

By: _____
Name:
      Title:
          Address: 200 Clarendon Street
                   54th Floor
                   Boston, MA 02216
                   Fax No.: (617) 619-5402


GB OFFSHORE EQUITY FUND V, L. P.

By:  Charlesbank Equity Fund V GP,
       Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
       its General Partner

By: _____
Name:
      Title:
          Address: 200 Clarendon Street
                   54th Floor
                   Boston, MA 02216
                   Fax No.: (617) 619-5402


[Signature Page To Stock Purchase and Management Equity Agreement]

CHARLESBANK EQUITY COINVESTMENT FUND V, LIMITED PARTNERSHIP

By:   Charlesbank Equity Fund V GP,
      Limited Partnership, its General Partner

By:   Charlesbank Capital Partners, LLC,
      its General Partner

By: _____
Name:
Title:
      Address: 200 Clarendon Street
      54th Floor
      Boston, MA 02216
      Fax No.: (617) 619-5402

CHARLESBANK COINVESTMENT PARTNERS, LIMITED PARTNERSHIP

By:   Charlesbank Capital Partners, LLC,
      its General Partner

By: _____
Name:
Title:
      Address: 200 Clarendon Street
      54th Floor
      Boston, MA 02210
      Fax No.: (617) 619-5402

[Signature Page To Stock Purchase and Management Equity Agreement]

SCHEDULE I

## Stockholders and Purchasers

| Stockholder or Purchaser | Number of Shares |
|---|---|
| Principal Stockholders | 486,250 |
| Investment funds not affiliated with the Principal Stockholders | 17,500 |
| Company executives and management (including board members not affiliated with the Principal Stockholders and excluding shares issuable upon exercise of options) | 56,206 |
| Other investors | 8,500 |
| Total | 568,456 |

EXHIBIT A

### Accredited Investor Questionnaire

**REGULATION D**
**QUALIFICATION STATEMENT**

The undersigned qualifies as an "accredited investor" pursuant to Regulation D under the Securities Act of 1933, as amended (the "1933 Act"), as a result of his, her or its status as (check the appropriate description(s)):

_____    1.    a natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1,000,000;

_____    2.    a natural person who had an individual income in excess of $200,000 in each of the two most recent years, or joint income with his or her spouse in excess of $300,000 in each of those years, and who reasonably expects an income of the same level in the current year;

_____    3.    a corporation or partnership with total assets in excess of $5,000,000 and not formed for the specific purpose of acquiring the securities offered;

_____    4.    a trust with total assets greater than $5,000,000 not formed for the purpose of acquiring the securities offered whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment;

_____    5.    an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if any of the following apply:

    (i)    the employee benefit plan has total assets in excess of $5,000,000;

    (ii)    the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser;

    (iii)    the plan is a self-directed plan in which the investment decisions are made solely by persons who are accredited investors. (Please put an "*" in the appropriate description(s) to indicate how the person(s) making investment decisions are "accredited"); or

_____    6.    an entity in which all of the equity owners are "accredited investors" under any one or more of the categories specified in subparagraphs 1 through 5 above.

Dated: _____, 2006

LEONARDO SEGATT _____

By: _____
Name:
Title (if applicable):

Exhibit D

Cat #5799 Mfg. by
JULIUS BLUMBERG, INC.
NYC 10013

## FIRST AMENDMENT OF SEPARATION AGREEMENT

THIS AGREEMENT OF AMENDMENT, dated December ___, 2006, by and among **AGROMARAU INDUSTRIA E COMERCIO LTDA.; THE GSI GROUP, INC; GSI HOLDINGS CORP, ASSUMPTION LEASING COMPANY, INC.;** and **LEONARDO SEGATT,** constitutes the first amendment to that certain Separation Agreement among the parties hereto and dated November 13, 2006 (the "Agreement"), all pursuant to Section 12 of the Agreement.

1. Section 2 of the Agreement is amended as follows:

   2. Agromarau will pay Segatt dividends on his equity capital, which will be in a total amount of $3,161,629 (Brazilian Reals).

2. Section 3 of the Agreement is amended as follows:

   3. Agromarau will redeem 2,005,868 quotas from Segatt as a capital refund in exchange of $2,005,868 (Brazilian Reals).

3. Section 5 of the agreement is amended as follows:

   5. Within three business days following receipt of the the capital refund by Segatt, he shall have the option to reinvest a portion of that amount or dividends he received in 3,072 shares of Holdings at a purchase price of $150 (U.S.) per share payable to Holdings by wire transfer and provided Segatt signs the investor documents required by Holdings for all of its investors.

4. Section 7 of the Agreement is amended only to eliminate the reference to the exchange contemplated by Section 5 because of the above amendment of Section 5.

5. In all other respects the Agreement is unchanged.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement of Amendment as of the date and year first above written.

WITNESS:                                          AGROMARAU INDUSTRIA E COMERCIO LTDA.

Name: _____

#8210684 v)

SERVIÇOS NOTARIAIS DE REGISTROS E ESPECIAIS
Camargo - RS
AUTENTICAÇÃO
Autentico a presente cópia reprográfica, conforme
o original a mim apresentada do que dou fé
Camargo - RS, ___ de _____ de ____

Bel. Ermelinda Zita Block - Oficial
Débora K. Block Trampusch - Ajudante Subst.

Title: _____

Name: _____
Title: _____

WITNESS:                                THE GSI GROUP, INC.

Name: _____                   By: _____
Title: _____                  Name: _____
                                        Title: _____

WITNESS:                                GSI HOLDINGS CORP.

Name: _____                   By: _____
Title: _____                  Name: _____
                                        Title: _____

WITNESS:                                ASSUMPTION LEASING COMPANY, INC.

Name: _____                   By: _____
Title: _____                  Name: _____
                                        Title: _____

WITNESS:                                LEONARDO SEGATT

Name: _____                   By: _____
Title: _____                  Name: _____
                                        Title: _____

SERVICOS NOTARIAIS DE REGISTROS E ESPECIAIS
Camargo - RS
AUTENTICAÇÃO
Autentico a presente cópia reprográfica, conforme
o original a mim apresentada do que dou fé.
Camargo - RS, __ de _____ de ____

☐ Bel. Ermelinda Zita Block - Oficial
☑ Débora K. Block Trampusch - Ajudante Subst.

#8210684 v1

Exhibit E

## SECOND AMENDMENT OF SEPARATION AGREEMENT

THIS AGREEMENT OF AMENDMENT, dated may 04, 2007, by and among AGROIMARAU INDUSTRIA E COMERICO LTDA.; THE GSI GROUP, INC; GSI HOLDINGS CORP ("Holdings"); ASSUMPTION LEASING COMPANY, INC.; and LEONARDO SEGATT ("Segatt"), constitutes the second amendment to that certain Separation Agreement among the parties hereto and dated November 13, 2006 (the "Agreement"), as amended by the First Amendment of that Agreement among the parties here to December, 28, 2006 (the "First Amendment"), all pursuant to Section 12 of the Agreement.

1. The parties have mutually agreed to, and hereby do, revoke Section 5 of the Agreement.

2. The parties have mutually determined that Segatt will not invest in any shares of Holdings, and in furtherance thereof, the Stock Purchase and Management Equity Agreement between Holdings and Segatt dated as of December 28, 2006, as amended by Amendment No. 1 thereto, dated December 28, 2006, between Holdings and Segatt (the "Purchase Agreement"), together with any other documents or agreements entered into between them pursuant to such Purchase Agreement, including but not limited to the joinder by Segatt to the October 2005 Registration Rights Agreement, dated as of October 6, 2005, by and among Holdings and the parties named therein, are hereby declared null, void, cancelled and without legal effect, and as if they have never been entered into; and the $ 460,800. (U.S.) which Segatt has deposited with Holdings pursuant to the First Amendment and the Purchase Agreement will forthwith be promptly returned to Segatt in U.S. currency.Segatt hereby agrees and authorizes the Company to cancel stock certificate number 48, representing 3,072 shares of the Company.

3. In all other respects the Agreement and the First Amendment are unchanged and remain in full force and effect and are hereby ratified and confirmed as amended.

4.   This Agreement of Amendment may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other parties.
Section 1 hereto, relating to the Agreement, shall be governed by and construed in accordance with the laws of Republica Federative do Brasil.
SECTION 2 HERETO, RELATING TO THE PURCHASE AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO

Errul Nome de propriedade do documento desconhecida.

AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT

REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement of Amendment as of the date and year first above written.

WITNESS:

Name:
Title:

AGROMARAU INDUSTRIA E COMERCIO LTDA.

TRENTIN ⟹ By:
Name:
Title:

WITNESS:

Name:
Title:

THE GSI GROUP, INC.

By:
Name:
Title:

WITNESS:

Name:
Title:

GSI HOLDINGS CORP.

By:
Name:
Title:

WITNESS:

Name:
Title:

ASSUMPTION LEASING COMPANY, INC.

By:
Name:
Title:

WITNESS:

Name:
Title:

LEONARDO SEGATT

TRENTIN ⟹ By:
Name:
Title:

TABELIONATO DE NOTAS – TRENTIN
Av. Júlio Borella, 894 - Marau/RS
RECONHEÇO a(s) firma(s)

*Jorge Erdecht e Leonardo Segatt.*

por semelhança com a(s) existente(s) no Arquivo deste Tabelionato.
Marau (RS) 24 de 200 de 200
Em testemunho da verdade

☒ Bel. Nelci Maria Trentin Pilatti -Tabeliã
☐ Heldér Abrahão Trentin - Substituto
☐ Francisco Scandolara - Substituto
☐ Fabiana Bergamini Trentin - Substituta
☐ Matheus Trentin Silveira - Substituto
☐ Gentil Trentin - Substituto = Emolumento R$6,80

Selo 0364.01. 07.00002. 00 270
Selo 0364.01. 07.00002. 06 281

Entwil Nome de propriedade do documento desconhecido.

State of Illinois
County of Christian

I, Jack L. Lewellyn do hereby certify that William J. Branch, Chairman of The GSI Group, Inc., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this _11_ day of _May_____, 2007.

OFFICIAL SEAL
JACK L LEWELLYN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/29/08

Erro! Nome de propriedade do documento desconhecido.

State of Illinois
County of Christian

I, Jack L. Lewellyn do hereby certify that William J. Branch, Chairman and Director of GSI Holdings Corp., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this __11__ day of __May__, 2007.

*Jack L. Lewellyn*

OFFICIAL SEAL
JACK L LEWELLYN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/29/08

Erral Nome de propriedade do documento desconhecido.

State of Illinois
County of Christian

I, Jack L. Lewellyn do hereby certify that William J. Branch for Assumption Leasing Company, Inc., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this __11__ day of ___May___, 2007.

_Jack L. Lewellyn_

```
OFFICIAL SEAL
JACK L LEWELLYN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/29/08
```

Errol Nome de propriedade do documento desconhecido.

STATE OF ILLINOIS              )

Christian County,              )

I, ~~Linda K Curtin~~, County Clerk in and for said County, do hereby certify that Jack L. Lewellyn is a Notary in said county, duly commissioned and sworn, and whose acts as such are entitled to credit; that his commission bears date of August 29 A.D., 2004 and will expire August 29 A.D., 2008.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court at Taylorville, in said County, this 29 day of MARCH A.D. 2006.

~~Linda K Curtin~~
County Clerk

#8210684 v1

State of Rio Grande do Sul, Brasil

I, _Neli Maria Trentin Pilatt_ do hereby certify that _Ivano Erhardt_, _____ of Agromarau Industria e Comercio Ltda., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this _04_ day of _Maio_, 2007.

_Neli M Trentin Pilatt_

TAEBLIONATO DE NOTAS E REGISTRO
CIVIL DAS PESSOAS NATURAIS
Nelci Maria Trentin Pilatti  Titular
Helder Abrahão Trentin   Substituto
Francisco Scandolara   Substituto
Fabiana Bergamini Trentin   Substituta
Matheus Trentin Silveira   Substituto
Genir Trentin   Substituto
Av. Júlio Borella, 894
CEP: 99-150-000 - MARAU - RS

Erro! Nome de propriedade do documento desconhecido.

State of Rio Grande do Sul, Brasil

I, *Adelei Maria Trentin Pilatti* do hereby certify that Leonardo Segatt, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his voluntary act, for the uses and purposes, therein set forth.

Given under my hand and official seal, this ___04___ day of ___Maio___, 2007.

*Adelei Maria Trentin Pilatti*

TABELIONATO DE NOTAS E REGISTRO
CIVIL DAS PESSOAS NATURAIS
Neloi Maria Trentin Pilatti   Titular
Helder Abrahão Trentin        Substituto
Francisco Scandolara          Substituto
Fabiana Bergamini Trentin     Substituta
Matheus Trentin Silveira      Substituto
Genti Trentin   Substituto
Av. Júlio Borella, 894
CEP: 99-150-000 - MARAU - RS

Errol Nome de propriedade do documento desconhecido.

Exhibit F

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

CB/GSI HOLDINGS, INC.,

CHARLESBANK EQUITY FUND V, LIMITED PARTNERSHIP,
AS PRINCIPAL STOCKHOLDER,

CHARLESBANK CAPITAL PARTNERS, LLC,
AS STOCKHOLDERS' REPRESENTATIVE,

AND

GSI HOLDINGS CORP.

Dated as of June 22, 2007

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

ARTICLE I  THE MERGER ................................................................................................... 2

SECTION 1.1    The Merger.................................................................................................. 2

SECTION 1.2    Effective Time; Closing Date ................................................................... 2

SECTION 1.3    Effect of the Merger.................................................................................... 2

SECTION 1.4    Certificate of Incorporation; Bylaws......................................................... 2

SECTION 1.5    Board of Directors and Officers................................................................. 3

SECTION 1.6    Further Assurances...................................................................................... 3

ARTICLE II  EFFECTS OF THE MERGER; CONSIDERATION ......................................... 3

SECTION 2.1    Conversion of Buyer and Company Securities .......................................... 3

SECTION 2.2    Estimated Merger Consideration ............................................................... 5

SECTION 2.3    Adjustment Amount.................................................................................... 5

SECTION 2.4    Exchange Procedures .................................................................................. 8

SECTION 2.5    Payments at Closing.................................................................................. 10

SECTION 2.6    Payment Annexes; Capital Structure Certificate ..................................... 10

SECTION 2.7    Dissenting Shares...................................................................................... 11

SECTION 2.8    Contingent Consideration ......................................................................... 11

SECTION 2.9    Withholding .............................................................................................. 14

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF THE COMPANY ................. 14

SECTION 3.1    Organization, Standing and Power............................................................ 15

SECTION 3.2    Authority; Approvals ................................................................................ 15

SECTION 3.3    Capitalization; Equity Interests; Holding Company Structure ................ 16

SECTION 3.4    Conflicts; Consents ................................................................................... 17

SECTION 3.5    Financial Information and SEC Reports; Undisclosed Liabilities ........... 17

SECTION 3.6    Absence of Changes.................................................................................. 19

SECTION 3.7    Assets and Properties ............................................................................... 21

SECTION 3.8    Other Agreements ..................................................................................... 22

SECTION 3.9    Environmental Matters.............................................................................. 23

i

SECTION 3.10  Litigation ........................................................................................... 23
SECTION 3.11  Compliance; Licenses and Permits ........................................................ 23
SECTION 3.12  Intellectual Property ............................................................................. 24
SECTION 3.13  Tax Matters ......................................................................................... 24
SECTION 3.14  Labor Relations; Employees. ............................................................... 26
SECTION 3.15  Transactions with Related Parties ......................................................... 28
SECTION 3.16  Brokers ............................................................................................... 29
SECTION 3.17  Insurance ............................................................................................ 29
SECTION 3.18  Product Liability .................................................................................. 29
ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF BUYER ...................................... 29
SECTION 4.1  Organization; Power and Authority ....................................................... 29
SECTION 4.2  Authority; Approvals ............................................................................ 30
SECTION 4.3  Conflicts; Consents .............................................................................. 30
SECTION 4.4  Investment Representation ..................................................................... 30
SECTION 4.5  Brokers ............................................................................................... 31
SECTION 4.6  Litigation ............................................................................................ 31
SECTION 4.7  Funds .................................................................................................. 31
SECTION 4.8  Guaranty .............................................................................................. 31
SECTION 4.9  Operations of Buyer ............................................................................. 31
ARTICLE V  REPRESENTATIONS AND WARRANTIES OF THE PRINCIPAL STOCKHOLDER ............. 32
SECTION 5.1  Authority; Binding Agreement .............................................................. 32
SECTION 5.2  Title to Shares ..................................................................................... 32
ARTICLE VI  CERTAIN COVENANTS ............................................................................ 32
SECTION 6.1  Conduct of Business ............................................................................. 32
SECTION 6.2  Access and Information; Confidentiality ................................................. 33
SECTION 6.3  Approval of the Stockholders of the Company ........................................ 34
SECTION 6.4  Reasonable Efforts; Further Assurances ................................................. 34
SECTION 6.5  Public Announcements .......................................................................... 35
SECTION 6.6  Indemnification of Directors and Officers ............................................... 35
SECTION 6.7  Section 280G ....................................................................................... 36
SECTION 6.8  Expenses ............................................................................................. 36
SECTION 6.9  Continuity of Employees and Employee Benefits .................................... 36
SECTION 6.10  Supplemental Information ..................................................................... 37

SECTION 6.11    Tax Matters ........................................................................... 37

SECTION 6.12    Debt Tender Offer and Consent Solicitation............................... 39

SECTION 6.13    Repayment of Senior Indebtedness........................................... 41

SECTION 6.13    Repayment of Senior Indebtedness........................................... 41

SECTION 6.14    Financing.................................................................................. 41

SECTION 6.15    No Solicitation of Transactions................................................. 43

SECTION 6.16    Stockholders Agreement; Tag-Along Rights ............................. 43

SECTION 6.17    Termination of Agreements with Equity Holders........................ 44

SECTION 6.18    Environmental Matters............................................................. 44

SECTION 6.19    Authorized Capital Stock ......................................................... 44

ARTICLE VII  CONDITIONS PRECEDENT ...................................................... 45

SECTION 7.1    Conditions Precedent to Obligations of Each Party.................... 45

SECTION 7.2    Conditions Precedent to Obligations of Buyer ........................... 45

SECTION 7.3    Conditions Precedent to Obligations of the Company and the
Principal Stockholder................................................................ 46

ARTICLE VIII  ESCROW; STOCKHOLDERS' REPRESENTATIVE ..................... 47

SECTION 8.1    Escrow Amount........................................................................ 47

SECTION 8.2    Stockholders' Representative.................................................... 47

SECTION 8.3    Disbursements from the Escrow Account; Adjustment Amount;
Payments to Option Holders .................................................... 50

ARTICLE IX  TERMINATION .......................................................................... 51

SECTION 9.1    Termination by Mutual Consent ................................................ 51

SECTION 9.2    Termination by Either Buyer or the Company............................. 51

SECTION 9.3    Termination by the Company .................................................... 51

SECTION 9.4    Termination by Buyer ............................................................... 52

SECTION 9.5    Effect of Termination and Abandonment .................................... 52

SECTION 9.6    Termination Fees...................................................................... 52

ARTICLE X  MISCELLANEOUS ...................................................................... 54

SECTION 10.1    Entire Agreement ................................................................... 54

SECTION 10.2    Assignment and Binding Effect ............................................... 54

SECTION 10.3    Notices ................................................................................... 55

SECTION 10.4    Amendment and Modification .................................................. 56

SECTION 10.5    Governing Law; Jurisdiction.................................................... 56

SECTION 10.6    Waiver of Jury Trial.................................................................................... 56

SECTION 10.7    Severability ................................................................................................ 56

SECTION 10.8    Counterparts ............................................................................................... 56

SECTION 10.9    Enforcement................................................................................................ 56

SECTION 10.10  Non-Survival of Representations, Warranties and Agreements; No
Recourse...................................................................................................... 57

SECTION 10.11  No Other Representations and Warranties................................................. 57

SECTION 10.12  Damages.................................................................................................... 57

SECTION 10.13  Disclosure Schedule................................................................................. 58

SECTION 10.14  Waiver of Conflicts Regarding Representation; Non-Assertion of
Attorney-Client Privilege........................................................................... 59

SECTION 10.15  No Third Party Beneficiaries ................................................................... 59

ARTICLE XI  DEFINED TERMS; INTERPRETATION........................................................................ 60

SECTION 11.1    Defined Terms............................................................................................ 60

SECTION 11.2    Interpretation.............................................................................................. 68

EXHIBITS

Exhibit A      Form of Option Acknowledgement

Exhibit B      Form of Written Consent of the Principal Stockholder

Exhibit C      Form of Escrow Agreement

ANNEXES

Annex 1        Calculation of Closing Net Working Capital

Annex 2        Form of Closing Net Indebtedness Annex

Annex 3        Form of Transaction Expenses Annex

SCHEDULES

Schedule 2.8   Indemnifiable Claims

Schedule 6.1   Conduct of Business

Schedule 6.12  Terms of Debt Tender Offer

-iv-

*Schedule 6.16(a)*    Stockholders Agreement

*Schedule 7.1(d)(i)*    Foreign Competition Law Approvals

*Schedule 9.6*    Buyer Termination Fee

*Schedule 10.12*    Damages Cap

*Schedule 11.1(a)*    Knowledge of the Company

DISCLOSURE SCHEDULE

INDEX OF DEFINED TERMS

*2005 Stock Purchase Agreement* .............. 70
*Adjusted Proceeds Amount* ...................... 55
*Adjustment Amount* ..................................... 8
*Affiliate* ..................................................... 62
*Agreement* ................................................... 1
*Alternative Transaction* ...................... 44, 55
*Amendments* ............................................. 40
*Arbitrator* ................................................. 13
*Business Day* ............................................. 62
*Buyer* ........................................................... 1
*Buyer Equity Fraction* ............................... 62
*Buyer Exchange Ratio* ............................... 62
*Buyer Material Adverse Effect* ................. 62
*Buyer Termination Fee* ............................. 54
*Capital Structure Certificate* ................... 62
*Cash and Cash Equivalents* ...................... 62
*Certificate of Merger* ................................. 2
*Certificates* ................................................. 9
*Charlesbank Rollover Amount* ................... 1
*Charlesbank Rollover Parties* ................... 1
*Charlesbank Rollover Shares* ................... 63
*Closing* .........................................................
*Closing Balance Sheet* .............................. 63
*Closing Date* ............................................... 2
*Closing Net Indebtedness* .......................... 63
*Closing Net Indebtedness Annex* .............. 11
*Closing Net Working Capital* .................... 63
*COBRA* ....................................................... 38
*Code* ........................................................... 63
*Common Stock* ........................................... 63
*Company* ..................................................... 1
*Company Material Adverse Effect* ............ 63
*Competition Laws* ...................................... 18

*Confidentiality Agreement* ........................ 64
*Contingent Consideration* ........................ 12
*Contingent Consideration Notice* ............. 12
*Contingent Consideration Notice of*
    *Objection* ................................................ 13
*Control* ....................................................... 64
*Current Assets* ........................................... 64
*Current Liabilities* ..................................... 64
*Current Representation* ............................. 61
*Debt Commitment Letter* ........................... 32
*Debt Financing* .......................................... 32
*Debt Receipt Failure* ................................. 54
*Debt Tender Offer* ...................................... 40
*Defeasance Costs* ...................................... 64
*Designated Person* ..................................... 61
*Determination Date* ..................................... 7
*DGCL* ........................................................... 1
*Disclosure Schedule* .................................. 15
*Disputed Items* ............................................. 6
*Dissenters' Rights Notice* ......................... 35
*Dissenting Shares* ...................................... 11
*Effective Time* .............................................. 2
*Enterprise Value* ........................................ 64
*Environmental Laws* .................................. 64
*Equity Commitment Letter* ........................ 32
*Equity Sponsor* ........................................... 32
*Equity Sponsor Contribution* .................... 64
*ERISA* ......................................................... 65
*ERISA Affiliate* .......................................... 65
*Escrow Account* .......................................... 65
*Escrow Agent* .............................................. 65
*Escrow Agreement* ...................................... 65
*Escrow Amount* ........................................... 65

Escrow Shortfall Amount .............................. 9
Escrow Surplus Amount ............................... 8
Estimated Merger Consideration.............. 65
Estimated Per Share Merger
    Consideration.......................................... 65
Exchange Act ........................................... 18
Existing Registration Agreement ............ 65
Existing Stockholders Agreement ............. 66
Final Merger Consideration ..................... 66
Financing ................................................ 32
Fully Diluted Equivalent Amount ............. 66
GAAP ...................................................... 66
Governmental Entity ................................ 66
GSI Group ............................................... 66
GSI Group Financials .............................. 66
Guaranty ................................................... 1
Hazardous Substances ............................. 66
HSR Act................................................... 18
Indebtedness............................................ 66
Independent Accountant............................. 7
Intellectual Property ................................ 67
knowledge of the Company ...................... 67
Laws ....................................................... 67
Letter of Transmittal ............................... 67
Lien ......................................................... 67
Management Rollover Amount ................... 1
Management Rollover Parties .................... 1
Management Rollover Shares ................... 68
Merger...................................................... 1
Notice of Objection ................................... 6
Offer Documents ..................................... 41
Option Acknowledgment ............................ 5
Option Cancellation Payment................... 68
Option Holder ......................................... 68
Option Plan............................................. 68
Options.................................................... 68
Paying Agent ........................................... 68
Per Share Adjustment Amount.................. 68
Per Share Contingent Consideration........ 68
Per Share Escrow Surplus Amount........... 68
Per Share Special Tax Deduction
    Benefit Amount....................................... 68

Person ..................................................... 68
Plan......................................................... 27
Post-Closing Representation .................... 61
Principal Stockholder ................................ 1
Principal Stockholder Shares ................... 33
Proceedings............................................. 24
Qualifying Transaction ............................ 55
Real Property .......................................... 22
Representative Section 2.3 Expenses .......... 7
Representative Section 2.8 Expenses ........ 14
Representatives ......................................... 6
Requisite Consent.................................... 40
Rollover Amount ...................................... 68
Rollover Shares ....................................... 69
Schedules................................................. 15
SEC ........................................................ 15
SEC Reports ........................................... 18
Securities Act .......................................... 69
Senior Notes ........................................... 69
Senior Notes Indenture ........................... 69
Shares..................................................... 69
Special Tax Deduction Benefit................. 39
Special Tax Deduction Items ................... 69
Stockholder ............................................. 69
Stockholders' Representative...................... 1
Subsidiary ............................................... 69
Sukup Litigation ...................................... 12
Sukup Litigation Expenses ...................... 12
Surviving Corporation ............................... 2
Tag-Along Shares..................................... 45
Target Net Working Capital...................... 69
Tax........................................................... 69
Tax Return............................................... 70
Third Party .............................................. 56
Threshold Amount .................................... 56
to the Company's knowledge ................... 67
Transaction Expenses .............................. 70
Transaction Expenses Annex ................... 11
Transfer Taxes ........................................ 38
Wachovia Credit Agreement .................... 70
Written Consent ....................................... 35

AGREEMENT AND PLAN OF MERGER (this "*Agreement*"), dated as of June 22, 2007, by and among CB/GSI HOLDINGS, INC., a Delaware corporation ("*Buyer*"), Charlesbank Equity Fund V, Limited Partnership, a Delaware limited partnership ("*Principal Stockholder*"), Charlesbank Capital Partners, LLC, a Delaware limited liability company, solely in its capacity as representative of the holders of the Company's capital stock ("*Stockholders' Representative*"), and GSI Holdings Corp., a Delaware corporation (the "*Company*").

## INTRODUCTION

The respective Boards of Directors of each of Buyer and the Company have unanimously (i) approved, and declared advisable and in the best interests of Buyer and the Company and their respective stockholders, the merger of Buyer with and into the Company (the "*Merger*") in accordance with the provisions of the Delaware General Corporation Law, as amended (the "*DGCL*"), and subject to the terms and conditions of this Agreement and (ii) approved this Agreement.

As an inducement for the Company to enter into this Agreement, Centerbridge Capital Partners, L.P., the sole stockholder of Buyer, has, on the date hereof, executed and delivered to the Company a guaranty (the "*Guaranty*") of the obligations of Buyer hereunder.

Principal Stockholder and the other investment funds that are managed by Charlesbank Capital Partners, LLC that hold shares of Common Stock (the "*Charlesbank Rollover Parties*") have agreed in connection with the Merger to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) shares of Common Stock having a value (based on the Estimated Per Share Merger Consideration) equal to $30,000,000, subject to reduction pursuant to Section 6.16 (the "*Charlesbank Rollover Amount*").

Certain members of the Company's management (such Persons, together with any additional members of the Company's management that enter into agreements with the Buyer in connection with the Merger to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) shares of Common Stock, the "*Management Rollover Parties*") have each agreed in connection with the Merger to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) shares of Common Stock having a value based on the Estimated Per Share Merger Consideration (the aggregate value agreed to be rolled over by the Management Parties, the "*Management Rollover Amount*").

Certain capitalized terms have the meanings set forth in Section 11.1.

In consideration of the mutual representations, warranties, covenants and other agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

06/22/2007 1:33 PM

# ARTICLE I

## THE MERGER

SECTION 1.1.    The Merger.  At the Effective Time, subject to the terms and conditions of this Agreement and in accordance with the DGCL, (i) Buyer shall be merged with and into the Company, (ii) the separate corporate existence of Buyer shall cease and (iii) the Company shall be the surviving corporation (the "*Surviving Corporation*") and shall continue its legal existence under the DGCL.

SECTION 1.2    Effective Time; Closing Date.  Subject to the terms and conditions of this Agreement, the Company and Buyer shall cause the Merger to be consummated by filing a certificate of merger with the Secretary of State of the State of Delaware (the "*Certificate of Merger*") and all other filings or recordings required by the DGCL in connection with the Merger.  The Merger shall become effective at such time as the Certificate of Merger is duly filed in accordance with the provisions of Section 251 of the DGCL, or at such later time as may be stated in the Certificate of Merger (the "*Effective Time*"). The closing of the Merger (the "*Closing*") shall take place at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York, two Business Days after the date on which the last of the conditions set forth in Article VII shall have been satisfied or waived (other than any such conditions that by their terms or nature cannot be satisfied until the Closing Date, which shall be satisfied or (to the extent permitted by applicable Law) waived on the Closing Date), or on such other date, time and place as the Company and Buyer may mutually agree; *provided, however*, that notwithstanding the satisfaction or waiver of the conditions set forth in Article VII: (i)  the Company and the Buyer shall not be required to effect the Closing prior to July 15, 2007; (ii) subject to the following clause (iii); Buyer shall use commercially reasonable efforts to effect the Closing no later than August 1, 2007; and (iii) notwithstanding Buyer's obligation in the preceding clause (ii), Buyer may defer the Closing until a date no later than August 17, 2007 to the extent Buyer in its sole discretion deems such deferral to be reasonably necessary in order to obtain Debt Financing on an optimal basis.  The date upon which the Closing actually occurs is referred to herein as the "*Closing Date*".

SECTION 1.3    Effect of the Merger.  At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of the DGCL.  Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, powers, franchises and assets of the Company and Buyer shall vest in the Surviving Corporation, and all debts, liabilities, obligations and duties of the Company and Buyer shall become the debts, liabilities, obligations and duties of the Surviving Corporation.

SECTION 1.4    Certificate of Incorporation; Bylaws.  (a) The certificate of incorporation of the Company, as in effect immediately prior to the Effective Time, shall be the certificate of incorporation of the Surviving Corporation until thereafter amended as provided by Law and such certificate of incorporation.

(b)    The by-laws of Buyer, as in effect immediately prior to the Effective Time, shall be the by-laws of the Surviving Corporation, until thereafter amended as provided by Law and such by-laws.

SECTION 1.5    Board of Directors and Officers.  The Board of Directors and officers of Buyer immediately prior to the Effective Time shall, from and after the Effective Time, be the Board of Directors and officers, respectively, of the Surviving Corporation, each to hold office until his or her respective successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of incorporation and by-laws of the Surviving Corporation.

SECTION 1.6    Further Assurances.  If at any time after the Effective Time the Surviving Corporation shall consider or be advised that any deeds, bills of sale, assignments or assurances or any other acts or things are necessary, desirable or proper (a) to vest, perfect or confirm, of record or otherwise, in the Surviving Corporation, its right, title or interest in, to or under any of the properties, rights, privileges, powers, franchises or assets of either the Company or Buyer or (b) otherwise to carry out the purposes of this Agreement, the Surviving Corporation and its proper officers and directors or their designees shall be authorized to execute and deliver, in the name and on behalf of the Company or Buyer, all such deeds, bills of sale, assignments and assurances and do, in the name and on behalf of the Company or Buyer, all such other acts and things necessary, desirable or proper to vest, perfect or confirm its right, title or interest in, to or under any of the properties, rights, privileges, powers, franchises or assets of the Company or Buyer, as applicable, and otherwise to carry out the purposes of this Agreement.

## ARTICLE II

### EFFECTS OF THE MERGER; CONSIDERATION

SECTION 2.1    Conversion of Buyer and Company Securities.  (a)  At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Buyer, the Stockholders or the Option Holders, each share of common stock of Buyer issued and outstanding immediately prior to the Effective Time shall be converted into and become a fraction of a validly issued, fully paid and nonassessable share of common stock of the Surviving Corporation equal to the Buyer Exchange Ratio.

(b)    At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Buyer, the Stockholders or the Option Holders, each Share that is owned by (i) the Company as treasury stock, (ii) Buyer or (iii) any wholly-owned Subsidiary of Buyer shall be canceled without any conversion thereof and no payment or distribution shall be made with respect thereto.  Each Share that is owned by any wholly-owned Subsidiary of the Company shall remain outstanding and such Subsidiaries shall not receive any Estimated Per Share Merger Consideration.

(c)    Except as otherwise provided in Section 2.1(b) or as otherwise agreed in writing by Buyer and the applicable holder of Shares and subject to Section 2.7, at the Effective Time, by virtue of the Merger and without any action on the part of the Company, Buyer, the Stockholders or the Option Holders, each Share outstanding immediately prior to the Effective Time (other than the Rollover Shares) shall be converted into the right to receive (i) from the Surviving Corporation promptly following the Effective Time, a sum in cash equal to the Estimated Per Share Merger Consideration and (ii) when, as and if any of the following become payable pursuant to the terms of this Agreement: (A) from the Surviving Corporation a sum in

-3-

cash equal to the Per Share Adjustment Amount, which amount will be paid in accordance with Section 8.3; (B) the Per Share Escrow Surplus Amount, which amount will be paid in accordance with Section 8.3; (C) a sum in cash equal to the Per Share Special Tax Deduction Benefit Amount, which amount shall be paid in accordance with Section 6.11(c); and (D) from the Surviving Corporation a sum in cash equal to the Per Share Contingent Consideration, which amount will be paid in accordance with Section 2.8. Each Rollover Share shall not be converted into the right to receive the amount referred to in clause (i) of the preceding sentence, shall remain outstanding following the Effective Time, and shall be entitled to receive the amounts referred to in clause (ii) of the preceding sentence as if such Rollover Share had been converted into the right to receive the merger consideration payable hereunder pursuant to this Section 2.1(c).

(d)    At the Effective Time, by virtue of the Merger and without any action on the part of the Company, each Option issued and outstanding immediately prior to the Effective Time shall vest to the extent provided in Section 3 of the applicable stock option agreement. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, each issued and outstanding Option that is vested at the Effective Time shall be converted into the right to receive (i) from the Surviving Corporation promptly following the Effective Time, a sum in cash (less any applicable withholding taxes and without interest) equal to the Option Cancellation Payment applicable to such Options and (ii) when, as and if any of the following become payable pursuant to the terms of this Agreement: (A) from the Surviving Corporation a sum in cash (less any applicable withholding taxes and without interest) equal to the Per Share Adjustment Amount multiplied by the number of shares of Common Stock subject to such Option, which amount will be paid in accordance with Section 8.3; (B) a sum in cash (less any applicable withholding taxes and without interest) equal to the Per Share Escrow Surplus Amount multiplied by the number of shares of Common Stock subject to such Option, which amount will be paid in accordance with Section 8.3; (C) a sum in cash equal to the Per Share Special Tax Deduction Benefit Amount, which amount shall be paid in accordance with Section 6.11(c); and (D) from the Surviving Corporation a sum in cash (less any applicable withholding taxes and without interest) equal to the Per Share Contingent Consideration multiplied by the number of shares of Common Stock subject to such Option, which amount will be paid in accordance with Section 2.8. Any payments made pursuant to this Section 2.1(d) shall be net of all applicable withholding and excise taxes. The portion of any Option that is not vested at the Effective Time, or that does not vest at the Effective Time in accordance with Section 3 of the applicable stock option agreement, shall be forfeited and cancelled at the Effective Time without the payment of any consideration therefor. As of the Effective Time, the Option Plan and each stock option agreement entered into by the Company shall terminate and all rights under any provision of any other plan, program or arrangement of the Company or any Subsidiary of the Company providing for the issuance or grant of any other interest in respect of the capital stock of the Company or any Subsidiary of the Company shall be cancelled. The Company shall take such actions or cause such actions to be taken as are necessary to cause the transactions contemplated by Section 2.1(d)-(f) to be accomplished.

(e)    The Company shall prepare and deliver on or prior to the Closing Date an acknowledgment to each Option Holder, substantially in the form of Exhibit A (each an "*Option Acknowledgment*"), which (i) acknowledges that each of such Option Holder's outstanding Options will be cancelled and surrendered at the Effective Time in exchange for the right to

-4-

receive, in respect of each Option that is vested at the Effective Time, the payments described in Section 2.1(d), and (ii) confirms the appointment of Stockholders' Representative as his, her or its agent, pursuant to the terms of Section 8.2.

(f)    After the Effective Time all capital stock of the Company, and any options relating thereto, shall no longer be outstanding and shall automatically be canceled and retired, or converted in accordance with this Section 2.1, as the case may be, and each holder of a certificate representing any such shares or options shall cease to have any rights with respect thereto, other than the right to receive the consideration provided herein.    The Company shall use its commercially reasonable efforts to take all actions necessary to effectuate the foregoing.

(g)    In calculating the consideration payable under this Section 2.1, Buyer shall be entitled to rely on the representations and warranties contained in Section 3.3 and the Capital Structure Certificate. If such representations and warranties and certificate are not correct, Buyer shall have the right to adjust the Per Share Adjustment Amount accordingly.

SECTION 2.2    Estimated Merger Consideration.  At least three Business Days prior to the Closing Date and giving effect to Section 2.6, the Company shall deliver to Buyer a statement setting forth its calculation (including reasonable supporting detail) of the Estimated Merger Consideration, including each component part thereof, and the Estimated Per Share Merger Consideration.  Such estimates shall be determined by the Company in good faith in accordance with this Agreement, including *Annexes 1, 2, and 3* attached hereto.

