UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| Leonardo Segatt, | : | |
| | : | |
| Plaintiff, | : | 07 Civ. 11413 (WHP)(JCF) |
| | : | |
| -against- | : | |
| | : | |
| GSI Holdings Corp., William J. Branch, | : | |
| Charlesbank Equity Fund V, Limited Partnership, | : | |
| CB Offshore Equity Fund V, L.P., Charlesbank | : | |
| Equity Coinvestment Fund V, Limited Partnership, | : | |
| Charlesbank Coinvestment Partners, Limited | : | |
| Partnership, Charlesbank Equity Fund V GP, | : | |
| Limited Partnership, and Charlesbank Capital | : | |
| Partners, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF THE
## CHARLESBANK DEFENDANTS' MOTION TO DISMISS

COVINGTON & BURLING LLP

The New York Times Building
620 Eighth Avenue
New York, New York  10018-1405
(212) 841-1000

*Attorneys for Defendants Charlesbank
Equity Fund V, Limited Partnership, CB
Offshore Equity Fund V, L.P., Charlesbank
Equity Coinvestment Fund V, Limited
Partnership, Charlesbank Coinvestment
Partners, Limited Partnership, Charlesbank
Equity Fund V GP, Limited Partnership, and
Charlesbank Capital Partners, LLC*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... iii

Preliminary Statement ........................................................................................................ 1

Statement of Alleged Facts ................................................................................................ 2

Claims Against the Charlesbank Defendants .................................................................... 7

Argument ............................................................................................................................ 8

I.    PLAINTIFF'S 10B-5 CLAIM SHOULD BE DISMISSED (FIRST CLAIM) .................. 8

    A.    Plaintiff Does Not Allege That Any Charlesbank Defendant Made Any
        Misleading Statement To Him, Nor Engaged In Any Deceptive Act. .................. 10

    B.    The Charlesbank Defendants Had No Duty To Disclose In The Absence
        Of Making Any Misleading Statement To Plaintiff Or Engaging In Any
        Transaction With Him. ........................................................................................ 11

    C.    Plaintiff Has Not Adequately Alleged Scienter. .................................................. 13

    D.    Plaintiff Has Not Alleged Reliance On The Charlesbank Defendants. ................ 15

    E.    The Alleged Fraud Was Initiated After Plaintiff's Share Purchase,
        And Therefore Was Not "In Connection With" A Purchase Or Sale
        Of Securities. ........................................................................................................ 15

    F.    Plaintiff Has Not Alleged Transaction Causation. ............................................... 16

    G.    Plaintiff Has Not Alleged That Any Statement Of The Charlesbank
        Defendants Was Communicated In Interstate Commerce Or By Mail. ................ 17

    H.    Plaintiff Has Not Alleged Any Actionable Misrepresentation Or
        Deceptive Act By Any Of The Defendants. .......................................................... 17

II.   PLAINTIFF HAS NOT PLED CULPABLE PARTICIPATION, AND
    THEREFORE CANNOT STATE A CONTROL-PERSON CLAIM
    (THIRD THROUGH EIGHTH CLAIMS). ........................................................................ 17

III.  PLAINTIFF'S COMMON LAW FRAUD CLAIM FAILS FOR THE SAME
    REASONS AS THE 10B-5 CLAIM (NINTH CLAIM). ................................................... 18

IV.   NO FIDUCIARY DUTY CLAIM IS STATED BECAUSE THERE WAS NO
    DUTY TO DISCLOSE IN THE ABSENCE OF ANY TRANSACTION OR
    COMMUNICATION WITH MR. SEGATT (ELEVENTH CLAIM). ............................... 20

V.    THE CHARLESBANK DEFENDANTS DID NOT BREACH ANY
      OBLIGATION UNDER THE SPA BECAUSE THAT AGREEMENT WAS
      RESCINDED BY THE SECOND AMENDMENT (THIRTEENTH CLAIM). ................. 21

VI.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED
      BECAUSE WRITTEN AGREEMENTS GOVERN HIS STOCK PURCHASE
      RIGHTS AND ANY BENEFIT WAS DIFFUSE (FOURTEENTH CLAIM). .................... 22

VII.  THE GENERAL PARTNERS ARE NOT LIABLE TO PLAINTIFF BECAUSE
      THE LIMITED PARTNERSHIPS ARE NOT LIABLE (FIFTEENTH AND
      SIXTEENTH CLAIMS). .......................................................................................... 25

Conclusion ................................................................................................................ 25

# TABLE OF AUTHORITIES

**CASES**

*164 Mulberry St. Corp. v. Columbia Univ.*, 4 A.D.3d 49, 771 N.Y.S.2d 16
(1st Dep't 2004) ........................................................................................19

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112
(2d Cir. 1984) .......................................................................................... 19

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308
(S.D.N.Y. 1997) .......................................................................................23

*Ahmed v. Nat'l Bank of Pakistan,* 572 F. Supp. 550 (S.D.N.Y. 1983) .............................22

*In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187 (S.D.N.Y. 2006) ...................................18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............9, 10, 16, 18

*Austin Instrument, Inc. v. Loral Corp.*, 35 A.D.2d 387, 316 N.Y.S.2d 528
(1st Dep't 1970) .......................................................................................23

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990)...................................................12

*Ballow Brasted O'Brien & Rusin, P.C. v. Logan*, 435 F.3d 235 (2d Cir. 2006) ......... 21-22

*Bangkok Crafts Corp. v. Capitolo di San Pietro*, No. 03 Civ. 0015,
2005 U.S. Dist. LEXIS 14700 (S.D.N.Y. July 21, 2005) .............................................8

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .....................................................8

*Blanchard v. Edgemark Fin. Corp.*, No. 94 C 1890, 2001 U.S. Dist. LEXIS 3090
(N.D. Ill. Mar. 12, 2001)..........................................................................12

*Blue Chip Emerald LLC v. Allied Partners Inc.*, 299 A.D.2d 278, 750 N.Y.S.2d
291 (1st Dep't 2002) ................................................................................19

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) ........................................................18

*Caplan v. Caplan*, 268 N.Y. 445 (1935)...........................................................................25

*In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000)............................10, 18

*City of New York v. 17 Vista Assocs.*, 153 Misc. 2d 194, 580 N.Y.S.2d 963
(Sup. Ct. N.Y. Cty. 1991) .........................................................................23

*Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382 (1987) ...................................22

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) .................................18

*In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562 (S.D.N.Y. 2007) ........................14

*Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595 (2d Cir. 1991) ...............................15

*Franklin Sav. Bank of N.Y. v. Levy*, 551 F.2d 521 (2d Cir. 1977) ....................................17

*Gandhi v. Filler*, No. 16345-04, 2007 N.Y. Misc. LEXIS 2619
    (N.Y. Sup. Ct. Nassau Cty. Apr. 11, 2007) ................................................................22

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992).....................................................11

*Gordon v. Burr*, 506 F.2d 1080 (2d Cir. 1974)..................................................................18

*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184 (2d Cir. 1998) .........................................8

*Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275
    (S.D.N.Y. 1998)........................................................................................................ 22-23

*Gristede's Foods, Inc. v. Unkechauge Nation*, No. 06-CV-120 (CBA),
    2007 U.S. Dist. LEXIS 87562 (E.D.N.Y. Nov. 28, 2007)...........................................24

*Handel v. Bruder*, 209 A.D.2d 282, 618 N.Y.S.2d 356 (1st Dep't 1994) ........................19

