UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

LEONARDO SEGATT                          :
                                         :
                Plaintiff,               :
                                         :
        v.                               :        07 CV 11413 (WHP)
                                         :
GSI HOLDINGS CORP., et. al.              :
                                         :
                Defendants.              :
                                         :
----------------------------------------------------------------

## MEMORANDUM OF DEFENDANTS GSI HOLDINGS CORP. AND WILLIAM J. BRANCH IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Angelo A. Stio, III (AS 7880)
Pepper Hamilton LLP
Suite 400
301 Carnegie Center
Princeton, NJ 08543-5276
(609) 452-0808

Joseph C. Crawford (admitted *pro hac vice*)
Frank H. Griffin, IV (admitted *pro hac vice*)
Pepper Hamilton LLP
Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103
(215) 981-4000

*Attorneys for Defendants GSI Holdings Corp
and William J. Branch*

March 28, 2008

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   THE ALLEGATIONS OF THE COMPLAINT ................................................... 4

   A.   GSI Discloses to Plaintiff that GSI Holdings Might Be Sold in 2007 ................................ 4

   B.   Plaintiff and GSI Enter Into the Stock Purchase Agreement Upon Plaintiff's Resignation from Agromarau ........................................................................... 5

   C.   Plaintiff and GSI Agree to Rescind the Stock Purchase Agreement, Despite Plaintiff's Recognition that the Shares Would be Valuable in a Sale of GSI Holdings ..................... 6

III.  ARGUMENT ........................................................................................................... 8

   A.   Standard of Review ................................................................................................. 8

   B.   The Complaint Fails to State a Claim for Federal Securities Fraud Under Rule 10b-5 ...... 9

      1.   Defendants Did Not Make a Material Misstatement or Omission in Connection With Plaintiff's Rescission of His Option to Purchase GSI Shares ....................................... 10

      2.   Plaintiff Has Failed to Plead Facts Sufficient to Warrant a Strong Inference of Scienter ................................................................................................................ 19

   C.   Plaintiff's Common Law Claims Must Also Be Dismissed ............................................. 22

      1.   Plaintiff Has Failed to State a Claim for Common Law Fraud ...................................... 22

      2.   Plaintiff Has Failed to State a Claim for Breach of Fiduciary Duty ............................... 23

      3.   Plaintiff Has Failed to State a Claim for Breach of Contract ........................................ 24

      4.   Plaintiff Has Failed to State a Claim for Unjust Enrichment ........................................ 25

IV.  CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

AT&T Communications v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ................................ 8, 19

Basic, Inc. v. Levinson, 485 U.S. 224 (1988) ................................................................................ 18

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007) ............................................................ 8, 9

In re Bristol Myers Squibb Sec. Litigation, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ..................... 10

Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020 (2d Cir. 1993) ................................................ 12

Campienello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655 (2d Cir. 1997) ........................ 20

Can-Am Organic Foods v. Phillips Business Systems, Inc., 441 N.Y.S.2d 452 (N.Y. App. Ct. 1981) ............................................................................................................................. 24

Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001) ...................................... 15, 16

Clark-Fitzpatrick, Inc. v. Long Island R. Co., 521 N.Y.S.2d 653 (N.Y. 1987) ............................ 25

Conley v. Gibson, 355 U.S. 41 (1957) ............................................................................................ 8

DeMuria v. Hawkes, 328 F.3d 704 (2d Cir. 2003) .......................................................................... 8

Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337 (S.D.N.Y. 2005) ............................... 15, 16

Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539 (2d Cir. 1996) ............................................ 14

Frigtemp Corp. v. Financial Dynamics Fund, 524 F.2d 275 (2d Cir. 1975) ................................. 18

Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000) ...................................................... 13

Glazer v. Formica, 964 F.2d 149 (2d Cir. 1993) .......................................................................... 17

Glenbrook Capital Limited Partnership v. Kuo, --- F. Supp. 2d -- 2007 WL 2601260 (N.D. Cal. Sept. 6, 2007) ...................................................................................................... 21

Harrison v. Rubenstein, 02 Civ. 9536, 2007 WL. 582955 (S.D.N.Y. Feb. 26, 2007) .................. 22

Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971 (9th Cir. 1999) ................................. 16

Page(s)

In re International Business Machines Sec. Litigation, 163 F.3d 102 (2d. Cir. 1998) .................10

Kaufman v. Cohen, 760 N.Y.S.2d 157 (N.Y. Ct. App. 2003) ........................................................22

In re Keyspan Corp. Sec. Litigation, 383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................16

Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005).   ..............................................9

Mercury Air Group, Inc. v. Jet USA Airlines, Inc., No. 97 Civ 3473, 1998 WL 542291
    (S.D.N.Y. Aug. 26, 1998) ........................................................................................................12

Muller-Parsner v. TIAA, 446 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................................................22

Powers v. British Vita, P.L.C., 57 F.3d 176 (2d Cir. 1995) ...........................................................20

Reiss v. Pan American World Airways, Inc., 711 F.2d 11 (2d Cir. 1983) .....................................21

Rizzo v. McManus Group, Inc., 158 F. Supp. 2d 297 (S.D.N.Y. 2001) ...................................3, 16

Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011 (2d Cir. 1989) ...............12

Sakhrani v. Brightpoint, Inc., No. 99-0870, 2001 WL. 395752 (S.D. Ind. Mar. 29, 2001) ..........21

Tellabs, Inc. v. Makor Issues & Rights, Inc., 127 S. Ct. 2499 (2007).......................................4, 19

Xenon Partners I, LLC v. Resurgent Asset Management LLC, 474 F. Supp. 2d 505
    (S.D.N.Y. 2007)........................................................................................................................22

## STATUTES

15 U.S.C.A. § 78u(4)(A) (West 1995) ...........................................................................................19

Fed. R. Civ. P. 9(b).........................................................................................................................9

## I.    INTRODUCTION

In May, 2006, Plaintiff Leo Segatt announced his intention to resign from his position as General Manager of Agromarau Indústria e Comercial Ltd. ("Agromarau"), an indirect Brazilian subsidiary of Defendant GSI Holdings Corp. ("GSI"). (Complaint ¶14). During the next several months, Plaintiff, Agromarau and GSI negotiated (and ultimately signed) a series of agreements -- a Separation Agreement, a Non-Competition Agreement and a Stock Purchase Agreement. Id. ¶15-23.

