UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

| | |
|---|---|
| LEONARDO SEGATT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| - against - ) | |
| ) | |
| GSI HOLDINGS CORP., WILLIAM J. BRANCH, ) | No.: 07 CV 11413 (WHP) |
| CHARLESBANK EQUITY FUND V, LIMITED ) | |
| PARTNERSHIP, CB OFFSHORE EQUITY FUND V, ) | ECF Case |
| L.P., CHARLESBANK EQUITY COINVEST- ) | |
| MENT FUND V, LIMITED PARTNERSHIP, ) | |
| CHARLESBANK COINVESTMENT PARTNERS, ) | |
| LIMITED PARTNERSHIP, CHARLESBANK ) | |
| EQUITY FUND V GP, LIMITED PARTNERSHIP ) | |
| and CHARLESBANK CAPITAL PARTNERS, LLC, ) | |
| ) | |
| Defendants. ) | |

-------------------------------------------------------------

PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

LAW OFFICES OF

# MARK P. ZIMMETT

ATTORNEY FOR:    Plaintiff

126 EAST 56TH STREET
NEW YORK 10022
(212) 755-0808

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        The Standard to Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        Defendants GSI Holdings and Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        The Charlesbank Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     DEFENDANTS ARE LIABLE ON THE FIRST CLAIM FOR
       FEDERAL SECURITIES LAW FRAUD UNDER SECTION 10(b)
       OF THE EXCHANGE ACT AND RULE 10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        *Castellano* and *Rizzo* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        Transaction Causation/Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        Interstate Commerce/the Mails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        "In Connection With" a Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.    DEFENDANT BRANCH AND THE CHARLESBANK
       DEFENDANTS ARE LIABLE ON THE SECOND THROUGH
       EIGHTH CLAIMS FOR FEDERAL SECURITIES LAW FRAUD
       UNDER SECTION 20(a) OF THE EXCHANGE ACT. . . . . . . . . . . . . . . . . . . . . . 23

III.   DEFENDANTS ARE LIABLE ON THE NINTH CLAIM
       FOR COMMON LAW FRAUD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   DEFENDANT BRANCH AND THE CHARLESBANK DEFENDANTS
       ARE LIABLE ON THE TENTH AND ELEVENTH CLAIMS FOR BREACH
       OF FIDUCIARY DUTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

V.    DEFENDANT GSI HOLDINGS AND THE CHARLESBANK
      DEFENDANTS ARE LIABLE  ON THE TWELFTH AND
      THIRTEENTH CLAIMS FOR  BREACH OF THE STOCK
      PURCHASE AGREEMENT.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VI.   DEFENDANTS ARE LIABLE ON THE FOURTEENTH CLAIM
      FOR UNJUST ENRICHMENT.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VII.  DEFENDANTS CHARLESBANK EQUITY FUND V GP LIMITED
      PARTNERSHIP AND CHARLESBANK CAPITAL PARTNERS
      LLC ARE LIABLE ON THE FIFTEENTH AND SIXTEENTH
      CLAIMS AS GENERAL PARTNERS.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

<u>CASES</u>

*Anglo American Ins. Group, P.L.C. v. CalFed, Inc.*,
  899 F. Supp. 1070 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Brown v. E.F. Hutton Group, Inc.*,
  991 F.2d 1020 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14-15, 16, 30

*Dujardin v. Liberty Media Corp.*,
  359 F. Supp. 2d 337 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Frigitemp Corp. v. Financial Dynamics Fund*,
  524 F.2d 275 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Glenbrook Capital Limited Partnership v. Kuo*,
  525 F. Supp. 2d 1130 (N.D. Cal.  2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Granite Partners, L.P. v. Bear Stearns & Co. Inc.*,
  17 F.Supp.2d 275 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Heliotrope General, Inc. v. Ford Motor Co.*,
  189 F. 3d 971 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re DRDGOLD Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Keyspan Corp. Sec. Litigation*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*In re MSC Indus. Direct Co. Sec. Litig.*,
  283 F. Supp. 2d 838 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kahn v. Household Acquisition Corp.*,
  591 A.2d 166 (Del. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Lank v. Steiner*,
  224 A.2d 242 (Del. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Lynch v. Vickers Energy Corp.*,
  383 A.2d 278 (Del. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

*Mallad Constr. Corp. v. County Federal Savings and Loan Ass'n.*,
  32 N.Y. 2d 285, 298 N.E. 2d 96 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Marbury Mgmt, Inc. v. Kohn*,
  629 F.2d 705 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Meinhard v. Salmon*,
  249 N.Y. 458, 164 N.E. 545 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mercury Air Group, Inc. v. Jet USA Airlines, Inc.*,
  No. 97 Civ. 3473, 1998 WL 542291 (S.D.N.Y. Aug. 26, 1998) . . . . . . . . . . . . . . . . . . . 19, 20

*Novack v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*O'Reilly v. Transworld Healthcare, Inc.*,
  745 A.2d 902 (Del. Ch. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
  794 A.2d 1211 (Del. Ch. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rizzo v. MacManus Group, Inc.*,
  158 F.Supp. 2d 297 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15-16, 17

*Roger v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Royal American Managers, Inc. v. IRC Holding Corp.*,
   885 F.2d 1011 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Sakhrani v. Brightpoint, Inc.*,
   No. 99-0870, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001) . . . . . . . . . . . . . . . . . . . . . . . . 22

*SEC v. National Securities, Inc.*,
   393 U.S. 453 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Shell Petroleum, Inc. v. Smith*,
   606 A.2d 112 (Del. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Tellabs v. Makor Rights, Ltd.*,
   127 S.Ct. 2499 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Turkish v. Kasenetz*,
   27 F.3d 23 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Wacht v. Cont'l Hosts, Ltd.*,
   No. 7954, 1994 Del Ch. LEXIS 171 (Del. Ch. Sept. 9, 1994) . . . . . . . . . . . . . . . . . . . . . 27

## STATUTES AND RULES

15 U.S.C. § 78t(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15 U.S.C. §78c (14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15 U.S.C. §78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23, 25

17 C.F.R. §240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23, 25

Del. Code Ann. tit. 6, §15-306(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Del. Code Ann. tit. 6, §17-403(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Mass. Gen. Law Ch. 108A, §15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

N.Y. Partnership Law §26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

N.Y. Partnership Law §121-403(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

| | |
|---|---|
| LEONARDO SEGATT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| - against - | ) |
| | ) |
| GSI HOLDINGS CORP., WILLIAM J. BRANCH, | ) |
| CHARLESBANK EQUITY FUND V, LIMITED | ) |
| PARTNERSHIP, CB OFFSHORE EQUITY FUND V, | ) |
| L.P., CHARLESBANK EQUITY COINVEST- | ) |
| MENT FUND V, LIMITED PARTNERSHIP, | ) |
| CHARLESBANK COINVESTMENT PARTNERS, | ) |
| LIMITED PARTNERSHIP, CHARLESBANK | ) |
| EQUITY FUND V GP, LIMITED PARTNERSHIP | ) |
| and CHARLESBANK CAPITAL PARTNERS, LLC, | ) |
| | ) |
| Defendants. | ) |

No.: 07 CV 11413 (WHP)

ECF Case

-------------------------------------------------------------

PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

     Plaintiff submits this single memorandum of law in response to the two memoranda filed by

the Charlesbank Defendants[1] and separately by Defendants GSI Holdings Corp. ("GSI Holdings")

and William J. Branch ("Branch").[2]

---

    [1]"Charlesbank Defendants" refers to Defendants Charlesbank Equity Fund V, Limited
Partnership, CB Offshore Equity Fund V, L.P., Charlesbank Equity Coinvestment Fund V, Limited
Partnership, Charlesbank Coinvestment Partners, Limited Partnership, Charlesbank Equity Fund V
GP, Limited Partnership and Charlesbank Capital Partners, LLC.  The Memorandum of Law in
Support of the Charlesbank Defendants' Motion to Dismiss will referenced as "Charlesbank Def.s'
Mem."

