UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| Leonardo Segatt, | : | |
| | : | |
| Plaintiff, | : | 07 Civ. 11413 (WHP)(JCF) |
| | : | |
| -against- | : | ECF Case |
| | : | |
| GSI Holdings Corp., William J. Branch, | : | |
| Charlesbank Equity Fund V, Limited Partnership, | : | |
| CB Offshore Equity Fund V, L.P., Charlesbank | : | |
| Equity Coinvestment Fund V, Limited Partnership, | : | |
| Charlesbank Coinvestment Partners, Limited | : | |
| Partnership, Charlesbank Equity Fund V GP, | : | |
| Limited Partnership, and Charlesbank Capital | : | |
| Partners, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE CHARLESBANK DEFENDANTS' MOTION TO DISMISS

COVINGTON & BURLING LLP

The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000

*Attorneys for Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund V, L.P., Charlesbank Equity Coinvestment Fund V, Limited Partnership, Charlesbank Coinvestment Partners, Limited Partnership, Charlesbank Equity Fund V GP, Limited Partnership, and Charlesbank Capital Partners, LLC*

Plaintiff's opposition brief tries, but fails, to obscure the lack of allegations that any of the Charlesbank Defendants made a misrepresentation to Plaintiff, or even had any contact with him, or otherwise orchestrated any fraud in connection with the rescission of his proposed stock purchase. The alleged facts, as they relate to the Charlesbank Defendants, are plainly insufficient under current pleading standards to sustain Plaintiff's claims.

*Plaintiff Promotes Incorrect Standards.*

Plaintiff begins his legal argument by citing *Rizzo v. MacManus Group, Inc.*, 158 F. Supp. 2d 297, 301 (S.D.N.Y. 2001), for the proposition that "[a] court should not dismiss a complaint for failure to state a claim unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Op. Br. at 10. But this standard no longer applies after *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-66 (2007), which requires factual allegations that "plausibly suggest" and are "not merely consistent with" entitlement to relief. The standard cited by Plaintiff is especially not the law with regard to securities fraud claims, which require specificity, particularity and facts giving rise to a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).

*Plaintiff's Primary Authorities Do Not Sustain the (Lack of) Factual Allegations Made Against the Charlesbank Defendants.*

Plaintiff likewise relies heavily on *Rizzo* on the merits. But *Rizzo* turned on facts and allegations that are simply not present here. In *Rizzo*, one of the individual defendants, Bostock, made direct misrepresentations to the plaintiff by denying rumors of a possible merger. 158 F. Supp. 2d at 299. The expressed view of the other individual defendant, Brown, was indirectly communicated to the plaintiff by the executive negotiating the transaction, who specifically represented that Brown was "inflexible" on the repurchase date. 158 F. Supp. 2d at 300. Thus both officers directly or indirectly made representations to the plaintiff. But, here, there is no

allegation that any of the Charlesbank Defendants made any direct or indirect representation: While Plaintiff alleges that Mr. Erhardt made representations to him about what *Mr. Branch* allegedly wanted, Compl. ¶ 30, there is no allegation that Mr. Erhardt or anyone else communicated any representation from the *Charlesbank Defendants*.  It also is worth noting that both Bostock and Brown were not only directors of the company, but officers as well, and were running the day-to-day affairs of the company, 158 F. Supp. 2d at 298, while the most that is suggested regarding the Charlesbank Defendants is that one or more of their representatives served on the GSI board.  Op. Br. at 24.

Plaintiff also relies heavily on *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001), but that case too rests on different facts.  Notably, the plaintiff in *Castellano* sued only the corporation that purchased his shares, not the parent or any of the shareholders of that corporation.  Moreover, direct misrepresentations were made to the plaintiff by the corporation, through its vice chairman, who stated that "the company was not going to go public and that 'nothing was going to change in the near future.'"  257 F.3d at 175.  *Castellano* clearly says nothing to support the liability of shareholders who are not alleged to have made any statement, let alone a misrepresentation, to the plaintiff.

*The Charlesbank Defendants Had No Fiduciary or Other Duty to Disclose, Given That They Did Not Communicate or Transact Business With Plaintiff.*

On the subject of a duty to disclose, *Castellano* held that:

> [C]losed corporations that purchase their own stock have a special obligation to disclose to sellers all material information. . . .  As we stated in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (en banc), any insider "in possession of material inside information must *either* disclose it to the investing public, *or, if* he is disabled from disclosing it in order to protect a corporate confidence, or *he chooses not to do so, must abstain from trading in or recommending the securities concerned* while such inside information remains undisclosed." . . .  It logically follows that just as knowledgeable corporate

insiders have a fiduciary duty to disclose material facts *when entering stock deals with outsiders*, so do closed corporations buying their own stock.

