USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/1/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                         :
LEONARDO SEGATT,                         :
                                         :
                    Plaintiff,           :   07 Civ. 11413 (WHP)
                                         :
       -against-                         :   MEMORANDUM AND ORDER
                                         :
GSI HOLDING CORP. et. al.,               :
                                         :
                    Defendant.           :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Leonardo Segatt ("Segatt") brings this federal securities action against Defendants GSI Holdings Corp. ("GSI"); William J. Branch ("Branch"); and Charlesbank Equity Coinvestment Fund V, Limited Partnership ("CB Fund V"), CB Offshore Equity Fund V, L.P., Charlesbank Equity Fund V, Limited Partnership, Charlesbank Coinvestment Partners, Limited Partnership, Charlesbank Equity Fund V GP, Limited Partnership ("Charlesbank GP"), and Charlesbank Capital Partners, LLC ("Charlesbank Capital Partners") (collectively the "Charlesbank Defendants"). Segatt asserts claims against: (1) all Defendants for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 et seq. (the "Exchange Act"), and Rule 10b-5 thereunder, common law fraud, and unjust enrichment; (2) Branch and the Charlesbank Defendants for violations of § 20(a) of the Securities Act of 1933, 15 U.S.C. § 77 et seq. (the "Securities Act"), and breach of fiduciary duty; (3) Branch and GSI for breach of contract; and (4) Charlesbank Capital Partners and Charlesbank GP for liability as a general partner. Defendants move to dismiss all claims. For the following reasons Defendants' motions to dismiss are granted.

## BACKGROUND

For the purposes of these motions, the Court accepts the following facts as true. Segatt was General Manager of Agromarau Industria e Comercio Ltd ("Agromarau"), an indirect subsidiary of GSI. (Complaint dated Dec. 19, 2007 ("Compl.") ¶ 14.) Branch was the chairman of GSI, a Delaware corporation. (Compl. ¶¶ 3-4.) As of July 2007, the Charlesbank Defendants collectively owned approximately 86 percent of GSI. (Compl. ¶ 48, Ex. G: July 2, 2007 GSI Information Statement at 7.)

In May 2006, Segatt informed Branch that he intended to resign. (Compl. ¶ 14.) In September 2006, Richard Christman, then the chief executive officer of GSI, told Segatt that the company was doing well and that the Charlesbank Defendants might sell GSI in 2007. (Compl. ¶ 58.) On November 13, 2006, Segatt entered into a separation agreement with GSI, which provided that Segatt would exchange his 661,725 Agromarau shares for 3,072 GSI shares (the "Separation Agreement"). (Compl. ¶ 15.) On December 13, 2006, Segatt also signed a Stock Purchase Agreement ("SPA"), which provided Segatt the right to receive notice and to sell his GSI shares if any of the signatories to the SPA entered into a transaction to sell more than 50 percent of GSI's shares (the "Tag Along Rights"). (Compl. ¶ 20.) Although GSI and Segatt were the parties to the SPA, the Charlesbank Defendants were also signatories to the SPA with respect to the sections including the Tag Along Rights. (Compl. Ex. C: SPA at 19, 21-22.) Segatt never received a SPA countersigned by GSI or the Charlesbank Defendants. (Compl. Ex. C: SPA at 19, 21-22.) The SPA states that it is governed by New York Law. (Compl. Ex. C: SPA at 16-17.)

Pursuant to an amendment to the Separation Agreement in December 2006, Segatt received payment for his Agromarau shares, and then wire transferred $460,829.50 to GSI for

the purchase of 3,072 shares of GSI. (Compl. ¶¶ 23,27.) Segatt never received stock certificates for the 3,072 shares. (Compl. ¶ 28.) Segatt telephoned and e-mailed Branch, and Claudio Moretti, a lawyer for Agromarau, several times between February and April 2007 regarding the status of the SPA and the stock certificates. (Compl. ¶ 28.) Segatt did not receive a response. (Compl. ¶ 28.)