SECTION 2.3    Adjustment Amount.  (a)  As soon as reasonably practicable following the Closing Date, and in any event within 60 days thereafter, the Surviving Corporation shall cause to be prepared and delivered to Stockholders' Representative its calculation of the Final Merger Consideration and each component part thereof, including reasonable supporting detail, prepared in good faith and in accordance with GAAP and this Agreement including *Annexes 1, 2 and 3*.  Closing Net Working Capital will be determined in accordance *Annex 1*, using the same accounting principles, practices, methodologies and policies as were used in the preparation of the GSI Group Financials, and shall not include any changes in assets or liabilities as a result of purchase accounting adjustments or other changes arising from or resulting as a consequence of the transactions contemplated hereby, except as otherwise described in *Annex 1*. The parties hereto acknowledge and agree that (i) the sole purpose of the determination of the Closing Net Working Capital is to determine the amount, if any, of the difference between Closing Net Working Capital and Target Net Working Capital and (ii) such difference can be measured only if the calculation is done using the same accounting principles, practices, methodologies, and policies used in the preparation of the GSI Group Financials, except as set forth on *Annex 1*.

(b)    Following the Closing, the Surviving Corporation shall not take any action with respect to the accounting books, records, policies or procedures of GSI Group and its Subsidiaries on which the Closing Balance Sheet and statement of Closing Net Working Capital is to be based that would affect the Closing Balance Sheet or statement of Closing Net Working Capital or would impede or delay the preparation of the Closing Balance Sheet or the determination of the Closing Net Working Capital in the manner and utilizing the methods required by this Agreement.  Without limiting the generality of the foregoing, no changes shall

be made in any reserve or other account existing as of the date of the GSI Group Financials except in accordance with GAAP using the same accounting principles, practices, methodologies and policies as were used in the preparation of the GSI Group Financials.

(c)    Unless Stockholders' Representative notifies the Surviving Corporation in writing within 30 days after the Surviving Corporation's delivery of its calculation of the Final Merger Consideration of any objection to the computation of the Final Merger Consideration set forth therein (the *"Notice of Objection"*), such calculation shall be final and binding for all purposes hereunder. During such 30-day period, Stockholders' Representative and its directors, officers, employees, agents and representatives (including legal counsel and independent accountants) (collectively, *"Representatives"*) shall be permitted to review the working papers of the Surviving Corporation relating to such calculations. Any Notice of Objection shall specify in reasonable detail the basis for the objections set forth therein and shall include only objections based on (i) mathematical errors in the computation of the Final Merger Consideration or the component parts thereof, or (ii) the Final Merger Consideration or the component parts thereof not having been calculated in accordance with this Agreement and GAAP, including the consistent application of the accounting principles, practices, methodologies and policies used in the preparation of the GSI Group Financials, except as set forth on *Annex 1, 2 or 3*. To be effective, any such notice of objection shall describe in reasonable detail those specific items that are in dispute (the *"Disputed Items"*) and the basis for such dispute and shall be accompanied by Stockholders' Representative's calculation of each of the Disputed Items and Stockholders' Representative's revised Final Merger Consideration and the component parts thereof. After the Closing Date, at Stockholders' Representative's request, the Surviving Corporation shall cause its and its Subsidiaries' employees to provide to Stockholders' Representative and its Representatives any information reasonably requested and access at all reasonable times to the personnel, properties, books and records of the Surviving Corporation and its Subsidiaries for such purpose.

(d)    To the extent Stockholders' Representative provides a Notice of Objection within such 30-day period, all items that are not Disputed Items shall be final and binding for all purposes hereunder. In the event that Stockholders' Representative does not provide a Notice of Objection within such 30-day period, Stockholders' Representative shall be deemed to have accepted in full the calculation of Final Merger Consideration and the component parts thereof as prepared by the Surviving Corporation, which shall be final and binding for all purposes hereunder. If Stockholders' Representative provides such Notice of Objection to the Surviving Corporation within such 30-day period, the Surviving Corporation and Stockholders' Representative shall, during the 30-day period following Stockholders' Representative's delivery of such Notice of Objection to the Surviving Corporation, attempt in good faith to resolve any Disputed Items. During such second 30-day period, at the Surviving Corporation's request, Stockholders' Representative shall provide any information reasonably requested by the Surviving Corporation and shall permit the Surviving Corporation to review the working papers of Stockholders' Representative relating to the notice of objection and the basis therefor.

(e)    If the Surviving Corporation and Stockholders' Representative are able to resolve all or a portion of such Disputed Items within such period, they shall reduce such resolution to writing and the matter so agreed upon shall be final and binding on the Surviving Corporation and Stockholders' Representative. If the Surviving Corporation and Stockholders'

Representative are unable to resolve all such Disputed Items within such period, the matters remaining in dispute shall be submitted to Deloitte & Touche LLP (or, if such firm declines to act, to another nationally recognized public accounting firm mutually agreed upon by the Surviving Corporation and Stockholders' Representative) (such accounting firm being referred to herein as the "*Independent Accountant*"). The Surviving Corporation and the Stockholders' Representative shall instruct the Independent Accountant to render its decision within 60 days of its selection. The Independent Accountant shall, with respect to the Disputed Items that comprise each component part of the definition of Final Merger Consideration, choose the amount for each such particular component that is submitted by either Buyer or Stockholders' Representative. The Surviving Corporation and Stockholders' Representative shall each furnish to the Independent Accountant such work papers and other documents and information relating to the Disputed Items as the Independent Accountant may request. The resolution of the Disputed Items by the Independent Accountant shall be final and binding, and the determination of the Independent Accountant shall constitute an arbitral award that is final, binding and unappealable and upon which a judgment may be entered by a court having jurisdiction thereover. After final determination of the Final Merger Consideration, neither the Surviving Corporation nor Stockholders' Representative shall have any further right to make any claims in respect of any element of the Final Merger Consideration. The date on which the Final Merger Consideration is finally determined in accordance with this Section 2.3(e) is hereinafter referred as to the "*Determination Date*." The full amount of the fees and expenses of the Independent Accountant shall be allocated to the Surviving Corporation or Stockholders' Representative as follows: (i) if the total amount of the Disputed Items submitted to the Independent Accountant (as finally determined by the Independent Accountant) is closer to the total amount of the Disputed Items as submitted to the Independent Accountant by the Surviving Corporation than to the total amount of the Disputed Items as submitted to the Independent Accountant by Stockholders' Representative, then the fees and expenses of the Independent Accountant shall be allocated to Stockholders' Representative, and (ii) if otherwise, to the Surviving Corporation. The Surviving Corporation shall be responsible for its own costs and expenses incurred in connection with this Section 2.3 (including any amount it may be required to pay to the Independent Accountant).

(f)    The costs and expenses reasonably incurred by Stockholders' Representative in connection with this Section 2.3, including any amount it is required to pay to the Independent Accountant (collectively, the "*Representative Section 2.3 Expenses*"), shall be paid by Stockholders' Representative as follows: (A) Stockholders' Representative shall be entitled to pay (or cause to be paid) the amount it is required to pay to the Independent Accountant from the Escrow Account pursuant to Section 8.3(a), (B) Stockholders' Representative shall be entitled to pay (or cause to be paid) any remaining Representative Section 2.3 Expenses from the Escrow Account pursuant to Section 8.3(a) and (C) to the extent that the amount so paid from the Escrow Account pursuant to Section 8.3(a) is insufficient to enable Stockholders' Representative to pay all of the Representative Section 2.3 Expenses, at Stockholders' Representative's election, Stockholders' Representative may instruct the Paying Agent to pay the Representative Section 2.3 Expenses from the Adjustment Amount, if any, payable to Stockholders' Representative pursuant to Section 2.3(g). For the avoidance of doubt, if the Adjustment Amount is negative and the amount remaining in the Escrow Account after payment of the fees and expenses of the Independent Accountant and the remittance of the absolute value of such Adjustment Amount to the Surviving Corporation is insufficient to pay for

-7-

all of the Representative Section 2.3 Expenses, any remaining Representative Section 2.3 Expenses not so paid out of the Escrow Account shall, subject to Section 8.2(b), be the sole responsibility of Stockholders' Representative.

(g)    *"Adjustment Amount"* (positive or negative) means the Final Merger Consideration minus the Estimated Merger Consideration. If the Adjustment Amount is a positive number, within three Business Days following the Determination Date, (1) the Surviving Corporation shall deliver by wire transfer of immediately available funds to an account, in the name of the Paying Agent, designated in writing by Stockholders' Representative, an amount equal to the Adjustment Amount and (2) the Surviving Corporation and Stockholders' Representative shall deliver a joint written instruction to the Escrow Agent to deliver, by wire transfer of immediately available funds to an account, in the name of the Paying Agent, designated in writing by Stockholders' Representative, all funds in the Escrow Account (after payment to the Stockholders' Representative of the Representative Section 2.3 Expenses, if any). Upon receipt of the Adjustment Amount and the funds in the Escrow Account, Stockholders' Representative shall direct the Paying Agent to promptly disburse the amounts so received by it in accordance with the terms and conditions of Section 8.3. If the Adjustment Amount is a negative number, within three Business Days following the Determination Date, (A) the Escrow Agent shall deliver from the Escrow Account to the Surviving Corporation, by wire transfer of immediately available funds to an account designated in writing by the Surviving Corporation, an amount equal to the lesser of (x) the absolute value of the Adjustment Amount (together with interest earned thereon) and (y) the full amount of the Escrow Account (together with interest earned thereon), and (B) if the amount paid from the Escrow Account pursuant to the foregoing clause (A) is less than all the funds in the Escrow Account (after payment of the Representative Section 2.3 Expenses, if any), then the Surviving Corporation and Stockholders' Representative shall deliver a joint written instruction to the Escrow Agent to deliver, by wire transfer of immediately available funds, to an account, in the name of the Paying Agent, designated by Stockholders' Representative, any funds remaining in the Escrow Account after payment of any amounts pursuant to the foregoing clause (A) (the *"Escrow Surplus Amount"*). Upon receipt by the Paying Agent of the Escrow Surplus Amount, Stockholders' Representative shall direct the Paying Agent to promptly disburse the amounts so received by it in accordance with Section 8.3. If the funds paid pursuant to the foregoing clause (A) is less than the absolute value of the Adjustment Amount, at the Surviving Corporation's election, the Surviving Corporation may retain the amount equal to the amount by which the absolute value of the Adjustment Amount exceeds the amount paid to the Surviving Corporation from the Escrow Account (the *"Escrow Shortfall Amount"*), without interest or penalty, from the Contingent Consideration.

SECTION 2.4    Exchange Procedures. (a) No later than five Business Days prior to the date that the Closing is scheduled to occur, Buyer shall cause to be mailed, or otherwise made available, to each holder of certificates (the *"Certificates"*) formerly evidencing Shares a form of the Letter of Transmittal. After the Effective Time, each holder of Certificates, within one Business Day following the surrender of such Certificates to the Paying Agent, together with the completed Letter of Transmittal, shall be entitled to receive from the Paying Agent, in exchange therefor, by wire transfer of immediately available funds to the account designated by such holder in the Letter of Transmittal, the aggregate consideration for such Shares as the case may be, in cash as contemplated by this Agreement, and the Certificates so surrendered shall be cancelled. The Surviving Corporation and the Paying Agent shall be

-8-

entitled to deduct and withhold or cause to be deducted or withheld from the consideration otherwise payable pursuant to this Agreement such amounts as the Surviving Corporation or the Paying Agent is required to deduct and withhold with respect to the making of such payment under any provision of applicable tax Law. To the extent that amounts are so deducted or withheld by the Surviving Corporation or the Paying Agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of such Shares, as the case may be, in respect of which such deduction and withholding was made by the Surviving Corporation or the Paying Agent, as the case may be. Until surrendered as contemplated by this Section 2.4 (other than Certificates representing Dissenting Shares (as defined below)), each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive the aggregate consideration for such Shares, as the case may be, in cash as contemplated by this Agreement, without interest thereon.

(b)    In the event of a transfer of ownership of any Shares, as the case may be, that is not registered in the transfer books of the Company, subject to any applicable deductions or withholdings as described in Section 2.4(a) above, payment may be made to a Person other than the Person in whose name the Certificate so surrendered is registered, if such Certificate shall be properly endorsed or otherwise be in proper form for transfer. Notwithstanding the foregoing, if any Certificate shall be lost, stolen or destroyed, upon the making of an affidavit of that fact and an undertaking of indemnity by the Person claiming such Certificate to be lost, stolen or destroyed, the Surviving Corporation will issue in exchange for such lost, stolen or destroyed Certificate the consideration deliverable in respect thereof pursuant to this Agreement.

(c)    At any time following the expiration of 12 months after the Effective Time, the Surviving Corporation shall, in its sole discretion, be entitled to require the Paying Agent to deliver to it any funds (including any interest received with respect thereto) which had been made available to the Paying Agent and which have not been disbursed to holders of Certificates, and such funds shall thereafter become the property of the Surviving Corporation. Such funds may be commingled with the general funds of the Surviving Corporation and shall be free and clear of any claims or interests of any Person. Thereafter, such holders shall be entitled to look to the Surviving Corporation (subject to any applicable abandoned property, escheat or similar Law) only as general creditors thereof with respect to the applicable consideration payable as contemplated by this Agreement (net of any amounts that would be subject to withholding) upon due surrender of their Certificates, without any interest thereon. Any portion of such remaining cash unclaimed by Stockholders or Option Holders, as the case may be, as of a date that is immediately prior to such time as such amounts would otherwise escheat to or become property of any Governmental Entity shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation free and clear of any claims or interest of any Person previously entitled thereto.

(d)    At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfer in the stock transfer books of the Surviving Corporation of the Shares or Options, as the case may be, that were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation or the Paying Agent for any reason, they shall be canceled and exchanged as provided in this Section 2.4.

(e)    As soon as practicable after the Effective Time (but not later than one payroll cycle thereafter), the Surviving Corporation shall make through its existing payroll service the Option Cancellation Payment to each Option Holder that became entitled to receive the consideration specified in Section 2.1 in respect of their Options. The Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Option Holder such amounts as the Surviving Corporation is required to deduct and withhold with respect to the making of such payment under any provision of applicable tax Law. To the extent that amounts are so withheld by the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Option Holder in respect of which such deduction and withholding was made by the Surviving Corporation.

SECTION 2.5    Payments at Closing.    At the Closing, on behalf of the Surviving Corporation, Buyer will make (or cause to be made) the following payments:

(i)    to the Paying Agent, by wire transfer of immediately available funds to the account or accounts designated by Stockholders' Representative in writing no later than two Business Days prior to the Closing Date, an amount equal to the Estimated Merger Consideration less the sum of (A) the Rollover Amount plus (B) the aggregate of all Option Cancellation Payments;

(ii)    to the Escrow Agent, by wire transfer of immediately available funds to the account or accounts designated by Stockholders' Representative in writing no later than two Business Days prior to the Closing Date, an amount equal to the Escrow Amount, for distribution in accordance with Sections 2.3 and 8.3 and otherwise in accordance with the Escrow Agreement;

(iii)    to the payroll account of the Surviving Corporation, by wire transfer of immediately available funds, an amount equal to the aggregate of all Option Cancellation Payments, for distribution to each Option Holder in accordance with Section 8.3(b); and

(iv)    on behalf of the Company, by wire transfer of immediately available funds to the account or accounts designated by Stockholders' Representative in writing no later than one Business Day prior to the Closing Date, an amount in the aggregate equal to the Transaction Expenses that are unpaid as of the Closing, which amount shall be distributed in accordance with the Transaction Expenses Annex (as defined below) as soon as practicable following the Closing.

SECTION 2.6    Payment Annexes; Capital Structure Certificate.

(a)    Closing Net Indebtedness.    The Company shall prepare a statement (the "*Closing Net Indebtedness Annex*") with a schedule setting forth an itemized list of the Indebtedness and Cash and Cash Equivalents estimated at Closing, and the estimated total amount of Closing Net Indebtedness in accordance with this Agreement and *Annex 2* attached hereto.

(b)     Transaction Expenses.  The Company shall prepare a statement (the "*Transaction Expenses Annex*") with a schedule setting forth an itemized list of any and all estimated Transaction Expenses and the total amount of estimated Transaction Expenses (the "*Estimated Transaction Expenses*"), in accordance with this Agreement and *Annex 3* attached hereto.

(c)     Delivery of Payment Annexes and Capital Structure Certificate.  Each of the Closing Net Indebtedness Annex, the Transaction Expenses Annex and the Capital Structure Certificate shall be prepared by the Company in form and substance reasonably satisfactory to Buyer and Stockholders' Representative, and each shall be delivered to Buyer at least three Business Days prior to the Closing Date.

SECTION 2.7     Dissenting Shares.  (a) Notwithstanding any provision of this Agreement to the contrary, Shares that are outstanding immediately prior to the Effective Time and which are held by Stockholders who shall not have voted in favor of the Merger or consented thereto in writing and who shall have demanded properly in writing appraisal for such Shares in accordance with Section 262 of the DGCL (collectively, the "*Dissenting Shares*") shall not be converted into or represent the right to receive the consideration set forth in Section 2.1. Such holders shall be entitled to receive such consideration as is determined to be due with respect to such Dissenting Shares in accordance with the provisions of Section 262 of the DGCL, except that all Dissenting Shares held by holders who shall have failed to perfect or who effectively shall have withdrawn or lost their rights to appraisal of such Shares under Section 262 of the DGCL shall thereupon be deemed to have been converted into and to have become exchangeable for, as of the Effective Time, the right to receive the consideration specified in Section 2.1 (as adjusted, if applicable), without any interest thereon, upon surrender, in the manner provided in Section 2.4, of the certificate or certificates that formerly evidenced such Dissenting Shares.

(b)     The Company shall give Buyer (i) prompt notice of any demands for appraisal received by the Company, withdrawals of such demands and any other instruments served pursuant to the DGCL and received by the Company and (ii) the right to direct all negotiations and proceedings with respect to demands for appraisal under the DGCL. The Company shall not, except with the prior written consent of Buyer, make any payment with respect to any demands for appraisal or offer to settle or settle any such demands.

SECTION 2.8     Contingent Consideration.  (a) If at any time and from time to time following the Closing Date, the Surviving Corporation or any of its Subsidiaries receives any amounts in cash or other property, or any other form of value or benefit, in connection with the resolution of the litigation currently pending in the United States District Court for the Central District of Illinois against Sukup Manufacturing Company (the "*Sukup Litigation*"), whether in settlement, judgment or otherwise, then the Stockholders and Option Holders shall be entitled to receive from the Surviving Corporation an additional payment in cash in the aggregate amount equal to 50% of the Net Litigation Recovery (the "*Contingent Consideration*").  For purposes of the immediately preceding sentence, "*Net Litigation Recovery*" means (i) the amount of cash, or the fair market value of any property, value or benefit, received by the Surviving Corporation or any of its Subsidiaries from Sukup Manufacturing Company or any of its Affiliates in connection with the Sukup Litigation *less* (ii)

-11-

(A) the Surviving Corporation's reasonable after-tax costs incurred following the Effective Time and on or prior to the Surviving Corporation's delivery of the Contingent Consideration Notice that are directly related to the Sukup Litigation (including third party costs and expenses and reasonable internal allocated costs based on the time spent by in-house counsel (such in-house counsel costs to be calculated at an hourly rate equal to in-house counsel's annual salary and bonus, divided by 2,080 hours, multiplied by 1.25), if any, on the Sukup Litigation but excluding, for the avoidance of doubt, any other internal, allocated or overhead costs or expenses) (the "*Sukup Litigation Expenses*"), and (B) any Taxes (or the value of any reduction in Tax attributes) resulting from the receipt of cash or property in connection with the Sukup Litigation; and *less* (iii) any portion of the negative Adjustment Amount not previously recovered by the Surviving Corporation out of Escrow Account and *less* (iv) any Indemnifiable Claims as defined on, and determined in accordance with the provisions of, Schedule 2.8 incurred by the Surviving Corporation following the Effective Time and on or prior to the Surviving Corporation's delivery of such Contingent Consideration Notice. Promptly, and in any event within five Business Days, following receipt of any such cash, property or other value or benefit (it being agreed and acknowledged by the Buyer, the Company and Stockholders' Representative that any promissory note or similar instrument received by the Surviving Corporation or any of its Subsidiaries in connection with the resolution of the Sukup Litigation shall not be deemed to be received for purposes of this Section 2.8, until, and only to the extent, that the Company or any of its Subsidiaries actually receives payment of cash with respect to such promissory note or instrument, whether from the obligor thereunder or upon a sale or other transfer thereof), the Surviving Corporation shall give the Stockholders' Representative written notice of such receipt and its calculation of each component of the relevant amount of Contingent Consideration (a "*Contingent Consideration Notice*"), which shall include reasonable detail and all necessary back-up calculations and supporting documentation (including copies of the relevant settlement agreement or judgment). Unless Stockholders' Representative notifies the Surviving Corporation in writing within 30 days after the Surviving Corporation's delivery of such Contingent Consideration Notice of any objection to the computation of the Contingent Consideration set forth therein (a "*Contingent Consideration Notice of Objection*"), the Surviving Corporation's determination of such Contingent Consideration shall be final and binding for all purposes hereunder. Any Contingent Consideration Notice of Objection shall detail the basis for the objections set forth therein and shall describe in reasonable detail those specific items that are in dispute (the "*Contingent Consideration Disputed Items*") and the basis for such dispute and shall be accompanied by Stockholders' Representative's calculation of each of the Contingent Consideration Disputed Items and Stockholders' Representative's revised Contingent Consideration. If Stockholders' Representative provides a Contingent Consideration Notice of Objection to the Surviving Corporation within such 30-day period, the Surviving Corporation and Stockholders' Representative shall, during the 30-day period following delivery of such notice to Stockholders' Representative, attempt in good faith to resolve any dispute with respect to the calculation of such Contingent Consideration. During such 30-day period, Stockholders' Representative and its Representatives shall be permitted to review the documents and records of the Surviving Corporation, the Surviving Company and its Subsidiaries relating to the Sukup Litigation, the calculation of such Contingent Consideration and the basis therefor. If the Surviving Corporation and Stockholders' Representative are unable to resolve all disputes within such period, then either the Surviving Corporation or Stockholders' Representative may

-12-

call for arbitration of the unresolved matters raised in the Contingent Consideration Notice of Objection by written demand to the other party and thereafter all such matters shall be finally resolved under the Rules of Arbitration of the American Arbitration Association as provided in this Section 2.8(a). Within 30 days after receipt of the demand for arbitration, the Surviving Corporation and Stockholders' Representative shall designate in writing one arbitrator (who shall not be an Affiliate, employee, consultant, officer, director or stockholder of the Surviving Corporation, Stockholders' Representative or any of their respective Affiliates) to resolve such unresolved matters; *provided*, that if the Surviving Corporation and Stockholders' Representative cannot agree on an arbitrator within such 30-day period, an arbitrator satisfying the criteria set forth in the preceding parenthetical shall be selected by the New York Office of the American Arbitration Association (the individual so selected, the "*Arbitrator* "). Within 30 days after the designation of the Arbitrator, the Arbitrator, the Surviving Corporation and Stockholders' Representative shall meet, at which time the Surviving Corporation and Stockholders' Representative shall be required to set forth in writing all unresolved matters and a proposed ruling on the merits of each such matter. The Arbitrator shall set a date for a hearing, which shall be no later than 45 days after the submission of written proposals pursuant to the preceding sentence, to discuss each of the matters identified by the Surviving Corporation and the Stockholders' Representative. Each of the Surviving Corporation and Stockholders' Representative shall have the right to be represented by counsel. The Surviving Corporation and Stockholders' Representative shall each furnish to the Arbitrator such documents and information relating to the Sukup Litigation as the Arbitrator may request. The parties shall instruct the Arbitrator to rule on each disputed matter within 60 days after the completion of the hearings described above. The Arbitrator shall, with respect to the Contingent Consideration Disputed Items submitted to the Arbitrator, choose the amount for each Contingent Consideration Disputed Item submitted by either the Surviving Corporation or the Stockholders' Representative. All rulings of the arbitrator shall be in writing and shall be delivered to the Surviving Corporation and Stockholders' Representative. The resolution of the determination of the Contingent Consideration by the Arbitrator shall be final and binding, and the determination of the Arbitrator shall constitute an arbitral award that is final, binding and unappealable and upon which a judgment may be entered by a court having jurisdiction thereover. The fees and expenses of the Arbitrator shall be allocated to the Surviving Corporation or Stockholders' Representative as follows: (i) if the total amount of Contingent Consideration Disputed Items submitted to the Arbitrator (as finally determined by the Arbitrator) is closer to the total amount of the Contingent Consideration Disputed Items as submitted to the Arbitrator by the Surviving Corporation than to the total amount of the Contingent Consideration Disputed Items as submitted to the Arbitrator by Stockholders' Representative, then the fees and expenses of the Arbitrator shall be allocated to Stockholders' Representative, and (ii) if otherwise, to the Surviving Corporation. Any arbitration pursuant to this Section 2.8 shall be conducted in New York City, New York. Any arbitration award may be entered in and enforced by any court having jurisdiction thereover and shall be final and binding upon the Surviving Corporation and Stockholders' Representative. The Surviving Corporation shall be responsible for its own costs and expenses incurred in connection with this Section 2.8 (including any amount it is required to pay to the Arbitrator). The costs and expenses reasonably incurred by Stockholders' Representative in connection with this Section 2.8, including any amount it is required to pay to the Arbitrator (collectively, the "*Representative Section 2.8 Expenses*"), shall be paid to the Stockholders' Representative from the Contingent Consideration, if any, that is otherwise

payable to the Stockholders and Option Holders pursuant to this Section 2.8. For the avoidance of doubt, if the Contingent Consideration is insufficient to pay for all of the Representative Section 2.8 Expenses, any remaining Representative Section 2.8 Expenses not so paid out of the Contingent Consideration shall, subject to the Section 8.2(b), be the sole responsibility of Stockholders' Representative.

(b)     Within two Business Days of the date that the amount of any Contingent Consideration is finally determined pursuant to Section 2.8(a), unless otherwise directed by the Stockholders' Representative pursuant to Section 8.3(b), the Surviving Corporation shall deposit an amount in cash equal to the amount of such Contingent Consideration (net of any Representative Section 2.8 Expenses that are paid to Stockholders' Representative pursuant to Section 2.8(a)) with the Paying Agent (or any successor paying agent appointed by the Surviving Corporation) for distribution to each Stockholder (other than in respect of any Shares that are Dissenting Shares) and Option Holder in accordance with their respective pro rata portions of such Contingent Consideration.  For purposes of this Section 2.8, each Rollover Share shall entitle the holder thereof to receive the Per Share Contingent Consideration Amount with respect to such Rollover Share as if such Rollover Share had been converted into the right to receive the merger consideration payable hereunder pursuant to Section 2.1(c).

(c)     The Surviving Corporation shall have complete discretion to conduct the prosecution of the Sukup Litigation as it sees fit including, but not limited to, the right to set all aspects of litigation strategy.  The Stockholders' Representative and the Stockholders recognize that the Surviving Corporation has the right to settle, compromise or terminate on any basis the Sukup Litigation without the consent of the Stockholders' Representative or any of the Stockholders. Within 10 Business Days of any written request from the Stockholders' Representative, the Surviving Corporation shall provide such information as is reasonably requested by the Stockholders' Representative regarding the status of the Sukup Litigation, *provided, however,* that the Surviving Corporation shall in no event be required to share any information where to do so might act to waive attorney-client or other applicable privilege.

SECTION 2.9     Withholding.  The Buyer and the Surviving Corporation shall be entitled to deduct and withhold from any payment otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to such payment under all applicable Tax laws. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction and withholding was made.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the GSI Group's Annual Report on Form 10-K for year ended December 31, 2006, and the GSI Group's Quarterly Reports on Form 10-Q for the period ended March 31, 2007, in each case filed by GSI Group or its Subsidiaries with the Securities and Exchange Commission (the "*SEC*") prior to the date hereof (other than disclosures in the "Risk Factors" sections thereof or any such disclosures included in such filings that are cautionary, predictive or forward-looking in nature) or in the disclosure schedule delivered by

-14-

the Company prior to, or concurrently with, the execution of this Agreement (the "*Disclosure Schedule*" or the "*Schedules*"), the Company hereby represents and warrants to Buyer as follows:

SECTION 3.1    Organization, Standing and Power.    Each of the Company and its Subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted. Each of the Company and its Subsidiaries is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary because of the property owned, leased or operated by it or because of the nature of its business as now being conducted, except for any failure to so qualify or be in good standing that individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect. Section 3.1 of the Disclosure Schedule lists the jurisdictions of incorporation and qualifications to do business (or the foreign equivalents, if any) of the Company and each of its Subsidiaries. The Company has made available to Buyer complete and correct copies of the constitutive documents of each of the Company and its Subsidiaries, in each case as amended to the date of this Agreement, and has made available to Buyer each such entity's minute books and stock records. Section 3.1 of the Disclosure Schedule contains a true and correct list of the directors and officers of each of the Company and its Subsidiaries as of the date of this Agreement.

SECTION 3.2    Authority; Approvals.    (a) The execution, delivery and performance of this Agreement by the Company and the consummation of the transactions contemplated hereby and thereby are within its corporate powers and have been duly and validly authorized by all necessary corporate action on the part of the Company (other than the approval of the Merger and this Agreement by the requisite vote of the Company's stockholders, and the filing of a Certificate of Merger pursuant to the DGCL). This Agreement has been duly executed and delivered by the Company, and (assuming due authorization, execution and delivery by Buyer, the Principal Stockholder and Stockholders' Representative) constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity.

(b)    The Board of Directors of the Company has unanimously (i) determined that this Agreement and the Merger are fair to, and in the best interests of, the Company and its stockholders, (ii) resolved that the Merger is fair to, and in the bests interests of, the Company and its stockholders and declared the Merger to be advisable and (iii) resolved to recommend that the Company's stockholders adopt this Agreement, and none of the aforesaid actions by the Board of Directors of the Company has been amended, rescinded or modified.

(c)    The affirmative vote of the holders of a majority of outstanding Shares to adopt this Agreement is the only vote of the holders of any class or series of the Company's capital stock necessary to approve the Merger.

(d)    No "fair price," "control share acquisition" or similar anti-takeover Law (collectively, "Takeover Laws") or any anti-takeover provision in the certificate of incorporation

-15-

or bylaws of the Company is applicable to the transactions contemplated by this Agreement. The Company does not have any stockholder rights plan.

SECTION 3.3    Capitalization; Equity Interests; Holding Company Structure. (a) The authorized capital stock of the Company consists of 700,000 shares of Common Stock, $.01 par value per share, except to the extent of any increase to the authorized capital stock of the Company pursuant to Section 6.19. As of the date of this Agreement, 565,484 shares of Common Stock were issued and outstanding and 69,350 shares of Common Stock were reserved for future issuance pursuant to the Options outstanding on such date. As of the date of this Agreement, the outstanding capital stock of the Company is owned of record as set forth in Section 3.3(a) of the Disclosure Schedule.

(b)    Section 3.3(b) of the Disclosure Schedule sets forth each of the Company's Subsidiaries' authorized capital stock and the number of shares issued and outstanding. Except as set forth in Section 3.3(b) of the Disclosure Schedule, the Company does not have any Subsidiaries or own or hold any equity interest in any other Person. Except as set forth in Section 3.3(b) of the Disclosure Schedule, all issued and outstanding shares of capital stock of the Company's Subsidiaries are directly or indirectly owned beneficially and of record by the Company, free and clear of all Encumbrances, and free of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such capital stock).

(c)    Except as set forth in Section 3.3(c) of the Disclosure Schedule, as of the date of this Agreement, no shares of capital stock or other voting securities of the Company or any of its Subsidiaries are reserved for issuance. All outstanding shares of capital stock of the Company were duly authorized and validly issued and are fully paid and nonassessable and, except as set forth in Section 3.3(c) of the Disclosure Schedule, are subject to no preemptive rights. Except as set forth in Section 3.3(c) of the Disclosure Schedule, there are no bonds, debentures, notes or other indebtedness or securities of the Company or any of its Subsidiaries having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders of the Company or such Subsidiary may vote. Except as set forth in Section 3.3(c) of the Disclosure Schedule or the issuance of restricted Shares to William Branch set forth in Section 3.14(k) of the Disclosure Schedule, there are no securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which the Company or any of its Subsidiaries is a party or by which any such Person is bound obligating such Person to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock or other voting securities of such Person or obligating such Person to issue, grant, extend or enter into any such security, option, warrant, call right, commitment, agreement, arrangement or undertaking. Except as set forth in Section 3.3(c) of the Disclosure Schedule, there are no outstanding rights, commitments, agreements, arrangements or undertakings of any kind obligating the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any shares of capital stock or other voting securities of the Company or any of its Subsidiaries or any securities of the type described in the two immediately preceding sentences. All Options have an exercise grant price equal to no less than the fair market value of the underlying shares of Common Stock on the date of grant.

(d)    The Company was incorporated on April 1, 2005 for the sole purpose of acquiring GSI Group and thereafter has been acting solely as a holding company by virtue of its ownership of all of the issued and outstanding shares of capital stock of GSI Group and has not engaged any activities other than through GSI Group and its Subsidiaries and those activities reasonably incidental to the foregoing. The Company does not own any assets other than the shares of GSI Group, and it has no liabilities except as described as Section 3.3(d) of the Disclosure Schedule.

(e)    Except as disclosed in Section 3.3(e) of the Disclosure Schedule, neither the Company nor any of the its Subsidiaries has entered into any commitment, arrangement or agreement, or are otherwise obligated, to contribute capital, loan money or otherwise provide funds or make additional investments in any other Person, in each case, in excess of $100,000, other than any such commitment, arrangement or agreement in the ordinary course of business consistent with past practice, with respect to wholly owned Subsidiaries of the Company.

SECTION 3.4    Conflicts; Consents. The execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby and thereby does not and will not (i) conflict with or result in a breach of the certificates of incorporation, by-laws or other constitutive documents of the Company or any of its Subsidiaries, (ii) except as set forth in Section 3.4 of the Disclosure Schedule, conflict with, breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the provisions of any note, bond, lease, mortgage, indenture, or any license, franchise, permit, agreement or other instrument or obligation to which any of the Company or its Subsidiaries is a party, or by which any such Person or its properties or assets are bound, (iii) violate any Laws applicable to the Company or any of its Subsidiaries or any such Person's properties or assets or (iv) result in the creation or imposition of any Encumbrance upon any property or assets used or held by the Company or any of its Subsidiaries, except where the occurrence of any of the foregoing described in clauses (ii), (iii) or (iv) above individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect or prevent or materially delay the consummation of the Merger. Except as set forth in Section 3.4 of the Disclosure Schedule and except for (1) the filing of a premerger notification and report form under the Hart-Scott-Rodino Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "*HSR Act*") and the expiration or early termination of the applicable waiting period thereunder, (2) compliance with and filings under the resolutions of the Administrative Economic Defense Counsel of Brazil, dated August 15, 1998, or other applicable laws relating to competition ("*Competition Laws*"), (3) any filings as may be required under the DGCL in connection with the Merger, (4) compliance with and filings under the Exchange Act and the Securities Act or under any applicable state securities or blue sky Laws and (5) such consents, approvals, notifications, registrations or filings the failure of which to obtain individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect, no consent or approval by, or notification of or registration or filing with, any Governmental Entity is required in connection with the execution, delivery and performance by the Company of this Agreement or the consummation of the transactions contemplated hereby.

SECTION 3.5    Financial Information and SEC Reports; Undisclosed Liabilities. (a) The Company has previously made available to Buyer true and complete copies

-17-

of all forms, reports and other documents required to be filed by GSI Group under the Securities Exchange Act of 1934, as amended (the *"Exchange Act"*), since December 31, 2005 (collectively, the *"SEC Reports"*).   Each of the balance sheets (including the related notes) included in the SEC Reports presents fairly, in all material respects, the consolidated financial position of the Person (consolidated with its Subsidiaries, as applicable) to which it relates as of the date thereof, and each of the other related financial statements (including the related notes) included in the SEC Reports presents fairly, in all material respects, the results of operations and changes in financial position of the Person (consolidated with its Subsidiaries, as applicable) to which it relates for the period or as of the date set forth therein, all in conformity with GAAP consistently applied during the periods involved, except as otherwise noted therein and subject, in the case of the unaudited interim financial statements, to normal year-end adjustments, the absence of notes and any other adjustments described therein.   Each SEC Report, as of its date (as amended through the date of this Agreement), (i) complied in all material respects with the requirements of the Exchange Act and the applicable rules and regulations promulgated thereunder and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.   No Subsidiary of the Company other than GSI Group is subject to the periodic reporting requirements of the Exchange Act.   The Company has made available to Buyer correct and complete copies of all material correspondence between the SEC, on the one hand, and the Company and any of its Subsidiaries, on the other hand, occurring since May 16, 2005 and prior to the date hereof.   As of the date hereof, to the knowledge of the Company, there are no outstanding or unresolved comments in comment letters from the SEC staff with respect to any of the SEC Reports.   To the knowledge of the Company, as of the date hereof, none of the SEC Reports is the subject of ongoing SEC review, outstanding SEC comment or outstanding SEC investigation.

(b)    Except as set forth in Section 3.5(b) of the Disclosure Schedule or as reflected in the consolidated balance sheet of GSI Group and its Subsidiaries at December 31, 2006, the Company and its Subsidiaries do not have any liabilities or obligations of any nature (whether absolute, accrued, contingent or otherwise, and whether due or to become due), except for liabilities and obligations (i) incurred in the ordinary course of business consistent with past practice since December 31, 2006 (ii) which would not be required to be disclosed in an audited balance sheet (or disclosed in the notes thereto) that is prepared in accordance with GAAP, or (iii) which individually or in the aggregate do not exceed $100,000.

(c)    Since May 16, 2005 to the knowledge of the Company, the Company's principal executive officer and its principal financial officer have disclosed to the Company's auditors and the audit committee of the Company's Board of Directors (i) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and the Company has provided to Buyer copies of any material written materials relating to the foregoing.   The Company has made available to Buyer these disclosures made by management to the Company's auditors and audit committee since May 16, 2005. Except as set forth in Section 3.5(c) of the Disclosure Schedule, the Company has established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 under

-18-

the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company required to be included in reports filed under the Exchange Act, including its consolidated subsidiaries, is made known to the Company's principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared, and such disclosure controls and procedures are effective in timely alerting the Company's principal executive officer and its principal financial officer to material information required to be included in the Company's periodic reports required under the Exchange Act. Since May 16, 2005, neither the Company nor any Subsidiary has made any prohibited loans to any executive officer of the Company (as defined in Rule 3b-7 under the Exchange Act) or director of the Company or any Subsidiary. There are no outstanding loans or other extensions of credit made by the Company or any of the Company Subsidiaries to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of the Company.

(d)    Except as set forth on Section 3.5(d) of the Disclosure Schedule, all of the instruments governing indebtedness for money borrowed of the Company or any of its Subsidiaries in an amount in excess of $100,000 outstanding on the date hereof have been filed as exhibits to the Company's Annual Report on Form 10-K for the year ended December 31, 2006, and there are no amendments to such instruments which are not included among such exhibits or have not otherwise been made available to Buyer. All of the Company's 10 1/4% Senior Subordinated Notes due 2007 have been retired.