*Index Fund, Inc. v. Hagopian*, 609 F. Supp. 499 (S.D.N.Y. 1985) ..................................18

*Internet Law Library, Inc. v. Southridge Capital Mgmt. LLC*, 223 F. Supp. 2d 474
    (S.D.N.Y. 2002), *rejected on unrelated legal issue by ATSI*, 493 F.3d at 106............18

*J.A.O. Acquisition Corp. v. Stavitsky*, 18 A.D.3d 389, 795 N.Y.S.2d 569
    (1st Dep't 2005) ...........................................................................................................19

*Kahn v. Household Acquisition Corp.*, 591 A.2d 166 (Del. 1990) ...................................20

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ........................................................8, 9, 14

*Katz v. Am. Mayflower Life Ins. Co.*, 14 A.D.3d 195, 788 N.Y.S.2d 15
    (1st Dep't 2004) ...........................................................................................................22

*Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) .......................19

*Lank v. Steiner*, 224 A.2d 242 (Del. Ch. 1966) ...............................................................20

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)........................................9, 16

*Lindner Fund, Inc. v. Waldbaum, Inc.*, 82 N.Y.2d 219 (1993)....................................12 n.3

*In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194 (S.D.N.Y. 1999)....................................10

*In re Livent Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001).........................................18

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...................................................19

*Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del. 1977)................................................20

*In re Motel 6 Sec. Litig*, Nos. 93-2183, 93-2866, 1997 U.S. Dist. LEXIS 3909
    (S.D.N.Y. Apr. 2, 1997)..................................................................................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State of New York*,
    75 N.Y.2d 175 (1990) ....................................................................................................22

*In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838 (E.D.N.Y. 2003)...............14

*Panos v. Island Gem Enters., Ltd.*, 880 F. Supp. 169 (S.D.N.Y. 1995) ............................16

*Pross v. Katz*, 784 F.2d 455 (2d Cir. 1986) .......................................................................16

*Ray Larsen Assocs. v. Nikko Am., Inc.*, No. 89-2809, 1999 U.S. Dist. LEXIS
    11163 (S.D.N.Y. Aug. 6, 1996) ....................................................................................19

*Redtail Leasing, Inc. v. Bellezza*, No. 95-5191, 1997 U.S. Dist. LEXIS 14821
    (S.D.N.Y. Sept. 30, 1997)..............................................................................................24

*Rodman v. Grant Found.*, 608 F.2d 64 (2d Cir. 1979) .......................................................14

*Salomon v. Hampton Athletic Club*, 245 A.D.2d 282, 666 N.Y.S.2d 19
    (2d Dep't 1997)..............................................................................................................23

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)...................................... 17-18

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998)..................................................................18

*Shell Petroleum, Inc. v. Smith*, 606 A.2d 112 (Del. 1992),
    *aff'd*, 94 N.Y.2d 43 (1999)............................................................................................20

*Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 679 N.Y.S.2d 593 (1st Dep't 1998) .......19

*State Teachers Ret. Bd. v. Fluor Corp.*, 500 F. Supp. 278 (S.D.N.Y. 1980),
    *rev'd on other grounds*, 654 F.2d 843 (2d Cir. 1981)..................................................12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) .............15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ............................ 8-9

*Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) ...................................................22

*Vail v. Reynolds*, 118 N.Y. 297 (1890) ............................................................22

*Wacht v. Cont'l Hosts, Ltd.*, No. 7954, 1994 Del Ch. LEXIS 171
    (Del. Ch. Sept. 9, 1994) .......................................................................20

*Williams v. New York*, 308 N.Y. 548 (1955) ......................................................22

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998)..........................................10

## STATUTES AND RULES

15 U.S.C. § 78j.................................................................................9, 17

15 U.S.C. § 78u-4(b)(1) .........................................................................9

15 U.S.C. § 78u-4(b)(2) .........................................................................9

Fed. R. Civ. P. 9(b) ............................................................................9

## OTHER AUTHORITIES

Lee S. Kreindler et al., *New York Law of Torts* § 9:8 (2007) ............................................25

27 Richard A. Lord, *Williston on Contracts* § 69:47 (4th ed. 2003) ..................................22

Defendants Charlesbank Equity Fund V, Limited Partnership ("CB Fund V"), CB Offshore Equity Fund V, L.P., Charlesbank Equity Coinvestment Fund V, Limited Partnership, Charlesbank Coinvestment Partners, Limited Partnership, Charlesbank Equity Fund V GP, Limited Partnership, and Charlesbank Capital Partners, LLC (together, the "Charlesbank Defendants") respectfully submit this memorandum in support of their motion to dismiss.

### Preliminary Statement

Plaintiff Leonardo Segatt was the General Manager of a Brazilian subsidiary of non-party GSI Group, Inc., which in turn became a subsidiary of defendant GSI Holdings Corp. when GSI Holdings acquired the stock of GSI Group in 2005. Defendant CB Fund V owned a majority of the shares of GSI Holdings from 2005 until June 2007, at which time it agreed to sell 80-90 percent of its interest. Other Charlesbank Defendants owned minority interests in GSI Holdings during this period, along with unrelated investors and management.

Mr. Segatt complains that he was offered the right to buy GSI Holdings shares in connection with his termination of employment in December 2006 — and took steps to, or actually did, consummate the transaction — but that he was later defrauded when he agreed to rescind the purchase without knowing certain facts about the sale of the company.

In his Complaint, Mr. Segatt does not allege that any of the Charlesbank Defendants made any misrepresentation to him, or indeed had any contact whatsoever with him in relation to the relevant events and agreements. Nor does he allege, let alone with particularity, any other deceptive act on the part of any of the Charlesbank Defendants. In fact, the Charlesbank Defendants are hardly mentioned in the Complaint at all, except indirectly by general allegations referring to all "Defendants" or in allegations asserting their "control person" status.

These general allegations, and the complete lack of anything specific, are clearly insufficient to sustain a 10b-5 or common law fraud claim. Regarding the "control person"

claims, there are no specific allegations to support a strong inference, indeed any inference, that any of the Charlesbank Defendants was a "culpable" participant in the alleged fraud.

Plaintiff's other claims also are deficient: (1) the breach of fiduciary duty claim because a duty to disclose only arises in circumstances where a fiduciary makes statements to, or transacts business with, the plaintiff, (2) the breach of contract claim because the only contract that the Charlesbank Defendants signed was rescinded by a later contract that Plaintiff, in electing his remedy, did not in turn seek to rescind, (3) the unjust enrichment claim because multiple contracts govern the subject of this action, and, in any event, because any benefit to the Charlesbank Defendants was general, diffuse and shared by all shareholders, and (4) the claim against the general partners because no claim is stated against the limited partnerships.

For these reasons, and the additional reasons stated below, all of Plaintiff's claims against the Charlesbank Defendants should be dismissed.

### Statement of Alleged Facts

Plaintiff alleges as follows:

At all relevant times prior to November 14, 2006, Mr. Segatt was the General Manager of Agromarau Industria e Comercio Ltd. ("Agromarau"), a Brazilian subsidiary of GSI Group. Compl. ¶¶ 14-15.  During the course of his employment, Mr. Segatt had been issued stock, or "quotas," in Agromarau, which he was contractually obliged to sell to GSI Group in the event he resigned.  Compl. Exh. A at 2.