The Stock Purchase Agreement granted Plaintiff the right to invest money he received from the sale of his Agromarau ownership interest to acquire 3,072 shares of privately-held GSI stock for a total purchase price of $406,809,50. Id. ¶23-27. As Plaintiff concedes, GSI's Chief Executive Officer disclosed to him before he signed the Stock Purchase Agreement that GSI was doing well, that it was a good time for GSI's owners to consider a sale of the Company and that such a sale might occur in 2007. (Complaint ¶58).

After he signed a Stock Purchase Agreement and delivered his money to GSI in late December, 2006, Plaintiff never received a copy of the Stock Purchase Agreement signed by GSI and did not receive any GSI shares. Id. ¶28. Four months later, on May 3, 2007, GSI informed Plaintiff that GSI did not want to complete the stock purchase transaction and requested that Plaintiff execute a rescission agreement under which GSI would return his money to him. Id. ¶30. Plaintiff signed the rescission agreement on May 4, 2007 and GSI returned his money to him. Id. ¶33-34; 43.

GSI's owners announced a sale of a majority stake in GSI on June 25, 2007. Id. ¶47. According to Plaintiff, he would have earned a profit in excess of $1.6 million on the sale of GSI if he had not signed the rescission agreement. Id. ¶65.

Plaintiff has filed this lawsuit asserting securities and related common law fraud claims against GSI, Mr. William J. Branch ("Branch"), GSI's Chairman, and GSI's former majority owners (the "Charlesbank Defendants"). Plaintiff's Complaint contains crucial admissions, which establish that his claims fail as a matter of law. As an initial matter, Plaintiff has not alleged -- because he cannot allege -- that any GSI representative made actionable misrepresentations in requesting and obtaining the rescission of the Stock Purchase Agreement. Indeed, all but one of the statements that Plaintiff admittedly relied upon in rescinding the agreement were true, and Plaintiff has not alleged otherwise. To the extent that the Complaint alleges that a GSI representative made a single misstatement regarding the physical issuance of GSI shares, that statement cannot support Plaintiff's fraud claim because it was contradicted by the express terms of the written rescission agreement, and in any event, was not material.

In the absence of any actionable misrepresentation, Plaintiff claims that Defendants had an affirmative duty to disclose their plans to sell GSI in 2007, and failed to do so. However, the Plaintiff admits that GSI's former CEO disclosed to Plaintiff in September 2006 that GSI's owners might sell the Company in 2007. Complaint ¶58. This conversation occurred after Plaintiff had announced his resignation, but before Plaintiff and GSI completed his Separation, Non-Competition and Stock Purchase Agreements. Id. ¶¶15, 17. In addition, on the day that he signed the rescission agreement (May 4, 2007), Plaintiff sent an e-mail to Mr. Branch confirming that he had agreed to rescind the Stock Purchase Agreement even though he would have preferred to hold and profit when the sale of GSI occurred. Id. ¶39. Plaintiff wrote:

> I would prefer to continue with the Stock because I believe in your work and of Ingo in doing our GSI / Agromarau to be worth more every day and certainly our Stock be worth much more than when of the sale of GSI. [sic]

See Ex. 1 to the Declaration of Frank H. Griffin, IV ("Griffin Decl.") (emphasis added).

Because the Complaint admits that GSI's CEO disclosed the potential sale to Plaintiff, and that Plaintiff knew that a sale would "certainly" occur when he rescinded the Stock Purchase Agreement, Plaintiff's claims present precisely the opposite of the factual situation that this Court analyzed in <u>Rizzo v. McManus Group, Inc.</u>, 158 F. Supp. 2d 297 (S.D.N.Y. 2001). In <u>Rizzo</u>, the plaintiff alleged that the defendants entirely failed to disclose McManus's intention to merge with another advertising company before repurchasing his stock. <u>Id.</u> at 300-01, 304. Moreover, the defendants affirmatively misrepresented to the plaintiff that McManus was not "planning anything" and did not contemplate a merger or public offering "in the near future." <u>Id.</u> at 300. After the plaintiff sold his stock for only $750, McManus entered into a merger and announced a subsequent public offering, the combination of which increased the value of the plaintiff's shares to $14.8 million only three months after the repurchase of plaintiff's shares. <u>Id.</u> at 299. This Court held that the plaintiff had pled an actionable securities fraud claim because the defendants had a duty to disclose McManus's intention to pursue a merger and/or public offering, and had failed to comply with that duty. <u>Id.</u> at 305-06.

Here, however, the Plaintiff admits that GSI's CEO disclosed during the negotiations leading to the Stock Purchase Agreement that a sale of GSI might occur in 2007, which is precisely what eventually occurred. Indeed, plaintiff commented on the possibility of a sale the day he rescinded his right to GSI stock. If the defendants in <u>Rizzo</u> had made such a disclosure – that McManus was doing well, that the time was right to consider a merger and that such a merger could occur in the very year of the repurchase transaction – the Court would have dismissed the complaint, because then the defendants plainly would have satisfied the affirmative duty of disclosure. Accordingly, dismissal of Plaintiff's Complaint is entirely consistent with and actually compelled by the Court's Opinion in <u>Rizzo</u>.

-3-

In addition, the Complaint must also be dismissed for failure to plead facts sufficient to demonstrate a cogent and compelling inference of scienter under Tellabs, Inc. v. Makor Issues & Rights, Inc., 127 S. Ct. 2499 (2007). Plaintiff's theory that GSI sought to defraud him because of a pending merger makes no sense in light of Plaintiff's allegation that GSI had commenced planning for that merger in November 2006 (Complaint ¶16) before Plaintiff signed the Stock Purchase Agreement in December 2006. Moreover, Plaintiff's claim that Defendants intentionally defrauded him cannot be squared with the fact that GSI's CEO told him in September 2006 that GSI's owners might sell the Company in 2007. Finally, because Plaintiff's common law claims are largely duplicative of his securities law claim, they also must be dismissed.

In sum, the factual allegations of the Complaint refute Plaintiff's claim that GSI fraudulently induced him to rescind the Stock Purchase Agreement. Therefore, the Court should dismiss Plaintiff's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## II.    THE ALLEGATIONS OF THE COMPLAINT

### A.    GSI Discloses to Plaintiff that GSI Holdings Might Be Sold in 2007

Plaintiff is a citizen of Brazil, residing in Marau, State of Rio Grande do Sul, Brazil. Complaint ¶2. Plaintiff previously worked as the General Manager of Agromarau, a company indirectly owned by GSI through its subsidiary, the GSI Group, Inc. Id. ¶14.