    [2]The Memorandum of Defendants GSI Holdings Corp. and William J. Branch in Support of
Their Motion to Dismiss the Complaint will be referenced as "Def.s GSI Holdings and Branch
Mem."

For the reasons stated below, the Defendants' motions to dismiss the Complaint for failure to state a claim should be denied.

THE FACTS

Simply stated, the Complaint pleads that Defendants deceived Plaintiff into rescinding his purchase of 3,072 shares of the common stock of Defendant GSI Holdings at $150 per share by misrepresenting to him that the shares had not been issued, by not disclosing to him their plans and activities to sell GSI Holdings at a much higher price of at least approximately $700 per share and by insinuating a threat that, if Plaintiff did not rescind his purchase of the 3,072 shares, there would be "problems" with the business conducted between Plaintiff's companies and Defendant GSI Holdings' Brazilian affiliate Agromarau Indústria e Commercio Ltd. ("Agromarau") Compl. ¶¶ 1, 29-34, 58.

Until his resignation in 2006, Plaintiff was the General Manager of Agromarau. The GSI Group, Inc., "a major worldwide manufacturer of agricultural equipment," was then the majority owner of Agromarau, holding more than 90% of its capital stock (or quotas) Compl. ¶14. Ex. G at 1. The GSI Group, Inc. was wholly owned by Defendant GSI Holdings, a Delaware corporation with a principal place of business in Illinois. *Id.* ¶¶3, 14. Defendant Branch was a director and Chairman of both The GSI Group, Inc. and Defendant GSI Holdings. *Id.* ¶14. The Charlesbank Defendants were all self-described "Principal Stockholders" of Defendant GSI Holdings. *Id.* ¶20 n. 5. Together they owned 86% of Defendant GSI Holdings. *Id.* ¶48.

In connection with his resignation as General Manager of Agromarau, Plaintiff purchased 3,072 shares of Defendant GSI Holdings. On or about December 13, 2006, he signed a Stock

-2-

Purchase and Management Equity Agreement ("Stock Purchase Agreement").[3] Compl. ¶¶17, 24. Defendant Branch is shown as the signatory for Defendant GSI Holdings on the Stock Purchase Agreement. *Id.* Ex. C at unnumbered page 19.

The Charlesbank Defendants were also parties or signatories of parties to the Stock Purchase Agreement. *Id.* ¶, Ex. C at unnumbered pages 21-22. In the event that they proposed to sell or transfer 50% of their shares in Defendant GSI Holdings, the Charlesbank Defendants were obligated by the Stock Purchase Agreement to so notify Plaintiff and to permit Plaintiff to exercise his so-called "tag-along" rights to sell his shares at the same price as the Charlesbank Defendants. *Id.* ¶¶20, 113-114.

Plaintiff wired $460,829.50 to Defendant GSI Holdings' bank on December 28, 2006 in payment of his 3,072 shares. *Id.* ¶27.

Plaintiff never received a Stock Purchase Agreement countersigned by Defendants. Nor did he receive a stock certificate for his 3,072 shares. He inquired a number of times over the next four months of Defendant Branch and of Claudio Moretti, a lawyer for Agromarau, as to the whereabouts of the fully executed Stock Purchase Agreement and his stock certificate, but neither they nor anyone else informed him as to what had happened to them. Compl. ¶28.

On May 3, 2007, Plaintiff went to see Ingo Erhardt who had succeeded Plaintiff as General Manager of Agromarau. Erhardt had requested in a phone call that Plaintiff visit him to discuss markets, production and other subjects concerning Agromarau's business. They met at Erhardt's

---

[3]The Stock Purchase Agreement is referenced throughout the text of the Complaint as the "Stock Purchase Agreement," but is mistakenly referenced in footnote 5 of the Complaint as the "Share Purchase Agreement."

office at Agromarau.  Compl. ¶29.

To Plaintiff's surprise, Erhardt, acting on behalf of Defendants at the request of Defendant Branch,  gave to Plaintiff, and asked him to sign, a Second Amendment of Separation Agreement ("Second Agreement")[4] drafted by or on behalf of Defendant GSI Holdings and its affiliated parties, which provides for rescission of Plaintiff's purchase of the 3,072 shares of Defendant GSI Holdings' common stock.  Erhardt said the following:

    a.      Branch wanted Plaintiff to sign the Second Amendment;

    b.      The funds transferred by Plaintiff were in a segregated account that Branch had forgotten about and that it would be a problem now to issue the shares;

    c.      Plaintiff had made a lot of money from his relationship with Agromarau; more than executives at comparable companies; and

    d.      Plaintiff's companies did business with Agromarau which Erhardt was sure Plaintiff wanted to continue without problems.  Compl. ¶30.

Defendants GSI Holdings and Branch concede that "Branch ... did rely on ... Erhardt."  and that it is "unquestionably true" that Branch wanted Plaintiff to sign the Second Amendment.  Def.s GSI Holdings and Branch Mem. at 10, 24.

Plaintiff requested a copy of the Second Amendment so that he could consult his financial advisor about it.  Erhardt provided by email draft copies in Portugese and in English.  Following his

---

[4]A previous First Amendment of Separation Agreement ("First Amendment") (Compl. Ex. D) had revised the method by which Plaintiff acquired his 3,072 shares: instead of exchanging his quotas in Agromarau for shares in GSI Holdings, as the Separation Agreement (Compl. Ex. A) had originally provided, the First Amendment provided for Plaintiff to sell his quotas and purchase the shares. *Id.* ¶23.

meeting with Erhardt, Plaintiff tried to reach his financial advisor, but the advisor was out of town. Compl. ¶¶31-32.

Plaintiff returned to Erhardt's office the next day, May 4, 2007, and told him that he had not had an opportunity to consult with his advisor.  Erhardt said that

a.   Plaintiff must sign the Second Amendment;

b.   He (Erhardt) was flying to the United States the next day and wanted to take the signed Second Amendment with him; and

c.   Again, the business Plaintiff's companies did with Agromarau could be jeopardized if Plaintiff did not sign. Compl. ¶33

In reliance on what Erhardt had told him in their two meetings and on there being no other information material to his decision whether to sign the Second Amendment, Plaintiff signed the Second Amendment in Erhardt's office on May 4, 2007.  Erhardt also  signed the Second Amendment on behalf of Agromarau on May 4, 2007, and Defendant Branch signed it on behalf of the other parties on May 11, 2007.  Compl. ¶¶34, 35, 42.