257 F.3d at 179 (emphases added). Thus, as *Castellano* recognizes, the duty to disclose is an alternate, or conditional, one. Indeed, the cases are myriad to the effect that a duty to disclose arises only when there are direct communications, or business dealings, between the insider and the seller of shares. *See* Charlesbank Initial Br. at 11-13, 20-21. If the insider abstains from communicating with or transacting opposite the seller, then there is no duty. *Rizzo* is perhaps not as precise on this point as it could have been, 158 F. Supp. 2d at 302, presumably because the issue was not squarely presented given that Bostock and Brown both made direct or indirect misrepresentations to the plaintiff on the subject of the stock purchase.[1]

Plaintiff tries to distinguish most of the Delaware cases cited by the Charlesbank Defendants to this effect, but only one of the federal cases, and in any event without success. Op. Br. at 16, 26-28. In the sole Delaware case cited by Plaintiff, *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999), the defendant 49-percent shareholder had entered into a merger agreement with the corporation, which required shareholder approval. So a self-dealing transaction was involved, and there were direct communications with shareholders by a proxy statement. Even the sentence quoted by Plaintiff clarifies that a duty of disclosure exists only when there are transactions or communications between the fiduciary and the shareholders: "Corporate fiduciaries, including corporate directors, majority stockholders, and

---

[1] *Rizzo*, after stating that the corporation had a duty to disclose when it purchased shares from the plaintiff, stated in addition that "*as pled*, defendants Bostock and Brown, as directors and officers of MacManus, owed a fiduciary duty to Rizzo, as an employee shareholder, to inform him of all material nonpublic facts concerning the value of MacManus stock prior to *causing* the company to complete the repurchase." 158 F. Supp. 2d 303 (emphases added). Perhaps more precisely, the latter duty could have been indicated to have arisen from the direct and indirect communications that Bostock and Brown had with the plaintiff.

presumably minority controlling stockholders, have a duty to disclose all material facts *when seeking stockholder action*." 745 A.2d at 916 (emphasis added). As mentioned, it is undisputed that the Charlesbank Defendants did not transact business with Plaintiff, by purchasing his shares or otherwise, and had no communications with him.

*Insufficient Facts Are Alleged to Sustain Any Fraud, or Control Person, Claim Against the Charlesbank Defendants.*

There is no allegation that the Charlesbank Defendants communicated with Plaintiff or purchased shares from him. Instead, according to the Complaint, the corporation rescinded or purchased Plaintiff's shares, and the corporation's lawyers or executives communicated with Plaintiff on that subject. Plaintiff suggests that the Charlesbank Defendants had one or more representatives on the board. Op. Br. at 24. But even if this were true, there is no authority for the proposition that a board member who learns of a corporate share repurchase that is being executed by the corporation's executives or lawyers, and who has no communications with the seller on the subject, must nonetheless personally intervene in the process to ensure that all necessary disclosures are made. Such a duty is not supported by the law, is contrary to the statement of the duty as an alternate one, and would be unworkable in practice. There likewise is no authority for the proposition that knowledge of a corporate share repurchase constitutes fraud, or culpable participation in any fraud committed by the corporation, and Plaintiff cites none.[2]

---

[2] The Delaware case cited by Plaintiff, *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1229 (Del. Ch. 2001), *rev'd*, 817 A.2d 149 (Del. 2002) (Plaintiff does not mention the reversal), found personal jurisdiction adequately stated under a conspiracy theory by which a corporation's "knowledge of [an alleged fraudulent] plan can be inferred from its participation in the [self-dealing] Transactions, and the fact that is representatives on the . . . board were the moving forces behind them." Here, by contrast, there is no personal jurisdiction question, the Charlesbank Defendants were not parties to the allegedly fraudulent rescission, and no Charlesbank board representative was allegedly the "moving force" behind the rescission.