On May 3, 2007, Ingo Erhardt, then general manager of Agromarau, asked Segatt to sign a second amendment to the Separation Agreement (the "Second Amendment"), which rescinded Segatt's purchase of the shares of GSI and voided the SPA. (Compl. ¶ 30, Ex. E: Second Amendment.) Erhardt told Segatt that: (1) Branch wanted Segatt to sign the Second Amendment; (2) the funds Segatt had transferred to purchase the GSI shares were in a segregated account that Branch had forgotten about and it would be difficult to now issue the shares; (3) Segatt had made a lot of money with Agromarau; and (4) Segatt's other companies did business with Agromarau and Segatt would want to continue those relationships. (Compl. ¶ 30.) Segatt asked to consult his financial advisor and Erhardt gave him copies of the Second Amendment in Portuguese and English. (Compl. ¶ 30.) The Second Amendment states: "Segatt hereby agrees and authorizes the Company to cancel stock certificate number 48, representing 3,072 shares of the Company." (Compl. Ex. E: Second Amendment.)

Segatt returned to Erhardt's office the next day and told Erhardt that he had not been able to reach his financial advisor. (Compl. ¶ 33.) Erhardt then told Segatt that: (1) Segatt must sign the Second Amendment; (2) Erhardt was flying to the United States the next day and wanted to take the signed Second Amendment with him; and (3) Segatt's business with Agromarau could be jeopardized if he did not sign the Second Amendment. (Compl. ¶ 33.) Segatt signed the Second Amendment on May 4, 2007. (Compl. ¶¶ 34-35.) That evening he sent

Branch an e-mail stating he would have preferred to hold his GSI shares "because . . . our stock be [sic] worth much more than when of [sic] the sale of GSI." (Compl. ¶ 39.) Branch signed the Second Amendment on May 11, 2007 on behalf of GSI. (Compl. ¶ 42.)

After Segatt signed the Second Amendment, his financial advisor told him that, contrary to Erhardt's assertion, the Second Amendment indicated that stock certificates had been issued. (Compl. ¶ 38.) On May 8, 2007, Segatt sent Erhardt an e-mail pointing out this apparent contradiction (Compl. ¶ 40.) Erhardt replied, in Portuguese, "this is a horse that was played against the fence and you should look the ones that are in the pasture. We will make more money with the other horses." (Compl. ¶ 40.)

In November 2006, GSI engaged UBS Securities LLC as a financial advisor to explore a possible sale. (Compl. ¶ 16.) On June 25, 2007, GSI announced that it had entered into an agreement (the "Merger Agreement") with Centerbridge Partners, L.P. ("Centerbridge"), who would acquire a majority stake in GSI for approximately $700 per share. (Compl. ¶¶ 44, 52.) At that time, GSI disclosed that it had conducted a staged auction process, with final offers due on June 12, 2007. (Compl ¶ 47.) The Merger Agreement required that all Stock Purchase and Management Equity Agreements between GSI and employees entered into since October 6, 2005 be terminated. (Compl. ¶ 51.) The Merger Agreement also indicated that "certain unnamed executives of [GSI] will be entitled to receive cash bonuses upon closing." (Compl. ¶ 53.)

## DISCUSSION

I. <u>Legal Standard</u>

On a motion to dismiss, the Court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. <u>Grandon v. Merrill Lynch & Co.</u>, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." <u>Bell Atl. Corp. v. Twombly</u>, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007) (requiring plaintiff to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [his claim]"); see also <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) ("We have declined to read <u>Twombly</u>'s flexible 'plausibility standard' as relating only to antitrust cases.").

A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." <u>Allen v. WestPoint-Pepperell, Inc.</u>, 945 F.2d 40, 44 (2d Cir. 1991).

II. <u>Section 10(b) Claims</u>

To state a claim for a violation of Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[] relied; and (5) that plaintiff's reliance was the proximate cause of the[] injury." <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 172 (2d Cir. 2005).

A. <u>Misstatements or Omissions</u>

1. <u>Misstatements</u>

"[A]n investor cannot rely on a misrepresentation if, through minimal diligence, the investor could have discovered the truth." <u>Brown v. E.F. Hutton Group, Inc.</u>, 991 F.2d 1020, 1032 (2d Cir. 1992); <u>see also</u> <u>Mercury Air Group, Inc. v. Jet USA Airlines, Inc.</u>, No. 97 Civ. 3473, 1998 WL 542291, at *7 (S.D.N.Y. Aug. 26, 1998) (plaintiff's reliance on an oral representation was not justified where plaintiff had a private offering memorandum contradicting the oral representation in "comprehensive, understandable language"). To determine whether an investor justifiably relied upon a representation, a court may consider: (1) the sophistication and expertise of the plaintiff in financial matters; (2) the existence of a longstanding business or personal relationship; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations. <u>Brown</u>, 991 F.2d 1032; <u>see also</u> <u>Steed Finance LDC v. Nomura Sec. Int'l, Inc.</u>, No. 00 CIV. 8058 (NRB), 2001 WL 1111508, at *8 (S.D.N.Y. Sept. 20, 2001).