SECTION 3.6    Absence of Changes.  Except as set forth in Section 3.6 of the Disclosure Schedule, since December 31, 2006, the Company and its Subsidiaries have been operated in the ordinary course consistent with past practice and there has not been:

(i)    any Company Material Adverse Effect;

(ii)    any material obligation or liability (whether absolute, accrued, contingent or otherwise, and whether due or to become due) incurred by the Company or any of its Subsidiaries, other than obligations under customer contracts and current obligations and other liabilities incurred in the ordinary course of business consistent with past practice;

(iii)    any payment, discharge or satisfaction of any material obligation of the Company or any of its Subsidiaries, except in the ordinary course of business consistent with past practice;

(iv)    any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property or any combination thereof) with respect to any shares of capital stock of the Company or any of its Subsidiaries or any direct or indirect redemption, purchase or other acquisition of any such shares;

(v)    any issuance, grant, transfer, delivery, pledge, promise, disposition or sale, or any contract entered into for the issuance, grant, transfer, delivery, pledge, promise, disposition or sale, of any shares of capital stock of any class, or any options, warrants, or securities convertible or exchangeable into or exercisable for shares

-19-

of capital stock or other rights of any kind to acquire any shares of capital stock or any other ownership interest of the Company or any of its Subsidiaries (other than (A) the issuance of shares of Common Stock upon the exercise of those Options set forth in Section 3.3(c) of the Disclosure Schedule; (B) prior to the date hereof, the issuance of Options and shares of Common Stock pursuant to the Stock Purchase and Management Equity agreements set forth in Section 3.3(c) of the Disclosure Schedule; and (C) the issuance of restricted Shares to William Branch described on Section 3.14(k) of the Disclosure Schedule);

(vi)    any sale, assignment, pledge, encumbrance, transfer or other disposition of any material asset of the Company or any of its Subsidiaries (excluding in all events sales of assets no longer useful in the operation of the business and sales of inventory to customers in the ordinary course of business consistent with past practice), or any sale, assignment, license, transfer or other disposition of any material Intellectual Property or any other material intangible assets of the Company or any of its Subsidiaries;

(vii)    any creation of any Encumbrance on any property of the Company or any of its Subsidiaries, except for Encumbrances created in the ordinary course of business consistent with past practice or which individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect;

(viii)    any write-down of the value of any asset of the Company or any of its Subsidiaries or any write-off as uncollectible of any accounts or notes receivable of the Company or any of its Subsidiaries or any portion thereof, other than (A) write-offs or write-downs of accounts receivable in the ordinary course of business, (B) write-downs or write-offs that are reserved for on the consolidated balance sheet of GSI Group at March 31, 2007 or (C) write-offs or write-downs which do not exceed $500,000 individually or in the aggregate;

(ix)    any material capital expenditures or commitments or additions to property, plant or equipment of the Company and its Subsidiaries, taken as a whole, other than in the ordinary course of business and consistent with the Company's capital expenditure budget, or any failure to make capital expenditures in the aggregate in at least the amount provided in the Company's capital expenditure budget;

(x)    any amendment to the certificate of incorporation or bylaws of the Company or any of its Subsidiaries, except for any such amendment following the date hereof to the extent required by Section 6.19;

(xi)    except in each case for regular annual increases or as may be granted pursuant to the change of control plan described in Section 3.14(k) of the Disclosure Schedule, any general increase in the compensation of employees of the Company or any of its Subsidiaries (including any increase pursuant to any written bonus, pension, profit-sharing or other benefit or compensation plan, policy or arrangement or commitment), or any increase in any such compensation or bonus

payable to any officer, stockholder, director, consultant or agent of the Company or any of its Subsidiaries having an annual salary or remuneration in excess of $200,000;

(xii)    any grant of severance or termination pay to any employee, officer, director, consultant or officer of the Company or any of its Subsidiaries, other than, prior to the date hereof, in connection with the Company's severance policies and procedures as in effect at the relevant time;

(xiii)    any loan or advance of money or other property by the Company or its Subsidiaries to any employee, officer, director, consultant or officer of the Company or any of its Subsidiaries;

(xiv)    any damage, destruction or loss not covered by insurance affecting any asset or property of the Company or any of its Subsidiaries resulting in liability or loss in excess of $500,000;

(xv)    any entry into, cancellation, termination, material modification or, prior to the date hereof, any failure to renew, of any material contract (in each case, other than in the ordinary course of business consistent with past practice);

(xvi)    any institution, payment, discharge, satisfaction or settlement by the Company or its Subsidiaries of any litigation (including, without limitation, the Sukup Litigation) or any waiver, assignment or release by the Company or its Subsidiaries of any rights or claims;

(xvii)    any change in the independent public accountants of the Company and its Subsidiaries or any change in the accounting methods or accounting practices followed by the Company or any material change in depreciation or amortization policies or rates; or

(xviii)    any agreement, whether in writing or otherwise, to take any of the actions specified in the foregoing items (i) through (xvii), subject to any dollar thresholds set forth in items (i) through (xvii) above.

SECTION 3.7    Assets and Properties.    (a)    Section 3.7 of the Disclosure Schedule sets forth a true and complete list of all real property ("*Real Property*") owned or leased by the Company or any of its Subsidiaries and the address and owner or lessee of each parcel of Real Property. Except as set forth in Section 3.7 of the Disclosure Schedule, each of the Company and its Subsidiaries has good, valid and marketable fee simple title to, or a good and valid leasehold interest in, as applicable, all of its owned or leased real property, except for defects in title or failures to be in full force and effect that individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect. Each of the Company and its Subsidiaries has good title to, or a valid leasehold interest in, as applicable, all buildings, machinery, equipment and all other tangible assets and personal property used in their respective businesses, except for defects in title or failures to be in full force and effect that individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect. Such property (individually or taken as a whole) is in good operating condition and repair,

ordinary wear and tear excepted, are usable in the ordinary course of business and are reasonably adequate and suitable for the uses to which they are put.

(b)    Neither the Company nor any of its Subsidiaries is in material default under any material term of any lease or, to the knowledge of the Company, any declaration, restriction, covenant, option agreement or right of first refusal relating to the Real Property leased by the Company or any of its Subsidiaries, nor, to the knowledge of the Company, does any state of facts exist which with the passage of time would constitute a material default of the Company or any of its Subsidiaries under any material term of any lease or any declaration, restriction, covenant, option agreement or right of first refusal relating to the Real Property leased by the Company or any of its Subsidiaries. Neither the Company nor any of its Subsidiaries is a party to any contract or option to purchase any real property or interest therein relating to, or intended to be used in the operation of its business. To the knowledge of the Company, there does not exist any actual, pending or threatened condemnation or eminent domain proceedings that affect any Real Property owned or leased by the Company or any of its Subsidiaries, and neither the Company nor any of its Subsidiaries have received any written notice of the intention of any Governmental Authority to condemn or take by eminent domain any Real Property owned or leased by the Company or any of its Subsidiaries that is necessary or material to the operations of the Company and its Subsidiaries taken as a whole. Except as set forth in Section 3.7(b) of the Disclosure Schedule, the Company has, prior to the date of this Agreement and to the extent reasonably available to the Company, made available to the Buyer, copies of all existing vesting deeds, title policies and surveys and all other material documents, instruments and agreements pursuant to which the Company or any of its Subsidiaries' holds or maintains property rights to, or the ownership, use and possession of, the Real Property owned or leased by the Company or any of its Subsidiaries.

SECTION 3.8    Other Agreements. (a) Section 3.8 of the Disclosure Schedule lists as of the date of this Agreement each written or oral contract (other than purchase orders, supply agreements and standard sales contracts in the ordinary course of business), agreement, commitment, license or lease of the Company and its Subsidiaries currently in effect that by its terms (i) is not terminable at will within 12 months and requires future expenditures or receipts or other performance with respect to goods, services, assets, rights or properties having a value in excess of $2,000,000 or (ii) is material to the Company and its Subsidiaries, taken as a whole. Copies of all such contracts, agreements, commitments, licenses and leases have previously been made available to Buyer. All of such contracts, agreements, commitments and leases are in full force and effect, except where the failure to be in full force and effect would not reasonably be expected to have a Company Material Adverse Effect, and all are enforceable against the Company or its applicable Subsidiary and, to the knowledge of the Company, the other parties thereto in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any other party to such contracts, agreements, commitments, licenses and leases is in breach of or default under any obligation thereunder or has given notice of default to any other party thereunder and, to the knowledge of the Company, no condition exists that with notice or lapse of time would constitute a default thereunder, in each case which breach or default would reasonably be expected to have a Company Material Adverse Effect.

-22-

(b)    Except as disclosed in Section 3.8(b) of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to or bound by any contract which relates to any acquisition by the Company or its Subsidiaries pursuant to which the Company or any of its Subsidiaries has continuing indemnification, "earn-out" or other contingent payment obligations, in each case, that could result in payments in excess of $100,000.

SECTION 3.9    Environmental Matters.    Each of the Company and its Subsidiaries holds all licenses, permits and other governmental authorizations required under all applicable Environmental Laws to operate as it currently operates and over the past fiscal year has been operated, except for such licenses, permits and other governmental authorizations the failure of which to hold, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.  None of the Company or any of its Subsidiaries is in violation of, or since May 16, 2005 (and to the knowledge of the Company at any time prior thereto), has violated, any applicable Environmental Laws, except for violations that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.  There are no conditions relating to the Company or any of its Subsidiaries or relating to any real property currently or, to the knowledge of the Company, formerly owned or leased or used by or on behalf of the Company or any of its Subsidiaries or, to the knowledge of the Company, any of their predecessors that in any such case would reasonably be expected to result in or be the basis for any liability of the Company or any of its Subsidiaries under any applicable Environmental Law or regarding Hazardous Substances that, individually or in the aggregate, would reasonably be expected to have a Company Material Adverse Effect.  The Company has, to the extent reasonably available to the Company or any of its Subsidiaries, made available to the Buyer copies of all material reports or similar documents regarding environmental assessments, reviews, audits, investigations, or other evaluations relating to the Company or any of its Subsidiaries.

SECTION 3.10    Litigation.    There are no actions, suits, arbitrations, proceedings, claims or disputes by or before any court or other Governmental Entity ("*Proceedings*") that would reasonably be expected to have a Company Material Adverse Effect. All pending or threatened in writing Proceedings involving claims against the Company or any of its Subsidiaries of which the Company has knowledge as of the date of this Agreement are set forth on Section 3.10 of the Disclosure Schedule.  For each action, suit, arbitration, proceeding, claim or dispute pending or threatened for which a reserve has been established by the Company, Section 3.10 of the Disclosure Schedule sets forth the amount of such reserve.  No injunction, judgment, writ, temporary restraining order, decree or any order of any nature has been issued by any court or other Governmental Entity seeking or purporting to enjoin or restrain the execution, delivery and performance by the Company of this Agreement or the consummation by the Company of the transactions contemplated hereby or that would reasonably be expected to have a Company Material Adverse Effect.

SECTION 3.11    Compliance; Licenses and Permits.  (a)  Except as set forth in Section 3.11(a) of the Disclosure Schedule, each of the Company and its Subsidiaries has been since May 16, 2005, and is, in compliance with all Laws applicable to the Company, any of its Subsidiaries or their respective businesses, except for failures to comply with such Laws that,

individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.

(b)    Each of the Company and its Subsidiaries holds all federal, state, local and foreign governmental licenses and permits that are necessary to conduct their respective businesses as presently being conducted, except for such licenses and permits the failure of which to hold, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect. Except as set forth in Section 3.11(b) of the Disclosure Schedule and except for breaches, violations, revocations, limitations, non-renewals and failures to be in full force and effect that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect, (i) such licenses and permits are in full force and effect, (ii) no material violations are or have been recorded in respect of any thereof, (iii) no proceeding is pending or, to the knowledge of the Company, threatened in writing, to revoke or limit any thereof and (iv) the consummation of the Merger and the transactions contemplated by this Agreement will not result in the non-renewal, revocation or termination of any such license or permit.

SECTION 3.12    Intellectual Property.    Each of the Company and its Subsidiaries owns or has licensed or otherwise has the right to use all Intellectual Property that is material to the operation of their businesses, free of all material Liens. The Intellectual Property owned by the Company and its Subsidiaries and the use thereof in the conduct of the business of the Company and its Subsidiaries, and, to the knowledge of the Company, any other Intellectual Property licensed or used by the Company and its Subsidiaries, and the use thereof in the conduct of the business of the Company and its Subsidiaries, does not infringe or violate any Intellectual Property owned by others. There is no pending or, to the knowledge of the Company, threatened in writing claim, action or proceeding against the Company or any of its Subsidiaries contesting the right of the Company or any of its Subsidiaries to own, sell, license or use any Intellectual Property owned, sold, licensed or used by the Company or any of its Subsidiaries. The Company and its Subsidiaries have taken measures they deem reasonable to protect and maintain the Intellectual Property owned or purported to be owned by the Company and its Subsidiaries, except where a failure to take such measures would not be material to the Company or its Subsidiaries.

SECTION 3.13    Tax Matters.    Except as set forth in Section 3.13 of the Disclosure Schedule:

(a)    Each of the Company and its Subsidiaries has timely filed (taking into account applicable extensions) all Tax Returns required to be filed by it and has timely paid all material Taxes (whether or not shown on such Tax Returns). All such Tax Returns are true, correct and complete in all material respects. The Company and each of its Subsidiaries has made adequate provision (or adequate provision has been made on its behalf), in accordance with GAAP, for all accrued Taxes not yet due.

(b)    The Company and its Subsidiaries have withheld and paid over all material Taxes required to have been withheld and paid over, and have complied in all material respects with the rules and regulations relating to the withholding or remittance of Taxes.

-24-

(c)    None of the Company or any of its Subsidiaries has requested any extension of time within which to file any Tax Return, which Tax Return has not since been filed.  There are no outstanding waivers or comparable consents that have been given by the Company or any of its Subsidiaries regarding the application of any statute of limitations with respect to any Taxes or Tax Returns of the Company or any such Subsidiary.  There are no audits, administrative proceedings or court proceedings relating to Taxes or Tax Returns of the Company or any Subsidiary currently pending.  There are no material Liens on any assets of the Company or any Subsidiary with respect to Taxes, other than Liens for Taxes not yet due and payable or for Taxes that the Company or any of its Subsidiaries is contesting in good faith through appropriate proceedings and for which the Company has established adequate reserves in accordance with GAAP.  No claim has been made by a taxing authority in a jurisdiction where the Company or any of its Subsidiaries has not filed a Tax Return that the Company or such Subsidiary is required to file a Tax Return in such jurisdiction.

(d)    Neither the Company nor any of its Subsidiaries (A) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was the Company) or (B) has any liability for Taxes of any Person arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law or as a transferee or successor by contract or otherwise.  Neither the Company nor any of its Subsidiaries is a party to any Tax sharing or Tax indemnity agreement or any other agreement of a similar nature that remains in effect.

(e)    None of the Company or any of its Subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable.

(f)    No closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or foreign law) has been entered into by or with respect to the Company or any of its Subsidiaries.

(g)    The Company will not be required to include amounts in income, or exclude items of deduction, in a taxable period beginning on or after the Closing Date as a result of (i) a change in method of accounting prior to the Closing Date, (ii) other than in the ordinary course of business, an installment sale or open transaction arising in a taxable period (or portion thereof) ending on or before the Closing Date, (iii) other than with respect to customer deposits in the ordinary course of business, a prepaid amount received, or paid, prior to Closing Date or (iv) deferred gains arising prior to the Closing Date.

(h)    Neither the Company nor any U.S. Subsidiary has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(i)    Neither the Company nor any of its Subsidiaries has participated in or has any liability or obligation with respect to any "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4.

-25-

(j)    The Company has made valid elections under Treasury Regulations §301.7701-3 to have all its non-U.S. Subsidiaries disregarded as entities separate from their owners, which elections are still valid and in effect as of the date hereof.

(k)    GSI Group, or a predecessor entity, was eligible to make, and did properly make, an election under Section 1362 to be treated as an S Corporation, and such election was valid and in effect until the date on which GSI Group was acquired by the Company.

SECTION 3.14    Labor Relations; Employees.    (a)    Except as set forth in Section 3.14(a) of the Disclosure Schedule, as of the date hereof:  (i) the Company and each Subsidiary is in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages, hours or work and occupational safety and health, Laws pertaining to the termination of employment including the Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act") and any similar state or local Law and the Company and each Subsidiary is not engaged in any act or practice which would reasonably be expected to constitute an unfair labor practice as defined in the National Labor Relations Act or other applicable Laws, except any non-compliance which individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect, (ii) there is no unfair labor practice charge or complaint, grievance or arbitration against the Company or any Subsidiary pending or, to the knowledge of the Company, threatened in writing before the National Labor Relations Board or any similar state or foreign agency, (iii) there is no labor strike, dispute, slowdown, stoppage, lockout or other labor controversy pending, affecting or, to the knowledge of the Company, threatened in writing against the Company or any Subsidiary, nor have there been any such controversies since May 16, 2005 (iv) the Company and each Subsidiary is not a party to or bound by any collective bargaining or similar agreement, nor is any such agreement presently being negotiated; (v) to the knowledge of the Company, there are no union organizing activities among the employees of the Company or any Subsidiary and no such activities have been conducted since May 16, 2005; (vi) no action, suit, complaint, arbitration, or proceeding, and to the knowledge of the Company, no charge, inquiry, or investigation, by or before any court, governmental agency, administrative agency or commission brought by or on behalf of any employee, prospective employee, former employee, retiree, labor organization or other representative of employees of the Company and each Subsidiary is pending or, to the knowledge of the Company, threatened against the Company or any Subsidiary; (vii) the Company and each Subsidiary has paid in full to all employees (or properly accrued if payment is not yet due) all wages, salaries, commissions, bonuses, benefits and other compensation due to such employees or otherwise arising under any policy, practice, agreement, plan, program, statute or other law and neither the Company or any Subsidiary is liable for any severance pay or other payments to any employee or former employee arising from the termination of employment that has not already been satisfied in full, nor will the Company or any Subsidiary have any liability under any benefit or severance policy, practice, agreement, plan, or program which exists or arises, or may be deemed to exist or arise, under any applicable law or otherwise, as a result of or in connection with the transactions contemplated hereunder or as a result of the termination of any persons employed by the Company or any Subsidiary on or prior to the Closing Date; and (viii) neither the Company or any Subsidiary has closed any plant or facility, effectuated any mass layoffs of employees or implemented any early retirement, separation or window program within the past five years, nor

-26-

has the Company or any Subsidiary planned or announced any such action or program for the future.

(b)    Section 3.14(b) of the Disclosure Schedule contains a list of each material pension, profit-sharing, retirement, compensation, employment termination, deferred compensation, stock option, stock appreciation, stock purchase, performance share, bonus or other incentive, severance or termination pay, health, group insurance agreement plan, program or arrangement, as well any other "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that the Company or any of its Subsidiaries sponsors, maintains, or contributes to with respect to current or former employees, officers, directors, consultants or agents of the Company or any of its Subsidiaries or under which the Company or any of its Subsidiaries could have any present or future liability (each such plan, program or arrangement being hereinafter referred to in this Agreement individually as a "*Plan*").

(c)    The Company has made available to Buyer or Buyer's counsel a true and complete copy of each Plan (and all summary plan descriptions), all amendments thereto, the most recent IRS determination letter (if any), the most recent annual report (if any) filed in connection with such Plan and any actuarial report or financial statements, if any.

(d)    Each Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS that remains in effect on the date hereof. No event has occurred since such favorable determination letter was issued that could reasonably be expected to jeopardize the tax-qualified status of such Plan.

(e)    All contributions due with respect to any Plan that is subject to Title I of ERISA have been made as required under ERISA and have been accrued on the consolidated balance sheet of GSI Group at March 31, 2007, in accordance with GAAP (except as indicated in the notes thereto). The reserves reflected in the consolidated balance sheet of GSI Group at March 31, 2007 for the obligations of the Company under all Plans are adequate and were determined in accordance with GAAP.

(f)    No Plan is subject to the provisions of Section 412 of the Code, Part 3 of Subtitle B of Title I of ERISA, or Title IV of ERISA. None of the Company and its Subsidiaries has incurred any current or projected liability in respect of post-employment or post-retirement health, medical or life insurance benefits with respect to any current or former employees, officers, directors, consultants or agents (or their dependents, spouses or beneficiaries), except as required to avoid an excise tax under Section 4980B of the Code or otherwise except as may be required pursuant to any other applicable law.

(g)    No Plan constitutes a "multiemployer plan" (within the meaning of Section 3(37) of ERISA), and, with respect to the Company, neither the Company nor any of its ERISA Affiliates has, in the past seven years, contributed to or otherwise had any obligation or liability in connection with any multiemployer plan (within the meaning of Section 3(37) of ERISA).

(h)    No event has occurred and no condition exists that would subject the Company or any of its ERISA Affiliates to any tax, fine, lien, penalty or other liability imposed

by ERISA, the Code or other applicable laws, rules or regulations and no "prohibited transaction" (within the meaning of Section 4975 of the Code or Section 406 of ERISA) that would reasonably be expected to result in material liability to the Company or any of its Subsidiaries has occurred with respect to any Plan.

(i)    Each Plan was established and has been operated, in all material respects, in accordance with its terms and applicable Laws, and will continue to be so operated until the Closing Date.

(j)    Other than routine claims for benefits there are no actions, claims, lawsuits or arbitrations pending or, to the knowledge of the Company, threatened with respect to any Plan.

(k)    Except as set forth in Section 3.14(k) of the Disclosure Schedule, no Plan exists that, as a result of the execution of this Agreement, shareholder approval of this Agreement, or the transactions contemplated by this Agreement (whether alone or in connection with any subsequent event(s)), could (i) result in severance pay or any increase in severance pay upon any termination of employment after the date of this Agreement, (ii) accelerate the time of vesting or payment or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to any Plan or (iii) result in payments under any Plan that would not be deductible under Section 280G of the Code.

(l)    Each Plan that is maintained for the benefit of employees of any Subsidiary of the Company located outside of the United States was established and has been maintained in all material respects in accordance with its terms and with all legal requirements applicable thereto and has been funded or provided for in accordance with the Laws applicable thereto (and as reflected on the Company's consolidated financial statements.

SECTION 3.15    Transactions with Related Parties.  To the knowledge of the Company, except as set forth in Section 3.15 of the Disclosure Schedule, no employee, officer, director or Affiliate of the Company or any of its Subsidiaries, and no relative or spouse of any such employee, officer, director or Affiliate: (i) owns, directly or indirectly, any interest in (excepting less than 5% stock holdings for investment purposes in securities of publicly held and traded companies), or is an officer, director, employee or consultant of, any Person that is a competitor, lessor, lessee, supplier, distributor, sales agent or customer of, or lender to or borrower from, the Company or any of its Subsidiaries, (ii) owns, directly or indirectly, in whole or in part, any material property that the Company or any of its Subsidiaries uses in the conduct of its business, (iii) is involved in any business arrangement or other relationship with the Company or any of its Subsidiaries, (iv) has any cause of action or other claim whatsoever against, or owes any amount to, the Company or any of its Subsidiaries, except for claims in the ordinary course of business such as for accrued vacation pay, accrued benefits under employee benefit plans, and similar matters and agreements arising in the ordinary course of business or (v) has engaged in any transaction, or series of related transactions, agreements, arrangements or understandings, nor are there any currently proposed transactions, or series of related transactions, that would be required to be disclosed under Item 404 of Regulation S-K promulgated under the Securities Act that have not been disclosed in the SEC Reports.

-28-

SECTION 3.16    Brokers.    Except for UBS Securities LLC and Charlesbank Capital Partners, LLC, the fees and expenses of which are included in the Transaction Expenses, no agent, broker, investment banker, person or firm acting on behalf of the Company or any of its Subsidiaries or under the authority of the Company or any of its Subsidiaries is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties hereto in connection with any of the transactions contemplated hereby.  The Company has provided to Buyer a copy of the monitoring agreement between the Company and Charlesbank Capital Partners LLC and, promptly following the date hereof, shall provide Buyer with a copy of the engagement letter of UBS Securities LLC.  Following the Closing, the Surviving Corporation will not have continuing obligation to either UBS Securities LLC or Charlesbank Capital Partners LLC for the payment of fees or with respect to the provision of services (other than (i) fees payable with respect to any amounts received following the Effective Time by Stockholders and Option Holders in respect of the Adjustment Amount, Escrow Surplus Amount, Special Tax Deduction Benefit or the Contingent Consideration, and (ii) standard indemnification provisions with respect to the period prior to Closing).

SECTION 3.17    Insurance.    Section 3.17 of the Disclosure Schedule contains a list of each material insurance policy maintained with respect to the business of the Company and its Subsidiaries.  Except as set forth on Section 3.17 of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is in material default with respect to its obligations under any material insurance policy maintained by them.  Neither the Company nor any of its Subsidiaries has received written notice of termination, cancellation or non-renewal of any such insurance policies from any of its insurance brokers or carriers.  The Company has complied with each such insurance policy except where the failure to so comply would not reasonably be expected to have a Company Material Adverse Effect.

SECTION 3.18    Product Liability.    Except as set forth in Section 3.18 of the Disclosure Schedule, since May 16, 2005, the Company and its Subsidiaries have never received a material claim, or incurred any uninsured or insured material liability, for or based upon breach of product warranty (other than warranty service and repair claims in the ordinary course of business not material in amount or significance), strict liability in tort, negligent manufacture of product, negligent provision of services or any other allegation of liability, including or resulting in, but not limited to, product recalls, arising from the materials, design, testing, manufacture, packaging, labeling (including instructions for use) or sale of its products or from the provision of services.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Company and the Principal Stockholder as follows:

SECTION 4.1    Organization; Power and Authority.    Buyer is a corporation duly organized, validly existing and in good standing under the laws of Delaware.  Buyer has made available to the Company and the Principal Stockholder complete and correct copies of the constitutive documents of Buyer, in each case as amended to the date of this Agreement.  Buyer

-29-

is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary because of the property owned, leased or operated by it or because of the nature of its business as now being conducted, except for any failure to so qualify or be in good standing that, individually or in the aggregate, would not reasonably be expected to have a Buyer Material Adverse Effect.

SECTION 4.2    Authority; Approvals.    The execution, delivery and performance of this Agreement and the Escrow Agreement by Buyer and the consummation of the transactions contemplated hereby and thereby are within its corporate powers and have been duly and validly authorized by all necessary corporate action on the part of Buyer (other than the filing of a Certificate of Merger pursuant to the DGCL). This Agreement has been, and at the Closing the Escrow Agreement will be, duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the Company, the Principal Stockholder and Stockholders' Representative) constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity.

SECTION 4.3    Conflicts; Consents.    The execution, delivery and performance by Buyer of this Agreement and the Escrow Agreement and the consummation of the transactions contemplated hereby and thereby does not and will not (i) conflict with or result in a breach of the certificates of incorporation, by-laws or other constitutive documents of Buyer, (ii) conflict with, breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the provisions of any note, bond, lease, mortgage, indenture, or any license, franchise, permit, agreement or other instrument or obligation to which Buyer is a party, or by which any such Person or its properties or assets are bound or (iii) violate any Laws applicable to Buyer or Buyer's properties or assets, except where the occurrence of any of the foregoing described in clauses (ii) or (iii) above, individually or in the aggregate, would not reasonably be expected to have a Buyer Material Adverse Effect or prevent or materially delay the consummation of the Merger. Except for (A) the filing of a premerger notification and report form under the HSR Act and the expiration or early termination of the applicable waiting period thereunder, (B) compliance with and filings under other Competition Laws, (C) any filings as may be required under the DGCL in connection with the Merger and (D) such consents, approvals, notifications, registrations or filings the failure to obtain which, individually or in the aggregate, would not reasonably be expected to have a Buyer Material Adverse Effect or prevent or materially delay the consummation of the Merger, no consent or approval by, or notification of or registration or filing with, any Governmental Entity is required in connection with the execution, delivery and performance by Buyer of this Agreement and the Escrow Agreement or the consummation of the transactions contemplated hereby and thereby.

SECTION 4.4    Investment Representation.    Buyer is acquiring the Shares for its own account and not with a view to or for sale in connection with any distribution within the meaning of the applicable federal securities laws. Buyer and each of its equity holders is an "accredited investor" as defined in Regulation D promulgated by the SEC under the Securities Act. Buyer acknowledges that it is informed as to the risks of the transactions contemplated hereby and of its ownership of the Shares, and further acknowledges that the Shares have not

-30-

been registered under the federal securities laws or under any state or foreign securities laws, and that the Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transaction is pursuant to the terms of an effective registration statement under the Securities Act and are registered under any applicable state or foreign securities laws or pursuant to an exemption from registration thereunder.

SECTION 4.5    Brokers.  No agent, broker, investment banker, person or firm acting on behalf of Buyer or under the authority of Buyer is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties hereto in connection with the Merger or any of the transactions contemplated hereby for which the Company could have any liability prior to the Closing.

SECTION 4.6    Litigation.  As of the date hereof, there are no actions, suits, proceedings, claims, arbitrations or disputes pending or, to the knowledge of Buyer, threatened in writing by or before any court or other Governmental Entity against Buyer that bring into question the validity of this Agreement or would reasonably be expected to have a Buyer Material Adverse Effect.

SECTION 4.7    Funds.  Buyer has delivered to the Company correct and complete copies of (a) an executed commitment letter from Centerbridge Capital Partners, L.P. (the *"Equity Sponsor"*) in an aggregate amount of $110,000,000, subject to reduction by the amount of the Management Rollover Amount and the aggregate other cash investment committed to by members of the Company's management (the *"Equity Commitment Letter"*), and (b) an executed commitment letter from UBS Loan Finance LLC (including all related termsheets, fee letters and other documents relating to such commitment, the *"Debt Commitment Letter"* and, together with the Equity Commitment Letter, the *"Commitments"*) pursuant to which such lender has committed to provide Buyer with financing in the amounts set forth therein (the *"Debt Financing"* and, together with the financing referred to in clause (a), the *"Financing"*).  As of the date hereof, the Commitments are in full force and effect and each Commitment is a legal, valid and binding obligation of Buyer, and to the knowledge of Buyer, the other parties thereto. No event has occurred that, with or without notice, lapse of time or both, would constitute a default on the part of Buyer under either the Equity Commitment Letter or the Debt Commitment Letter.  Buyer has no reason to believe that it will be unable to satisfy on a timely basis any term of, or condition to closing to be satisfied by it contained in, the Equity Commitment Letter or the Debt Commitment Letter.  Buyer has fully paid any and all commitment fees and other fees required by the Debt Commitment Letter to be paid as of the date hereof.  Subject to terms and conditions of the Commitments and this Agreement, the aggregate proceeds contemplated by the Commitments when funded in accordance with their terms, will in aggregate be sufficient to consummate the Merger upon the terms contemplated by this Agreement.

SECTION 4.8    Guaranty.  The Guaranty is valid and in full force and effect, and no event has occurred that, with or without notice, lapse of time or both, would constitute a default on the part of Centerbridge Capital Partners, L.P. under the Guaranty.

SECTION 4.9    Operations of Buyer.  Buyer has been formed solely for the purpose of engaging in the transactions contemplated hereby and prior to the Effective Time will have engaged in no other business activities and will have incurred no liabilities or obligations

other than in connection with this Agreement, the performance of its obligations hereunder and matters ancillary thereto.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE PRINCIPAL STOCKHOLDER

The Principal Stockholder represents and warrants to Buyer as follows:

SECTION 5.1    Authority; Binding Agreement.  The Principal Stockholder has all requisite authority to enter into this Agreement and to consummate the transactions contemplated hereby.   The execution, delivery and performance of this Agreement by the Principal Stockholder and the consummation of the transactions contemplated hereby are within its partnership powers and have been duly and validly authorized by all necessary partnership action on the part of the Principal Stockholder.  This Agreement has been duly executed and delivered by the Principal Stockholder, and (assuming due authorization, execution and delivery by Buyer the Company and Stockholders' Representative) constitutes the valid and binding obligation of the Principal Stockholder, enforceable against the Principal Stockholder in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity.

SECTION 5.2    Title to Shares.  The Principal Stockholder holds of record and beneficially owns all of the Shares listed on Section 5.2 of the Disclosure Schedule as owned by the Principal Stockholder (the "*Principal Stockholder Shares*") and owns no securities issued by, or other obligations of, the Company other than the Principal Stockholder Shares.  Except as set forth on Section 5.2 of the Disclosure Schedule, the Principal Stockholder's Principal Stockholder Shares are held by the Principal Stockholder free and clear of all Encumbrances, restrictions on transfer (other than restrictions under the Securities Act and state securities law), rights of first refusal and voting trust, proxy, or other agreements or understandings.  Except as set forth on Section 5.2 of the Disclosure Schedule, the Principal Stockholder is not a party to any option, warrant, right, contract, call, put, or other agreement or commitment relating to the capital stock of the Company or providing for the disposition or acquisition of any capital stock or other equity rights of the Company, other than this Agreement.

## ARTICLE VI

### CERTAIN COVENANTS

SECTION 6.1    Conduct of Business.  (a)  From the date of this Agreement until the Closing, except as set forth on Schedule 6.1 or as permitted or required by this Agreement or otherwise consented to by Buyer in writing (which consent shall not be unreasonably withheld or delayed), the Company shall operate its business only in the ordinary course of business consistent with past practice.  The Company shall use its commercially reasonable efforts to:

(i)    preserve intact the present organization of the Company and its Subsidiaries;

(ii)    keep available the services of the present officers and employees of the Company;

(iii)    preserve the Company's goodwill and relationships with material customers, suppliers, licensors, licensees, contractors, distributors, lenders and other Persons having significant business dealings with the Company and its Subsidiaries;

(iv)    continue all current sales, marketing and other promotional policies, programs and activities;

(v)    maintain the assets of the Company and its Subsidiaries in good repair, order and condition;

(vi)    maintain the Company's insurance policies and risk management programs, and in the event of casualty, loss or damage to any assets of the Company or any of its Subsidiaries, repair or replace such assets with assets of comparable quality, as the case may be; and

(vii)    not, at any time within the 90-day period prior to the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act or any similar triggering event under state law, affecting in whole or in part any site of employment, facility, operating unit or employee of the Company or its Subsidiaries, without notifying the Buyer in advance and obtaining the advance approval of the Buyer, and complying with all provisions of the WARN Act or any state law.

(b)    Without limiting the generality of the foregoing, except as set forth on Schedule 6.1, the Company shall not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), directly or indirectly (i) cause or permit any state of affairs, action or omission described in Section 3.6 or (ii) take or agree in writing or otherwise to take any action that would reasonably be expected to prevent the satisfaction of any condition to closing set forth in Article VII.

SECTION 6.2    Access and Information; Confidentiality. (a) Subject to the terms of the Confidentiality Agreement, from the date of this Agreement until the earlier of (i) the Closing and (ii) the termination of this Agreement in accordance with Article IX, the Company shall allow Buyer and its financing parties and their respective Representatives to make such reasonable investigation of the business, operations and properties of the Company as is reasonably necessary in connection with the transactions contemplated by this Agreement. Such investigation shall include reasonable access to the officers, employees and agents of the Company and its Subsidiaries and the properties, books, records and commitments of the Company and its Subsidiaries. The Company shall furnish Buyer and its Representatives with such financial, operating and other data and information and copies of documents with respect to the Company or any of the transactions contemplated by this Agreement as Buyer shall from time to time reasonably request unless the disclosure of any information would jeopardize attorney-client privilege or the attorney-client work product doctrine.

-33-

(b)    Buyer shall, and shall cause its financing parties and their respective Representatives to, hold any information regarding the Company or any of its Subsidiaries that is non-public in confidence in accordance with the terms of the Confidentiality Agreement and, in the event this Agreement is terminated, Buyer shall, and shall cause its financing parties and their respective Representatives to, promptly return or destroy such information in accordance with the Confidentiality Agreement.

(c)    All access and investigation pursuant to this Section 6.2 shall be coordinated through the chief financial officer of GSI Group and shall occur only upon reasonable notice and during normal business hours and shall be conducted at Buyer's expense and in such a manner as not to unreasonably interfere with the normal operations of the business of the Company and its Subsidiaries and shall be subject to existing confidentiality obligations of the Company and its Subsidiaries and applicable Law.

SECTION 6.3    Approval of the Stockholders of the Company.  (a) Neither the Board of Directors of the Company nor any committee thereof shall withdraw, amend or modify, or propose or resolve to withdraw, amend or modify in a manner adverse to Buyer, the recommendation of the Board of Directors of the Company that the Company's stockholders vote in favor of the adoption of this Agreement.

(b)    Promptly following execution of this Agreement, the Principal Stockholder expects to execute and deliver to Buyer the action by written consent of stockholders in lieu of a meeting to adopt this Agreement and approve the Merger pursuant to the DGCL in the form attached hereto as Exhibit B (the "Written Consent").

(c)    Within ten Business Days following the date hereof, the Company shall deliver by any manner permitted by applicable Law the notice required pursuant to Section 262 of the DGCL to each Stockholder of record that has not theretofore executed and delivered such action by written consent referred to in Section 6.3(b) and each Option Holder holding Options that are or may become exercisable prior to the Effective Time (the "Dissenters' Rights Notice"). The Dissenters' Rights Notice shall comply in all material respects with applicable Law. The Company shall take all actions, and do or cause to be done, all things necessary, proper or advisable to deliver the Dissenters' Rights Notice and any subsequent notice required to be delivered, or subsequent action to be taken with respect to Dissenting Shares, pursuant to the DGCL and other applicable Law.

SECTION 6.4    Reasonable Efforts; Further Assurances. (a) Upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto will use all commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Escrow Agreement as expeditiously as practicable and to ensure that the conditions set forth in Article VII are satisfied, insofar as such matters are within the control of any of them, including making the requisite filings pursuant to the HSR Act and other applicable Competition Laws. Without limiting the generality of the foregoing, and subject to Section 6.2, the Company and the Principal Stockholder, on the one hand, and Buyer, on the other hand, shall each furnish to the

other such necessary information and reasonable assistance as the other party may reasonably request in connection with the foregoing.

(b)     In case at any time after the Effective Time any further action is necessary to carry out the purposes of this Agreement, each of the parties to this Agreement shall take or cause to be taken all such necessary action, including the execution and delivery of such further instruments and documents, as may be reasonably requested by any party hereto for such purposes or otherwise to consummate the transactions contemplated by this Agreement and the Escrow Agreement.

SECTION 6.5     Public Announcements. (a) Other than the joint press release to be issued by the parties in connection with the execution of this Agreement, none of the parties shall issue any press release or any public statement with respect to the existence of this Agreement or the transactions contemplated hereby and, except as may be required by applicable Law, will not issue any such press release or make any such public statement without obtaining the prior written approval of the other parties hereto, which approval shall not be unreasonably withheld or delayed.

(b)     Each party agrees that the terms of this Agreement shall not be disclosed or otherwise made public and the copies of this Agreement shall not be publicly filed or otherwise made available to the public, except where such disclosure, availability or filing is required by applicable Law and only to the extent required by such Law.  In the event that such disclosure, availability or filing is required by applicable Law, then to the extent "confidential treatment" would be available, each of the parties agrees to use its reasonable best efforts to obtain "confidential treatment" of this Agreement and to redact such terms of this Agreement the other party shall request.  In any event, the Company shall be permitted to disclose this Agreement and the terms hereof, to the extent required by any forms, reports and other documents that are required to be filed by the Company under the Exchange Act; *provided*, that the Company has provided the Buyer with a reasonable opportunity to review and comment on such disclosures.