In 2005, GSI Holdings purchased all of the stock of GSI Group.  Compl. Exh. B at 1. GSI Holdings was majority owned by CB Fund V.  Compl. Exh. F at 1 (CB Fund V is "Principal Stockholder"); Compl. ¶ 48.  Other Charlesbank entities owned minority interests in GSI Holdings, as did unrelated investors and company management.  *Id.*; Compl. Exh. B at 2.

In May 2006, Mr. Segatt informed the Chairman of GSI Group and GSI Holdings, defendant William J. Branch, of his desire to resign.  Compl. ¶¶ 4, 14.  Thereafter, Mr. Segatt negotiated and entered into a Separation Agreement dated November 13, 2006.  Compl. ¶ 15 & Exh. A.  The parties to the Separation Agreement were Mr. Segatt, Agromarau, GSI Group, GSI Holdings and Assumption Leasing Company (apparently a related company that owned .01% of Agromarau).  Compl. ¶ 42 & Exh. A.  None of the Charlesbank Defendants was a party to the Separation Agreement, and there is no allegation that any of the Charlesbank Defendants had any contact with Mr. Segatt or otherwise had any role whatsoever in relation to that agreement.

The Separation Agreement provided that Mr. Segatt would receive certain cash payments from Agromarau, including dividends on his equity capital, and would enter into a Non-Compete and Consulting Agreement; it also provided that 1,344,143 of his quotas would be purchased by Agromarau at one Brazilian Real per share.  Compl. Exh. A at 3.  For reasons that do not appear in the Separation Agreement, Mr. Segatt's remaining 661,725 quotas in Agromarau were given a higher valuation, namely $1,000,000 (Brazilian Reals), and using this increased value were to be exchanged for 3,072 shares in GSI Holdings valued at approximately $150 per share.  *Id.*

In December 2006, the Separation Agreement was amended.  Compl. Exh. D.  The First Amendment increased the amount payable to Mr. Segatt as dividends on his equity capital, and decreased the valuation of his remaining quotas so that all of them were valued one-for-one in Brazilian Reals.  *Id.*  The First Amendment also provided that, rather than exchanging quotas for shares in GSI Holdings, all of Mr. Segatt's quotas would be redeemed in cash and he would be given the option to purchase up to 3,072 shares in GSI Holdings at $150 per share.  *Id.*  None of the Charlesbank Defendants was a party to the First Amendment, and there is no allegation that any of the Charlesbank Defendants had any contact with Mr. Segatt or otherwise had any role whatsoever in relation to that amendment.

The First Amendment provided that the option to purchase shares was conditioned on Mr. Segatt "sign[ing] the investor documents required by [GSI] Holdings for all of its investors." *Id.* To that end, Mr. Segatt signed a Stock Purchase and Management Equity Agreement ("SPA"), dated December 28, 2006. Compl. Exh. C. Without explanation, the SPA reverted to the structure contemplated by the Separation Agreement and provided that shares in GSI Holdings would be exchanged for quotas in Agromarau, not purchased. *Id.* The SPA provided for "drag-along" and "tag-along" rights in the event of a sale of more than 50 percent of the GSI Holdings stock held by the "Principal Stockholders." *Id.* §§ 5.4, 5.5. The SPA also provided that, in the event Mr. Segatt ceased to serve as a consultant to GSI Group for any reason, then GSI Holdings would have the right to repurchase his shares either at fair market value (as determined by the GSI Holding board) or at cost if Mr. Segatt failed to comply with the non-diversion or non-compete provisions of his Non-Compete and Consulting Agreement. *Id.* § 5.2(a).

The SPA was between GSI Holdings and Mr. Segatt, *id.* at 1, although to effectuate certain of the provisions, the Charlesbank Defendants "[a]ccepted and agreed to [the SPA] for purposes of Sections 5.2, 5.4 and 5.5 only [relating to repurchase, drag-along and tag-along rights]." *Id.* at signature pages. There is no allegation that any of the Charlesbank Defendants had any contact with Mr. Segatt or otherwise had any additional role in relation to the SPA.[1]

Mr. Segatt does not allege that he performed in accordance with the quotas-for-stock exchange procedure in the SPA. Rather, he alleges that he wired funds to GSI Holdings in

---

[1] The Complaint alleges generally, with no factual support, that the SPA "was prepared by or on behalf of Defendant GSI Holdings and the Defendant Principal Stockholders." Compl. ¶ 18. The Complaint also notes that notices under the SPA were to be sent to GSI Holdings c/o Charlesbank Capital Partners LLC at its offices. Compl. ¶ 21. This is not surprising given that notices contemplated by the SPA were primarily in relation to repurchase, drag-along and tag-along rights, which were the only provisions in the SPA that implicated, and had been "accepted and agreed to" by, the Charlesbank Defendants. Compl. Exh. C §§ 5.2, 5.4, 5.5.

accordance with the First Amendment (although at the value set forth in the Separation Agreement ($460,829.50), not the price in the First Amendment). Compl. ¶ 27. Thereafter, beginning in late February 2007, Mr. Segatt made inquiries to Mr. Branch and Claudio Moretti, a lawyer for Agromarau, to obtain a copy of an executed SPA and a GSI Holdings share certificate, but without success. Compl. ¶ 28. Mr. Segatt does not allege that he contacted any of the Charlesbank Defendants in relation to the SPA or to obtain a share certificate.

On May 3, 2007, Mr. Segatt allegedly went to see Ingo Erhardt, the new General Manager of Agromarau. Compl. ¶ 30. During that meeting, Mr. Erhardt presented Mr. Segatt with a proposed Second Amendment to the Separation Agreement "drafted by or on behalf of Defendant GSI Holdings and its affiliated parties" (but not on behalf of any of the Charlesbank Defendants). *Id.* Mr. Erhardt allegedly represented at the meeting that:

> (a) *Branch* wanted Plaintiff to sign the Second Amendment; (b) The funds transferred by Plaintiff were in a segregated account that *Branch* had forgotten about and that it would be a problem now to issue the shares; (c) Plaintiff had made a lot of money from his relationship with Agromarau; more than executives at comparable companies; and (d) Plaintiff's companies did business with Agromarau which *Erhardt* was sure Plaintiff wanted to continue without problems.

*Id.* (emphases added). Plaintiff requested a copy of the proposed Second Amendment so he could consult with his financial advisor about it, and received from Mr. Erhardt drafts both in English and in Portuguese. *Id.* ¶ 31.

Mr. Segatt returned to Mr. Erhardt's office the following day, May 4, 2007, and told Mr. Erhardt that he had not yet consulted with his advisor. Mr. Erhardt allegedly stated that:

> (a) Plaintiff must sign the Second Amendment; (b) He (Erhardt) was flying to the United States the next day and wanted to take the signed Second Amendment with him; and (c) Again, the business Plaintiff's companies did with Agromarau could be jeopardized if Plaintiff did not sign.

*Id.* ¶ 33. During this meeting, Mr. Segatt executed the Second Amendment. *Id.* ¶ 34. The Second Amendment rescinded the stock exchange and stock purchase provisions of the

Separation Agreement and First Amendment, as well as the SPA in its entirety, by providing:

> The parties have mutually determined that Segatt will not invest in any shares of [GSI] Holdings, and in furtherance thereof, the [SPA] between Holdings and Segatt (the "Purchase Agreement"), together with any other documents or agreements entered into between them pursuant to such Purchase Agreement, . . . are hereby declared null, void, cancelled and without legal effect, and as if they have never been entered into, and the $460,800 (U.S.) which Segatt has deposited with Holdings . . . will forthwith be promptly returned to Segatt . . . .