On May 17, 2006, Plaintiff informed Mr. Branch by email that he intended to resign from Agromarau. Id. After this announcement, Plaintiff and GSI engaged in a series of negotiations regarding the terms of his departure, resulting in the Separation, Non-Competition

and Stock Purchase Agreements that Plaintiff signed in November and December 2006.  See id. ¶¶15, 17.

Between May and November, however, Plaintiff remained employed by Agromarau, and admittedly had contact with senior GSI executives.  See id. ¶58.  Most importantly, in September 2006, GSI's CEO at the time, Richard Christman, informed Plaintiff that (1) GSI was doing well; (2) that because of GSI's performance, it was a "good time to sell"; and (3) that Defendant Charlesbank Capital Partners ("Charlesbank"), which owned GSI, "might sell [GSI] in 2007." Id. Thus, Plaintiff specifically concedes in the Complaint that GSI disclosed to him the fact that GSI's owners might sell the Company in 2007 before Plaintiff even signed the Stock Purchase Agreement in December 2006. Id. As discussed below, the Complaint demonstrates that Plaintiff remained aware that GSI might be sold in 2007 at all times after this disclosure.

**B.    Plaintiff and GSI Enter Into the Stock Purchase Agreement Upon Plaintiff's Resignation from Agromarau**

In November 2006, Plaintiff and GSI completed his Separation Agreement, which provided that, upon his departure, Agromarau would repurchase Plaintiff's ownership interest ("quotas") in Agromarau, and that in return, Plaintiff would obtain shares of Common Stock of GSI. Id. ¶15. The parties subsequently entered into a Stock Purchase Agreement, which governed GSI's conveyance of those shares to Plaintiff. Id. ¶17. The Stock Purchase Agreement provided, among other things, that GSI would issue 3,072 shares to Plaintiff (in exchange for his Agromarau quotas), and that Plaintiff would have the opportunity to sell those shares if and when GSI's owners transferred a controlling interest in GSI to a third party. Id. ¶¶19-20. The Complaint alleges that the parties executed the Stock Purchase Agreement on or about December 13, 2006.

Immediately after Plaintiff executed the Stock Purchase Agreement, the parties negotiated an amendment to that agreement ("First Amendment"). Id. ¶23. The First Amendment provided that Plaintiff would not receive Common Stock from GSI in exchange for the Agromarau quotas. Instead, GSI would pay cash for Plaintiff's quotas, and he would have an option to use that money to purchase 3,072 GSI shares at a fixed price of $150 per share. Id. Accordingly, after the parties executed the First Amendment, GSI wired a cash payment for the Agromarau quotas to Plaintiff on December 27, 2006. Id. ¶26. The next day, Plaintiff wired that money back to GSI in order to purchase the GSI shares. Id. ¶27.

### C.    Plaintiff and GSI Agree to Rescind the Stock Purchase Agreement, Despite Plaintiff's Recognition that the Shares Would be Valuable in a Sale of GSI Holdings

Notwithstanding its receipt of Plaintiff's money, GSI did not complete the stock purchase transaction and did not send GSI share certificates to Plaintiff. Complaint ¶28. Nor did Plaintiff receive a copy of the Stock Purchase Agreement executed by GSI. Id. In February and March 2006, Plaintiff allegedly made a number of inquiries to Mr. Branch and an Agromarau attorney in Brazil regarding the GSI share certificates. Id. The Complaint also alleges that GSI and Mr. Branch did not respond to these communications. Id.

On May 3, 2007, Plaintiff met with Ingo Erhardt, the new General Manager of Agromarau. Id. ¶29. During that meeting, Mr. Erhardt gave Plaintiff a copy of a proposed Second Amendment to the Stock Purchase Agreement ("Second Amendment"), and told him that GSI wanted to rescind the Stock Purchase Agreement. Id. ¶30. The Complaint alleges that Mr. Erhardt made four statements in order to induce Plaintiff to sign the Second Amendment:

> (a) Branch wanted Plaintiff to sign the Second Amendment; (b) The funds transferred by Plaintiff were in a segregated account that Branch had forgotten about and that it would be a problem now to issue the shares; (c) Plaintiff had made a lot of money from his relationship with Agromarau; more than executives at comparable

> companies; and (d) Plaintiff's companies did business with
> Agromarau, which Erhardt was sure Plaintiff wanted to continue
> without problems.

Id.

According to the Complaint, Plaintiff responded to Mr. Erhardt by asking to review the Second Amendment and consult with his financial advisor. Id. ¶31. To facilitate his review, Mr. Erhardt provided Plaintiff with two copies of the Second Amendment -- one in English, and one in Portuguese. Id.

Plaintiff purportedly returned to Mr. Erhardt's office the following day, and stated that he had not yet consulted with his advisor. Id. ¶33. In response, Erdhart allegedly told him that:

> (a) Plaintiff must sign the Second Amendment; (b) He (Erhardt)
> was flying to the United States the next day and wanted to take the
> signed Second Amendment with him; and (c) Again, the business
> Plaintiff's companies did with Agromarau could be jeopardized if
> Plaintiff did not sign.

Id. ¶ 33.

Plaintiff then decided to sign the Second Amendment and he did so on May 4, 2007. Id. ¶ 34. Mr. Erhardt signed the Second Amendment at the same time on behalf of Agromarau and flew to the U.S. Id. ¶ 35. On the same day (May 4, 2007), Plaintiff sent an email to Mr. Branch stating that he initially had not wanted to sign the Second Amendment because he knew that the value of GSI was increasing and "certainly our Stock be worth much more than when of [sic] the sale of GSI." Id. ¶ 39; Griffin Decl. Ex. 1 (emphasis added).

In addition, on May 8, 2007, Plaintiff sent an email to Mr. Erhardt stating that, notwithstanding Mr. Erhardt's alleged statement in the May 3, 2007 meeting, the text of the Second Amendment clearly showed that a share certificate had been issued on his behalf. Id. However, the Complaint does not aver any attempts by Plaintiff to challenge or otherwise contest

-7-

the rescission of the Stock Purchase Agreement in light of this information. Instead, he simply made arrangements to receive his money from the U.S. Id. ¶ 40.