The Second Amendment provides in Section 2 as follows:

> The parties have mutually determined that [Plaintiff] Segatt will not invest in any shares of [Defendant GSI] Holdings, and in furtherance thereof, the Stock Purchase and Management Equity Agreement between [Defendant GSI] Holdings and [Plaintiff] Segatt dated as of December 28, 2006, as amended by Amendment No. 1 thereto, dated December 28, 2006, between [Defendant GSI] Holdings and [Plaintiff] Segatt  (the "Purchase Agreement"), together with any other documents or agreements entered into between them pursuant to such Purchase Agreement, including but not limited to the joinder by [Plaintiff] Segatt to the October 2005 Registration Rights Agreement, dated as of October 6, 2005, by and among [Defendant GSI] Holdings and the parties named therein, are hereby declared

> null, void, cancelled and without legal effect, and as if they have
> never been entered into, and the $460,800 (U.S.) which [Plaintiff]
> Segatt has deposited with [Defendant GSI] Holdings pursuant to the
> First Amendment and the Purchase Agreement will forthwith be
> promptly returned to [Plaintiff] Segatt in U.S. currency. [Plaintiff]
> Segatt hereby agrees and authorizes the Company [Defendant GSI
> Holdings] to cancel stock certificate number 48, representing 3,072
> shares of the Company [Defendant GSI Holdings].

Compl. ¶36.

Following his signing of the Second Amendment, Plaintiff consulted his financial advisor who pointed out to him that, contrary to what Erhardt had told him, the certificate for the 3,072 shares had in fact been issued; it was "stock certificate number 48, representing 3,072 shares of the Company [Defendant GSI Holdings]" as described in Section 2 of the Second Amendment. Compl. ¶38.

On the evening of May 4, 2007, Plaintiff sent an email message to Defendant Branch stating that he (Plaintiff) had "signed the cancellation of my Stock according to your request. Ingo will be taking for you [sic] the document. I was a little surprise [sic] with this, because I believed that this transaction had already been made." Plaintiff added that he would have preferred to hold his GSI Holdings shares "because ... our Stock be worth much more than when of [sic] the sale of GSI." Branch never responded. Compl. ¶39.

Plaintiff sent an email message to Erhardt on May 8, 2007 pointing out that, contrary to what Erhardt had said, the Second Amendment indicated that a stock certificate had been issued. He asked Erhardt to explain. Erhardt, then in the U.S., responded by email that same day, stating that what he had told Plaintiff was correct and that (in Portuguese) "this is a horse that was played against the fence and you should look the ones that are in the pasture. We will make much money with the

other horses." Compl. ¶40.

No one told Plaintiff that six months earlier in November 2006 Defendant GSI Holdings had engaged UBS Securities LLC as a financial advisor to assist its board in exploring a possible sale of Defendant GSI Holdings (Compl. ¶¶16, 46, 58), that since then Defendants had been working with UBS Securities to sell Defendant GSI Holdings and that they were then engaged in a staged auction process with potential acquirors. *Id.* ¶¶47, 58.

On June 25, 2007, The GSI Group announced that its parent company, Defendant GSI Holdings, controlled by Defendant Charlesbank Capital Partners, LLC, had entered into an agreement by which affiliates of Centerbridge Partners, L.P. would acquire a majority stake in Defendant GSI Holdings. Defendant Branch is quoted in the announcement. Compl. ¶44.

On June 29, 2007, The GSI Group announced a cash tender offer to repurchase its publicly-held debt. According to the announcement, the tender offer was made in connection with the sale to Centerbridge Partners. Compl. ¶45.

An Information Statement dated July 2, 2007 (Compl. Ex. G) disclosed that Defendant GSI Holdings had engaged in a staged auction process that culminated in the receipt on June 12, 2007 of final offers from the remaining potential acquirers, including the ultimate buyer, an affiliate Centerbridge Capital Partners, L.P. *Id.* ¶¶46-47.

The culmination of the auction process on June 12 was only five and one-half weeks after Plaintiff signed the Second Amendment rescinding his purchase of 3,072 shares of Defendant GSI Holdings common stock.

According to the Information Statement, the estimated sale price will be approximately $700

per share of the common stock of Defendant GSI Holdings plus additional consideration (Compl.

¶52), far in excess of the $150 Plaintiff received for each of his shares.

The Information Statement also disclosed that Defendant Charlesbank Capital Partners stood

to benefit not only by selling its shares, but also by receiving fees in an amount undisclosed by the

Merger Agreement attached to the Information Statement, but referenced in Section 3.16 and Annex

3 to the Merger Agreement. *Id.* ¶65e, Ex. F.

In addition, the Information Statement disclosed that certain unnamed executives of

Defendant GSI Holdings will be entitled to receive cash bonuses upon closing or will be entitled to

acquire restricted shares of Defendant GSI Holdings' Common Stock prior to the closing at a

substantial discount subject to the closing occurring before October 1, 2007 and to shareholder

approval. Compl. ¶53.

Defendant GSI Holdings represented and warranted to the buyer that, among other things,

neither it nor its subsidiaries had any undisclosed liabilities or obligations of any nature, which

individually or in the aggregate exceed $100,000 and had no undisclosed agreement or commitment

valued in excess of $2 million.   Compl. ¶50.  In order for these representations and warranties to be

true, Plaintiff's tag-along rights to sell his 3,072 shares at the estimated minimum sale price of $700

per share had to be eliminated.

And they were eliminated.  As a condition to the closing, Defendants GSI Holdings and

Charlesbank Equity Fund V, Limited Partnership were obligated to obtain the termination of all

Stock Purchase and Management Equity Agreements entered into between Defendant GSI Holdings

and its employees, directors or consultants since October 6, 2005. Compl. ¶51b.

On August 1, 2007, The GSI Group publicly announced that its parent company, Defendant GSI Holdings, completed its previously announced sale to affiliates of Centerbridge Partners, L.P. The announcement stated: "Terms of the transaction were not disclosed."  Compl. ¶54

Plaintiff had been told in early September 2006 by Richard Christman, then chief executive officer of The GSI Group, that the company was doing well, that it was a good time to sell it and that Defendant Charlesbank Capital Partners might sell it in 2007.  However, Plaintiff was not informed as of May 4, 2007, and did not learn until after the sale was publicly announced, that any of the Defendants had engaged a financial advisor to assist with an auction or  sale of Defendant GSI Holdings, or of any plans or activities to auction or sell Defendant GSI Holdings or of any contemplated or actual terms of an auction or sale, including a sales price.  Based on the timing of events that occurred shortly after Plaintiff signed the Second Amendment on May 4, 2007, including the June 12, 2007 completion of the staged auction process and the June 29, 2007 tender offer for The GSI Group's publicly-held debt,  it is obvious that, as of May 4, 2007, such plans, activities and terms had advanced to the point at which they were material to Plaintiff's decision whether to rescind his purchase of 3,072 shares of Defendant GSI Holdings' common stock.   Compl. ¶58.

On or about November 7, 2007, Agromarau's attorney notified Plaintiff that The GSI Group had ordered $460,809.50 to be wired to Plaintiff's bank account.  Plaintiff replied that receipt of the funds does not mean the renunciation of his rights against GSI.  Plaintiff's bank received the funds and credited them on November 13, 2007 to a segregated account that Plaintiff had opened to receive these funds.  Compl. ¶43.