Plaintiff points to the fact that the Charlesbank Defendants were parties to the Stock Purchase Agreement ("SPA"), without also acknowledging that the Charlesbank Defendants merely "[a]ccepted and agreed to [the SPA] for purposes of Sections 5.2, 5.4 and 5.5 only [relating to repurchase, drag-along and tag-along rights]." Compl. Exh. C at signature pages. More critically, Plaintiff does not allege that there was any fraudulent inducement in relation to the SPA; indeed, Plaintiff's alleged right to purchase shares relies on the *bona fides* of the SPA. Plaintiff alleges that a later agreement, the Second Amendment, was induced by fraud, but there is no allegation that any of the Charlesbank Defendants were parties to, or made any representations to Plaintiff about, that later agreement.

It is no surprise that the Charlesbank Defendants were parties, for a limited purpose, to the SPA, given that, as the First Amendment recognizes, the SPA was documentation "required by [GSI] Holdings for all of its investors." Compl. Exh. D (Mr. Segatt's right to purchase shares was conditioned on him "sign[ing] the investor documents required by [GSI] Holdings for all of its investors," namely the SPA). It therefore likewise would be no surprise if this form of SPA, required to be signed by all of GSI Holdings' investors, was maintained on a server used by attorneys for the Charlesbank Defendants, as Plaintiff suggests in his brief. Op. Br. at 12. This is a non-event, and a far cry from the smoking-gun fact that Plaintiff pretends it is; this alleged fact suggests nothing that would evidence that the Charlesbank Defendants engaged in a fraud with respect to a later agreement that Plaintiff never discussed with them.

In this regard, and others, Plaintiff repeatedly jumbles the chronology of events to suggest wrongdoing on the part of the Charlesbank Defendants. So, for example, Plaintiff makes much of a provision in the Merger Agreement that provides that GSI Holdings and CB Fund V will obtain the termination of certain Stock Purchase and Management Equity Agreements in advance of the closing. Op. Br. at 8, 12, 24, 27. But the Merger Agreement is dated as of June 22, 2007,

Compl. Exh. F, and the merger closed on or about August 1, 2007, Compl. ¶ 54, several months *after* the Second Amendment was signed rescinding Plaintiff's purchase.  Therefore, the obligation undertaken at the later time of the Merger Agreement is no evidence that CB Fund V orchestrated the rescission of Plaintiff's stock purchase at the earlier time, let alone fraudulently.

Plaintiff therefore has failed to allege specific facts that would establish a securities or common-law fraud claim against the Charlesbank Defendants, or that would establish a control-person claim by culpable participation in such a fraud.[3]

*Plaintiff Does Not Allege Facts Giving Rise to a Strong Inference of Scienter on the Part of the Charlesbank Defendants.*

Plaintiff argues that there is no alternative explanation for why Defendants (presumably including the Charlesbank Defendants) "did not tell him about the ongoing staged auction process to sell GSI Holdings," Op. Br. at 17, and therefore a fraudulent inference, according to Plaintiff, is equally or more compelling under *Tellabs* than other (non-existent) inferences.  But the most plausible and obvious inference as to why the Charlesbank Defendants did not tell Plaintiff of the auction process (assuming he didn't know of the sale and disclosure was necessary), is because the Charlesbank Defendants (who were in the US) were not communicating with or entering into a transaction opposite Plaintiff (who was in Brazil), and therefore had no occasion or reason or duty to advise him.

Plaintiff responds to the point that the benefit received by the Charlesbank Defendants from Plaintiff's rescission was diffuse, shared by all of GSI Holdings' shareholders, and

---

[3] Plaintiff cites *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980), in support of his control person claim, but that case merely held that the acts of an errant employee could be attributed to his employer.  *Marbury* says nothing to suggest that a majority shareholder is liable for the acts of the corporation, absent culpable participation.

exceedingly minor in relation to the merger consideration, by drawing a distinction between public and closely-held corporations.  But the cases draw no such distinction, *see* Charlesbank Initial Br. at 13-14, GSI indisputably had investors other than the Charlesbank Defendants (although the Charlesbank Defendants owned most of the Company), and in any event, it is simply not reasonable to draw a "strong inference" that the Charlesbank Defendants sought to defraud Plaintiff from an allegation that the per-share merger consideration received by them (and by other shareholders) would increase by less than ½ of 1 percent.  *See Rodman v. Grant Found.*, 608 F.2d 64, 72-73 (2d Cir. 1979) (purchase by company of 0.4% of its stock did not suggest fraudulent intent to entrench management).