The only misrepresentation alleged in the Complaint is that Erhardt told Segatt that the funds Segatt had transferred to purchase the GSI shares were in a segregated account that Branch had forgotten about and it therefore would be difficult to issue the shares. However, Segatt signed the Second Amendment canceling his stock certificates, which was only possible if the shares had in fact been issued. As general manager of Agromarau, Segatt was a sophisticated business person who should have understood this. Moreover, he had access to the Second Amendment in both English and Portuguese and was given the opportunity to review it with his

financial advisor. Therefore, Segatt had access to the truth and his reliance on Erhardt's oral representation was not justified.

2. Omissions

A failure to disclose material information is actionable if the defendant had an affirmative duty to disclose those facts. Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001). A duty to disclose arises from a "relationship of trust and confidence between parties to a transaction." Chiarella v. United States, 445 U.S. 222, 230 (1980). When a closely held corporation purchases its own stock from shareholders, there is a "special obligation to disclose to sellers all material information." Castellano, 257 F.3d at 179.

"For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by [a] reasonable investor as having significantly altered the total mix of information made available.'" Castellano, 257 F.3d at 180 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). "Material facts include those that affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities." Castellano, 257 F.3d at 180 (internal citations and quotation marks omitted). When "contingent or speculative events are at issue," such as a merger, "the materiality of those events depends on a 'balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" Castellano, 257 F.3d at 180 (quoting Basic, 485 U.S. at 238). "Because materiality is often a fact intensive inquiry, summary adjudication of a Rule 10b-5 claim is not appropriate on the grounds that the alleged misstatements or omissions were not material 'unless they would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Rizzo v. MacManus Group, Inc., 158 F.

Supp. 2d 297, 303 (S.D.N.Y. 2001) (quoting <u>Arzielli v. Cohen Law Offices</u>, 21 F.3d 512, 518 (2d Cir. 1994)).

### i. GSI and Branch

GSI and Branch had a duty to disclose material information to Segatt in connection with the Second Amendment because the relationship between these parties was similar to that of a closed corporation purchasing its own stock. Although GSI told Segatt in September 2006 that the company might be sold in 2007, accepting the alleged facts as true and construing all reasonable inferences in Segatt's favor, in May 2007 a sale may have been more than just a possibility. See <u>Rizzo</u>, 158 F. Supp. 2d at 305 (withheld information was material where it would have "transformed the likelihood of a . . . merger from mere possibility at some time in the future to one that was highly probable quite soon"). Whether or not any specific, omitted information known to GSI or Branch in early May 2007 "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" is a question of fact that cannot be determined at this stage.

### ii. Charlesbank Defendants

The group pleading exception permits plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." <u>In re Oxford Health Plans, Inc.</u>, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (internal quotation marks omitted). However, the exception "applies only to group-published documents, such as SEC filings and press releases," and not to oral statements. <u>Goldin Assoc., L.L.C. v. Donaldson, Lufkin & Jenrette Secs. Corp.</u>, No. 00 Civ. 8688 (WHP), 2003 WL 22218643, at *5 (S.D.N.Y. Sept. 25, 2003) (citations omitted); <u>Elliott Assoc., L.P. v.</u>

Covance, Inc., No. 00 Civ. 4115 (SAS), 2000 WL 1752848, at *12 (S.D.N.Y. Nov. 28, 2000). There are no specific allegations in the Complaint that the Charlesbank Defendants were involved in the rescission of Segatt's shares. Segatt does allege that Erhardt was "acting on behalf of Defendants" when he gave Segatt the Second Amendment. However, that allegation is insufficient to satisfy the group pleading exception.

In addition, the Charlesbank Defendants were not parties to the Second Amendment. Thus, the Complaint does not allege that the Charlesbank Defendants and Segatt were parties to a transaction such that the Charlesbank Defendants had a duty to disclose arising from a "relationship of trust and confidence between parties to a transaction." Chiarella, 445 U.S. at 230. Accordingly, the Charlesbank Defendants' motion to dismiss the Section 10(b) claim is granted.