SECTION 6.6     Indemnification of Directors and Officers. For six years from and after the Closing Date, the Surviving Corporation and its successors will indemnify and hold harmless the present and former officers, directors, employees and agents of the Company and its Subsidiaries in respect of acts or omissions arising out of or pertaining to such Person's service as a director or officer of the Company or its Subsidiary or services performed by such Person at the request of the Company or its Subsidiary occurring on or prior to the Closing Date to the extent provided under the Company's certificate of incorporation and by-laws in effect on the date of this Agreement; *provided* that such indemnification shall be subject to any limitation imposed from time to time under applicable Law.  As soon as practicable following the Effective Time, the Surviving Corporation will purchase a six year "run-off" or "tail" policy  in respect of acts or omissions occurring on or prior to the Closing Date covering each Person currently covered by the Company's and each Subsidiary's officers' and directors' liability insurance policies on terms and in amounts comparable to those of such policies in effect on the date of this Agreement and covering the period of six years from and after the Closing Date; *provided, however*, that in no event shall the Surviving Corporation be permitted or required to expend for such policies pursuant to this sentence an amount in excess of 200% of the annual premium paid

for the policies in effect on the date of this Agreement; and *provided, further*, that if the premium for such insurance coverage exceeds such amount, the Surviving Corporation shall obtain an extension with the greatest coverage available for a cost not exceeding such amount. The Surviving Corporation and its successors shall cause such policy to remain in effect for six years from and after the Closing Date.

SECTION 6.7    <u>Section 280G</u>.  With respect to each employee of the Company or any subsidiary of the Company who is, or would reasonably be expected to be as of the Closing Date, a "disqualified individual" (as defined in Section 280G(c) of the Code), the Company shall use its commercially reasonable efforts to (i) ensure that any payments that would otherwise constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code) shall be exempt from the definition of "parachute payment" by reason of the exemption provided under Section 280G(b)(5)(A)(ii) of the Code, and (ii) take all actions reasonably necessary to so exempt such payments (including obtaining any necessary waivers or consents from such "disqualified individuals") as soon as reasonably practicable following the date of this Agreement.  To the extent that, as of the Effective Time, any "excess parachute payment" (as defined in Section 280G of the Code) is paid or payable to any disqualified individual in connection with the transactions contemplated by this Agreement, the Enterprise Value shall be reduced by the cost to the Company and its Subsidiaries of any obligation to make additional payments to any such disqualified individual as a result of the existence of such excess parachute payment.

SECTION 6.8    <u>Expenses</u>.  Each party hereto shall bear its own fees, costs and expenses incurred in the pursuit of the transactions contemplated by this Agreement, including the fees and expenses of its respective counsel, financial advisors and accountants; and *provided* that Buyer shall pay, or cause to be paid, any Transaction Expenses that are unpaid as of the Closing as provided in Section 2.5; and *provided further* that the fees and expenses of the Independent Accountant, if any, shall be allocated as provided in Section 2.3 and the fees and expenses of the Arbitrator, if any, shall be allocated as provided in Section 2.8. Notwithstanding the foregoing, upon consummation of the transactions contemplated hereby, the Surviving Corporation may reimburse Buyer and Centerbridge Capital Partners L.P. for the reasonable fees, costs and expenses incurred by Buyer and Centerbridge Capital Partners L.P. in connection with the transactions contemplated by this Agreement (including the reasonable fees and expenses of Buyer's counsel, financial advisors, and accountants and consultants and any transaction fee paid by Buyer to Centerbridge Partners, L.P. or one of its Affiliates (to the extent consistent with Schedule 6.16)).

SECTION 6.9    <u>Continuity of Employees and Employee Benefits</u>.    The Surviving Corporation shall, for a period of one year after the Closing, provide employees of the Surviving Corporation who were employees of the Company and its Subsidiaries immediately prior to the Closing with annual rates of base salary or hourly wages, as applicable, annual incentive opportunities and coverage and benefits pursuant to employee benefit plans, programs, policies and arrangements that are, in the aggregate, not materially less favorable than the compensation and benefits provided to such employees under the Plans immediately prior to the Closing; *provided*, that the foregoing shall not obligate the Company to maintain the employment of any employee for any specified period after the Closing.  Where applicable, each such employee shall receive full credit for service with the Company and its Subsidiaries

-36-

(including predecessor companies) for purposes of determining eligibility to participate, vesting and accrual (excluding benefit accrual under defined benefit plans) under each employee benefit plan, program, policy or arrangement to be provided by the Surviving Corporation to such employee to the same extent such service was recognized under the applicable Plan immediately prior to the Closing. In addition, as of the Effective Time, the Surviving Corporation shall assume all obligations, liabilities or commitments with respect to continued participation in health programs required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the rules and regulations promulgated thereunder ("*COBRA*"), for all "M&A qualified beneficiaries" (within the meaning of 26 C.F.R. § 54.4980B-9, Q&A-4).

SECTION 6.10    Supplemental Information.    Prior to Closing, the Company will supplement or amend the Disclosure Schedule with respect to any fact, matter or circumstance that the Company or the Principal Stockholder learns of and that is required to make each representation or warranty set forth in Articles III and V, respectively, accurate as of the date such supplement or amendment is made. The parties hereto agree that the furnishing of such corrected and supplemental information pursuant to this Section 6.10 shall not affect whether a breach has occurred pursuant to the representations and warranties being made as of the date hereof or as of the Closing Date.

SECTION 6.11    Tax Matters.    (a) The Surviving Corporation shall be liable for all Transfer Taxes arising from the transactions contemplated by this Agreement. "*Transfer Taxes*" means all sales, use, real property transfer, real property gains, transfer, stamp, registration, documentary, recording or similar Taxes, together with any interest thereon, penalties, fines, costs, fees or additions to tax.

(b)    The Company shall deliver to Buyer and the Principal Stockholder a certificate pursuant to Treasury Regulations Section 1.897-2(h) stating that it is not a U.S. real property holding corporation as defined in Section 897 of the Code and certifying any facts that would exempt the transaction contemplated hereby from withholding under Section 1445 of the Code.

(c)    To the extent permitted by law, the Surviving Corporation and its Affiliates shall (i) claim the appropriate deductions on their Tax Returns for any Special Tax Deduction Items, and (ii) carry back any net operating losses for the taxable year in which such deductions are claimed. The Tax Returns reflecting any Special Tax Deduction Items shall be filed by the Surviving Corporation or appropriate Affiliate on or prior to the due date thereof (taking into account extensions) and any claim for refund (as permitted by law) shall be filed on such date or as reasonably practicable thereafter. To the extent any Special Tax Deduction Items give rise to a Special Tax Deduction Benefit (as defined below), unless otherwise directed by Stockholders' Representative pursuant to Section 8.3(b), the Surviving Corporation shall pay (at such time as described in Section 6.11(d) below) to the Stockholders' Representative (on behalf of the Stockholders and Option Holders), which payment shall be treated by all parties hereto for Tax purposes, as an adjustment to the Final Merger Consideration, any such Special Tax Deduction Benefit. For purposes of this Section 6.11(c), each Rollover Share shall entitle the holder thereof to participate in the payment of Special Tax Deduction Benefit pursuant to the preceding sentence with respect to such Rollover Share as if such Rollover Share had been converted into the right to receive the merger consideration payable hereunder pursuant to

payable to any officer, stockholder, director, consultant or agent of the Company or any of its Subsidiaries having an annual salary or remuneration in excess of $200,000;

(xii)    any grant of severance or termination pay to any employee, officer, director, consultant or officer of the Company or any of its Subsidiaries, other than, prior to the date hereof, in connection with the Company's severance policies and procedures as in effect at the relevant time;

(xiii)    any loan or advance of money or other property by the Company or its Subsidiaries to any employee, officer, director, consultant or officer of the Company or any of its Subsidiaries;

(xiv)    any damage, destruction or loss not covered by insurance affecting any asset or property of the Company or any of its Subsidiaries resulting in liability or loss in excess of $500,000;

(xv)    any entry into, cancellation, termination, material modification or, prior to the date hereof, any failure to renew, of any material contract (in each case, other than in the ordinary course of business consistent with past practice);

(xvi)    any institution, payment, discharge, satisfaction or settlement by the Company or its Subsidiaries of any litigation (including, without limitation, the Sukup Litigation) or any waiver, assignment or release by the Company or its Subsidiaries of any rights or claims;

(xvii)    any change in the independent public accountants of the Company and its Subsidiaries or any change in the accounting methods or accounting practices followed by the Company or any material change in depreciation or amortization policies or rates; or

(xviii)    any agreement, whether in writing or otherwise, to take any of the actions specified in the foregoing items (i) through (xvii), subject to any dollar thresholds set forth in items (i) through (xvii) above.

SECTION 3.7    Assets and Properties.    (a)    Section 3.7 of the Disclosure Schedule sets forth a true and complete list of all real property ("*Real Property*") owned or leased by the Company or any of its Subsidiaries and the address and owner or lessee of each parcel of Real Property. Except as set forth in Section 3.7 of the Disclosure Schedule, each of the Company and its Subsidiaries has good, valid and marketable fee simple title to, or a good and valid leasehold interest in, as applicable, all of its owned or leased real property, except for defects in title or failures to be in full force and effect that individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect. Each of the Company and its Subsidiaries has good title to, or a valid leasehold interest in, as applicable, all buildings, machinery, equipment and all other tangible assets and personal property used in their respective businesses, except for defects in title or failures to be in full force and effect that individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect. Such property (individually or taken as a whole) is in good operating condition and repair,

ordinary wear and tear excepted, are usable in the ordinary course of business and are reasonably adequate and suitable for the uses to which they are put.

(b)     Neither the Company nor any of its Subsidiaries is in material default under any material term of any lease or, to the knowledge of the Company, any declaration, restriction, covenant, option agreement or right of first refusal relating to the Real Property leased by the Company or any of its Subsidiaries, nor, to the knowledge of the Company, does any state of facts exist which with the passage of time would constitute a material default of the Company or any of its Subsidiaries under any material term of any lease or any declaration, restriction, covenant, option agreement or right of first refusal relating to the Real Property leased by the Company or any of its Subsidiaries. Neither the Company nor any of its Subsidiaries is a party to any contract or option to purchase any real property or interest therein relating to, or intended to be used in the operation of its business. To the knowledge of the Company, there does not exist any actual, pending or threatened condemnation or eminent domain proceedings that affect any Real Property owned or leased by the Company or any of its Subsidiaries, and neither the Company nor any of its Subsidiaries have received any written notice of the intention of any Governmental Authority to condemn or take by eminent domain any Real Property owned or leased by the Company or any of its Subsidiaries that is necessary or material to the operations of the Company and its Subsidiaries taken as a whole. Except as set forth in Section 3.7(b) of the Disclosure Schedule, the Company has, prior to the date of this Agreement and to the extent reasonably available to the Company, made available to the Buyer, copies of all existing vesting deeds, title policies and surveys and all other material documents, instruments and agreements pursuant to which the Company or any of its Subsidiaries' holds or maintains property rights to, or the ownership, use and possession of, the Real Property owned or leased by the Company or any of its Subsidiaries.

SECTION 3.8    Other Agreements. (a) Section 3.8 of the Disclosure Schedule lists as of the date of this Agreement each written or oral contract (other than purchase orders, supply agreements and standard sales contracts in the ordinary course of business), agreement, commitment, license or lease of the Company and its Subsidiaries currently in effect that by its terms (i) is not terminable at will within 12 months and requires future expenditures or receipts or other performance with respect to goods, services, assets, rights or properties having a value in excess of $2,000,000 or (ii) is material to the Company and its Subsidiaries, taken as a whole. Copies of all such contracts, agreements, commitments, licenses and leases have previously been made available to Buyer. All of such contracts, agreements, commitments and leases are in full force and effect, except where the failure to be in full force and effect would not reasonably be expected to have a Company Material Adverse Effect, and all are enforceable against the Company or its applicable Subsidiary and, to the knowledge of the Company, the other parties thereto in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any other party to such contracts, agreements, commitments, licenses and leases is in breach of or default under any obligation thereunder or has given notice of default to any other party thereunder and, to the knowledge of the Company, no condition exists that with notice or lapse of time would constitute a default thereunder, in each case which breach or default would reasonably be expected to have a Company Material Adverse Effect.

(b)    Except as disclosed in Section 3.8(b) of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to or bound by any contract which relates to any acquisition by the Company or its Subsidiaries pursuant to which the Company or any of its Subsidiaries has continuing indemnification, "earn-out" or other contingent payment obligations, in each case, that could result in payments in excess of $100,000.

SECTION 3.9    Environmental Matters.    Each of the Company and its Subsidiaries holds all licenses, permits and other governmental authorizations required under all applicable Environmental Laws to operate as it currently operates and over the past fiscal year has been operated, except for such licenses, permits and other governmental authorizations the failure of which to hold, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect. None of the Company or any of its Subsidiaries is in violation of, or since May 16, 2005 (and to the knowledge of the Company at any time prior thereto), has violated, any applicable Environmental Laws, except for violations that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect. There are no conditions relating to the Company or any of its Subsidiaries or relating to any real property currently or, to the knowledge of the Company, formerly owned or leased or used by or on behalf of the Company or any of its Subsidiaries or, to the knowledge of the Company, any of their predecessors that in any such case would reasonably be expected to result in or be the basis for any liability of the Company or any of its Subsidiaries under any applicable Environmental Law or regarding Hazardous Substances that, individually or in the aggregate, would reasonably be expected to have a Company Material Adverse Effect. The Company has, to the extent reasonably available to the Company or any of its Subsidiaries, made available to the Buyer copies of all material reports or similar documents regarding environmental assessments, reviews, audits, investigations, or other evaluations relating to the Company or any of its Subsidiaries.

SECTION 3.10    Litigation.    There are no actions, suits, arbitrations, proceedings, claims or disputes by or before any court or other Governmental Entity ("*Proceedings*") that would reasonably be expected to have a Company Material Adverse Effect. All pending or threatened in writing Proceedings involving claims against the Company or any of its Subsidiaries of which the Company has knowledge as of the date of this Agreement are set forth on Section 3.10 of the Disclosure Schedule. For each action, suit, arbitration, proceeding, claim or dispute pending or threatened for which a reserve has been established by the Company, Section 3.10 of the Disclosure Schedule sets forth the amount of such reserve. No injunction, judgment, writ, temporary restraining order, decree or any order of any nature has been issued by any court or other Governmental Entity seeking or purporting to enjoin or restrain the execution, delivery and performance by the Company of this Agreement or the consummation by the Company of the transactions contemplated hereby or that would reasonably be expected to have a Company Material Adverse Effect.

SECTION 3.11    Compliance; Licenses and Permits.    (a) Except as set forth in Section 3.11(a) of the Disclosure Schedule, each of the Company and its Subsidiaries has been since May 16, 2005, and is, in compliance with all Laws applicable to the Company, any of its Subsidiaries or their respective businesses, except for failures to comply with such Laws that,

individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.

(b)    Each of the Company and its Subsidiaries holds all federal, state, local and foreign governmental licenses and permits that are necessary to conduct their respective businesses as presently being conducted, except for such licenses and permits the failure of which to hold, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.  Except as set forth in Section 3.11(b) of the Disclosure Schedule and except for breaches, violations, revocations, limitations, non-renewals and failures to be in full force and effect that, individually or in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect, (i) such licenses and permits are in full force and effect, (ii) no material violations are or have been recorded in respect of any thereof, (iii) no proceeding is pending or, to the knowledge of the Company, threatened in writing, to revoke or limit any thereof and (iv) the consummation of the Merger and the transactions contemplated by this Agreement will not result in the non-renewal, revocation or termination of any such license or permit.

SECTION 3.12    Intellectual Property.    Each of the Company and its Subsidiaries owns or has licensed or otherwise has the right to use all Intellectual Property that is material to the operation of their businesses, free of all material Liens.  The Intellectual Property owned by the Company and its Subsidiaries and the use thereof in the conduct of the business of the Company and its Subsidiaries, and, to the knowledge of the Company, any other Intellectual Property licensed or used by the Company and its Subsidiaries, and the use thereof in the conduct of the business of the Company and its Subsidiaries, does not infringe or violate any Intellectual Property owned by others.  There is no pending or, to the knowledge of the Company, threatened in writing claim, action or proceeding against the Company or any of its Subsidiaries contesting the right of the Company or any of its Subsidiaries to own, sell, license or use any Intellectual Property owned, sold, licensed or used by the Company or any of its Subsidiaries.  The Company and its Subsidiaries have taken measures they deem reasonable to protect and maintain the Intellectual Property owned or purported to be owned by the Company and its Subsidiaries, except where a failure to take such measures would not be material to the Company or its Subsidiaries.

SECTION 3.13    Tax Matters.    Except as set forth in Section 3.13 of the Disclosure Schedule:

(a)    Each of the Company and its Subsidiaries has timely filed (taking into account applicable extensions) all Tax Returns required to be filed by it and has timely paid all material Taxes (whether or not shown on such Tax Returns).  All such Tax Returns are true, correct and complete in all material respects.  The Company and each of its Subsidiaries has made adequate provision (or adequate provision has been made on its behalf), in accordance with GAAP, for all accrued Taxes not yet due.

(b)    The Company and its Subsidiaries have withheld and paid over all material Taxes required to have been withheld and paid over, and have complied in all material respects with the rules and regulations relating to the withholding or remittance of Taxes.

-24-

(c)    None of the Company or any of its Subsidiaries has requested any extension of time within which to file any Tax Return, which Tax Return has not since been filed.  There are no outstanding waivers or comparable consents that have been given by the Company or any of its Subsidiaries regarding the application of any statute of limitations with respect to any Taxes or Tax Returns of the Company or any such Subsidiary.  There are no audits, administrative proceedings or court proceedings relating to Taxes or Tax Returns of the Company or any Subsidiary currently pending.  There are no material Liens on any assets of the Company or any Subsidiary with respect to Taxes, other than Liens for Taxes not yet due and payable or for Taxes that the Company or any of its Subsidiaries is contesting in good faith through appropriate proceedings and for which the Company has established adequate reserves in accordance with GAAP.  No claim has been made by a taxing authority in a jurisdiction where the Company or any of its Subsidiaries has not filed a Tax Return that the Company or such Subsidiary is required to file a Tax Return in such jurisdiction.

(d)    Neither the Company nor any of its Subsidiaries (A) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was the Company) or (B) has any liability for Taxes of any Person arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law or as a transferee or successor by contract or otherwise.  Neither the Company nor any of its Subsidiaries is a party to any Tax sharing or Tax indemnity agreement or any other agreement of a similar nature that remains in effect.

(e)    None of the Company or any of its Subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable.

(f)    No closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or foreign law) has been entered into by or with respect to the Company or any of its Subsidiaries.

(g)    The Company will not be required to include amounts in income, or exclude items of deduction, in a taxable period beginning on or after the Closing Date as a result of (i) a change in method of accounting prior to the Closing Date, (ii) other than in the ordinary course of business, an installment sale or open transaction arising in a taxable period (or portion thereof) ending on or before the Closing Date, (iii) other than with respect to customer deposits in the ordinary course of business, a prepaid amount received, or paid, prior to Closing Date or (iv) deferred gains arising prior to the Closing Date.

(h)    Neither the Company nor any U.S. Subsidiary has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(i)    Neither the Company nor any of its Subsidiaries has participated in or has any liability or obligation with respect to any "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4.

(j)    The Company has made valid elections under Treasury Regulations §301.7701-3 to have all its non-U.S. Subsidiaries disregarded as entities separate from their owners, which elections are still valid and in effect as of the date hereof.

(k)    GSI Group, or a predecessor entity, was eligible to make, and did properly make, an election under Section 1362 to be treated as an S Corporation, and such election was valid and in effect until the date on which GSI Group was acquired by the Company.

SECTION 3.14    Labor Relations; Employees.    (a) Except as set forth in Section 3.14(a) of the Disclosure Schedule, as of the date hereof: (i) the Company and each Subsidiary is in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages, hours or work and occupational safety and health, Laws pertaining to the termination of employment including the Worker Adjustment and Retraining Notification Act of 1988 ("*WARN Act*") and any similar state or local Law and the Company and each Subsidiary is not engaged in any act or practice which would reasonably be expected to constitute an unfair labor practice as defined in the National Labor Relations Act or other applicable Laws, except any non-compliance which individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect, (ii) there is no unfair labor practice charge or complaint, grievance or arbitration against the Company or any Subsidiary pending or, to the knowledge of the Company, threatened in writing before the National Labor Relations Board or any similar state or foreign agency, (iii) there is no labor strike, dispute, slowdown, stoppage, lockout or other labor controversy pending, affecting or, to the knowledge of the Company, threatened in writing against the Company or any Subsidiary, nor have there been any such controversies since May 16, 2005 (iv) the Company and each Subsidiary is not a party to or bound by any collective bargaining or similar agreement, nor is any such agreement presently being negotiated; (v) to the knowledge of the Company, there are no union organizing activities among the employees of the Company or any Subsidiary and no such activities have been conducted since May 16, 2005; (vi) no action, suit, complaint, arbitration, or proceeding, and to the knowledge of the Company, no charge, inquiry, or investigation, by or before any court, governmental agency, administrative agency or commission brought by or on behalf of any employee, prospective employee, former employee, retiree, labor organization or other representative of employees of the Company and each Subsidiary is pending or, to the knowledge of the Company, threatened against the Company or any Subsidiary; (vii) the Company and each Subsidiary has paid in full to all employees (or properly accrued if payment is not yet due) all wages, salaries, commissions, bonuses, benefits and other compensation due to such employees or otherwise arising under any policy, practice, agreement, plan, program, statute or other law and neither the Company or any Subsidiary is liable for any severance pay or other payments to any employee or former employee arising from the termination of employment that has not already been satisfied in full, nor will the Company or any Subsidiary have any liability under any benefit or severance policy, practice, agreement, plan, or program which exists or arises, or may be deemed to exist or arise, under any applicable law or otherwise, as a result of or in connection with the transactions contemplated hereunder or as a result of the termination of any persons employed by the Company or any Subsidiary on or prior to the Closing Date; and (viii) neither the Company or any Subsidiary has closed any plant or facility, effectuated any mass layoffs of employees or implemented any early retirement, separation or window program within the past five years, nor

-26-

has the Company or any Subsidiary planned or announced any such action or program for the future.

(b)    Section 3.14(b) of the Disclosure Schedule contains a list of each material pension, profit-sharing, retirement, compensation, employment termination, deferred compensation, stock option, stock appreciation, stock purchase, performance share, bonus or other incentive, severance or termination pay, health, group insurance agreement plan, program or arrangement, as well any other "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that the Company or any of its Subsidiaries sponsors, maintains, or contributes to with respect to current or former employees, officers, directors, consultants or agents of the Company or any of its Subsidiaries or under which the Company or any of its Subsidiaries could have any present or future liability (each such plan, program or arrangement being hereinafter referred to in this Agreement individually as a "*Plan*").

(c)    The Company has made available to Buyer or Buyer's counsel a true and complete copy of each Plan (and all summary plan descriptions), all amendments thereto, the most recent IRS determination letter (if any), the most recent annual report (if any) filed in connection with such Plan and any actuarial report or financial statements, if any.

(d)    Each Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS that remains in effect on the date hereof.  No event has occurred since such favorable determination letter was issued that could reasonably be expected to jeopardize the tax-qualified status of such Plan.

(e)    All contributions due with respect to any Plan that is subject to Title I of ERISA have been made as required under ERISA and have been accrued on the consolidated balance sheet of GSI Group at March 31, 2007, in accordance with GAAP (except as indicated in the notes thereto).  The reserves reflected in the consolidated balance sheet of GSI Group at March 31, 2007 for the obligations of the Company under all Plans are adequate and were determined in accordance with GAAP.

(f)    No Plan is subject to the provisions of Section 412 of the Code, Part 3 of Subtitle B of Title I of ERISA, or Title IV of ERISA.  None of the Company and its Subsidiaries has incurred any current or projected liability in respect of post-employment or post-retirement health, medical or life insurance benefits with respect to any current or former employees, officers, directors, consultants or agents (or their dependents, spouses or beneficiaries), except as required to avoid an excise tax under Section 4980B of the Code or otherwise except as may be required pursuant to any other applicable law.

(g)    No Plan constitutes a "multiemployer plan" (within the meaning of Section 3(37) of ERISA), and, with respect to the Company, neither the Company nor any of its ERISA Affiliates has, in the past seven years, contributed to or otherwise had any obligation or liability in connection with any multiemployer plan (within the meaning of Section 3(37) of ERISA).

(h)    No event has occurred and no condition exists that would subject the Company or any of its ERISA Affiliates to any tax, fine, lien, penalty or other liability imposed

by ERISA, the Code or other applicable laws, rules or regulations and no "prohibited transaction" (within the meaning of Section 4975 of the Code or Section 406 of ERISA) that would reasonably be expected to result in material liability to the Company or any of its Subsidiaries has occurred with respect to any Plan.

(i)     Each Plan was established and has been operated, in all material respects, in accordance with its terms and applicable Laws, and will continue to be so operated until the Closing Date.

(j)     Other than routine claims for benefits there are no actions, claims, lawsuits or arbitrations pending or, to the knowledge of the Company, threatened with respect to any Plan.

(k)     Except as set forth in Section 3.14(k) of the Disclosure Schedule, no Plan exists that, as a result of the execution of this Agreement, shareholder approval of this Agreement, or the transactions contemplated by this Agreement (whether alone or in connection with any subsequent event(s)), could (i) result in severance pay or any increase in severance pay upon any termination of employment after the date of this Agreement, (ii) accelerate the time of vesting or payment or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to any Plan or (iii) result in payments under any Plan that would not be deductible under Section 280G of the Code.

(l)     Each Plan that is maintained for the benefit of employees of any Subsidiary of the Company located outside of the United States was established and has been maintained in all material respects in accordance with its terms and with all legal requirements applicable thereto and has been funded or provided for in accordance with the Laws applicable thereto (and as reflected on the Company's consolidated financial statements.

SECTION 3.15    Transactions with Related Parties.  To the knowledge of the Company, except as set forth in Section 3.15 of the Disclosure Schedule, no employee, officer, director or Affiliate of the Company or any of its Subsidiaries, and no relative or spouse of any such employee, officer, director or Affiliate: (i) owns, directly or indirectly, any interest in (excepting less than 5% stock holdings for investment purposes in securities of publicly held and traded companies), or is an officer, director, employee or consultant of, any Person that is a competitor, lessor, lessee, supplier, distributor, sales agent or customer of, or lender to or borrower from, the Company or any of its Subsidiaries, (ii) owns, directly or indirectly, in whole or in part, any material property that the Company or any of its Subsidiaries uses in the conduct of its business, (iii) is involved in any business arrangement or other relationship with the Company or any of its Subsidiaries, (iv) has any cause of action or other claim whatsoever against, or owes any amount to, the Company or any of its Subsidiaries, except for claims in the ordinary course of business such as for accrued vacation pay, accrued benefits under employee benefit plans, and similar matters and agreements arising in the ordinary course of business or (v) has engaged in any transaction, or series of related transactions, agreements, arrangements or understandings, nor are there any currently proposed transactions, or series of related transactions, that would be required to be disclosed under Item 404 of Regulation S-K promulgated under the Securities Act that have not been disclosed in the SEC Reports.

-28-

SECTION 3.16    <u>Brokers</u>.  Except for UBS Securities LLC and Charlesbank Capital Partners, LLC, the fees and expenses of which are included in the Transaction Expenses, no agent, broker, investment banker, person or firm acting on behalf of the Company or any of its Subsidiaries or under the authority of the Company or any of its Subsidiaries is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties hereto in connection with any of the transactions contemplated hereby.  The Company has provided to Buyer a copy of the monitoring agreement between the Company and Charlesbank Capital Partners LLC and, promptly following the date hereof, shall provide Buyer with a copy of the engagement letter of UBS Securities LLC.  Following the Closing, the Surviving Corporation will not have continuing obligation to either UBS Securities LLC or Charlesbank Capital Partners LLC for the payment of fees or with respect to the provision of services (other than (i) fees payable with respect to any amounts received following the Effective Time by Stockholders and Option Holders in respect of the Adjustment Amount, Escrow Surplus Amount, Special Tax Deduction Benefit or the Contingent Consideration, and (ii) standard indemnification provisions with respect to the period prior to Closing).

SECTION 3.17    <u>Insurance</u>.  Section 3.17 of the Disclosure Schedule contains a list of each material insurance policy maintained with respect to the business of the Company and its Subsidiaries.  Except as set forth on Section 3.17 of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is in material default with respect to its obligations under any material insurance policy maintained by them.  Neither the Company nor any of its Subsidiaries has received written notice of termination, cancellation or non-renewal of any such insurance policies from any of its insurance brokers or carriers.  The Company has complied with each such insurance policy except where the failure to so comply would not reasonably be expected to have a Company Material Adverse Effect.

SECTION 3.18    <u>Product Liability</u>.  Except as set forth in Section 3.18 of the Disclosure Schedule, since May 16, 2005, the Company and its Subsidiaries have never received a material claim, or incurred any uninsured or insured material liability, for or based upon breach of product warranty (other than warranty service and repair claims in the ordinary course of business not material in amount or significance), strict liability in tort, negligent manufacture of product, negligent provision of services or any other allegation of liability, including or resulting in, but not limited to, product recalls, arising from the materials, design, testing, manufacture, packaging, labeling (including instructions for use) or sale of its products or from the provision of services.

ARTICLE IV

<u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to the Company and the Principal Stockholder as follows:

SECTION 4.1    <u>Organization; Power and Authority</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of Delaware.  Buyer has made available to the Company and the Principal Stockholder complete and correct copies of the constitutive documents of Buyer, in each case as amended to the date of this Agreement.  Buyer

-29-

is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary because of the property owned, leased or operated by it or because of the nature of its business as now being conducted, except for any failure to so qualify or be in good standing that, individually or in the aggregate, would not reasonably be expected to have a Buyer Material Adverse Effect.

SECTION 4.2    Authority; Approvals.    The execution, delivery and performance of this Agreement and the Escrow Agreement by Buyer and the consummation of the transactions contemplated hereby and thereby are within its corporate powers and have been duly and validly authorized by all necessary corporate action on the part of Buyer (other than the filing of a Certificate of Merger pursuant to the DGCL). This Agreement has been, and at the Closing the Escrow Agreement will be, duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the Company, the Principal Stockholder and Stockholders' Representative) constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity.

SECTION 4.3    Conflicts; Consents.    The execution, delivery and performance by Buyer of this Agreement and the Escrow Agreement and the consummation of the transactions contemplated hereby and thereby does not and will not (i) conflict with or result in a breach of the certificates of incorporation, by-laws or other constitutive documents of Buyer, (ii) conflict with, breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the provisions of any note, bond, lease, mortgage, indenture, or any license, franchise, permit, agreement or other instrument or obligation to which Buyer is a party, or by which any such Person or its properties or assets are bound or (iii) violate any Laws applicable to Buyer or Buyer's properties or assets, except where the occurrence of any of the foregoing described in clauses (ii) or (iii) above, individually or in the aggregate, would not reasonably be expected to have a Buyer Material Adverse Effect or prevent or materially delay the consummation of the Merger. Except for (A) the filing of a premerger notification and report form under the HSR Act and the expiration or early termination of the applicable waiting period thereunder, (B) compliance with and filings under other Competition Laws, (C) any filings as may be required under the DGCL in connection with the Merger and (D) such consents, approvals, notifications, registrations or filings the failure to obtain which, individually or in the aggregate, would not reasonably be expected to have a Buyer Material Adverse Effect or prevent or materially delay the consummation of the Merger, no consent or approval by, or notification of or registration or filing with, any Governmental Entity is required in connection with the execution, delivery and performance by Buyer of this Agreement and the Escrow Agreement or the consummation of the transactions contemplated hereby and thereby.

SECTION 4.4    Investment Representation.    Buyer is acquiring the Shares for its own account and not with a view to or for sale in connection with any distribution within the meaning of the applicable federal securities laws. Buyer and each of its equity holders is an "accredited investor" as defined in Regulation D promulgated by the SEC under the Securities Act. Buyer acknowledges that it is informed as to the risks of the transactions contemplated hereby and of its ownership of the Shares, and further acknowledges that the Shares have not

-30-

been registered under the federal securities laws or under any state or foreign securities laws, and that the Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transaction is pursuant to the terms of an effective registration statement under the Securities Act and are registered under any applicable state or foreign securities laws or pursuant to an exemption from registration thereunder.

SECTION 4.5    Brokers.  No agent, broker, investment banker, person or firm acting on behalf of Buyer or under the authority of Buyer is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties hereto in connection with the Merger or any of the transactions contemplated hereby for which the Company could have any liability prior to the Closing.

SECTION 4.6    Litigation.  As of the date hereof, there are no actions, suits, proceedings, claims, arbitrations or disputes pending or, to the knowledge of Buyer, threatened in writing by or before any court or other Governmental Entity against Buyer that bring into question the validity of this Agreement or would reasonably be expected to have a Buyer Material Adverse Effect.

SECTION 4.7    Funds.  Buyer has delivered to the Company correct and complete copies of (a) an executed commitment letter from Centerbridge Capital Partners, L.P. (the "*Equity Sponsor*") in an aggregate amount of $110,000,000, subject to reduction by the amount of the Management Rollover Amount and the aggregate other cash investment committed to by members of the Company's management (the "*Equity Commitment Letter*"), and (b) an executed commitment letter from UBS Loan Finance LLC (including all related termsheets, fee letters and other documents relating to such commitment, the "*Debt Commitment Letter*" and, together with the Equity Commitment Letter, the "*Commitments*") pursuant to which such lender has committed to provide Buyer with financing in the amounts set forth therein (the "*Debt Financing*" and, together with the financing referred to in clause (a), the "*Financing*"). As of the date hereof, the Commitments are in full force and effect and each Commitment is a legal, valid and binding obligation of Buyer, and to the knowledge of Buyer, the other parties thereto. No event has occurred that, with or without notice, lapse of time or both, would constitute a default on the part of Buyer under either the Equity Commitment Letter or the Debt Commitment Letter.  Buyer has no reason to believe that it will be unable to satisfy on a timely basis any term of, or condition to closing to be satisfied by it contained in, the Equity Commitment Letter or the Debt Commitment Letter.  Buyer has fully paid any and all commitment fees and other fees required by the Debt Commitment Letter to be paid as of the date hereof.  Subject to terms and conditions of the Commitments and this Agreement, the aggregate proceeds contemplated by the Commitments when funded in accordance with their terms, will in aggregate be sufficient to consummate the Merger upon the terms contemplated by this Agreement.

SECTION 4.8    Guaranty.  The Guaranty is valid and in full force and effect, and no event has occurred that, with or without notice, lapse of time or both, would constitute a default on the part of Centerbridge Capital Partners, L.P. under the Guaranty.

SECTION 4.9    Operations of Buyer.  Buyer has been formed solely for the purpose of engaging in the transactions contemplated hereby and prior to the Effective Time will have engaged in no other business activities and will have incurred no liabilities or obligations

-31-

other than in connection with this Agreement, the performance of its obligations hereunder and matters ancillary thereto.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE PRINCIPAL STOCKHOLDER

The Principal Stockholder represents and warrants to Buyer as follows:

SECTION 5.1    Authority; Binding Agreement.  The Principal Stockholder has all requisite authority to enter into this Agreement and to consummate the transactions contemplated hereby.   The execution, delivery and performance of this Agreement by the Principal Stockholder and the consummation of the transactions contemplated hereby are within its partnership powers and have been duly and validly authorized by all necessary partnership action on the part of the Principal Stockholder.  This Agreement has been duly executed and delivered by the Principal Stockholder, and (assuming due authorization, execution and delivery by Buyer the Company and Stockholders' Representative) constitutes the valid and binding obligation of the Principal Stockholder, enforceable against the Principal Stockholder in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity.

SECTION 5.2    Title to Shares.  The Principal Stockholder holds of record and beneficially owns all of the Shares listed on Section 5.2 of the Disclosure Schedule as owned by the Principal Stockholder (the "*Principal Stockholder Shares*") and owns no securities issued by, or other obligations of, the Company other than the Principal Stockholder Shares.  Except as set forth on Section 5.2 of the Disclosure Schedule, the Principal Stockholder's Principal Stockholder Shares are held by the Principal Stockholder free and clear of all Encumbrances, restrictions on transfer (other than restrictions under the Securities Act and state securities law), rights of first refusal and voting trust, proxy, or other agreements or understandings.  Except as set forth on Section 5.2 of the Disclosure Schedule, the Principal Stockholder is not a party to any option, warrant, right, contract, call, put, or other agreement or commitment relating to the capital stock of the Company or providing for the disposition or acquisition of any capital stock or other equity rights of the Company, other than this Agreement.

## ARTICLE VI

### CERTAIN COVENANTS

SECTION 6.1    Conduct of Business.  (a)  From the date of this Agreement until the Closing, except as set forth on Schedule 6.1 or as permitted or required by this Agreement or otherwise consented to by Buyer in writing (which consent shall not be unreasonably withheld or delayed), the Company shall operate its business only in the ordinary course of business consistent with past practice.  The Company shall use its commercially reasonable efforts to:

-32-

(i)     preserve intact the present organization of the Company and its Subsidiaries;

(ii)    keep available the services of the present officers and employees of the Company;

(iii)   preserve the Company's goodwill and relationships with material customers, suppliers, licensors, licensees, contractors, distributors, lenders and other Persons having significant business dealings with the Company and its Subsidiaries;

(iv)    continue all current sales, marketing and other promotional policies, programs and activities;

(v)     maintain the assets of the Company and its Subsidiaries in good repair, order and condition;

(vi)    maintain the Company's insurance policies and risk management programs, and in the event of casualty, loss or damage to any assets of the Company or any of its Subsidiaries, repair or replace such assets with assets of comparable quality, as the case may be; and

(vii)   not, at any time within the 90-day period prior to the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act or any similar triggering event under state law, affecting in whole or in part any site of employment, facility, operating unit or employee of the Company or its Subsidiaries, without notifying the Buyer in advance and obtaining the advance approval of the Buyer, and complying with all provisions of the WARN Act or any state law.

(b)     Without limiting the generality of the foregoing, except as set forth on Schedule 6.1, the Company shall not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), directly or indirectly (i) cause or permit any state of affairs, action or omission described in Section 3.6 or (ii) take or agree in writing or otherwise to take any action that would reasonably be expected to prevent the satisfaction of any condition to closing set forth in Article VII.

SECTION 6.2    Access and Information; Confidentiality.  (a) Subject to the terms of the Confidentiality Agreement, from the date of this Agreement until the earlier of (i) the Closing and (ii) the termination of this Agreement in accordance with Article IX, the Company shall allow Buyer and its financing parties and their respective Representatives to make such reasonable investigation of the business, operations and properties of the Company as is reasonably necessary in connection with the transactions contemplated by this Agreement. Such investigation shall include reasonable access to the officers, employees and agents of the Company and its Subsidiaries and the properties, books, records and commitments of the Company and its Subsidiaries. The Company shall furnish Buyer and its Representatives with such financial, operating and other data and information and copies of documents with respect to the Company or any of the transactions contemplated by this Agreement as Buyer shall from time to time reasonably request unless the disclosure of any information would jeopardize attorney-client privilege or the attorney-client work product doctrine.