Compl. Exh. D at 1.  After a series of administrative delays, Mr. Segatt received back the substantially the amount that he had originally paid to GSI Holdings.  Compl. ¶ 43.b.[2]

None of the Charlesbank Defendants is a party to the Second Amendment, which was entered into among the same parties that entered into the Separation Agreement and the First Amendment, and there is no allegation that any of the Charlesbank Defendants had any contact with Mr. Segatt or otherwise had any role in relation to the Second Amendment.

On June 22, 2007, a Merger Agreement was executed providing that an affiliate of Centerbridge Capital Partners, L.P. would be merged with GSI Holdings.  Compl. ¶ 48; Compl. Exh. F at 2.  In connection with the merger, the Charlesbank Defendants would sell 80-90% of their shares, retaining an approximate $30 million interest in the surviving corporation.  Compl. ¶ 53; Compl. Exh. G at 12.  Certain members of management also would retain an interest in the surviving corporation, while other investors would sell their entire interest.  *Id.*

Plaintiff complains that he was not told, prior to signing the Second Amendment, that a financial advisor, UBS Securities LLC, had been retained by GSI Holdings in November 2007 to assist with a potential sale of the Company, nor of any plans or activities to auction or sell GSI

---

[2] The Complaint is silent concerning the reasons leading to the Second Amendment, but if this case were to proceed, the evidence would show on information and belief that given Mr. Segatt's self-dealing in relation to his other businesses, and an audit of those activities, a dispute was incipient as to whether Mr. Segatt had engaged in wrongdoing that would have violated the non-interference and non-competition provisions of his Non-Compete and Consulting Agreement.

Holdings, nor of any contemplated or actual terms of any auction or sale.  Compl. ¶¶ 16, 58.

Plaintiff admits, however, that in September 2006 GSI Group's CEO informed him "that the

company was doing well, that it was a good time to sell it and that Defendant Charlesbank

Capital Partners might sell it in 2007."  Compl. ¶ 58.  Plaintiff also admits that, on the date he

signed the Second Amendment, he reflected his awareness of the sale process in an email to Mr.

Branch stating he "would have preferred to hold his GSI Holdings shares 'because . . . our Stock

be worth much more than when of [sic] the sale of GSI.'"  Compl. ¶ 39.  And Plaintiff concedes

that final offers from potential acquirers were not received until June 12, 2007, after the Second

Amendment was signed.  Compl. ¶ 47.  Mr. Segatt does not allege that any false statements were

made to him about the status of the sales process at any point in time.  Mr. Segatt also does not

allege that he ever asked any questions about the sale process.

Plaintiff alleges that the Charlesbank Defendants benefited from the rescission of the

SPA because they were able to share, along with all other investors, in "the consideration that the

buyer would otherwise have had to pay to Plaintiff for his Shares."  Compl. ¶ 30.  At the time of

the SPA, GSI Holdings had 568,456 shares outstanding (including the 3,072 shares that Mr.

Segatt proposed to purchase).  Compl. Exh. B at 2.  Therefore, Mr. Segatt's proposed interest

represented by 3,072 shares would have been approximately 0.5 percent of the company.

### Claims Against the Charlesbank Defendants

Plaintiff asserts claims against the Charlesbank Defendants for (a) securities fraud under

Section 10(b) of the Exchange Act (First Claim), (b) control person liability under Section 20(a)

of the Exchange Act (Third through Eighth Claims), (c) common law fraud (Ninth Claim),

(d) breach of fiduciary duty (Eleventh Claim), (e) breach of contract (Thirteenth Claim),

(f) unjust enrichment (Fourteenth Claim), and (g) general partner liability against CB Fund V

and Charlesbank Capital (Fifteenth and Sixteenth Claims).  Plaintiff seeks damages in the

amount of $1,689,590.50, which is the difference between the approximate $700 per share payable to shareholders in connection with the merger and the $150 per share repaid to him pursuant to the Second Amendment, multiplied by the 3,072 shares he proposed to purchase ($700-$150 = $550; $550 x 3,072 = $1,689,600).  Plaintiff does not seek rescission of the Second Amendment — apparently intending to stand on that agreement, keep the $150 per share repaid to him pursuant to that agreement, and sue for damages.

### Argument

This Court must accept well-pleaded factual allegations as true.  *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998).  However, this Court need not credit "legal conclusions, deductions, or opinions couched as factual allegations."  *Bangkok Crafts Corp. v. Capitolo di San Pietro*, No. 03 Civ. 0015, 2005 U.S. Dist. LEXIS 14700, at *10 n.5 (S.D.N.Y. July 21, 2005) (internal quotation omitted).  A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . .  Factual allegations must . . . plausibly suggest[] (not merely [be] consistent with) [entitlement to relief]."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-66 (2007) (internal quotations omitted).

In assessing whether these standards are met, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

### I.    PLAINTIFF'S 10B-5 CLAIM SHOULD BE DISMISSED (FIRST CLAIM).

The elements of a 10b-5 claim include (a) a materially false statement or omission, (b) in connection with a purchase or sale of a security, (c) scienter, (d) reliance, and (e) causation of damages.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  Plaintiffs also must allege that

each defendant engaged in the fraud by "use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange" 15 U.S.C. § 78j. "Any fraud must be pled with particularity, *Fed. R. Civ. P. 9(b)*; but the rule is applied assiduously to securities fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005). Scienter requires an intent to deceive, manipulate, or defraud, and likewise must be alleged with particularity consistent with Rule 9(b). *See Kalnit*, 264 F.3d at 138.

The PSLRA requires even more. Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). For claims requiring scienter, the Complaint must "with respect to each act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To survive a motion to dismiss, an inference of scienter drawn from particularly stated facts "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2510.

A plaintiff can establish a "strong inference" of fraudulent intent by alleging facts (a) that show defendants had a motive and opportunity to commit fraud, or (b) that constitute "strong circumstantial evidence" of conscious misbehavior or recklessness. *See Kalnit*, 264 F.3d at 138; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Allegations of motive, however, must involve "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit*, 264 F.3d at 139. Motives that can be ascribed to virtually all corporate insiders, or any corporate for-profit endeavor, are not sufficient. *Id.* at 140. To allege strong circumstantial evidence of concious misbehavior, a

plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc., Sec. Lit.,* 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation omitted).

### A.  Plaintiff Does Not Allege That Any Charlesbank Defendant Made Any Misleading Statement to Him, Nor Engaged in Any Deceptive Act.

Plaintiff's Complaint is utterly barren of any specific allegation concerning any statement or act by any of the Charlesbank Defendants.  Instead, the Complaint contains only allegations as to what Mr. Erhardt, or Mr. Moretti, or Mr. Branch said to him. *See*, *e.g.*, Compl. ¶¶ 28-35, 39-40.  The only factual allegations that even conceivably encompass the Charlesbank Defendants are completely general, wholly unsupported, and impermissibly lump multiple Defendants together. *See*, *e.g.*, Compl. ¶ 1 ("Defendants deceived Plaintiff"); Compl. ¶ 30 ("Erhardt, acting on behalf of Defendants at the request of Defendant Branch").  Allegations of this type, almost by definition, are insufficiently particular. *See ATSI*, 493 F.3d at 102 ("[g]eneral allegations not tied to the defendants or resting upon speculation are insufficient") (applying relaxed standard for manipulation claim); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (in assessing 10b-5 claim, defendant must 'know or should know' that *his* representation would be communicated to investors") (emphasis in original; internal quotation omitted); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 213 (S.D.N.Y. 1999) ("The pleading must also give notice to each opposing party of its alleged misconduct.  Thus, a claim may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.").