GSI and Mr. Branch executed the Second Amendment on May 11, 2007. Id. ¶42. Despite several attempts by GSI to return Plaintiff's money, Plaintiff did not receive his $460,809.50 until November 13, 2007. Id. ¶43. While Plaintiff waited for the return of his money, GSI announced in June 25, 2007 that Centerbridge Partners had acquired a majority stake in GSI. Subsequent filings revealed that GSI had engaged in an auction process in 2007 as a means for identifying a potential acquirer, which culminated in Centerbridge's bid to purchase GSI in June 2007. Id. ¶47. UBS Securities LLC ("UBS"), which GSI had engaged in November 2006 as its financial advisor to explore a possible sale of the company, Id. ¶16, had facilitated the auction process. Id. ¶¶46-7.

## III.   ARGUMENT

### A.   Standard of Review

In deciding a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to the plaintiff. DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir. 2003). However, a complaint must include more "than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (abrogating the "no set of facts" language from Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); see also AT&T Communications v. Shaar Fund, Ltd., 493 F.3d 87, 98 n.2 (2d Cir. 2007) ("plausibility" requirement applies to all claims). Twombly at 1965. Factual allegations "must be enough to raise a right to relief above the speculative level," and the relief

must be "plausible, not merely possible." Id. at 1965-66. In this case, Plaintiff must plead his securities and common law fraud claims with particularity. See Fed. R. Civ. P. 9(b).

### B.    The Complaint Fails to State a Claim for Federal Securities Fraud Under Rule 10b-5

To state a claim for securities fraud under Section 10b of the Exchange Act and Rule 10b-5, a plaintiff must allege that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005). Plaintiff's Complaint fails to allege the first two essential elements of his securities claim.

First, the Complaint fails to allege that Defendants made actionable misstatements or omissions of material fact in connection with the rescission. Of the four statements that supposedly induced Plaintiff's decision to sign the Second Amendment, three were true and one was contradicted by the written rescission agreement (i.e., the Second Amendment), which Plaintiff signed.

With respect to alleged omissions, Plaintiff admits in paragraph 58 of the Complaint that GSI's chief executive officer disclosed to him in September 2006 the possibility that GSI's owners might sell the Company in 2007, and Plaintiff himself referred to the possibility of a sale in an e-mail he wrote to GSI's chairman (Mr. Branch) on May 4, 2007, the day Plaintiff signed the rescission agreement. (Id. ¶39). As a matter of law, Plaintiff cannot base an "omission" claim on a fact he admits that GSI's chief executive officer disclosed to him before he signed any of the agreements relating to the purchase of GSI shares, and a fact that he admits he was aware of when he signed the rescission agreement.

Second, the facts pled in the Complaint do not give rise to a "cogent and compelling inference" of scienter. Plaintiff's theory that Defendants intended to deceive him cannot survive a reading of Plaintiff's own Complaint, which confirms that GSI truthfully told him that GSI wanted to rescind the stock purchase agreement and that Plaintiff should accommodate GSI in order to preserve the other business relationships between Plaintiff and Agromarau. Plaintiff's scienter theory also ignores that GSI disclosed its intent to sell the company. For all of these reasons, the securities fraud claim must be dismissed.

### 1. Defendants Did Not Make a Material Misstatement or Omission in Connection With Plaintiff's Rescission of His Option to Purchase GSI Shares

#### (a) The Statements That Induced Plaintiff to Rescind the Stock Purchase Agreement Were True

An affirmative representation must be false or misleading in order to be actionable under Section 10b and Rule 10b-5. See, e.g., In re International Business Machines Sec. Litig., 163 F.3d 102, 107 (2d. Cir. 1998). "It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true. . . ." In re Bristol Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004). Here, Plaintiff Segatt concedes that truthful statements by GSI induced him to sign the Second Amendment to the Stock Purchase Agreement.

Paragraph 30 of the Complaint alleges that four statements by Mr. Erhardt induced Plaintiff to rescind the Stock Purchase Agreement. With respect to three of those statements, Plaintiff has not alleged any false or misleading aspect. See Complaint ¶¶ 59-67. First, the Complaint alleges that Erhardt told Plaintiff that, "Branch wanted Plaintiff to sign the Second Amendment." Id. ¶ 30. This was unquestionably true. GSI asked Plaintiff to rescind the Stock Purchase Agreement and hoped he would agree to do so. Second, Erhardt allegedly told

-10-

Plaintiff that "Plaintiff had made a lot of money from his relationship with Agromarau; more than executives at comparable companies." Id. This was also true and, in any event, immaterial. Plaintiff had not only been well compensated as Agromarau's General Manager (a position akin to CEO), but had also admittedly benefited from the business relationships between his other companies and Agromarau. See id.¶¶ 30, 63-4. Third, Erhardt allegedly stated that, if Plaintiff did not sign the Second Amendment, Agromarau might not continue to do business with Plaintiff's other companies. Id. ¶ 30. Although Plaintiff characterizes this statement as an "implied threat," at most, it reflected Agromarau and GSI's position, that if Plaintiff refused to accommodate GSI with respect to rescission of the Stock Purchase Agreement, then Agromarau and GSI might exercise their right to re-evaluate the extent to which they wished Agromarau to do business with Plaintiff's other companies. Such a statement – like the first two – is not misleading and does not constitute a misrepresentation of material facts, and therefore is not actionable under Rule 10b-5.

> **(b)** **The Alleged Misrepresentation Regarding the Issuance of the Share Certificate Was Contradicted by the Rescission Agreement Itself, and Was Not Material**

The lone affirmative "misrepresentation" alleged by Plaintiff to have induced the rescission of the Stock Purchase Agreement is Mr. Erhardt's alleged statement during the May 3, 2007 meeting that "[t]he funds transferred by Plaintiff were in a segregated account that Branch had forgotten about and that it would be a problem now to issue the shares." Complaint ¶ 30. Even if, contrary to fact, Mr. Erhardt actually had made this statement, it would not be actionable because Plaintiff admits that the rescission agreement he signed disclosed the truth concerning the issuance of the shares.

As a matter of law, a claimant cannot base a federal securities law claim on alleged oral misrepresentations where, as here, the claimant received a document accurately disclosing the true facts. "An investor cannot rely on a misrepresentation if, through minimal diligence, the investor could have discovered the truth." Brown v. E.F. Hutton Group, Inc. 991 F.2d 1020, 1032 (2d Cir. 1993); see also Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1015 (2d Cir. 1989) ("A showing of reliance may be defeated…where defendant establishes that plaintiff should have discovered the true facts.") "Under this standard, §10(b) liability will not be imposed when an investor's conduct rises to the level of recklessness." Brown, 991 F.2d at 1032.