<u>ARGUMENT</u>

<u>Introduction</u>

The Standard to Apply

In *Rizzo v. MacManus Group, Inc.*, 158 F.Supp. 2d 297 (S.D.N.Y. 2001), this Court correctly

described the standard for evaluating a complaint on a motion to dismiss for failure to state a claim:

> On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must
> accept the material facts alleged in the complaint as true and construe all
> reasonable inferences in a plaintiff's favor. A court should not dismiss a
> complaint for failure to state a claim unless "it appears beyond doubt that the
> plaintiff can prove no set of facts in support of his claim which would entitle
> him to relief." This Court may consider documents that are incorporated by
> reference in the pleadings.

*Id.* at 301 (citations omitted).

Defendants GSI Holdings and Branch

Defendants GSI Holdings and Branch argue that timely and adequate disclosure of the

sale of Defendant GSI Holdings was made when Christman, then the chief executive of The GSI

Group, speculated in September 2006 that Defendant Charlesbank Capital Partners might sell

sometime in 2007. In addition, they contend that Erhardt told Plaintiff nothing false on May 3

and 4, 2007, except his lie that Plaintiff's shares had not been issued, and that lie, they argue, is

not "actionable."

Christman's statement as to what Defendant Charlesbank Capital Partners might do at some

unspecified time in 2007 was too idle and indefinite to be a meaningful disclosure to affect

Plaintiff's decision whether to dispose of his shares at a particular time for a particular price. No

price, time or other terms were mentioned.

Defendants GSI Holdings and Branch argue that Plaintiff cannot have justifiably relied upon the misrepresentation that his shares had not been issued because he could have seen in the Second Amendment that "the Company [is] to cancel stock certificate number 48, representing 3,072 shares of the Company." Compl., Ex. E ¶ 2. As for the other statements by which Plaintiff was pressured into signing the Second Amendment before he could consult with his financial advisor (Compl. ¶¶ 31-33), Defendants GSI Holdings and Branch claim that they were true and immaterial. There is nothing in the above-quoted language of the Second Amendment that would convey to a lay person, much less a barely-English-literate Brazilian lay person, that, as a matter of law in the U.S., his shares had been "issued" and, therefore, he had been lied to. The very material point of the insinuating threat was to pressure Plaintiff into signing the rescission agreement before he could contact his financial advisor and discover the truth, which he subsequently did. Compl. ¶ 38.

The Charlesbank Defendants

The Charlesbank Defendants argue that they did nothing wrong, they were uninvolved and the Complaint is "utterly barren of any specific allegation" against them. Charlesbank Def.s' Mem. at 10. They knew that Plaintiff had purchased 3,072 shares of GSI Holdings' common stock. They were parties to his Stock Purchase Agreement. They were obligated by the Stock Purchase Agreement to notify Plaintiff if they "propose" to sell or transfer more than 50% of their own shares of GSI Holdings' common stock. Compl. ¶20, Ex.C. §5.5. They failed to so notify Plaintiff in breach of the Stock Purchase Agreement even before the Stock Purchase Agreement was fraudulently rescinded. Instead, they undertook to eliminate Plaintiff's shareholdings and sold their shares without notice to him.

In order to close the sale of the Charlesbank Defendants' shares, Defendants GSI Holdings and Charlesbank Equity Fund V, Limited Partnership had to "obtain the termination" of Plaintiff's rights under the Stock Purchase Agreement. Compl. ¶51b, Ex. F. §§6.17, 7.2(a). In order to know that it had done so, Defendant Charlesbank Equity Fund V, Limited Partnership, acting through its general partner Defendant Charlesbank Equity Fund V GP, Limited Partnership and through its manager and Stockholders Representative Defendant Charlesbank Capital Partners LLC, the manager and Stockholders Representative of all Charlesbank Defendant Selling Principal Stockholders (Compl. ¶¶9, 10), had to know what happened to Plaintiff's Stock Purchase Agreement and to Plaintiff's shares. And they all know that they had not disclosed to him their proposed sale of their own shares as required by (i) the Stock Purchase Agreement (ii) their fiduciary duty under Delaware law and (iii) their duty under federal securities law. In a misleading and feeble attempt to try to distance the Charlesbank Defendants from this case, the memorandum of law filed on their behalf states:

> There is no allegation that any of the Charlesbank Defendants had any contact with Mr. Segatt or otherwise had any additional role in relation to the SPA [Stock Purchase Agreement][1]

---

[1] The Complaint alleges generally, with no factual support, that the SPA "was prepared by or on behalf of Defendant GSI Holdings and the Defendant Principal Stockholders." Compl. ¶18.

Charlesbank Def.s' Mem. at 4, n.1. One need only read the next sentence in paragraph 18 of the Complaint for the "factual support":

> Upon information and belief, base on its computer-generated document number "NY 52967303," the Stock Purchase Agreement was prepared in New York.

-12-

Compl. ¶18.  Representing both Defendant GSI Holdings and the Charlesbank Defendants, in the

Stock Purchase Agreement was the New York office of Covington & Burling (Compl. Ex. C §6.3),

the very lawyers who, based on the computer-generated number, apparently prepared the Stock

Purchase Agreement and who now suggest there is no evidence that it was prepared on behalf of

their clients.

I.

DEFENDANTS ARE LIABLE ON
THE FIRST CLAIM FOR FEDERAL
SECURITIES LAW FRAUD UNDER
SECTION 10(b) OF THE EXCHANGE
ACT AND RULE 10b-5.

Defendants are liable for securities law fraud under Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5,

thereunder.

U.S. securities law prohibits fraud through use of the mails or any instrumentality of

interstate commerce in connection with the purchase or sale of any security, regardless whether the

security is publicly traded over an exchange.  Plaintiff must plead and prove a misrepresentation of,

or failure to disclose by one who has a duty to disclose, a material fact, either through reckless

disregard of the truth or with intent to harm; Plaintiff's own  justifiable reliance on the

misrepresentation or, in the case of a non-disclosure, on there being withheld no material

information; and a loss resulting from the misrepresentation or undisclosed fact.  *Castellano v.*

*Young & Rubicam, Inc.*, 257 F.3d 171, 178-79, 186 (2d Cir. 2001).

Under federal law, fraudulent intent or recklessness may be inferred from either (i) facts showing that the defendant had both motive and opportunity to commit fraud, or (ii) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Rizzo*, 158 F.Supp.2d at 306, *citing Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000); *Novack v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). The inference of fraudulent intent or recklessness arises where the defendant benefitted in a direct and concrete way from the alleged fraud. *Rizzo*, 158 F.Supp 2d at 306, *citing Novack*, 216 F.3d at 311.

<u>*Castellano*</u> and <u>*Rizzo*</u>

The facts in this case are astonishingly similar to those in *Castellano*, 257 F.3d 171, and *Rizzo*, 158 F.Supp.2d 297. In *Castellano* and *Rizzo*, plaintiffs sold back their shares to then privately-owned defendant corporations in connection with their severance as the heads of foreign affiliates, not knowing that in each case the defendant corporation was working with an investment bank and negotiating with potential suitors to sell itself or merge with another company. In each case, shortly after the plaintiff sold back his shares, the defendant corporation entered into a transaction that valued its shares at a multiple many times greater than the price at which the plaintiff sold.