> *Plaintiff's Securities Fraud Claim Suffers Additional Infirmities.*

Plaintiff claims that the instrumentalities of interstate commerce or the mails were used based on an allegation that the SPA "was transmitted to Plaintiff by email from Agromarau's lawyer."  Op. Br. at 22.  But Plaintiff was in Brazil as was Agromarau's lawyer.  Moreover, the allegation says nothing about the Charlesbank Defendants, who, in order for Plaintiff to state a claim, must themselves allegedly have used the mails or interstate commerce to further a fraud. *See* 15 U.S.C. § 78j; *Franklin Sav. Bank of N.Y. v. Levy*, 551 F.2d 521, 523-24 (2d Cir. 1977). Plaintiff also points to the merger by which the Charlesbank Defendants sold shares in GSI Holdings, stating in his opposition brief that the merger involved interstate commerce.  Op. Br. at 22.  But the merger occurred months *after* Plaintiff allegedly was defrauded into rescinding his stock purchase.  The fact that Plaintiff calculates his damages in relation to the merger consideration, *id.*, does not mean that mail or interstate commerce used in connection with the merger furthered the alleged fraud.

Plaintiff argues that the allegedly fraudulent rescission, although not in connection with a purchase of securities, was in connection with a sale, citing the definition of sale in the Exchange

Act.  Op. Br. at 23.  But Plaintiff makes no effort whatsoever to distinguish the cases, cited by the Charlesbank Defendants, holding that a post-purchase fraud that results in deprivation of a plaintiff's shares does not constitute a fraud in connection with a purchase or sale within the meaning of the federal securities laws.  *See* Charlesbank Initial Br. at 15-16.

> *Plaintiff's Contract Claim Rests on a Rescinded Contract, and Therefore Fails.*

Plaintiff concedes that he kept the consideration paid under the Second Amendment, and is not seeking rescission of that agreement in this action, but rather is seeking damages in the amount of the difference between what he received under the Second Amendment and what he would have received had he sold his shares in connection with the merger.   He therefore is bound by the terms of the Second Amendment, which rescinded the SPA and thereby abrogated the Charlesbank Defendants' obligations under that agreement (which were limited in any event to certain notice provisions for exercising repurchase, drag-along or tag-along rights).  In his opposition, Plaintiff now claims that the SPA was breached before he signed the Second Amendment on May 4, Op. Br. at 29, apparently claiming that the Charlesbank Defendants should have given him notice of his ability to exercise tag-along rights in relation to the merger before that date.  But this claimed obligation is absurd, given that Plaintiff concedes that final offers were not received in the auction until June, the merger agreement was not signed until later that month, and the merger did not close until August 1.  *See* Compl. ¶¶ 47, 54.

> *Plaintiff's Unjust Enrichment Claim Fails Because Several Written Contracts Govern the Subject of Plaintiff's Alleged Right to Purchase Shares, and Any Enrichment By GSI Holdings' Shareholders Was Incidental and Diffuse.*

Plaintiff argues that the myriad written agreements relating to his stock purchase, and its rescission, do not explicitly cover or refer to unjust enrichment, Op. Br. at 30, but the point in the cases cited in our initial brief is that equitable claims are foreclosed when written contracts

govern the general subject matter, as they do here.  Plaintiff does not deny that the purported

enrichment received by the Charlesbank Defendants was incidental, diffuse, and was received by

all GSI Holdings shareholders.  Instead, Plaintiff argues that this small diffuse benefit added up

to a significant sum in the case of the Charlesbank Defendants because they held so many shares

of GSI Holdings.  Op. Br. at 31.  But the benefit allegedly received by a corporation — in this

case, the acquisition of shares at allegedly less than their value — does not become an unjust

enrichment on the part of the corporation's shareholders that own enough shares such that the

diffuse benefit becomes significant.  Plaintiff of course cites no authority for this argument; by

contrast, many decisions have denied claims for unjust enrichment where the alleged benefit was

indirect, or diffuse.  *See* cases cited in Charlesbank Initial Br. at 24.


Dated:  April 28, 2008

                                                        Respectfully submitted,

                                                        COVINGTON & BURLING LLP

                                                        By: s/ David W. Haller
                                                              David W. Haller

                                                        The New York Times Building
                                                        620 Eighth Avenue
                                                        New York, New York  10018-1405
                                                        (212) 841-1000

                                                        *Attorneys for the Charlesbank Defendants*