    B. Scienter

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud or at least knowing misconduct." SEC v. First Jersey Sec., Inc, 101 F.3d 1450, 1467 (2d Cir. 1996). The Private Securities Litigation Reform Act requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant" acted with scienter. 15 U.S.C. § 78u-4(b)(2). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S. Ct. 2499, 2510 (2007). For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510.

"When the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., __ F.3d __, No. 06-2902-cv, 2008 WL 2521676, at *4 (2d Cir. Jun. 26, 2008). "[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." Dynex, 2008 WL 2521676, at *4. For example, there would be a strong inference of corporate scienter if the company made a dramatic announcement that was false because the announcement "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." Dynex, 2008 WL 2521676, at *4 (citing Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 710 (7th Cir. 2008)).

Scienter may be shown by motive and opportunity, or strong circumstantial evidence of conscious misbehavior or recklessness. Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996). In the absence of motive, the "strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).

A plaintiff may plead motive by alleging that "concrete benefits could be realized by one or more of the false statements and wrongful disclosures alleged," and opportunity by alleging "the means and likely prospect of achieving concrete benefits by the means alleged." Shields v. Citytrust Bancorp Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). A "generalized motive, . . . which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter." Chill, 101 F.3d at 268. "[S]peculative, conditional benefits"

do not establish a "concrete benefit." In re Am. Bank Note Holographics, Inc. Sec. Litig., 93 F.Supp.2d 424, 446 (S.D.N.Y. 2000).

1. Branch

Segatt alleges that Branch was motivated by the bonus he would receive at the closing of the merger. He also alleges that because GSI had more cash on hand than it would if it had paid Segatt $700 per share, Branch benefited from a higher price per share from Centerbridge for his own shares. Alternatively, if Centerbridge, rather than GSI, had purchased Segatt's shares for $700 per share that would have reduced the price Branch would have received for his shares. The final offers in the auction process were not due until the middle of June 2007 and the merger was not finalized until the end of June. Therefore, in the beginning of May 2007, Branch could not have known whether the merger would occur, what specific price he would receive for his shares, or what the terms of the merger would be, including whether he would receive a bonus at the closing of the merger. Accordingly, these motive allegations are speculative at best.

Segatt also alleges that the following facts provide circumstantial evidence of Defendants' conscious misbehavior: (1) GSI kept Segatt's $460,829.50 for six months without returning a countersigned SPA; (2) Branch and Moretti failed to respond to Segatt's e-mails and phone calls between February 2007 and April 2007 regarding the status of the SPA and the stock certificates; (3) Erhardt, acting on behalf of all the Defendants, misrepresented that Segatt's stock certificates had not been issued and implicitly threatened that Segatt's relationship with Agromarau would be affected if he did not sign the Second Amendment; (4) Branch failed to respond to Segatt's e-mail on May 4, 2007 stating his desire to hold on to his shares; and (5)

Erhardt responded to Segatt's May 8, 2007 e-mail that this was a "horse that was played against the fence."

First, the "mere non-performance of promises is insufficient to create an inference of fraudulent intent." Powers v. British Vita, P.L.C., 57 F.3d 176, 185 (2d Cir. 1995). Accordingly, the failure to sign the SPA cannot provide a strong inference of scienter.

Second, Branch's failure to respond to Segatt's e-mails and phone calls does not give rise to a strong inference of scienter. A more compelling inference is that Branch, as chairman of GSI, was too busy to respond to e-mails and phone calls from a former employee of a subsidiary. See Tellabs, 127 S. Ct. at 2510.

Finally, even assuming Erhardt was acting on behalf of Branch, the allegations that he intentionally misled and pressured Segatt are insufficient. Given that the Second Amendment indicated that Segatt's stock certificates had been issued and Erhardt gave Segatt the opportunity to review the Second Amendment with his financial advisor and find out the truth, his misrepresentation cannot provide circumstantial evidence of conscious misbehavior by Branch. Moreover, it is unclear what, if anything, Erhardt's May 8, 2007 statement was intended to convey. Accordingly, Branch's motion to dismiss the § 10b claim is granted.

2. GSI

Segatt alleges that GSI was motivated by: (1) the need to terminate all Stock Purchase and Management Equity Agreements in order to close the merger with Centerbridge; and (2) the benefit of the difference between the $150 per share it paid Segatt and the $700 per share it received from Centerbridge for the 3,072 GSI shares.