(b)    Buyer shall, and shall cause its financing parties and their respective Representatives to, hold any information regarding the Company or any of its Subsidiaries that is non-public in confidence in accordance with the terms of the Confidentiality Agreement and, in the event this Agreement is terminated, Buyer shall, and shall cause its financing parties and their respective Representatives to, promptly return or destroy such information in accordance with the Confidentiality Agreement.

(c)    All access and investigation pursuant to this Section 6.2 shall be coordinated through the chief financial officer of GSI Group and shall occur only upon reasonable notice and during normal business hours and shall be conducted at Buyer's expense and in such a manner as not to unreasonably interfere with the normal operations of the business of the Company and its Subsidiaries and shall be subject to existing confidentiality obligations of the Company and its Subsidiaries and applicable Law.

SECTION 6.3    Approval of the Stockholders of the Company.    (a) Neither the Board of Directors of the Company nor any committee thereof shall withdraw, amend, or modify, or propose or resolve to withdraw, amend or modify in a manner adverse to Buyer, the recommendation of the Board of Directors of the Company that the Company's stockholders vote in favor of the adoption of this Agreement.

(b)    Promptly following execution of this Agreement, the Principal Stockholder expects to execute and deliver to Buyer the action by written consent of stockholders in lieu of a meeting to adopt this Agreement and approve the Merger pursuant to the DGCL in the form attached hereto as Exhibit B (the "Written Consent").

(c)    Within ten Business Days following the date hereof, the Company shall deliver by any manner permitted by applicable Law the notice required pursuant to Section 262 of the DGCL to each Stockholder of record that has not theretofore executed and delivered such action by written consent referred to in Section 6.3(b) and each Option Holder holding Options that are or may become exercisable prior to the Effective Time (the "Dissenters' Rights Notice"). The Dissenters' Rights Notice shall comply in all material respects with applicable Law. The Company shall take all actions, and do or cause to be done, all things necessary, proper or advisable to deliver the Dissenters' Rights Notice and any subsequent notice required to be delivered, or subsequent action to be taken with respect to Dissenting Shares, pursuant to the DGCL and other applicable Law.

SECTION 6.4    Reasonable Efforts; Further Assurances. (a) Upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto will use all commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Escrow Agreement as expeditiously as practicable and to ensure that the conditions set forth in Article VII are satisfied, insofar as such matters are within the control of any of them, including making the requisite filings pursuant to the HSR Act and other applicable Competition Laws. Without limiting the generality of the foregoing, and subject to Section 6.2, the Company and the Principal Stockholder, on the one hand, and Buyer, on the other hand, shall each furnish to the

other such necessary information and reasonable assistance as the other party may reasonably request in connection with the foregoing.

(b)    In case at any time after the Effective Time any further action is necessary to carry out the purposes of this Agreement, each of the parties to this Agreement shall take or cause to be taken all such necessary action, including the execution and delivery of such further instruments and documents, as may be reasonably requested by any party hereto for such purposes or otherwise to consummate the transactions contemplated by this Agreement and the Escrow Agreement.

SECTION 6.5    Public Announcements. (a) Other than the joint press release to be issued by the parties hereto in connection with the execution of this Agreement, none of the parties shall issue any press release or any public statement with respect to the existence of this Agreement or the transactions contemplated hereby and, except as may be required by applicable Law, will not issue any such press release or make any such public statement without obtaining the prior written approval of the other parties hereto, which approval shall not be unreasonably withheld or delayed.

(b)    Each party agrees that the terms of this Agreement shall not be disclosed or otherwise made public and the copies of this Agreement shall not be publicly filed or otherwise made available to the public, except where such disclosure, availability or filing is required by applicable Law and only to the extent required by such Law. In the event that such disclosure, availability or filing is required by applicable Law, then to the extent "confidential treatment" would be available, each of the parties agrees to use its reasonable best efforts to obtain "confidential treatment" of this Agreement and to redact such terms of this Agreement the other party shall request. In any event, the Company shall be permitted to disclose this Agreement and the terms hereof, to the extent required by any forms, reports and other documents that are required to be filed by the Company under the Exchange Act; *provided*, that the Company has provided the Buyer with a reasonable opportunity to review and comment on such disclosures.

SECTION 6.6    Indemnification of Directors and Officers. For six years from and after the Closing Date, the Surviving Corporation and its successors will indemnify and hold harmless the present and former officers, directors, employees and agents of the Company and its Subsidiaries in respect of acts or omissions arising out of or pertaining to such Person's service as a director or officer of the Company or its Subsidiary or services performed by such Person at the request of the Company or its Subsidiary occurring on or prior to the Closing Date to the extent provided under the Company's certificate of incorporation and by-laws in effect on the date of this Agreement; *provided* that such indemnification shall be subject to any limitation imposed from time to time under applicable Law. As soon as practicable following the Effective Time, the Surviving Corporation will purchase a six year "run-off" or "tail" policy in respect of acts or omissions occurring on or prior to the Closing Date covering each Person currently covered by the Company's and each Subsidiary's officers' and directors' liability insurance policies on terms and in amounts comparable to those of such policies in effect on the date of this Agreement and covering the period of six years from and after the Closing Date; *provided, however*, that in no event shall the Surviving Corporation be permitted or required to expend for such policies pursuant to this sentence an amount in excess of 200% of the annual premium paid

for the policies in effect on the date of this Agreement; and *provided, further*, that if the premium for such insurance coverage exceeds such amount, the Surviving Corporation shall obtain an extension with the greatest coverage available for a cost not exceeding such amount. The Surviving Corporation and its successors shall cause such policy to remain in effect for six years from and after the Closing Date.

SECTION 6.7    Section 280G. With respect to each employee of the Company or any subsidiary of the Company who is, or would reasonably be expected to be as of the Closing Date, a "disqualified individual" (as defined in Section 280G(c) of the Code), the Company shall use its commercially reasonable efforts to (i) ensure that any payments that would otherwise constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code) shall be exempt from the definition of "parachute payment" by reason of the exemption provided under Section 280G(b)(5)(A)(ii) of the Code, and (ii) take all actions reasonably necessary to so exempt such payments (including obtaining any necessary waivers or consents from such "disqualified individuals") as soon as reasonably practicable following the date of this Agreement. To the extent that, as of the Effective Time, any "excess parachute payment" (as defined in Section 280G of the Code) is paid or payable to any disqualified individual in connection with the transactions contemplated by this Agreement, the Enterprise Value shall be reduced by the cost to the Company and its Subsidiaries of any obligation to make additional payments to any such disqualified individual as a result of the existence of such excess parachute payment.

SECTION 6.8    Expenses. Each party hereto shall bear its own fees, costs and expenses incurred in the pursuit of the transactions contemplated by this Agreement, including the fees and expenses of its respective counsel, financial advisors and accountants; and *provided* that Buyer shall pay, or cause to be paid, any Transaction Expenses that are unpaid as of the Closing as provided in Section 2.5; and *provided further* that the fees and expenses of the Independent Accountant, if any, shall be allocated as provided in Section 2.3 and the fees and expenses of the Arbitrator, if any, shall be allocated as provided in Section 2.8. Notwithstanding the foregoing, upon consummation of the transactions contemplated hereby, the Surviving Corporation may reimburse Buyer and Centerbridge Capital Partners L.P. for the reasonable fees, costs and expenses incurred by Buyer and Centerbridge Capital Partners L.P. in connection with the transactions contemplated by this Agreement (including the reasonable fees and expenses of Buyer's counsel, financial advisors, and accountants and consultants and any transaction fee paid by Buyer to Centerbridge Partners, L.P. or one of its Affiliates (to the extent consistent with Schedule 6.16)).

SECTION 6.9    Continuity of Employees and Employee Benefits. The Surviving Corporation shall, for a period of one year after the Closing, provide employees of the Surviving Corporation who were employees of the Company and its Subsidiaries immediately prior to the Closing with annual rates of base salary or hourly wages, as applicable, annual incentive opportunities and coverage and benefits pursuant to employee benefit plans, programs, policies and arrangements that are, in the aggregate, not materially less favorable than the compensation and benefits provided to such employees under the Plans immediately prior to the Closing; *provided*, that the foregoing shall not obligate the Company to maintain the employment of any employee for any specified period after the Closing. Where applicable, each such employee shall receive full credit for service with the Company and its Subsidiaries

-36-

(including predecessor companies) for purposes of determining eligibility to participate, vesting and accrual (excluding benefit accrual under defined benefit plans) under each employee benefit plan, program, policy or arrangement to be provided by the Surviving Corporation to such employee to the same extent such service was recognized under the applicable Plan immediately prior to the Closing. In addition, as of the Effective Time, the Surviving Corporation shall assume all obligations, liabilities or commitments with respect to continued participation in health programs required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the rules and regulations promulgated thereunder ("*COBRA*"), for all "M&A qualified beneficiaries" (within the meaning of 26 C.F.R. § 54.4980B-9, Q&A-4).

SECTION 6.10    Supplemental Information.    Prior to Closing, the Company will supplement or amend the Disclosure Schedule with respect to any fact, matter or circumstance that the Company or the Principal Stockholder learns of and that is required to make each representation or warranty set forth in Articles III and V, respectively, accurate as of the date such supplement or amendment is made. The parties hereto agree that the furnishing of such corrected and supplemental information pursuant to this Section 6.10 shall not affect whether a breach has occurred pursuant to the representations and warranties being made as of the date hereof or as of the Closing Date.

SECTION 6.11    Tax Matters.    (a) The Surviving Corporation shall be liable for all Transfer Taxes arising from the transactions contemplated by this Agreement. "*Transfer Taxes*" means all sales, use, real property transfer, real property gains, transfer, stamp, registration, documentary, recording or similar Taxes, together with any interest thereon, penalties, fines, costs, fees or additions to tax.

(b)    The Company shall deliver to Buyer and the Principal Stockholder a certificate pursuant to Treasury Regulations Section 1.897-2(h) stating that it is not a U.S. real property holding corporation as defined in Section 897 of the Code and certifying any facts that would exempt the transaction contemplated hereby from withholding under Section 1445 of the Code.

(c)    To the extent permitted by law, the Surviving Corporation and its Affiliates shall (i) claim the appropriate deductions on their Tax Returns for any Special Tax Deduction Items, and (ii) carry back any net operating losses for the taxable year in which such deductions are claimed. The Tax Returns reflecting any Special Tax Deduction Items shall be filed by the Surviving Corporation or appropriate Affiliate on or prior to the due date thereof (taking into account extensions) and any claim for refund (as permitted by law) shall be filed on such date or as reasonably practicable thereafter. To the extent any Special Tax Deduction Items give rise to a Special Tax Deduction Benefit (as defined below), unless otherwise directed by Stockholders' Representative pursuant to Section 8.3(b), the Surviving Corporation shall pay (at such time as described in Section 6.11(d) below) to the Stockholders' Representative (on behalf of the Stockholders and Option Holders), which payment shall be treated by all parties hereto for Tax purposes, as an adjustment to the Final Merger Consideration, any such Special Tax Deduction Benefit. For purposes of this Section 6.11(c), each Rollover Share shall entitle the holder thereof to participate in the payment of Special Tax Deduction Benefit pursuant to the preceding sentence with respect to such Rollover Share as if such Rollover Share had been converted into the right to receive the merger consideration payable hereunder pursuant to

-37-

Section 2.1(c). For purposes of this Agreement, "*Special Tax Deduction Benefit*" means (A) the income tax refund (net of any Tax costs associated with, or any other adverse Tax consequences resulting from, the receipt of such refund) of estimated Tax payments previously made for the first quarter of the 2007 Tax year of the Surviving Corporation attributable to the deductions claimed (pursuant to Section 6.11(c)(i) above) for any Special Tax Deduction Items (for the purposes of this clause (A), the amount of such estimated Tax refund that is attributable to such deductions shall be computed as if the taxable period of the Surviving Corporation had closed at the close of business on the Closing Date and shall be equal to the portion of any such refund that is allocable to deductions resulting from events occurring during such portion of such taxable period ending at the close of business on the Closing Date); (B) the income Tax refund (net of any Tax costs associated with, or any other adverse Tax consequences resulting from the receipt of such refund) that the Surviving Corporation and its Affiliates receive that is attributable to the carrying back (pursuant to Section 6.11(c)(ii) above) of any net operating loss deductions attributable to any Special Tax Deduction Items, to the extent such net operating loss deductions are available after giving effect to clause (A) above (for the purposes of this clause (B), the amount of such refund that is attributable to such carry backs shall be computed as if the taxable period of the Surviving Corporation had closed at the close of business on the Closing Date and shall be equal to the portion of any such refund that is allocable to deductions resulting from events occurring during such portion of such taxable period ending at the close of business on the Closing Date); and (C) to the extent the amount of any Special Tax Deduction Item is not taken into account in determining a Special Tax Deduction Benefit pursuant to clauses (A) or (B), the reduction in the Surviving Corporation's (and its Affiliates') Tax liability in any taxable period beginning after the Closing Date attributable to the carry forward of any net operating loss attributable to any Special Tax Deduction Item, provided that for purposes of this clause (C), (x) the amount of such reduction that is attributable to such carry forwards shall be computed as if the taxable period of the Surviving Corporation had closed at the close of business on the Closing Date and shall be equal to the portion of any such reduction that is allocable to deductions resulting from events occurring during such portion of such taxable period ending at the close of business on the Closing Date, and (y) the Surviving Corporation and its Affiliates shall be deemed to use all other deductions, amortizations, exclusions from income or other Tax allowances of the Surviving Corporation and its Affiliates (to the extent such deductions, amortizations, exclusions from income or other Tax allowances are entitled to be used under applicable Tax law) prior to the use of any Special Tax Deduction Item in respect of which Buyer is obligated to pay the Stockholders' Representative under this clause (C). Notwithstanding anything to the contrary in this Section 6.11 or in Section 10.10 hereof, the Surviving Corporation shall only be obligated to make a payment pursuant to clause (C) of this Section 6.11(c) for any Special Tax Deduction Benefit that reduces the Surviving Corporation's (and its Affiliates') Tax liability for a taxable year ending on or before December 31, 2014.

(d)      Any payment to the Stockholders' Representative pursuant to Section 6.11(c) shall be made (i) with respect to the Special Tax Deduction Benefit described in clauses (A) and (B) thereof, within five business days of the receipt of any refund described therein, and (ii) with respect to the Special Tax Deduction Benefit described in clause (C) thereof, within five business days of the date on which the reduction of Tax liability actually occurs (or, if applicable, within five business days of the receipt of a refund of Tax liabilities previously paid); and in any event no such payment shall be required earlier than five business days from the filing of any Tax Return reflecting the actual realization of a Special Tax Deduction Benefit. For the

avoidance of doubt, and for the purposes of this Agreement, Special Tax Deduction Benefits taken into account pursuant to this Agreement (other than with respect to Section 6.11) shall not also be taken into account under this Section 6.11.

(e)     To the extent any Special Tax Deduction Benefit described in Section 6.11(c) is successfully disallowed by a taxing authority and such successful challenge reduces the amount to which the Stockholders' Representative (on behalf of the Stockholders and Option Holders) would have been entitled under Section 6.11(c), the Surviving Corporation shall be entitled to set off the amount of such reduction against any subsequent Contingent Consideration otherwise payable to the Stockholders and Option Holders pursuant to Section 2.8.

(f)     Prior to the Closing Date, the Company shall not change any method of Tax accounting, make or change any Tax election, file any amended Tax Return, settle or compromise any Tax liability, agree to an extension or waiver of the statute of limitations with respect to the assessment or determination of Taxes, enter into any closing agreement with respect to any Tax or surrender any right to claim a Tax refund.

SECTION 6.12    Debt Tender Offer and Consent Solicitation. (a) Upon the request of Buyer, the Company shall (or shall cause GSI Group to) (i) promptly commence a cash tender offer to purchase all of the outstanding Senior Notes and (ii) solicit the consent of the requisite holders of the Senior Notes (the "*Requisite Consent*") to amend the Senior Notes Indenture to eliminate all material covenants and related defaults and to permit the transactions contemplated by this Agreement, including the financing thereof and to make the other changes specified in Schedule 6.12 or as otherwise agreed by Buyer and the Company (collectively, the "*Amendments*"), which acceptance for payment of the Senior Notes shall be conditioned upon the concurrent consummation of the Merger and shall be on the terms and conditions set forth on Schedule 6.12 (clauses (i) and (ii) together, the "*Debt Tender Offer*") or as may otherwise be reasonably requested by Buyer and consented to by the Company. Buyer and the Company shall use their commercially reasonable efforts to cause the Debt Tender Offer to close on the Closing Date. The Surviving Corporation shall (or shall cause GSI Group to) take any and all other additional steps or actions and execute any and all additional documents, instruments or certificates necessary to effect the purchase of tendered Senior Notes and satisfaction and discharge of the Indenture, as applicable, all at the expense of the Surviving Corporation and/or Buyer. For the avoidance of doubt, consummation of the Merger shall not be conditioned upon the results of the Debt Tender Offer.

(b)     Following the commencement of the Debt Tender Offer, the Company shall make such changes to the terms and conditions of the Debt Tender Offer as may be reasonably requested in writing by Buyer; *provided* that neither the Company nor GSI Group shall be required to (i) increase the price per Senior Note payable, (ii) remove the condition that the Merger shall be consummated concurrently or the condition that there shall be no order or injunction prohibiting consummation of the Debt Tender Offer or (iii) make any binding commitment by the Company or any of its Subsidiaries (including GSI Group) unless such commitment is either conditioned on the Closing or terminates without liability to the Company or such Subsidiaries (including GSI Group). Following the commencement of the Debt Tender Offer, the Company shall not (and shall cause GSI Group not to), without the written consent of Buyer, waive any condition to the Debt Tender Offer or make any changes to the terms and

conditions of the Debt Tender Offer, except as otherwise requested or agreed in writing by Buyer. If Buyer advises the Company in writing that, in its reasonable judgment based on the advice of the lead dealer manager of the Debt Tender Offer, there is a significant possibility that the Requisite Consent will not be obtained as of immediately prior to the Effective Time (due to the Debt Tender Offer not having been consummated or otherwise), the Company and Buyer shall use commercially reasonable efforts to make preparations to defease the Senior Notes, and if the Requisite Consent is not timely received, then no later than the time scheduled for the Closing, the Company shall (or shall cause GSI Group to) defease the Senior Notes in connection with and at the time of the Merger in accordance with Section 8.03 of the Senior Notes Indenture; *provided, however,* that neither the Company nor GSI Group shall be required to defease the Senior Notes or provide any irrevocable notice regarding such defeasance unless (i) such action is taken simultaneously with the Merger being consummated and (ii) Buyer shall have deposited, or caused to be deposited, the amount of funds necessary to effect such defeasance as provided and calculated in accordance with the terms of the Senior Note Indenture. In connection with any such defeasance, the Company shall (or shall cause GSI Group to) deliver, or arrange for the delivery of, such certificates and opinions of counsel contemplated by the Senior Notes Indenture in order for such defeasance to comply with the terms of the Senior Notes Indenture.

(c)     Promptly following receipt of the Requisite Consent, the Company shall and shall cause GSI Group and each of the other guarantors of the Senior Notes to, and shall use its commercially reasonable efforts to cause the trustee under the Senior Notes Indenture to, execute a supplemental indenture incorporating and giving effect to the Amendments, which supplemental indenture shall become effective immediately upon its execution and delivery and which supplemental indenture shall provide that the Amendments shall become operative immediately upon the acceptance for payment of Senior Notes in the Debt Tender Offer. In connection with the execution and delivery of the supplemental indenture, the Company, GSI Group and the other guarantors of the Senior Notes shall deliver certificates and opinions from its officers and its counsel in order to comply with the terms of the Senior Notes Indenture. As promptly as practicable following the acceptance of Senior Notes in the Debt Tender Offer and the Effective Time, the Surviving Corporation shall (or shall cause GSI Group to) pay for the purchased Senior Notes.

(d)     All necessary and appropriate documentation in connection with the Debt Tender Offer, including the offer to purchase, related letter of transmittal and other related documents (collectively, the *"Offer Documents"*) shall be provided by Buyer, subject to prior review and comment by the Company and the Principal Stockholder, and no Offer Document shall be mailed or otherwise distributed to holders of the Senior Notes without the written consent of Buyer, such consent not to be unreasonably withheld or delayed. Buyer and the Company shall cooperate with each other in the preparation of the Offer Documents. All mailings to the holders of the Senior Notes in connection with the Debt Tender Offer shall be subject to the prior review and comment of the Company and Buyer and shall be reasonably acceptable to each of them. If at any time prior to the completion of the Debt Tender Offer any information in the Offer Documents should be discovered by the Company or Buyer that should be set forth in an amendment or supplement to the Offer Documents, so that the Offer Documents shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of

the circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other party, and an appropriate amendment or supplement describing such information shall be disseminated to the holders of the Senior Notes. Notwithstanding anything to the contrary in this Section 6.12, the Company shall (and shall cause GSI Group to) comply with the requirements of Rule 14e−1 under the Exchange Act and any other applicable Law to the extent such Laws are applicable in connection with the Debt Tender Offer. To the extent that the provisions of any applicable Law conflict with this Section 6.12, the Company shall (and shall cause GSI Group to) comply with the applicable Law and shall not be deemed to have breached its obligations hereunder by such compliance.

(e)    In connection with the Debt Tender Offer, Buyer may select one or more dealer managers or solicitation agents, information agents, depositaries and other agents reasonably satisfactory to the Company (and pursuant to customary arrangements reasonably satisfactory to the Company) to provide assistance in connection therewith and the Company shall, and shall cause its Subsidiaries to, enter into customary agreements (including indemnities) with such parties so selected and on terms and conditions acceptable to Buyer. Pursuant to the terms of such agreements, the Company shall deliver, or arrange for the delivery of, such certificates and opinions of counsel as is customary in connection with debt tender offers and consent solicitations. The reasonable and customary fees and expenses of any dealer manager, solicitation agent, information agent, depositary or other agent retained in connection with the Debt Tender Offers will be included in the Defeasance Costs.

SECTION 6.13    Repayment of Senior Indebtedness; Defeasance of Senior Notes.    On or prior to the second Business Day prior to the Effective Time, the Company shall use its commercially reasonable efforts to deliver to Buyer copies of payoff letters (subject to delivery of funds as arranged by Buyer), in commercially reasonable form, from the administrative agent under the Wachovia Credit Agreement and shall use its commercially reasonable efforts to make arrangements for the release of all Liens and other security over the Company's and its Subsidiaries' properties and assets securing such obligations (subject to delivery of funds as arranged by Buyer).

SECTION 6.14    Financing. (a) Buyer shall not amend, supersede or otherwise modify, or waive, any provision of the Equity Commitment Letter or the Debt Commitment Letter without the prior written consent of the Company and Stockholders' Representative; provided, that the Debt Commitment Letter may be amended or superseded and provisions may be otherwise modified or waived, without the prior consent of the Company or the Stockholder Representative to replace or add one or more lenders, lead arrangers, bookrunners, syndication agents or similar entities which had not executed the Debt Commitment Letter as of the date hereof, or otherwise, provided, further, that in no event shall the Debt Commitment Letter be amended or superseded, or any provision therein be otherwise modified or waived, in a manner that would (i) expand or amend the conditions to the debt financing set forth in the Debt Commitment Letter in a manner adverse to the Company or the Stockholders; (ii) reasonably be expected to hinder, delay or prevent the Closing; (iii) reduce the aggregate amount of debt financing set forth in the Debt Commitment Letters (unless, in the case of this clause (iii), replaced with an amount of new equity financing on terms no less favorable to Buyer, the Company and the Stockholders than the terms set forth in the Equity Commitment Letter); (iv) adversely impact the ability of Buyer to enforce its rights under the Debt Commitment Letter; or

-41-

(v) require any information, assistance or cooperation of the Company, its Subsidiaries or its or their Representatives materially beyond the information, assistance and cooperation that would be required by the agent for the financing contemplated by the Debt Commitment Letter (as in effect on the date herof) in order to consummate such financing.    Buyer shall use its commercially reasonable efforts to arrange the financing contemplated by the Debt Commitment Letter on the terms and conditions contemplated thereby, including using commercially reasonable efforts to (i) negotiate definitive agreements with respect thereto on the terms and conditions contained therein or on other terms no less favorable in the aggregate to Buyer and the Surviving Corporation, (ii) satisfy on a timely basis all conditions applicable to Buyer in such definitive agreements and (iii) consummate the financing contemplated by the Debt Commitment Letter or an alternate financing at Closing.

        (b)    Buyer shall give the Company prompt notice of any material breach by any party of the Debt Commitment Letter or any termination of the Debt Commitment Letter. If the Debt Financing has not been obtained, Buyer shall continue to be obligated to consummate the Merger on the terms contemplated by this Agreement and subject only to the satisfaction or waiver of the conditions set forth in Sections 7.1 and 7.2 and Buyer's rights under Sections 9.2 and 9.4, regardless of whether Buyer have complied with all of their other obligations under this Agreement (including their obligations under this Section 6.14).    The Company agrees to provide, and shall cause its Subsidiaries and its and their Representatives to provide, reasonable and customary cooperation in connection with the arrangement of the Debt Financing as may be reasonably requested by Buyer (to the extent reasonably determined by the agent for the Debt Financing to be required in connection with the arrangement of the Debt Financing) (provided that such requested cooperation does not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries beyond the level of involvement ordinarily required in similar financing transactions), including (a) furnishing Buyer and the agents for the Debt Financing as promptly as practicable with such financial and other pertinent information regarding the Company and its Subsidiaries as may be reasonably requested by Buyer in order to consummate the financing contemplated by the Debt Commitment Letter, (b) participating in meetings, drafting sessions, diligence sessions and sessions with the rating agencies in connection with the Debt Financing, (c) assisting with the preparation of materials for rating agency presentations, (d) using commercially reasonable efforts to cause its independent accountants to provide assistance and cooperation with Buyer and in the preparation of an offering document for the Debt Financing, (e) reasonably cooperating with the marketing efforts for the Debt Financing, and (f) executing and delivering any pledge and security documents, currency or interest hedging arrangements or other definitive financing documents or other certificates, legal opinions and documents as may be reasonably requested by Buyer (including certificates of the chief financial officer or any of the Company's Subsidiaries with respect to financing matters) or otherwise facilitating the pledging of collateral as may be reasonably requested by Buyer; *provided* that any obligations contained in such documents shall be effective no earlier than as of the Effective Time.  Neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee or incur any other liability in connection with the Debt Financing prior to the Effective Time.  Buyer shall, promptly upon request by the Company, reimburse the Company for all reasonable out-of-pocket costs incurred by the Company or its Subsidiaries in connection with such cooperation.  If the Closing does not occur, Buyer shall indemnify and hold harmless the Company, its Subsidiaries, and their respective Representatives for and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties

suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(c)     In the event any portion of the Debt Financing becomes unavailable on the terms and conditions contemplated in the Debt Commitment Letters, Buyer shall use its commercially reasonable efforts to arrange to obtain alternative financing to replace such portion, including from alternative sources, on terms that are no less favorable in the aggregate to Buyer and the Surviving Corporation as promptly as practicable following the occurrence of such event.

(d)     Buyer shall cause the definitive documentation for the Debt Financing (or any alternative debt financing arranged by Buyer) to permit the payment of any positive Adjustment Amount, Escrow Surplus Amount, Special Tax Deduction Benefit or Contingent Consideration when and as such items become payable pursuant to the terms of this Agreement.

SECTION 6.15     No Solicitation of Transactions. (a)  The Company shall not, nor shall it authorize or permit any of the Subsidiaries or its Affiliates, any of its or their respective Representatives retained by it or any of the Subsidiaries or its Affiliates to, (i) solicit, initiate or encourage, or take any other action to facilitate, any inquiries or the making of any proposal that constitutes an Alternative Transaction or (ii) participate in any discussions or negotiations regarding, or furnish to any Person any information, or otherwise cooperate in any way with, any Alternative Transaction. The Company shall, and shall cause its Subsidiaries and its Affiliates to, immediately cease and cause to be terminated any existing discussions or negotiations with any Person conducted heretofore with respect to any Alternative Transaction.

(b)     For purposes of this Agreement, "*Alternative Transaction*" shall mean (i) any proposal or offer for a merger, consolidation, dissolution, recapitalization or other business combination involving the Company, (ii) any proposal for the issuance of 5% or more of the equity securities of the Company as consideration for the assets or securities of another Person or (iii) any proposal or offer to acquire in any manner, directly or indirectly, 5% or more of the equity securities of the Company or assets (including equity securities of any Subsidiary of the Company) that represent 5% or more of the total consolidated assets of the Company and the Subsidiaries, in each case other than the transactions contemplated by this Agreement.

(c)     Nothing contained in this Section 6.15 shall prohibit the Company from making disclosures to its Stockholders and Option Holders as required by applicable Law; *provided*, however, that no such disclosure shall be made without providing the Buyer a reasonable opportunity to consult with the Company as to the content of such disclosures and in no event shall the Company or its board of directors or any committee thereof take, or agree or resolve to take, any action prohibited by Section 6.15(a).

SECTION 6.16     Stockholders Agreement; Tag-Along Rights. (a)  At Closing, the Company, Buyer and Principal Stockholder shall, Principal Stockholder shall cause the other Charlesbank Parties to, and Buyer shall cause the Equity Sponsor to, enter into a stockholders agreement with respect to their respective interests in the Surviving Corporation, and a management services agreement, in each case having the terms and conditions described in Schedule 6.16(a).

-43-

(b)     Principal Stockholder will cause each of the other Charlesbank Parties to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) Shares in accordance with such Charlesbank Party's pro rata share of the Charlesbank Rollover Amount. To the extent that any holders of Shares that are not members of the Company's management validly exercise of any right to "tag along" in the rollover of their Shares, as provided in the Existing Stockholders Agreement, or the "drag along" provisions of the Existing Stockholders Agreement are enforced against such holders: (i) such Persons shall be entitled to include the portion of their Shares having a value (based on the Estimated Per Share Merger Consideration) equal to such holders' pro rata share of the Charlesbank Rollover Amount (but not to exceed 10% of the Charlesbank Rollover Amount) in the shares to be rolled over pursuant to Section 2.1(c) (the "*Tag-Along Shares*") (ii) the Tag-Along Shares shall be rolled over in lieu of the corresponding number of Shares that were to have been rolled over by the Charlesbank Parties and shall correspondingly reduce the Charlesbank Rollover Amount by the value of such shares (based on the Estimated Per Share Merger Consideration).

SECTION 6.17    Termination of Agreements with Equity Holders. Prior to the Closing the Company and Principal Stockholder shall obtain the termination, subject to the Closing and effective as of the Effective Time, of the following agreements without further liability to the Company, the GSI Group or the Surviving Corporation: (i) the Existing Registration Agreement; (ii) the Existing Stockholders Agreement; and (iii) all the Stock Purchase and Management Equity Agreements entered into between the Company and its directors or consultants since October 6, 2005.

SECTION 6.18    Environmental Matters . Following the Effective Time, in the event of any condition relating to the facilities or real property located at 1051 W. North Avenue, Flora, Illinois that results in any liability of the Surviving Corporation or any of its Subsidiaries under any applicable Environmental Law or regarding Hazardous Substances, the Surviving Corporation shall use its commercially reasonable efforts to recover the amount of such liabilities from the Sellers (as defined in the 2005 Stock Purchase Agreement) pursuant to the indemnification provisions of Section 9.1 of the 2005 Stock Purchase Agreement. Following the Effective Time, the Surviving Corporation shall not take any action with respect to the facilities or real property located at 1051 W. North Avenue, Flora, Illinois, that would result in the indemnification provisions of the 2005 Stock Purchase Agreement being unavailable with respect to a Flora Environmental Condition (as defined in the 2005 Stock Purchase Agreement) pursuant to the proviso to Section 9.1(e) of the 2005 Stock Purchase Agreement.

SECTION 6.19    Authorized Capital Stock. To the extent that the authorized capital stock of the Company is insufficient to permit the issuance immediately following the Effective Time of the aggregate number of shares of common stock of the Surviving Corporation required upon conversion pursuant to Section 2.1 of all shares of common stock of Buyer outstanding immediately prior to the Effective Time, then the Company and Principal Stockholder shall take any necessary action to amend the Company's certificate of incorporation so as to permit such issuance.

-44-

ARTICLE VII

CONDITIONS PRECEDENT

SECTION 7.1    Conditions Precedent to Obligations of Each Party.    The respective obligations of each party hereto to effect the Merger shall be subject to the fulfillment or satisfaction, prior to or on the Closing Date, of each of the following conditions precedent:

(a)    Approvals.    All authorizations, consents, orders, declarations or approvals of, or filings with, or terminations or expirations of waiting periods imposed by, any Governmental Entity, which the failure to obtain, make or occur would have the effect of making the Merger or any of the transactions contemplated hereby illegal or would have a Buyer Material Adverse Effect or a Company Material Adverse Effect, as the case may be, assuming the Merger had taken place, shall be in effect.

(b)    No Litigation or Injunction.    There shall not be instituted or pending any suit, action or proceeding by any Governmental Entity relating to this Agreement or any of the agreements contemplated hereby or any of the transactions contemplated herein.

(c)    Stockholder Approval.    The Merger shall have been duly approved by holders of the Company's capital stock as required by the Company's certificate of incorporation and the DGCL.

(d)    HSR Act: Competition Laws.    All filing and waiting periods applicable (including any extensions thereof) to the consummation of the Merger under the HSR Act shall have expired or been terminated. All approvals required under the Competition Laws identified on Schedule 7.1(d)(i) shall have been obtained.

SECTION 7.2    Conditions Precedent to Obligations of Buyer.    The obligations of Buyer to effect the Merger shall be subject to the fulfillment or satisfaction, prior to or on the Closing Date, of each of the following conditions precedent:

(a)    Representations and Warranties: Performance of Obligations.    Each of the Company's representations and warranties contained in Article III (without giving effect to any "material", "materiality" or "Company Material Adverse Effect" qualification on such representations and warranties) shall be true and correct on and as of the date hereof and as of the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except, in each case, where the failure to be true and correct individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect; *provided, however,* that the representations and warranties set forth in Section 3.3 shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date. Each of the representations and warranties of the Principal Stockholder contained in Article V shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and

-45-

correct in all material respects as of such earlier date. The Company shall have performed in all material respects and complied in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by it prior to or at the Closing Date. Buyer shall have received a certificate dated the Closing Date and signed by the chief executive officer or chief financial officer of the Company, certifying that the conditions specified in this Section 7.2(a) have been satisfied.

(b)    Company Material Adverse Effect. No Company Material Adverse Effect shall have occurred since the date hereof and be continuing.

(c)    Dissenting Shares. No more than ten percent of the Shares outstanding on the date hereof shall be Dissenting Shares.

(d)    Annex and Certificate Delivery. The Company shall have delivered to Buyer each of the Closing Net Indebtedness Annex, the Transaction Expenses Annex, and the Capital Structure Certificate.

(e)    Director Resignations. The Company shall have delivered to Buyer a resignation from each member of the Board of Directors or comparable body for each Subsidiary of the Company, unless specified by Buyer no later than three Business Days prior to Closing.

(f)    Escrow Agreement. The Escrow Agent and Stockholders' Representative shall each have executed and delivered the Escrow Agreement.

(g)    Charlesbank Monitoring Agreement. The Corporate Development and Administrative Services Agreement, dated as of May 16, 2005, among Charlesbank Capital Partners, LLC, the Company and GSI Group, shall have been terminated without further liability to the Company, the GSI Group or the Surviving Corporation.

(h)    Senior Notes. Either (i) (A) an aggregate principal amount of the issued and outstanding Senior Notes representing the Requisite Consent shall have been tendered into the Debt Tender Offer and not withdrawn, (B) the supplemental indenture to the Senior Notes Indenture effecting the Amendments shall have been executed by the Company, GSI Group, the other guarantors under the Senior Notes Indenture and the trustee for the Senior Notes Indenture and (C) to the extent that Buyer shall have provided to the Company the amount of funds necessary to pay for all Senior Notes tendered into the Debt Tender Offer and all consent payments that may be payable to the holders of Senior Notes in connection with such tenders, the Company (or GSI Group) shall have accepted for payment all Senior Notes tendered into the Debt Tender Offer; or (ii) to the extent that Buyer shall have provided to the Company the amount of funds necessary to effect such defeasance as provided and calculated in accordance with the terms of the Senior Note Indenture, the Senior Notes shall have been defeased pursuant to Section 8.03 of the Senior Notes Indenture.

SECTION 7.3    Conditions Precedent to Obligations of the Company. The obligations of the Company to effect the Merger shall be subject to the fulfillment or satisfaction, prior to or on the Closing Date, of each of the following conditions precedent:

(a)    <u>Performance of Obligations; Representations and Warranties</u>.  Each of Buyer's representations and warranties contained in Article IV of this Agreement (without giving effect to any "material", "materiality" or "Buyer Material Adverse Effect" qualification on such representations and warranties) shall be true and correct on and as of the date hereof and as of the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, in each case, except where the failure to be true and correct individually or in the aggregate would not reasonably be expected to have a Buyer Material Adverse Effect.  Buyer shall have performed in all material respects and complied in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by them prior to or at the Closing.  The Company shall have received a certificate dated the Closing Date and signed by an authorized officer of Buyer, certifying that the conditions specified in this Section 7.3(a) have been satisfied.

(b)    <u>Escrow Agreement</u>.  Buyer and the Escrow Agent shall each have executed and delivered the Escrow Agreement.


## ARTICLE VIII

### ESCROW; STOCKHOLDERS' REPRESENTATIVE

SECTION 8.1    <u>Escrow Amount</u>.    Each of the Stockholders and Option Holders receiving consideration in the Merger pursuant to Section 2.1 will be deemed to have received and deposited with the Escrow Agent its pro rata portion of the Escrow Amount so deposited.  Escrow Amount will be deposited with and will be held by the Escrow Agent, as contemplated by Section 2.5, in accordance with the terms of the Escrow Agreement.

SECTION 8.2    <u>Stockholders' Representative</u>.

(a)    <u>Appointment</u>.  Each Stockholder (other than a holder of Dissenting Shares) and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, constitutes and appoints Stockholders' Representative to act as such Person's representative under this Agreement and the Escrow Agreement, with full authority to act on behalf of, and to bind, each such Person for purposes of this Agreement and the Escrow Agreement, and Stockholders' Representative hereby accepts such appointment.  Stockholders' Representative shall have full power and authority to represent all of such holders and their successors with respect to all matters arising under this Agreement and the Escrow Agreement and all actions taken by Stockholders' Representative hereunder and thereunder shall be binding upon all such holders and their successors as if expressly confirmed and ratified in writing by each of them.  Stockholders' Representative shall take any and all actions that it believes are necessary or appropriate under this Agreement and the Escrow Agreement for and on behalf of such holders, as fully as if such holders were acting on their own behalf, including dealing with Buyer, the Surviving Corporation, the Paying Agent and the Escrow Agent under this Agreement and the Escrow Agreement with respect to all matters arising under this Agreement and the

Escrow Agreement, taking any and all other actions specified in or contemplated by this Agreement and the Escrow Agreement, and engaging counsel, accountants or other Stockholders' Representatives, in connection with the foregoing matters. Without limiting the generality of the foregoing, Stockholders' Representative shall have full power and authority to effect and interpret all the terms and provisions of this Agreement and the Escrow Agreement (including the determination of the Adjustment Amount and to authorize disbursements and payments in accordance with Section 8.3) and to consent to any amendment hereof or thereof on behalf of all such holders and their successors.