General allegations in the latter part of Plaintiff's Complaint are unsupported, indeed contradicted, by specific allegations in the Fact section. For example, Mr. Segatt states in paragraph 62 that, "[i]n soliciting Plaintiff's agreement to rescind his purchase of 3,072 shares of . . . GSI Holding's Common Stock, the Charlesbank Defendants . . . had a duty to disclose . . . ." However, it is clear from paragraphs 29-34 that Mr. Erhardt, not any of the Charlesbank Defendants, allegedly solicited Plaintiff to rescind his purchase. Similarly, paragraph 63 states broadly that "Defendants withheld such information [concerning the sale], misrepresented to [Mr. Segatt] that his Shares had not been issued and implicitly threatened [his ongoing business with the company]." But paragraph 30 clearly alleges that Mr. Erhardt, not the Charlesbank Defendants, made the purported statements concerning non-issuance of the shares and the purported threat jeopardizing Mr. Segatt's ongoing business. Plaintiff's elisions are cute, but apparent, and should be recognized and rejected by the Court for what they are.

**B.    The Charlesbank Defendants Had No Duty to Disclose in the Absence of Making Any Misleading Statement to Plaintiff or Engaging in Any Transaction with Him.**

Plaintiff suggests that the Charlesbank Defendants had a duty to disclose material facts relating to the sale of GSI Holdings prior to his execution of the Second Amendment, based on the fact that CB Fund V was a majority shareholder. Compl. ¶ 62. But the Charlesbank Defendants are not alleged to have made any misleading statement to him, nor to have engaged in any transaction with him, which would have been necessary for any such duty to arise.

A duty to disclose does not arise between a corporation and its shareholders, or between a majority shareholder and the company's minority shareholders, in a vacuum. Rather, such a duty is triggered only in specified circumstances — most notably when the corporation or majority shareholder makes an affirmative misleading statement, or engages in a transaction opposite the minority shareholder. *See*, *e.g.*, *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)

("reject[ing] the proposition that 'a corporation has an affirmative duty to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures'") (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990) (en banc)) (additional internal quotation omitted); *State Teachers Ret. Bd. v. Fluor Corp.*, 500 F. Supp. 278, 291 (S.D.N.Y. 1980) ("A duty to disclose . . . typically arises under Rule 10b-5 when the corporate insider desires to trade, and has been described as an alternative duty rather than an absolute one; to disclose or abstain from trading. . . .  The other situation in which a duty to disclose usually arises is when there had been a previous misstatement of a material fact by a corporation to its shareholders."), *rev'd on other grounds*, 654 F.2d 843 (2d Cir. 1981); 7 Louis Loss & Joel Seligman, *Securities Regulation* 3510-11 (3d ed. 2003) (no duty to disclose unless statute or rule requires disclosure, insider is trading, or previous disclosure becomes inaccurate or misleading); *Blanchard v. Edgemark Fin. Corp.*, No. 94 C 1890, 2001 U.S. Dist. LEXIS 3090, at *14-*15 (N.D. Ill. Mar. 12, 2001):

> Plaintiffs argue that the defendants had a duty to disclose all material information because they had a general fiduciary duty created by corporate law.  We have already held that defendants were under no duty to disclose, other than during the period of the Voting Trust, unless they acted in a manner which triggered a duty, for example, using the information to engage in insider trading. . . .

> This Court agrees with the analysis contained in one learned treatise, "it is highly doubtful that Rule 10b-5 alone is sufficient to trigger a similar duty of disclosure . . . the language of the rule does not provide any basis for such an affirmative disclosure requirement.  Mere nondisclosure, absent insider trading or some other collateral activity, will not establish a violation under Rule 10b-5." Cox, James D., Hazen, Thomas Lee & O'Neal, F. Hodge, *Corporations* § 12.11 (2000).[3]

---

[3] *See also Lindner Fund, Inc. v. Waldbaum, Inc.*, 82 N.Y.2d 219, 223 (1993) ("[C]orporate officers and directors have a fiduciary relationship with the shareholders of their corporation . . . . Thus, there are specific instances where a duty to disclose a major transaction of the kind involved in this case will spring into being.  Three principal categories for such a disclosure duty have been recognized:  (1) insider trading, (2) a statute or regulation requiring disclosure, or (3) inaccurate, incomplete, or misleading prior disclosures . . . .") (citations omitted).

If the law were otherwise, if majority shareholders had duties to disclose unrelated to any direct contact or business with minority shareholders, then majority shareholders would need to monitor constantly all of the company's communications with it shareholders, keeping a sharp lookout for any omissions, taking quick steps to correct any they managed to catch, and suffering strict liability for any they missed. Such a rule obviously would make no sense, and as described above, is decidedly not a correct statement of the law.

Here, Mr. Segatt does not allege that any of the Charlesbank Defendants made any misstatement to him, nor transacted any business directly with him. The Charlesbank Defendants were not even parties to the Second Amendment, which is the only contract that Mr. Segatt alleges was procured by fraud. The Charlesbank Defendants accepted and agreed to limited provisions of the SPA, but Mr. Segatt does not allege that the SPA was fraudulently induced. In fact, Mr. Segatt affirms the SPA as the basis for his claims, which arise from an alleged fraudulent rescission of that agreement. Therefore, no duty to disclose ever arose.

### C.    Plaintiff Has Not Adequately Alleged Scienter.

Given that no misstatement or deceptive act has been alleged as to any of the Charlesbank Defendants, then obviously there is no allegation that any such statement or act was done with the requisite intent to deceive, manipulate or defraud. But even if a misstatement or deceptive act had been adequately alleged, there still are insufficient allegations, made with particularity, to give rise to a "strong inference" of scienter.

Attempting to demonstrate motive, Plaintiff points to the fact that, given fewer outstanding shares at the time of the merger (because of his rescinded purchase), the Charlesbank Defendants (and all other shareholders at the time) received a proportionate increased share of the consideration paid by Centerbridge. But it is true in every case where a corporation acquires its shares allegedly at less than fair market value that the holdings of every shareholder,

including any majority shareholder, will increase in value, even if slightly — irrespective of whether there is any merger or other transaction in the offing.  Motives like this that can be ascribed to virtually all corporate insiders are not sufficient to support a fraud claim.  *See Kalnit*, 264 F.3d at 140; *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007); *In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003).

Unlike unusual, concurrent insider stock sales that have been deemed in certain cases to suggest a possible fraudulent motive, the merger transaction here benefited all of the company's shareholders, not just one or a select group of insiders at the expense of everyone else.  The terms of that transaction, moreover, and whether it even would occur, were not known at the time of the Second Amendment, as Mr. Segatt concedes.  Compl. ¶ 47 (final offers were received June 12, 2007, more than one month after Second Amendment was signed).  In any event, the proportionate gain posited by Plaintiff was very small.  As stated above, if Mr. Segatt had not rescinded his purchase, he would have held only an approximate 0.5% interest in GSI Holdings.  In a transaction valued in the range of $500,000,000, a strong inference does not possibly arise that Mr. Segatt was defrauded by GSI Holding's majority shareholder into rescinding his stock purchase at $150 per share so all shareholders could later receive (in a future transaction with respect to which final offers had not yet been received) approximately $702.97 per share instead of $700 per share.[4]  *Compare Rodman v. Grant Found.*, 608 F.2d 64, 72-73 (2d Cir. 1979) ("every purchase by a corporation of its own stock serves to some extent to consolidate the control of existing management"; purchase by company of 0.4% of its stock did not suggest fraudulent intent to entrench management).