For example, in Mercury Air Group, Inc. v. Jet USA Airlines, Inc., No. 97 Civ 3473, 1998 WL 542291 (S.D.N.Y. Aug. 26, 1998), the plaintiff sued defendant for securities fraud, alleging that prior to a private offering, the defendant's representatives made oral misrepresentations regarding the status of the defendant's lease and investment with a third party aircraft leasing company. Id. at *1, 5. The court held that Plaintiff was not entitled to rely upon those misrepresentations because they were directly contradicted by the terms of the written Private Offering Memorandum that governed the securities. Id. at *6; see also Brown, 991 F.2d at 1032-33 (plaintiff not entitled to rely on oral assurances of brokers regarding risk of investing in energy fund, where risks were easily ascertainable in the written offering prospectus).

Plaintiff admits that the terms of the Second Amendment -- a one page document that Plaintiff signed -- explicitly contradicted Mr. Erhardt's alleged statement that GSI had never issued the shares. Specifically, Plaintiff alleges that Section 2 of the Second Amendment, which authorizes GSI "to cancel stock certificate number 48, representing 3,072 shares of the Company," demonstrates that such a certificate did exist. See Complaint Ex. E at 1. Plaintiff

-12-

further admits that he received copies of the Second Amendment in English and Portuguese after his first meeting with Erhardt on May 3, 2007. Id. ¶ 31. Finally, Plaintiff admits that upon inspection of the Second Amendment, his financial advisor told him no later than May 8, 2007 that the Second Amendment showed that a share certificate did exist, despite Plaintiff's alleged misunderstanding. Id. ¶ 38

In light of the plain statement in the written agreement, Plaintiff cannot claim to have reasonably relied on Mr. Erhardt's supposed misrepresentation regarding the issuance of the shares. Like the plaintiff in Mercury, supra, Plaintiff seeks to rely upon a misrepresentation that the written document at the center of this transaction directly contradicted. In this case, Plaintiff did not have to consult a lengthy prospectus or offering memorandum to uncover the truth regarding his investment, but only needed to read a rescission agreement (the Second Amendment) consisting of a single page. He admittedly had that page in his possession in two languages for at least 24 hours before executing the final agreement, and his financial advisor certainly understood that the agreement showed GSI had issued the 3,072 shares using certificate number 48. Under settled law, his claim based on the alleged misrepresentation regarding the issuance of the GSI shares fails as a matter of law and should be dismissed.

In any event, the alleged misrepresentation regarding the issuance of the shares was also immaterial to Plaintiff's decision to rescind the shares. In order to satisfy the materiality requirement of Rule 10b-5 at the pleadings stage, the plaintiff must allege "a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). A court will dismiss the complaint if the statement is one which is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996) quoting Goldman v. Belden, 754 F.2d 1059 (2d. Cir. 1985).

Here, Plaintiff faced the choice of deciding whether to retain his contractual right to stock in GSI, or to relinquish his rights as GSI requested, receive his money back and preserve a positive business relationship with Agromarau.  Under those circumstances, no reasonable investor would have viewed whether or not GSI had formally issued the shares yet as material to the ultimate decision.  So long as Plaintiff retained his contractual rights under the Stock Purchase Agreement, a reasonable investor would understand that Plaintiff could enforce those rights and ensure that the shares were issued.  Since the rescission agreement resulted in the relinquishment of Plaintiff's entitlement to the shares altogether, the "issuance" of the shares *vel non* is legally irrelevant.  Accordingly, the statement is immaterial as a matter of law.

For all these reasons, the purported misrepresentation regarding the issuance of the shares is not actionable under Rule 10b-5.

**(c)    Plaintiff Cannot Demonstrate Fraud by Omission Because the Complaint Admits GSI Had Disclosed the Potential Sale of the Company to Him.**

In the absence of any affirmative material misrepresentation, Plaintiff alleges that Defendants failed to disclose "the plans and activities to sell [GSI]" before Plaintiff's rescission of the Stock Purchase Agreement.  This claim fails as a matter of law because the Complaint admits that GSI's chief executive officer disclosed to Plaintiff in September, 2006 that GSI's owners might sell the Company in 2007, and that Plaintiff knew this when he rescinded the Stock Purchase Agreement.

-14-

Even if one assumes that an affirmative duty of disclosure existed,[1] GSI complied with it when its chief executive officer told Plaintiff that GSI's owners might sell the Company in 2007. Thus, in Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001). – the leading Second Circuit case on this issue – the plaintiff sued his former privately-held employer in connection with the repurchase of his shareholdings upon his resignation from the company. Id. at 174-75. The record demonstrated that the defendants completely failed to disclose Young & Rubicam's pursuit of a potential merger and/or recapitalization before repurchasing the plaintiff's shares. Id. at 175. Moreover, the defendants affirmatively misrepresented to the plaintiff "nothing is going to change in the near future." Id. However, after repurchasing the plaintiff's shares Young & Rubicam approved a leveraged recapitalization plan, which significantly increased the value of the shares in a few short months. The Second Circuit reversed the district court's grant of summary judgment for Young & Rubicam, holding that a fact finder could conclude that Young & Rubicam had a duty to disclose its pursuit of a merger/recapitalization transaction to the plaintiff before repurchasing his shares, and that Young & Rubicam had affirmatively misrepresented that intention. Id. at 178, 180-86. As in Rizzo v. McManus Group, supra p.3, had the defendants in Castellano disclosed Young & Rubicam's

---

[1]The duty to disclose "arises from the 'relationship of trust and confidence' between corporate insiders and shareholders." Castellano, 257 F.3d at 179 quoting Chiarella v. United States, 445 U.S. 222, 230 (1980). In this case, however, the parties never completed the stock purchase transaction, and so any affirmative duty of disclosure owed to GSI shareholders would not extend to Plaintiff Segatt. Thus, GSI did not have a duty to disclose all material facts to Plaintiff. See Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 351 (S.D.N.Y. 2005) (private company selling its stock owed no duty of disclosure to parties where no "fiduciary or special relationship" was alleged). However, the Court need not reach this issue, because, even if the Court were to treat Plaintiff as a GSI shareholder, Plaintiff concedes that GSI's chief executive officer actually disclosed to him in September, 2006 the material fact that GSI's owners might sell the Company in 2007.

intention to pursue a merger or recapitalization – as GSI did here – the case would have been dismissed because the defendants would have complied with the affirmative duty of disclosure.