In *Castellano*, plaintiff "recognized the possibility that [the defendant corporation] might become a publicly-traded company." 257 F.3d at 178. "Although [plaintiff] was obviously aware of *some* possibility that the [defendant corporation] might go public" (*id.*, emphasis in original), the court held that there was a question of fact whether he relied on a statement by the defendant corporation's vice chairman that "'nothing was going to change in the near future.'" *Id.* at 175.

Quite apart from that alleged misrepresentation, the court held that "closed corporations that purchase their own stock have a special obligation to disclose to sellers all material information...." *Id.* at 179. The court reversed summary judgment in favor of the defendant corporation holding that "[a] jury could find that by failing to disclose material information about such restructuring and recapitalization efforts, [the defendant corporation] disguised the very risk to which [plaintiff] fell victim: that a recapitalization would soon occur that could double or triple the worth of his shares." *Id.* at 189.

In *Rizzo*, this Court denied a motion to dismiss claims for securities fraud under Rule 10b-5, control person liability and breach of fiduciary duty. The defendants were the corporation that bought back plaintiff's shares, two of its directors and senior officers and the corporation's privately-held corporate parent. This Court held that the corporate defendant "operated under a duty of disclosure to [plaintiff] when it undertook to repurchase [plaintiff's] stock in the company..., [and that the other] defendants likewise had a duty to speak and correct prior statements." 158 F.Supp.2d at 302-03. Defendants argued that a magazine article on the prospects of a merger or acquisition published two months before plaintiff signed his severance agreement "obviated the duty to disclose the ongoing merger negotiations." *Id.* at 304. This Court rejected their argument. The article reported on "rumors and surmise." *Id.* at 305. Had defendants properly disclosed their insider information, it "would have transformed the likelihood of a ...merger from mere possibility at some time in the future to one that was highly probable quite soon." *Id.* Accordingly, this Court denied defendants' motion to dismiss.

The Charlesbank Defendants do not discuss or even cite *Castellano* or *Rizzo*.  Defendants GSI Holdings and Branch attempt to distinguish *Castellano* as a case that turns on a misrepresentation, but the attempt is unavailing.  *Castellano* involved, as does this case,  both a misrepresentation to induce an executive to resell his shares back to the corporation and a failure to disclose that the corporation was then actively involved in a process to be sold for a much higher price per share.  As this Court noted in *Rizzo*, the duty to disclose arises from a variety of relationships and include circumstances not only where a party has made an inaccurate, incomplete or misleading prior disclosure that must be corrected, but also, as in this case, "(i) where one party stands in a fiduciary relationship to another; [or] (ii) where one party possesses superior knowledge not available to the other and knows that the other is acting on the basis of mistaken knowledge...." 158 F.Supp.2d at 302.

The earlier case of *Glazer v. Formica Corp.,* 964 F.2d 149 (2d Cir. 1992),  on which Defendants in this case rely, is not to the contrary.  *Glazer* held that negotiations leading to a leveraged buyout did not have to be disclosed, but the obvious distinguishing fact is that in *Glazer* the company did not buy back plaintiff's shares.  It entered into no transaction with him.  He sold his shares to an unaffiliated third-party.

Scienter

Citing *Tellabs v. Makor Rights, Ltd.*, 127 S.Ct. 2499 (2007), Defendants argue that the Complaint fails to plead a "cogent and compelling" inference of scienter.  *Tellabs* holds that a strong inference of scienter must be cogent and at least as compelling – at least as likely – as any plausible nonculpable explanations.  *Id.* at 2509-10, 2513.

-16-

In *Tellabs*, a securities fraud class action against a manufacturing company and its chief executive, the defendants argued that the Circuit Court refused to consider (i) that the alleged "channel stuffing" (flooding customers with unwanted products) may have been legitimate (e.g., offering customers discounts as an incentive to buy) and (ii) that there was no allegation that the chief executive sold any shares during the class period, indicating a lack of motive (as to which the Supreme Court noted "the absence of a motive allegation is not fatal"). 127 S.Ct. at 2511.

In this case, no nonculpable explanation has been offered as to (i) why Defendant GSI Holdings kept plaintiff's share purchase price for six months, (ii) why it did not send to him his shares or the countersigned Stock Purchase and Management Agreement, (iii) why Defendants GSI Holdings and Branch ignored Plaintiff's repeated requests and inquiries, (iv) why Defendants pressured Plaintiff to rescind his stock purchase, (v) why they did not tell him about the ongoing staged auction process to sell GSI Holdings and (vi) why Defendant Branch ignored Plaintiff's email in which he expressed surprise with the rescission and stated his desire to continue to hold his shares (Compl. ¶¶ 27-34, 39, 58, 63, 64).

The Charlesbank Defendants contend that there are no specific allegations that would give rise to a strong inference of their scienter. Although "the absence of a motive allegation is not fatal" *(Tellabs*, 127 S.Ct. at 2511), their scienter is inferred from their having benefitted in a concrete and personal way from the fraud. *Rizzo*, 158 F.Supp.2d at 306; Compl. ¶ 65(a)-(c), (e). Relying on *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), the Charlesbank Defendants argue that scienter may not be inferred from a proportionate increase in their merger consideration. But *Kalnit* involved the merger of a publicly-owned corporation. The alleged benefit to the defendant corporate insiders was

no different from the benefit to the public shareholders. This case involves Defendants' sale of their privately-owned corporation while they excluded Plaintiff from selling his shares in the corporation. *Kalnit* explicitly recognized that scienter may be inferred by a manipulative scheme "to inflate stock prices while [defendants] sold their own shares." *Id.* at 139.

The Charlesbank Defendants also cite *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562 (S.D.N.Y. 2007), and *In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838 (E.D.N.Y. 2003), both of which are also readily distinguishable. Like *Kalnit*, both cases involved publicly-owned corporations. In *DRDGOLD*, the court held that a "significant stock sale by just one corporate insider is insufficient to support ... an inference" of scienter against all defendants. 472 F.Supp. 2d at 570. In *MSC*, the court held that "[t]o show motive based on stock sales, the plaintiff must allege that those sales were 'unusual,'" which the plaintiff failed to do. 283 F.Supp.2d at 848. In this case, all Defendant shareholders sold their shares in an unusual — indeed, unique — event, their sale of the company.

The Charlesbank Defendants claim that Defendants wanted Plaintiff's shares returned because of Plaintiff's own alleged "self-dealing" in breach of a Non-Compete and Consulting Agreement in Brazil. Charlesbank Def.s' Mem at 6 n. 2. Interestingly this argument is made on behalf of the Charlesbank Defendants who otherwise try to distance themselves from the fraud, rather than on behalf of Defendants GSI Holdings and Branch, and is based on a "fact" extraneous to the Complaint insinuated "on information and belief" in the memorandum of the Charlesbank Defendants' counsel without any specified information or supporting affidavit or documentation.

-18-

What a curious argument: because the Charlesbank Defendants believe Plaintiff had breached an agreement, they could deceive him into returning his shares!?  Far from negating scienter, it accounts for an *animus* or antipathy that explains the Defendants' scienter.

Transaction Causation/Reliance

The Charlesbank Defendants claim that no transaction causation or reliance is alleged.