First, the desire to satisfy conditions and complete a merger is a motive that could be attributed to any corporation, and therefore, is insufficient to plead motive. See Kalnit, 264

F.3d at 139; Freedman v. Value Health, Nos. 95 Civ. 2038 JCH, 97 Civ. 2711, 2000 WL 630916, at *4 (D. Conn. Mar. 24, 2000) (defendant's desire to consummate a merger is insufficient motive).

Second, while GSI could not have known in early May 2007 that it would receive $700 per share from Centerbridge, given that it had engaged a financial advisor in December 2006 it likely knew that it might receive significantly more than $150 per share. Thus, there were concrete benefits that could be realized by concealing information relating to the sale of the company while rescinding Segatt's purchase of shares. But the Complaint fails to create a strong inference that Branch had the requisite intent or that generally corporate officers was motivated by this concrete benefit. See Dynex, 2008 WL 2521676, at *4. Therefore the motive allegations are insufficient.

Because the allegations of conscious misbehavior by GSI are the same as those alleged for Branch, they are insufficient for the reasons set forth above. Accordingly, GSI's motion to dismiss the § 10(b) claim is granted.

III. Section 20(a) Claims

"In order to establish a prima facie case of liability under § 20(a), a plaintiff must show, inter alia, a primary violation by a controlled person." In re Alstom SA Sec. Litig., 454 F. Supp. 2d 187, 209 (S.D.N.Y. 2006) (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)); see also 15 U.S.C. § 78t(a). Because the Complaint fails to allege a primary violation by a controlled person, the Charlesbank Defendants and Branch's motion to dismiss the § 20(a) claim is granted.

IV. State Law Claims

In considering state law claims, federal courts apply the choice-of-law rules of the forum state to determine the applicable substantive law. Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997). "However, where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." Am. Fuel Corp., 122 F.3d at 134.

A. Common Law Fraud

The parties all apply New York law to the common law fraud claim and therefore, the Court will apply New York law.[1]

Because the elements for a cause of action for common law fraud are essentially the same as for federal securities fraud claims, see e.g., Kaufman v. Cohen, 307 A.D.2d 113, 120-21 (N.Y. 2003), courts regularly dismiss duplicative common law claims where the federal claim fails as a matter of law, see e.g., Harrison v. Rubenstein, 02 Civ. 9536, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007); Xenon Partners I, LLC v. Resurgent Asset Mgmt. LLC, 474 F. Supp. 2d 505 (S.D.N.Y. 2007). Accordingly, Defendants' motions to dismiss the common law fraud claims are granted.

B. Breach of Fiduciary Duty

For breach of fiduciary duty claims, New York applies the law of the state of incorporation. Walton v. Morgan Stanley & Co. Inc., 623 F.2d 796, 798 n.3 (2d Cir. 1980) (citing Diamond v. Oreamuno, 248 N.E.2d 910 (N.Y. 1969)). Because GSI is a Delaware corporation, Delaware law applies to Segatt's breach of fiduciary duty claims.

---

[1] While Branch and GSI do not agree that New York law applies, they apply it for purposes of their motion.

1. Branch

Under Delaware law, "directors generally do not occupy a fiduciary position vis a vis individual stockholders in direct personal dealings as opposed to dealings with stockholders as a class." Solomon v. Scientific American, Inc., No. 87 CIV. 4591 (MJL), 1989 WL 111165, at *4 (S.D.N.Y. Sep. 18, 1989) (quoting Kors v. Carey, 158 A.2d 136, 143 (Del. Ch. 1960)). However, "special cases may exist when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them." Solomon, 1989 WL 111165, at *4 (quoting Lank v. Steiner, 224 A.2d 242 (Del. 1966)). For the same reasons that the Complaint fails to allege scienter as to Branch, it fails to allege facts that show Branch deliberately misled Segatt. Accordingly, Branch's motion to dismiss the breach of fiduciary duty claim is granted.

2. Charlesbank Defendants

Under Delaware law, fiduciary duties arise "where one person reposes special confidence in another, or where a special duty exists on the part of one person to protect the interests of another, or where there is a reposing of faith, confidence, and trust, and the placing of reliance by one person on the judgment and advice of another." Lank, 213 A.2d at 852. When dealing with the company's property, a majority shareholder occupies a fiduciary relationship to a minority shareholder. Sterling v. Mayflower Hotel Corp., 93 A.2d 107, 109-10 (Del 1952). However, as discussed above the allegations in the Complaint do not establish that the Charlesbank Defendants had a duty to disclose that arose from a relationship of trust and confidence. Accordingly, the Charlesbank Defendants' motion to dismiss the breach of fiduciary duty claim is granted.