(b)    <u>Indemnification of Stockholders' Representative.</u>    Stockholders' Representative may act upon any instrument or other writing believed by Stockholders' Representative in good faith to be genuine and to be signed or presented by the proper Person and shall not be liable in connection with the performance by it of its duties pursuant to the provisions of this Agreement or the Escrow Agreement, except for its own willful default or gross negligence. Stockholders' Representative shall be, and hereby is, indemnified and held harmless, jointly and severally, by each Stockholder (other than a holder of Dissenting Shares), and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, from all losses, costs and expenses (including attorneys' fees) that may be incurred by Stockholders' Representative as a result of Stockholders' Representative's performance of its duties under this Agreement and the Escrow Agreement (including (i) any portion of the Representative Section 2.3 expenses that are not satisfied out of the Escrow Amount and (ii) any portion of the Representative Section 2.8 Expenses that are not satisfied out of the Contingent Consideration, if any); *provided* that Stockholders' Representative shall not be entitled to indemnification for losses, costs or expenses that result from any action taken or omitted by Stockholders' Representative as a result of its own willful default or gross negligence.

(c)    <u>Reasonable Reliance.</u>    In the performance of its duties hereunder, Stockholders' Representative shall be entitled to rely upon any document or instrument reasonably believed by it to be genuine, accurate as to content and signed by any Stockholder (other than a holder of Dissenting Shares) or Option Holder who executes and delivers an Option Acknowledgement, as the case may be, or Buyer. Stockholders' Representative may assume that any Person purporting to give any notice in accordance with the provisions hereof has been duly authorized to do so.

(d)    <u>Attorney-in-Fact.</u> (i) Stockholders' Representative is hereby appointed and constituted the true and lawful attorney-in-fact of each Stockholder (other than a holder of Dissenting Shares), and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, with full power in their name and on their behalf to act according to the terms of this Agreement and the Escrow Agreement in the absolute discretion of Stockholders' Representative; and in general to do all things and to perform all acts including executing and delivering the Escrow Agreement and any other agreements, certificates, receipts, instructions, notices or instruments contemplated by or deemed advisable in connection with this Agreement and the Escrow Agreement. Such appointment shall be deemed to be a power coupled with an interest.

(ii)    This power of attorney and all authority hereby conferred is granted and shall be irrevocable, subject to replacement of Stockholders' Representative

pursuant to Section 8.2(f), and shall not be terminated by any act of any Stockholder (other than a holder of Dissenting Shares), or any Option Holder who executes and delivers an Option Acknowledgement, as the case may be, by operation of Law, whether by such holder's death, disability, protective supervision or any other event. Without limitation to the foregoing, this power of attorney is to ensure the performance of a special obligation and, accordingly, each Stockholder (other than a holder of Dissenting Shares) and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, hereby renounces its, his or her right to renounce this power of attorney unilaterally any time before the end of the Escrow Period (as such term is defined in the Escrow Agreement).

(iii)    Each Stockholder (other than a holder of Dissenting Shares) and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, waives any and all defenses that may be available to contest, negate or disaffirm the action of Stockholders' Representative taken in good faith under this Agreement or the Escrow Agreement.

(iv)    Notwithstanding the power of attorney granted in this Section 8.2, no agreement, instrument, acknowledgement or other act or document shall be ineffective by reason only of a Stockholder (other than a holder of Dissenting Shares) or an Option Holder who executes and delivers an Option Acknowledgement, as the case may be, having signed or given such act or document directly instead of Stockholders' Representative.

(e)    Liability. If Stockholders' Representative is required to determine the occurrence of any event or contingency, Stockholders' Representative shall, in making such determination, be liable to each Stockholder (other than a holder of Dissenting Shares), and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, only for Stockholders' Representative's proven bad faith as determined in light of all the circumstances, including the time and facilities available to it in the ordinary conduct of business. In determining the occurrence of any such event or contingency, Stockholders' Representative may request from any Stockholder (other than a holder of Dissenting Shares), or Option Holder who executes and delivers an Option Acknowledgement, as the case may be, or any other Person such reasonable additional evidence as Stockholders' Representative in its sole discretion may deem necessary to determine any fact relating to the occurrence of such event or contingency, and may at any time inquire of and consult with others, including any Stockholder (other than a holder of Dissenting Shares) or Option Holder who executes and delivers an Option Acknowledgement, as the case may be, and Stockholders' Representative shall not be liable to any such holder for any damages resulting from its delay in acting hereunder pending its receipt and examination of additional evidence requested by it.

(f)    Successor Representatives. Stockholders' Representative shall designate one or more Persons to serve as successor Stockholders' Representative in the event of its death, incapacity, bankruptcy or dissolution, which Person or Persons shall in such event succeed to and become vested with all the rights, powers, privileges and duties of Stockholders' Representative under this Agreement and the Escrow Agreement. Each successor Stockholders' Representative

shall designate one or more successors to serve as Stockholders' Representative in the event of such successor Stockholders' Representative's death, incapacity, bankruptcy or dissolution.

SECTION 8.3    Disbursements from the Escrow Account; Adjustment Amount; Special Tax Deduction Benefit; Contingent Consideration; Payments to Option Holders. (a) Following the Determination Date, if, as determined in accordance with Section 2.3(e), the Adjustment Amount is positive or an Escrow Surplus Amount exists, or pursuant to Section 2.8 a payment is due in respect of any Contingent Consideration, or pursuant to Section 6.11 a payment is due in respect of any Special Tax Deduction Benefit, Stockholders' Representative shall be entitled to authorize disbursements from the Escrow Account and direct the payment of the Adjustment Amount, Contingent Consideration, or Special Tax Deduction Benefit, as applicable, as follows:

(i)    to direct the payment of any Representative Section 2.3 Expenses from the Escrow Account or the Adjustment Amount, if any, in accordance with the provisions of Section 2.3 and the Escrow Agreement;

(ii)    to direct the payment of all or a portion of the Escrow Amount, as the case may be, pro rata to the Stockholders and Option Holders in accordance with the provisions of Section 2.3, the Escrow Agreement and the Capital Structure Certificate;

(iii)    to direct the payment of the Adjustment Amount, if any, pro rata to the Stockholders and the Option Holders in accordance with the provisions of Section 2.3, the Escrow Agreement and the Capital Structure Certificate;

(iv)    to direct the payment of the Contingent Consideration, if any, pro rata to the Stockholders and the Option Holders in accordance with the provisions of Section 2.8 and the Capital Structure Certificate; and

(v)    to direct the payment of the Special Tax Deduction Benefit, if any, pro rata to the Stockholders and the Option Holders in accordance with the provisions of Section 6.11 and the Capital Structure Certificate.

For purposes of this Section 8.3, each Rollover Share shall entitle the holder thereof to receive the payments provided in the foregoing clauses (ii) through (v) with respect to such Rollover Share as if such Rollover Share had been converted into the right to receive the merger consideration payable hereunder pursuant to Section 2.1(c).

(b)    Without limiting the foregoing, if, as determined in accordance with Section 2.3(g), the Adjustment Amount is positive or an Escrow Surplus Amount exists, if as determined in accordance with Section 2.8(a) any Contingent Consideration is payable, or if as determined in accordance with Section 6.11(c) any Special Tax Deduction Benefit is payable, then the Stockholders' Representative may, in its sole discretion, in lieu of the payments to Option Holders set forth in paragraph (a) above, Section 2.8(b), or Section 6.11(c), respectively, direct the Surviving Corporation, and the Escrow Agent, as the case may be, to deliver the portion of the Adjustment Amount, Escrow Amount, Contingent Consideration or Special Tax Deduction Benefit, as applicable, that is payable to Option Holders, to the Surviving Corporation for the benefit of such Option Holders. As promptly as possible, but in any event within two

Business Days following receipt of such funds, the Surviving Corporation shall pay to each Option Holder through its existing payroll service, the applicable pro rata portion of such funds. The Surviving Corporation shall be entitled to deduct and withhold from such payments such amounts as the Surviving Corporation is required to deduct and withhold with respect to the making of such payment under any provision of applicable tax Law. To the extent that amounts are so withheld by the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Option Holder in respect of which such deduction and withholding was made by the Surviving Corporation.

(c)    In connection with any positive Adjustment Amount, Escrow Surplus Amount, Contingent Consideration or Special Tax Deduction Benefit to be paid to the Stockholders, the Stockholders' Representative shall direct the Surviving Corporation to, and the Surviving Corporation shall, pay any applicable fees with respect to such amounts pursuant to the Company's engagement letter with UBS Securities LLC in accordance with the terms thereof, and the distributions contemplated by this Section 8.3, Section 2.8(b) or Section 6.11(c), as the case may be, shall be made net of such fees.

ARTICLE IX

TERMINATION

SECTION 9.1    Termination by Mutual Consent.    This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by mutual written consent of the Company and Buyer.

SECTION 9.2    Termination by Either Buyer or the Company.    This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by action of either Buyer or the Board of Directors of the Company if (a) any order, decree, ruling or other non-appealable final action has been issued by a Governmental Entity permanently restraining, enjoining or otherwise prohibiting consummation of the Merger or (b) the Merger shall not have been consummated by September 28, 2007; *provided, however*, that the right to terminate this Agreement under this Section 9.2(b) shall not be available to any party hereto whose action or failure to act has been a principal cause of or resulted in the failure of the Merger to occur on or before such date and such action or failure to act constitutes a material breach of this Agreement.

SECTION 9.3    Termination by the Company.    This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by action of the Board of Directors of the Company, if the Company is not in material breach of its obligations under this Agreement and (a) there is a breach by Buyer of any material representation, warranty, covenant or other agreement of them contained in this Agreement and such breach has not been cured within 30 days after written notice thereof to Buyer, or such breach cannot be cured, and would cause a condition set forth in Section 7.1 or Section 7.3(a) to be incapable of being satisfied or (b) all conditions to the obligations of Buyer to effect the Merger set forth in Section 7.1 and 7.2 shall have been satisfied (other than those conditions that by their nature or terms are to be satisfied at the Closing), but the Closing has not occurred by the time specified for the Closing in Section 1.2.

-51-

SECTION 9.4    Termination by Buyer.  This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by written notice given to the Company by Buyer, if Buyer is not in material breach of its obligations under the Agreement and (a) there is a breach by the Company of any material representation, warranty, covenant or other agreement of it contained in this Agreement, and such breach has not been cured within 30 days after written notice thereof to the Company, or such breach cannot be cured, and would cause a condition set forth in Section 7.1 or Section 7.2(a) to be incapable of being satisfied or (b) if within 24 hours after the execution and delivery of this Agreement the Written Consent shall not have been executed and delivered by the Principal Stockholder to Buyer duly adopting the resolutions contained therein.

SECTION 9.5    Effect of Termination and Abandonment.  In the event of termination of this Agreement and the abandonment of the Merger pursuant to this Article IX, written notice thereof shall be given to the other parties hereto, and this Agreement (other than as set forth in this Section 9.5 and other than Sections 6.5 [*Public Announcements*], 6.8 [*Expenses*] 9.6 [*Termination Fees*], and Articles X and XI) shall become void and of no effect with no liability on the part of any party hereto (or of any of its respective Representatives); *provided, however*, except as otherwise provided herein, no such termination shall relieve any party hereto of any liability or damages resulting from any breach of this Agreement.  If this Agreement is terminated and the Merger is abandoned pursuant to this Article IX, all confidential information received by Buyer its financing sources or their respective Representatives and Affiliates with respect to the Company, its Subsidiaries and their respective Affiliates shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

SECTION 9.6    Termination Fees.  (a) If this Agreement is terminated by the Company in accordance with Section 9.2 or 9.3, and at such time all conditions in Section 7.1 and Section 7.2 shall have been satisfied or waived (other than those conditions that by their nature or terms are to be satisfied at the Closing) but Buyer has not received the proceeds of the Debt Financing or alternate financing as contemplated by Section 6.14 (a "*Debt Receipt Failure*") then Buyer shall pay to the Company a fee in the amount set forth in Section 9.6 of the Disclosure Schedule (the "*Buyer Termination Fee*") by wire transfer of immediately available funds to the account specified by the Company, as promptly as practicable, and in any event within two business days, following such termination.  If Buyer fails promptly to pay the Buyer Termination Fee when due, and, in order to obtain such payment, the Company commences a Proceeding that results in a judgment against Buyer for the Buyer Termination Fee, Buyer shall pay the Company's costs and expenses (including attorneys' fees and expenses) in connection with such Proceeding, together with interest on the Buyer Termination Fee from the date such payment was required to be made until the date of payment, at the prime lending rate of UBS AG at its principal office in New York City, as in effect on the date such payment was required to be made.  Notwithstanding anything to the contrary in this Agreement, if in the circumstances in which the Buyer becomes obligated to pay the Buyer Termination Fee, Buyer is not in breach in any material respect of this Agreement (other than failing to Close when obligated to do so solely as a result of a Debt Receipt Failure that is not due to the failure or refusal of the Equity Sponsor to make the equity contribution described in the Equity Commitment Letter to Buyer), then the Company's right to terminate this Agreement in accordance with Section 9.3 and receive the Buyer Termination Fee in accordance with this Section 9.6 shall be (a) the sole and

-52-

exclusive remedy of the Company and its Subsidiaries against Buyer and any of their respective former, current or future general or limited partners, members or stockholders or against any of their former, current or future directors, officers, employees, Affiliates, general or limited partners, stockholders, managers, members or agents for any loss or damage suffered as a result of the breach of any representation, warranty, covenant or agreement contained in this Agreement by Buyer or their respective former, current or future general or limited partners, members or stockholders or against any of their former, current or future directors, officers, employees, Affiliates, general or limited partners, stockholders, managers, members or agents and the failure of the Merger to be consummated and (b) compensation and liquidated damages for the damages suffered by the Company and its stockholders as a result of failure of the Merger to be consummated and/or as a result of any breach of the Agreement by Buyer prior to such termination, in each case so as to avoid the difficulty of determining damages under the circumstances and not a penalty; it being understood that in no event shall the Buyer be required to pay fees or damages pursuant to this Section 9.6 on more than one occasion; and it being further understood that in any other case the Company's right to recover any other or additional damages and remedies available to it in respect of any intentional material breach of this Agreement by Buyer shall not be limited in any respect, subject to the limitation set forth in Section 10.12(b). The Buyer Termination Fee shall be reduced by any amounts as may be required to be deducted or withheld therefrom under applicable Tax Laws.

(b)    In the event that (i) the Buyer Termination Fee is paid to the Company; (ii) as of the termination of this Agreement, Buyer was not in breach in any material respect of this Agreement (other than failing to Close when obligated to do so solely a result of a Debt Receipt Failure that is not due to the failure or refusal of the Equity Sponsor to make the equity contribution described in the Equity Commitment Letter to Buyer); and (iii) no later than December 31, 2007, a definitive agreement with respect to an Alternative Transaction that is reasonably anticipated to be a Qualifying Transaction is entered into or a Qualifying Transaction is consummated, then the Company shall, upon the consummation thereof (assuming it is a Qualifying Transaction), pay back, or cause to be paid back, to the relevant payer in immediately available funds, the portion of the fee (but not in any event exceeding the amount of such fee) previously paid to the Company under Section 9.6 of the Merger Agreement equal to the excess, if any, of the Adjusted Proceeds Amount over the Threshold Amount. An *"Alternative Transaction"* is a transaction or series of related transactions that involves (i) the acquisition by a Third Party of 50% or more of the outstanding shares of Common Stock of the Company or its successor, (ii) a merger, consolidation, business combination, reorganization, share exchange, sale of assets, recapitalization, liquidation, dissolution or similar transaction which would result in any Third Party acquiring assets representing 50% or more of the net revenues, net income or assets (based on the fair market value thereof) of the Company and its Subsidiaries, taken as a whole (including capital stock of Subsidiaries of the Company), (iii) any other transaction which would result in a Third Party acquiring assets representing 50% or more of the net revenues, net income or assets (based on the fair market value thereof) of the Company and its Subsidiaries, taken as a whole (including capital stock of such Subsidiaries), immediately prior to such transaction (whether by purchase of assets, acquisition of stock of a Subsidiary or otherwise) or (iv) any combination of the foregoing. A *"Qualifying Transaction"* is an Alternative Transaction in which the Adjusted Proceeds Amount is not less than the Threshold Amount. The *"Adjusted Proceeds Amount"* is equal to (i) the aggregate value actually received by holders of the Common Stock and Option Holders upon the consummation of such Alternative Transaction

(*provided*, that if less than 100% of the outstanding shares of Common Stock are acquired in such Alternative Transaction, the shares of Common Stock that are not acquired will be deemed to have been acquired at the same price per share as the shares of Common Stock that were acquired in such Alternative Transaction), plus (ii) any benefit of tax deductions attributable to the period prior to the closing of such Alternative Transaction reasonably assured to be received in cash by the holders of Common Stock and Option Holders within 12 months of the consummation of such Alternative Transaction, less (iii) the fee previously paid to the Company under Section 9.6 of the Merger Agreement, less (iv) the positive after tax cash flow from operations, generated by the Company between the most recent month end immediately prior to the date this Agreement is terminated and the most recent month end immediately prior to the date of consummation of the relevant Alternative Transaction, net of capital expenditures during such period, plus (v) the amount of cash or the value of other property or securities otherwise paid out in respect of the Common Stock or other equity equivalents together with a 15% per annum interest factor therefrom and including the date of receipt until the date of consummation of the relevant Alternative Transaction. The "*Threshold Amount*" is (a) (i) the Estimated Merger Consideration (assuming the Merger had been consummated on the date this Agreement is terminated), plus (ii) the Escrow Amount, plus (iii) a 15% per annum interest factor thereon from and including August 17, 2007 to the date of consummation of the relevant Alternative Transaction, plus (b) the value of the Special Tax Deduction Benefit that would reasonably be anticipated to be received by holders of Common Stock and Option Holders on or prior to December 31, 2008, if the Merger had been consummated on the date this Agreement is terminated. "*Third Party*" means any Person other than Charlesbank Capital Partners, LLC , any investment fund managed by Charlesbank Capital Partners, LLC or their respective Affiliates.

## ARTICLE X

### MISCELLANEOUS

SECTION 10.1    Entire Agreement.    This Agreement (including the annexes, exhibits and schedules hereto) and the Confidentiality Agreement set forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby, and, except as set forth in this Agreement, there are no representations or warranties, express or implied, made by any party to this Agreement with respect to the subject matter of this Agreement and the Confidentiality Agreement.    Except for the matters set forth in the Confidentiality Agreement, any and all previous agreements and understandings between or among the parties hereto regarding the subject matter hereof, whether written or oral, are superseded by this Agreement and the agreements referred to or contemplated herein.

SECTION 10.2    Assignment and Binding Effect.    This Agreement shall not be assigned by any party hereto without the prior written consent of the other parties hereto; *provided, however*, that Buyer shall be permitted to assign this Agreement to any Affiliate of Buyer that is organized under the Laws of the United States or any State thereof (*provided* that Buyer shall remain liable for all of its obligations hereunder following such assignment). All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto.

SECTION 10.3    Notices.    Any notice, request, demand, waiver, consent, approval, or other communication that is required or permitted to be given to any party hereunder shall be in writing and shall be deemed given only if delivered to such party personally or sent to such party by facsimile transmission (promptly followed by a hard-copy delivered in accordance with this Section 10.3) or by registered or certified mail (return receipt requested), with postage and registration or certification fees thereon prepaid, addressed to the party at its address set forth below:

If to Buyer or the Surviving Corporation:

Centerbridge Capital Partners, L.P.
375 Park Avenue, 12th Floor
New York, NY 10152
Facsimile: (212) 672-5001
Attention:  Steven M. Silver and Will Manuel

with a copy to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile: (212) 455-2000
Attention: Wilson S. Neely

If to the Company, the Principal Stockholder or the Stockholders' Representative:

c/o Charlesbank Capital Partners, LLC
200 Clarendon Street
54th Floor
Boston, MA 02116
Facsimile:  (617) 619-5402
Attention:    Andrew Janower
              Tami Nason

with a copy to:

Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Facsimile:  (212) 841-1010
Attention: Stephen A. Infante

or to such other address or Person as any party hereto may have specified in a notice duly given to the other parties hereto as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, telegraphed or mailed.

Section 2.1(c).  For purposes of this Agreement, *"Special Tax Deduction Benefit"* means (A) the income tax refund (net of any Tax costs associated with, or any other adverse Tax consequences resulting from, the receipt of such refund) of estimated Tax payments previously made for the first quarter of the 2007 Tax year of the Surviving Corporation attributable to the deductions claimed (pursuant to Section 6.11(c)(i) above) for any Special Tax Deduction Items (for the purposes of this clause (A), the amount of such estimated Tax refund that is attributable to such deductions shall be computed as if the taxable period of the Surviving Corporation had closed at the close of business on the Closing Date and shall be equal to the portion of any such refund that is allocable to deductions resulting from events occurring during such portion of such taxable period ending at the close of business on the Closing Date); (B) the income Tax refund (net of any Tax costs associated with, or any other adverse Tax consequences resulting from the receipt of such refund) that the Surviving Corporation and its Affiliates receive that is attributable to the carrying back (pursuant to Section 6.11(c)(ii) above) of any net operating loss deductions attributable to any Special Tax Deduction Items, to the extent such net operating loss deductions are available after giving effect to clause (A) above (for the purposes of this clause (B), the amount of such refund that is attributable to such carry backs shall be computed as if the taxable period of the Surviving Corporation had closed at the close of business on the Closing Date and shall be equal to the portion of any such refund that is allocable to deductions resulting from events occurring during such portion of such taxable period ending at the close of business on the Closing Date); and (C) to the extent the amount of any Special Tax Deduction Item is not taken into account in determining a Special Tax Deduction Benefit pursuant to clauses (A) or (B), the reduction in the Surviving Corporation's (and its Affiliates') Tax liability in any taxable period beginning after the Closing Date attributable to the carry forward of any net operating loss attributable to any Special Tax Deduction Item, provided that for purposes of this clause (C), (x) the amount of such reduction that is attributable to such carry forwards shall be computed as if the taxable period of the Surviving Corporation had closed at the close of business on the Closing Date and shall be equal to the portion of any such reduction that is allocable to deductions resulting from events occurring during such portion of such taxable period ending at the close of business on the Closing Date, and (y) the Surviving Corporation and its Affiliates shall be deemed to use all other deductions, amortizations, exclusions from income or other Tax allowances of the Surviving Corporation and its Affiliates (to the extent such deductions, amortizations, exclusions from income or other Tax allowances are entitled to be used under applicable Tax law) prior to the use of any Special Tax Deduction Item in respect of which Buyer is obligated to pay the Stockholders' Representative under this clause (C). Notwithstanding anything to the contrary in this Section 6.11 or in Section 10.10 hereof, the Surviving Corporation shall only be obligated to make a payment pursuant to clause (C) of this Section 6.11(c) for any Special Tax Deduction Benefit that reduces the Surviving Corporation's (and its Affiliates') Tax liability for a taxable year ending on or before December 31, 2014.

(d)    Any payment to the Stockholders' Representative pursuant to  Section 6.11(c) shall be made (i) with respect to the Special Tax Deduction Benefit described in clauses (A) and (B) thereof, within five business days of the receipt of any refund described therein, and (ii) with respect to the Special Tax Deduction Benefit described in clause (C) thereof, within five business days of the date on which the reduction of Tax liability actually occurs (or, if applicable, within five business days of the receipt of a refund of Tax liabilities previously paid); and in any event no such payment shall be required earlier than five business days from the filing of any Tax Return reflecting the actual realization of a Special Tax Deduction Benefit. For the

avoidance of doubt, and for the purposes of this Agreement, Special Tax Deduction Benefits taken into account pursuant to this Agreement (other than with respect to Section 6.11) shall not also be taken into account under this Section 6.11.

(e)    To the extent any Special Tax Deduction Benefit described in Section 6.11(c) is successfully disallowed by a taxing authority and such successful challenge reduces the amount to which the Stockholders' Representative (on behalf of the Stockholders and Option Holders) would have been entitled under Section 6.11(c), the Surviving Corporation shall be entitled to set off the amount of such reduction against any subsequent Contingent Consideration otherwise payable to the Stockholders and Option Holders pursuant to Section 2.8.

(f)    Prior to the Closing Date, the Company shall not change any method of Tax accounting, make or change any Tax election, file any amended Tax Return, settle or compromise any Tax liability, agree to an extension or waiver of the statute of limitations with respect to the assessment or determination of Taxes, enter into any closing agreement with respect to any Tax or surrender any right to claim a Tax refund.

SECTION 6.12    Debt Tender Offer and Consent Solicitation.  (a)  Upon the request of Buyer, the Company shall (or shall cause GSI Group to) (i) promptly commence a cash tender offer to purchase all of the outstanding Senior Notes and (ii) solicit the consent of the requisite holders of the Senior Notes (the "*Requisite Consent*") to amend the Senior Notes Indenture to eliminate all material covenants and related defaults and to permit the transactions contemplated by this Agreement, including the financing thereof and to make the other changes specified in Schedule 6.12 or as otherwise agreed by Buyer and the Company (collectively, the "*Amendments*"), which acceptance for payment of the Senior Notes shall be conditioned upon the concurrent consummation of the Merger and shall be on the terms and conditions set forth on Schedule 6.12 (clauses (i) and (ii) together, the "*Debt Tender Offer*") or as may otherwise be reasonably requested by Buyer and consented to by the Company.  Buyer and the Company shall use their commercially reasonable efforts to cause the Debt Tender Offer to close on the Closing Date.  The Surviving Corporation shall (or shall cause GSI Group to) take any and all other additional steps or actions and execute any and all additional documents, instruments or certificates necessary to effect the purchase of tendered Senior Notes and satisfaction and discharge of the Indenture, as applicable, all at the expense of the Surviving Corporation and/or Buyer.  For the avoidance of doubt, consummation of the Merger shall not be conditioned upon the results of the Debt Tender Offer.

(b)    Following the commencement of the Debt Tender Offer, the Company shall make such changes to the terms and conditions of the Debt Tender Offer as may be reasonably requested in writing by Buyer; *provided* that neither the Company nor GSI Group shall be required to (i) increase the price per Senior Note payable, (ii) remove the condition that the Merger shall be consummated concurrently or the condition that there shall be no order or injunction prohibiting consummation of the Debt Tender Offer or (iii) make any binding commitment by the Company or any of its Subsidiaries (including GSI Group) unless such commitment is either conditioned on the Closing or terminates without liability to the Company or such Subsidiaries (including GSI Group). Following the commencement of the Debt Tender Offer, the Company shall not (and shall cause GSI Group not to), without the written consent of Buyer, waive any condition to the Debt Tender Offer or make any changes to the terms and

conditions of the Debt Tender Offer, except as otherwise requested or agreed in writing by Buyer. If Buyer advises the Company in writing that, in its reasonable judgment based on the advice of the lead dealer manager of the Debt Tender Offer, there is a significant possibility that the Requisite Consent will not be obtained as of immediately prior to the Effective Time (due to the Debt Tender Offer not having been consummated or otherwise), the Company and Buyer shall use commercially reasonable efforts to make preparations to defease the Senior Notes, and if the Requisite Consent is not timely received, then no later than the time scheduled for the Closing, the Company shall (or shall cause GSI Group to) defease the Senior Notes in connection with and at the time of the Merger in accordance with Section 8.03 of the Senior Notes Indenture; *provided, however,* that neither the Company nor GSI Group shall be required to defease the Senior Notes or provide any irrevocable notice regarding such defeasance unless (i) such action is taken simultaneously with the Merger being consummated and (ii) Buyer shall have deposited, or caused to be deposited, the amount of funds necessary to effect such defeasance as provided and calculated in accordance with the terms of the Senior Note Indenture. In connection with any such defeasance, the Company shall (or shall cause GSI Group to) deliver, or arrange for the delivery of, such certificates and opinions of counsel contemplated by the Senior Notes Indenture in order for such defeasance to comply with the terms of the Senior Notes Indenture.

(c)     Promptly following receipt of the Requisite Consent, the Company shall and shall cause GSI Group and each of the other guarantors of the Senior Notes to, and shall use its commercially reasonable efforts to cause the trustee under the Senior Notes Indenture to, execute a supplemental indenture incorporating and giving effect to the Amendments, which supplemental indenture shall become effective immediately upon its execution and delivery and which supplemental indenture shall provide that the Amendments shall become operative immediately upon the acceptance for payment of Senior Notes in the Debt Tender Offer. In connection with the execution and delivery of the supplemental indenture, the Company, GSI Group and the other guarantors of the Senior Notes shall deliver certificates and opinions from its officers and its counsel in order to comply with the terms of the Senior Notes Indenture. As promptly as practicable following the acceptance of Senior Notes in the Debt Tender Offer and the Effective Time, the Surviving Corporation shall (or shall cause GSI Group to) pay for the purchased Senior Notes.

(d)     All necessary and appropriate documentation in connection with the Debt Tender Offer, including the offer to purchase, related letter of transmittal and other related documents (collectively, the "*Offer Documents*") shall be provided by Buyer, subject to prior review and comment by the Company and the Principal Stockholder, and no Offer Document shall be mailed or otherwise distributed to holders of the Senior Notes without the written consent of Buyer, such consent not to be unreasonably withheld or delayed. Buyer and the Company shall cooperate with each other in the preparation of the Offer Documents. All mailings to the holders of the Senior Notes in connection with the Debt Tender Offer shall be subject to the prior review and comment of the Company and Buyer and shall be reasonably acceptable to each of them. If at any time prior to the completion of the Debt Tender Offer any information in the Offer Documents should be discovered by the Company or Buyer that should be set forth in an amendment or supplement to the Offer Documents, so that the Offer Documents shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of

the circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other party, and an appropriate amendment or supplement describing such information shall be disseminated to the holders of the Senior Notes. Notwithstanding anything to the contrary in this Section 6.12, the Company shall (and shall cause GSI Group to) comply with the requirements of Rule 14e-1 under the Exchange Act and any other applicable Law to the extent such Laws are applicable in connection with the Debt Tender Offer. To the extent that the provisions of any applicable Law conflict with this Section 6.12, the Company shall (and shall cause GSI Group to) comply with the applicable Law and *shall not be deemed to have breached its obligations hereunder by such compliance.*

(e)    In connection with the Debt Tender Offer, Buyer may select one or more dealer managers or solicitation agents, information agents, depositaries and other agents reasonably satisfactory to the Company (and *pursuant to customary arrangements reasonably satisfactory to the Company*) to provide assistance in connection therewith and the Company shall, and shall cause its Subsidiaries to, enter into customary agreements (including indemnities) with such parties so selected and on terms and conditions acceptable to Buyer. Pursuant to the terms of such agreements, the Company shall deliver, or arrange for the delivery of, such certificates and opinions of counsel as is customary in connection with debt tender offers and consent solicitations. The reasonable and customary fees and expenses of any dealer manager, solicitation agent, information agent, depositary or other agent retained in connection with the Debt Tender Offers will be included in the Defeasance Costs.

SECTION 6.13    Repayment of Senior Indebtedness; Defeasance of Senior Notes.    On or prior to the second Business Day prior to the Effective Time, the Company shall use its commercially reasonable efforts to deliver to Buyer copies of payoff letters (subject to delivery of funds as arranged by Buyer), in commercially reasonable form, from the administrative agent under the Wachovia Credit Agreement and shall use its commercially reasonable efforts to make arrangements for the release of all Liens and other security over the Company's and its Subsidiaries' properties and assets securing such obligations (subject to delivery of funds as arranged by Buyer).

SECTION 6.14    Financing. (a) Buyer shall not amend, supersede or otherwise modify, or waive, any provision of the Equity Commitment Letter or the Debt Commitment Letter without the prior written consent of the Company and Stockholders' Representative; *provided,* that the Debt Commitment Letter may be amended or superseded and provisions may be otherwise modified or waived, without the prior consent of the Company or the Stockholder Representative to replace or add one or more lenders, lead arrangers, bookrunners, syndication agents or similar entities which had not executed the Debt Commitment Letter as of the date hereof, or otherwise, *provided, further,* that in no event shall the Debt Commitment Letter be amended or superseded, or any provision therein be otherwise modified or waived, in a manner that would (i) expand or amend the conditions to the debt financing set forth in the Debt Commitment Letter in a manner adverse to the Company or the Stockholders; (ii) reasonably be expected to hinder, delay or prevent the Closing; (iii) reduce the aggregate amount of debt financing set forth in the Debt Commitment Letters (unless, in the case of this clause (iii), replaced with an amount of new equity financing on terms no less favorable to Buyer, the Company and the Stockholders than the terms set forth in the Equity Commitment Letter); (iv) adversely impact the ability of Buyer to enforce its rights under the Debt Commitment Letter; or

(v) require any information, assistance or cooperation of the Company, its Subsidiaries or its or their Representatives materially beyond the information, assistance and cooperation that would be required by the agent for the financing contemplated by the Debt Commitment Letter (as in effect on the date herof) in order to consummate such financing. Buyer shall use its commercially reasonable efforts to arrange the financing contemplated by the Debt Commitment Letter on the terms and conditions contemplated thereby, including using commercially reasonable efforts to (i) negotiate definitive agreements with respect thereto on the terms and conditions contained therein or on other terms no less favorable in the aggregate to Buyer and the Surviving Corporation, (ii) satisfy on a timely basis all conditions applicable to Buyer in such definitive agreements and (iii) consummate the financing contemplated by the Debt Commitment Letter or an alternate financing at Closing.

(b)    Buyer shall give the Company prompt notice of any material breach by any party of the Debt Commitment Letter or any termination of the Debt Commitment Letter. If the Debt Financing has not been obtained, Buyer shall continue to be obligated to consummate the Merger on the terms contemplated by this Agreement and subject only to the satisfaction or waiver of the conditions set forth in Sections 7.1 and 7.2 and Buyer's rights under Sections 9.2 and 9.4, regardless of whether Buyer have complied with all of their other obligations under this Agreement (including their obligations under this Section 6.14). The Company agrees to provide, and shall cause its Subsidiaries and its and their Representatives to provide, reasonable and customary cooperation in connection with the arrangement of the Debt Financing as may be reasonably requested by Buyer (to the extent reasonably determined by the agent for the Debt Financing to be required in connection with the arrangement of the Debt Financing) (provided that such requested cooperation does not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries beyond the level of involvement ordinarily required in similar financing transactions), including (a) furnishing Buyer and the agents for the Debt Financing as promptly as practicable with such financial and other pertinent information regarding the Company and its Subsidiaries as may be reasonably requested by Buyer in order to consummate the financing contemplated by the Debt Commitment Letter, (b) participating in meetings, drafting sessions, diligence sessions and sessions with the rating agencies in connection with the Debt Financing, (c) assisting with the preparation of materials for rating agency presentations, (d) using commercially reasonable efforts to cause its independent accountants to provide assistance and cooperation with Buyer and in the preparation of an offering document for the Debt Financing, (e) reasonably cooperating with the marketing efforts for the Debt Financing, and (f) executing and delivering any pledge and security documents, currency or interest hedging arrangements or other definitive financing documents or other certificates, legal opinions and documents as may be reasonably requested by Buyer (including certificates of the chief financial officer or any of the Company's Subsidiaries with respect to financing matters) or otherwise facilitating the pledging of collateral as may be reasonably requested by Buyer; *provided* that any obligations contained in such documents shall be effective no earlier than as of the Effective Time. Neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee or incur any other liability in connection with the Debt Financing prior to the Effective Time. Buyer shall, promptly upon request by the Company, reimburse the Company for all reasonable out-of-pocket costs incurred by the Company or its Subsidiaries in connection with such cooperation. If the Closing does not occur, Buyer shall indemnify and hold harmless the Company, its Subsidiaries, and their respective Representatives for and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties

suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(c)     In the event any portion of the Debt Financing becomes unavailable on the terms and conditions contemplated in the Debt Commitment Letters, Buyer shall use its commercially reasonable efforts to arrange to obtain alternative financing to replace such portion, including from alternative sources, on terms that are no less favorable in the aggregate to Buyer and the Surviving Corporation as promptly as practicable following the occurrence of such event.

(d)     Buyer shall cause the definitive documentation for the Debt Financing (or any alternative debt financing arranged by Buyer) to permit the payment of any positive Adjustment Amount, Escrow Surplus Amount, Special Tax Deduction Benefit or Contingent Consideration when and as such items become payable pursuant to the terms of this Agreement.

SECTION 6.15     No Solicitation of Transactions. (a)  The Company shall not, nor shall it authorize or permit any of the Subsidiaries or its Affiliates, any of its or their respective Representatives retained by it or any of the Subsidiaries or its Affiliates to, (i) solicit, initiate or encourage, or take any other action to facilitate, any inquiries or the making of any proposal that constitutes an Alternative Transaction or (ii) participate in any discussions or negotiations regarding, or furnish to any Person any information, or otherwise cooperate in any way with, any Alternative Transaction. The Company shall, and shall cause its Subsidiaries and its Affiliates to, immediately cease and cause to be terminated any existing discussions or negotiations with any Person conducted heretofore with respect to any Alternative Transaction.

(b)     For purposes of this Agreement, "*Alternative Transaction*" shall mean (i) any proposal or offer for a merger, consolidation, dissolution, recapitalization or other business combination involving the Company, (ii) any proposal for the issuance of 5% or more of the equity securities of the Company as consideration for the assets or securities of another Person or (iii) any proposal or offer to acquire in any manner, directly or indirectly, 5% or more of the equity securities of the Company or assets (including equity securities of any Subsidiary of the Company) that represent 5% or more of the total consolidated assets of the Company and the Subsidiaries, in each case other than the transactions contemplated by this Agreement.

(c)     Nothing contained in this Section 6.15 shall prohibit the Company from making disclosures to its Stockholders and Option Holders as required by applicable Law; *provided*, however, that no such disclosure shall be made without providing the Buyer a reasonable opportunity to consult with the Company as to the content of such disclosures and in no event shall the Company or its board of directors or any committee thereof take, or agree or resolve to take, any action prohibited by Section 6.15(a).

SECTION 6.16     Stockholders Agreement; Tag-Along Rights. (a)  At Closing, the Company, Buyer and Principal Stockholder shall, Principal Stockholder shall cause the other Charlesbank Parties to, and Buyer shall cause the Equity Sponsor to, enter into a stockholders agreement with respect to their respective interests in the Surviving Corporation, and a management services agreement, in each case having the terms and conditions described in Schedule 6.16(a).