_____

[4] The differential claimed by Mr. Segatt of approximately $1,689,600, divided by 568,456 outstanding shares, is $2.97 per share.

Plaintiff also suggests that a provision in the Merger Agreement requiring termination of outstanding SPAs provides evidence of a fraudulent motive to rescind Mr. Segatt's SPA. Compl. ¶ 65.a. But the Merger Agreement was not signed until a month and a half *after* the purported fraudulent inducement to execute the Second Amendment. In any event, there is no allegation to suggest that the relevant provision of the Merger Agreement required or even encouraged *fraudulent* terminations of outstanding SPAs.

**D.    Plaintiff Has Not Alleged Reliance on the Charlesbank Defendants.**

As the Supreme Court recently stated, "[r]eliance by the plaintiff upon *the defendant's* deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769 (2008) (emphasis added). Here, no deceptive act or statement by any of the Charlesbank Defendants has been identified; therefore, Plaintiff cannot possibly have relied upon any of their actions "except in an indirect chain that . . . [is] too remote for liability." *Id.* Mr. Segatt alleges that he "relied on what he was told *by Erhardt*, on May 3 and 4, 2007 and on there being no other information material to his decision whether to sign the Second Amendment," Compl. ¶ 66 (emphasis added), but that is not sufficient to state a claim against the Charlesbank Defendants.

**E.    The Alleged Fraud Was Initiated After Plaintiff's Share Purchase, and Therefore Was Not "In Connection With" a Purchase or Sale of Securities.**

Courts repeatedly have held that where an alleged fraud is initiated after the plaintiff's securities purchase, the fraud is not "in connection with" a purchase or sale and therefore does give rise to a securities law claim. *See, e.g.*, *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 598 (2d Cir. 1991) (no claim because alleged fraud began 3 or 4 months after securities purchase, at which point defendant made false statement and cancelled plaintiff's share certificate):

> We have held that the "in connection with" language requires proof that the defendant's alleged fraud was "integral to the purchase and sale of the security in

question." . . . Section 10(b) is not violated by a fraudulent scheme that, some
time after a purchase of securities, divests the purchaser of ownership.

*See also Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986) ("An intent to cause a conversion of

ownership interests at some uncertain future time and through uncertain means does not bring

federal law into play . . . . The steps to be taken to effectuate the fraud are not integral to the

purchase and sale of the securities in question and are to occur only well after the securities

transaction has been completed. Other transactions or events may intervene and cause the plan

to be abandoned."); *Panos v. Island Gem Enters., Ltd.*, 880 F. Supp. 169, 179 (S.D.N.Y. 1995)

("[W]hile a misleading statement as to the value of a security to be sold may be actionable, post-

stock-purchase . . . breach of contractual obligations or fiduciary responsibilities, while possibly

equally reprehensible, is not proscribed by § 10(b)'s language.").

Here, Mr. Segatt alleges that more than four months after he purchased shares pursuant to

the SPA, one or more of the Defendants fraudulently induced him to rescind the sale thereby

regaining for GSI Holdings possession of the shares and ultimately cancellation of the share

certificate. These acts allegedly divested Mr. Segatt of ownership of the shares, through, not

only fraud, but alleged breaches of contract and fiduciary duties. Transactions or events could

have caused the alleged fraud not to occur; most simply, Mr. Segatt could have refused to rescind

his purchase. For these reasons, the alleged fraud was not "in connection with" a purchase or

sale of securities and does not give rise to a federal claim.

### F.    Plaintiff Has Not Alleged Transaction Causation.

Transaction causation "requires allegations that 'but for the claimed misrepresentations or

omissions, the plaintiff would not have entered into the detrimental securities transaction.'"

*ATSI*, 493 F.3d at 106 (quoting *Lentell*, 396 F.3d at 172). Mr. Segatt alleges that he "relied on

what he was told by Erhardt, on May 3 and 4, 2007 and on there being no other information

material to his decision whether to sign the Second Amendment." Compl. ¶ 66. But Mr. Erhardt

made several statements to Mr. Segatt on those days on different topics — including alleged

threats to Mr. Segatt's other businesses. Compl. ¶¶ 30, 33. Mr. Segatt nowhere alleges that, if

he had known the status of the sale process, he would not have signed the Second Amendment.

(This is not surprising since he admittedly knew that a sale process was imminent or underway.)

Absent such a "but for" allegation, Plaintiff has not alleged transaction causation.

> **G.    Plaintiff Has Not Alleged That Any Statement of the Charlesbank
> Defendants Was Communicated in Interstate Commerce or By Mail.**

Under the federal securities laws, it is a jurisdictional requirement that Plaintiff allege

that each defendant engaged in the alleged fraud "by the use of any means or instrumentality of

interstate commerce or of the mails, or of any facility of any national securities exchange" 15

U.S.C. § 78j. *See also Franklin Sav. Bank of N.Y. v. Levy*, 551 F.2d 521, 523-24 (2d Cir. 1977).

Given that no misstatement or deceptive act has been alleged as to any of the Charlesbank

Defendants, then obviously there is no allegation that any such statement or act was

communicated or furthered by means of any instrumentality of interstate commerce or the mails.

> **H.    Plaintiff Has Not Alleged Any Actionable Misrepresentation
> or Deceptive Act By Any of the Defendants.**

The Charlesbank Defendants incorporate and adopt the arguments by GSI Holdings and

Mr. Branch that, particularly given Mr. Segatt's admitted knowledge of the potential sale, no

misrepresentation or deceptive act has been adequately alleged even on the part of the Company.

**II.    PLAINTIFF HAS NOT PLED CULPABLE PARTICIPATION, AND
THEREFORE CANNOT STATE A CONTROL-PERSON CLAIM (THIRD
THROUGH EIGHTH CLAIMS).**

"In order to establish a prima facie case of controlling-person liability, a plaintiff must

show a primary violation . . . and control of the primary violator by the targeted defendant . . . ,

and show that the controlling person was 'in some meaningful sense [a] culpable participant[] in

the fraud perpetrated by [the] controlled person[]' . . . ." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (quoting *Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir. 1974)) (other internal quotations omitted). *See also Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998).

Moreover, the state of mind of the control person must be knowing, or at least reckless. *See In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 206 n.14 (S.D.N.Y. 2006) (citing *In re Livent Sec. Litig.*, 151 F. Supp. 2d 371, 417 (S.D.N.Y. 2001)); *Index Fund, Inc. v. Hagopian*, 609 F. Supp. 499, 506 (S.D.N.Y. 1985) ("defendant must have had actual knowledge of the violation, or the defendant must have had a fiduciary relationship with the plaintiff and have acted recklessly"). A defendant is reckless "to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Carter-Wallace*, 220 F.3d at 39. *See also SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). Under the PSLRA, sufficient particular facts must be alleged to establish a strong inference of the required state of mind. *Alstom*, 454 F. Supp. 2d at 206; *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001).