Plaintiff's claims are the opposite of those in Castellano and Rizzo in two material respects. First, Plaintiff has not alleged that GSI made any affirmative misrepresentation regarding its intention to sell the company in 2007. See Sec. II.B.1.(a-b). Second, Plaintiff has admitted that GSI's CEO told him in September, 2006 that GSI might be sold in 2007, and has admitted he was aware of that disclosure when he rescinded the Stock Purchase Agreement. See Complaint ¶¶39, 58. Thus, even if Plaintiff could claim the status of a shareholder for purposes of the Castellano and Rizzo affirmative duty to disclose, Plaintiff's claim would still fail as a matter of law. His admission that GSI disclosed the potential sale of the Company before he signed the Stock Purchase Agreement in December, 2006 precludes Plaintiff from asserting that GSI had a duty to disclose the same thing when the parties agreed to rescind the agreement only four months later in May of 2007. As a matter of law, Plaintiff had the material information necessary to inform his decision.

"Even at the pleadings stage, dismissal is appropriate where the complaint is premised on the non-disclosure of information that was accurately disclosed." In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); see also Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 350 (S.D.N.Y. 2005) (dismissing complaint where allegedly omitted information had been previously disclosed).

Courts have not hesitated to apply this doctrine where, as here, the Company had disclosed its intention to enter into a subsequent merger. For example, in Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971 (9th Cir. 1999), the plaintiff alleged that Ford failed to disclose sufficient information regarding its plans to merge with its subsidiary, Ford Holdings,

Inc. to take advantage of certain tax benefits.  The Ninth Circuit affirmed the dismissal of the

complaint, because the prospectus that had been issued with Ford Holding, Inc. securities five

years earlier informed investors that Ford Holding, Inc. could be merged with another Ford entity

"at any time," and in that event, FHI security-holders would receive $25/share.  Id. at 974.

Accordingly, "Ford's disclosure of the potential for the merger could not have been clearer," and

further disclosures would have been immaterial.  Id. at 982; see also Glazer v. Formica, 964 F.2d

149, 155 (2d Cir. 1993) (Press release stating that defendant would "consider any legitimate

proposal to acquire the company" adequately disclosed the potential for a subsequent merger or

recapitalization).

   Once a corporation makes a meaningful and specific disclosure to the Plaintiff of

the possibility of a sale or merger, as Plaintiff concedes in paragraph 58 of the Complaint that

GSI did, it makes no sense to say that the Company must repeat the disclosure periodically or

provide an update on the likelihood or non-likelihood of the sale or merger, particularly where it

is clear that the initial disclosure was effective.  Here, Plaintiff admits that the CEO of GSI

informed him as early as September 2006 that "it was a good time to sell [GSI]," and that

"Defendant Charlesbank Capital Partners might sell [GSI] in 2007."  Complaint ¶ 58.  At all

times after this disclosure, Plaintiff was aware of the possibility that GSI would be sold.

Critically, on the day that he rescinded the Stock Purchase Agreement, Plaintiff sent an email to

Mr. Branch confirming Plaintiff's knowledge of the plan to sell GSI, and acknowledging his

understanding that the value of GSI/Agromarau was increasing and that GSI shares would

"certainly" have been "worth much more when of [sic] the sale of GSI."  Id. ¶ 39; Griffin Decl.

Ex. 1.  Yet, despite that knowledge, Plaintiff still chose to rescind the Stock Purchase Agreement

for other business reasons, including his desire to maintain his other business relationships with Agromarau.

In light of these facts, any further disclosure by GSI of a potential sale on May 4, 2007 would definitely have been duplicative and speculative. Although Plaintiff makes many allegations regarding the terms of the Centerbridge sale executed in June-July 2007, see id. ¶¶ 44-57, the Complaint admits that GSI did not receive final offers from potential acquirers until June 2007, nearly six weeks after the rescission of the Stock Purchase Agreement. Id. ¶ 47. Stripped of these allegations, Plaintiff claims that as of May 4, 2007, Defendants failed to disclose *for a second time* that GSI's owners might sell the Company in 2007. At most, GSI could have said: "Remember when our CEO told you in September, 2006 about the possibility that GSI's owners might sell the Company in 2007 -- that is still a true statement." The federal courts have rejected the notion that the securities laws require repetitive disclosures of the same basic information. See e.g., Frigtemp Corp. v. Financial Dynamics Fund, 524 F.2d 275, 281 (2d Cir. 1975) (a defendant's "reasonable belief that the other party already has access to the facts should excuse him from new disclosures which reasonably appear to be repetitive.")

Such a duplicative disclosure could not have materially added to "the total mix" of information that GSI had already disclosed to Plaintiff, in light of Plaintiff's same day admission that he would have preferred to keep the GSI stock in order to make money in the event of a sale of GSI. See Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). In light of GSI's affirmative disclosure of the possibility of a sale of GSI in 2007 and the complete absence of any misrepresentation regarding its intentions, Plaintiff has failed to state a claim for securities fraud based on any "material omission" theory.

2.    **Plaintiff Has Failed to Plead Facts Sufficient to Warrant a Strong Inference of Scienter**

Even if the Complaint sufficiently alleged a material misstatement regarding the issuance of the shares or material omission regarding the possibility of a sale or merger in 2007 (which it does not), the Complaint fails to allege facts that support the requisite strong inference of scienter. 15 U.S.C.A. § 78u(4)(b)(3)(A) (West 1995). In evaluating whether such a strong inference is warranted, the Court must read the Complaint as a whole, and take into account all the competing inferences that may be drawn from the well-pled facts. Tellabs, 127 S. Ct. at 2509-10. The inference of scienter must be "cogent and compelling, thus strong in light of other explanations." Id. at 2510. "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." AT&T Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). In this case, the Complaint attempts to satisfy both prongs of this test, see Complaint ¶¶ 64-65, but succeeds at neither.

With respect to motive and opportunity, Plaintiff's theory is that in May 2007 Defendants sought to defraud Plaintiff because Defendants knew that GSI would be sold, and wanted GSI – and not Plaintiff – to profit from the sale of any shares pledged to Plaintiff. Complaint ¶ 65. This theory ignores the other allegations of the Complaint, which demonstrate GSI had the same motive and opportunity in December 2006, but went ahead with the Stock Purchase Agreement anyway. Specifically, Plaintiff concedes that before entering into the Stock Purchase Agreement in December 2006, GSI told Plaintiff that GSI might be sold in 2007, and hired UBS to advise GSI in the sale process. Complaint ¶¶ 16, 58. According to the Complaint, GSI's owners had in mind the possibility of a sale or merger before entering into the Stock Purchase Agreement with Plaintiff.