Transaction causation, means that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction.... [T]ransaction causation is generally understood as reliance.... In the securities fraud context, transaction causation is presumed when a claim rests on a material omission." *Castellano,* 257 F.3d at 186.  Although reliance is presumed as to the material nondisclosure of the merger transaction, it is also alleged.  Compl. ¶¶ 34, 66.

As for the lie that Plaintiff's shares had not been issued, Defendants GSI Holdings and Branch argue that Plaintiff could not justifiably have relied on it because he had received the Second Amendment which explicitly provided that he authorized Defendant GSI Holdings "to cancel stock certificate number 48 representing 3,072 shares of the Company" Compl. ¶36.  There are two fundamental problems with this argument.  First, the standard by which Plaintiff's presumed oversight is to be judged is recklessness.  The recklessness standard is made clear by the very cases on which Defendants GSI Holdings and Branch purport to rely.  *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989); *Mercury Air Group, Inc. v. Jet USA Airlines, Inc.*, No. 97 Civ. 3473, 1998 WL 542291, *6 (S.D.N.Y. Aug. 26, 1998).  Surely one cannot seriously contend that it is reckless for a Brazilian lay person not to realize that cancellation of a certificate means that, as a

-19-

matter of law in the U.S., his shares had been issued, particularly if Ingo Erhardt — and those in the U.S. who gave him his instructions — did not also see the connection. Or perhaps they did. Either they concocted the lie unaware of the language in the Second Amendment, or aware of it, they just did not care. Either way, the lie was designed to induce Plaintiff to sign. It was material, it colors the entire deceptive scheme *("falsus in uno, falsus in omnibus")* and it is actionable.

Second, Defendants had a fiduciary duty to tell Plaintiff the truth. Fiduciaries who must be guided by a "punctilio of an honor the most sensitive" *(Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546-47 (1928)), cannot turn the table and rely on those to whom they owe a duty of full disclosure to ferret out the truth for themselves. Again, the point is plainly made by the cases Defendants cite. In *Brown* and *Mercury Air* the courts noted that no fiduciary duty was owed. *Brown*, 991 F.2d at 1032; *Mercury Air*, 1998 WL 542291 at *7. In *Royal American*, it is obvious from the facts that the defendant sellers owed no fiduciary duty to the plaintiff purchaser or to the purchaser's attorney.

Defendants GSI Holdings and Branch cite a number of other cases in support of their argument that a repetitive disclosure was not necessary following Christman's September 2006 speculation that the Charlesbank Defendants might sell the company sometime in 2007. None of the cases they cite supports their position in this case. In *In re Keyspan Corp. Sec. Litigation*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003), the plaintiff complained that the corporate defendant did not disclose a regulatory requirement to divest a business division that it would acquire by merger. The court not only found that the required divestiture clearly had been disclosed, but also held that a

disclosure relating the regulatory effect on the company's future business was not required to be disclosed under the applicable Public Utility Holding Company Act.

In *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337 (S.D.N.Y. 2005), a case in which no fiduciary relationship was alleged, what was disclosed was that a transaction "was in the process of being negotiated," precisely what was not disclosed in this case.

In *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F. 3d 971 (9th Cir. 1999), defendant disclosed a merger with its subsidiary three times before plaintiff purchased shares of the subsidiary's preferred stock. After plaintiff's purchases, defendant disclosed that a restructuring "was in the works," and finally that it was merging with the subsidiary. The Complaint failed to allege what information should have been disclosed concerning the likelihood of a merger. Plaintiff purchased its preferred shares with knowledge that if there were a merger, it had no choice but to be cashed out at $25 per share. And it was cashed out at that price. Unlike the plaintiff in *Heliotrope*, Plaintiff in this case did not get what he had bargained for. He had tag-along rights to sell his shares on the same terms as the other selling Defendants, but he was fraudulently induced to give up those rights.

In *Frigitemp Corp. v. Financial Dynamics Fund*, 524 F.2d 275 (2d Cir. 1975), the material facts were available to plaintiffs and defendants could reasonably assume plaintiffs knew them. Therefore, there was no need for further disclosures. In this case, however, Defendants did not disclose the sale until after it was signed and even then did not disclose the terms to anyone (Compl. ¶54) other than shareholders whom they permitted to participate.

In *Glenbrook Capital Limited Partnership v. Kuo*, 525 F. Supp. 2d 1130 (N.D. Cal. 2007), the complaint pleaded no facts to support its allegations on information and belief that defendants tried to conceal that they were selling substantially all the assets of the corporation (a disclosure that the court held was made nineteen days before the sale contract was signed) and that the proceeds would be used to pay the chief executive's personal debts.

In *Sakhrani v. Brightpoint, Inc.*, No. 99-0870, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001), a disclosure was made by the defendant company in the third quarter of 1998 that it would "be eliminating" its trading division in the fourth quarter of that year. This was not a speculation like Christman's that a third-party might sell sometime in the following year. Moreover, *Sakhrani*, unlike this case, involved no insider stock sales.

Interstate Commerce/the Mails

The Charlesbank Defendants inaccurately claim that no use of the instrumentalities of interstate commerce or the mails is alleged (*but see,* Compl. ¶¶ 18, 27, 28, 31, 33, 39, 40, 42, 43, 44-46, 54, 57, 67). Specifically the Stock Purchase Agreement that was prepared in New York on behalf of both Defendant GSI Holdings and the Charlesbank Defendants (*Id.* ¶18) "was transmitted to Plaintiff by email from Agromarau's lawyer." *Id.* More generally, and obviously, the merger transaction by which the Charlesbank Defendants sold their shares was done in interstate commerce and through the mails (*Id.* ¶¶44-46, 54, 57). The merger transaction by which the shares were sold was integral to the fraud; the sale consummated the fraud, establishing Plaintiff's damages of at least $550/per share ($1,689,590.50).

<u>"In Connection With" a Sale</u>

In addition, the Charlesbank Defendants contend that because the alleged fraud post-dated

Plaintiff's stock purchase, the fraud was not "in connection with" a purchase or sale of securities.

But the fraud clearly was in connection with the reacquisition of Plaintiff's shares for which he was

paid, albeit at a fraudulently low price. That is a "sale" under the Exchange Act. "The term 'sale'

and 'sell' each include any contract to sell *or otherwise dispose of*." 15 U.S.C. §78c (14) (emphasis

added); *Frigitemp*, 524 F.2d at 282, *quoting SEC v. National Securities, Inc.*, 393 U.S. 453, 467

(1969): "[A]n exchange of stock in a merger constituted a 'purchase' of stock for purposes of §10(b)

and Rule 10b-5: 'The broad anti-fraud purposes of the statute and the rule would clearly be furthered

by their application to this type of situation.'"

II.

DEFENDANT BRANCH
AND THE CHARLESBANK DEFENDANTS
ARE LIABLE ON THE SECOND THROUGH
EIGHTH CLAIMS  FOR FEDERAL
SECURITIES LAW FRAUD UNDER
<u>SECTION 20(a) OF THE EXCHANGE ACT.</u>

As controlling persons of Defendants that are liable for securities law fraud under Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder,

Defendant Branch and the Charlesbank Defendants are liable for securities law fraud under Section

20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendant Branch was a director, the chairman and chief executive of Defendant GSI

Holdings, sold his shares, received an as yet undisclosed bonus on the sale and relied on  Erhardt to

get Plaintiff to sign the Second Amendment.  Compl. ¶¶ 4, 30, 53, 65 c and d, Ex. G at unnumbered signature page; Def.s' GSI Holdings and Branch Mem. at 10, 24.