C. Breach of Contract

Because the SPA states that it is governed by New York law, the Court applies New York law to the breach of contract claims.

Absent fraud or a reservation of rights, a party is foreclosed from asserting any claim for breach of a rescinded contract. Russ v. Minuteman Optical Corp., 99 A.D.2d 632, 633-34 (N.Y. App. Div. 1984); Can-Am Organic Foods, Ltd. v. Philips Bus. Sys., Inc., 83 A.D.2d 528, 529 (N.Y. App. Div. 1981). However, "a party induced to enter a contract by fraud or misrepresentations must make a choice; the party may either 'elect to accept the situation created by the fraud and seek to recover his damages or he may elect to repudiate the transaction and seek to be placed in status quo.'" Ballow Brasted O'Brien & Rusin P.C. v. Logan, 435 F.3d 235, 238 (2d Cir. 2006) (quoting 27 Richard A. Lord, Williston on Contracts § 69:47, at 102 (4th ed. 2003)). In addition, "whether a substituted agreement . . . effects a discharge of a pre-existing cause of action for breach of the prior agreement is . . . a question of intention." Mallad Const. Corp. v. County Fed. Sav. & Loan Ass'n, 298 N.E.2d 96, 101 (N.Y. 1973).

Segatt alleges that GSI breached the SPA by failing to deliver the stock certificates and by failing to permit Segatt to take advantage of his Tag Along Rights under the SPA. Segatt also alleges that the Charlesbank Defendants breached the SPA by failing to give him written notice of the proposed transfer of more than 50% of their shares, as required under the SPA, and by failing to permit him to take advantage of his Tag Along Rights.

The Second Amendment rescinded the SPA. Segatt alleges that he was induced to enter into the Second Amendment by fraud and he seeks to recover damages. Therefore, he may not also elect to repudiate the Second Amendment in order to bring a breach of contract claim under the SPA. In addition, there are no causes of action that pre-existed or could have

survived the Second Amendment. At the time Segatt signed the Second Amendment, he did not have any cause of action relating to his Tag Along Rights or any notice required by the SPA because the auction process leading to the sale of GSI was not complete until more than a month later. To the extent Segatt had a cause of action against GSI for its failure to deliver the stock certificates, he was aware of that breach at the time he signed the Second Amendment, which specifically cancelled those stock certificates. Segatt cannot now argue that he intended to retain this cause of action when the Second Amendment explicitly discharges it.

Accordingly the Defendants' motions to dismiss the breach of contract claims are granted.

### D. Unjust Enrichment

The parties agree New York law applies to the unjust enrichment claim. Under New York law, a plaintiff cannot bring a claim for unjust enrichment when there is a valid and enforceable contract governing the same subject. Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y.1987). However, "a claim of unjust enrichment may be alleged . . . when the validity of the contract is in question, because recovery under a quasi-contract theory may be proper if the contract is found to be void." Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano, No. 03 Civ. 15 (RWS), 2007 WL 1687044, at *9 (S.D.N.Y. June 11, 2007).

Although the Complaint alleges that the Second Amendment was procured by fraud, the Court has dismissed all claims alleging fraud. Moreover, even if the Second Amendment were void, the SPA would be a valid and enforceable contract governing the same subject. Accordingly, the Defendants' motions to dismiss the unjust enrichment claim are granted.

E. **Liability as General Partner**

Because all of the claims against the Charlesbank Defendants have been dismissed, the Charlsbank Defendants' motion to dismiss the claims for liability as a general partner is also granted.

## CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss are granted and the Complaint is dismissed in its entirety.

Dated: August 1, 2008
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*

Mark P. Zimmett, Esq.
126 East 56th Street
New York, NY 10022
*Counsel for Plaintiff*

Angelo Anthony Stio, III, Esq.
Pepper Hamilton LLP
301 Carnegie Center
Suite 400
Princeton, NJ 08543
*Counsel for Defendants GSI Holdings and William J. Branch*

David W. Haller, Esq.
Covington & Burling LLP
620 Eighth Ave.
New York, NY 10018
212-841-1000
*Counsel for Defendants Charlesbank Equity Fund V, LP, CB Offshore Equity Fund V, LP, Charlesbank Equity Coinvestment Fund V LP, Charlesbank Coinvestment Partners LP, Charlesbank Equity Fund V GP, LP and Charlesbank Capital Partners LLP*