-43-

(b)    Principal Stockholder will cause each of the other Charlesbank Parties to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) Shares in accordance with such Charlesbank Party's pro rata share of the Charlesbank Rollover Amount. To the extent that any holders of Shares that are not members of the Company's management validly exercise of any right to "tag along" in the rollover of their Shares, as provided in the Existing Stockholders Agreement, or the "drag along" provisions of the Existing Stockholders Agreement are enforced against such holders: (i) such Persons shall be entitled to include the portion of their Shares having a value (based on the Estimated Per Share Merger Consideration) equal to such holders' pro rata share of the Charlesbank Rollover Amount (but not to exceed 10% of the Charlesbank Rollover Amount) in the shares to be rolled over pursuant to Section 2.1(c) (the "*Tag-Along Shares*") (ii) the Tag-Along Shares shall be rolled over in lieu of the corresponding number of Shares that were to have been rolled over by the Charlesbank Parties and shall correspondingly reduce the Charlesbank Rollover Amount by the value of such shares (based on the Estimated Per Share Merger Consideration).

SECTION 6.17    <u>Termination of Agreements with Equity Holders</u>. Prior to the Closing the Company and Principal Stockholder shall obtain the termination, subject to the Closing and effective as of the Effective Time, of the following agreements without further liability to the Company, the GSI Group or the Surviving Corporation: (i) the Existing Registration Agreement; (ii) the Existing Stockholders Agreement; and (iii) all the Stock Purchase and Management Equity Agreements entered into between the Company and its employees, directors or consultants since October 6, 2005.

SECTION 6.18    <u>Environmental Matters</u>. Following the Effective Time, in the event of any condition relating to the facilities or real property located at 1051 W. North Avenue, Flora, Illinois that results in any liability of the Surviving Corporation or any of its Subsidiaries under any applicable Environmental Law or regarding Hazardous Substances, the Surviving Corporation shall use its commercially reasonable efforts to recover the amount of such liabilities from the Sellers (as defined in the 2005 Stock Purchase Agreement) pursuant to the indemnification provisions of Section 9.1 of the 2005 Stock Purchase Agreement. Following the Effective Time, the Surviving Corporation shall not take any action with respect to the facilities or real property located at 1051 W. North Avenue, Flora, Illinois, that would result in the indemnification provisions of the 2005 Stock Purchase Agreement being unavailable with respect to a Flora Environmental Condition (as defined in the 2005 Stock Purchase Agreement) pursuant to the proviso to Section 9.1(e) of the 2005 Stock Purchase Agreement.

SECTION 6.19    <u>Authorized Capital Stock</u>. To the extent that the authorized capital stock of the Company is insufficient to permit the issuance immediately following the Effective Time of the aggregate number of shares of common stock of the Surviving Corporation required upon conversion pursuant to Section 2.1 of all shares of common stock of Buyer outstanding immediately prior to the Effective Time, then the Company and Principal Stockholder shall take any necessary action to amend the Company's certificate of incorporation so as to permit such issuance.

## ARTICLE VII

### CONDITIONS PRECEDENT

SECTION 7.1    Conditions Precedent to Obligations of Each Party.    The respective obligations of each party hereto to effect the Merger shall be subject to the fulfillment or satisfaction, prior to or on the Closing Date, of each of the following conditions precedent:

(a)    Approvals.    All authorizations, consents, orders, declarations or approvals of, or filings with, or terminations or expirations of waiting periods imposed by, any Governmental Entity, which the failure to obtain, make or occur would have the effect of making the Merger or any of the transactions contemplated hereby illegal or would have a Buyer Material Adverse Effect or a Company Material Adverse Effect, as the case may be, assuming the Merger had taken place, shall be in effect.

(b)    No Litigation or Injunction.    There shall not be instituted or pending any suit, action or proceeding by any Governmental Entity relating to this Agreement or any of the agreements contemplated hereby or any of the transactions contemplated herein.

(c)    Stockholder Approval.    The Merger shall have been duly approved by holders of the Company's capital stock as required by the Company's certificate of incorporation and the DGCL.

(d)    HSR Act; Competition Laws.    All filing and waiting periods applicable (including any extensions thereof) to the consummation of the Merger under the HSR Act shall have expired or been terminated. All approvals required under the Competition Laws identified on Schedule 7.1(d)(i) shall have been obtained.

SECTION 7.2    Conditions Precedent to Obligations of Buyer.    The obligations of Buyer to effect the Merger shall be subject to the fulfillment or satisfaction, prior to or on the Closing Date, of each of the following conditions precedent:

(a)    Representations and Warranties; Performance of Obligations.    Each of the Company's representations and warranties contained in Article III (without giving effect to any "material", "materiality" or "Company Material Adverse Effect" qualification on such representations and warranties) shall be true and correct on and as of the date hereof and as of the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except, in each case, where the failure to be true and correct individually or in the aggregate would not reasonably be expected to have a Company Material Adverse Effect; *provided, however,* that the representations and warranties set forth in Section 3.3 shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date. Each of the representations and warranties of the Principal Stockholder contained in Article V shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and

-45-

correct in all material respects as of such earlier date. The Company shall have performed in all material respects and complied in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by it prior to or at the Closing Date. Buyer shall have received a certificate dated the Closing Date and signed by the chief executive officer or chief financial officer of the Company, certifying that the conditions specified in this Section 7.2(a) have been satisfied.

(b)    Company Material Adverse Effect. No Company Material Adverse Effect shall have occurred since the date hereof and be continuing.

(c)    Dissenting Shares. No more than ten percent of the Shares outstanding on the date hereof shall be Dissenting Shares.

(d)    Annex and Certificate Delivery. The Company shall have delivered to Buyer each of the Closing Net Indebtedness Annex, the Transaction Expenses Annex, and the Capital Structure Certificate.

(e)    Director Resignations. The Company shall have delivered to Buyer a resignation from each member of the Board of Directors or comparable body for each Subsidiary of the Company, unless specified by Buyer no later than three Business Days prior to Closing.

(f)    Escrow Agreement. The Escrow Agent and Stockholders' Representative shall each have executed and delivered the Escrow Agreement.

(g)    Charlesbank Monitoring Agreement. The Corporate Development and Administrative Services Agreement, dated as of May 16, 2005, among Charlesbank Capital Partners, LLC, the Company and GSI Group, shall have been terminated without further liability to the Company, the GSI Group or the Surviving Corporation.

(h)    Senior Notes. Either (i) (A) an aggregate principal amount of the issued and outstanding Senior Notes representing the Requisite Consent shall have been tendered into the Debt Tender Offer and not withdrawn, (B) the supplemental indenture to the Senior Notes Indenture effecting the Amendments shall have been executed by the Company, GSI Group, the other guarantors under the Senior Notes Indenture and the trustee for the Senior Notes Indenture and (C) to the extent that Buyer shall have provided to the Company the amount of funds necessary to pay for all Senior Notes tendered into the Debt Tender Offer and all consent payments that may be payable to the holders of Senior Notes in connection with such tenders, the Company (or GSI Group) shall have accepted for payment all Senior Notes tendered into the Debt Tender Offer; or (ii) to the extent that Buyer shall have provided to the Company the amount of funds necessary to effect such defeasance as provided and calculated in accordance with the terms of the Senior Note Indenture, the Senior Notes shall have been defeased pursuant to Section 8.03 of the Senior Notes Indenture.

SECTION 7.3    Conditions Precedent to Obligations of the Company. The obligations of the Company to effect the Merger shall be subject to the fulfillment or satisfaction, prior to or on the Closing Date, of each of the following conditions precedent:

(a)    <u>Performance of Obligations; Representations and Warranties</u>.    Each of Buyer's representations and warranties contained in Article IV of this Agreement (without giving effect to any "material", "materiality" or "Buyer Material Adverse Effect" qualification on such representations and warranties) shall be true and correct on and as of the date hereof and as of the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, in each case, except where the failure to be true and correct individually or in the aggregate would not reasonably be expected to have a Buyer Material Adverse Effect.  Buyer shall have performed in all material respects and complied in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by them prior to or at the Closing.  The Company shall have received a certificate dated the Closing Date and signed by an authorized officer of Buyer, certifying that the conditions specified in this Section 7.3(a) have been satisfied.

(b)    <u>Escrow Agreement</u>.    Buyer and the Escrow Agent shall each have executed and delivered the Escrow Agreement.


ARTICLE VIII

<span style="letter-spacing:1px">ESCROW; STOCKHOLDERS' REPRESENTATIVE</span>

SECTION 8.1    <u>Escrow Amount</u>.    Each of the Stockholders and Option Holders receiving consideration in the Merger pursuant to Section 2.1 will be deemed to have received and deposited with the Escrow Agent its pro rata portion of the Escrow Amount so deposited.  Escrow Amount will be deposited with and will be held by the Escrow Agent, as contemplated by Section 2.5, in accordance with the terms of the Escrow Agreement.

SECTION 8.2    <u>Stockholders' Representative</u>.

(a)    <u>Appointment</u>.    Each Stockholder (other than a holder of Dissenting Shares) and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, constitutes and appoints Stockholders' Representative to act as such Person's representative under this Agreement and the Escrow Agreement, with full authority to act on behalf of, and to bind, each such Person for purposes of this Agreement and the Escrow Agreement, and Stockholders' Representative hereby accepts such appointment. Stockholders' Representative shall have full power and authority to represent all of such holders and their successors with respect to all matters arising under this Agreement and the Escrow Agreement and all actions taken by Stockholders' Representative hereunder and thereunder shall be binding upon all such holders and their successors as if expressly confirmed and ratified in writing by each of them.  Stockholders' Representative shall take any and all actions that it believes are necessary or appropriate under this Agreement and the Escrow Agreement for and on behalf of such holders, as fully as if such holders were acting on their own behalf, including dealing with Buyer, the Surviving Corporation, the Paying Agent and the Escrow Agent under this Agreement and the Escrow Agreement with respect to all matters arising under this Agreement and the

-47-

Escrow Agreement, taking any and all other actions specified in or contemplated by this Agreement and the Escrow Agreement, and engaging counsel, accountants or other Stockholders' Representatives, in connection with the foregoing matters. Without limiting the generality of the foregoing, Stockholders' Representative shall have full power and authority to effect and interpret all the terms and provisions of this Agreement and the Escrow Agreement (including the determination of the Adjustment Amount and to authorize disbursements and payments in accordance with Section 8.3) and to consent to any amendment hereof or thereof on behalf of all such holders and their successors.

(b)    <u>Indemnification of Stockholders' Representative.</u>    Stockholders' Representative may act upon any instrument or other writing believed by Stockholders' Representative in good faith to be genuine and to be signed or presented by the proper Person and shall not be liable in connection with the performance by it of its duties pursuant to the provisions of this Agreement or the Escrow Agreement, except for its own willful default or gross negligence. Stockholders' Representative shall be, and hereby is, indemnified and held harmless, jointly and severally, by each Stockholder (other than a holder of Dissenting Shares), and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, from all losses, costs and expenses (including attorneys' fees) that may be incurred by Stockholders' Representative as a result of Stockholders' Representative's performance of its duties under this Agreement and the Escrow Agreement (including (i) any portion of the Representative Section 2.3 expenses that are not satisfied out of the Escrow Amount and (ii) any portion of the Representative Section 2.8 Expenses that are not satisfied out of the Contingent Consideration, if any); *provided* that Stockholders' Representative shall not be entitled to indemnification for losses, costs or expenses that result from any action taken or omitted by Stockholders' Representative as a result of its own willful default or gross negligence.

(c)    <u>Reasonable Reliance.</u>    In the performance of its duties hereunder, Stockholders' Representative shall be entitled to rely upon any document or instrument reasonably believed by it to be genuine, accurate as to content and signed by any Stockholder (other than a holder of Dissenting Shares) or Option Holder who executes and delivers an Option Acknowledgement, as the case may be, or Buyer. Stockholders' Representative may assume that any Person purporting to give any notice in accordance with the provisions hereof has been duly authorized to do so.

(d)    <u>Attorney-in-Fact.</u> (i) Stockholders' Representative is hereby appointed and constituted the true and lawful attorney-in-fact of each Stockholder (other than a holder of Dissenting Shares), and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, with full power in their name and on their behalf to act according to the terms of this Agreement and the Escrow Agreement in the absolute discretion of Stockholders' Representative; and in general to do all things and to perform all acts including executing and delivering the Escrow Agreement and any other agreements, certificates, receipts, instructions, notices or instruments contemplated by or deemed advisable in connection with this Agreement and the Escrow Agreement. Such appointment shall be deemed to be a power coupled with an interest.

(ii)    This power of attorney and all authority hereby conferred is granted and shall be irrevocable, subject to replacement of Stockholders' Representative

pursuant to Section 8.2(f), and shall not be terminated by any act of any Stockholder (other than a holder of Dissenting Shares), or any Option Holder who executes and delivers an Option Acknowledgement, as the case may be, by operation of Law, whether by such holder's death, disability, protective supervision or any other event. Without limitation to the foregoing, this power of attorney is to ensure the performance of a special obligation and, accordingly, each Stockholder (other than a holder of Dissenting Shares) and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, hereby renounces its, his or her right to renounce this power of attorney unilaterally any time before the end of the Escrow Period (as such term is defined in the Escrow Agreement).

(iii)    Each Stockholder (other than a holder of Dissenting Shares) and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, waives any and all defenses that may be available to contest, negate or disaffirm the action of Stockholders' Representative taken in good faith under this Agreement or the Escrow Agreement.

(iv)    Notwithstanding the power of attorney granted in this Section 8.2, no agreement, instrument, acknowledgement or other act or document shall be ineffective by reason only of a Stockholder (other than a holder of Dissenting Shares) or an Option Holder who executes and delivers an Option Acknowledgement, as the case may be, having signed or given such act or document directly instead of Stockholders' Representative.

(e)    Liability.  If Stockholders' Representative is required to determine the occurrence of any event or contingency, Stockholders' Representative shall, in making such determination, be liable to each Stockholder (other than a holder of Dissenting Shares), and each Option Holder who executes and delivers an Option Acknowledgement, as the case may be, only for Stockholders' Representative's proven bad faith as determined in light of all the circumstances, including the time and facilities available to it in the ordinary conduct of business.  In determining the occurrence of any such event or contingency, Stockholders' Representative may request from any Stockholder (other than a holder of Dissenting Shares), or Option Holder who executes and delivers an Option Acknowledgement, as the case may be, or any other Person such reasonable additional evidence as Stockholders' Representative in its sole discretion may deem necessary to determine any fact relating to the occurrence of such event or contingency, and may at any time inquire of and consult with others, including any Stockholder (other than a holder of Dissenting Shares) or Option Holder who executes and delivers an Option Acknowledgement, as the case may be, and Stockholders' Representative shall not be liable to any such holder for any damages resulting from its delay in acting hereunder pending its receipt and examination of additional evidence requested by it.

(f)    Successor Representatives.  Stockholders' Representative shall designate one or more Persons to serve as successor Stockholders' Representative in the event of its death, incapacity, bankruptcy or dissolution, which Person or Persons shall in such event succeed to and become vested with all the rights, powers, privileges and duties of Stockholders' Representative under this Agreement and the Escrow Agreement.  Each successor Stockholders' Representative

-49-

shall designate one or more successors to serve as Stockholders' Representative in the event of such successor Stockholders' Representative's death, incapacity, bankruptcy or dissolution.

SECTION 8.3    Disbursements from the Escrow Account; Adjustment Amount; Special Tax Deduction Benefit; Contingent Consideration; Payments to Option Holders. (a) Following the Determination Date, if, as determined in accordance with Section 2.3(e), the Adjustment Amount is positive or an Escrow Surplus Amount exists, or pursuant to Section 2.8 a payment is due in respect of any Contingent Consideration, or pursuant to Section 6.11 a payment is due in respect of any Special Tax Deduction Benefit, Stockholders' Representative shall be entitled to authorize disbursements from the Escrow Account and direct the payment of the Adjustment Amount, Contingent Consideration, or Special Tax Deduction Benefit, as applicable, as follows:

(i)    to direct the payment of any Representative Section 2.3 Expenses from the Escrow Account or the Adjustment Amount, if any, in accordance with the provisions of Section 2.3 and the Escrow Agreement;

(ii)    to direct the payment of all or a portion of the Escrow Amount, as the case may be, pro rata to the Stockholders and Option Holders in accordance with the provisions of Section 2.3, the Escrow Agreement and the Capital Structure Certificate;

(iii)    to direct the payment of the Adjustment Amount, if any, pro rata to the Stockholders and the Option Holders in accordance with the provisions of Section 2.3, the Escrow Agreement and the Capital Structure Certificate;

(iv)    to direct the payment of the Contingent Consideration, if any, pro rata to the Stockholders and the Option Holders in accordance with the provisions of Section 2.8 and the Capital Structure Certificate; and

(v)    to direct the payment of the Special Tax Deduction Benefit, if any, pro rata to the Stockholders and the Option Holders in accordance with the provisions of Section 6.11 and the Capital Structure Certificate.

For purposes of this Section 8.3, each Rollover Share shall entitle the holder thereof to receive the payments provided in the foregoing clauses (ii) through (v) with respect to such Rollover Share as if such Rollover Share had been converted into the right to receive the merger consideration payable hereunder pursuant to Section 2.1(c).

(b)    Without limiting the foregoing, if, as determined in accordance with Section 2.3(g), the Adjustment Amount is positive or an Escrow Surplus Amount exists, if as determined in accordance with Section 2.8(a) any Contingent Consideration is payable, or if as determined in accordance with Section 6.11(c) any Special Tax Deduction Benefit is payable, then the Stockholders' Representative may, in its sole discretion, in lieu of the payments to Option Holders set forth in paragraph (a) above, Section 2.8(b), or Section 6.11(c), respectively, direct the Surviving Corporation, and the Escrow Agent, as the case may be, to deliver the portion of the Adjustment Amount, Escrow Amount, Contingent Consideration or Special Tax Deduction Benefit, as applicable, that is payable to Option Holders, to the Surviving Corporation for the benefit of such Option Holders. As promptly as possible, but in any event within two

Business Days following receipt of such funds, the Surviving Corporation shall pay to each Option Holder through its existing payroll service, the applicable pro rata portion of such funds. The Surviving Corporation shall be entitled to deduct and withhold from such payments such amounts as the Surviving Corporation is required to deduct and withhold with respect to the making of such payment under any provision of applicable tax Law. To the extent that amounts are so withheld by the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Option Holder in respect of which such deduction and withholding was made by the Surviving Corporation.

(c)    In connection with any positive Adjustment Amount, Escrow Surplus Amount, Contingent Consideration or Special Tax Deduction Benefit to be paid to the Stockholders, the Stockholders' Representative shall direct the Surviving Corporation to, and the Surviving Corporation shall, pay any applicable fees with respect to such amounts pursuant to the Company's engagement letter with UBS Securities LLC in accordance with the terms thereof, and the distributions contemplated by this Section 8.3, Section 2.8(b) or Section 6.11(c), as the case may be, shall be made net of such fees.

ARTICLE IX

TERMINATION

SECTION 9.1    Termination by Mutual Consent.    This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by mutual written consent of the Company and Buyer.

SECTION 9.2    Termination by Either Buyer or the Company.    This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by action of either Buyer or the Board of Directors of the Company if (a) any order, decree, ruling or other non-appealable final action has been issued by a Governmental Entity permanently restraining, enjoining or otherwise prohibiting consummation of the Merger or (b) the Merger shall not have been consummated by September 28, 2007; *provided, however,* that the right to terminate this Agreement under this Section 9.2(b) shall not be available to any party hereto whose action or failure to act has been a principal cause of or resulted in the failure of the Merger to occur on or before such date and such action or failure to act constitutes a material breach of this Agreement.

SECTION 9.3    Termination by the Company.    This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by action of the Board of Directors of the Company, if the Company is not in material breach of its obligations under this Agreement and (a) there is a breach by Buyer of any material representation, warranty, covenant or other agreement of them contained in this Agreement and such breach has not been cured within 30 days after written notice thereof to Buyer, or such breach cannot be cured, and would cause a condition set forth in Section 7.1 or Section 7.3(a) to be incapable of being satisfied or (b) all conditions to the obligations of Buyer to effect the Merger set forth in Section 7.1 and 7.2 shall have been satisfied (other than those conditions that by their nature or terms are to be satisfied at the Closing), but the Closing has not occurred by the time specified for the Closing in Section 1.2.

SECTION 9.4    Termination by Buyer.  This Agreement may be terminated, and the Merger may be abandoned at any time prior to the Effective Time, by written notice given to the Company by Buyer, if Buyer is not in material breach of its obligations under the Agreement and (a) there is a breach by the Company of any material representation, warranty, covenant or other agreement of it contained in this Agreement, and such breach has not been cured within 30 days after written notice thereof to the Company, or such breach cannot be cured, and would cause a condition set forth in Section 7.1 or Section 7.2(a) to be incapable of being satisfied or (b) if within 24 hours after the execution and delivery of this Agreement the Written Consent shall not have been executed and delivered by the Principal Stockholder to Buyer duly adopting the resolutions contained therein.

SECTION 9.5    Effect of Termination and Abandonment.  In the event of termination of this Agreement and the abandonment of the Merger pursuant to this Article IX, written notice thereof shall be given to the other parties hereto, and this Agreement (other than as set forth in this Section 9.5 and other than Sections 6.5 [*Public Announcements*], 6.8 [*Expenses*] 9.6 [*Termination Fees*], and Articles X and XI) shall become void and of no effect with no liability on the part of any party hereto (or of any of its respective Representatives); *provided, however*, except as otherwise provided herein, no such termination shall relieve any party hereto of any liability or damages resulting from any breach of this Agreement.  If this Agreement is terminated and the Merger is abandoned pursuant to this Article IX, all confidential information received by Buyer its financing sources or their respective Representatives and Affiliates with respect to the Company, its Subsidiaries and their respective Affiliates shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

SECTION 9.6    Termination Fees.  (a)  If this Agreement is terminated by the Company in accordance with Section 9.2 or 9.3, and at such time all conditions in Section 7.1 and Section 7.2 shall have been satisfied or waived (other than those conditions that by their nature or terms are to be satisfied at the Closing) but Buyer has not received the proceeds of the Debt Financing or alternate financing as contemplated by Section 6.14 (a "*Debt Receipt Failure*") then Buyer shall pay to the Company a fee in the amount set forth in Section 9.6 of the Disclosure Schedule (the "*Buyer Termination Fee*") by wire transfer of immediately available funds to the account specified by the Company, as promptly as practicable, and in any event within two business days, following such termination.  If Buyer fails promptly to pay the Buyer Termination Fee when due, and, in order to obtain such payment, the Company commences a Proceeding that results in a judgment against Buyer for the Buyer Termination Fee, Buyer shall pay the Company's costs and expenses (including attorneys' fees and expenses) in connection with such Proceeding, together with interest on the Buyer Termination Fee from the date such payment was required to be made until the date of payment, at the prime lending rate of UBS AG at its principal office in New York City, as in effect on the date such payment was required to be made.  Notwithstanding anything to the contrary in this Agreement, if in the circumstances in which the Buyer becomes obligated to pay the Buyer Termination Fee, Buyer is not in breach in any material respect of this Agreement (other than failing to Close when obligated to do so solely as a result of a Debt Receipt Failure that is not due to the failure or refusal of the Equity Sponsor to make the equity contribution described in the Equity Commitment Letter to Buyer), then the Company's right to terminate this Agreement in accordance with Section 9.3 and receive the Buyer Termination Fee in accordance with this Section 9.6 shall be (a) the sole and

-52-

exclusive remedy of the Company and its Subsidiaries against Buyer and any of their respective former, current or future general or limited partners, members or stockholders or against any of their former, current or future directors, officers, employees, Affiliates, general or limited partners, stockholders, managers, members or agents for any loss or damage suffered as a result of the breach of any representation, warranty, covenant or agreement contained in this Agreement by Buyer or their respective former, current or future general or limited partners, members or stockholders or against any of their former, current or future directors, officers, employees, Affiliates, general or limited partners, stockholders, managers, members or agents and the failure of the Merger to be consummated and (b) compensation and liquidated damages for the damages suffered by the Company and its stockholders as a result of failure of the Merger to be consummated and/or as a result of any breach of the Agreement by Buyer prior to such termination, in each case so as to avoid the difficulty of determining damages under the circumstances and not a penalty; it being understood that in no event shall the Buyer be required to pay fees or damages pursuant to this Section 9.6 on more than one occasion; and it being further understood that in any other case the Company's right to recover any other or additional damages and remedies available to it in respect of any intentional material breach of this Agreement by Buyer shall not be limited in any respect, subject to the limitation set forth in Section 10.12(b). The Buyer Termination Fee shall be reduced by any amounts as may be required to be deducted or withheld therefrom under applicable Tax Laws.

(b)    In the event that (i) the Buyer Termination Fee is paid to the Company; (ii) as of the termination of this Agreement, Buyer was not in breach in any material respect of this Agreement (other than failing to Close when obligated to do so solely a result of a Debt Receipt Failure that is not due to the failure or refusal of the Equity Sponsor to make the equity contribution described in the Equity Commitment Letter to Buyer); and (iii) no later than December 31, 2007, a definitive agreement with respect to an Alternative Transaction that is reasonably anticipated to be a Qualifying Transaction is entered into or a Qualifying Transaction is consummated, then the Company shall, upon the consummation thereof (assuming it is a Qualifying Transaction), pay back, or cause to be paid back, to the relevant payer in immediately available funds, the portion of the fee (but not in any event exceeding the amount of such fee) previously paid to the Company under Section 9.6 of the Merger Agreement equal to the excess, if any, of the Adjusted Proceeds Amount over the Threshold Amount. An *"Alternative Transaction"* is a transaction or series of related transactions that involves (i) the acquisition by a Third Party of 50% or more of the outstanding shares of Common Stock of the Company or its successor, (ii) a merger, consolidation, business combination, reorganization, share exchange, sale of assets, recapitalization, liquidation, dissolution or similar transaction which would result in any Third Party acquiring assets representing 50% or more of the net revenues, net income or assets (based on the fair market value thereof) of the Company and its Subsidiaries, taken as a whole (including capital stock of Subsidiaries of the Company), (iii) any other transaction which would result in a Third Party acquiring assets representing 50% or more of the net revenues, net income or assets (based on the fair market value thereof) of the Company and its Subsidiaries, taken as a whole (including capital stock of such Subsidiaries), immediately prior to such transaction (whether by purchase of assets, acquisition of stock of a Subsidiary or otherwise) or (iv) any combination of the foregoing. A *"Qualifying Transaction"* is an Alternative Transaction in which the Adjusted Proceeds Amount is not less than the Threshold Amount. The *"Adjusted Proceeds Amount"* is equal to (i) the aggregate value actually received by holders of the Common Stock and Option Holders upon the consummation of such Alternative Transaction

(*provided*, that if less than 100% of the outstanding shares of Common Stock are acquired in such Alternative Transaction, the shares of Common Stock that are not acquired will be deemed to have been acquired at the same price per share as the shares of Common Stock that were acquired in such Alternative Transaction), plus (ii) any benefit of tax deductions attributable to the period prior to the closing of such Alternative Transaction reasonably assured to be received in cash by the holders of Common Stock and Option Holders within 12 months of the consummation of such Alternative Transaction, less (iii) the fee previously paid to the Company under Section 9.6 of the Merger Agreement, less (iv) the positive after tax cash flow from operations, generated by the Company between the most recent month end immediately prior to the date this Agreement is terminated and the most recent month end immediately prior to the date of consummation of the relevant Alternative Transaction, net of capital expenditures during such period, plus (v) the amount of cash or the value of other property or securities otherwise paid out in respect of the Common Stock or other equity equivalents together with a 15% per annum interest factor therefrom and including the date of receipt until the date of consummation of the relevant Alternative Transaction. The "*Threshold Amount*" is (a) (i) the Estimated Merger Consideration (assuming the Merger had been consummated on the date this Agreement is terminated), plus (ii) the Escrow Amount, plus (iii) a 15% per annum interest factor thereon from and including August 17, 2007 to the date of consummation of the relevant Alternative Transaction, plus (b) the value of the Special Tax Deduction Benefit that would reasonably be anticipated to be received by holders of Common Stock and Option Holders on or prior to December 31, 2008, if the Merger had been consummated on the date this Agreement is terminated. "*Third Party*" means any Person other than Charlesbank Capital Partners, LLC , any investment fund managed by Charlesbank Capital Partners, LLC or their respective Affiliates.

## ARTICLE X

### MISCELLANEOUS

SECTION 10.1    Entire Agreement.    This Agreement (including the annexes, exhibits and schedules hereto) and the Confidentiality Agreement set forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby, and, except as set forth in this Agreement, there are no representations or warranties, express or implied, made by any party to this Agreement with respect to the subject matter of this Agreement and the Confidentiality Agreement.    Except for the matters set forth in the Confidentiality Agreement, any and all previous agreements and understandings between or among the parties hereto regarding the subject matter hereof, whether written or oral, are superseded by this Agreement and the agreements referred to or contemplated herein.

SECTION 10.2    Assignment and Binding Effect.    This Agreement shall not be assigned by any party hereto without the prior written consent of the other parties hereto; *provided, however,* that Buyer shall be permitted to assign this Agreement to any Affiliate of Buyer that is organized under the Laws of the United States or any State thereof (*provided* that Buyer shall remain liable for all of its obligations hereunder following such assignment). All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto.

SECTION 10.3   Notices.   Any notice, request, demand, waiver, consent, approval, or other communication that is required or permitted to be given to any party hereunder shall be in writing and shall be deemed given only if delivered to such party personally or sent to such party by facsimile transmission (promptly followed by a hard-copy delivered in accordance with this Section 10.3) or by registered or certified mail (return receipt requested), with postage and registration or certification fees thereon prepaid, addressed to the party at its address set forth below:

If to Buyer or the Surviving Corporation:

Centerbridge Capital Partners, L.P.
375 Park Avenue, 12th Floor
New York, NY 10152
Facsimile: (212) 672-5001
Attention:  Steven M. Silver and Will Manuel

with a copy to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile: (212) 455-2000
Attention: Wilson S. Neely

If to the Company, the Principal Stockholder or the Stockholders' Representative:

c/o Charlesbank Capital Partners, LLC
200 Clarendon Street
54th Floor
Boston, MA 02116
Facsimile:  (617) 619-5402
Attention:    Andrew Janower
              Tami Nason

with a copy to:

Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Facsimile: (212) 841-1010
Attention: Stephen A. Infante

or to such other address or Person as any party hereto may have specified in a notice duly given to the other parties hereto as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, telegraphed or mailed.

Exhibit G

**GSI HOLDINGS CORP.**

## INFORMATION STATEMENT

This Information Statement is being furnished on behalf of the Board of Directors (the "*Board of Directors*") of GSI Holdings Corp., a Delaware corporation (the "*Company*"), to the holders of record at the close of business on June 29, 2007 of the outstanding shares of the Company's Common Stock, par value $0.01 per share (the "*Common Stock*") in connection with the proposed merger (the "*Merger*") of CB/GSI Holdings, Inc., a Delaware corporation ("*Buyer*"), with and into the Company pursuant to an Agreement and Plan of Merger, dated as of June 22, 2007, by and among the Buyer, Charlesbank Equity Fund V, Limited Partnership, a Delaware limited partnership (the "*Principal Stockholder*"), Charlesbank Capital Partners, LLC, a Delaware limited liability company ("*Stockholders' Representative*") and the Company (the "*Merger Agreement*"), a copy of which is attached hereto as Annex I (the "*Merger Agreement*").

Notice is hereby given pursuant to the requirements of Section 228(e) and 262(d)(2) of the Delaware General Corporation Law (the "*DGCL*") that the Merger Agreement attached hereto as Annex I was adopted and approved by the written consent of Company stockholders holding a majority of the outstanding shares of Common Stock pursuant to the applicable provisions of the DGCL and the Company's Certificate of Incorporation and Bylaws.

The purposes of this Information Statement are:

- to notify the Company's stockholders of the pending Merger,

- to provide a summary of the material terms and conditions of the Merger Agreement,

- to notify the Company's stockholders that they are entitled to appraisal rights under Section 262 of the DGCL in connection with the Merger; and

- to provide general information about the Company, background information about the Merger and the Board of Directors' reasons for the Merger.

We expect to send you a separate information statement to inform you of and obtain approval for certain payments being made in connection with the Merger in accordance with Section 280G of the Internal Revenue Code of 1986, as amended (the "*Code*").

Under the DGCL and pursuant to the Company's Certificate of Incorporation (the "*Charter*"), the approval of the holders of a majority of the outstanding Common Stock is necessary to adopt the Merger Agreement.  The Principal Stockholder adopted and approved the Merger Agreement by written consent (the "*Majority Stockholder Written Consent*").  AS A RESULT, UNDER APPLICABLE DELAWARE LAW, NO ACTION WAS OR IS REQUIRED BY THE COMPANY'S OTHER STOCKHOLDERS TO APPROVE THE MERGER.  Upon the consummation of the Merger, all outstanding shares of Common Stock (other than those owned by any wholly-owned subsidiary of the Company) will automatically be canceled as a result and by virtue of the Merger, and former holders of shares of Common Stock will no longer have any rights with respect to such shares other than (i) the right as a former stockholder of the Company to receive certain payments described herein, or (ii) the right to obtain an appraisal of such shares as described in Section 262 of the DGCL, a copy of which is attached to this Information Statement as Annex II. See "Appraisal Rights" below for additional information on Section 262 of the DGCL and appraisal rights generally.

PLEASE NOTE THAT THE DESCRIPTION OF THE MERGER CONTAINED HEREIN DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ATTACHED MERGER AGREEMENT. STOCKHOLDERS AND OPTION HOLDERS ARE ENCOURAGED TO REVIEW THE MERGER AGREEMENT IN ITS ENTIRETY.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION OF THE MERGER AGREEMENT CONTAINED HEREIN AND THE MERGER AGREEMENT, THE TERMS AND CONDITIONS OF THE MERGER AGREEMENT SHALL CONTROL.

HOLDERS OF THE COMPANY'S COMMON STOCK OR STOCK OPTIONS ARE ENCOURAGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE PARTICULAR U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE MERGER.

Capitalized terms used in this Information Statement and not otherwise defined herein shall have the same meanings given to them in the Merger Agreement.

This Information Statement is dated July 2, 2007.

PAGE

**THE COMPANIES** ................................................................................................................. 1
    Company ............................................................................................................................ 1
    Buyer ................................................................................................................................. 1

**THE MERGER** ...................................................................................................................... 2
    General .............................................................................................................................. 2
    Merger Consideration ....................................................................................................... 2
        Common Stock Consideration ....................................................................................... 2
        Option Consideration .................................................................................................... 4
    Payment for Common Stock and Options ......................................................................... 5
        Payment for Common Stock ......................................................................................... 5
        Payment for Options ..................................................................................................... 6
    Background of the Merger ................................................................................................. 6
    The Company's Reasons for the Merger ........................................................................... 7
    Stockholder Approval; Required Consent ........................................................................ 7
    Appraisal Rights ............................................................................................................... 7
    Effective Time of the Merger ........................................................................................... 7

**MERGER AGREEMENT** ....................................................................................................... 8
    General .............................................................................................................................. 8
    Management After the Merger .......................................................................................... 8
    Merger Consideration ....................................................................................................... 8
    Payment for Common Stock and Options ......................................................................... 8
    Effective Time .................................................................................................................. 8
    Representations and Warranties ........................................................................................ 9
    Indemnification ................................................................................................................. 9
    Certain Conditions to the Merger ..................................................................................... 10
    Conduct of Business ......................................................................................................... 10
    Government and Regulatory Approvals ............................................................................ 10
    Termination ...................................................................................................................... 11
    Fees and Expenses ............................................................................................................ 11
    Board of Directors' Recommendation .............................................................................. 11
    Majority Stockholder Merger Consent ............................................................................. 12
    Interests of Certain Persons in the Merger ....................................................................... 12

**APPRAISAL RIGHTS** .......................................................................................................... 13

**ANNEXES**
Annex I - Merger Agreement Written Consent ..................................................................... Tab A
Annex II - Section 262 of the DGCL ................................................................................... Tab B

# THE COMPANIES

## *Company*

The Company was incorporated on April 1, 2005 for the sole purpose of acquiring GSI Group and thereafter has been acting solely as a holding company by virtue of its ownership of all of the issued and outstanding shares of common stock of GSI Group and has not engaged any activities other than through GSI Group and its other subsidiaries and those activities reasonably incidental to the foregoing.

GSI Group is a major worldwide manufacturer of agricultural equipment, including both (i) grain storage bins and related conditioning and handling systems and (ii) swine feed storage and delivery, ventilation and confinement systems. GSI Group also is one of the largest global providers of equipment to the poultry producing industry, providing feed storage and delivery, watering, ventilation and nesting systems. It markets its agricultural equipment in approximately 75 countries through a network of over 2,500 independent dealers. GSI Group filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 with the Securities and Exchange Commission (the "SEC") on March 27, 2007 and its Quarterly Report on Form 10-Q with the SEC on May 14, 2007, both of which are incorporated by reference and are available on the SEC's Edgar filing system at www.sec.gov.

The Company's principal executive offices are located at 1004 E Illinois St, Assumption, IL 62510.

## *Buyer*

Buyer is a newly-formed Delaware corporation controlled by Centerbridge Capital Partners, L.P., a Delaware limited partnership. Buyer was formed by affiliates of Centerbridge Partners, L.P. for the purpose of effecting the Merger. Buyer has not engaged in any other business activities and did not incur any liabilities or obligations other than in connection with the Merger.

## General

This Information Statement is being delivered in connection with the Merger of Buyer with and the Company pursuant to the Merger Agreement. As a result of the Merger: (a) the Company will be the surviving corporation following the Merger (the *"Surviving Corporation"*) and will become controlled by affiliates of Centerbridge Partners, L.P.; (b) each share of the Company's Common Stock owned by (i) the Company as treasury stock, (ii) Buyer, or (iii) any wholly-owned subsidiary of Buyer shall be cancelled automatically without any conversion thereof and no payment or distribution made with respect thereto; (c) except as otherwise provided in (b) above, each issued and outstanding share of the Company's Common Stock shall convert automatically into the right to receive the cash payments set forth in the Merger Agreement and described in further detail below under "Common Stock Consideration"; (d) all of the outstanding shares of the Buyer's Common Stock shall be converted, in the aggregate, into a number of validly issued, fully paid and nonassessable shares of Common Stock of the Surviving Corporation equal to the aggregate amount contributed to the Buyer in cash as common equity by Centerbridge Capital Partners, L.P. in connection with the Closing divided by the Estimated Per Share Merger Consideration (as defined in the Merger Agreement); and (e) each Option issued and outstanding immediately prior to the Effective Time (the *"Options"*) shall vest to the extent provided in Section 3 of the applicable stock option agreement, and subject to the receipt of stockholder approval contemplated by Section 6.7 of the Merger Agreement and explained more fully below under "Compensation Arrangements"), each such Option shall be cancelled in exchange for the cash payments set forth in the Merger Agreement and described in further detail below under "Option Consideration." In connection with the Merger, the Principal Stockholder and other investment funds managed by Charlesbank Capital Partners, LLC that hold shares of Common Stock will retain, and not exchange for the cash payment at Closing, shares of Common Stock having an aggregate value (based on the estimated per share Merger Consideration) of $30 million, subject to reduction pursuant to Section 6.16 of the Merger Agreement (the *"Charlesbank Rollover Amount"*). In addition, members of the Company's management team will retain, and not exchange for the cash payment at Closing, certain of their shares of Common Stock, and will reinvest a portion of the proceeds to them of the cash out of their options, having an aggregate value that is expected to be approximately $15 to $20 million, with the final amount to be determined prior to Closing.