Here, Plaintiff does not identify any particular statement or act of the Charlesbank Defendants, let alone sufficient particular statements and acts that would give rise to a strong inference that any of them was a knowing or reckless culpable participant in the alleged fraud.

## III.    PLAINTIFF'S COMMON LAW FRAUD CLAIM FAILS FOR THE SAME REASONS AS THE 10B-5 CLAIM (NINTH CLAIM).

The requirements for pleading common law fraud in New York "are basically identical" to the requirements for stating a 10b-5 claim. *Internet Law Library, Inc. v. Southridge Capital Mgmt. LLC*, 223 F. Supp. 2d 474, 489-90 (S.D.N.Y. 2002), *rejected on unrelated legal issue by ATSI*, 493 F.3d at 106. For example, a common law fraud claim should be dismissed if the plaintiff "fail[s] to set forth specific and detailed factual allegations that the defendant personally

participated in, or had knowledge of any alleged fraud . . . ."  *Handel v. Bruder*, 209 A.D.2d 282,

282-83, 618 N.Y.S.2d 356, 356 (1st Dep't 1994).  *See also J.A.O. Acquisition Corp. v. Stavitsky*,

18 A.D.3d 389, 390-91, 795 N.Y.S.2d 569, 570-71 (1st Dep't 2005) (dismissing fraud claim for

lack of specific allegations that defendant made any statement to plaintiff concerning subject of

alleged fraud); *164 Mulberry St. Corp. v. Columbia Univ.*, 4 A.D.3d 49, 59, 771 N.Y.S.2d 16, 23

(1st Dep't 2004) (plaintiff must show that misrepresentation was "known to be false by the

defendant"); *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 15, 679 N.Y.S.2d 593, 604 (1st

Dep't 1998) ("To make out a prima facie case of fraud, the pleadings must contain detailed

allegations in support of every element:  representation of material fact, falsity, scienter,

reasonably reliance and damages."), *aff'd*, 94 N.Y.2d 43 (1999).

 "'[I]nstead of an affirmative misrepresentation, a fraud cause of action may be predicated

on acts of concealment where the defendant had a duty to disclose material information.'"

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291-92 (2d Cir. 2006) (quoting *Kaufman v. Cohen*, 307

A.D.2d 113, 119, 760 N.Y.S.2d 157, 165 (1st Dep't 2003)).  Such a duty, however, arises not in

a vacuum, but rather "'during the course of negotiations surrounding a business transaction'" and

"'usually . . . where parties are entering a contract.'"  *Lerner*, 459 F.3d at 292 (quoting *Aaron

Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984) and *Ray

Larsen Assocs. v. Nikko Am., Inc.*, No. 89-2809, 1999 U.S. Dist. LEXIS 11163, at *14 (S.D.N.Y.

Aug. 6, 1996)).  *See also Blue Chip Emerald LLC v. Allied Partners Inc.*, 299 A.D.2d 278, 279,

750 N.Y.S.2d 291, 294 (1st Dep't 2002) ("when a fiduciary, in furtherance of its individual

interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship,

the fiduciary is strictly obligated to make 'full disclosure' of all material facts").

 Plaintiff's common law fraud claim, therefore, fails for the same long list of reasons as

the 10b-5 claim:  no misrepresentation or deceptive act by any of the Charlesbank Defendants is

alleged with particularity, no statement or transaction is alleged which could have provided a context for imposing a duty to disclose, no particular facts are alleged that would give rise to an inference of scienter, no reliance is alleged to have been placed on any statement or act of the Charlesbank Defendants, no transaction or "but for" causation is alleged, and in the context of what Mr. Segatt admittedly knew, the representations of others were not materially misleading.

## IV.    NO FIDUCIARY DUTY CLAIM IS STATED BECAUSE THERE WAS NO DUTY TO DISCLOSE IN THE ABSENCE OF ANY TRANSACTION OR COMMUNICATION WITH MR. SEGATT (ELEVENTH CLAIM).

Delaware courts recognize a duty to disclose on the part of majority shareholders only when the majority shareholder actively transacts business, or communicates, with its minority counterpart.[5]  For example, in *Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del. 1977), the court found that Vickers, the majority shareholder of TransOcean, had a fiduciary duty to disclose material non-public information when it made a tender offer to TransOcean's remaining shareholders.  *See also Kahn v. Household Acquisition Corp.*, 591 A.2d 166 (Del. 1990) (majority shareholder owed duty to disclose when it authored and distributed  proxy statement to acquisition target's remaining shareholders); *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 115-16 (Del. 1992) (majority shareholder had duty to disclose information relevant to merger proposal when "it played a substantial role in the preparation and distribution of the disclosure material" at issue; *Wacht v. Cont'l Hosts, Ltd.*, No. 7954, 1994 Del Ch. LEXIS 171 (Del. Ch. Sept. 9, 1994) (when seeking to "cash out" minority shareholder, majority shareholder owed duty to disclose process by which he arrived at cash out price); *Lank v. Steiner*, 224 A.2d 242, 245 (Del. Ch. 1966) (fiduciary duties arise "between the parties to the transaction").

---

[5] GSI Holdings is a Delaware corporation.  Compl. ¶ 3.  Delaware law therefore governs relations among the shareholders.

When negotiating the terms of his Separation Agreement, and in relation to the First and Second Amendments, Plaintiff allegedly transacted with Agromarau and GSI Holdings, through Mr. Branch and Mr. Erhardt, and not with any of the Charlesbank Defendants.   Therefore, Plaintiff's fiduciary duty claim against the Charlesbank Defendants should be dismissed.

## V.    THE CHARLESBANK DEFENDANTS DID NOT BREACH ANY OBLIGATION UNDER THE SPA BECAUSE THAT AGREEMENT WAS RESCINDED BY THE SECOND AMENDMENT (THIRTEENTH CLAIM).

This Court should dismiss Plaintiff's breach of contract claim because, by failing to seek rescission of the Second Amendment, which in turn rescinded the SPA, Plaintiff concedes that no duties are owed to him under the SPA.

In his breach of contract claim, Mr. Segatt asserts that notice provisions in the SPA were violated when the Charlesbank Defendants failed to give him written notice of the sale to Centerbridge (which provisions were designed to give notice of the possible assertion of drag-along or tag-along rights).   But in the Second Amendment, Plaintiff agreed to rescind the SPA.

Plaintiff now alleges that he was fraudulently induced into signing the Second Amendment, but he does not seek rescission of that agreement.   Rather, he stands on the Second Amendment and seeks damages in the amount of the difference between the $150 per share he received pursuant to the Second Amendment (which he apparently intends to keep) and the approximate $700 per share paid in the merger.   Compl. ¶¶ 91-93.

A plaintiff alleging fraudulent inducement may not seek both monetary damages and rescission as remedies.   "The law is clear that a party induced to enter a contract by fraud or misrepresentations must make a choice; the party may either 'elect to accept the situation created by the fraud and seek to recover his damages or he may elect to repudiate the transaction and seek to be placed in status quo.   As a general rule, however, the defrauded party cannot both rescind and maintain an action for deceit.'"   *Ballow Brasted O'Brien & Rusin, P.C. v. Logan*,

435 F.3d 235, 238-39 (2d Cir. 2006) (quoting 27 Richard A. Lord, *Williston on Contracts* § 69:47, at 102 (4th ed. 2003)). *See also Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) ("A party who has been fraudulently induced to settle a claim may either (1) rescind the settlement or (2) ratify the settlement, retain the proceeds, and institute an action to recover fraud damages.").