-19-

If, contrary to fact, GSI had a motive of preventing Plaintiff from profiting on a sale or merger of GSI in 2007, then GSI could simply chosen not to enter into the Stock Purchase Agreement with him in December of 2006. Id. ¶ 20. However, GSI not only agreed to provide Plaintiff with an option to purchase GSI shares, but also included terms in the Stock Purchase Agreement that expressly contemplated Plaintiff's participation in a future sale of GSI. Id. ¶ 20. These terms provide further compelling evidence that both parties understood when they entered into the Stock Purchase Agreement that a sale or merger might occur in 2007. Given that GSI's alleged motivation to retain its shares in anticipation of a planned 2007 sale would have existed both when the parties signed the Stock Purchase Agreement and when they rescinded it four months later, that supposed motive certainly does not provide any basis for a strong inference that GSI intended to deceive Plaintiff. The only "cogent and compelling" inference is that GSI's motives in entering into (and then rescinding) the Stock Purchase Agreement had nothing to do with the possibility of a sale or merger of GSI in 2007.

Plaintiff also fails to establish a strong inference of intentional or reckless deception from allegations that GSI did not complete the transactions contemplated by the Stock Purchase Agreement for four months (from December 28, 2006 through May 3, 2007) and did not respond to Plaintiff's inquiries about the GSI shares during that period. ¶ 64. As an initial matter, GSI's alleged failure to perform under the Stock Purchase Agreement does not establish that it attempted to defraud Plaintiff when it asked him to rescind that agreement four months later. See Campienello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 664 (2d Cir. 1997) ("allegations of mere non-performance under a contract do not provide strong evidence of fraudulent intent"); Powers v. British Vita, P.L.C., 57 F.3d 176, 185 (2d Cir. 1995) (same). Nor does delay in performance provide any basis for a strong inference of fraud where, as here, GSI

acknowledged its contractual obligations by informing Plaintiff on May 3, 2007 (through Mr. Erhardt) that GSI preferred to rescind the agreement. (Complaint ¶30). The fact that a party asks to undo and rescind a contract certainly provides no basis for a strong inference of scienter, as required by the statute.

More importantly, however, Plaintiff seeks to brush aside the fact that GSI told Plaintiff that the company would likely be sold in 2007. When a party attempts to prove fraud by omission, "more than a conscious failure to disclose must be shown. Rather, there must be proof that the non-disclosure was intended to mislead." Reiss v. Pan American World Airways, Inc., 711 F.2d 11, 14 (2d Cir. 1983). Under this standard, any inference that Defendants intended to defraud Plaintiff is not credible in light of the fact that GSI told Plaintiff about the planned sale of GSI as early as September 2006, and Plaintiff remained aware of that plan until May 2007.

Courts have not hesitated to dismiss securities fraud claims for failure to plead scienter where the subject of the alleged omission was at least partially affirmatively disclosed. See Glenbrook Capital Limited Partnership v. Kuo, --- F. Supp. 2d ----, No. 07-02377, 2007 WL 2601260, at *8-9 (N.D. Cal. Sept. 6, 2007) (complaint failed to adequately allege scienter in light of fact that prior SEC filing partially disclosed the allegedly omitted information regarding the company's sale of its assets); Sakhrani v. Brightpoint, Inc., No. 99-0870, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001) ("early and accurate disclosure" of aspects of the defendant's decision to terminate its trading division undermined the plaintiff's allegations of scienter.). The result should be no different here. Defendants' admitted disclosure to Plaintiff about the potential sale in September 2006 negates any inference that Defendants attempted to mislead Plaintiff through

purported omissions in May 2007. Absent a strong inference of scienter, which plainly does not exist here, Plaintiff's securities fraud claim must be dismissed.

### C.    Plaintiff's Common Law Claims Must Also Be Dismissed

Plaintiff's common law claims against GSI and Mr. Branch are essentially duplicative of the securities fraud claim, and must be dismissed on the basis of the same deficiencies.

### 1.    Plaintiff Has Failed to State a Claim for Common Law Fraud

Under New York law[2], to state a cause of action for fraud, a plaintiff must allege (1) a representation (or omission) of material fact; (2) that the representation was false; (3) that the party making the representation knew it was false; and (4) justifiable reliance; and (5) resulting injury. See, e.g., Kaufman v. Cohen, 760 N.Y.S.2d 157, 165 (N.Y. Ct. App. 2003). Because the elements of the two claims are essentially the same, courts regularly dismiss duplicative common law fraud claims in cases in which a federal securities fraud claim fails as a matter of law. E.g., Harrison v. Rubenstein, 02 Civ. 9536, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007); Xenon Partners I, LLC v. Resurgent Asset Mgmt. LLC, 474 F. Supp. 2d 505 (S.D.N.Y. 2007); Muller-Parsner v. TIAA, 446 F. Supp. 2d 221 (S.D.N.Y. 2006).

The result is the same here. For all the reasons explained in our analysis of the deficiencies in Plaintiff's federal securities law claim, Plaintiff cannot establish that GSI or

_____

[2] Plaintiff apparently contends that New York law applies to all of his common law claims by virtue the Stock Purchase Agreement. Complaint ¶ 22. GSI does not agree that New York law applies to any of Plaintiff's extra-contractual claims (indeed, Delaware law controls his breach of fiduciary duty claims), and reserves the right to challenge the application of New York law to any of Plaintiff's extra-contractual claims in future pleadings. However, the Court need not resolve the issue on this motion because Plaintiff's claims fail under New York law for the reasons stated in this brief.

Branch made any material misstatement or omission in connection with his rescission of his right to purchase GSI stock. GSI's chief executive officer told Plaintiff that GSI's owners might sell the Company in 2007. Plaintiff decided to rescind the agreement anyway. Moreover, for the same reasons that the allegations of the Complaint fail to permit an inference of scienter, they also fail to allege with specificity that GSI acted with fraudulent intent. Accordingly, Plaintiff's common law fraud claim fails as a matter of law and should be dismissed.

### 2.    Plaintiff Has Failed to State a Claim for Breach of Fiduciary Duty

Plaintiff's Breach of Fiduciary Duty claim against Mr. Branch is also duplicative of his securities and common law fraud claims. Plaintiff alleges that Mr. Branch, the Chairman and director of GSI, breached fiduciary duties owed to a Plaintiff, a "minority shareholder"[3] of GSI by (1) failing to disclose material information to Plaintiff about the plan to sell GSI; (2) failing to respond to alleged emails and phone calls from Plaintiff, and (3) "by otherwise working through Erhardt to deceive Plaintiff into signing the Second Amendment." Complaint ¶ 96.