The Charlesbank Defendants, self-described Principal Stockholders, also knew of Plaintiff's shareholdings and, like Defendant Branch, undertook under the Merger Agreement to eliminate them.

Together, Defendants Branch and the Charlesbank defendants sold their shares and kept for themselves at least $2,150,400 of sales proceeds owed to Plaintiff ($700 x 3,072 shares = $2,150,400), returning to him only $460,809.50.

Defendant Branch does not argue against Section 20(a) liability.  The Charlesbank Defendants argue that no facts are alleged from which their culpable participation could be inferred. Knowledge of a Charlesbank representative on the Defendant GSI Holdings' board could be imputed to the Charlesbank Defendants (*Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1229 (Del. Ch. 2001)), but Plaintiff does not yet know who that is.  At this early stage of the case, before any discovery has been taken, it can at least be pleaded that the Charlesbank Defendants profited from the fraud (Compl. ¶ 65(a)-(c), (e)) and that is sufficient under Section 20(a).  *Marbury Mgmt, Inc. v. Kohn,* 629 F.2d 705, 716 (2d Cir. 1980).

III.

DEFENDANTS ARE LIABLE
ON THE NINTH CLAIM
FOR COMMON LAW FRAUD.

Defendants argue that the claim for common law fraud has essentially the same

-24-

elements as the claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5. Def.s' GSI Holdings and Branch Mem. at 22; Charlesbank Def.s' Mem. at 18. Accordingly, for the reasons explained above, they are liable not only for federal securities law fraud, but also for common law fraud.

IV.

DEFENDANT BRANCH AND
THE CHARLESBANK DEFENDANTS
ARE LIABLE ON THE TENTH AND
ELEVENTH CLAIMS FOR BREACH
OF FIDUCIARY DUTY.

As director and chairman of Defendant GSI Holdings, and as its chief executive officer (Compl. Ex. F at unnumbered signature page), Defendant Branch owed fiduciary duties of care and loyalty to Plaintiff, a minority shareholder of Defendant GSI Holdings. *Id.* at 95. Defendant Branch breached his fiduciary duties of care and loyalty to Plaintiff (i) by failing to disclose material information to Plaintiff about the plans and activities to sell Defendant GSI Holdings, (ii) by his calculated lack of response to Plaintiff's inquiries about the countersigned Stock Purchase Agreement and share certificate and about the reason for the Second Amendment rescinding Plaintiff's purchase and (iii) by his otherwise working through Erhardt to deceive Plaintiff into signing the Second Amendment.    As a result of his breach of fiduciary duty, Defendant Branch not only damaged Plaintiff , but profited himself as described above. *Id.* at ¶¶ 96, 97.

As controlling principal shareholders of Defendant GSI Holdings, the Charlesbank Defendants owed a fiduciary duty of disclosure to Plaintiff, a minority shareholder, when his

-25-

agreement to rescind his purchase of shares was solicited.  The Charlesbank Defendants were signatories to the Stock Purchase Agreement.  Consequently, they knew about Plaintiff's purchase of 3,072 shares of Defendant GSI Holdings' Common Stock and his tag-along rights.  Nevertheless, they withheld from Plaintiff, in breach of their fiduciary duty of disclosure, material information about the plans and activities to sell Defendant GSI Holdings. As a result of their breach of fiduciary duty, the Charlesbank Defendants not only damaged Plaintiff, but profited themselves as described above. Compl. ¶¶ 101-104.

Defendant Branch argues that the claim for breach of fiduciary duty is duplicative.  His arguments are repetitive and will not be addressed again.

The Charlesbank Defendants argue that, although majority shareholders owe a duty of disclosure to a minority shareholder when the minority shareholder's action is solicited in a corporate transaction, the duty is owed only "when the majority shareholder actively transacts business, or communicates, with its minority counterpart."  Charlesbank Def.s' Mem. at 20.  In other words, the majority shareholder will not breach its duty of disclosure if it is really quiet and hides or works indirectly through others.  That is absurd.

None of the cases that the Charlesbank Defendants cite support such a ridiculous proposition. *Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del. 1977), involved not majority or controlling shareholders as defendants, but defendant corporate directors who breached their fiduciary duty to make full "disclosure of *all* germane facts," not merely disclosure of "adequate facts."  *Id.* at 281. In addition, they "coerced the minority shareholders, through use of their superior bargaining

-26-

position and control over corporate assets and processes, to sell their respective shares for a grossly

inadequate price *(Id.* at 279), much as the Defendants did in the present case.

In *Kahn v. Household Acquisition Corp.*, 591 A.2d 166 (Del. 1990), the majority

shareholder's proxy statement properly disclosed all material information in connection with a

merger transaction. There was no issue of the majority shareholder's degree of involvement.

In *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112 (Del. 1992), the majority shareholder argued

that it "neither knew nor should have known of the error" in the corporation's disclosure materials

and, therefore, should not be liable for it. *Id.* at 115.   The Court rejected the argument.   The

majority shareholder "should have known about the error," based not only on its fiduciary duty, but

also "on the substantial role it played in the preparation and distribution of the disclosure materials."

*Id.* at 115.   In this case, the Charlesbank Defendants had not only a fiduciary duty to make full

disclosure, but they apparently controlled the merger from the sellers' side[5] and undertook as part

of the merger to eliminate Plaintiff's shareholdings.

In *Wacht v. Cont'l Hosts, Ltd.*, No. 7954, 1994 Del Ch. LEXIS 171 (Del. Ch. Sept. 9, 1994),

again, there was no issue about the degree of the majority shareholder's involvement. "It is

uncontroverted that the Merger was structured and approved by the Majority Shareholders." *Id.* at

---

[5]The merger was done not in Illinois where The GSI Group and GSI Holdings are located, nor in Philadelphia where their lawyers are located, but in New York where Defendant Charlesbank Capital Partners, the selling Stockholders' Representative maintains an office, using its lawyers in New York, Covington & Burling, electing the governing law of New York, not Illinois, and specifying New York as the exclusive forum for the resolution of disputes.   Compl. ¶¶ 3, 10, 45, 57.

*4. The court held that "they breached their duty to disclose fully all material information regarding the Merger." *Id.* at 10-11.

Finally, in *Lank v. Steiner*, 224 A.2d 242 (Del. 1966) , as in *Lynch*, the defendant fiduciary was a corporate director, not a majority shareholder and, once again, there was no issue for the court to consider concerning the extent of the defendant's involvement. The Charlesbank Defendants have simply culled another quote out of context.

The Charlesbank Defendants were intimately involved in selling GSI Holdings  and undertook to get Plaintiff to give up his tag-along rights without telling him about the sale.  The law is clear: "Corporate fiduciaries, including corporate directors, majority stockholders, and presumably minority controlling stockholders, have a duty to disclose all material facts when seeking stockholder action."  *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999).

V.

DEFENDANT GSI HOLDINGS AND THE
CHARLESBANK DEFENDANTS ARE LIABLE
ON THE TWELFTH AND THIRTEENTH CLAIMS FOR
BREACH OF THE STOCK PURCHASE AGREEMENT.