## Merger Consideration

**Common Stock Consideration**

At the Effective Time of the Merger, each issued and outstanding share of Common Stock (other than "Rollover Shares" as described below in the Merger Agreement and those shares owned by shareholders who have demanded properly in writing appraisal for such shares in accordance with Section 262 of the DGCL) automatically will be cancelled and converted into the right to receive the cash consideration set forth in Section 2.1(c) of the Merger Agreement (the *"Common Stock Consideration"*). The Common Stock Consideration consists of the following:

1.  Estimated Merger Consideration. Upon surrender of a certificate representing shares of Common Stock, the holder will be entitled to receive, per share of Common Stock, the quotient obtained by dividing (A) (i) $540 million minus (ii) the amount of the Company's net debt as of the close of business on the day immediately preceding the Closing Date, minus (iii) the Company's transaction expenses that have not been paid as of the close of business on the day immediately preceding the Closing Date, minus (iv) the amount of premium, fees, and penalties and other costs and expenses of the repayment, repurchase or defeasance of the Company's outstanding senior notes or prepayment of the Company's senior credit facility that have not been paid as of

2

the close of business on the day immediately preceding the Closing Date, plus (v) the aggregate exercise prices of the Company's Options that are vested as of the Effective Time plus (vi) the Company's net working capital, minus (vii) $40 Million minus (viii) $5.5 million which will be deposited by Buyer into escrow pending the final determination of the amount of the Merger Consideration, by (B) the aggregate number of outstanding shares of Common Stock and vested Options as of the Effective Time (the "*Estimated Per Share Merger Consideration*"). The Estimated Per Share Merger Consideration will be determined using the Company's estimates as of the Closing of each component described above. **The precise amount of the Estimated Merger Consideration will not be known until Closing but is anticipated to be approximately $700 per share.**

2.  <u>Adjustment Amount</u> (if any). Approximately 90 to 120 days following the Closing, the final amount of items (ii), (iii), (iv) and (vi) of Estimated Merger Consideration described above will be determined. Once determined, former holders of the Company's outstanding Common Stock will be entitled to receive, per share of Common Stock, a sum in cash equal to the quotient obtained by dividing (A) any positive difference between the finally determined Merger Consideration and the Estimated Merger Consideration by (B) the aggregate number of outstanding shares of Common Stock and shares of Common Stock issuable upon the exercise of the vested Options as of the Effective Time (the "*Per Share Adjustment Amount*").

3.  <u>Escrow Surplus Amount</u> (if any). At the time that the Merger Consideration is finally determined, former holders of the Company's outstanding Common Stock will be entitled to receive, per share of Common Stock, a sum in cash equal to the quotient obtained by dividing (A) any portion of the amount escrowed at Closing that is not paid to the Surviving Corporation because the finally determined amount of the Merger Consideration is less than the estimated Merger Consideration at Closing or applied to reimburse fees and expenses of the Stockholders' Representative in connection with the Merger Agreement by (B) the aggregate number of outstanding shares of Common Stock and shares of Common Stock issuable upon the exercise of the vested Options as of the Effective Time (the "*Per Share Escrow Surplus Amount*").

4.  <u>Special Tax Deduction Benefit</u> (if any). When, as and if payable pursuant to the terms of the Merger Agreement, former holders of the Company's outstanding Common Stock will be entitled to receive, per share of Common Stock, a sum in cash equal to the quotient obtained by dividing (A) the sum of (i) any income tax refund for the current or prior tax years (net of any tax costs associated with, or any other adverse tax consequences resulting from, the receipt of such refund) attributable to deductions that arise from certain costs and expenses related to the Merger incurred by the Company and (ii) any actually realized reduction in tax liability for any taxable period beginning after the Closing Date that is attributable to deductions that arise from certain costs and expenses not taken into account in clause (i) above, by (B) the aggregate number of outstanding shares of Common Stock and shares of Common Stock issuable upon the exercise of the vested Options as of the Effective Time (the "*Per Share Special Tax Deduction Benefit*").

5.  <u>Contingent Consideration</u> (if any). When, as and if payable pursuant to the terms of the Merger Agreement, former holders of the Company's outstanding Common Stock will be entitled to receive, per share of Common Stock, a sum in cash equal to the quotient obtained by dividing (A) (i) the fair market value of any benefit received as a result of the resolution of the litigation currently pending in the United States District Court for the Central District of Illinois against Sukup Manufacturing Company (the "*Sukup Litigation*"), minus (ii) any taxes payable by the Surviving Corporation (or the value of any reduction in tax attributes) with respect to the benefits received, minus (iii) reasonable after-tax costs related to the prosecution of the Sukup Litigation, minus any negative difference between the finally determined Merger Consideration and the Estimated Merger Consideration that was not satisfied out of the funds deposited into escrow at Closing, minus (iv) any amount owed to the Surviving Corporation with respect to certain

aggregate number of outstanding shares of Common Stock and shares of Common Stock issuable upon the exercise of the vested Options as of the Effective Time (the *"Per Share Contingent Consideration"*).

In connection with the Merger, the Principal Stockholder and other investment funds managed by Charlesbank Capital Partners, LLC that hold shares of Common Stock will retain, and not exchange for the cash payment at Closing, shares of Common Stock having an aggregate value (based on the estimated per share Merger Consideration) of $30 million, subject to reduction pursuant to Section 6.16 of the Merger Agreement (the *"Charlesbank Rollover Amount"*). In addition, members of the Company's management team will retain, and not exchange for the cash payment at Closing, certain of their shares of Common Stock, and will reinvest a portion of the proceeds to them of the cash out of their options, having an aggregate value that is expected to be approximately $15 to $20 million, with the final amount to be determined prior to Closing. The shares of Common Stock that will not be converted by the parties described above are referred to in this Information Statement as the *"Rollover Shares"*. The Rollover Shares shall not entitle the holders thereof to receive the Estimated Merger Consideration, but following the Effective Time the holders of Rollover Shares shall be entitled to receive the contingent payments described in paragraphs 2 - 5 above as if such Rollover Shares had been converted into the right to receive the Common Stock Consideration.

## Option Consideration

At the Effective Time of the Merger and subject to the execution and delivery of an option acknowledgment by each holder of outstanding Options (each an *"Option Acknowledgment"*), all Options that would vest upon the Merger pursuant to the terms of Section 3 of the applicable stock option agreement will, to the extent not already vested, be accelerated (subject to obtaining shareholder approval in respect of the acceleration in accordance with Section 6.7 of the Merger Agreement) and become fully vested immediately prior to consummation of the Merger. Following the consummation of the Merger all such options will be canceled and converted into the right to receive the cash consideration set forth in Section 2.1(d) of the Merger Agreement (the *"Option Consideration"*). Payment of Option Consideration to holders of Options shall be net of applicable withholding and excise taxes and without interest. The Option Consideration consists of the following:

1. <u>Estimated Option Cancellation Payment</u>. Promptly following the consummation of the Merger, Option Holders will receive from the Surviving Corporation for each Option, a sum in cash equal to the product of (i) the number of shares of Common Stock subject to such Option that are vested at the Effective Time, multiplied by (ii) (x) the Estimated Per Share Merger Consideration minus (y) the per share exercise price of such Option (the *"Estimated Option Cancellation Payment"*) (which may be zero). **The precise amount of the Estimated Per Share Merger Consideration will not be known until Closing, but is expected to be approximately $700 per share.**

2. <u>Adjustment Amount</u> (if any). When, as and if payable pursuant to the terms of the Merger Agreement, Option Holders will receive from the Surviving Corporation for each Option, a sum in cash equal to the Per Share Adjustment Amount multiplied by the number of shares of Common Stock subject to such Option that are vested at the Effective Time.

3. <u>Escrow Surplus Amount</u> (if any). When, as and if payable pursuant to the terms of the Merger Agreement, Option Holders will receive for each Option, a sum in cash equal to the Per Share Escrow Surplus Amount multiplied by the number of shares of Common Stock subject to such Option that are vested at the Effective Time.

4. Special Tax Deduction Benefit (if any). When, as and if payable pursuant to the terms of the Merger Agreement, Option Holders will be entitled to receive for each Option, a sum in cash equal to the Per Share Special Tax Deduction Benefit multiplied by the number of shares of Common Stock subject to such Option that are vested at the Effective Time.

5. Contingent Consideration (if any). When, as and if payable pursuant to the terms of the Merger Agreement, Option Holders will receive from the Surviving Corporation for each Option, a sum in cash equal to the Per Share Contingent Consideration multiplied by the number of shares of Common Stock subject to such Option that are vested at the Effective Time.

The portion of any Option that is not vested at the Effective Time, or that does not vest at the Effective Time in accordance with Section 3 of the applicable stock option agreement, shall be forfeited and canceled at the Effective Time without the payment of any consideration therefor.

## *Payment for Common Stock and Options*

### Payment for Common Stock

*General.* Upon consummation of the Merger, Buyer shall deposit, or cause to be deposited, to the paying agent, which may be the Company or a financial institution which is reasonably acceptable to Buyer and Stockholders' Representative (the "*Paying Agent*"), for the holders of record of shares of Common Stock, the aggregate Estimated Per Share Merger Consideration to be paid with respect to all shares of Common Stock outstanding as of immediately prior to the Effective Time, other than the Rollover Shares. Holders of record should use the Letter of Transmittal referred to below to effect the surrender of certificates evidencing shares of Common Stock in exchange for the consideration contemplated by the Merger Agreement. All certificates so surrendered will be cancelled. Upon consummation of the Merger and surrender by a holder of record of all of his or its certificates evidencing shares of Common Stock, together with a properly completed and duly executed Letter of Transmittal, the holder of record will receive in exchange for each share of Common Stock, a sum in cash equal to the Estimated Per Share Merger Consideration and when, as and if any of the following become payable pursuant to the terms of the Merger Agreement: (i) the Per Share Adjustment Amount; (ii) the Per Share Escrow Surplus Amount; (iii) the Per Share Special Tax Deduction Benefit Amount; and (iv) the Per Share Contingent Consideration. Any cash held by the Paying Agent that remains unclaimed by stockholders for twelve months after the Effective Time of the Merger may be claimed by the Company and thereafter holders of Common Stock may look, subject to applicable abandoned property, escheat and other similar laws, only to the Company as general creditors thereof for payment. HOLDERS OF COMMON STOCK ARE ENCOURAGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE PARTICULAR U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE MERGER.

*Letter of Transmittal.* A Letter of Transmittal will be sent to all stockholders of the Company under separate cover no later than five Business Days prior to the date that the Closing is scheduled to occur. The Letter of Transmittal will advise such holder of the terms of the Merger and the procedures for surrendering to the Paying Agent certificates evidencing shares of Common Stock in exchange for the Common Stock Consideration.

*Valid Surrender of Common Stock.* Stockholders will not receive any payment for their shares of Common Stock unless and until they deliver the Letter of Transmittal (or a manually signed facsimile thereof), properly completed and duly executed, to the Paying Agent, together with all of their certificate(s) representing shares of Common Stock and any required accompanying evidences of authority in a form satisfactory to Buyer. If the certificate(s) has (have) been lost or destroyed, such should be indicated on the front cover of the Letter of Transmittal. In such event, the Paying Agent will

forward additional documentation necessary to be completed in order to surrender effectively such lost or destroyed certificate(s). No interest will be paid on amounts due for shares of Common Stock.

*Signature Guarantee.* If any certificate representing shares of Common Stock is registered in the name of a person other than the signer of the Letter of Transmittal, or if the payment is to be made to a person other than the registered owner, then the surrendered certificates must be endorsed or accompanied by duly executed instruments of transfer, in either case signed exactly as the name or names of the registered owner or owners appear on the certificates, with the signatures on the certificates or instruments of transfer in the form described in the Letter of Transmittal. A person requesting such payment shall have paid any transfer and other taxes required by reasons of the payment of the Common Stock Consideration to a person other than the registered owner or shall have established to the satisfaction of the Company that such tax has been paid or is not required to be paid.

YOU SHOULD NOT FORWARD YOUR STOCK CERTIFICATES TO THE PAYING AGENT UNLESS AND UNTIL YOU RECEIVE THE LETTER OF TRANSMITTAL, AT WHICH TIME YOU SHOULD FORWARD THEM ONLY IN ACCORDANCE WITH THE INSTRUCTIONS SPECIFIED IN THE LETTER OF TRANSMITTAL.

**Payment for Options**

Upon consummation of the Merger, Buyer shall deposit, or cause to be deposited, with the payroll account of the Surviving Corporation, for each Option Holder, an amount equal to the aggregate of all Option Cancellation Payments. As soon as practicable after the Effective Time (but not later than one payroll cycle thereafter), the Surviving Corporation shall make through its existing payroll service the Option Cancellation Payment to each Option Holder that became entitled to receive the consideration specified in Section 2.1 of the Merger Agreement. Option Holders will also receive the right to the following contingent payments when, as and if any of they become payable pursuant to the terms of the Merger Agreement: (i) a sum in cash equal to the Per Share Adjustment Amount; (ii) the Per Share Escrow Surplus Amount; (iii) a sum in cash equal to the Per Share Special Tax Deduction Benefit Amount; and (iv) a sum in cash equal to the Per Share Contingent Consideration, in each case multiplied by the number of shares of Common Stock subject to such Option that are vested as of the Effective Time.

The Surviving Corporation and Buyer shall be entitled to deduct and withhold from the consideration otherwise payable to any Option Holder such amounts as the Surviving Corporation is required to deduct and withhold with respect to the making of such payment under any provision of applicable tax Law. To the extent that amounts are so withheld by the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Option Holder in respect of which such deduction and withholding was made by the Surviving Corporation. The Company has provided, or will cause to be provided promptly, to all holders of Options, an Option Acknowledgment. Holders of Options should promptly return their executed Option Acknowledgment to ensure that such holders will receive the Option Consideration. No interest will be paid on amounts due for Options. HOLDERS OF OPTIONS ARE ENCOURAGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE PARTICULAR U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE MERGER.

**_Background of the Merger_**

In late 2006, the Board of Directors determined that it was in the best interest of the Company's stockholders to explore a possible sale of the Company. In November 2006, the Company engaged UBS Securities LLC ("*UBS*") as its financial advisor to assist the Board of Directors and senior management in that process. Working with Company management, UBS identified a number of potential financial buyers who were then contacted by UBS about their interest in a potential acquisition of the Company.

that culminated in the receipt on June 12, 2007 of final offers from the remaining potential acquirors, including Buyer. After determining that Buyer's bid was the most favorable to the Company and its stockholders, the Company entered into exclusive negotiations with Buyer and its representatives.

On June 22, 2007, the Board of Directors unanimously approved the execution of the Merger Agreement and the related documents and the terms of the Merger. The Merger Agreement was executed by Buyer, the Company, the Stockholders' Representative and the Principal Stockholder on June 22, 2007. The Principal Stockholder executed a written consent adopting and approving the Merger Agreement later that evening and a press release announcing the terms of the Merger was issued on June 25, 2007.

### The Company's Reasons for the Merger

The Board of Directors and management of the Company believe the terms of the Merger Agreement and the Merger are advisable and fair to, and in the best interests of, the Company and its stockholders, and the Board of Directors has approved the Merger Agreement and the transactions contemplated thereby, including the Merger.

In evaluating the Merger, the Board of Directors and management of the Company considered and evaluated among other things: (a) the consideration offered by Buyer for the Company's issued and outstanding Common Stock; (b) the fact that the consideration finally offered by Buyer resulted from an auction process with several potential acquirors bidding; (c) current economic, industry and market conditions affecting the Company; and (d) the terms of the Merger Agreement. Based on all of these matters, and such other matters as the Board of Directors deems relevant, the Board of Directors supports the Merger Agreement and unanimously recommended that the holders of shares of Common Stock approve its adoption. The Company has not sought or obtained an opinion from an outside investment bank or financial advisor as to the fairness of the consideration payable to the Company's stockholders in the Merger.

### Stockholder Approval; Required Consent

Under the DGCL and pursuant to the Charter, the approval of the holders of a majority of the issued and outstanding Common Stock is necessary to adopt the Merger Agreement. As of June 22, 2007 and as of the date hereof, the Principal Stockholder owned and owns approximately 74% of the outstanding Common Stock of the Company, and the Principal Stockholder, together with its affiliates, owned and owns approximately 86% of the outstanding Common Stock of the Company.

The Principal Stockholder adopted and approved the Merger Agreement by executing the Majority Stockholder Written Consent. AS A RESULT, THE REQUISITE STOCKHOLDER APPROVAL FOR THE MERGER HAS ALREADY BEEN OBTAINED.

### Appraisal Rights

Stockholders who do not consent to the adoption of the Merger Agreement will be entitled to have certain appraisal rights if they follow the procedures described in Section 262 of the DGCL, a copy of which is attached to this Information Statement as Annex II. See "Appraisal Rights" below for additional information on Section 262 of the DGCL and appraisal rights generally.

### Effective Time of the Merger

The Company currently anticipates that the Merger will be consummated on or about August 1, 2007 following the satisfaction of certain conditions, as described more fully below.

The following is a brief summary of certain provisions of the Merger Agreement, a copy of which is attached hereto as Annex I and is incorporated herein by reference. This summary does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement. STOCKHOLDERS OF THE COMPANY ARE URGED TO READ THE MERGER AGREEMENT IN ITS ENTIRETY.

## General

The Merger Agreement provides that Buyer will be merged with and into the Company at the Effective Time of the Merger. Buyer will then cease to exist as an independent corporate entity, and the Company will survive the merger. At the Effective Time of the Merger, each outstanding share of Common Stock (other than those shares of Common Stock owned by Buyer, the Company or any of their subsidiaries, or by stockholders of the Company who have properly exercised their dissenter's rights under the DGCL) will be converted into the right to receive cash, without interest or dividends, all as more fully described above.

## Management After the Merger

The Merger Agreement provides that the Board of Directors and officers of Buyer immediately prior to the Effective Time shall, from and after the Effective Time, be the Board of Directors and officers, respectively, of the Surviving Corporation, each to hold office until his or her respective successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

The form of certificate of incorporation of the Company, as in effect immediately prior to the Effective Time, shall be the certificate of incorporation of the Surviving Corporation until thereafter amended as provided by Law and such certificate of incorporation. The bylaws of Buyer, as in effect immediately prior to the Effective Time, shall be the bylaws of the Surviving Corporation, until thereafter amended as provided by Law and such bylaws.

## Merger Consideration

See Sections "Common Stock Consideration" and "Option Consideration" above for details of the Common Stock Consideration and Option Consideration.

## Payment for Common Stock and Options

See Sections "Payment for Common Stock" and "Payment for Options" above for details on how to receive payment for Common Stock and Options.

## Effective Time

The Merger will occur after each of the conditions set forth in Article VII of the Merger Agreement have been satisfied or waived: (i) the Company and the Buyer shall not be required to effect the Closing prior to July 15, 2007; (ii) subject to the following clause (iii), Buyer shall use commercially reasonable efforts to effect the Closing no later than August 1, 2007; and (iii) notwithstanding Buyer's obligation in the preceding clause (ii), Buyer may defer the Closing until a date no later than August 17, 2007 to the extent Buyer in its sole discretion deems such deferral to be reasonably necessary in order to obtain Debt Financing on an optimal basis. No later than the second business day after the satisfaction or waiver of such conditions, the parties will hold a scheduled closing. The Merger will be effective as of the date and time that a certificate of merger is filed with the Secretary of State of the State of Delaware. Buyer and the Company each anticipate that the Merger will be consummated on or about August 1, 2007.

The Merger Agreement contains customary representations and warranties of each of the parties thereto. Each of the Company and Buyer has made representations regarding, among other things: (a) such company's organization and qualification; (b) such company's authority to enter into and perform its obligations under the Merger Agreement; (c) the compliance of the transaction with such company's charter and bylaws and certain agreements and applicable law; (d) such company's payment obligations to any brokers; (e) Buyer's availability of funds; (f) litigation pending or threatened against such company; and (g) certain securities law matters.

The Majority Stockholder has made representations regarding, among other things: (a) its authority to enter into and perform its obligations under the Merger Agreement; and (b) its ownership of its shares in the Company.

In addition, the Company has made representations and warranties in the Merger Agreement that are subject, in some cases, to specified exceptions and qualifications. These representations and warranties relate to, among other things: (a) its capitalization and subsidiaries; (b) the approval of its Board of Directors, (c) the required vote of its stockholders; (d) its financial statements; (e) the absence of certain adverse changes since May 16, 2005; (f) the absence of undisclosed liabilities; (g) litigation pending or threatened against the Company; (h) its employees and employee benefits plans; (i) certain tax matters; (j) certain information regarding contracts to which it is a party; (k) its title to properties and certain related matters; (l) certain transactions with persons related to it; (m) its ownership of intellectual property and proprietary rights; (n) certain labor matters; (o) its compliance with laws; (p) product liability claims against the Company; (q) its inventory; (r) its compliance with environmental regulations; (s) the insurance held by it; (t) its minute books; (u) its payment obligations to any brokers; and (v) the applicability of state takeover statutes to the Merger.

Except for the representations and warranties made by the Majority Stockholder, which shall survive indefinitely, and the representations made by the Company relating to certain tax matters, which shall survive until the earlier of (A) 30 days following the expiration of the relevant statute of limitations and (B) the date on which the amount of Contingent Consideration is finally determined pursuant to Section 2.8 of the Merger Agreement, none of the representations and warranties contained in the Merger Agreement will survive the Merger. After the Effective Time of the Merger, the Company's stockholders, other than the Majority Stockholder (solely to the extent expressly set forth in the Merger Agreement), will have no liability under the Merger Agreement for any breach of the representations, warranties, covenants or obligations of the Company. The Majority Stockholder will have no right of contribution from the other stockholders of the Company with respect to any loss claimed by Buyer after the Closing Date.

### *Indemnification of Directors and Officers*

For six years from and after the Closing Date, Buyer will cause the Surviving Corporation and its successors to indemnify and hold harmless the present and former officers, directors, employees and agents of the Company and its subsidiaries in respect of acts or omissions arising out of or pertaining to such person's service as a director or officer of the Company or its subsidiary or services performed by such person at the request of the Company or its subsidiary occurring on or prior to the Closing Date to the extent provided under the Company's certificate of incorporation and by-laws in effect on the date of the Merger Agreement; *provided* that such indemnification shall be subject to any limitation imposed from time to time under applicable Law.

From and after the Closing, the Buyer will cause the Surviving Corporation to maintain in effect a six year "run-off" or "tail" policy in respect of acts or omissions occurring on or prior to the Closing Date covering each person currently covered by the Company's and each subsidiary's officers' and directors'

liability insurance policies on terms with an amounts comparable to those of such policies in effect on the date of the Merger Agreement and covering the period of six years from and after the Closing Date; *provided, however,* that in no event shall the Surviving Corporation be permitted or required to expend for such policies pursuant to this sentence an amount in excess of 200% of the annual premium paid for the policies in effect on the date of this Agreement; and *provided, further,* that if the premium for such insurance coverage exceeds such amount, the Surviving Corporation shall obtain an extension with the greatest coverage available for a cost not exceeding such amount. The Surviving Corporation and its successors shall cause such policy to remain in effect for six years from and after the Closing Date.

## *Certain Conditions to the Merger*

The consummation of the Merger is conditioned upon, among other things: (a) as of June 22, 2007, the accuracy of the representations and warranties of the Company and Buyer as of the Closing Date of the Merger; (b) the performance in all material respects of all obligations of the Company and Buyer; (c) the absence of litigation seeking to block the Merger; (d) the receipt of all necessary governmental consents and approvals, including compliance with the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*") and any foreign antitrust approvals; (e) the approval of the Company's stockholders; (f) the holders of no more than 10% of the aggregate of the Company's Common Stock properly demanding an appraisal of their Shares of Common Stock under the DGCL; (g) the termination of certain agreements between the Company and certain of its stockholders; (h) the absence of a Company Material Adverse Effect; (i) either (i) (A) an aggregate principal amount of the issued and outstanding Senior Notes representing the Requisite Consent having been tendered into the Debt Tender Offer and not withdrawn, (B) the supplemental indenture to the Senior Notes Indenture effecting the Amendments being properly executed by the Company, GSI Group, and the trustee for the Senior Notes Indenture and (C) the Company (or GSI Group) accepting for payment all Senior Notes tendered into the Debt Tender Offer to the extent that Buyer shall have provided to the Company the amount of funds necessary to pay for all Senior Notes tendered into the Debt Tender Offer and all consent payments that may be payable to the holders of Senior Notes in connection with such tenders; or (ii) the Senior Notes having defeased pursuant to Section 8.03 of the Senior Notes Indenture to the extent that Buyer shall have provided to the Company the amount of funds necessary to effect such defeasance as provided and calculated in accordance with the terms of the Senior Note Indenture; and (j) the satisfaction of certain other customary closing conditions. Any of the conditions to effect the Merger may be waived at any time prior to the Effective Time of the Merger by the party or parties to the Merger Agreement benefiting from such conditions. However, no assurance can be given that any of such parties will waive any unfulfilled conditions.

## *Conduct of Business*

The Merger Agreement contains customary covenants requiring the Company to conduct its business in the ordinary course through the Effective Time of the Merger and to use reasonable efforts to obtain the consents and approvals required to consummate the Merger. In addition, the Merger Agreement prohibits the Company from entering into an agreement to sell equity or derivative securities or, except in the ordinary course, sell or transfer any of its material assets.

The Merger Agreement contemplates that the Company will, or will cause The GSI Group, Inc. to consummate a tender offer for its outstanding 12% Senior Notes.

## *Government and Regulatory Approvals*

The HSR Act and its related rules and regulations prohibit the Company and Buyer from completing the Merger until the Company and Buyer make a filing with the Antitrust Division of the Department of Justice and the Federal Trade Commission and the HSR Act waiting period requirements have been satisfied. Even after the waiting period expires or terminates, the Antitrust Division or the

## Termination

The Merger Agreement provides that it may be terminated as follows: (a) by mutual written consent of the Company and Buyer; (b) by either the Company or Buyer if the consummation of the Merger is prohibited by applicable law or any court or governmental or regulatory agency; (c) by either the Company or Buyer if the Merger has not been consummated by September 28, 2007; (d) by Buyer, if it is not in material breach of its obligations under the Merger Agreement and upon a breach of any representation, warranty, covenant or agreement on the part of the Company, which breach shall not have been cured within 30 days following written notice of such breach from Buyer or is unable to be cured and would result in the Company being unable to satisfy one or more of the conditions to closing in the Merger Agreement; or (e) by the Company, if it is not in material breach of its obligations under the Merger Agreement and (i) upon a breach of any representation, warranty, covenant or agreement on the part of Buyer, which breach shall not have been cured within 30 days following written notice of such breach from the Company or is unable to be cured and would result in Buyer being unable to satisfy one or more of the conditions to closing in the Merger Agreement or (ii) all conditions to the obligations of Buyer to effect the Merger set forth in Section 7.1 and 7.2 of the Merger Agreement shall have been satisfied (other than those conditions that by their nature or terms are to be satisfied at the Closing), but the Closing has not occurred by August 17, 2007.

## Fees and Expenses

Each party to the Merger Agreement will generally bear its own expenses in connection with the consummation of the transactions contemplated by the Merger Agreement, including the fees and expenses of its respective counsel, financial advisors and accountants, except as otherwise provided in Section 2.3 or 2.8 of the Merger Agreement; *provided* that Buyer shall pay, or cause to be paid, any Transaction Expenses that are unpaid as of the Closing as provided in Section 2.5 of the Merger Agreement.

If this Agreement is terminated by the Company on or after August 17, 2007, and all conditions have been satisfied except that Buyer has not received the proceeds of the Debt Financing or alternate financing as contemplated by Section 6.14 (a *"Debt Receipt Failure"*) then Buyer shall pay to the Company a fee of $25,000,000 (the *"Buyer Termination Fee"*). If in circumstances where Buyer is obligated to pay the Buyer Termination Fee, Buyer is not in breach in any material respect of the Merger Agreement (other than failing to close when obligated to do so solely as a result of a Debt Receipt Failure) that is not due to the failure or refusal of Centerbridge Capital Partners, L.P., to make the equity contribution described in its equity commitment letter with the Buyer, then the Company's right to terminate the Merger Agreement and return the Buyer Termination Fee will be its sole and exclusive remedy of the Company against Buyer for breach of the Merger Agreement. If the Buyer Termination Fee is paid to the Company, it may be required to be refunded in whole or in part in certain circumstances if the Company enters into or consummates an alternate transaction no later than December 31, 2007.

## Board of Directors' Recommendation

The Board of Directors approved the Merger and the Merger Agreement subsequent to the Board Director's determination that the Merger Agreement and the Merger are fair to, and in the best interests of, the Company and its stockholders.

The Majority Stockholder and certain of its affiliates adopted and approved the Merger Agreement by executing the Majority Stockholder Written Consent. AS A RESULT, THE REQUISITE STOCKHOLDER APPROVAL FOR THE MERGER HAS BEEN OBTAINED.

### *Interests of Certain Persons in the Merger*

Principal Stockholder and the other investment funds that are managed by Charlesbank Capital Partners, LLC that hold shares of Common Stock (the *"Charlesbank Rollover Parties"*) have agreed in connection with the Merger to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) shares of Common Stock having a value (based on the Estimated Per Share Merger Consideration) equal to $30,000,000, subject to reduction pursuant to Section 6.16 of the Merger Agreement (the *"Charlesbank Rollover Amount"*). Certain members of the Company's management (such Persons, together with any additional members of the Company's management that enter into agreements with the Buyer in connection with the Merger to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) shares of Common Stock, the *"Management Rollover Parties"*) have each agreed in connection with the Merger to rollover (i.e., have such shares not be converted into the right to receive merger consideration in the Merger, but instead remaining outstanding) shares of Common Stock having a value based on the Estimated Per Share Merger Consideration (the aggregate value agreed to be rolled over by the Management Rollover Parties, the *"Management Rollover Amount"*).

Certain executives of the Company are entitled to receive cash bonuses upon Closing of the transactions or will be entitled to acquire restricted shares of Common Stock prior to the Closing at a substantial discount to the Estimated Per Share Merger Consideration. The executives' rights to receive the bonuses or acquire the restricted shares are contingent on (a) the Closing occurring before October 1, 2007, and (b) the bonuses being approved by the shareholders of the Company in a vote that complies with the requirements of Q&A 7 of Section 1.280G-1 of the Regulations. If the Closing does not occur before October 1, 2007, or if the shareholders of the Company do not approve the bonuses in a shareholder vote that complies with the requirements of Q&A 7 of Section 1.280G-1 of the Regulations, the executives' rights to the bonuses shall be forfeited and no bonuses shall be paid and no restricted shares shall be issued.

The Company expects to disseminate to its stockholders an additional information statement and request for consent in connection with the bonuses and other compensation described above.

Pursuant to the Merger Agreement, for six years after the Closing Date of the Merger, the Company will indemnify and hold harmless the present and former officers, directors, employees and agents of the Company and its subsidiaries for acts or omissions occurring before the completion of the Merger to the extent provided under the certificate of incorporation and by-laws in effect on the date of the Merger Agreement. For six years after the completion of the Merger, the Company will provide officers' and directors' or fiduciary liability insurance for acts or omissions occurring before the completion of the Merger covering each person currently covered by the Company's officers' and directors' or fiduciary liability insurance policy on terms with respect to coverage and amount no less favorable than those in effect on the date of the Merger Agreement.

See Sections "Common Stock Consideration" and "Option Consideration" for details on other interests that may differ from your interests.

Delaware law also requires us to notify you that stockholders of the Company are entitled to appraisal rights under Section 262 of the DGCL ("*Section 262*") as to shares of Common Stock held by them. Set forth below is a summary description of Section 262. Section 262 is reprinted in its entirety as Annex II to this Information Statement. All references in Section 262 and in this summary to a "stockholder" are to the record holder of the shares of Common Stock as to which appraisal rights are asserted. A person having a beneficial interest in shares of Common Stock that are held of record in the name of another person, such as a broker or nominee, must act promptly to cause the record holder to follow the steps summarized below properly and in a timely manner to perfect whatever appraisal rights the beneficial owner may have.

THE FOLLOWING SUMMARY IS NOT A COMPLETE STATEMENT OF THE LAW RELATING TO APPRAISAL RIGHTS AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO ANNEX II. THIS SUMMARY AND ANNEX II SHOULD BE REVIEWED CAREFULLY BY ANY STOCKHOLDER WHO WISHES TO EXERCISE STATUTORY APPRAISAL RIGHTS OR WHO WISHES TO PRESERVE THE RIGHT TO DO SO BECAUSE FAILURE TO COMPLY STRICTLY WITH THE PROCEDURES SET FORTH HEREIN AND THEREIN WILL RESULT IN THE LOSS OF APPRAISAL RIGHTS.

In accordance with Section 262, the Company is obligated to mail to each holder of shares of Common Stock as of the date hereof notice of the availability of appraisal rights for their shares of Common Stock. THIS INFORMATION STATEMENT, WHICH THE COMPANY COMMENCED MAILING ON July 2, 2007, CONSTITUTES SUCH NOTICE. Each stockholder electing to demand the appraisal of such stockholder's shares of Common Stock must satisfy each of the following conditions:

- Deliver to the Company, within 20 days after the date of the mailing of this information statement, a written demand for appraisal of such stockholder's shares of Common Stock. Such demand must reasonably inform the Company of the identity of the stockholder and that the stockholder intends to demand the appraisal of such stockholder's shares of Common Stock. Any stockholder (other than a record owner who is acting as a nominee holder for different beneficial owners) seeking to exercise appraisal rights for a portion, but not all, of such stockholder's shares of Common Stock should consult with legal counsel before taking any such action. A stockholder who elects to exercise appraisal rights must mail or deliver such stockholder's written demand to:

  John Henderson
  Chief Financial Officer
  GSI Holdings Corp.
  1004 E. Illinois Street
  Assumption, IL 62510

- Continuously hold the shares of Common Stock of the Company for which it seeks appraisal from the date of demand through the Effective Time.

To be effective, a demand for appraisal must be executed by or for the stockholder of record, fully and correctly, as such stockholder's name appears on the certificate or certificates representing such stockholder's shares of Common Stock. If the shares of Common Stock are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, such demand must be executed by the fiduciary. If the shares of Common Stock are owned of record by more than one person, as in a joint tenancy or tenancy in common, such demand must be executed by all joint owners. An authorized agent, including an agent for two or more joint owners, may execute the demand for appraisal for a stockholder

A record owner, such as a broker, who holds shares of Common Stock as a nominee for others, may exercise appraisal rights with respect to the shares of Common Stock held for all or less than all beneficial owners of shares of Common Stock as to which such person is the record owner. In such case, the written demand must set forth the number of shares of Common Stock covered by such demand. Where the number of shares of Common Stock is not expressly stated, the demand will be presumed to cover all shares of Common Stock outstanding in the name of such record owner. Beneficial owners who are not record owners and who intend to exercise appraisal rights should instruct the record owner to comply strictly with the statutory requirements with respect to the exercise of appraisal rights.

On or within 10 days after the Effective Time of the Merger, the Company will mail, by certified or registered mail, return receipt requested, a second notice of the Effective Time of the Merger as required under Sections 228(d) and 262(d)(2) of the DGCL to those stockholders who are entitled to appraisal rights; *provided* that if such second notice is sent more than 20 days following the mailing of this Information Statement, such second notice will be sent only to those stockholders who have timely delivered a written demand for appraisal of such stockholder's shares of Common Stock in accordance with the required conditions of Section 262.

Within 120 days after the Effective Time of the Merger, (i) either the Company or any stockholder who has complied with the required conditions of Section 262 may file a petition in the Delaware Court of Chancery (the "*Delaware Chancery Court*") demanding a determination of the fair value of the shares of Common Stock of the dissenting stockholders, and (ii) any stockholder who has complied with the required conditions of Section 262 shall be entitled to receive from the Company a statement setting forth the aggregate number of shares not voted in favor of the Merger and with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such written statement shall be mailed to the requesting stockholder within the later of (A) 10 days after the Company received such stockholder's request, or (B) 10 days after the expiration of the permitted period for delivery of demands for appraisal. After filing of such a petition by a stockholder, such stockholder is required to serve a copy of such petition on the Company. If a petition for an appraisal is timely filed, after a hearing on such petition, the Delaware Chancery Court will determine which stockholders are entitled to appraisal rights and will appraise the shares of Common Stock formerly owned by such stockholders, determining the fair value of such shares of Common Stock, exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court will take into account all relevant factors, including the rate of interest that the Company would have had to pay to borrow money during the pendency of the proceeding. In *Weinberger v. UOP, Inc. et al.*, decided February 1, 1983, the Delaware Supreme Court set forth the considerations that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered, and that "fair price obviously requires consideration of all relevant factors involving the value of a company...." The Delaware Supreme Court stated that in making this determination of fair value, the court must consider market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts which could be ascertained as of the date of the merger which throw any light on future prospects of the merged corporation. Section 262 provides that fair value is to be "exclusive of any element of value arising from the accomplishment or expectation of the merger." In *Weinberger*, the Delaware Supreme Court held that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."

Stockholders considering seeking appraisal should note that the fair value of their shares of Common Stock determined under Section 262 could be more than, the same as or less than, the Common

Stock Consideration. The cost of the appraisal proceeding may be determined by the Delaware Chancery Court and taxed against the parties as the Delaware Chancery Court deems equitable in the circumstances. Upon application of a dissenting stockholder, the Delaware Chancery Court may order that all or a portion of the expenses incurred by any dissenting stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorneys' fees and the fees and expenses of experts, charged pro rata against the value of all shares of Common Stock entitled to appraisal. In the absence of such a determination or assessment, each party bears his or its own expenses.

From and after the Effective Time of the Merger, no stockholder who has duly demanded appraisal in compliance with Section 262 will be entitled to vote for any purpose the shares of Common Stock subject to such demand or to receive payment of dividends or other distributions on such shares of Common Stock, except for dividends or distributions payable to stockholders of record at a date prior to the Effective Time of the Merger.

At any time within 60 days after the Effective Time of the Merger, any stockholder shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered in the Merger Agreement; after this period, a stockholder may withdraw such stockholder's demand for appraisal only with the consent of the Company. If no petition for appraisal is filed with the Delaware Chancery Court within 120 days after the Effective Time of the Merger, stockholders' rights to appraisal shall cease, and all stockholders who had previously demanded appraisal shall thereafter be entitled to receive the Common Stock Consideration, if and as applicable, upon surrender of the certificates that formerly represented their shares of Common Stock. Inasmuch as the Company has no obligation to file such a petition, and has no present intention to do so, any stockholder who desires such a petition to be filed is advised to file it on a timely basis. However, no petition timely filed in the Delaware Chancery Court demanding appraisal shall be dismissed.

FAILURE TO TAKE ANY REQUIRED STEP IN CONNECTION WITH EXERCISING APPRAISAL RIGHTS MAY RESULT IN THE TERMINATION OR WAIVER OF SUCH RIGHTS.