In addition, a Plaintiff seeking "rescission to restore the *status quo ante*" must "offer[] in his complaint to return the amount received and make tender of it on the trial." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State of New York*, 75 N.Y.2d 175, 182-83 (1990). *See also Vail v. Reynolds*, 118 N.Y. 297, 302 (1890) (similar); *Gandhi v. Filler*, No. 16345-04, 2007 N.Y. Misc. LEXIS 2619, at **3-**5 (N.Y. Sup. Ct. Nassau Cty. Apr. 11, 2007) (similar).

Given Plaintiff's request for damages, and his failure to tender the amount received from GSI Holdings, Plaintiff clearly has elected to seek damages, rather than rescission, as a remedy for his fraudulent inducement claim. Therefore, without rescission of the Second Amendment, the SPA remains void and cannot have given rise to any duties on the part of the Charlesbank Defendants. "It is beyond peradventure that '[w]ithout duty, there can be no breach of duty and without a breach of duty, there can be no liability." *Ahmed v. Nat'l Bank of Pakistan,* 572 F. Supp. 550, 554 (S.D.N.Y. 1983) (quoting *Williams v. New York*, 308 N.Y. 548, 557 (1955)).

## VI.    PLAINTIFF'S UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED BECAUSE WRITTEN AGREEMENTS GOVERN HIS STOCK PURCHASE RIGHTS AND ANY BENEFIT WAS DIFFUSE (FOURTEENTH CLAIM).

Unjust enrichment "is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 311 (S.D.N.Y. 1998); *see also Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388 (1987); *Katz v. Am. Mayflower Life Ins. Co.,* 14 A.D.3d 195, 201-02, 788 N.Y.S.2d 15, 19-20 (1st Dep't 2004). Here, multiple written contracts govern Mr. Segatt's share purchase rights, only one of which he

alleges was induced by fraud (the Second Amendment), and even as to that one, he does not seek rescission but rather stands on it and seeks damages.

The fact that the Charlesbank Defendants are not parties to the contracts makes no difference; the unjust enrichment claim is still barred. *See Granite Partners, L.P.*, 17 F. Supp. 2d at 311 (unjust enrichment claims are barred even if "one party to the lawsuit is not a party to the contract"); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1334 (S.D.N.Y. 1997) (same); *Salomon v. Hampton Athletic Club*, 245 A.D.2d 282, 282-83, 666 N.Y.S.2d 19, 19 (2d Dep't 1997) (dismissing unjust enrichment claim against one defendant where subject matter of claim was governed by contract between plaintiff and another defendant).

Although the Complaint suggests that Mr. Segatt's agreement to the Second Amendment was obtained through economic duress, that too does not make a difference as Mr. Segatt stands on the contract to seek damages, not rescission. But in any event, the allegations are insufficient to support a claim of duress. Mr. Segatt's purported fear that his other businesses would be injured in their dealings with Agromarau does not come close to making the required allegation that he was faced with an immediate threat that deprived him of free will, and that he lacked appropriate legal remedies or other means of relief. *See Austin Instrument, Inc. v. Loral Corp.*, 35 A.D.2d 387, 392, 316 N.Y.S.2d 528, 533 (1st Dep't 1970) (party seeking to avoid contract based on duress has burden of proof and must establish that contract resulted from "such fear as precluded him from the exercise of free will and judgment"); *City of New York v. 17 Vista Assocs.*, 153 Misc. 2d 194, 199, 580 N.Y.S.2d 963, 967 (Sup. Ct. N.Y. Cty. 1991) (contract is voidable based on duress only if plaintiff can show "wrongful threat," that it "was suffering serious financial difficulties or faced an immediate threat, such as a loss of property, which deprived [it] of its free will," and that it "had no legal remedies or other alternatives").

Finally, and critically, the benefit allegedly received by the Charlesbank Defendants was the proportionate increase (from approximately $700 per share to $702.97 per share) that all of GSI Holdings' shareholders received by virtue of Mr. Segatt's non-participation in the sale to Centerbridge. This shared and diffuse benefit is not sufficiently direct to constitute the type of unjust, concrete benefit that courts of equity might require to be restored. *See Redtail Leasing, Inc. v. Bellezza*, No. 95-5191, 1997 U.S. Dist. LEXIS 14821, at *22 (S.D.N.Y. Sept. 30, 1997) ("an unjust enrichment claim requires some type of direct dealing or actual, substantive relationship with a defendant"); *Gristede's Foods, Inc. v. Unkechauge Nation*, No. 06-CV-120 (CBA), 2007 U.S. Dist. LEXIS 87562, at *38 (E.D.N.Y. Nov. 28, 2007) ("the weight of authority suggests that there are circumstances where the relationship between a plaintiff and defendant is simply too attenuated to support [a] claim [for unjust enrichment]"); *In re Motel 6 Sec. Litig*, Nos. 93-2183, 93-2866, 1997 U.S. Dist. LEXIS 3909, at *20 (S.D.N.Y. Apr. 2, 1997) ("The requirements [of unjust enrichment] clearly contemplate that the defendant and the plaintiff must have had some type of direct dealing, an actual relationship or some greater substantive connection than is alleged in this case.").

The rule requiring a direct benefit is grounded in sound policy, particularly under the circumstances here, because shareholders always benefit indirectly when the value of a corporation increases. Surely, this Court should not create a rule of equity that provides, in instances when a plaintiff has a claim to funds from a corporation, as Mr. Segatt purports to have, that all of the shareholders have unjustly benefited and in equity and good conscience need to return funds to the plaintiff. This is particularly so in situations, like the one here, where there is no identified wrongdoing on the part of the shareholders. Mr. Segatt's claim is against GSI Holdings, if he has any at all.

## VII.  THE GENERAL PARTNERS ARE NOT LIABLE TO PLAINTIFF BECAUSE THE LIMITED PARTNERSHIPS ARE NOT LIABLE (FIFTEENTH AND SIXTEENTH CLAIMS).

Mr. Segatt seeks to hold the Charlesbank general partners liable for any amounts owed by the other Charlesbank Defendants.  But no claim is stated against any of them, and therefore there is no basis on which to hold the general partners liable.  *See Caplan v. Caplan*, 268 N.Y. 445, 452 (1935) ("we have found no case in any jurisdiction where a liability has been successfully asserted against a partnership for the wrongful act of a partner where the partner who performed the wrongful act was not liable"); Lee S. Kreindler et al., *New York Law of Torts* § 9:8 (2007) ("[I]f the partner who committed the wrongful act or omission is not liable, there can be no liability imposed upon the partnership or its members.") (citing *Caplan*).

### Conclusion

For the reasons stated above, Plaintiff's claims against the Charlesbank Defendants should be dismissed in their entirety.  The Charlesbank Defendants also incorporate and adopt the arguments made by GSI Holdings and Mr. Branch in support of their motion to dismiss.

Dated:  March 28, 2008

Respectfully submitted,

COVINGTON & BURLING LLP

By: s/ David W. Haller_____
      David W. Haller

The New York Times Building
620 Eighth Avenue
New York, New York  10018-1405
(212) 841-1000

*Attorneys for the Charlesbank Defendants*