The first and third grounds for the claim are legally meritless for the reasons we have previously explained. As with Plaintiff's fraud claims, because GSI disclosed to Plaintiff the possibility of a sale of GSI in 2007, Plaintiff had all the material information necessary to make a decision as to whether to rescind the Stock Purchase Agreement. See Sect. III.B.1(c). Similarly, with respect to Mr. Erhardt, the Complaint does not contain allegations sufficient to

---

[3]As observed in note 1, supra, because the Plaintiff never completed performance of (and actually rescinded) the Stock Purchase Agreement, Mr. Branch never owed any fiduciary duties to Plaintiff as a shareholder of GSI. However, the Court need not reach this issue to decide this motion, because Plaintiff's claim fails for the reasons described above.

support a claim that Erhardt "deceive[d]" Plaintiff into rescinding the Stock Purchase

Agreement, as Mr. Erhardt made no material misrepresentations that induced Plaintiff to sign the

Second Amendment.  See Sec. III.B.1(a-b), supra.

        Without these allegations, what remains is a claim that Mr. Branch breached his

alleged fiduciary duty to Plaintiff by failing to respond to a single telephone call and two or three

emails regarding GSI's non-performance under the Stock Purchase Agreement.  As a matter of

law, Mr. Branch did not have any legal duty, whether a fiduciary duty or otherwise, to

communicate personally with Plaintiff in response to Plaintiff's inquiries about the stock

purchase transaction.  Mr. Branch could (and did) rely on an Agromarau representative (Mr.

Erhardt) to address any contractual issues with Plaintiff directly.  Therefore, the breach of

fiduciary duty claim must be dismissed.

### 3.    Plaintiff Has Failed to State a Claim for Breach of Contract

        Plaintiff premises his breach of contract claim on GSI's alleged failure to deliver

the GSI shares and afford Plaintiff his "Tag-Along Rights" under Section 5.5. of the Stock

Purchase Agreement.  Complaint ¶¶ 108-9.  However, the Second Amendment rescinded both of

these obligations, id. Ex. E at 1.  In the absence of fraud, which does not exist here for the

reasons we have previously explained, that rescission forecloses Plaintiff from asserting any

breach of contract claim based on the Stock Purchase Agreement.  See e.g., Can-Am Organic

Foods v. Phillips Business Systems, Inc., 441 N.Y.S.2d 452, 453 (N.Y. App. Ct. 1981) (no

breach of contract lies on a validly rescinded agreement, absent a reservation of rights).

        Accordingly, in view of the dismissal of Plaintiff's securities, common law fraud

and breach of fiduciary duty claims, Plaintiff has no legal basis for challenging the enforceability

of the rescission agreement, and so the breach of contract claim fails as a matter of law.

**4.    Plaintiff Has Failed to State a Claim for Unjust Enrichment**

Finally, Plaintiff's unjust enrichment claim is premised on his claim that Defendants "deceiv[ed] Plaintiff into agreeing to rescind" his rights under the Stock Purchase Agreement. But Plaintiff has not alleged any facts that demonstrate any material misrepresentations by GSI or any of the Defendants, and GSI had already disclosed to Plaintiff the possibility of a sale in 2007. There was nothing unjust about the rescission. Plaintiff is merely unhappy with his decision.

Even more fundamentally, Plaintiff cannot proceed on a theory of unjust enrichment where, as here, the parties entered into written agreements setting forth (and then rescinding) their rights and obligations to one another. See Clark-Fitzpatrick, Inc. v. Long Island R. Co., 521 N.Y.S.2d 653, 656 (N.Y. 1987) (performance of valid and enforceable written contract precludes recovery on theory of unjust enrichment). Even if contrary to fact, Plaintiff had any legal basis for challenging the rescission agreement, he certainly cannot proceed on a theory of unjust enrichment, which assumes that no binding contract ever existed between Plaintiff and GSI.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiff's complaint should be dismissed in its entirety. The GSI Defendants also incorporate and adopt the arguments of the Charlesbank Defendants in support of their motion to dismiss.

Respectfully submitted,

___Joseph C. Crawford  /s/_____
Angelo A. Stio, III (AS 7880)
Pepper Hamilton LLP
Suite 400
301 Carnegie Center
Princeton, NJ 08543-5276
(609) 452-0808

Joseph C. Crawford (admitted *pro hac vice*)
Frank H. Griffin, IV (admitted *pro hac vice*)
Pepper Hamilton LLP
Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103
(215) 981-4000

*Attorneys for Defendants GSI Holdings Corp
and William J. Branch*

March 28, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

LEONARDO SEGATT                           :
                                          :
              Plaintiff,                   :
                                          :
      v.                                   :        07 CV 11413 (WHP)
                                          :
GSI HOLDINGS CORP., et. al.                :
                                          :
              Defendants.                  :
                                          :
--------------------------------------------------------  :

### DECLARATION OF FRANK H. GRIFFIN, IV

I, Frank H. Griffin, IV, hereby declare:

1.      I am an attorney at Pepper Hamilton LLP, and one of the attorneys for

Defendants GSI Holdings Corp. and William J. Branch (the "GSI Defendants") in the above

captioned action.

2.      Attached as Exhibit 1 is a true and correct copy of a May 4, 2007 email

from Plaintiff Leonardo Segatt to Defendant William J. Branch, which is referenced in Paragraph

39 of Plaintiff's Complaint and submitted in support of the GSI Defendants' Motion to Dismiss

the Complaint.

3.      I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.  Executed on March 28, 2008

                                    _/s/ Frank H. Griffin, IV_____
                                    Frank H. Griffin, IV (admitted *pro hac vice*)

# EXHIBIT 1

-----Original Message-----
From: Leonardo Segatt [mailto:leo@colloni.com.br]
Sent: Friday, May 04, 2007 4:53 PM
To: wjbranch@aol.com; billb@grainsystems.com
Subject: Stock

>Dear Bill!

I am communicating you that today  I signed the cancellation of my  Stock
according to your request, Ingo will be taking for you the document .
I was a little surprise with this, because I believed that this transaction
had already been made.

I would  prefer to continue with the Stock because I believe in your work
and of Ingo in doing our GSI / Agromarau to be worth more every day and
certainly our Stock be worth much more than when of the sale of GSI.

Thank you for the attempt of becoming me a  partner of GSI, in USA. Maybe
in another opportunity that can happen.

Same no more as partners you can "count" with me if you think necessary.

Regards.....leo