Defendant GSI Holdings breached the Stock Purchase Agreement by not delivering to Plaintiff his stock certificates and by failing to make sufficient provision as required by Section 5.5(a) to permit Plaintiff to sell his shares.  Compl. ¶¶ 108, 109.    The Charlesbank Defendants breached the Stock Purchase Agreement by failing to give Plaintiff written notice of the proposed sale and by failing to make sufficient provision as required by Section 5.5(a) to permit Plaintiff to sell his Shares. Compl. ¶¶ 113, 114.

-28-

Defendant GSI Holdings and the Charlesbank Defendants argue that they cannot be held liable for breach of the Stock Purchase Agreement because it was rescinded by the Second Amendment and Plaintiff has elected damages rather than to rescind the Second Amendment.

That argument has no merit for two reasons. First, defendants cannot "shield...themselves from liability for their own fraud by...the very contract that was procured by fraud." *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994), cited in the Charlesbank Def.s' Mem. at 22.

Second, the Stock Purchase Agreement was breached prior to Plaintiff signing the Second Amendment on May 4, 2007. "[W]hether a substituted agreement...effects a discharge of a pre-existing cause of action for breach...is, indeed, a question of intention." *Mallad Constr. Corp. v. County Federal Savings and Loan Ass'n.*, 32 N.Y. 2d 285, 293, 298 N.E. 2d 96, 101 (1973). In *Mallad*, the plaintiff knew of the breach of the prior agreement, but offered no parol evidence to explain its alleged intention not to release the claim for breach when it entered into a subsequent agreement revoking and cancelling the prior agreement. Consequently, the Court of Appeals affirmed summary judgment for the lender.

However, the "question of intention ... will rise to be a triable issue of fact if relevant, disputed extrinsic evidence is offered or present." *Mallad*, 32 N.Y. 2d at 293, 298 N.E. 2d at 101. In the present case, Plaintiff did not know that the Stock Purchase Agreement had been breached. He did not know of the proposed sale and, therefore, of Defendants' breach in failing to notify him of the proposed sale and to recognize and provide for his tag-along rights. Nothing suggests that he had any intention to release his claims for breach.

-29-

VI.

### DEFENDANTS ARE LIABLE
### ON THE FOURTEENTH CLAIM
### FOR UNJUST ENRICHMENT.

Defendants argue that the unjust enrichment claim must be dismissed because written agreements cover the subject matter of Plaintiff's stock purchase rights. This is an overbroad argument. In *Granite Partners, L.P. v. Bear Stearns & Co. Inc.*, 17 F.Supp.2d 275 (S.D.N.Y. 1998), the principal case on which the Charlesbank Defendants rely, an unjust enrichment claim was dismissed because the subjects of plaintiff's complaint, "[t]he sale of and profits made from inappropriate...[investments] are covered by the [parties'] contract...." *Id.* at 312. However, as Judge Sweet explained in that case, where "'the agreements [do] not expressly address' the matter about which the plaintiff complained" (*id.*, citation omitted), unjust enrichment may be claimed. In this case, the agreement rescinding plaintiff's share purchase returned the shares to Defendant GSI Holdings. That agreement does not at all deal with the Defendants then having enriched themselves at Plaintiff's expense by sharing among themselves the merger consideration that was rightly his. In *Castellano*, the Court of Appeals reversed the dismissal of plaintiff's unjust enrichment claim even though plaintiff's written severance agreement covered the return of his shares to the corporate defendant. *Castellano*, 257 F.3d at 190-91.

The Charlesbank Defendants also argue that they were not enriched; that as result of rescinding Plaintiff's shares they received only a "diffuse benefit" that increased their share of the

proceeds from the sale of GSI Holdings "from approximately $700 per share to $702.97 per share." Charlesbank Def.s' Mem. at 24.

This is a *de minimus* "silly-little-millimeter" argument. But, if one smokes enough of them, those cigarettes that are only a silly little millimeter longer can still kill, only faster. And if one steals $2.97 many times – such as 568,456 times (Charlesbank Def.s' Mem. at 7) – one can cause a lot of damage. The fact is Defendants stole from Plaintiff, not $2.97, but more than $2,150,400, returning to him only $460,809.50 and enriching themselves by more than $1,689,590.50.

VII.

### DEFENDANTS CHARLESBANK EQUITY FUND V GP LIMITED PARTNERSHIP AND CHARLESBANK CAPITAL PARTNERS LLC ARE LIABLE ON THE FIFTEENTH AND SIXTEENTH CLAIMS AS GENERAL PARTNERS.

Defendants Charlesbank Equity Fund V GP Limited Partnership and Charlesbank Capital Partners LLC are jointly and severally liable for the liabilities of the respective partnerships for which they are general partners.[6] Compl. ¶¶ 9, 10, 120, 121, 123, 124; Del. Code Ann. tit. 6, §17-403(b), referring to §15-306(a); Mass. Gen. Law Ch. 108A, §15; N.Y. Partnership Law §121-403(b), referring to §26.[7]

---

[6]The fifteenth and sixteenth *ad damnum* clauses of the Complaint mistakenly demand damages on the fifteenth and sixteenth claims from "all Defendants." Compl. at pp. 49-50. The demand should be against Defendants Charlesbank Equity Fund V GP, Limited Partnership and Charlesbank Capital Partners, LLC, respectively.

[7]The Complaint pleads that Defendant Charlesbank Equity Fund V GP Limited Partnership
(continued...)

-31-

These two Charlesbank Defendants do not dispute this fundamental point of law. Rather, their position is that, for all of the other reasons they have argued, the partnerships of which they are general partners are not liable to Plaintiff, and therefore, they are not liable as general partners. Obviously, that is not an argument for failure to state a claim for general partner liability. Instead, having made no other argument, their position should be taken as a concession that if the partnerships are liable, then so too are their general partners.

CONCLUSION

Based on the authorities and arguments set forth above, Defendants' motions to dismiss the Complaint should be denied.

Dated: New York, New York
April 18, 2008

LAW OFFICES OF MARK P. ZIMMETT

By:_____

Mark P. Zimmett (MZ 8735)

Attorneys for Plaintiff
126 East 56th Street
New York, New York 10022
(212) 755-0808

Of Counsel:

Herman Daniel. Farrell III

---

[7](...continued)
is a general partner of three defendant limited partnerships organized, respectively, under the laws of Delaware, Massachusetts and a jurisdiction unknown at this time to Plaintiff (Compl. ¶9, referring to ¶¶5-7), and Defendant Charlesbank Capital Partners LLC is a general partner of two defendant limited partnerships organized, respectively, under the laws of Massachusetts and a jurisdiction unknown at this time to Plaintiff. Compl. ¶10, referring to ¶¶8, 9. Accordingly, the relevant provisions of the limited partnership statutes of Delaware and Massachusetts are cited and, because the law of an unknown jurisdiction is presumed to be the same as that of New York, whether it is the law of another state (*Roger v. Grimaldi*, 875 F.2d 994, 1002-04 (2d Cir. 1989)), or the law of a foreign country (*Anglo American Ins. Group, P.L.C. v. CalFed, Inc.*, 899 F. Supp. 1070, 1077 (S.D.N.Y. 1995)), the corresponding provision of the limited partnership statute of New York is also cited.