UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEONARDO SEGATT,

                              Plaintiff,

   - against -

GSI HOLDINGS CORP., WILLIAM J. BRANCH,
CHARLESBANK EQUITY FUND V, LIMITED
PARTNERSHIP, CB OFFSHORE EQUITY FUND V,
L.P., CHARLESBANK EQUITY COINVEST-
MENT FUND V, LIMITED PARTNERSHIP,
CHARLESBANK COINVESTMENT PARTNERS,
LIMITED PARTNERSHIP, CHARLESBANK
EQUITY FUND V GP, LIMITED PARTNERSHIP
and CHARLESBANK CAPITAL PARTNERS, LLC,

                           Defendants.

07 Civ. 1413 (WHP)(JCF)
ECF Case

---

### PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR RELIEF FROM JUDGMENT, RECONSIDERATION AND LEAVE TO AMEND AND SUPPLEMENT HIS COMPLAINT

LAW OFFICES OF

## MARK P. ZIMMETT

ATTORNEY FOR:     Plaintiff

126 EAST 56TH STREET
NEW YORK 10022
(212) 755-0808

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................... iii

I.    RECENTLY DISCOVERED DOCUMENTS SHOW THE
      CHARLESBANK DEFENDANTS' INVOLVMENT AND
      DEFENDANTS' SCIENTER IN RESCINDING PLAINTIFF'S
      PURCHASE OF GSI HOLDINGS SHARES ...................................1

II.   A FORM OF AMENDED AND SUPPLEMENTAL PLEADING
      SHOULD NOT BE NECESSARY, BUT ONE IS SUBMITTED...............13

CONCLUSION ............................................................................15

EXHIBITS                                                                     TAB

Prospectus of The GSI Group Offer to Exchange $110,000,000     A
12% Senior Notes due 2013 that have been registered under the
Securities Act of 1933 for any and all outstanding unregistered
12% Senior Notes due 2013, dated February 3, 2006 (excerpt
consisting of cover page, table of contents, pages 2-16, 70-72)

Defendants GSI Holdings Corp. and William J. Branch's          B
Responses and Objections to Plaintiff's Initial Requests for
Production of Documents, dated May 22, 2008 (excerpt consisting
of contents, pages 1, 15, 17-18)

Emails (GSI0339-GSI0341)                                        C

Affirmative Pledge of Assignment of Quotas and Other Provisions,  D
dated January 1, 2002 (in English and Portuguese) (LS0440-
LS0451)

Emails (LS0374, LS0073, LS0070, LS0086, LS0085, LS0088,        E
LS0089)

Section 3.3(d) (CB000353) of Disclosure Schedule to Agreement  F
and Plan of Merger dated as of June 22, 2007

Letter of Transmittal and List of Addresses (CB000644-         G
CB000655)

EXHIBITS                                                                                          <u>TAB</u>

Amended and Restated Stock Purchase and Management Equity          H
Agreement, dated as of November __, 2006, between GSI
Holdings Corp., a Delaware corporation (the "Company"), and
Richard M. Christman (the "Purchaser") (CB058274-CB052682)

Stock Purchase and Management Equity Agreement, dated as of
October 6, 2005, between GSI Holdings Corp., a Delaware
corporation (the "Company"), and Ann M. Montgomery (the
"Purchaser") (CB059995-CB060019)

Amendment to Stock Purchase and Management Equity
Agreement (this "Amendment"), dated as of April 5, 2007,
between GSI Holdings Corp., a Delaware corporation (the
"Company"), and Ann Montgomery (the "Purchaser") (CB061592-
CB061597)

Stock Purchase and Management Equity Agreement, dated as of          I
December 28, 2006, between GSI Holdings Corp., a Delaware
corporation (the "Company"), and Leonardo Segatt (the
"Purchaser") (excerpt consisting of CB036585-CB036606)

Stock Purchase and Management Equity Agreement, dated as of          J
December __, 2006, between GSI Holdings Corp., a Delaware
corporation (the "Company"), and Leonardo Segatt (the
"Purchaser") (C&B Draft – 12.05.06) (CB040529-CB040552)

Schedule 2.8 (CB005074-CB005076) of Disclosure Schedule to          K
Agreement and Plan of Merger dated as of June 22, 2007

Schedule 3.10 (CB000369) of Disclosure Schedule to Agreement        L
and Plan of Merger dated as of June 22, 2007

TABLE OF AUTHORITIES

PAGE

CASES

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ...............................10

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001) ...................…...……….11

*Christiana Gen. Ins. Corp. of N.Y. v. Great American Ins. Co.*,
   745 F. Supp. 150 (S.D.N.Y. 1990) ......................................................................…...14-15

*Deluca v. Smithkline Beecham Corp.*, No. 06 Civ. 2153 (NRB),
   2007 WL 541656 (S.D.N.Y. Feb. 20, 2007) ..............................................…………..14

*Fei v. WESTLB AG*, No. 07 Civ. 8785 (HB), 2008 WL 594768
   (S.D.N.Y. Mar. 5, 2008)……......................................................................................14

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB),
   2007 WL 2589482 (S.D.N.Y. Sept. 7, 2007) .....................................................……13

*In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000) ..........................................7

*Kurzweil v. Philip Morris Companies, Inc.*, Nos. 94 Civ 2373 (MBM),
   1997 WL 167043 (S.D.N.Y. Apr. 9, 1997) ..................................……...................13

*MacQuesten General Contracting, Inc. v. HCE, Inc.*, 296 F.Supp.2d 437
   (S.D.N.Y. 2003) ................................................................................................….4

*McKinnon v. Hermes of Paris, Inc.*, No. 06 Civ. 1001 (NRB),
   2007 WL 1098707 (S.D.N.Y. Apr. 10, 2007) ......................................................14

*Nat'l Fire & Marine Ins. Co. v. R.R. Resource & Recovery, Inc.*,
   No. 93 Civ 6379 (RLC), 1994 WL 606049 (S.D.N.Y. Nov. 3, 1994) ........................…13-14

*Sieger v. Zak*, 18 Misc. 3d 1143 (A), 859 N.Y.S. 2d 899
   (Sup. Ct. Nassau Co. 2008) .........................................................................................7

*Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107 (Del. 1952) ......................................11

*Smith v. Planas*, 151 F.R.D. 547 (S.D.N.Y. 1993) ...................................................…15

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ...........…...…10

PAGE

## CASES

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) …….…………..………..12

*United States v. Gole*, 158, F.3d 166 (2d Cir 1998) *cert denied*,
  526 U.S. 1078 (1999)……………………………………..……..………………………4

*United States v. Lauersen*, No. 98 Cr. 1134 (WHP), 1999 WL 637237
  (S.D.N.Y.  Aug. 20, 1999)..……………………………………………..………………...4-5

*Zito v. Leasecomm Corp.,* No. 02 Civ. 8074 (GEL), 2004 WL 2211650
  (S.D.N.Y. Sept. 30, 2004) ……………………………………..………………………13


## STATUTES AND RULES

15 U.S.C. §78j(b) …………………………………………………………………....10

17 C.F.R. §240.10b-5 ………………………………………………………………...10

Fed. R. Civ. P. 15(a)(2) …………………………………………………………………13

Fed. R. Ev. 1002 …………………………………………………………………………7

I.

RECENTLY DISCOVERED
DOCUMENTS SHOW THE
CHARLESBANK DEFENDANTS'
INVOLVMENT AND  DEFENDANTS'
SCIENTER IN RESCINDING PLAINTIFF'S
PURCHASE OF GSI HOLDINGS SHARES.

In discovery, Plaintiff has begun to learn additional facts to support his case.

Whereas previously "[t]he Complaint [was] silent concerning the reasons leading to the

Second Amendment…" (Mem. of Law in Support of the Charlesbank Def.s' Motion to Dismiss,

(Mar. 28, 2009) ("Charlesbank Def.s' Mem. Mot. to Dismiss"), n. 2 at 6), we now have

discovered the February 17, 2007 email of Defendant GSI Holding's chief financial officer John

Henderson requesting a "follow up audit" of the Brazilian subsidiary Agromarau because, as part

of GSI Holdings' purchase of Plaintiff's 15% minority interest in Agromarau, Henderson had

"become aware of several related-party transactions" between Agromarau and companies in

which Henderson believed Plaintiff had an interest.  (GSI04746 under Tab 4 to Plaintiff's Mem.

of Law in Support of His Motion for Relief from Judgment, Reconsideration and Leave to

Amend and Supplement His Complaint (August 6, 2008) ("Pl. Mem. For Relief")).

Whereas, prior to discovery, the Complaint pleaded that Defendant Branch failed to

respond to Plaintiff's emails and phone calls from February through April 2007 inquiring as to

the whereabouts of his stock certificate and the signed Stock Purchase and Management Equity

Agreement ("Stock Purchase Agreement", Complaint ¶ 28), and the Court inferred from

Branch's failure to respond that he may have been simply "too busy to respond" (Mem. and

Order filed Aug. 1, 2008 at 12), we now know that, far from being too busy to focus on

Plaintiff's shareholdings, Defendant Branch and others on behalf of GSI Holdings and the

Charlesbank Defendants spoke and corresponded on at least 25 occasions during the seven-week

- 1 -

period form March 12, 2007 to May 4, 2007 about the related-party transactions, the audit, Plaintiff's shares, the preparation of the Second Amendment to the Separation Agreement rescinding Plaintiff's share purchase and planning for negotiations with Plaintiff over the Second Amendment. (Pl. Mem. for Relief, Tab 5).  They were not too busy for Plaintiff; they were consumed with him.[1]  Branch dodged Plaintiff's inquiries while they decided what to do.

There is strong evidence that the professed concern over related-party transactions was a pretext to withhold Plaintiff's shares.  The GSI Group, a wholly-owned subsidiary of Defendant GSI Holdings Corp., filed a prospectus with the United States Securities and Exchange Commission on February 3, 2006 (Tab A), a year before Henderson's email and five months before Plaintiff announced his intention to resign which led to the negotiations to purchase his minority interest in Agromarau during which the related-party transactions were allegedly discovered.  The February 2006 prospectus explicitly discloses the related-party transactions with companies owned by Plaintiff's family:

> We conduct transactions in the ordinary course of business with companies owned by the Segatt family, one of whom is a current employee of our subsidiary in Brazil. Such transactions generally consist of purchases of materials, freight payments and commissions that amounted to $925,768, $564,362 and $538,388 for 2004, 2003 and 2002, respectively, and sales of poultry equipment that amounted to $296,681, $99,815 and $63,225 for 2004, 2003 and 2002, respectively.

> • • •

> We believe that the above described transactions were, and future transactions with the Segatt family, … will be, on terms no less favorable to us

---

[1] Previously, Plaintiff pointed out that Defendants spoke and corresponded on at least 14 occasions between March 30, 2007 and May 4, 2007 about what to do about his shares and to prepare the Second Amendment that rescinded his share purchase. (Pl. Mem. for Relief at 5, Tab 5).  Defendants have linked the rescission to their alleged discovery of related-party transactions and the audit requested in February 2007.  Accordingly, the 25 conferences beginning on March 12, 2007 may be viewed as related to the rescission of Plaintiff's share purchase.

than could have been obtained from an independent third party in arm's length transactions.

(Tab A at 71-72).

A further indication that the alleged discovery of related-party transactions was an ill-considered subterfuge to rescind Plaintiff's share purchase is that Plaintiff's Non-Competition and Consulting Agreement (Pl. Mem. for Relief, Tab 11) that was supposedly "violated" by the related-party transactions (Charlesbank Def.s' Mot. to Dismiss, n. 2 at 6) was not signed until November 13, 2006 (Pl. Mem. for Relief, Tab 11) and, therefore, did not exist at the time of Defendant's alleged discovery of related-party transactions during the negotiations with Plaintiff from July to November, 2006.

Nevertheless, Defendants contend that their discovery of related-party transactions violated the Non-Competition and Consulting Agreement and led to 25 conferences and their decision to rescind his share purchase. Further discovery should reveal whether the related-party transactions and purported breach of the Non-Competition and Consulting Agreement were part of a subterfuge. However, what is now clear is that Defendants did not stand on their supposed rights under the Non-Competition and Consulting Agreement, but pressured Plaintiff into giving up his shares by threatening to cut off business with certain of his companies, concealing from him that they were then engaged in selling GSI Holdings, that they had already received bids ranging from approximately $500 to $800 per share (Pl. Mem. for Relief, n.1 at 5, Tab 7), and that they were proceeding with another round of bids (Pl. Mem. for Relief, Tab 8). What they told him instead were lies to make it seem that the share purchase had never been completed; that his shares had not been issued and that his money had been held in a segregated account. In fact, the shares had been issued (Pl. Mem. for Relief, Tabs 2, 3) and there was no segregated account (Tab B, Response No. 16 at 15).

- 3 -

When Ingo Erhardt reported to Defendant Branch that he had accomplished his mission ("I believe you should have a wonderful weekend, since I am bringing with me [to Illinois] the signed contract [Second Amendment] with [Plaintiff] Leo,"), Defendant Branch gushed :

> You are my hero! I plan to buy you the best fried pork cutlet sandwich Assumption [Illinois] has to offer.

(Tab C, GSI 0339-40).

The law is clear that a party may not engage in self-help by violating the rights of its adversary rather than relying exclusively on its legal remedies. *MacQuesten General Contracting, Inc. v. HCE, Inc.*, 296 F.Supp.2d 437, 447 (S.D.N.Y. 2003) (awarding exemplary damages for such self-help).

This Court applied that rule in *United States v. Lauersen*, No. 98 Cr. 1134 (WHP), 1999 WL 637237 (S.D.N.Y. Aug. 20, 1999), rejecting the so-called "claim-of-right" defense for mail fraud and health care fraud. Defendants falsified the description of the services they rendered in order to obtain insurance coverage reimbursements to which they claimed they would have been entitled anyway, i.e., even if they had accurately described their services.

> "If...self-help were the law, anyone who believed he was legally entitled to benefits..., but who was concerned that he or she might nevertheless be denied such benefits, would be given carte blanche simply to lie to obtain those benefits. Such a course of action would often be much easier than pursuing legal remedies through civil actions in court, and would guarantee success as long as the misrepresentation remained undiscovered. We will not encourage people to lie to obtain benefits rather than pursue their rights in civil actions. Such controversies may be resolved by civil suit or settlement, but cannot be won by using lies and deception."

*Id.* at *4, *quoting*, *United States v. Gole*, 158, F.3d 166, 168 (2d Cir 1998), *cert denied*, 526 U.S. 1078 (1999). In language that applies with equal force to this case, this Court held in *Lauersen* that when one is misled

> and thereby deprive[d] … from determining for [oneself] the merit
> of the claim based on truthful representations, … [he] has been
> defrauded.

*Lauersen*, 1999 WL 637237 at *5.

Defendants GSI Holdings and Branch argue that Defendants could not possibly have tried to defraud Plaintiff out of $1.7 million in a $400 million sale of the company because the $1.7 million amount is too small. Their argument proves too much. If the amount was insignificant, then why not pay it? Clearly it was significant enough to correspond and confer on at least 25 separate occasions leading up to the rescission of Plaintiff's stock purchase. Defendants decided to prevent Plaintiff from profiting on the sale of GSI Holdings shares for which he had traded in part his 15% interest in Agromarau.

Defendants GSI Holdings and Branch argue that the rescission of Plaintiff's GSI Holdings share purchase was unrelated to GSI Holdings repurchase of Plaintiff's 15% interest in Agromarau. They claim that the repurchase of Plaintiff's 15% interest in Agromarau was pursuant to a formula prescribed in a 2002 Affirmative Pledge of Assignment of Quotas and Other Provisions ("Pledge", a copy of which is attached under Tab D). That is plainly wrong. The Pledge provides that if Plaintiff elects to leave Agromarau, he will transfer his 15% interest to The GSI Group, Inc., a wholly owned subsidiary of Defendant GSI Holdings, at "book value," hardly a formulaic fixed amount. (Tab D, sec. 10 at 4). In the Separation Agreement (Complaint, Ex. A), the parties referred to the requirement that Plaintiff transfer his interest in Agromarau pursuant to Section 10 of the "Outstanding Agreement" (the Pledge), but then agreed that "the provisions of this [Separation] Agreement will, in some respects, amend the Outstanding Agreement." (Complaint, Ex. A at 2). And so it did. Instead of reacquiring at book value all of Plaintiff's 15% interest represented by his 2,005,868 "quotas" or shares in

Agromarau, the parties agreed through negotiation to value 1,344,143 quotas at R$1,344,143 (Brazilian Reals) and to value the remaining 661,772 quotas that would be exchanged for 3,072 shares of GSI Holdings at a different amount, R$ 1 million (Brazilian Reals). (Complaint, Ex. A, 2d "WHEREAS" cl. at 2, secs. 3, 5 at 3).

The value of Plaintiff's quotas in Agromarau was only one element of the parties' negotiation. Two other related elements were the value the GSI Holdings shares (Plaintiff wanted a value of $100 or $115; Defendants wanted and won a value of $150), and the amount Plaintiff would be paid in consulting fees. Copies of emails reflecting these negotiations are attached under Tab E.

In short, Defendants did not reacquire Plaintiff's 15% interest in Agromarau at a prescribed formula. It was a negotiation that lasted five months, from July to November 2006. And from the outset, before any values were agreed upon, Defendants held out to Plaintiff the "investment opportunity" for him to purchase GSI Holdings shares in connection with their "proposal to you about buying your stock [i.e., quotas]…." (Tab E, LS0374).

Although this Court held, "There are no specific allegations in the Complaint that the Charlesbank Defendants were involved in the rescission of Segatt's shares, " (Mem. and Order at 9), the recently discovered evidence shows their involvement. Nevertheless, the Charlesbank Defendants continue to deny that they were involved. They suggest that the request for legal advice from their lawyers at Covington & Burling on April 17, 2007 and on May 4, 2007 as reflected on the privilege log (Pl. Mem. for Relief, Tab 5) may have been only about "employment law." (The Charlesbank Defendants' Mem. of Law in Opposition to Plaintiff's Motion for Relief from Judgment, Reconsideration and Leave to Amend at 5 (August 20, 2008) ("Charlesbank Def.s' Mem. Opp. Relief") at 7).

There are two problems with this. First, it is fundamental that a party may not selectively suggest for its own benefit the content of a document, but withhold the document from its adversary and the Court on a claim of privilege. That violates the best evidence rule (Fed. R. Ev. 1002) and waives the claim of privilege.[2] Second, the privilege log entry does not indicate employment law advice as the subject of the communications. The sole subject of the May 4, 2007 communication is "L. Segatt's rescission of stock purchase agreement," and the sole subject of the April 17, 2007 communication is "draft of Second Amendment to Separation Agreement." The Second Amendment to the Separation Agreement deals only with rescission of Plaintiff's stock purchase.

The Charlesbank Defendants also argue that its general counsel was not acting in connection with the rescission of Plaintiff's stock purchase when she sent his share certificate to DTC to be "held in escrow" (Pl. Mem. for Relief, Tab 3), rather than delivering the certificate to Plaintiff as required by section 2.2 of the Stock Purchase and Management Equity Agreement (Complaint, Ex. C). They claim that she was merely acting in accordance with the escrow provision in Section 5.2(b) of the Stock Purchase Agreement, which permits Defendant GSI

---

[2] "[I]mplied waiver may be found where the privilege holder asserts a claim that *in fairness* requires examination of protected communications…. In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party. *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) (citations omitted; emphasis in original). Indeed, the documents in question may not be privileged at all. *Sieger v. Zak*, 18 Misc. 3d 1143 (A), 859 N.Y.S. 2d 899 (Sup. Ct. Nassau Co. 2008) (where "there is probable cause to believe that [defendant majority shareholder] breached his duty of fair dealing by withholding critical information from plaintiffs concerning the value of their … stock" in connection with purchasing their shares and reselling them together with his own shares to a third-party for a much higher price, all communications leading up to and relating to the stock purchase agreement with plaintiff must be produced, including communications with counsel and counsel's drafts, comments and edits concerning the stock purchase agreement).

Holdings to hold the stock certificate in escrow in order to "effectively" exercise its repurchase rights under section 5.2(a) in the event that Plaintiff "ceases to serve as a consultant." (*Id.*).

This belated argument is an odds with Defendant GSI Holdings representation at the time of the merger.    In Section 3.3(d) of the Disclosure Schedule to the Agreement and Plan of Merger (Complaint, Ex. F), which was produced in discovery and a copy of which is attached as Tab F, Defendants GSI Holdings represented that "no shares were ever issued" to Plaintiff. (Tab F, CB000353).

Worse, the argument is grossly misleading to the Court.    The fact is that, without exception, every other GSI Holdings shareholder retained custody of his/her/its stock certificate. In connection with the sale of GSI Holdings to Centerbridge, each shareholder was notified that he/she/it would receive a Letter of Transmittal for surrendering his/her/its shares.   (Complaint, Ex. G at 5).   In fact, such Letters of Transmittal were sent to each shareholder (Tab G), including all former executives like Plaintiff.    (The addressees on the Letters of Transmittal (Tab G) include "Christman, Montgomery and Zabik" who, along with Plaintiff, are identified as "Former Senior executives" in the second "Note" on the list of shareholders under Tab 10 to Pl. Mem. for Relief).    The only executive whose share certificate was held in escrow is Plaintiff. [3]

Tellingly, Plaintiff's Stock Purchase Agreement that contains the escrow provision and that was signed by him on December 13, 2006 (Complaint, ¶24) and by Defendants on or about December 28, 2006 (Tab I) was drafted on or about December 5, 2006 (Tab J), *after* the parties

---

[3] Defendants have produced in discovery thus far Stock Purchase and Management Equity Agreements with only two other executives, Richard Christman and Ann Montgomery, both identified, as is Plaintiff, as "Former Senior executives." (Pl. Mem. for Relief, Tab 10, second "Note").  Both such agreements (Tab H) provide, as does the agreement with Plaintiff, that their shares are subject to Defendant GSI Holdings' repurchase rights (Tab H at CB058284-85 and CB060004-06 (amended at CB061592-93), respectively).   However, neither Christman's nor Montgomery's agreement provides for Defendant GSI Holdings to hold their shares in escrow.

executed Plaintiff's Separation Agreement in November, 2006.   (Complaint, Ex. A). The Separation Agreement was the culmination of the negotiations that had begun in July 2006 over the valuation and repurchase of Plaintiff's 15% interest in Agromarau, the valuation of the 3,072 GSI Holdings shares he would purchase and the amount of consulting fees he would be paid.  It was during those negotiations that John Henderson claims to have become concerned about related-party transactions between Agromarau and companies in which Plaintiff was believed to have an interest.  In other words, the escrow was drafted *after* those concerns arose, the very concerns that Defendants claim caused them to rescind Plaintiff's purchase of the GSI Holdings shares.

Obviously, Plaintiff did not understand that his share certificate would be held in escrow. He repeatedly asked for it (Complaint, ¶28).  Defendants never once informed him that the certificate was being held in escrow.  Defendant Branch dodged his inquiries as Defendants conferred 25 times about what to do with Plaintiff and his shares.

The Charlesbank Defendants ask this court to infer that the escrow was simply business as usual.   In fact, it was unique.  It protected them pending their rescission of Plaintiff's share purchase, and laid the groundwork for their deception that the stock purchase transaction had not been completed, that the shares had not been issued and that Plaintiff's money was being held in a segregated account.  (Complaint, ¶30).  This is what Defendants concocted to tell Plaintiff because they would not tell him the truth:  that the Charlesbank Defendants were proceeding with plans to sell GSI Holdings, that they already had received bids in the range of $500 to $800 per share and that they and other shareholders would profit from the sale, but Plaintiff would not. Their profits "were concrete benefits that could be realized by concealing information relating to the sale of the company while rescinding Segatt's purchase of shares." Mem. and Order at 13.

This was the rough justice Defendants meted out.  They submit that because of Plaintiff's supposed breach of his Non-Competition and Consulting Agreement, they could deny him the profit (the so-called "investment opportunity") on the GSI Holdings shares for which he had traded his Agromarau quotas.

That is the explanation of the Charlesbank Defendants' own counsel (Charlesbank Def.s' Mem. Mot. To Dismiss, n. 2 at 6) who protests his clients' involvement and seeks to shelter them behind *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 128 S. Ct. 761 (2008). But *Stoneridge* is irrelevant.  It involved the liability not of the issuer, its executives or majority shareholder, but of "two other defendants, … suppliers, and later customers," of the issuer (*Stoneridge*, 128 S. Ct. at 766), who "had no duty to disclose." (*Id.* At 769).  The Charlesbank Defendants argue that *Stoneridge* requires proof of Plaintiff's reliance on misrepresentations they made directly to him.  Wrong.   The defendant suppliers and later customers who aided and abetted the securities fraud in *Stoneridge* had no duty to disclose; and their deceptive acts were not communicated to the public.  *Stoneridge*, 128 S. Ct. at 769.  Therefore, they had no liability under section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b)) or Rule 10b-5 (17 C.F.R. §240.10b-5) thereunder.   However, in so-holding, the court reaffirmed its decision thirty-six years ago in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), that "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge*, 128 S. Ct. at 769, citing *Affiliated Ute*, 485 U.S. at 153-54.

This is not an action against secondary aiders and abettors, but against primary defendants who had a clear duty to disclose.  The Charlesbank Defendants had a three-fold duty under federal securities law, under Delaware law and under the Stock Purchase Agreement.

- 10 -

Under federal securities law, "[w]hen a closely held corporation purchases its own stock from shareholders, there is a 'special obligation to disclose to sellers all material information.'" Mem. and Order at 7, *quoting Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 at 179 (2d Cir. 2001).    Under Delaware law, "[w]hen dealing with the company's property, a majority shareholder occupies a fiduciary relationship to a minority shareholder." Mem. and Order at 15, *citing Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109-10 (Del. 1952).    Under the Stock Purchase Agreement, if the Charlesbank Defendants "propose[d] to enter into a transaction" to transfer more than 50% of their shares, they were required to give Plaintiff written notice "of such proposed Transfer" (Complaint, Ex. C, §5.5 at 12) so that Plaintiff could exercise his so-called "tag-along" rights to participate in the transaction.    The Charlesbank Defendants' obligation to give notice arises before they become contractually bound to the transaction, *i.e.*, before they execute a merger agreement or other sale document.  They must give notice if they "propose" to enter into a transaction to sell.  Clearly, as of May 4, 2007, they proposed to sell GSI Holdings.   By then, they had been working with UBS Securities LLC for six months to sell the company, they had structured the transaction as a merger and had a draft merger agreement, they had arranged a staged auction, had received bids ranging from approximately $500 to $800 per share and were proceeding with a second round of bidding.   Even if the transaction ultimately were not done, clearly as of May 4, 2007, they proposed to sell.  But they did not tell Plaintiff.

The Charlesbank Defendants' protest of involvement in the rescission of Plaintiff's share purchase is belied by their recently discovered indemnity.  They agreed to indemnify[4] the

---

[4] The indemnity reduces the amount of "Contingent Consideration" (Complaint, ¶52(d) and Ex. F, §2.8 at 11-13) that the Charlesbank Defendants, Defendant Branch and other GSI Holdings

Centerbridge purchaser of GSI Holdings against any claim "arising out of or related to the entry into, or subsequent amendment or termination of, the Stock Purchase and Management Equity Agreement dated as of December 28, 2006 between the Company and Leonardo Segatt." (Tab K at CB005075-76).    The Charlesbank Defendants gave no indemnity for pending lawsuits and other asserted claims against GSI Holdings. (Tab L).    At the time they agreed to indemnify claims arising from the rescission of Plaintiff's share purchase, Plaintiff had not asserted a claim. It would be peculiar indeed for one to indemnify claims arising from a transaction with which one had no involvement.

The inference of Defendants' culpability is at least as strong, "at least as compelling as [the] opposing inference" of business as usual that Defendants ask the Court to draw from the facts.  Mem. and Order at 9, quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).  That is the standard: "at least a compelling"; not "ineluctable", not even "more compelling", but simply "as compelling".    Whether a culpable inference is more compelling is for discovery to develop and a trial to determine. But the facts discovered so far clearly make the inference of Defendants' culpability at least strong as the innocent business-as-usual inference that Defendants urge the Court to draw.

shareholders and optionholders would receive in the event of a claim by Plaintiff exceeding $500,000 (Tab K).

II.

A FORM OF AMENDED
AND SUPPLEMENTAL PLEADING
SHOULD NOT BE NECESSARY,
BUT ONE IS SUBMITTED.

The Charlesbank Defendants raise a procedural objection to this motion: a form of amended pleading was not filed.

The applicable federal rule of civil procedure provides: "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The same standard applies to motions to supplement a pleading. *Kurzweil v. Philip Morris Companies, Inc.*, Nos. 94 Civ. 2373, 2546 (MBM), 1997 WL 167043 *10 (S.D.N.Y. Apr. 9, 1997).

There is no federal rule nor any local rule of this Court that explicitly requires the filing of a proposed amended or supplemental pleading.

In the main case on which the Charlesbank Defendants rely, *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 2589482 (S.D.N.Y. Sept. 7, 2007), the court denied plaintiff's motion to amend their complaint because they not only did not file a proposed amended complaint, but also "failed to provide this Court or defendants ... any indication as to what information or allegations they would add to their complaint." 2007 WL 2589482 at *4. Similarly, in *Zito v. Leasecomm Corp.,* No. 02 Civ. 8074 (GEL), 2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004), the court denied, but only in part, plaintiffs' motion to amend their complaint because not only did they not file a proposed amended pleading, but their motion papers "have done precious little to clarify the scope of the proposed amendments." *Zito*, 2004 WL 2211650 at *25. In *Nat'l Fire & Marine Ins. Co. v. R.R. Resource & Recovery, Inc.*, No. 93 Civ. 6379(RLC), 1994 WL 606049 (S.D.N.Y. Nov. 3, 1994), the court denied a defendant's motion to

amend its answer because it not only did not offer a proposed amended answer, but also failed to state the additional facts supporting its motion and failed to file a supporting memorandum of law required by then Local Civil Rule 3(c). *Nat'l Fire and Marine Ins. Co., 1994 WL 606049 at *1*. *Deluca v. Smithkline Beecham Corp.*, No. 06 Civ. 2153 (NRB), 2007 WL 541656 (S.D.N.Y. Feb. 20, 2007), and *McKinnon v. Hermes of Paris, Inc.*, No. 06 Civ. 1001 (NRB), 2007 WL 1098707 (S.D.N.Y. Apr. 10, 2007), also cited by the Charlesbank Defendants, involved no formal written motion to amend or supplement a pleading, but requests to amend made informally. The court noted in each case that a motion to amend "*generally* requires a movant to supply a copy of the proposed amendment." *DeLuca*, 2007 WL 541656, at *3 n. 6; *McKinnon*, 2007 WL 1098707 at *4 n.5 (emphasis added).

In this case, the additional documented facts are provided and the inferences that may be drawn from them are clearly explained. One need not have supernatural powers to "divine the exact changes Plaintiff might make to his complaint...." ("Charlesbank Def.s' Mem. Opp. Relief at 5). Even the most common lawyer of ordinary ability need only read Plaintiff's motion to understand what additional facts are to be pleaded.

Nevertheless, to avoid procedural wrangling, Plaintiff is filing the accompanying Proposed Amended and Supplemental Complaint, clearly marked to show the changes from the original complaint. *Fei v. WESTLB AG*, No. 07 Civ. 8785 (HB), 2008 WL 594768 (S.D.N.Y. Mar. 5, 2008); *Christiana Gen. Ins. Corp. of N.Y. v. Great American Ins. Co.*, 745 F. Supp. 150

(S.D.N.Y. 1990) (both cases granting motions to amend complaints when the proposed amended pleadings were filed and served after the motions were made). *Accord, Smith v. Planas*, 151 F.R.D. 547 (S.D.N.Y. 1993) (plaintiff's motion to amend complaint held in abeyance pending the filing of proposed amended complaint).

<u>CONCLUSION</u>

For the reasons stated above and in Plaintiff's earlier memorandum, this Court should set aside or vacate the Judgment entered on August 4, 2008, grant reconsideration of its Memorandum and Order entered on August 1, 2008 and permit Plaintiff to amend and supplement his Complaint.

Dated: New York, New York
      September 5, 2008

LAW OFFICES OF MARK P. ZIMMETT

By:_____
        Mark P. Zimmett (MZ 8735)

Attorneys for Plaintiff
126 East 56th Street
New York, New York 10022
(212) 755-0808

**TAB A**

424B3 1 d424b3.htm PROSPECTUS

**Table of Contents**

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-127529

**PROSPECTUS**

## T H E   G S I   G R O U P



### OFFER TO EXCHANGE

**$110,000,000 12% Senior Notes due 2013 that have been registered under the Securities Act of 1933 for any and all outstanding unregistered 12% Senior Notes due 2013.**

We are offering to exchange $110,000,000 in aggregate principal amount of our 12% Senior Notes due 2013, which we refer to as the exchange notes, for any and all outstanding unregistered 12% Senior Notes due 2013, which we refer to as the original notes. We refer to the exchange notes and the original notes that remain outstanding following the exchange offer as the notes. The terms of the exchange notes will be identical in all material respects to the respective terms of the original notes except that the exchange notes will be registered under the Securities Act of 1933 and, therefore, the transfer restrictions applicable to the original notes will not be applicable to the exchange notes.

- Our offer to exchange original notes for exchange notes will be open until 5:00 p.m., New York City time, on Monday, March 6, 2006, unless we extend the offer.

- We will exchange all outstanding original notes that are validly tendered and not validly withdrawn prior to the expiration date of the exchange offer. You should carefully review the procedures for tendering the original notes beginning on page 76 of this prospectus.

- If you fail to tender your original notes, you will continue to hold unregistered securities and your ability to transfer them could be adversely affected.

- The exchange of original notes for exchange notes pursuant to the exchange offer generally will not be a taxable event for U.S. federal income tax purposes.

- We will not receive any proceeds from the exchange offer.

- No public market currently exists for the outstanding notes or the exchange notes. We do not intend to list the exchange notes on any national securities exchange or the Nasdaq Stock Market.

- Each broker-dealer that receives exchange notes for its own account pursuant to the exchange offer must acknowledge that it will deliver a prospectus in connection with any resale of such exchange notes. The letter of transmittal to be used in connection with the exchange offer states that by so acknowledging and by delivering a prospectus, a broker-dealer will not be deemed to admit that it is an "underwriter" within the meaning of the Securities Act. This prospectus, as it may be amended or supplemented from time to time, may be used by a broker-dealer in connection with resales of exchange notes received in exchange for original notes where such original notes were acquired by such broker-dealer as a result of market-making activities or other trading activities. We have agreed that, for a period of one year after the consummation of the exchange offer, we will make this prospectus available to any broker-dealer for use in connection with any such resale. See "Plan of Distribution" starting on page 73 of this prospectus.

**Investing in the exchange notes involves risks. See " Risk Factors" beginning on page 17 of this prospectus.**

**We are not asking you for a proxy in connection with the exchange offer and you are requested not to send us a proxy.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

**THE DATE OF THIS PROSPECTUS IS FEBRUARY 3, 2006.**

# TABLE OF CONTENTS

|  | Page |
|---|---|
| MARKET AND INDUSTRY DATA | 1 |
| FORWARD-LOOKING INFORMATION—SAFE HARBOR STATEMENT | 1 |
| ADDITIONAL INFORMATION | 1 |
| SUMMARY | 2 |
| RISK FACTORS | 17 |
| USE OF PROCEEDS | 27 |
| CONSOLIDATED RATIO OF EARNINGS TO FIXED CHARGES | 27 |
| UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL DATA | 28 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA | 35 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 38 |
| QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 55 |
| BUSINESS | 56 |
| PROPERTIES | 64 |
| LEGAL PROCEEDINGS | 64 |
| MANAGEMENT | 65 |
| EXECUTIVE COMPENSATION | 67 |
| PRINCIPAL STOCKHOLDERS | 69 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 70 |
| PLAN OF DISTRIBUTION | 73 |
| THE EXCHANGE OFFER | 74 |
| DESCRIPTION OF EXCHANGE NOTES | 85 |
| DESCRIPTION OF OTHER INDEBTEDNESS | 126 |
| MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES | 128 |
| LEGAL MATTERS | 128 |
| EXPERTS | 128 |
| AVAILABLE INFORMATION | 128 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

We have not authorized any dealer, salesperson or other person to give any information or to make any representation other than that which is contained in this prospectus. You must not rely upon any information or representation not contained in this prospectus as if we had authorized it. This prospectus does not constitute an offer to sell or solicitation of an offer to buy securities in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction.

Table of Contents

## MARKET AND INDUSTRY DATA

Industry and market data included in this prospectus were obtained from our own research, studies conducted by third parties and industry and general publications published by third parties and, in some cases, are management estimates based on industry and other knowledge. We do not make any representations as to the accuracy of such information. While we believe internal company estimates are reliable and market definitions are appropriate, they have not been verified by any independent sources, and we do not make any representations as to the accuracy of such estimates. We have included industry and market data from the United States Department of Agriculture's (USDA's) Baseline Projections to 2014 report, dated February 2005, which we refer to in this prospectus as the "2005 USDA Report." References in this prospectus to the USDA such as "according to the USDA" refer to information in the 2005 USDA Report and other data published by the USDA.

## FORWARD-LOOKING INFORMATION—SAFE HARBOR STATEMENT

All statements other than statements of historical facts or current facts included in this prospectus, including, without limitation, statements regarding our future financial position, business strategy, budgets, projected costs and plans and objectives of management for future operations, are forward-looking statements. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "intend," "estimate," "anticipate," "believe" or "continue" or the negative thereof or variations thereon or similar terminology. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from our expectations, or cautionary statements, are disclosed under "Risk Factors" and elsewhere in this prospectus, including, without limitation, in conjunction with the forward-looking statements included in this prospectus.

We urge you to review carefully the section "Risk Factors" beginning on page 17 of this prospectus for a more complete discussion of the risks of investing in the notes. All subsequent written and oral forward-looking statements attributable to us, or persons acting on any of our behalf, are expressly qualified in their entirety by the cautionary statements.

## ADDITIONAL INFORMATION

We are obligated by the indenture governing the notes to file annual, quarterly and current reports and other information with the SEC. See "Available Information." You may request a copy of these documents at no cost by writing or calling us at The GSI Group, Inc., 1004 E. Illinois Street, Assumption, Illinois 62510, Attention: Vice President of Finance, Phone: (217) 226-4421. Our SEC filings are also available to the public from the SEC's web site at www.sec.gov.

1

Table of Contents

## SUMMARY

*The following summary contains basic information about this offering. It may not contain all of the information that is important to you and it is qualified in its entirety by the more detailed information included in this prospectus. You should carefully consider the information contained in the entire prospectus, including the information set forth under the heading "Risk Factors" in this prospectus. In addition, certain statements include forward-looking information that involves risks and uncertainties. See "Forward-looking Information — Safe Harbor Statement."*

*In this prospectus, "GSI," "The GSI Group," "the Company," "we," "us," and "our" refer to The GSI Group, Inc. and its consolidated subsidiaries, except as otherwise indicated.*

### The Company

We are a major worldwide manufacturer of agricultural equipment. We believe that we are the largest global manufacturer of both (i) grain storage bins and related conditioning and handling systems and (ii) swine feed storage and delivery, ventilation and confinement systems. We are also one of the largest global providers of equipment to the poultry producing industry, providing feed storage and delivery, watering, ventilation and nesting systems. We market our agricultural equipment primarily under our GSI®, DMC™, FFI™, Zimmerman™, AP™ and Cumberland® brand names in approximately 75 countries through a network of over 2,500 independent dealers, with whom we generally have long-term relationships. Our leading market position in the industry reflects both the strong, long-term relationships we have developed with our customers as well as the breadth, quality and reliability of our products. For the fiscal year ended December 31, 2004, as restated, we generated sales of $288.1 million. For the three and the nine months ended September 30, 2005, we generated sales of $107.7 million and $270.5 million, respectively.

The following table summarizes the key attributes of each of our product lines:

| | Grain Product Line | Swine Product Line | Poultry Product Line |
|---|---|---|---|
| **2004 Sales(1)** | $177.6 million (62% of total sales) | $46.8 million (16% of total sales) | $64.3 million (22% of total sales) |
| **Q3 2005 Sales** | $64.1 million (59% of total sales) | $20.2 million (19% of total sales) | $23.4 million (22% of total sales) |
| **Nine Months 2005 Sales** | $160.3 million (59% of total sales) | $50.4 million (19% of total sales) | $59.8 million (22% of total sales) |
| **• Product Categories** <br> – Product Classes | • Grain Storage Bins <br> • Grain Conditioning Equipment <br> – Fans <br> – Heaters <br> – Dryers <br> • Grain Handling Equipment <br> – Elevators <br> – Conveyors <br> – Augers | • Feed Storage and Delivery Systems <br> – Augers <br> – Storage Tanks <br> – Dispensers <br> • Ventilation Systems <br> – Fans <br> – Heaters <br> – Cooling Systems <br> • Confinement Systems and Other <br> – Slated Flooring <br> – Water Devices <br> – Environmental Monitors | • Feed Storage and Delivery Systems <br> – Feed Storage Bins <br> – Conveyance Systems <br> – HI-LO® Pan Feeder <br> • Watering Systems <br> • Ventilation Systems <br> – Fans <br> – Evaporative Cooling Systems <br> – Heating Systems <br> – Automated Controls <br> • Nesting Systems |
| **• Select Brands** | • GSI® <br> • DMC™ <br> • FFI™ <br> • Zimmerman™ | • AP™ <br> • Airstream® | • Cumberland® <br> • Airstream® |
| **• Distribution Network** | • Approximately 2,000 Dealers | • Approximately 350 Dealers | • Approximately 150 Dealers |

(1) Includes sales from discontinued operations of $0.6 million.

2

Table of Contents

Through our distribution network of independent dealers, we market and sell a broad range of fully integrated grain storage, conditioning and handling products to farm operators and commercial businesses, such as the Archer-Daniels-Midland Company and Cargill, Inc. The end users of our equipment operate grain farms, feed mills, grain elevators, port storage facilities and commercial grain processing facilities. We believe that our grain storage, conditioning and handling equipment is superior to that of our principal competitors based on strength, durability, reliability, design efficiency and breadth of product offering.

We market and sell our feeding and ventilation systems to swine and poultry growers, who purchase equipment through our distribution network of independent dealers. We also market our products to large integrators, such as Pilgrim's Pride Corporation, Tyson Foods, Inc. and Smithfield Foods, Inc., who purchase swine and poultry from growers pursuant to contracts that specify which particular agricultural equipment is used in the growing process. We believe that our swine and poultry systems are the most effective in the industry in minimizing the feed-to-meat ratio, a key measure of operational efficiency. We also believe that our swine and poultry systems are superior to those of our principal competitors due to our proprietary, patented designs and our broad range of fully integrated products and systems.

On April 6, 2005, our stockholders entered into an agreement to sell all of the issued and outstanding shares of our common stock to GSI Holdings Corp. ("GSI Holdings"). On May 16, 2005, that transaction closed, concurrently with the closing of the offering for the original notes. The exchange offer is being consummated to satisfy our obligations under the registration rights agreement that we entered into when the original notes were sold in transactions exempt from the registration requirements of the Securities Act.

### Competitive Strengths

We believe that our competitive strengths include the following:

- *Leading Market Positions.* We believe that we are the largest global manufacturer of both (i) grain storage bins and related conditioning and handling systems and (ii) swine feed storage and delivery, ventilation and confinement systems. We are also one of the largest global manufacturers of equipment for the poultry producing industry, providing feed storage and delivery, watering, ventilation and nesting systems. We believe that we have achieved our leading market positions due to the breadth, quality and reliability of our products, our commitment to customer service and the effectiveness of our distribution network of independent dealers.

- *Provider of Fully Integrated Systems with Strong Brand Name Recognition.* We offer a broad range of integrated products and systems that permits customers to purchase all of their grain, swine and poultry production equipment needs through our distribution network of independent dealers. Through our manufacturing expertise and experience, our GSI®, DMC™, FFI™, Zimmerman™, AP™ and Cumberland® brand names have achieved strong recognition in our markets. We design our fully integrated systems to help our end-user customers achieve operational efficiencies and maximize operating results by lowering their total production costs and enhancing their productivity. We also believe that our dealers benefit from purchasing fully integrated systems due to our strong after-market support for our end-user customers, lower administrative and shipping costs and the efficiencies our dealers gain from dealing with a single supplier.

- *Effective Global Distribution Network.* We believe that we have developed a highly effective global distribution network consisting of over 2,500 independent dealers that market our products in approximately 75 countries. To ensure a high level of customer service, we carefully select and train our dealers. This approach to dealer selection and training has helped us to maintain a very low turnover rate within our dealer network, thereby providing our end-user customers with consistent and stable equipment and system supply. As a result, over the last three fiscal years, no domestic dealer representing sales to us in excess of $1 million per year has discontinued sales of any of our principal

3

Table of Contents

products in favor of those of a competitor. Our distribution network is also the principal supplier of repair parts to the end users of our products, which enables us to maintain strong ongoing relationships with our end-user customers and dealers. These relationships often result in long-term brand loyalty to our products on the part of end-user customers and create a steady base of recurring revenues for us.

- *Highly Diversified Revenue Base.* We are well diversified by product line, geography and customer base. We sell our products to customers in approximately 75 countries through a network of over 2,500 independent dealers. In each of the last three fiscal years, no single customer or product class represented more than 10% of our sales.

**% of 2004 Sales by Product Line**     **% of 2004 Sales by Geographic Region**     **% of 2004 Sales by Customer**





- *Strong Cash Flow Characteristics.* We believe that the combination of our relatively low maintenance capital expenditure requirements and the tax benefit created by the making of a section 338(h)(10) election in connection with the acquisition will enable us to utilize a higher proportion of our operating profits for debt service and investments in growth than would otherwise be the case. For our past two fiscal years, capital expenditures averaged $4.0 million each year, or 1.5% of sales.

- *Experienced Management Team.* We are currently led by a management team with significant experience in the agricultural equipment industry. Our executive management team has an average of 24 years of industry experience, which we believe has helped us to establish strong, credible customer relationships and identify and respond quickly to market opportunities. In addition, following the closing of the acquisition, we added to our management team a Chairman and a Chief Executive Officer with significant senior management experience in capital goods manufacturing companies, and an Interim Chief Financial Officer. In October 2005, certain members of our senior management team and certain other individual investors purchased approximately 10% of the outstanding shares of GSI Holdings' common stock at the same price per share paid to our selling stockholders in the acquisition.

### Business Strategy

We are a major provider of agricultural equipment, and our objective is to continue to pursue profitable growth in our markets. Our business strategy includes the following principal elements:

- *Capitalize on Favorable Market Conditions and Trends.* We intend to capitalize on the strong conditions and attractive market trends that exist in our industry. According to the USDA, from 2003 to 2004 U.S. net farm income increased 24% to $74 billion. We believe this increase will lead to increased domestic demand for our equipment in 2005. In addition, we believe there are several other trends that are driving demand for our grain equipment. As described in more detail below under "—Industry Overview," these trends include (i) conversion of domestic cropland from soybeans to corn which continues to result in an increase in the aggregate volume of bushels produced, (ii) growth in demand for corn driven primarily by an increase in ethanol production in the United States, (iii) growth in

4

Table of Contents

genetically modified grains, which have greater storage and handling needs, (iv) continued increases in domestic corn yields and (v) continuing consolidation of the grain farm sector and the resulting increase in large scale on-farm grain storage. Demand for our products is also being driven by producers' increasing focus on the efficiency of their agricultural equipment and by the increased presence of protein (for example, poultry and pork) in the diets of consumers.

- *Leverage Extensive Global Distribution Network.*    We have developed a highly effective and established global distribution network that provides barriers to entry for competing products and services, and we intend to continue to use our distribution network and strong brand names to deepen our relationships with existing customers as well as to attract new customers. Part of this strategy involves using our distribution network to introduce new products into the market. For example, in 1998 we used our distribution network to introduce our grain handling equipment, including the Grain King™ line of auger products for the movement of grain, which equipment accounted for approximately $30.0 million of our 2004 sales.

- *Capitalize on Growth in International Markets.*    We believe that we have leading positions in key international growth markets for grain and livestock equipment, such as Brazil, China and Eastern Europe. We intend to continue to leverage our worldwide brand name recognition, leading market positions and international distribution network to capture the growing demand for our products that exists in the international marketplace. We also believe that the economic growth occurring in our international markets will result in consumers devoting larger portions of their income to improved and higher-protein diets, stimulating demand for poultry and pork and, in turn, our products.

- *Continue Development of Proprietary Product Innovations.*    Our research and development efforts focus on the development of new and technologically advanced products to respond to customer demands, changes in the marketplace and new technology. We work closely with our customers and utilize our existing technology to improve our existing products and develop new value-added products. For example, our HI-LO® pan feeder has the unique ability to adjust from floor feeding to regulated feed levels, thereby minimizing the feed-to-meat ratio and increasing growers' efficiency. We intend to continue to actively develop product improvements and innovations to more effectively serve our customers.

- *Focus on Improving Profitability and Cash Flow Generation.*    In 2002, we began to implement a lean manufacturing initiative, which was primarily responsible for reducing our labor expense as a percentage of sales between 2002 and 2004. We believe that significant opportunities exist to continue to enhance our profitability and capital efficiency by further applying lean techniques to our manufacturing operations.

### Industry Overview

The industry in which we operate is characterized both domestically and internationally by a few large companies with broad product offerings, such as GSI, CTB, Inc., a Berkshire Hathaway company, and Big Dutchman International GmbH, and numerous small manufacturers of single product lines. Competition is based on product value, reputation, quality, design and price as well as customer service. We believe that our leading brand names, diversified high-quality product lines and strong distribution network enable us to compete effectively.

Demand for agricultural equipment is driven by the overall level of grain, swine and poultry production, the level of net farm income, agricultural real estate values and producers' increasing focus on improving productivity. The USDA projects U.S. net farm income to average $61 billion per year over the next 10 years as compared to an average of $48 billion per year in the 1990s.

5

Table of Contents

Demand for grain equipment is increasing, due in large part to the following factors:

- *Conversion of Domestic Cropland from Soybeans to Corn.*    U.S. farmers are increasingly converting cropland to corn production due to expanded applications for corn and the increased relative profitability of corn production as compared to soybean production. According to the USDA, 2004 corn yields averaged 160 bushels per acre, compared to an average yield of 43 bushels per acre of soybeans. In addition, the harvesting, processing and distribution of corn is more equipment intensive than that of soybeans, due principally to the greater conditioning needs of corn. These factors are driving demand for additional infrastructure for grain storage, conditioning and handling.

- *Increase in Domestic Ethanol Production.*    Ethanol, produced from corn, is used as an additive to gasoline. According to the USDA, corn used in ethanol production grew at a compound annual growth rate of 14% from 1997 to 2004. Approximately 12% of 2004 domestic corn production was devoted to the production of ethanol. The USDA projects that demand for ethanol will continue to increase due to, among other factors, continued strong petroleum prices and regulatory bans on methyl tertiary butyl ether (MTBE) as an alternative fuel oxygenate.

- *Proliferation of Genetically Modified Organisms ("GMOs").*    GMO acceptance among consumers has been growing, as has the breadth of GMO offerings. In order to ensure traceability, genetically modified grains must be separated during storage, transfer and conditioning, which requires that farmers and processors maintain multiple storage units and related conditioning and handling equipment.

- *Long-term Increases in Corn Yields.*    The increase in grain production attributable to advancements in seed and fertilizer engineering requires additional storage and other equipment to keep pace with production. According to the USDA, from 1984 to 2004, domestic corn production increased from 107 bushels per acre to 160 bushels per acre, which we believe resulted, in part, from these engineering changes and other technological advancements.

- *Consolidation of Grain Farm Production.*    According to the USDA, the percentage of total cropland acreage managed by farms with more than $1 million in annual revenue is projected to increase from 12% in 2004 to 26% in 2010. Larger grain farms are more likely to invest in large on-farm storage facilities due to their ability to afford greater capital goods purchases and their need for greater scale economies.

Our sales of swine and poultry equipment historically have been affected by the level of construction of new facilities undertaken by swine and poultry producers, which is affected by feed prices, environmental regulations and domestic and international demand for pork and poultry. Increases in feed and grain prices, which historically have supported sales of our grain equipment and systems, have also historically resulted in a decline in sales of feeding, watering and ventilation systems to swine and poultry producers. Demand for our swine and poultry equipment is also impacted by changes in consumers' dietary habits, as consumers in the U.S. increase their consumption of poultry and pork and as consumers in developing countries devote larger portions of their income to improved and higher protein-based diets.

### Recent Developments

*The Restatements.*    As described in our Current Report on Form 8-K filed with the SEC on July 12, 2005, after the closing of the Acquisition as described below, the Board of Directors and management (including our Chairman and interim CFO) became aware of information indicating possible errors in previously issued financial statements and commenced a review of certain of the Company's accounting policies and practices, including among other things accounting policies and practices relating to the capitalization of overhead into inventory and reserves for slow moving and obsolete inventory. Based on the preliminary results of this review, on July 8, 2005, we, in consultation with our independent auditors, BKD, LLP, determined that our previously

6

**Table of Contents**

issued financial statements for the years ended December 31, 2004, 2003, and 2002 (and the quarterly periods included therein) and the quarter ended April 1, 2005 may have contained certain errors, some or all of which may be material to our previously reported financial results, and that certain adjustments were likely to be required to correct such errors. Accordingly, we warned that the financial statements referred to in the preceding sentence should not be relied upon until such time as we are able to quantify such errors and ascertain those matters, if any, as to which a restatement of our financial statements might be needed.

As described in our Amendment No. 1 to our Annual Report on Form 10-K/A for the fiscal year ended December 31, 2004, filed with the SEC on August 12, 2005, which is incorporated herein by reference, we, in consultation with our independent auditors, BKD, LLP, subsequently determined that it is necessary to make the restatements mentioned above to correct for historical errors in inventory accounting. The identified errors relate to three separate issues:

1) capitalization rates of overhead expense in inventory, which were inconsistent with actual spending;

2) the capitalization of warranty and R&D costs in inventory, which management believes should be expensed in their entirety; and

3) improper application of our policy for establishing reserves for slow moving inventory, which resulted in inadequate historical reserve levels.

We have therefore restated our consolidated financial statements as of December 31, 2004, 2003, 2002, 2001 and 2000 and made related changes to Item 6 — Selected Financial Data and Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations. The restatements of our consolidated financial statements as of December 31, 2003 and 2002 are in addition to the restatement of those financial statements set forth in Amendment No. 1 to our Annual Report on Form 10-K/A for the fiscal year ended December 31, 2003, which was filed on April 26, 2005. Also on August 12, 2005, we filed Amendment No. 1 to our Quarterly Report on Form 10-Q/A for the quarterly period ended April 1, 2005, which contains restatements of our unaudited condensed consolidated financial statements as of April 1, 2005 and April 2, 2004, and related changes.

*Management.*    Promptly following the closing of the Acquisition, described below, we retained an Interim Chief Executive Officer, William Branch, whereupon Russell Mello, who had previously served as our Chief Financial Officer and had been elected as our Chief Executive Officer in July 2004, resumed his former position as our Chief Financial Officer. At that same time, Mr. Branch, Michael Choe, Kim Davis and Andrew Janower were elected as our directors, replacing Mr. Sloan and Cathy Sloan, who resigned as directors in connection with the Acquisition. Mr. Branch was elected as Chairman. Mr. Mello subsequently left the Company and was replaced by Interim Chief Financial Officer, Randall Paulfus in July 2005. In August 2005, Richard M. Christman was appointed Chief Executive Officer, replacing Mr. Branch, who resigned as President and Chief Executive Officer. Mr. Christman was also elected as a director at that time. Mr. Branch remains as Chairman. Effective January 30, 2006, Mr. Paulfus has resigned as Interim Chief Financial Officer. The Company has appointed Robert E. Girardin to serve as Interim Chief Financial Officer, effective January 30, 2006.

*The Acquisition.*    On April 6, 2005, all of our stockholders entered into a stock purchase agreement with GSI Holdings pursuant to which GSI Holdings purchased for cash all of the issued and outstanding shares of our common stock. Upon the closing of that stock purchase, we became a direct, wholly owned subsidiary of GSI Holdings. The transactions pursuant to the Stock Purchase Agreement are collectively referred to in this prospectus as the "Acquisition." On May 16, 2005, the closing of the Acquisition occurred concurrently with the closing of the offering for the original notes. In October 2005, certain members of our senior management team and certain other individual investors purchased approximately 10% of the outstanding shares of GSI Holdings' common stock at the same price per share paid to our selling stockholders by GSI Holdings in the Acquisition.

Immediately following the closing, we converted from a subchapter "S" corporation to a subchapter "C" corporation, which means that we became a taxable entity for federal and state income tax purposes. For the

7

Table of Contents

portion of our 2005 fiscal year preceding the closing date, we made tax distributions to our selling stockholders at the closing in an amount sufficient to allow them to pay income taxes relating to such period.

*The Financing Transactions.*     In connection with the closing of the Acquisition on May 16, 2005, we entered into the following financing transactions, which are collectively referred to in this prospectus as the "Financing Transactions," each of which occurred prior to or concurrently with the closing of the Acquisition:

- the closing of the issuance of the original notes;

- the closing of our refinanced senior secured credit facility, which we refer to as the "refinanced credit facility" in this prospectus, consisting of a $60.0 million revolving credit facility. Approximately $29.5 million was drawn on the revolving credit facility on the closing date, with additional availability of approximately $20 million under the revolving credit facility on the closing date;

- the call for redemption of all of our existing 10 $1/4$% senior subordinated notes due 2007, the deposit of all amounts necessary to redeem those notes with the trustee, and the subsequent retirement of all of those notes upon completion of the redemption;

- the repayment in full of all amounts outstanding under our existing credit facility;

- the repayment in full of all amounts outstanding under loans made to us by Craig Sloan, our founder and selling majority stockholder; and

- the cash equity contribution to GSI Holdings by our equity sponsor (a small amount of which was made by nonaffiliated funds) of $56.3 million, of which approximately $34.9 million was paid to our selling stockholders, and approximately $15.3 million was contributed to our common equity (after certain expenses and other amounts).

### Our Equity Sponsor

Charlesbank Capital Partners LLC ("Charlesbank") is a leading private equity firm with over $1.5 billion of capital under management and offices in Boston and New York. Originally managing an investment portfolio solely for Harvard University, the firm broadened its investor base in 2000 to include other institutional clients and is currently investing its fifth fund. Charlesbank manages private equity investments across a wide range of industries. The firm's principals have broad experience investing in agribusiness, distribution and manufacturing companies, such as Aurora Organic Dairy, Bell Sports and Wabtec.

### Information about The GSI Group, Inc.

We were incorporated in Delaware on April 30, 1964. Our principal executive office is located at 1004 East Illinois Street, Assumption, Illinois 62510, and our telephone number is (217) 226-4421.

### Information about GSI Holdings Corp.

GSI Holdings Corp. was incorporated in Delaware on April 1, 2005. Its principal executive office is located at 1004 East Illinois Street, Assumption, Illinois 62510 and telephone number is (217) 226-4421.

8

Table of Contents

## Summary Terms of the Exchange Offer

On May 16, 2005, we completed an offering of $110,000,000 in aggregate principal amount of original notes. That offering was exempt from the registration requirements of the Securities Act. In connection with that offering, we entered into a registration rights agreement with the initial purchaser of the original notes in which we agreed, among other things, to deliver this prospectus to you and to use our commercially reasonable efforts to complete the exchange offer.

| | |
|---|---|
| Exchange Offer | We are offering to exchange up to $110,000,000 in aggregate principal amount of 12% Senior Notes due 2013, which have been registered under the Securities Act, for an equal aggregate principal amount of our outstanding 12% Senior Notes due 2013, to satisfy our obligations under the registration rights agreement that we entered into when the original notes were sold in transactions exempt from the registration requirements of the Securities Act. |
| Expiration Date | The exchange offer will expire at 5:00 p.m., New York City time, on March 6, 2006, unless extended. |
| Withdrawal; Non-Acceptance | You may withdraw any original notes tendered in the exchange offer at any time prior to 5:00 p.m., New York City time, on March 6, 2006. If we decide for any reason not to accept any original notes tendered for exchange, the original notes will be returned to the registered holders at our expense promptly after the expiration or termination of the exchange offer. In the case of original notes tendered by book-entry transfer into the exchange agent's account at The Depository Trust Company, any withdrawn or unaccepted original notes will be credited to the tendering holder's account at The Depository Trust Company. |
| | For further information regarding the withdrawal of tendered original notes, see "The Exchange Offer—Terms of the Exchange Offer;" "—Expiration Date; Extension; Termination; Amendment" and "—Withdrawal Rights." |
| Conditions to the Exchange Offer | The exchange offer is subject to customary conditions, which we may waive. See the discussion below under the caption "The Exchange Offer—Conditions to the Exchange Offer" for more information regarding the conditions to the exchange offer. |
| Exchange Agent | U.S. Bank National Association is serving as exchange agent in connection with the exchange offer. |
| Procedures for Tendering Original Notes | If you wish to participate in the exchange offer, you must either: |

- complete, sign and date an original or faxed letter of transmittal in accordance with the instructions in the letter of transmittal accompanying this prospectus; or

- arrange for The Depository Trust Company to transmit required information to the exchange agent in connection with a book-entry transfer.

**Table of Contents**

Then you must mail, fax or deliver all required documentation to U.S. Bank National Association, which is acting as the exchange agent for the exchange offer. The exchange agent's address appears on the letter of transmittal. By tendering your original notes in either of these manners, you will represent to and agree with us that:

- you are acquiring the exchange notes in the ordinary course of your business;

- you are not engaged in, and you do not intend to engage in, the distribution (within the meaning of the federal securities laws) of the exchange notes in violation of the provisions of the Securities Act;

- you have no arrangement or understanding with anyone to participate in a distribution of the exchange notes; and

- you are not an "affiliate," within the meaning of Rule 405 under the Securities Act, of the Company.

See "The Exchange Offer—Procedures for Tendering Original Notes" and "The Depository Trust Company Book-Entry Transfer."

Each broker-dealer that receives exchange notes for its own account in exchange for original notes, where such original notes were acquired by such broker-dealer as a result of market-making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such exchange notes. See "Plan of Distribution."

Special Procedures for Beneficial Owners

If you are a beneficial owner of original notes that are held by or registered in the name of a broker, dealer, commercial bank, trust company or other nominee or custodian and you wish to tender your original notes, you should contact your intermediary entity promptly and instruct it to tender the exchange notes on your behalf.

Guaranteed Delivery Procedures

If you desire to tender original notes in the exchange offer and:

- the original notes are not immediately available;

- time will not permit delivery of the original notes and all required documents to the exchange agent on or prior to the expiration date; or

- the procedures for book-entry transfer cannot be completed on a timely basis;

you may nevertheless tender the original notes, provided that you comply with all of the guaranteed delivery procedures set forth in "The Exchange Offer—Guaranteed Delivery Procedures."

10

**Table of Contents**

| | |
|---|---|
| Resales of Exchange Notes | Based on an interpretation by the staff of the SEC set forth in no-action letters issued to third parties, we believe that you can resell and transfer your exchange notes without compliance with the registration and prospectus delivery requirements of the Securities Act, if you can make the representations that appear above under the heading "—Procedures for Tendering Original Notes." |
| | We cannot guarantee that the SEC or its staff would make a similar decision about the exchange offer. If our belief is wrong, or if you cannot truthfully make the representations appearing above, and you transfer any exchange note without delivering a prospectus meeting the requirements of the Securities Act or without an exemption from registration of your exchange notes from such requirements, you may incur liability under the Securities Act. We are not indemnifying you against this liability. |
| Accrued Interest on the Exchange Notes and the Original Notes | The exchange notes will bear interest from the most recent date to which interest has been paid on the corresponding series of original notes. If your original notes are accepted for exchange, then you will receive interest on the exchange notes and not on the original notes on the next succeeding interest payment date on the exchange notes. No payment will be made in respect of accrued and unpaid interest on the original notes at the date we consummate the exchange offer. |
| Certain United States Federal Tax Considerations | The exchange of original notes for exchange notes in the exchange offer will not be a taxable transaction for United States federal income tax purposes. See the discussion below under the caption "Material United States Federal Tax Considerations." |
| Consequences of Failure to Exchange Original Notes | All untendered original notes will remain subject to the restrictions on transfer provided for in the original notes and in the indenture. Generally, the original notes that are not exchanged for exchange notes pursuant to the exchange offer will remain restricted securities and may not be offered or sold unless registered under the Securities Act, except pursuant to an exemption from, or in a transaction not subject to, the Securities Act and applicable state securities laws. Other than in connection with the exchange offer, we do not currently anticipate that we will register the original notes under the Securities Act. |
| | Because we anticipate that most holders of the original notes will elect to exchange their original notes, we expect that the liquidity of the markets, if any, for any original notes remaining after the completion of the exchange offer will be substantially limited. |
| Use of Proceeds | We will not receive any proceeds from the issuance of exchange notes in the exchange offer. We will pay all registration and other expenses incidental to the exchange offer. |

11

Table of Contents

## Summary Terms of the Exchange Notes

| | |
|---|---|
| Issuer | The GSI Group, Inc. |
| Notes Offered | $110.0 million in aggregate principal amount of 12% Senior Notes due 2013. |
| Maturity Date | May 15, 2013. |
| Interest Payment Dates | May 15 and November 15, commencing on November 15, 2005. |

**Guarantees**

Our obligations with respect to the notes will be fully and unconditionally guaranteed by GSI Holdings and all of our domestic material subsidiaries. None of our domestic subsidiaries are currently material subsidiaries. Our foreign subsidiaries will not guarantee the notes. Our non-guarantor subsidiaries generated 17.0% of our consolidated revenues in the twelve-month period ended September 30, 2005 and held 17.5% of our consolidated assets as of September 30, 2005.

**Ranking**

The notes and the guarantees are unsecured senior obligations. Accordingly, they will be:

- senior in right of payment to all of our and the guarantor's existing and future subordinated indebtedness;
- equal in right of payment with all of our and the guarantor's existing and future senior indebtedness; and
- effectively subordinated to all obligations of our non-guarantor subsidiaries.

However, the notes and the guarantees will be effectively subordinated to all of our and the guarantor's secured indebtedness (including borrowings under our refinanced credit facility, which will be secured by substantially all of our assets), to the extent of the collateral securing such indebtedness.

As of September 30, 2005, there was approximately $117.5 million principal amount of senior indebtedness outstanding and approximately $47.9 million available for additional borrowing under our refinanced credit facility subject to borrowing base limitations. As of September 30, 2005, our non-guarantor subsidiaries had aggregate indebtedness of $0.3 million.

**Optional Redemption**

On or after May 15, 2009, we may redeem some or all of the notes at the redemption prices set forth under "Description of the Exchange Notes—Optional Redemption," plus accrued and unpaid interest, if any, to the date of redemption.

Prior to May 15, 2008, we may redeem up to 35% of the notes issued under the indenture at a redemption price of 112% of the principal amount, plus accrued and unpaid interest, if any, to the date of

12

**Table of Contents**

redemption, with the proceeds of certain equity offerings, provided at least 65% of the aggregate principal amount of the notes originally issued under the indenture remains outstanding after the redemption.

Offer to Purchase

If we experience a change of control, or we or any of our restricted subsidiaries sell certain assets, we may be required to offer to purchase the notes at the prices set forth under "Description of Exchange Notes—Repurchase at the Option of Holders—Change of Control" and "—Asset Sales."

Covenants

We will issue the exchange notes under the same indenture that governs the original notes. The indenture is between us and the trustee. The indenture, among other things, limits our ability and the ability of our restricted subsidiaries to:

- incur additional indebtedness and issue preferred stock;

- pay dividends or distributions on our capital stock or purchase, redeem or retire our capital stock;

- issue or sell stock of subsidiaries;

- make certain investments;

- create liens on our assets;

- enter into transactions with affiliates;

- merge or consolidate with another company; and

- transfer and sell assets

Each of these covenants is subject to a number of important limitations and exceptions. See "Description of Exchange Notes—Certain Covenants."

Exchange Offer; Registration Rights

In connection with the issuance of the original notes, we and the guarantor entered into the registration rights agreement with the initial purchaser in which we agreed to:

- file with the SEC the registration statement of which this prospectus is a part within 90 days after the issue date of the notes and guarantees, enabling holders of the original notes and guarantees to exchange the original notes and guarantees for the exchange notes and guarantees;

- use all commercially reasonable efforts to cause the registration statement to become effective within 180 days after the issuance date of the original notes and to consummate the exchange offer within 30 business days thereafter; and

- file a shelf registration statement for the resale of the original notes if we cannot effect an exchange offer within the time period listed above and in certain other circumstances.

If we do not comply with these registration obligations, we will be required to pay liquidated damages to holders of the original notes

13

**Table of Contents**

|  |  |
|---|---|
|  | under certain circumstances. See "Description of Exchange Notes—Registration Rights; Liquidated Damages." |
| No Public Market; PORTAL<sup>SM</sup> Listing | The exchange notes will be new securities for which there currently is no market. Although the initial purchaser of the original notes informed us at the time of issuance of the original notes that they intended to make a market in the original notes, they made no such undertaking with respect to the exchange notes and, with respect to the original notes, they are not obligated to make such a market and they may discontinue any such market-making that they may elect to undertake at any time without notice. Accordingly, we cannot assure you that a liquid market for the exchange notes will develop or be maintained. The original notes are eligible for trading on the PORTAL<sup>SM</sup> Market. |
| Use of Proceeds | We will not receive any proceeds from the issuance of the exchange notes in the exchange offer. We will receive in exchange outstanding notes in like principal amount. We will retire or cancel all of the outstanding notes tendered in the exchange offer. See "Use of Proceeds." |

**Risk Factors**

Investing in the notes involves a number of material risks. See "Risk Factors" for a discussion of certain risks you should consider in connection with an investment in the notes, including factors affecting forward-looking statements.

14

Table of Contents

## Summary Pro Forma Consolidated Financial Data

The following table sets forth our summary pro forma consolidated financial data for the year ended December 31, 2004 and nine months ended September 30, 2005 to give effect to the Acquisition and the Financing Transactions as if they had been consummated on January 1, 2004. The summary pro forma consolidated financial data are presented for informational purposes only and do not purport to project our financial position as of any future date or our results of operations for any future period. You should read the following summary pro forma consolidated financial data in conjunction with the information under "Use of Proceeds," "Unaudited Pro Forma Consolidated Financial Data," "Selected Historical Consolidated Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" as well as our consolidated financial statements and the notes to those statements included elsewhere in this prospectus.

As discussed in our audited consolidated financial statements included in this prospectus, certain historical information in our audited consolidated financial statements and our unaudited condensed consolidated financial statements has been restated. You should read note 18 to our audited consolidated financial statements beginning on page F-24 as well as "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information about these restatements. The summary pro forma consolidated financial data presented in the table below reflects these restatements.

Prior to the Acquisition, we operated as a subchapter "S" corporation. Accordingly, we had not been subject to federal income taxation prior to the Acquisition, and no provision for federal income taxes has been included for such periods. Immediately following the closing of the Acquisition, however, we converted to a subchapter "C" corporation and became a taxable entity subject to federal income taxation for all periods thereafter.

15

**Table of Contents**

|  | (Unaudited)<br>Pro Forma<br>Year Ended<br>December 31, 2004 | (Unaudited)<br>Pro Forma<br>Nine Months<br>September 30, 2005 |
|---|---|---|
| **Statement of Operations Data:** |  |  |
| **(In thousands)** |  |  |
| Sales | $ 288,131 | $ 270,536 |
| Cost of sales | 222,565 | 201,400 |
| Gross profit | 65,566 | 69,136 |
| Selling, general and administrative expenses | 36,712 | 45,982 |
| FarmPro loss | 7,152 | — |
| Amortization expense | 7,700 | 3,158 |
| Total operating expenses | 51,564 | 49,140 |
| Operating income | 14,002 | 19,996 |
| Other income (expense): |  |  |
| Interest expense | (15,298) | (11,474) |
| Interest income | 446 | 333 |
| (Loss) gain on sale of fixed assets | (452) | 110 |
| Foreign currency transaction (loss) gain | (146) | 488 |
| Other, net gain (loss) | 62 | 145 |
| Income (loss) before income taxes and minority interest | (1,386) | 9,598 |
| Minority interest in net income (loss) from subsidiary | (92) | (279) |
| Income tax provision (benefit) | (582) | 4,031 |
| Income (loss) from continuing operations | (896) | 5,288 |
| Discontinued operations: |  |  |
| Gain from sale of discontinued operations | 118 | — |
| Gain (loss) from discontinued operations, net of income taxes | (93) | — |
| Net income (loss) | $ (871) | $ 5,288 |

16

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

### Management Equity Investments

In October 2005, certain members of our senior management team and certain other individual investors purchased approximately 10% of the outstanding shares of GSI Holdings' common stock for $100.00 per share, the same price per share paid by GSI Holdings in the Acquisition. The following table sets forth certain information with respect to stock purchases by our directors, our Chief Executive Officer and by the other executive officers identified herein under "Executive Compensation." Each of the stockholders listed below, except for Richard M. Christman, currently owns less than 1% of the outstanding shares of common stock of GSI Holdings. Mr. Christman currently owns 1.77% of the outstanding shares of common stock of GSI Holdings.

| Name of Owner | Relationship to the Registrants | Nature of Interest in the Transaction(s) | Amount of Individual's Transaction |
|---|---|---|---|
| Richard M. Christman | Chief Executive Officer and Director (The GSI Group and GSI Holdings) | Stockholder | $1,000,000 |
| William Branch | Chairman (The GSI Group and GSI Holdings) | Stockholder | $ 500,000 |
| Paul Farris | Director (GSI Holdings) | Stockholder | $ 100,000 |
| Ann Montgomery | Vice President of Finance | Stockholder | $ 100,000 |

In connection with these purchases, GSI Holdings entered into Stock Purchase and Management Equity Agreements with each of Richard Christman, William Branch, Paul Farris and Ann Montgomery in October 2005. Because Mr. Christman purchased his shares of common stock of GSI Holdings in two tranches, GSI Holdings entered into a second Stock Purchase and Management Equity Agreement with Mr. Christman in December 2005. Such agreements set forth, among other things, the terms of the stock purchases, transfer restrictions, repurchase rights and certain sale/purchase rights and certain piggyback registration rights. A form of such agreements is filed as an exhibit to this registration statement.

### Corporate Development and Administrative Services Agreement

In connection with the closing of the Acquisition, we and GSI Holdings entered into a 10-year Corporate Development and Administrative Services Agreement with Charlesbank, pursuant to which Charlesbank will assist us with certain corporate development activities and will provide us with certain administrative services. Pursuant to that agreement, Charlesbank will be entitled to receive a $600,000 per year monitoring fee, payable quarterly, in addition to a 1% transaction fee on future acquisitions, dispositions and financings, together with reimbursement of reasonable out-of-pocket expenses in connection with the provision of such services to us and indemnification of Charlesbank and its affiliates, officers and directors against claims or liabilities relating to that agreement. Payment of monitoring and transaction fees will be subordinated to payments on our refinanced credit facility and these notes.

70

Table of Contents

**Executive Severance and Restrictive Covenant Agreements with Directors and Senior Management**

Immediately following the Acquisition, we entered into Executive Severance and Restrictive Covenant Agreements with each of our executive officers (including Ann Montgomery). Such agreements include provisions that prohibit the executive from competing with or soliciting clients of the Company during his employment period and for a period of 18 months thereafter if the executive has more than ten years of service at the Company or 12 months thereafter if the executive has less than ten years of service at the Company, soliciting employees of the Company during his employment period and for a period of three years thereafter or disclosing confidential information of the Company or its subsidiaries or affiliates. In addition, such agreements impose certain obligations on us upon the termination of the executive's employment, including, under certain circumstances, the payment of severance, the continuation of benefits and the continued vesting and exercisability of certain equity based compensation. In the event of the breach by the executive of any of the restrictive covenants described above, the executive will forfeit certain severance payments, equity based compensation and amounts received in connection with such equity based compensation. A form of such agreements is filed as an exhibit to this registration statement. A similar agreement was entered into by the Company with Richard M. Christman in November 2005. See "Executive Compensation — Retention of New Chief Executive Officer." A copy of such agreement is filed as an exhibit to this registration statement.

**Stock Option Agreements with Directors and Senior Management**

In October 2005, GSI Holdings entered into Stock Option Agreements with its chairman, each of its executive officers (including Richard Christman and Ann Montgomery), Paul Farris and certain non-executive officers. Under such agreements, GSI Holdings granted to each of the above-named directors and officers non-qualified options to purchase additional shares of GSI Holdings' common stock under the GSI Holdings Corp. 2005 Management Stock Incentive Plan. Such granted options shall vest 20% annually for a period of five years and have an exercise price of $100.00 per share, the same price per share paid by GSI Holdings in the Acquisition. Upon a change in control in which there is a change in ownership of GSI Holdings of more than 50%, unless the acquiring company assumes or provides substitute options for the options of each of the above-named directors and officers, all such holder's options will vest and become exercisable immediately preceding the change in control. If the acquiring company assumes or provides substitute options for the options of any of the above-named directors and officers, GSI Holdings will take all actions reasonably necessary to ensure that the acquiring or succeeding corporation provides that any such assumed or substituted options granted to the above-named officers become fully vested and exercisable for 30 days after the termination of such officer's employment in the event of termination other than for cause or good reason within 12 months after the occurrence of the change in control. A form of such agreements is filed as an exhibit to this registration statement. At the same time, GSI Holdings entered into additional Stock Option Agreements with each of Mr. Christman and Mr. Branch providing for the grant of non-qualified options to purchase additional shares of GSI Holdings' common stock under the GSI Holdings Corp. 2005 Management Stock Incentive Plan. Such granted options shall have an exercise price of $100.00 per share, the same price per share paid by GSI Holdings in the Acquisition. Such granted options shall vest on a pro rata basis, based on the level of return on investment for certain stockholders, upon the satisfaction of certain conditions, including the occurrence of a sale of the Company or other liquidity event, provided that a minimum internal rate of return and multiple of investment is obtained. A form of such agreements is filed as an exhibit to this registration statement.

**Other Related Party Transactions**

We conduct transactions in the ordinary course of business with companies owned by the Segatt family, one of whom is a current employee of our subsidiary in Brazil. Such transactions generally consist of purchases of materials, freight payments and commissions that amounted to $925,768, $564,362 and $538,388 for 2004, 2003 and 2002, respectively, and sales of poultry equipment that amounted to $296,681, $99,815 and $63,225 for 2004, 2003 and 2002, respectively.

71

Table of Contents

We conduct transactions in the ordinary course of business with Reliance, a supplier of poultry equipment, which is owned by one of our employees. Such transactions generally consist of purchases of materials for poultry equipment that amounted to $958,040, $238,095 and $243,946 from 2004, 2003 and 2002, respectively, and sales of poultry equipment that amounted to $150,127, $239,005 and $37,877 from 2004, 2003 and 2002, respectively.

We make sales in the ordinary course of business to Mayland Enterprises, a distributor of grain equipment, which is owned by one of our employees. Such transactions generally consist of sales of grain equipment and amounted to $41,178, $89,348 and $26,056 for 2004, 2003 and 2002, respectively.

We believe that the above described transactions were, and future transactions with the Segatt family, Reliance and Mayland Enterprises will be, on terms no less favorable to us than could have been obtained from an independent third party in arm's length transactions.

72

**TAB B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEONARDO SEGATT, | ) |
| | ) |
| Plaintiff, | ) No.: 07 CV 11413 (WHP) |
| | ) |
| -against- | ) ECF Case |
| | ) |
| GSI HOLDINGS CORP., WILLIAM J. BRANCH, | ) |
| CHARLESBANK EQUITY FUND V, LIMITED | ) |
| PARTNERSHIP, CB OFFSHORE EQUITY FUND V, | ) |
| L.P., CHARLESBANK EQUITY COINVESTMENT | ) |
| FUND V, LIMITED PARTNERSHIP, | ) |
| CHARLESBANK COINVESTMENT PARTNERS, | ) |
| LIMITED PARTNERSHIP, CHARLESBANK | ) |
| EQUITY FUND V GP, LIMITED PARTNERSHIP | ) |
| and CHARLESBANK CAPITAL PARTNERS, LLC, | ) |
| | ) |
| Defendants | ) |

### DEFENDANTS GSI HOLDINGS CORP AND WILLIAM J. BRANCH'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S INITIAL REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendants GSI Holdings Corp. ("GSI") and William J. Branch (collectively, the "GSI Defendants") serve these responses and objections to Plaintiff's First Requests for Production of Document in accordance with Federal Rule of Civil Procedure 34 and the Local Rules of the United States District Court for the Southern District of New York.

### GENERAL OBJECTIONS

1.     The GSI Defendants object to Plaintiff's Requests for Production of Documents to the extent they attempt to impose obligations on the GSI Defendants different than those imposed under the Federal Rules of Civil Procedure and the Local Rules of this Court.

2.     The GSI Defendants object to Plaintiff's Requests for Production of Documents to the extent that they call for information or documents protected by the attorney-client privilege, the work product immunity, or any other privilege.

-1-

of any documents concerning non-privileged communications between Plaintiff and Mr. Moretti.

The GSI Defendants further object to Document Request No. 14 on the ground that it is

irrelevant to the subject matter involved in this action, not reasonably calculated to lead to the

discovery of admissible evidence, overly broad and unreasonably burdensome to the extent that

it purports to call for production of any Stockholders Agreement, Stock Purchase and

Management Equity Agreement or Option Acknowledgement involving any party other than

Plaintiff.  Subject to and without waiving the foregoing objections, the GSI Defendants will

produce copies of all non-privileged documents concerning any communications between any

defendant and Ingo Erhardt involving Plaintiff's Stockholders Agreement, the Stock Purchase

and Management Agreement and the Second Amendment to Separation Agreement executed by

GSI Holdings on May 11, 2007.

15.    Please produce all documents concerning each transfer of funds referenced in
paragraphs 27 and 43 of the Complaint in this action, including documents concerning the
authorization(s) for making such transfers, documents concerning the receipt, disposition and
accounting for such funds and each document concerning each communication concerning such
funds, or the transfer, authorization, receipt, disposition or accounting thereof.

**RESPONSE:**

Subject to and without waiving the General Objections, the GSI Defendants will

produce all non-privileged documents that are responsive to this request.

16.    Please produce all documents concerning the "segregated account" referenced in
paragraph 30b of the Complaint, including all documents concerning the opening or closing of
such account, the designation of authorized signers for such account and each monthly statement
for such account from January 2006 through November 2007.

**RESPONSE:**

After reasonable inquiry, the GSI Defendants respond that there are no responsive

documents.

17.    Please produce all documents concerning each of Plaintiffs communications
referenced in paragraphs 28, 39 and 40 of the Complaint in this action and to Ingo Erhardt's

-15-

Dated: Philadelphia, PA
      May 22, 2008

PEPPER HAMILTON LLP

By: _____

    Joseph C. Crawford
    Frank H. Griffin, IV
    3000 Two Logan Square
    Eighteenth and Arch Streets
    Philadelphia, PA 19103-2799
    (215) 981-4247

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of May 2008, a copy of Defendants GSI Holding Corp. and William J. Branch's Objections and Responses to Plaintiff's First Set of Document Requests was served by Federal Express and electronic mail on the following:

Mark P. Zimmett, Esq.
Law Offices of Mark P. Zimmett
126 East 56th Street
New York, New York 10022

*Attorneys for Plaintiff*

David W. Haller, Esq.
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Attorneys for the Charlesbank Defendants*

Frank H. Griffin, IV

**TAB C**

From:  William J. Branch [wjbranch@aol.com]
Sent:   Friday, May 04, 2007 4:59 PM
To:      'ingo@gsibrasil.ind.br'
Subject:      RE: ALT

Follow Up Flag:        Follow up
Flag Status:    Red

Oh, I forgot, yes, we'll find a beer or two.  BB

-----Original Message-----
From: ingo@gsibrasil.ind.br [mailto:ingo@gsibrasil.ind.br]
Sent: Friday, May 04, 2007 4:51 PM
To: wjbranch@aol.com
Subject: Re: ALT

Bill,
Can I also get a beer?
Bill, on another subject, I am not sure if you received my message from yesterday, regarding you
interviewing Avi on Tuesday. Avi is that professional we discussed before and that could add a
lot of value to GSI, in areas like finance and business development. I  have an idea on how to
replace Rafael and would like to discuss this with you Monday. If you agree, I will coordinate
with John M.
Thanks, Ingo

-----Original Message-----

From:  wjbranch@aol.com
Subj:  Re: ALT
Date:  Fri May 4, 2007 2:59 pm
Size:  2K
To:  "Ingo Erhardt" <ingo@gsibrasil.ind.br>

You are my hero!  I plan to buy you the best fried pork cutlet sandwich Assumption has to offer.
BB
Sent from my Blackberry

-----Original Message-----
From: Ingo <ingo@gsibrasil.ind.br>
Date: Fri, 04 May 2007 11:22:49
To:wjbranch@aol.com
Subject: Re: ALT

Bill,
This works for me. Thank you for your help.
I believe you should have a wonderful weekend, since I am bringing

GSI0339

with me the signed contract with Leo.
See you Monday, Ingo


At 10:04 4/5/2007, you wrote:
>Ok.
>I'll arrive at Assumption around 10:30 so let's start the meeting at
>about 11 and go through lunch.  If you get there earlier maybe the
>consultant can take a plant tour before the meeting.
>Sent from my Blackberry
>
>-----Original Message-----
>From: <ingo@gsibrasil.ind.br>
>Date: Thu, 3 May 2007 21:47:00
>To:wjbranch@aol.com
>Subject: Re: ALT
>
>Bill,
>I am all set. All I need is your help in setting up the meetig
>Monday morning. It would be nice to have this meeting in the
>morning, for 3 hours, so the cosultant could visit the plant thereafter.
>Chris is alredy helping me.
>Thanks, Ingo
>
>-----Original Message-----
>
>From:  wjbranch@aol.com
>Subj:  Re: ALT
>Date:  Wed May 2, 2007 2:14 pm
>Size:  1K
>To:  "Ingo Erhardt" <ingo@gsibrasil.ind.br>
>
>Nah,. Assumption has much more charm than Boston.  See you here Monday.  BB
>Sent from my Blackberry
>
>-----Original Message-----
>From: Ingo <ingo@gsibrasil.ind.br>
>Date: Wed, 02 May 2007 13:55:23
>To:wjbranch@aol.com
>Subject: Re: ALT
>
>Bill,
>This meeting is very important for us at GSI Brazil. Our goal is to
>leave with a decision from this meeting. If you believe that AJ's
>presence can influence our decision, we could have this meeting in Boston.

>The advantage of holding this meeting in Assumption, is that we could
>invite Dennis and John to help us take a decision. I will start
>planning the meeting in Assumption. Do not worry about picking us up
>in Atlanta. We will meet you in Assumption.
>Please let me know if you want us to consider Boston.
>Have a good day, Ingo
>

REDACTED FOR NON-RESPONSIVENESS

GSI0341

**TAB D**

## <u>AFFIRMATIVE PLEDGE OF ASSIGNMENT OF QUOTAS AND OTHER PROVISIONS</u>

The parties below:

**THE GSI GROUP, INC.,** a company organized and existing under the Laws of the State of Delaware, USA, with its head offices at 1004 E. Illinois Street, Assumption, Illinois, in this act represented by its attorney-in-fact, Luis Fernando Ayres de Mello Pacheco, Brazilian citizen, lawyer, registered with the OAB/RJ under No. 58.898, and at the Taxpayer's Registry (CPF/MF) under No. 800.912.107-04, resident at the city and State of Rio de Janeiro, at Avenida Rio Branco n° 1, 19° andar, setor B, herein after referred to as "GSI"; and

**LEONARDO SEGATT,** Brazilian citizen, married, businessman, registered with the SSP under No. 202137899 and at the Taxpayer Registry (CPF/MF) under No. 374.013.430-53, resident at Marau, State of Rio Grande do Sul, at rua Duque de Caxias, n° 444 – ZIP 99.150-000, herein after referred to as "Assignee"; both jointly referred to as "Parties";

and, as intervening party ,

**ASSUMPTION LEASING COMPANY, INC.,** a company organized and existing under the Laws of the State of Delaware, USA, with its head offices at 1004 E. Illinois Street, Assumption, Illinois, in this act represented by its attorney-in-fact, Luis Fernando Ayres de Mello Pacheco, qualified above, herein after referred to as "Assumption Leasing".

## RECITALS

**WHEREAS** GSI is the majority quotaholder of the limited liability quota company **AGROMARAU INDÚSTRIA E COMÉRCIO LTDA.,** with its head offices at Rodovia RS 324, Km 74, in the city of Marau, State of Rio Grande do Sul, registered at the Taxpayer's Registry (CNPJ) under No. 01.770.039/0001-50, herein after referred to as "Company", holding 99,99% of the Company's corporate capital, which currently corresponds to 31.019.129 quotas, in the total value of R$ 31,019,129.00;

**WHEREAS** Assumption Leasing is the minority quotaholder of the Company, holding 00,01% of the Company's corporate capital, which currently corresponds to 3,735 quotas, in the total amount of R$ 3,735.00;

**WHEREAS** the Company's Articles of Organization provide, in its Clause 5, that the quotas may be assigned, sold or transferred upon the affirmative vote of the quotaholders holding the majority of the Company's corporate capital;

1

LS 0440

WHEREAS GSI wishes to assign to the Assignee a certain percentage of its quotas in the Company, to be transferred in a certain period of time and according to the criteria and conditions set forth in this instrument, and the Assignee accepts to acquire such quotas from GSI according to the same criteria and conditions;

WHEREAS in the event that the Assignee wishes to assign, sell or transfer the totality or part of its quotas, after he acquires title to such quotas, the Assignee agrees to grant GSI or a designee of GSI, at GSI's sole discretion, the right of first refusal in regard to the purchase of such quotas.

The parties hereto decide to execute this Affirmative Pledge of Assignment of Quotas and Other Provisions to be governed by the following terms and conditions:

## I.    ASSIGNEMENT OF QUOTAS

1.    GSI agrees to assign title of 5% of its quotas in the Company to Assignee, for free, and Assignee agrees to accept such quotas, to be transferred in the following manner, independent of the implementation of any condition:

(i)    2% of the quotas held by GSI in the Company, representing 620,382 quotas, in the total amount of R$620,382.00, are hereby transferred to Assignee on the date hereof, when the 14th Amendment to the Company's Articles of Organization shall be amended to effective the transfer thereof.

(ii)    1% of the quotas held by GSI in the Company on January 1, 2003 will be transferred to Assignee on such date.

(iii)    1% of the quotas held by GSI in the Company on January 1, 2004 will be transferred to Assignee on such date.

(iv)    1% of the quotas held by GSI in the Company on January 1, 2005 will be transferred to Assignee on such date.

2.    GSI agrees to award Assignee and therefore to assign to Assignee up to the maximum amount of 10% of its quotas in the Company, and Assignee agrees to accept such quotas, to be transferred in the following manner upon the implementation of the condition described below:

2.a.    For every R$ 6.00 (six) reais of cash that is either (i) returned to the US through reduction of inter-company payable or dividend on capital; or (ii) invested in the Company at GSI management's own discretion, the Assignee will be awarded 01 (one) quota of GSI's participation in the corporate capital of the Company.

2.b.    The awarding of quotas as ascribed in this Article 2 will be based on audited results and on the annual balance sheet of the Company,




2

LS 0441

and shall be considered a company payable, should be reduced to zero before any dividend is paid.

2.c.     Any existing negative balances drawn up during a certain fiscal year, after the execution of this instrument, must be recovered within the following fiscal year, before quotas can be earned as per this Article 2.

3.     The threshold of 10% of shares set forth in Article 2 hereof shall never be altered and Assignee shall never be entitled to a percentage higher than 15% in the corporate capital of the Company, considering also the shares awarded as set forth in Article 1 hereof.  The shares to be awarded in accordance with this Article 2 may be so awarded during an undetermined period of time.

4.     It is hereby agreed that Assignee shall have no claim of title as to the percentage of the quotas described in Article 2 above if he does not implement the condition imposed for the awarding of such quotas.

5.     GSI, Assumption Leasing and the Assignee, as of the moment the latter becomes a quotaholder of the Company, mutually agree that upon a capital increase by one of the quotaholders, they shall give each other the preemptive right to subscribe capital in such amount so that they maintain their proportion in the Company's corporate capital.  The quotaholders shall have until 30 (thirty) days as of the deliberation of the capital increase to exercise such preemptive right.

6.     The Assignee hereby agrees to adhere to all the provisions in the Company's Articles of Organization as well as to the amendments to be made thereto agreed upon herein.

## II.     RIGHT OF FIRST REFUSAL AND CALL OPTION

7.     As soon as Assignee acquires title to the Company's quotas as provided for herein, the Assignee agrees that it may only assign, transfer or encumber the totality or part of its quotas upon the affirmative vote of the quotaholders holding more than one quarter of the Company's corporate capital.

8.     In case Assignee is dismissed from the Company for theft, fraud, or any other crime committed against the Company, Assignee shall assign and transfer the quotas he owns at that moment for GSI, for free, within 7 business days as of the leaving of Assignee. The Assignee hereby grants irrevocable powers to Luis Fernando Ayres de Mello Pacheco, attorney-in-law of GSI, for the specific purpose of executing, on his behalf, the amendment to the Articles of Organization of the Company to effectuate the transfer of such shares to GSI, in such specific situations.



3

LS 0442

9. In case Assignee is dismissed from the Company for any reason other than the reasons set forth in Article 8 above, Assignee shall assign and transfer the quotas he owns at that moment for GSI, within 7 business days as of the leaving of Assignee. The parties agree that the price for such quota(s) shall be calculated as set forth in Article 12 herein.

10. In case Assignee wishes to leave the Company by his own, Assignee shall assign and transfer the quotas he owns at that moment for GSI, within 7 business days as of the leaving of Assignee. The parties agree that the price for such quota(s) shall be calculated as set forth in Article 12 herein. In this case, if the Assignee decides to leave the Company between the dates specified below, the value to be paid by GSI for his quotas, shall be ascertained as follows:

10.a. From January 1, 2002 – To December 31, 2002, he will be paid for his quotas at 25% of the book value attributed to each quota;

10.b. From January 1, 2003 – To December 31, 2003, he will be paid for his quotas at 50% of the book value attributed to each quota;

10.c. From January 1, 2004 – To December 31, 2004, he will be paid for his quotas at 75% of the book value attributed to each quota;

10.d. Beyond January 1, 2005, he will be paid for his quotas at 100% of the book value attributed to each quota.

11. In case Assignee whishes to assign or transfer its quotas to third parties it shall always give GSI the right of first refusal to acquire such quotas upon the same price and conditions offered to third parties. The Parties agree that the price for such quota(s) shall not supersede, in any way, the net value of the quotas, as calculated as set forth in Article 12 below. For the full exercise of GSI's right of first refusal, it is hereby agreed that Assignee shall give GSI a prior written notice, in which it shall be indicated the offer of transfer of quotas, the amount of quotas offered, the price to be paid for such quotas, the conditions of payment, as well as any other relevant condition, provided that such offer shall be made in the exact terms and conditions as those agreed upon with the third party.

12. The net value of the quotas shall be based on the net worth of the Company, after presentation of the financial statements, which shall calculate the net worth with the total assets, less intangible assets, and less liabilities. As a result of this calculation, the amount of the Company's net worth shall then be divided upon the number of the Company's existing quotas on the time of the referred transfer, so as to calculate the net value of each quota.



4

LS 0443

GSI shall have sixty (60) days, as of receipt of the notice referred in Article 11, above, to indicate its interest in acquiring the quotas offered by Assignee.

14. GSI's failure to declare acceptance of the offer within the 60-day period above mentioned shall be understood as its waiver to exercise the right of first refusal.

15. In case GSI declines the offer or waives its right of first refusal, as per Article 14, above, Assignee may transfer its quotas to the third party, provided that the sale of such quotas shall be made according to the same price and conditions offered to GSI, referred to in Article 11.

## III. CALL OPTION UPON THE CHANGE IN GSI'S CORPORATE STRUCTURE

16. In the event of merger, acquisition, spin off or the change of control in GSI's corporate structure, GSI or whichever company succeeds GSI in its position of a quotaholder of the Company shall have the option to purchase from Assignee all, and not a portion, of its quotas in the Company.

17. The amount to be agreed for the sale of the quotas, as mentioned in Article 16, above, shall be calculated by the net value of the quotas, as established in Article 12, except if the Company is sold out separately, when the amount shall be calculated by the market value of the quotas, whichever amount is higher.

## IV. FINAL PROVISIONS

18. The Parties and Assumption Leasing hereby agree to execute the necessary amendments to the Company's Articles of Organization, which shall be duly registered before the appropriate Commercial Board, formalizing the assignment of quotas hereby agreed upon, as they become due to Assignee, as well as the other provisions agreed upon herein, regardless of the powers granted by Assignee to Luis Fernando Ayres de Mello Pacheco, as per Article 8 hereof.

19. This instrument shall be governed by the Laws of República Federativa do Brasil.



5

LS 0444

competent venue for any disputes that may arise from this agreement, waiving the right to claim any other venue, irrespective of how privileged it may be.

IN WITNESS WHEREOF, the parties hereunder execute this Affirmative Pledge of Assignement of Quotas and Other Provisions in four (4) identical counterparts both in English and in Portuguese. The Portuguese version shall prevail, should any dispute arise from the interpretation of both versions.

Rio de Janeiro, January 1, 2002

_____
THE GSI GROUP, INC.

TRENTIN →

_____
LEONARDO SEGATT

_____
ASSUMPTION LEASING COMPANY, INC.

Witnesses:

1. _____     2. _____
Name: LAND LUCIA RIBEIRO MAMEDE   Name: RUTH IKER
CPF: 935.835.407-00              CPF: 425.208.987-2...

TABELIONATO DE NOTAS - TRENTIN
Av. Júlio Borella, 894 - Marau/RS
RECONHEÇO a(s) firma(s)

_Leonardo Segatt_

por semelhança com a(s) existente(s) no
Arquivo deste Tabelionato
Marau (RS) 02 de Julho de 2008
Em testemunho da verdade

☐ Bel. Nelci Maria Trentin Pilatti - Tabeliã
☐ Helder Alertando Trentin - Substituto
☒ Francisco Scandolara - Substituto
☐ Fabiana Bergamini Trentin - Substituta
Emolumento R$ 150

6

LS 0445

## INSTRUMENTO PARTICULAR DE PROMESSA DE CESSÃO DE QUOTAS E OUTRAS AVENÇAS

Pelo presente instrumento particular ("Contrato"), as partes a seguir:

**THE GSI GROUP, INC.**, uma empresa existente de acordo com as leis do Estado de Delaware, Estados Unidos da América, com sede em 1004 E. Illinois Street, Assumption, Illinois, neste ato representada por seu bastante procurador, Luis Fernando Ayres de Mello Pacheco, brasileiro, separado judicialmente, advogado, portador da carteira de identidade nº 58.898 expedida pela OAB-RJ e inscrito no CPF/MF sob o nº 800.912.107-04, residente e domiciliado na Cidade e Estado do Rio de Janeiro, à Avenida Rio Branco nº 1, 19º andar, setor B, doravante designada "GSI"; e

**LEONARDO SEGATT**, brasileiro, casado, industriário, portador da cédula de identidade nº 2021837899 SSP, inscrito no CPF/MF sob o nº 374.013.430-53, residente e domiciliado na rua Duque de Caxias, nº 444, Marau, Rio Grande do Sul, CEP 99.150-000, doravante designado "Promitente Cessionário", ambos conjuntamente designados "Partes";

e, na qualidade de interveniente anuente,

**ASSUMPTION LEASING COMPANY, INC.**, uma empresa existente de acordo com as leis do Estado de Illinois, Estados Unidos da América, com sede em 1004 E. Illinois Street, Assumption, Illinois, neste ato representada por seu bastante procurador, Luis Fernando Ayres de Mello Pacheco, acima qualificado, doravante designada "Assumption Leasing";

Considerando que a GSI é sócia-quotista majoritária da sociedade por quotas de responsabilidade limitada, **AGROMARAU INDÚSTRIA E COMÉRCIO LTDA.**, com sede na Rodovia RS 324, Km 74, na cidade de Marau, Estado do Rio Grande do Sul, inscrita no CNPJ sob o número 01.770.039/0001-50, doravante designada "Sociedade", detendo 99,99% do capital social da Sociedade, que atualmente perfaz o montante de 31.019.129 quotas, no valor total de R$ 31.019.129,00;

Considerando que a Assumption Leasing é sócia-quotista minoritária da Sociedade, detendo 00,01% do capital social da Sociedade, que atualmente perfaz o montante de 3.735 quotas, no valor total de R$ 3.735,00;

Considerando que o contrato social da Sociedade dispõe, em sua Cláusula 5ª, que as quotas poderão ser cedidas, vendidas ou transferidas mediante o consentimento das sócias-quotistas representando a maioria do capital social;

Considerando que a GSI pretende ceder ao Promitente Cessionário certa percentagem de suas quotas de participação no capital social da Sociedade, a serem transferidas durante um certo período de tempo e de acordo com os critérios e condições

1

LS 0446

estabelecidas neste instrumento, e que o Promitente Cessionário concorda em aceitar as referidas quotas representativas do capital social da Sociedade, nas mesmas condições;

Considerando que, na eventualidade de o Promitente Cessionário, ao adquirir o direito de propriedade das quotas, pretender alienar total ou parcialmente suas quotas, concorda em dar à GSI, ou a terceiros indicados pela GSI, o direito de preferência em relação à aquisição destas quotas;

As Partes resolvem, de comum acordo, celebrar esta Promessa de Cessão de Quotas e Outras Avenças, através das seguintes cláusulas e condições:

## I.    CESSÃO DAS QUOTAS

1.    A GSI concorda em ceder, a título gratuito, a titularidade de 5% de suas quotas representativas do capital social da Sociedade para o Promitente Cessionário, e o Promitente Cessionário concorda em aceitar as referidas quotas, que serão transferidas da seguinte forma, independente de implementação de qualquer condição:

   (i)    2% das quotas detidas pela GSI no capital social da Sociedade, representando 620.382 quotas, no valor de R$620.382,00, são transferidas ao Promitente Cessionário na presente data, em que também será assinada a 14ª Alteração ao Contrato Social da Sociedade, efetivando a respectiva cessão de quotas.

   (ii)   1% das quotas detidas pela GSI no capital social da Sociedade em 1° de janeiro de 2003 será transferida ao Promitente Cessionário naquela data.

   (iii)  1% das quotas detidas pela GSI no capital social da Sociedade em 1° de janeiro de 2004 será transferida ao Promitente Cessionário naquela data.

   (iv)   1% das quotas detidas pela GSI no capital social da Sociedade em 1° de janeiro de 2005 será transferida ao Promitente Cessionário naquela data.

2.    GSI concorda em ceder ao Promitente Cessionário a quantidade máxima de até 10% das quotas do capital social da Sociedade que possuir nos respectivos momentos de efetivação das cessões, e o Promitente Cessionário concorda em aceitar estas quotas, a serem transferidas da seguinte forma mediante implementação da condição descrita abaixo:

2.a    Para cada R$ 6,00 (seis) reais em dinheiro que for: (i) remetido aos Estados Unidos da América através de amortização do pagamento de empréstimos entre empresas ou pagamento de dividendo no capital da

2

LS 0447

Sociedade; ou (ii) investido na Sociedade por mera discricionariedade da diretoria da GSI, ao Promitente Cessionário será cedida 1 (uma) quota da participação da GSI no capital social da Sociedade.

2.b    A cessão das quotas conforme descrito no Artigo 2, será baseada em resultados auditados e no balanço patrimonial da Sociedade, e os dividendos decorrentes de tais quotas cedidas somente serão pagos ao Promitente Cessionário após reduzidas a zero as remessas para amortização ou pagamento de dívida entre empresas.

2.c    Qualquer balanço negativo levantado em um certo ano fiscal, a partir da celebração deste instrumento, deverá ser recuperado dentro do ano fiscal seguinte àquele, antes que se possa implementar a cessão de quotas conforme estabelecida neste Artigo 2.

3.    A percentagem máxima de 10% de quotas prevista no Artigo 2 deste instrumento, jamais será alterada e o Promitente Cessionário jamais será titular de quotas que equivalham a mais de 15% no capital social da Sociedade (neste percentual incluindo-se, também, as quotas cedidas a título gratuito na forma do Artigo 1 deste instrumento). As quotas a serem cedidas de acordo com o Artigo 2 deste instrumento poderão o ser durante lapso de tempo indeterminado.

4.    O Promitente Cessionário não poderá reclamar para com a GSI a efetivação da cessão das quotas como prevista no Artigo 2 deste Instrumento, caso a condição para a efetivação de tal cessão não seja implementada.

5.    A GSI, a Assumption Leasing e o Promitente Cessionário, a partir do momento em que este tornar-se sócio-quotista da Sociedade, comprometem-se mutuamente a se dar o direito de preferência a, em cada aumento de capital, subscrever a parcela desse aumento proporcionalmente às suas respectivas participações no capital social da Sociedade. O exercício do direito dos sócios-quotistas em adquirir a preferência dar-se-á em até 30 (trinta) dias após a deliberação em relação ao referido aumento de capital.

6.    O Promitente Cessionário concorda em aderir a todos os termos do contrato social da Sociedade e às demais alterações ora avençadas.

## II.    DIREITO DE PREFERÊNCIA E OPÇÃO DE COMPRA

7.    A partir do momento em que adquirir direito à titularidade de qualquer quota da Sociedade, o Promitente Cessionário apenas poderá cedê-las, gravá-las ou aliená-las, total ou parcialmente, após o consentimento expresso das demais sócias-quotistas representando mais de um quarto do capital social.

3

LS 0448

8. Caso o Promitente Cessionário incorra em qualquer crime, incluindo, mas não se limitando a, furto, fraude ou qualquer outro ato deste gênero, praticado contra a Sociedade, o Promitente Cessionário se obriga a ceder e transferir, a título gratuito, as quotas que detiver no momento para a GSI, dentro de sete dias úteis da data da saída Promitente Cessionário. O Promitente Cessionário por este instrumento outorga poderes irrevogáveis e irretratáveis a Luis Fernando Ayres de Mello Pacheco, procurador da GSI, já qualificado no intróito, para o específico propósito de assinar, em seu nome, a correspondente alteração do Contato Social da Sociedade para efetuar a transferência destas quotas, nestas situações específicas.

9. Caso o Promitente Cessionário seja destituído do cargo que ocupe na Sociedade por qualquer motivo diferente das razões previstas no Artigo 8 acima, o Promitente Cessionário obriga-se a ceder e transferir as quotas que detiver no momento para a GSI, dentro de 7 dias úteis da data da saída Promitente Cessionário. As partes concordam que o preço destas quotas será calculado conforme previsto no Artigo 12 deste instrumento.

10. Caso o Promitente Cessionário deseje deixar a Sociedade por sua espontânea vontade, o Promitente Cessionário obriga-se a ceder e transferir as quotas que detiver no momento para a GSI, dentro de 7 dias úteis da data da saída Promitente Cessionário. As partes concordam que o preço destas quotas será calculado conforme previsto no Artigo 12 deste instrumento. Neste caso, se o Promitente Cessionário decidir deixar a Sociedade entre as datas especificadas abaixo, o preço a ser pago pela GSI pela cessão das quotas, deverá ser fixado da seguinte forma:

   10.a    De 1º de janeiro de 2002 até 31 de dezembro de 2002, a GSI pagará pelas quotas cedidas o correspondente a 25% do valor patrimonial atribuído a cada quota;

   10.b    De 1º de janeiro de 2003 até 31 de dezembro de 2003, a GSI pagará pelas quotas cedidas o correspondente a 50% do valor patrimonial atribuído a cada quota;

   10.c    De 1º de janeiro de 2004 até 31 de dezembro de 2004, a GSI pagará pelas quotas cedidas o correspondente a 75% do valor patrimonial atribuído a cada quota;

   10.d    De 1º de janeiro de 2005 em diante, a GSI pagará pelas quotas cedidas o correspondente a 100% do valor patrimonial atribuído a cada quota;

11. O Promitente Cessionário somente poderá alienar ou ceder a terceiros as quotas de que seja titular desde que as ofereça antes à GSI, pelo mesmo preço e pelas mesmas condições ofertadas a terceiro, sendo certo que o preço pela (s) quota(s) a ser(em) alienada(s) não poderá ultrapassar, em qualquer hipótese, o valor

4

LS 0449

líquido das mesmas quotas, como calculado no Artigo 12 deste instrumento. Para permitir o pleno exercício do direito de preferência pela GSI na aquisição das quotas de titularidade do Promitente Cessionário, este último deverá encaminhar à GSI notificação, que deverá dispor sobre a quantidade de quotas pretendida ceder a terceiros, o preço da cessão em questão, bem como as condições de pagamento e quaisquer outras porventura acertadas entre Promitente Cessionário e o terceiro.

12.  O valor líquido de cada quota pretendida transferir pelo Promitente Cessionário será apurado pelo patrimônio líquido da Sociedade, com levantamento de balanço especial, calculado pelo total de ativos da Sociedade, diminuídos os bens intangíveis e o passivo, dividindo-se o valor do patrimônio líquido apurado pelo número de quotas representativas do capital social da Sociedade no momento da transferência.

13.  A GSI terá sessenta [60] dias, a contar do recebimento da notificação referida no Artigo 11 acima, para manifestar-se quanto ao interesse ou não de adquirir as quotas ofertadas.

14.  O silêncio da GSI em manifestar-se dentro do prazo acima avençado será entendido como sua renúncia ao exercício do direito de aquirir as quotas.

15.  Caso a GSI deixe de exercer seu direito de preferência, conforme Artigo 14, acima, o Promitente Cessionário poderá ceder suas quotas ao pretendente comprador, contanto que o seja pelo mesmo preço e condições contidas na notificação enviada à GSI, a que se refere o Artigo 11 acima.

## III.  OPÇÃO DE COMPRA EM DECORRÊNCIA DE ALTERAÇÃO NA ESTRUTURA SOCIETÁRIA DA GSI

16.  Em caso de fusão, cisão, aquisição, ou mudança no controle acionário da GSI, a GSI ou a qualquer sociedade que venha a suceder a GSI em sua posição de sócia-quotista da Sociedade, terá a opção de adquirir a totalidade das quotas pertencentes ao Cessionário naquele momento.

17.  O valor da alienação das quotas na hipótese do Artigo 16 acima será calculado pelo valor líquido das quotas, conforme estabelecido no Artigo 12, acima, exceto na hipótese de as quotas representativas do controle da Sociedade serem vendidas separadamente, quando o preço a ser pago pelas quotas de propriedade do Cessionário deverá corresponder ao valor de mercado das quotas, determinados no momento da venda da participação da GSI no capital social da Sociedade ao novo controlador, o que for maior.

5

LS 0450

## DISPOSIÇÕES FINAIS

18.      As Partes e a Assumption Leasing concordam em firmar as necessárias alterações ao contrato social da Sociedade, que serão devidamente arquivadas na Junta Comercial competente, formalizando as transferências das quotas ora acordadas, na medida em que estas forem transferidas, e as demais disposições ora acordadas, independente dos poderes outorgados pelo Promitente Cessionário a Luis Fernando Ayres de Mello Pacheco, de acordo com o Artigo 8 deste instrumento.

19.      Este instrumento será regido pelas Leis da República Federativa do Brasil.

20.      As partes elegem o foro da comarca central da cidade do Rio de Janeiro para dirimir qualquer controvérsia oriunda deste Contrato, renunciando qualquer outro foro por mais privilegiado que seja.

E, por estarem assim, justas e contratadas, as Partes e a Assumption Leasing assinam o presente instrumento, em 4 (quatro) vias de igual teor, na presença de duas testemunhas abaixo assinadas, em inglês e português. Em caso de contradição entre as duas versões, a versão em português deverá prevalecer sobre a versão em inglês.

Rio de Janeiro, 1º de janeiro de 2002

THE GSI GROUP, INC.

TRENTIN →

LEONARDO SEGATT

ASSUMPTION LEASING COMPANY, INC.

Testemunhas:

1. _Nome:_ LAND LUCIA RIBEIRO MAMEDE
CPF: 935.835.407-00

2. _Nome:_ RUTH JUER
CPF: 425.208.787-20

TABELIONATO DE NOTAS - TRENTIN
Av. Júlio Borella, 894 - Marau/RS
RECONHEÇO a(s) firma(s)

_Leonardo Segatt_

por semelhança com a(s) existente(s) no
Arquivo deste Tabelionato.

6

**LS 0451**

Date: Mon, 24 Jul 2006 15:53:28 -0300
To: Wjbranch@aol.com
From: Leonardo Segatt <leo@gsibrasil.ind.br>
Subject: Re:stocks
Cc: Richard.Christman

Hello Bill,
I hope that all is ok with  you and your family.

Do have some new to me about my stocks?

Regards, Léo


At 19:10 03/07/2006, Wjbranch@aol.com wrote:

> Hello, Leo.
> .............
>   On another subject, as soon as I have an opportunity to discuss the matter
> with Richard, we will make a proposal to you about buying your stock and
> providing a GSI investment opportunity for you.
>
> Keep well.  BB

LS  0374

Wjbranch@aol.com. 17:48:53/7/2006 stocks

Delivered To: leo@gsibrasil.ind.br
From: Wjbranch@aol.com
Date: Tue, 25 Jul 2006 16:48:53 EDT
Subject: stocks
To: leo@gsibrasil.ind.br


Leo: I was just about to send you two documents for our call when I noticed a problem with one of the schedules. Maybe it's my misunderstanding, but I want to check it with our lawyers before sending it to you. Unfortunately, I just tried to call Peter Clauss in the States and Claudio Moretti in Brasil and neither of them is available this afternoon. As soon as I clear up this matter, hopefully tomorrow, I'll send the documents to you and we can schedule another call.

Sorry for the inconvenience. Bill

LS 0073

Delivered-To: leo@gsibrasil.ind.br
From: Wjbranch@aol.com
Date: Sat, 9 Sep 2006 09:36:23 EDT
Subject: Re: Stocks
To: leo@gsibrasil.ind.br
CC: rafaelcoletta@gsibrasil.ind.br, john.henderson@thegsigroup.biz,
    richard.christman@thegsigroup.biz

Howdy, partner:

We finally have a document that I think is right. When I left Assumption yesterday John Henderson was checking the numbers one last time. He will send it to Rafael who will discuss it with you. After that, Richard will address any outstanding issues when he comes to Brasil next week.

If you think it is better than the original agreement – and I'm sure you will agree that it is – we should execute the stock swap and payment of interest on shareholders equity ASAP.

After that, Rafael and John Henderson will need your help in borrowing money from a Brasilian bank so we can buy your remaining stock when the new CEO arrives for work.

Incidentally, everyone at Assumption liked Ingo very much, and, Richard has two or three more guys to speak with when he comes to Brasil – so we are well on our way to finding a new man. No one, however, will be as good as you.

Regards, Bill

LS 0070

GSI, 15:23 15/09/2006, Agreement

To: Bill - William J. Branch(GSI)
From: Leonardo Segatt <leo@gsibrasil.ind.br>
Subject: Agreement
Cc: Richard Christman
Bcc:
Attached:


Hello Bill,
I hope everything is well with you and your family

I received your proposal and I will be doing some considerations, because I don't know if I understood well or if really the proposal is not very good same

About the payment form of my shares

- About the generated save in the proposal of your of R$ 211.436,00 is a good save and I am thankful with that

- Away the save be good as reduction of rates, it as value of the non competition is really very low to be 2 years committed of not working in something with direct relationship.
- Bill, do you remember who commented about this subject in our meeting ?
I was, with the purpose of being clear how would be my situation after my exit etc... but as I commented yet, this value don't feel me comfortable in accepting. I don't intend to work as a competitor, but I prefer not to accept this condition for this value. So, I would prefer to pay the integral rates.

- About the value of the GSI's shares, when we began we talking about US $100 per share, in our meeting in Atlanta we talking about US $115 per Share, (that the value that I was thinking to invest would be R$ 1.000.000,00 it would be 0.7% of GSI approximately) and now to Real proposal is oUS. $150 per share.
- I am happy in knowing that GSI has been having a very good valorization in just some months, but as investor, I believe that I am doing very late and it is not much more interesting to buy for this value, I want to think and understand better before accepting these share for this value.

- About I work like advisory for Agromarau in the value of R$ 2.170,00 a month, with 12 hours, I don't judge that it is a value that justifies that I can dedicate me for Agromarau. I prefer to work free for 3 months collaborating with the new CEO if he judges necessary, or to review a value to be really attractive for me and for Agromarau.

Bill, maybe our big distance is my difficulty with the English language and in not getting to transmit for you what I think, or I get understanding better you, or, as I know that you are really very very good in doing proposal with excellent results, but I need to get a little money too.


I believe that as I commented yet with you, I will be always here in Marau, Brazil and we can take advantage with our relationship for new businesses, so much for GSI as new business futures, but I also like to get more money too. ( it's really true)

Certainly I will be talking about with Richard next week.

Regards my friend.

LS 0086

Delivered-To: leo@gsibrasil.ind.br
Subject: Leo Exit
Date: Fri, 22 Sep 2006 09:23:57 -0500
Thread-Topic: Leo Exit
Thread-Index: AcbeUr1wTIZmvD+cS+Scwn0zsbpcqg==
From: "Richard Christman" <Richard.Christman@thegsigroup.biz>
To: <wjbranch@aol.com>
Cc: "John Henderson" <John.Henderson@thegsigroup.biz>,
    <leo@gsibrasil.ind.br>,
    "Richard M Christman" <richard.christman@thegsigroup.biz>

Bill,

As I indicated on the phone, the discussions with Leo were very difficult with the primary issue focusing on the change in share price from 115 to 150. Leo and I reached an agreement this morning relative to his separation package.

1. He will still invest $R1,000,000 in the GSI Group at a price of $150 per share.

2. For the 24 month non-compete and consulting agreement, we agreed on the payments as shown on the attachment with a portion being paid in the US and a portion being paid in Brazil.

3. We will proceed with the more favorable tax treatment of the payments.

4. Relative to the payments for dividends/interest that were calculated from the audited June results, we need to recalculate based on September YTD results since Leo has continued to serve as CEO during this period.

We should get the above executed as quickly as possible.

Richard <<Leo Exit.xls>>

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.405 / Virus Database: 268.12.6/453 - Release Date: 9/20/2006

 Leo Exit.xls

LS 0085

Delivered-To: leo@gsibrasil.ind.br
Subject: Leo Non-Compete and Consulting Agreement
Date: Tue, 26 Sep 2006 10:29:30 -0500
Thread-Topic: Leo Non-Compete and Consulting Agreement
Thread-Index: AcbeUr1wTIZmvD+cS+Scwn0zsbpcqgDLAfqw
From: "Richard Christman" <Richard.Christman@thegsigroup.biz>
To: "Clauss, Peter @pepperlaw.com" <CLAUSSP@pepperlaw.com>
Cc: <wjbranch@aol.com>,
    "Leonardo Segatt" <leo@gsibrasil.ind.br>,
    "John Henderson" <John.Henderson@thegsigroup.biz>,
    "Rafael Coletta" <rafaelcoletta@gsibrasil.ind.br>,
    "Richard M Christman" <richard.christman@thegsigroup.biz>

Peter,

Leo and myself had very productive meetings last week in Brazil relative to his exit and have reached final
agreement which is outlined below with these additional comments.

1. Stock investment: Leo will invest R$1,000,000 of the proceeds that are due to him into stock of the GSI
Group at a price of $150 US per share.

2. Interest and Dividend on Equity: Since Leo continued as CEO we will recalculate based on September 30,
2006 results.

    -- John Henderson to work with Rafael Coletta to determine the amount due.

3. We will continue with the process that will yield the estimated tax savings of R$211,436 for Leo.

4. Consulting: We will simplify this section and pay Leo a set amount for the next 24 months ... with $3000
per month of the total due being paid in the US in US$ and the balance being paid in Brazil in R$. The
payments due in Brazil for the first 9 months are R$15,000 per month and for the next 15 months R$6,000 per
month. The payments due in the US are $3,000 per month for 24 months. The attached worksheet shows
these amoounts.

5. All other terms and conditions should be OK.

Could you please revise the draft agreements so that they can be finalized as quickly as possible.

Thank you,

Richard Christman

------------------------------------------

**From:** Richard Christman
**Sent:** Friday, September 22, 2006 9:24 AM
**To:** wjbranch@aol.com
**Cc:** John Henderson; leo@gsibrasil.ind.br; Richard M Christman
**Subject:** Leo Exit

Bill,

As I indicated on the phone, the discussions with Leo were very difficult with the primary issue focusing on the
change in share price from 115 to 150. Leo and I reached an agreement this morning relative to his
separation package.

LS 0088

2. For the 24 month non-compete and consulting agreement, we agreed on the payments as shown on the attachment with a portion being paid in the US and a portion being paid in Brazil.

3. We will proceed with the more favorable tax treatment of the payments.

4. Relative to the payments for dividends/interest that were calculated from the audited June results, we need to recalculate based on September YTD results since Leo has continued to serve as CEO during this period.

We should get the above executed as quickly as possible.

Richard. <<Leo Exit.xls>>

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.405 / Virus Database: 268.12.6/453 - Release Date: 9/20/2006

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.405 / Virus Database: 268.12.9/456 - Release Date: 9/25/2006

 Leo Exit1.xls

**TAB F**

## Section 3.3(d)

Assets and liabilities:

- On December 28, 2006, the Company received from Leonardo Segatt the amount of $460,809.50, which he intended to be used to buy Company stock. No shares were ever issued and, on May 11, 2007, the Company returned these funds to Leonardo Segatt with interest.

20

CONFIDENTIAL

**TAB G**

**Letter of Transmittal**

*By Mail or Overnight Courier:*

*JPMorgan Chase Bank, N.A.*
4 New York Plaza, 11th Floor
Attn: Escrow Processing
New York, NY 10004

*Telephone Assistance:*
1-800-318-5202

**Please read this Letter of Transmittal carefully. This Letter of Transmittal should be completed and signed in the space provided in Box D on page 4 and hand-delivered or sent by overnight courier or registered mail, return receipt requested and insured, with the completed and signed enclosed Internal Revenue Service ("IRS") Form W-9 (or the appropriate IRS Form W-8 if you are a non-U.S. stockholder) and the certificates for common stock of GSI Holdings Corp., to be surrendered in connection with the transactions contemplated by the Merger Agreement (as defined below).**

**THE INSTRUCTIONS TO THIS LETTER OF TRANSMITTAL SHOULD BE READ CAREFULLY**

Gentlemen:

The undersigned surrenders herewith the above certificate(s) representing shares of common stock, par value $0.01 per share (the "Shares"), of GSI Holdings Corp., (the "Company"), in exchange for the applicable consideration for such Shares and certificate(s) that is payable to the undersigned pursuant to that certain Agreement and Plan of Merger, dated as of June 22, 2007 (the "Merger Agreement"), by and among the Company, CB/GSI Holdings, Inc. ("Buyer"), Charlesbank Equity Fund V, Limited Partnership, as Principal Shareholder and Charlesbank Capital Partners, LLC, a Delaware limited liability company, solely in its capacity as the Stockholders' Representative (the "Stockholders' Representative").

Please deliver the applicable consideration contemplated by the Merger Agreement to which the undersigned is entitled in the name appearing above subject to the following instructions:

☐ **Please check this box if you have lost your certificate(s).**

☐ **Please check this box if this is a non-certificated Letter of Transmittal.**

**Delivery by wire transfer or check of cash payment to which you are entitled under the Merger Agreement (as defined on page 1) shall be made within approximately three (3) business days after the proper delivery, and receipt by the Paying Agent, of this Letter of Transmittal and the appropriate stock certificates.**

## LETTER OF TRANSMITTAL

| BOX A | DESCRIPTION OF COMPANY STOCK SURRENDERED |
|---|---|
| **Name(s) and Address of Registered Holder(s)**<br>*If there is any error in the name or address shown below, please make the necessary corrections.* | **Certificate(s) Enclosed:**<br>*(Please fill in. Attach separate schedule if needed)* |

| Certificate Numbers | Number of Shares of Common Stock Represented by Certificate(s) |
|---|---|
| | |
| | |
| | |
| | |
| **TOTAL SHARES** | |

| BOX B    SPECIAL PAYMENT INSTRUCTIONS | BOX C    SPECIAL DELIVERY INSTRUCTIONS |
|---|---|
| Fill in ONLY if the check or wire transfer of cash to be received by the undersigned is to be issued in a name OTHER than the name appearing in Box A above. *(Unless otherwise indicated in Box C, such check (if applicable) will be mailed to the address indicated below.) (See Instruction below.) (Medallion Signature Guarantee Required)*<br><br>Name: _____<br><br>Address: _____<br><br>_____<br><br>Tax Identification/Social Security Number | Fill in ONLY if the check or wire transfer of cash to be received by the undersigned is to be sent to an address OTHER than the address appearing in Box A or B.<br><br>Name: _____<br>Address: _____<br>_____<br>_____ |

| BOX D    SIGNATURE | BOX E    WIRE TRANSFER INSTRUCTIONS |
|---|---|
| Must be signed by registered holder(s), exactly as name appears on stock certificate(s), or by person(s) authorized to become registered holder(s) by certificates and documents transmitted herewith.  If signature is by an agent, attorney, administrator, executor, guardian, trustee or others acting in a fiduciary or representative capacity, or by an officer of a corporation on behalf of the corporation, please set forth full title and furnish appropriate supporting evidence. *(See Instructions below.)*<br><br>_____<br>Signature of Registered Holder(s)<br><br>_____<br>Printed Name of Registered Holder(s)<br><br>_____<br>Title, if any<br><br>Date: _____    Phone No: _____<br><br>Email Address (optional): _____ | Wire Transfer Instructions:<br><br>Bank Name: _____<br><br>Bank Telephone Number: _____<br><br>Account Name: _____<br><br>Account Number: _____<br><br>Routing Number: _____ |

| SIGNATURE(S) MEDALLION GUARANTEED BY:    *(REQUIRED ONLY AS PROVIDED IN INSTRUCTION BELOW.)* |
|---|

| Name of Institution | Address (including Zip Code) | |
|---|---|---|
| | | |
| Authorized Signature | Printed Name | Date |

Delivery of the enclosed stock certificate(s) will be effected and risk of loss shall pass only upon receipt by the Paying Agent at the address below. **Delivery by check or wire transfer of cash payment to which you are entitled under the Merger Agreement (as defined on page 1) shall be made within approximately three business days after the proper delivery, and receipt by the Paying Agent, of this Letter of Transmittal and the appropriate stock certificates.**

**CONFIDENTIAL**

**CB000645**

## INSTRUCTIONS

A former stockholder of GSI Holdings Corp. will not receive the applicable consideration as contemplated by the Merger Agreement in exchange for such stockholders' Certificate(s) formerly representing Shares until the Certificate(s) owned by such stockholder are received by the Paying Agent at the address set forth above, together with such documents as the Paying Agent may require, and until the same are processed for payment by the Paying Agent. No interest will accrue on any amounts due.

Guarantee of Signatures.  No signature guarantee on this Letter of Transmittal is required (i) if this Letter of Transmittal is signed by the registered holder of the Certificate(s) surrendered herewith, unless such holder has completed the box entitled "Special Payment Instructions" on the Letter of Transmittal, or (ii) if the Certificate(s) is to be surrendered for the account of an eligible guarantor institution such as a commercial bank, trust company, securities broker/dealer, credit union or a savings association participating in a Medallion Program approved by the Securities Transfer Association, Inc. (each of the foregoing being an "Eligible Institution").  In all other cases, all signatures on the Letter of Transmittal must be medallion guaranteed by an Eligible Institution.

Delivery of Letter of Transmittal and Certificates.  This Letter of Transmittal, properly completed and duly executed, together with the Certificate(s), should be delivered to the Paying Agent at the address set forth in this Letter of Transmittal.

The method of delivery of Certificate(s) and any other required documents is at the election and risk of the owner. However, if Certificate(s) are sent by mail, it is recommended that they be sent by certified mail, properly insured, with return receipt requested.  Risk of loss and title of the Certificate(s) shall pass only upon delivery of the Certificate(s) to the Paying Agent.

In the event that the Paying Agent determines that any Letter of Transmittal does not appear to have been properly completed or executed, or that a Certificate does not appear to be in proper form for surrender, or any other irregularity in connection with the surrender appears to exist, the Paying Agent shall be entitled to consult with the Buyer and the Stockholders' Representative for further instructions.  Stockholders entitled to payment in excess of $500,000 may be contacted directly by the Paying Agent and requested to provide any missing or incomplete information. The Paying Agent reserves the right to reject all other such incomplete or irregular presentations directly to the stockholder.  If there are any discrepancies between the number of Shares that any Letter of Transmittal, Certificate or other supporting document may indicate are owned by a stockholder and the number of shares of Company common stock that the Holders List provided by the Buyer to the Paying Agent indicates such stockholder owned of record, the Paying Agent shall consult with the Buyer and the Stockholders' Representative for instructions as to the number of shares of Company common stock, if any, it is authorized to accept for payment; and in the absence of such instructions, the Paying Agent is not authorized to make payment and shall, except as thereafter directed in writing by the Buyer and the Stockholders' Representative, continue to hold any Certificates surrendered in connection therewith, this Letter of Transmittal and any other supporting documents received with such Certificates. A surrender will not be deemed to have been made until all irregularities have been cured or waived.

Inadequate Space.  If the space provided herein is inadequate, the Certificate numbers and the number of Shares formerly represented thereby should be listed on a separate schedule attached hereto.

Signature on Letter of Transmittal, Stock Powers and Endorsements.  If this Letter of Transmittal is signed by the registered holder of the Certificate(s) surrendered hereby, the signature must correspond exactly with the name written on the face of the Certificate(s) without alteration, enlargement or any change whatsoever.

If the Certificate(s) surrendered hereby is owned of record by two or more joint owners, all such owners must sign this Letter of Transmittal.

If any surrendered Certificates are registered in different names on several Certificates, it will be necessary to complete, sign and submit as many separate Letters of Transmittal as there are different registrations of Certificates.

When this Letter of Transmittal is signed by the registered owner(s) of the Certificate(s) listed and surrendered hereby, no endorsements of the Certificate(s) or separate stock powers are required.

If this Letter of Transmittal is signed by a person other than the registered owner of the Certificate(s) listed, such Certificate(s) must be endorsed or accompanied by appropriate stock power(s), in either case signed by the registered

**CONFIDENTIAL**

**CB000646**

owner or owners or a person with full authority to sign on behalf of the registered owner.  Signatures on such Certificate(s) or stock power(s) must be medallion guaranteed by an Eligible Institution.  See Instruction 1.

If this Letter of Transmittal or any Certificate(s) or stock power(s) is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or others acting in a fiduciary or representative capacity, such persons should so indicate when signing, and evidence satisfactory to the Paying Agent of his or her authority to so act must be submitted.  The Paying Agent will not exchange any Certificate(s) until all instructions herein are complied with.

Stock Transfer Taxes.  The registered holder shall timely pay all transfer, documentary, sales, use, stamp, registration and other taxes arising from or relating to the transactions contemplated by the Merger Agreement, to the extent they relate specifically to the payment of cash to the undersigned, and the undersigned shall, at his or her own expense, file all necessary tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes.  In the event that any transfer, documentary, sales, use, stamp, registration or other taxes becomes payable by reason of the payment of the applicable consideration as contemplated by the Merger Agreement in any name other than that of the registered holder, such transferee or assignee must pay such tax or must establish that such tax has been paid or is not applicable.  The Paying Agent will have no responsibility with respect to transfer, documentary, sales, use, stamp, registration or other taxes.

Special Delivery Instructions.  Indicate the name and address of the person(s) to whom the wire transfer comprising the applicable consideration as contemplated by the Merger Agreement is to be sent if different from the name and address of the person(s) signing this Letter of Transmittal.

Substitute Form W-9.  Each surrendering stockholder is required to provide the Paying Agent with such holder's correct Taxpayer Identification Number ("TIN") on the Substitute Form W-9, which is a part of this Letter of Transmittal, and to certify whether the stockholder is subject to backup withholding.  Failure to provide such information or an adequate basis for exemption on the form may subject the surrendering stockholder to United States federal income tax withholding on cash payments made to such surrendering stockholder with respect to the Certificate(s).  If such holder is an individual, the TIN is his or her social security number.  A holder must cross out item (2) in Part 2 of Substitute Form W-9 if such holder is subject to backup withholding.  The box in Part 3 of the form should be checked if the surrendering holder has not been issued a TIN and has applied for a TIN or intends to apply for a TIN in the near future.  If the box in Part 3 is checked, the surrendering holder must also complete the Certificate of Awaiting Taxpayer Identification Number below in order to avoid backup withholding.  Notwithstanding that the box in Part 3 is checked and the Certificate of Awaiting Taxpayer Identification Number is completed, the Paying Agent will withhold at a rate not to exceed 28% on all payments made prior to the time a properly certified TIN is provided to the Paying Agent.  However, such amounts will be refunded to such surrendering holder if a TIN is provided to the Paying Agent within 60 days.

Lost, Stolen or Destroyed Certificate(s).  If your Certificate(s) has been lost, stolen or destroyed, please call the Paying Agent at 1-800-318-5202.  An affidavit of loss will be mailed to you, which must be properly completed and returned (along with a surety fee unless waived by the Buyer) to the Paying Agent.

Information and Additional Copies.  Information and additional copies of this Letter of Transmittal may be obtained from the Paying Agent by writing to the address above or calling the Paying Agent at 1-800-318-5202.

## IMPORTANT TAX INFORMATION

Under United States federal income tax laws, a holder who receives cash payments pursuant to the Merger is required to provide the Paying Agent (as payer) with such holder's correct TIN on the Substitute Form W-9 below (or otherwise establish a basis for exemption from backup withholding) and certify under penalty of perjury that such TIN is correct and that such holder is not subject to backup withholding.  If such holder is an individual, the TIN is his or her social security number.  If the Paying Agent is not provided with the correct TIN, a $50 penalty may be imposed by the Internal Revenue Service, and the payment of any cash pursuant to the Merger may be subject to backup withholding.

Certain holders (including, among others, all corporations and foreign individuals and entities) are not subject to these backup withholding and reporting requirements.  Exempt holders should indicate their exempt status on Substitute Form W-9.  In order for a foreign individual to qualify as an exempt recipient, such individual must submit a Form W-8 BEN, signed under penalties of perjury, attesting to such individual's exempt status.  A Form W-8 BEN can be obtained from the Paying Agent.  See the enclosed "Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9" for additional instructions.

**CONFIDENTIAL**

If backup withholding applies, the Paying Agent is required to withhold at a rate not to exceed 28% of any payments made to the holder or other payee. Backup withholding is not an additional tax. Rather, the Federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld provided that the required information is given to the IRS. If withholding results in an overpayment of taxes, a refund may be obtained from the Internal Revenue Service.

**Purpose of Substitute Form W-9**

To prevent backup withholding on payments made with respect to Certificate(s), the holder is required to notify the Paying Agent of such holder's correct TIN by completing the form below, certifying that (1) the TIN provided on the Substitute Form W-9 is correct (or that such holder is awaiting a TIN), (2) such holder is not subject to backup withholding because (a) such holder is exempt from backup withholding, (b) such holder has not been notified by the Internal Revenue Service that he is subject to backup withholding as a result of a failure to report all interest or dividends or (c) the Internal Revenue Service has notified such holder that such holder is no longer subject to backup withholding and (3) such holder is a U.S. person (including a U.S. resident alien).

**What Number to Give the Paying Agent**

The holder is required to give the Paying Agent the TIN (i.e., social security number or employer identification number) of the holder of the Certificate(s) tendered hereby. If the Certificate(s) are held in more than one name or are not held in the name of the actual owner, consult the enclosed "Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9" for additional guidance on which number to report.

All inquiries regarding this form should be made directly to:

JPMorgan Chase Bank, N.A.
Phone: 1-800-318-5202

All inquiries regarding the Merger should be made directly to:

Company Name: GSI Holdings Corp.

Attention: John Henderson

Address: 1004 E. Illinois St., Assumption, IL 62510 USA

Telephone: 217-226-4421

International Telephone: 1-217-226-4401

U.S. Fax: 800-800-5329

International Fax: 1-217-226-3404

**CONFIDENTIAL**                                                    **CB000648**

| PAYER'S NAME: JPMORGAN CHASE BANK, N.A. | | |
|---|---|---|
| **SUBSTITUTE FORM W-9**<br><br>Please fill in your name and address below | **Part 1**—PLEASE PROVIDE YOUR TIN IN THE BOX AT RIGHT AND CERTIFY BY SIGNING AND DATING BELOW. | Social Security Number(s)<br><br>OR<br><br>Employer Identification Number(s) |
| Name<br><br><br>Address (number and street)<br><br><br>City, State and Zip code | **Part 2**—Certification—Under penalties of perjury, I certify that:<br><br>(1)  the number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me);<br><br>(2)  I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (the "IRS") that I am subject to backup withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified me that I am no longer subject to backup withholding; and<br><br>(3)  I am a U.S. person (including a U.S. resident alien). | **Part 3**—<br><br><br><br><br><br>**Awaiting TIN** ☐ |
| **Department of the Treasury / Internal Revenue Service**<br><br>**Payer's Request for Taxpayer Identification Number (TIN)** | Certification Instructions—You must cross out item (2) in Part 2 above if you have been notified by the IRS that you are subject to backup withholding because you have failed to report all interest or dividends on your tax return.<br><br><br>SIGNATURE _____         DATE _____ | |

NOTE:    FAILURE TO COMPLETE AND RETURN THIS FORM MAY RESULT IN BACKUP WITHHOLDING OF ANY PAYMENTS MADE TO YOU PURSUANT TO THE MERGER. PLEASE REVIEW THE ENCLOSED GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9 FOR ADDITIONAL DETAILS.

YOU MUST COMPLETE THE FOLLOWING CERTIFICATE IF YOU CHECKED
THE BOX IN PART 3 OF SUBSTITUTE FORM W-9.

### CERTIFICATE OF AWAITING TAXPAYER IDENTIFICATION NUMBER

I certify under penalty of perjury that a taxpayer identification number has not been issued to me, and either (a) I have mailed or delivered an application to receive a taxpayer identification number to the appropriate Internal Revenue Service Center or Social Security Administration Office or (b) I intend to mail or deliver an application in the near future.  I understand that if I do not provide a taxpayer identification number by time of payment, all reportable payments made to me will be subject to withholding at a rate not to exceed 28%, but such withheld amounts will be refunded if I provide a certified taxpayer identification number within 60 days.

_____          _____
Signature                                                Date

**CONFIDENTIAL**                                          **CB000649**

# GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9

Guidelines for Determining the Proper Identification Number to Give the Payer.—Social Security numbers have nine digits separated by two hyphens: i.e. 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). Employer identification numbers have nine digits separated by only one hyphen, i.e. 00-0000000. The table below will help determine the number to give the payer.

| For this type of account: | Give the SSN of- | For this type of account | Give the EIN of- |
|---|---|---|---|
| 1. An individual's account | The individual | 8. Sole proprietorship | The owner (4) |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account.[1] | 9. A valid trust, estate, or pension trust | Legal entity (Do not furnish the identifying number of the personal representative or trustee unless the legal entity itself is not designated in the account title)(5) |
| 3. Husband and wife (joint account) | The actual owner of the account or, if joint funds, either person (1) | 10. Corporate account | The corporation |
| 4. Custodian account of a minor (Uniform Gift to Minors Act) | The minor (2) | 11. Religious, charitable, or educational organization account | The organization |
| 5. Adult and minor (joint account) | The adult or, if the minor is the only contributor, the minor (1) | 12. Partnership account held in the name of the business | The partnership |
| 6. Account in the name of guardian or committee for a designated ward, minor, or incompetent person | The ward, minor, or incompetent person (3) | 13. Association, club or other tax-exempt organization | The organization |
| 7. (a) The usual revocable savings trust account (grantor is also trustee) | The grantor-trustee (1) | 14. A broker or registered nominee | The broker or nominee |
| (b) So-called trust account that is not a legal or valid trust under State law | The actual owner (1) | 15. Account with the Department of Agriculture in the name of a public entity (such as a State or local government, school district, or prison) that receives agricultural program payments | The public entity |

1. List first and circle the name of the person whose number you furnish. If only one person on a joint account has a social security number, that person's number must be furnished.
2. Circle the minor's name and furnish the minor's social security number.
3. Circle the ward's, minor's or incompetent person's name and furnish such person's social security number.
4. You must show your individual name, but you may also enter your business or "DBA" name. You may use either your SSN or your EIN (if you have one).
5. List first and circle the name of the legal trust, estate, or pension trust.

*NOTE:    If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.*

**CONFIDENTIAL**

**CB000650**

**Obtaining a Number**

If you don't have a taxpayer identification number or you don't know your number, obtain Form SS-5, Application for a Social Security Number Card, Form W-7, Application for IRS Individual Taxpayer Identification Number, or Form SS-4, Application for Employer Identification Number, at the local office of the Social Security Administration or the Internal Revenue Service and apply for a number.

**Payees Exempt from Backup Withholding**

The following is a list of payees exempt from backup withholding and for which no information reporting is required. For interest and dividends, all listed payees are exempt except item (9). For broker transactions, payees listed in items (1) through (13) and a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker are exempt. Payments subject to reporting under sections 6041 and 6041A are generally exempt from backup withholding only if made to payees described in items (1) through (7), except a corporation that provides medical and health care services or bills and collects payments for such services is not exempt from backup withholding or information reporting. Only payees described in items (2) through (6) are exempt from backup withholding for barter exchange transactions, patronage dividends, and payments by certain fishing boat operators.

(1) A corporation.
(2) An organization exempt from tax under section 501(a), or an IRA, or a custodial account under section 403(b)(7).
(3) The United States or any of its agencies or instrumentalities.
(4) A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities.
(5) A foreign government or any of its political subdivisions, agencies, or instrumentalities.
(6) An international organization or any of its agencies or instrumentalities.
(7) A foreign central bank of issue.
(8) A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States.
(9) A futures commission merchant registered with the Commodity Futures Trading Commission.
(10) A real estate investment trust.
(11) An entity registered at all times during the tax year under the Investment Company Act of 1940.
(12) A common trust fund operated by a bank under section 584(a).
(13) A financial institution.
(14) A middleman known in the investment community as a nominee or listed in the most recent publication of the American Society of Corporate Secretaries, Inc., Nominee List
(15) A trust exempt from tax under section 664 or described in section 4947.

**Payments Exempt from Backup Withholding**

Payments of dividends and patronage dividends not generally subject to backup withholding include the following:

● Payments to nonresident aliens subject to withholding under section 1441.

● Payments to partnerships not engaged in a trade or business in the U.S. and which have at least one nonresident alien partner.

● Payments of patronage dividends where the amount received is not paid in money.

● Payments made by certain foreign organizations.

● Section 404(k) distributions made by an ESOP.

Payments of interest not generally subject to backup withholding include the following:

● Payments of interest on obligations issued by individuals.

**Note:** The payee may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and the payee has not provided his or her correct TIN to the payer.

● Payments of tax-exempt interest (including exempt-interest dividends under Section 852).

● Payments described in Section 6049(b)(5) to nonresident aliens.

● Payments on tax-free covenant bonds under section 1451.

● Payments made by certain foreign organizations.

● Mortgage interest paid to you.

Exempt payees described above should file Form W-9 to avoid possible erroneous backup withholding. FILE THIS FORM WITH THE PAYER, FURNISH YOUR TAXPAYER IDENTIFICATION NUMBER, WRITE "EXEMPT" IN PART II, AND RETURN IT TO THE PAYER. IF THE PAYMENTS ARE INTEREST, DIVIDENDS, OR PATRONAGE DIVIDENDS, ALSO SIGN AND DATE THE FORM.

Certain payments that are not subject to information reporting are also not subject to backup withholding. For details, see sections 6041, 6041A(a), 6042, 6044, 6045, 6049, 6050(N) and 6050A and the regulations thereunder.

*Privacy Act Notice* - Section 6109 requires you to give your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

**CONFIDENTIAL**

CB000651

**Penalties**

*(1) Penalty for Failure to Furnish Taxpayer Identification Number.* – If you fail to furnish your taxpayer identification number to a payer, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

*(2) Civil Penalty for False Information with Respect to Withholding.* – If you make a false statement with no reasonable basis which results in no imposition of backup withholding, you are subject to a penalty of $500.

*(3) Criminal Penalty for Falsifying Information.* – Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

*(4) Misuse of TINS.* – If the requester discloses or uses TINS in violation of Federal law, the requester may be subject to civil and criminal penalties.

FOR ADDITIONAL INFORMATION CONTACT YOUR TAX CONSULTANT OR THE INTERNAL REVENUE SERVICE.

**CONFIDENTIAL**

**CB000652**

Form **W-8BEN**

(Rev. February 2006)

Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner
### for United States Tax Withholding

► Section references are to the Internal Revenue Code.    ► See separate instructions.
► Give this form to the withholding agent or payer. Do not send it to the IRS.

OMB No. 1545-1621

**Do not use this form for:**                                                                                    **Instead, use Form:**

- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct
  of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . . . W-8ECI or W-8EXP

**Note:** *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** *See instructions for additional exceptions.*

### Part I    Identification of Beneficial Owner (See instructions.)

| 1   Name of individual or organization that is the beneficial owner | 2   Country of incorporation or organization |
|---|---|

3   Type of beneficial owner:    ☐ Individual    ☐ Corporation    ☐ Disregarded entity    ☐ Partnership    ☐ Simple trust
☐ Grantor trust    ☐ Complex trust    ☐ Estate    ☐ Government    ☐ International organization
☐ Central bank of issue    ☐ Tax-exempt organization    ☐ Private foundation

4   Permanent residence address (street, apt. or suite no., or rural route). Do not use a P.O. box or in-care-of address.

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|

5   Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|

| 6   U.S. taxpayer identification number, if required (see instructions)     ☐ SSN or ITIN  ☐ EIN | 7   Foreign tax identifying number, if any (optional) |
|---|---|

8   Reference number(s) (see instructions)

### Part II    Claim of Tax Treaty Benefits (if applicable)

9   I certify that (check all that apply):

a ☐ The beneficial owner is a resident of . . . . . . . . . . . . . . . . within the meaning of the income tax treaty between the United States and that country.

b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

d ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10   Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article . . . . . . . . . . . . of the treaty identified on line 9a above to claim a . . . . . . . . . . . . % rate of withholding on (specify type of income): . . . . . . . . . . . . . . . . . . . .
Explain the reasons the beneficial owner meets the terms of the treaty article: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Part III    Notional Principal Contracts

11 ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

### Part IV    Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,

2 The beneficial owner is not a U.S. person,

3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, and

4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ►

| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) | Capacity in which acting |
|---|---|---|

For Paperwork Reduction Act Notice, see separate instructions.                          Cat. No. 25047Z                          Form **W-8BEN** (Rev. 2-2006)

**CONFIDENTIAL**                                                                                                      CB000653

SHAREHOLDER ADDRESS LIST 6-29-07

| Name | Address Line 1 | Address Line 2 | City | State | Zipcode |
|------|----------------|----------------|------|-------|---------|
| Adams, Donald E | 2470 Enola Road | | Carlisle | PA | 17013- |
| Andricks, William D | 2951 Oakmont Drive | | Decatur | IL | 62521- |
| Ares Capital Corporation | c/o Ares Management LLC | | | | |
| Baker, Michael L | Attn: Michael Smith | 280 Park Avenue, 22nd Flr East | New York | NY | 10017 |
| Barth, Jay P | 13906 N. 900th Street | | Effingham | IL | 62401- |
| Basham, Steven R | 773 Spyglass Blvd | | Forsyth | IL | 62535- |
| Bekenstein, Josh | 1108 LEE COURT | | TAYLORVILLE | IL | 62568- |
| Bond, Michael D | Bain Capital | 111 Huntington Av -34th Fl | Boston | MA | 02199 |
| Branch, William | 6442 Cedarcrest Court | | Decatur | IL | 62521- |
| Brotherton, Michael D | 114 Old Camp Road | | Wilmington | NC | 28409 |
| Brown, Gerardo | 1661 E 1500 N Road | | Taylorville | IL | 62568- |
| Cave, Jerry | 1208 WEST MARKET ST. | | Taylorville | IL | 62568- |
| CB Offshore Equity Fund V, L.P. | J. Cave Associates LLC | 4451 Oak Pointe Drive | Brighton | MI | 48116 |
| Charlesbank Coinvestment Partners L.P. | c/o Charlesbank Capital Partners | 200 Clarendon St., 54th Flr | Boston | MA | 02116 |
| Charlesbank Equity Coinvestment Fund V, L.P. | c/o Charlesbank Capital Partners | 200 Clarendon St., 54th Flr | Boston | MA | 02116 |
| Charlesbank Equity Fund V, L.P. | c/o Charlesbank Capital Partners | 200 Clarendon St., 54th Flr | Boston | MA | 02116 |
| Christman, Richard | c/o Charlesbank Capital Partners | 200 Clarendon St., 54th Flr | Boston | MA | 02116 |
| Colletta, Rafael Dalla | 3320 Woodland Shores Drive | | Decatur | IL | 62521 |
| Deutsch, Allen A | Rua Darvin Marozin, 11 Apto 902 | Centro | Marau - RS | Brazil | 99150-000 |
| Duhaime, Nathalie M | 999 E 1260 North Rd | | Taylorville | IL | 62568- |
| Edgerley, Paul | 4817 Lathrop Avenue | | Racine | WI | 53403- |
| Erhardt, Ingo | Bain Capital | 111 Huntington Av -34th Fl | Boston | MA | 02199 |
| Farris, Paul | Rua Orleans, 750 | Bairro America | Joinville - SC | Brazil | 89204-590 |
| Fischer, John | 445 Spring Lane | | Charlottesville | VA | 22903 |
| Fryman, Tom | 4 Lake Julia Drive, South | | Ponte Vedra | FL | 32082 |
| Fuqua, Michael K | 952 N. Linden Avenue | | Decatur | IL | 62522 |
| Galvin, Donald J | 2665 Timber Ridge Drive | | Decatur | IL | 62521- |
| Garrett, Timothy L | 407 Walnut Street | | WESTERVELT | IL | 62565- |
| Golleher, Mitchell D | 8325 US Highway 150 | | W Terre Haute | IN | 47885- |
| Haugan, Clyde | 103 Melbourne Court | | Hot Springs | AR | 71913- |
| Henderson, John W | 516 Eleuthera Lane | | Indian Harbour Beach | FL | 32937 |
| Jordan, Charles L | 1455 E Ashland Avenue | | Mt. Zion | IL | 62549- |
| Kraut, Richard | 609 N. East Street | | Moweaqua | IL | 62550- |
| | 7 Fox Wood Court | P.O. Box 4495 | Park City | UT | 84060 |

NY: 555149-1

CONFIDENTIAL

CB000654

SHAREHOLDER ADDRESS LIST 6-29-07

| Name | Address Line 1 | Address Line 2 | City | State | Zipcode |
|---|---|---|---|---|---|
| Leg Partners III SBIC, L.P. | c/o Golub Capital Incorporated Attn: Greg Chapman. | 551 Madison Avenue, 6th Floor | New York | NY | 10022 |
| Luster, Jason S | P.O. BOX 202 | | Ramsey | IL | 62080- |
| Makie, Don | 1127 SW Russ Lane | | McMinnville | OR | 97128 |
| McGeehan, John T | 380 Secretariat Place | | Mt. Zion | IL | 62549- |
| Meyer, Douglas E | 109 NORTH ST. JOHN STREET | | ASSUMPTION | IL | 62510- |
| Montgomery, Ann | 977 East 1830 North Road | | Taylorville | IL | 62568 |
| Nash, David L | 12597 Baker Road | | Macon | IL | 62544- |
| Nicol, Donald L | 202 N. Shelby Street | | MOWEAQUA | IL | 62550- |
| Pollock, Eugene B | ROUTE #1: BOX #56 | | ASSUMPTION | IL | 62510- |
| Pritchett, Larry D | 3709 Kennedy Drive | | Taylorville | IL | 62568- |
| Rickman, Rex A | 1318 W. Vandeveer | | Taylorville | IL | 62568- |
| Santin, Alexandre Reveilleau | Travessa Padre Capuchinhos, 65 | Centro | Marau - RS | Brazil | 99150-000 |
| Schwieger, Dennis E | 62 South Shores Drive | | Decatur | IL | 62521- |
| Sears, Rick | 1413 Regatta Drive | | Wilmington | NC | 28406 |
| Shuler, Burl A | 1446 E 800 N Road | | OWANECO | IL | 62555-5507 |
| Stuthman, Thomas C | 3 Ladue Court | | Taylorville | IL | 62568- |
| Vettel, David L | 870 Country Court | | Mt. Zion | IL | 62549- |
| Watson II, William A | 5170 Goodwin Ct. | | Dalton City | IL | 61925-9644 |
| Administrator, Watson (401K) | 5170 Goodwin Ct. | | Dalton City | IL | 61925-9644 |
| Edward A Hauck, as Trustee of the William J. Branch Granter Retained Annuity Trust | c/o William Branch | 114 Old Camp Road | Wilmington | NC | 28409 |
| Wiseman, Gene | 4781 W 250 N | | Rensselaer | IN | 47978- |
| Yan, Goh Bak | 8-2-8 Desa University, Jalan Sungai Dua | 11700 Gelugor | Penang, Malaysia | | |
| Zabik, Matt | 4466 Lake Fork Road | | Illiopolis | IL | 62539 |

NY: 555149-1

CONFIDENTIAL

CB000655

**TAB H**

**EXHIBIT H**

**TEMPORARILY OMITTED**

**TAB I**

STOCK PURCHASE AND MANAGEMENT EQUITY AGREEMENT, dated as of December 28, 2006, between GSI HOLDINGS CORP., a Delaware corporation (the "*Company*"), and LEONARDO SEGATT (the "*Purchaser*").

### INTRODUCTION

The Purchaser is a consultant to The GSI Group, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("*GSI Group*"), or a wholly-owned subsidiary of GSI Group, and desires to acquire an equity interest in the Company.

The Company desires to issue and sell to the Purchaser, and the Purchaser desires to purchase from the Company, 3,072 shares (the shares of Common Stock now or hereafter acquired by the Purchaser, the "*Shares*") of the Company's Common Stock, $.01 par value per share (the "*Common Stock*").

In addition to the terms of the issuance, sale and purchase of the Shares, the Company and the Purchaser desire to set forth herein certain matters regarding the ownership of the Shares by the Purchaser.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

"*2005 Stock Plan*" means the GSI Holdings Corp. 2005 Management Stock Incentive Plan.

"*Affiliate*" means, with respect to any specified person, a limited or general partner or member of such Person or another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified, and with respect to a natural Person shall include any Family Member of such Person.

"*Agreement*" means this Stock Purchase and Management Equity Agreement.

"*Board*" means the Board of Directors of the Company.

"*Capital Stock*" means all shares of common stock, preferred stock or other equity securities of the Company or securities, rights, options or warrants convertible into or exchangeable or exercisable therefor now held or hereafter acquired by the Stockholders, including without limitation upon the conversion, exercise or exchange of such securities or options or warrants or preemptive rights to acquire the same.

"*Claims*" is defined in Section 2.2.

"*Closing*" means the closing for the consummation of the transactions contemplated by this Agreement.

NY: 529673-3

CONFIDENTIAL

CB036585

SECTION 6.15. *Remedies.*   In the event of a breach by any party to this Agreement of its obligations under this Agreement, any party injured by such breach, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement.  The parties agree that the provisions of this Agreement shall be specifically enforceable, it being agreed by the parties that the remedy at law, including monetary damages, for breach of any such provision will be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is hereby waived.

SECTION 6.16. *Not an Employment Contract.*  Nothing in this Agreement or any other instrument executed pursuant hereto shall confer upon the Purchaser any right to continue in the employ or service of the Company or any Subsidiary or Affiliate thereof or limit the right of the Company or any Subsidiary or Affiliate thereof to terminate the employment or service of the Purchaser at any time with or without cause.

SECTION 6.17. *Further Assurances.*  Each party shall cooperate and take such action as may be reasonably requested by another party in order to carry out the provisions and purposes of this Agreement.

[Signature Page Follows]

18

CONFIDENTIAL

CB036602

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

THE COMPANY:

GSI HOLDINGS CORP.

By: _____
Name:  William Branch
Title:    Chairman

[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

CB038603

PURCHASER:

Name:    Leonardo Segatt

Address: Rua Duque de eaxian 444

MARAU    RS - Brasil

Facsimile:

[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

CB036604

Accepted and agreed to for purposes of Sections 5.2, 5.4 and 5.5 only:

PRINCIPAL STOCKHOLDERS:

CHARLESBANK EQUITY FUND V, LIMITED PARTNERSHIP

By:  Charlesbank Equity Fund V GP,
     Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By:
Name:
    Title:
       Address: 200 Clarendon Street
             54th Floor
             Boston, MA 02216
             Fax No.:  (617) 619-5402


CB OFFSHORE EQUITY FUND V, L. P.

By:  Charlesbank Equity Fund V GP,
     Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By:
Name:
    Title:
       Address: 200 Clarendon Street
             54th Floor
             Boston, MA 02216
             Fax No.:  (617) 619-5402

[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

CB036605

CHARLESBANK EQUITY COINVESTMENT FUND V, LIMITED PARTNERSHIP

By:  Charlesbank Equity Fund V GP,
     Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By:
Name:
     Title:
          Address: 200 Clarendon Street
                   54th Floor
                   Boston, MA 02216
                   Fax No.:  (617) 619-5402


CHARLESBANK COINVESTMENT PARTNERS, LIMITED PARTNERSHIP

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By:
Name:
     Title:
          Address: 200 Clarendon Street
                   54th Floor
                   Boston, MA 02210
                   Fax No.:  (617) 619-5402

[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

CB036606

**TAB J**

*C&B Draft - 12.05.06*

STOCK PURCHASE AND MANAGEMENT EQUITY AGREEMENT, dated as of December __, 2006, between GSI HOLDINGS CORP., a Delaware corporation (the "*Company*"), and LEONARDO SEGATT (the "*Purchaser*").

### INTRODUCTION

The Purchaser is an employee or director of, or consultant to, The GSI Group, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("*GSI Group*"), or a wholly-owned subsidiary of GSI Group, and desires to acquire an equity interest in the Company.

The Company desires to issue and sell to the Purchaser, and the Purchaser desires to purchase from the Company, 3,072 shares (the shares of Common Stock now or hereafter acquired by the Purchaser, the "*Shares*") of the Company's Common Stock, $.01 par value per share (the "*Common Stock*").

In addition to the terms of the issuance, sale and purchase of the Shares, the Company and the Purchaser desire to set forth herein certain matters regarding the ownership of the Shares by the Purchaser.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

"*2005 Stock Plan*" means the GSI Holdings Corp. 2005 Management Stock Incentive Plan.

"*Affiliate*" means, with respect to any specified person, a limited or general partner or member of such Person or another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified, and with respect to a natural Person shall include any Family Member of such Person.

"*Agreement*" means this Stock Purchase and Management Equity Agreement.

"*Board*" means the Board of Directors of the Company.

"*Capital Stock*" means all shares of common stock, preferred stock or other equity securities of the Company or securities, rights, options or warrants convertible into or exchangeable or exercisable therefor now held or hereafter acquired by the Stockholders, including without limitation upon the conversion, exercise or exchange of such securities or options or warrants or preemptive rights to acquire the same.

"*Cause*" means the Purchaser's (1) indictment for, conviction of or plea of guilty or *nolo contendere* to a felony or any crime involving moral turpitude, fraud, embezzlement or theft, (2) breach of fiduciary duties, which breach is not cured within 30 days after written notice from GSI Group, or (3) gross negligence or willful misconduct in the performance of the services

NY: 529673-2

and duties consistent with the Purchaser's title and position, which negligence or misconduct is not cured within 30 days after written notice from GSI Group.

"*Claims*" is defined in Section 2.2.

"*Closing*" means the closing for the consummation of the transactions contemplated by this Agreement.

"*Combined Voting Power*" with respect to Capital Stock of the Company means the number of votes such stock is normally entitled (without regard to the occurrence of any contingency) to vote in an election of directors of the Company.

"*Common Stock*" is defined in the Introduction.

"*Company*" is defined in the preamble.

"*Consulting Agreement*" means the Non-Competition and Consulting Agreement, dated November 13, 2006, by and among Agromarau Industria e Comercio Ltda., GSI Group, the Company, the Purchaser and Colloni Participações Ltda.

"*control*" (including, with its correlative meanings, "*controlled by*" and "*under common control with*") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"*Controlling Interest*" means shares of Capital Stock of the Company representing at least 50% of the Combined Voting Power of the then outstanding shares of Capital Stock of the Company.

"*Cost*" equals $150.00 per share (subject to adjustment pursuant to Section 6.1), with respect to the Shares, and the exercise price per share, with respect to any Option Shares.

"*Disability*" has the meaning ascribed to such term in the Executive Severance and Restrictive Covenant Agreement or if the Purchaser is not party to such an agreement, means the Purchaser becoming unable to substantially perform services for 30 consecutive days, or for shorter periods aggregating 90 days in any 12-month period, due to a physical or mental disability, whether resulting from illness, accident or otherwise.

"*Drag Along Transaction*" is defined in Section 5.4(a).

"*Executive Severance and Restrictive Covenant Agreement*" means any Executive Severance and Restrictive Covenant Agreement entered into by and between GSI Group and the Purchaser, whether on, before or after the date hereof.

"*Fair Market Value*" means the value of a Share calculated pursuant to Section 5.2(c) as of the applicable date of determination.

"*Family Member*," with respect to the Purchaser, means (x) the Purchaser's spouse, children, grandchildren, parents, grandparents (natural, step, adopted or in-laws),

2

CB040530

siblings, nieces and nephews or (y) a trust, corporation, limited liability company, partnership or other entity, all of the beneficial interests in which shall be held directly or indirectly by the Purchaser or one or more persons described in clause (x); *provided, however*, that during the period any such trust, corporation, limited liability company, partnership or other entity holds any right, title or interest in any Common Stock, no person or entity other than the Purchaser or one or more Family Members of the Purchaser of the type listed in clause (x) may be or become beneficiaries, stockholders, members or limited or general partners or owners thereof.

"*Fully Diluted Basis*" means (i) when referring to the computation of a percentage of the shares of Common Stock that would be held by a Stockholder, the ratio, after giving effect to the full conversion or exercise, as the case may be, of (A) all outstanding Capital Stock of the Company held by such Stockholder whether or not such Capital Stock is then convertible or exercisable, as the case may be, to (B) the aggregate number of shares of Common Stock that would be outstanding after giving effect to the full exercise and conversion, as the case may be, of any outstanding Capital Stock of the Company held by all security holders, whether or not such Capital Stock is then exercisable or convertible and (ii) when referring to the number of shares of Common Stock held by a Stockholder, the number of shares of Common Stock that would be held by such Stockholder after giving effect to the full conversion or exercise, as the case may be, of all outstanding Capital Stock of the Company held by such Stockholder and all other security holders, whether or not such Capital Stock is then exercisable or convertible.

"*Good Reason*" means (1) the failure of GSI Group to pay any amount (in the aggregate over $10,000) due to the Purchaser within 45 days after written notice to GSI Group of such failure (provided that if GSI Group disputes any amount or that any such amount is due, and pays any undisputed amount, the 45 day cure period will be tolled until the resolution of the dispute) or (2) any other material breach by GSI Group of any obligations owed to the Purchaser in connection with the Purchaser's employment, directorship or consultancy.

"*GSI Group*" is defined in the Introduction.

"*Initial Public Offering*" means the sale of any shares of the Common Stock of the Company pursuant to a registration statement that has been declared effective under the Act, if as a result of such sale (i) the issuer becomes a reporting company under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, and (ii) such stock is traded on the New York Stock Exchange or the American Stock Exchange, or is quoted on the NASDAQ National Market System or is traded or quoted on any other national stock exchange or national securities system.

"*Option Shares*" means any shares of Common Stock issued to the Purchaser pursuant to the exercise of stock options under the 2005 Stock Plan or any other equity incentive program, arrangement or agreement approved by the Board.

"*Permitted Transferee*" means (a) any person to whom the Shares are transferred by will or the laws of descent and distribution or (b) with the approval of the Company in its sole discretion and provided that the transfer is for no consideration, any Family Member of the Purchaser.

3

CB040531

"*Person*" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, governmental authority or other entity, and shall include any successor (by merger or otherwise) of such entity.

"*Principal Stockholders*" means the Persons executing this Agreement as "Principal Stockholders" on or after the date hereof and their respective Affiliates and direct and indirect transferees.

"*Proportionate Percentage*" means, with respect to the Purchaser, a percentage equal to the quotient of (a) the number of shares of Common Stock then owned by the Purchaser, including the Shares and any Option Shares (but excluding any unexercised vested or unvested stock options and the shares of Common Stock underlying such stock options) divided by (b) the sum of (i) the number of issued and outstanding shares of Common Stock plus (ii) the number of shares of Common Stock issuable upon conversion, exercise or exchange of all Capital Stock which is convertible into or exercisable or exchangeable for Common Stock held by all Stockholders, whether or not such Capital Stock is then convertible, exercisable or exchangeable, including any and all shares of Common Stock issuable upon the exercise of stock options granted under the 2005 Stock Plan.

"*Purchase Price*" is defined in Section 2.1.

"*Purchaser*" is defined in the preamble.

"*Registration Rights Agreement*" means the October 2005 Registration Rights Agreement, dated as of October 6, 2005, among the Company, the Purchaser and others.

"*Repurchase Period*" and "*Repurchase Right*" are defined in Section 5.2(a).

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Selling Principal Stockholders*" is defined in Section 5.4(a).

"*Shares*" is defined in the Introduction.

"*Stockholder*" means any current or future holder of Capital Stock of the Company, including without limitation the Principal Stockholders and the Purchaser.

"*Stockholders Agreement*" means the Stockholders Agreement, dated as of May 16, 2005, among the Company, the Principal Stockholders and certain other stockholders party thereto.

"*Stockholder Transferee*" is defined in Section 5.5.

"*Subscription Rights Offer*" is defined in Section 5.6(a).

4

CONFIDENTIAL

CB040532

"*Subsidiary*" means any joint venture, corporation, partnership, limited liability company or other entity, as to which the Company, either directly or indirectly, has more than fifty percent (50%) of the voting power or rights to capital or profits.

"*Tag-Along Notice*" is defined in Section 5.4(b).

"*Tag-Along Transaction*" is defined in Section 5.5(a).

"*Termination Date*" means the date on which the Purchaser ceases to be employed by or serve as a director of or consultant to GSI Group or any Affiliate thereof for any reason.

"*Transfer*" means any sale, transfer, assignment, or other disposition.

## ARTICLE II

### PURCHASE AND SALE

SECTION 2.1. *Purchase and Sale of Common Stock.* Subject to the terms and conditions of this Agreement, the Company hereby issues and sells to the Purchaser, and the Purchaser hereby acquires from the Company, on the date hereof, the Shares for a purchase price of $150.00 per Share or an aggregate amount of $460,800 (the "*Purchase Price*"), in cash, payable by wire transfer of immediately available funds to an account heretofore designated to the Purchaser by the Company, by certified bank check or money order payable to the Company.

SECTION 2.2. *Delivery of Certificates.* The Company is hereby issuing and selling the Shares to the Purchaser by delivering to the Purchaser a duly executed certificate or certificates representing the Shares registered in the name of the Purchaser, with appropriate issue stamps, if any, affixed at the expense of the Company, free and clear of all security interests, liens, pledges, charges, options, rights of first refusal, mortgages, indentures, security agreements or other claims, encumbrances, agreements, arrangements or commitments of any kind or character, whether written or oral and whether or not relating in any way to credit or the borrowing of money ("*Claims*"), other than the transfer and other restrictions set forth in this Agreement and restrictions imposed by Federal and state securities laws, and the Purchaser is hereby purchasing the Shares for the Purchase Price.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Purchaser as follows:

SECTION 3.1. *Organization, Good Standing and Qualification.* The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly qualified as a foreign corporation in each jurisdiction in which the nature of its activities and/or of its properties makes such qualification necessary, except for those jurisdictions in which failure to be so qualified would not have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the condition (financial or otherwise), assets, liabilities, operations, earnings or business of the Company. The

5

CONFIDENTIAL

CB040533

Company has all requisite corporate power and authority to execute and deliver this Agreement, to issue and sell the Shares, and to carry out the other provisions of this Agreement.

SECTION 3.2. *Capitalization.* The authorized capital of the Company as of the date hereof and immediately prior to the purchase and sale of the Shares contemplated hereby consists of 700,000 shares of Common Stock, $.01 par value per share. Immediately after giving effect to the purchase and sale of the Shares contemplated hereby and by any other agreements to purchase capital stock of the Company as of the date hereof, the authorized Capital Stock of the Company will consist of 700,000 shares of Common Stock, of which 568,456 shares will be issued and outstanding as of the date hereof, all of which will be owned as set forth on Schedule I hereto, and all of which is or will be duly authorized, validly issued, fully paid and nonassessable. The Shares have been duly authorized and, when issued in accordance with this Agreement, will be duly issued, fully paid and nonassessable and will not have been issued in violation of, and will not be subject to, any preemptive or subscription rights other than pursuant to this Agreement. The Shares, when issued and delivered in accordance with this Agreement, will be free and clear of any Claims and the Purchaser will have good title to such Shares; *provided, however,* that the Shares may be subject to restrictions on transfer under this Agreement and under applicable state and/or federal securities laws. The Company has no outstanding rights (either preemptive or other) or options to subscribe for or purchase from the Company and no warrants or other agreements providing for or requiring the issuance by the Company, of any of its Capital Stock or any securities convertible into or exchangeable for its Capital Stock, other than (i) the 100,000 shares of Common Stock reserved for issuance under the 2005 Stock Incentive Plan, (ii) pursuant to the Stockholders Agreement and (iii) pursuant to this Agreement.

SECTION 3.3. *Authority; Binding Agreements.* The Company has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of the Company. This Agreement has been duly executed and delivered by the Company, and constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, or (b) general principles of equity.

SECTION 3.4. *Consents and Approvals.* No filings with, notices to, or approvals of any governmental or regulatory body are required to be obtained or made by the Company in connection with the consummation of the transactions contemplated by this Agreement.

SECTION 3.5. *No Violations.* The execution and delivery of this Agreement and the performance by the Company of its obligations hereunder (i) do not and will not conflict with or violate any provision of the Certificate of Incorporation or Bylaws of the Company, and (ii) do not and will not (a) conflict with or result in a breach of the terms, conditions or provisions of, (b) constitute a default under, (c) result in the creation of any Claim upon the Capital Stock or assets of the Company pursuant to, (d) give any third party the right to modify, terminate or accelerate any obligation under, (e) result in a violation of, or (f) require any authorization, consent, approval, exemption or other action by or notice to any court or administrative or governmental body or other third party pursuant to, any law, statute, rule or regulation or any

6

CONFIDENTIAL

CB040534

agreement or instrument or any order, judgment or decree to which the Company is subject or by which any of its assets are bound.

SECTION 3.6. *Use of Proceeds.*  The proceeds of the sale of the Shares shall be used to prepay or repay a portion of the Notes and for working capital for purposes of conducting the business of GSI Group and its subsidiaries.

SECTION 3.7. *Charter Documents.*  The Company has made available to each Purchaser true and complete copies of the Company's Certificate of Incorporation and Bylaws as in effect on the date hereof.

Except for the representations and warranties expressly set forth in this Article III, the Company is not making any other express or implied representations or warranties with respect to the Shares or the transactions contemplated by this Agreement.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Company as follows:

SECTION 4.1. *Capacity; Binding Agreements.*  The Purchaser has all requisite capacity to execute and deliver this Agreement and the Joinder to the Registration Rights Agreement and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Joinder to the Registration Rights Agreement, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary action on the part of the Purchaser.  This Agreement and the Joinder to the Registration Rights Agreement have been duly executed and delivered by the Purchaser, and constitute the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, or (b) general principles of equity.

SECTION 4.2. *Residence.*  The residence of the Purchaser in which its investment decision was made is located at the address set forth on the signature page hereto.

SECTION 4.3. *Investment Representations.*

(a)     If the Purchaser is an "*Accredited Investor*" as defined under <u>Regulation D</u> of the Securities Act and applicable counterpart state statutes, the Purchaser has completed and signed the accredited investor questionnaire, attached as Exhibit A hereto, and represents and warrants to the Company as set forth therein and such representations and warranties are hereby incorporated into this Agreement.  If the Purchaser is not an "Accredited Investor" as defined under <u>Regulation D</u> of the Securities Act, the Purchaser has not completed or signed the accredited investor questionnaire attached as Exhibit A hereto.

(b)     The Purchaser understands that participation in the offering is the Purchaser's decision and will have no impact, positive, negative or otherwise, on Purchaser's employment or other relationship with GSI Group.  The Purchaser acknowledges that the

7

                                                                  CB040535

Purchaser's decision to participate in the offering is voluntary and not the product of coercion by the Company or any of its Affiliates.

(c)    The Purchaser recognizes that an investment in the Shares involves substantial risk and has taken full cognizance of and understands all of the risks related to the purchase of the Shares.    The Purchaser represents that there have been no representations, guarantees, or warranties made to the Purchaser by the Company, GSI Group, their respective agents or employees, or by any other person, expressly or by implication, solely with respect to: (i) the approximate length of time that the Purchaser will be required to remain as owner of the Shares and (ii) the percentage of profit and/or amount or type of consideration, profit or loss (including tax benefits) to be realized, if any, as a result of an investment in the Shares.

(d)    The Purchaser has reached the age of majority in the state in which the Purchaser resides, is a bona fide resident and domiciliary (not a temporary or transient resident) of that state of residence, is a citizen of the United States, has adequate means of providing for the Purchaser's current needs and personal contingencies, is able to bear the substantial economic risks of an investment in the Company, has no need for liquidity in such investment, could afford a complete loss of such investment and represents that the amount of the investment is not unreasonably large when compared with the Purchaser's total financial capability.

(e)    The Purchaser is acquiring the Shares for investment and not with a view toward resale or distribution, and the Purchaser does not anticipate any change in circumstances that would cause the Purchaser to desire to sell the Shares or any part thereof.    The Purchaser is acquiring the Shares for its own account and not as nominee or agent for any third party.

(f)    The Purchaser understands that:  (a) the Shares have not been registered under the Securities Act, or state securities laws; (b) the Purchaser has no right to require such registration other than such rights as may be granted to the Purchaser pursuant to this Agreement or the Registration Rights Agreement; (c) state securities administrators and the Securities and Exchange Commission have not reviewed, approved or disapproved the Shares or passed on the merits of the offering; and (d) a legend restricting transferability will be placed on all certificates representing the Shares.

(g)    The Purchaser understands that the Company may accept or reject this subscription in whole or in part for any reason.

(h)    The Purchaser understands that (a) there might not ever be a market for the Shares and (b) the Purchaser may be unable to liquidate the Shares in the case of an emergency or otherwise.

(i)    The Purchaser acknowledges that the Company is not providing Purchaser with legal, tax or investment advice and understands that Purchaser should consult his own advisers as to legal, tax, business and related matters concerning investment in the Shares. Purchaser represents and warrants that the Purchaser has, either alone or with a professional representative, such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of this investment.

(j)    The Purchaser acknowledges that (i) the Shares do not carry any rights of cumulative voting, or any other rights to assure that the Purchaser may designate any one or

8

CONFIDENTIAL

CB040536

more directors on the Board and (ii) nothing herein shall limit the ability of the Company to issue Shares and Purchaser's ownership percentage of the Company's Capital Stock may be diluted in certain circumstances, including, without limitation, in the event that the Company issues additional securities to fund an acquisition, raise capital or for any other purposes.

(k)     All representations and warranties set forth above, on Exhibit A hereto or in any other written statements or documents delivered by the Purchaser in connection with the transactions contemplated hereby are true and correct as of the date of this Agreement and shall survive that date.

(l)     The Purchaser agrees to the imprinting of a legend on certificates representing all of the Shares to the following effect:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED, QUALIFIED, APPROVED OR DISAPPROVED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR AN APPLICABLE EXEMPTION TO THE REGISTRATION REQUIREMENTS OF SUCH ACT OR SUCH LAWS AND NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY HAS PASSED ON OR ENDORSED THE MERITS OF THESE SECURITIES.  THE TRANSFER OF ANY SECURITIES REPRESENTED BY THIS CERTIFICATE IS FURTHER LIMITED BY THE PROVISIONS OF THE STOCK PURCHASE AND MANAGEMENT EQUITY AGREEMENT BETWEEN GSI HOLDINGS CORP. AND THE PURCHASER IDENTIFIED THEREIN, A COPY OF WHICH IS ON FILE AT THE EXECUTIVE OFFICE OF THE COMPANY."

(m)     The Purchaser acknowledges and understands that the Shares have not been registered under the Securities Act and agrees that the Shares may not be offered, sold or transferred except (i) pursuant to a registration statement under the Securities Act that has become effective and is current with respect to the Shares or (ii) pursuant to a specific exemption from registration under the Securities Act.

SECTION 4.4. *Nature of Purchaser*.  The Purchaser acknowledges that the offer and sale of the Shares is intended to be exempt from registration under the Securities Act.  The Purchaser is an employee or director of, or consultant to, the Company or an Affiliate, has had full opportunity to ask questions of and has received satisfactory answers from the Company or its representatives concerning the terms and conditions of their investment and has been given access to all information necessary to make an investment decision as to the Shares, including without limitation the Information Statement.

SECTION 4.5.  The Purchaser understands the meaning and legal consequences of the representations and warranties, and agrees to indemnify, defend and hold harmless the Company, GSI Group and each director, officer and shareholder of each of them from and against any and all loss, damage or liability (including without limitation attorneys' fees) due to or arising out of a breach of any representation or warranty of the Purchaser, except that the

9

CONFIDENTIAL

CB040537

Purchaser does not waive any rights granted to the Purchaser under federal or state securities laws.

Except for the representations and warranties expressly set forth in this Article IV, the Purchaser is not making any other express or implied representations or warranties with respect to the Shares or the transactions contemplated by this Agreement.

ARTICLE V

TRANSFERABILITY OF SHARES

SECTION 5.1. *Restrictions on Transfers of Shares; Permitted Transferees.* Prior to the expiration of 180 calendar days following an Initial Public Offering, the Shares shall not be transferable or transferred, assigned, pledged or hypothecated in any way (whether by operation of law or otherwise) except that the Purchaser may transfer the Shares (a) to a Permitted Transferee, (b) to the Company in accordance with Section 5.2 of this Agreement, or (c) as provided for in Sections 5.4 and 5.5 of this Agreement. This Agreement shall be binding on and enforceable against any person who is a Permitted Transferee of the Shares but not a person who acquires the Shares pursuant to Section 5.2, 5.4 or 5.5 of this Agreement or as part of the Initial Public Offering. Each Permitted Transferee shall, as a condition to the transfer thereof to such Permitted Transferee, execute an agreement pursuant to which it shall become a party to this Agreement.

SECTION 5.2. *Repurchase Rights.*

(a)    In the event that the Purchaser ceases to be employed by or serve as a director of or consultant to GSI Group or any of its Affiliates for any reason prior to an Initial Public Offering, the Company, during, in the case of termination due to death or Disability, the period from the Termination Date until 90 calendar days following the 12 month anniversary of the Termination Date, and in all other cases, the 180 calendar days following the Termination Date (as applicable, the "*Repurchase Period*"), shall, subject to Section 5.2(e), have the right to purchase all or any portion of the Shares (the "*Repurchase Right*"). The purchase price for each Share purchased under this Section 5.2(a) shall equal Fair Market Value; provided, however, that, if the Purchaser fails to comply with Section 2 or Section 3 of the Consulting Agreement in accordance with the terms thereof, the purchase price shall equal the lower of Fair Market Value or Cost. If the Company elects to purchase some or all of the Shares, it shall notify the Purchaser at or before the end of the Repurchase Period of such election and the purchase price for the Shares to be purchased shall be paid in cash to the Purchaser at the following times: (i) if the total repurchase price of all Shares being repurchased from an individual is no more than $250,000, at a time set by the Company within 30 calendar days after the date notice is given to the Purchaser of the Company's election to exercise the Repurchase Right or (ii) if the total repurchase price of all Shares being repurchased from an individual is more than $250,000, at the Company's election, as to which it shall notify the Purchaser, either (1) at a time set by the Company within 30 calendar days after the date notice is given to the Purchaser of the Company's election to exercise the Repurchase Right or (2) in three equal installments, with the first installment payable within 30 calendar days after the date notice is given to the Purchaser of the Company's election to exercise the Repurchase Right, and the second and third installments payable on the first and second anniversaries of such initial payment date, provided in all cases

10

CONFIDENTIAL

CB040538

that the Purchaser has presented to the Company a stock certificate or certificates evidencing the Shares to be purchased (or an affidavit of loss with respect thereto) duly endorsed for transfer. If the Purchaser fails to deliver such stock certificate or certificates (or an affidavit of loss with respect thereto) duly endorsed for transfer, the Shares represented thereby shall be deemed to have been purchased upon (i) the payment by the Company of the total purchase price or the first installment thereof, as elected by the Company, for the purchased Shares to the Purchaser or (ii) notice to the Purchaser that the Company is holding the total purchase price or the first installment thereof, as elected by the Company, for the purchased Shares for the account of the Purchaser, and upon such payment or notice, the Purchaser will have no further rights in or to such Shares. In the event that the Company elects to pay the repurchase price in three installments, upon receipt of the stock certificate or certificates for the Shares, or payment or notice as described in the preceding sentence, the Company shall deliver to the Purchaser a non-negotiable promissory note with a principal amount equal to the unpaid installments and bearing interest on the unpaid amount at a per annum rate equal to the prime rate as of the Termination Date, where the "prime rate" means the rate published as the prime rate for such day (or if such day is not a business day, for the immediately preceding business day) by the *Wall Street Journal* or, if the *Wall Street Journal* does not publish the prime rate, by any publication or other source reasonably selected by the Company. Accrued and unpaid interest under such note shall be payable on each installment payment date. Notwithstanding the foregoing, to the extent that applicable law or regulation or any of the credit facilities provided to the Company or GSI Group prohibits or restricts the Company or GSI Group from making any payments of or in respect of the purchase price for the purchased Shares, or the Board determines in good faith that it would not be prudent business judgment for the Company or GSI Group to make any payments of or in respect of the purchase price for the purchased Shares, the Company may (x) defer its exercise of the Repurchase Right or any installment thereof for so long as such restriction or condition pertains or (y) assign its rights under this Section 5.2(a) to any one or more of the Principal Stockholders.

(b)　　In order to carry out the provisions of this Section 5.2 more effectively, the Company shall hold the Shares in escrow together with separate stock powers executed by the Purchaser in blank for transfer. The Company shall not dispose of the Shares except as otherwise provided in this Agreement. In the event of any repurchase by the Company (or any of its assigns), the Company is hereby authorized by the Purchaser, as the Purchaser's attorney-in-fact, to date and complete the stock powers necessary for the transfer of the Shares being purchased and to transfer such Shares in accordance with the terms hereof. At such time as any Shares are no longer subject to the Company's repurchase right, the Company shall, at the written request of the Purchaser, deliver to the Purchaser (or the relevant Permitted Transferee) a certificate representing such Shares with the balance of the Shares (if any) to be held in escrow pursuant to this Section 5.2(b).

(c)　　The Fair Market Value of Shares to be purchased hereunder by the Company or any of the Principal Stockholders, as the case may be, shall be determined in good faith by the Company's Board of Directors as of the Termination Date.

(d)　　The Purchaser shall not be considered to have ceased to be employed by GSI Group for purposes of this Agreement if the Purchaser continues to be employed by GSI Group or an Affiliate thereof.

11

CB040539

(e)    In the event that, on the Termination Date, the Purchaser owns Shares, including Option Shares that have not been owned by the Purchaser for a period of at least six months, except in the case of termination due to death or Disability, with respect to all such Shares, the Repurchase Period will not commence on the Termination Date but rather will commence on the first date on which all such Shares have been owned by the Purchaser for six months and a day. In the event that following the Termination Date, the Purchaser exercises any then outstanding vested stock options, with respect to such Option Shares, except in the case of termination due to death or Disability the Repurchase Period will not commence on the Termination Date but rather will commence on the first date on which all such Option Shares have been owned by the Purchaser for six months and a day.

SECTION 5.3. *Lock-up Arrangements*.    If requested in writing by the underwriters for an underwritten public offering of Common Stock of the Company, the Purchaser shall agree not to sell or transfer any Shares (other than Shares being registered in such offering) without the consent of such underwriters for a period of at least (a) 180 calendar days following the effective date of the registration statement relating to the Initial Public Offering, and (b) 90 calendar days following the effective date of the registration statement relating to any other underwritten public offering, and to execute and deliver any form of agreement requested by such underwriter reasonably and in good faith to evidence the agreements of the Purchaser set forth herein.

SECTION 5.4. *Drag Along Rights*.    (a) If any Principal Stockholder, acting singly or in combination with any other Principal Stockholder (collectively, the "*Selling Principal Stockholders*"), proposes to enter into a transaction or series of related transactions (collectively, the "*Drag Along Transaction*") pursuant to which the Selling Principal Stockholders shall transfer to any transferee a Controlling Interest, then the Selling Principal Stockholders may require the Purchaser to sell, or cause to be sold, and the Purchaser shall be obligated to sell or cause to be sold, which obligation shall be enforceable by the Company, to the proposed transferee in the Drag Along Transaction any or all Shares owned by the Purchaser for the same relative consideration received by the Selling Principal Stockholders in the Drag Along Transaction and otherwise on the same terms and conditions obtained by the Selling Principal Stockholders in the Drag Along Transaction. The Selling Principal Stockholders shall provide a written notice of such sale to the Purchaser not less than 10 calendar days prior to the closing of such sale.

(b)    At the closing of any sale of Common Stock contemplated in Section 5.4(a), the Purchaser agrees to take all actions in connection with the consummation of the proposed Transfer as may reasonably be requested by the Principal Stockholders, including the delivery of a certificate or certificates representing the Purchaser's Shares, duly endorsed in blank or otherwise in suitable form for transfer, against payment in full of the purchase price therefor.   The Purchaser agrees to take all reasonable and necessary action to cause the consummation of any Transfers to which Section 5.4(a) applies, including voting its Common Stock (whether at an annual or special meeting of the Company, whether by written consent, proxy or otherwise, and whether or not at an adjourned meeting) in favor of such Transfer and not exercising any appraisal rights in connection therewith. The Company shall take all actions necessary within its control to cooperate with and give effect to any Transfers to which Section 5.4(a) applies.

12

CB040540

SECTION 5.5. *Tag-Along Right.* (a) In the event that the Selling Principal Stockholders propose to enter into a transaction or series of related transactions (collectively, the "*Tag Along Transaction*"), pursuant to which the Selling Principal Stockholders shall transfer to any transferee shares of Common Stock constituting more than 50% of the then outstanding shares of Capital Stock held by all the Principal Stockholders, and the Selling Principal Stockholders do not elect, or do not have the right to elect, to require the sale of the Shares of the Purchaser pursuant to Section 5.4(a), such Selling Principal Stockholders shall notify the Purchaser in writing of such proposed Transfer and its terms and conditions. Within 10 calendar days after the date of such notice, the Purchaser shall notify the Selling Principal Stockholders in writing if the Purchaser elects to participate in such Transfer. If the Purchaser fails to notify the Selling Principal Stockholders within such 10 calendar day period, the Purchaser shall be deemed to have waived its rights hereunder. If the Purchaser notifies the Selling Principal Stockholders that it intends to participate in the Tag Along Transaction, the Purchaser shall have the right to sell at the same price and on the same terms and conditions as the Selling Principal Stockholders, a number of shares of Common Stock equal to the shares of Common Stock the third party actually proposes to purchase from the Selling Principal Stockholders multiplied by the Proportionate Percentage. Nothing in this Section 5.5 shall be construed to limit the ability of the Selling Principal Stockholders to complete the Transfer prior to the passage of 15 calendar days, provided that sufficient provision is made to permit the Purchaser to complete the sale of his or her stock hereunder within 10 calendar days of the election by the Purchaser to exercise such rights.

(b)     This Section 5.5 will not apply to any Transfer of Common Stock by any Principal Stockholder to an Affiliate of any Principal Stockholder.

SECTION 5.6. *Subscription Rights.* (a) Subject to the provisions of Section 5.6(b), the Company will not issue, sell, or enter into any agreements or commitments pursuant to which it becomes obligated to issue or sell, any shares of its Common Stock, or any warrants, options or other securities convertible or exchangeable into such shares of Common Stock, excluding any debt securities convertible or exchangeable into shares of Common Stock, unless the Company first offers (the "*Subscription Rights Offer*") in writing to sell to the Purchaser, at the same price and on the same terms and conditions, the Purchaser's Proportionate Percentage of such securities proposed to be offered by the Company. Such Subscription Rights Offer will remain outstanding for at least 10 calendar days from the date of such notice and will be exercised by the Purchaser by giving written notice to the Company within such period.

(b)     The Subscription Rights Offer shall not apply to: (i) the issuance of any shares of Capital Stock or by any of the Company's subsidiaries other equity securities, or any warrants, options or other securities convertible or exchangeable into such shares, to directors, officers, employees, advisors or consultants of the Company or any of its subsidiaries pursuant to an incentive compensation, bonus, stock option, stock grant, stock purchase or other similar plan or arrangement approved by the Company's Board of Directors (provided that the foregoing shall not include issuances to directors or officers who are employees of the Principal Stockholders), (ii) issuances to third party equipment lessors, banks, financial institutions, manufacturers, vendors, suppliers, consultants or similar Persons in arm's-length transactions approved by the Company's Board of Directors, the principal purpose of which is other than the raising of capital, (iii) issuances as consideration in connection with an acquisition of a third party on an arm's-length basis by the Company or one of its subsidiaries, (iv) issuances in a

13

CONFIDENTIAL

CB040541

merger with a third party on an arm's-length basis involving the Company or one of its subsidiaries that is approved by the Company's Board of Directors, the principal purpose of which is other than the raising of capital, (v) any arm's-length borrowing, direct or indirect, from financial institutions or other Persons by the Company, including any type of loan or payment evidenced by any type of debt instrument, including borrowings that have equity features, including warrants, options or other rights to purchase Capital Stock, or are convertible into or exchangeable for Capital Stock, (vi) the issuance of any securities by the Company in a firmly underwritten public offering, or (vii) issuances pursuant to a stock split, stock dividend, reclassification or other distribution made on a pro rata basis to all holders of Capital Stock.

> SECTION 5.7. *Information Rights*. The Company shall deliver the following to the Purchaser:

> (a)    at any time when the Company is not required pursuant to applicable law, rule or regulation or the terms of any outstanding indenture or security to file reports under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), not later than 120 days after the end of each fiscal year of the Company, a full copy of the audit report containing a copy of the consolidated balance sheet of the Company and its subsidiaries as of the end of such year and the related consolidated statements of income and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail with footnotes and accompanied by the opinion of the Company's independent public accounting firm;

> (b)    at any time when the Company is not required pursuant to applicable law, rule or regulation or the terms of any outstanding indenture or security to file reports under the Exchange Act, as soon as available, but not later than 45 days after the end of each of the first three fiscal quarters of each year the unaudited consolidated balance sheet of the Company and its subsidiaries, and the related consolidated statements of income and cash flow for such quarter and for the period commencing on the first day of the fiscal year and ending on the last day of such quarter, all certified by an appropriate officer of the Company; and

> (c)    at any time when the Company is required pursuant to applicable law, rule or regulation or the terms of any outstanding indenture or security to file reports under the Exchange Act, promptly after the same are filed, copies of all reports, statements and other documents filed with the Securities and Exchange Commission at which point Section 5.7(a) and (b) shall expire and no longer be binding upon the Company.

> (d)    Notwithstanding the terms and conditions of Section 5.7(a), (b) and (c), as long as the Company or any Subsidiary of the Company files regular reports under the Securities Exchange Act of 1934, as amended, the delivery to the Purchaser of each Annual Report on Form 10-K and Quarterly Report on Form 10-Q filed with the SEC will satisfy the Company's obligations under this Section 5.7.

ARTICLE VI

MISCELLANEOUS

14

CONFIDENTIAL

SECTION 6.1. *Option Shares; Recapitalizations, Exchanges, Etc. Affecting Shares; Adjustment of Cost.*

(a)     If, subsequent to the date hereof, any additional shares of Common Stock are issued to the Purchaser or any Permitted Transferee, including any shares of Common Stock issued pursuant to the exercise of any option (including options granted under the 2005 Stock Plan), warrant or other security convertible into or exercisable for shares of Common Stock, such shares of Common Stock will be deemed to be Shares for all purposes of Article V (and any applicable provisions of Article VI) of this Agreement.

(b)     The provisions of this Agreement shall apply to any and all shares of capital stock of the Company or any successor or assign of the Company that may be issued in respect of, in exchange for, or in substitution of, the Shares by reason of any stock dividend, stock split, stock issuance, reverse stock split, combination, recapitalization, reclassification, merger, consolidation or otherwise.  Nothing herein shall prohibit or restrict the Company from taking any corporate action or engaging in any corporation transaction of any kind, including, without limitation, any merger, consolidation, liquidation or sale of assets.

(c)     In the event of any stock dividend, stock split, stock issuance, reverse stock split, combination, recapitalization, reclassification, merger, consolidation or similar event as a result of which the Purchaser holds a lesser or greater number of Shares and/or other securities, the Cost shall be appropriately adjusted as determined in good faith by the Board.

SECTION 6.2. *Survival of Provisions; Termination.*  This Agreement will terminate upon the earliest to occur of (i) an Initial Public Offering and (ii) written consent of the Purchaser and the Company.  Upon such a termination, all rights and obligations under this Agreement will terminate, except the Purchaser's obligations under Section 5.3 with respect to lock-up arrangements in connection with an Initial Public Offering or any subsequent underwritten public offering.

SECTION 6.3. *Notices.*  All notices, demands and other communications provided for or permitted hereunder will be made in writing and will be by registered or certified first-class mail, return receipt requested, telecopier, courier services or personal delivery to the following addresses, or to such other addresses as will be designated from time to time by a party in accordance with this Section 6.3:

If to the Company:

GSI Holdings Corp.
c/o Charlesbank Capital Partners LLC
200 Clarendon Street, 54th Floor
Boston, Massachusetts 02216
Attention:  General Counsel
Facsimile:  (617) 619-5402

with a copy to:

15

CONFIDENTIAL

CB040543

Covington & Burling LLP
1330 Avenue of the Americas
New York, New York 10019
Attention: Scott F. Smith
Facsimile: (212) 841-1010

If to the Purchaser, to the address set forth below the Purchaser's signature below.

If to the Principal Stockholders:

Charlesbank Capital Partners LLC
200 Clarendon Street, 54th Floor
Boston, Massachusetts 02116
Attention: General Counsel
Facsimile: (617) 619-5402

with a copy to:

Covington & Burling LLP
1330 Avenue of the Americas
New York, New York 10019
Attention: Scott F. Smith
Facsimile: (212) 841-1010

or at such other address as the party to whom notice is to be given may have furnished to the other party in writing in accordance herewith. If such notice or communication is mailed, such communication shall be deemed to have been given on the fifth business day following the date on which such communication is posted.

SECTION 6.4. *Successors and Assigns.* This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns, including any Permitted Transferees. The provisions of Article V also will inure to the benefit of and be enforceable by the Principal Stockholders.

SECTION 6.5. *Amendment and Waiver.* (a) No failure or delay on the part of the Company or the Purchaser in exercising any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver of or consent to any departure by the Company or the Purchaser from any provision of this Agreement will be effective unless signed in writing by the party entitled to the benefit thereof, *provided* that notice of any such waiver will be given to each party hereto as set forth herein. Except as otherwise provided herein, no amendment, modification or termination of any provision of this Agreement will be effective unless signed in writing by or on behalf of the Company and the Purchaser.

(b) Any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure by the Company or the Purchaser from the terms of any provision of this Agreement, will be

16

CONFIDENTIAL

CB040544

effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or the Purchaser in any case will entitle the Company or the Purchaser to any other or further notice or demand in similar or other circumstances.

SECTION 6.6. *Counterparts*. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed will be deemed to be an original and all of which taken together will constitute one and the same agreement.

SECTION 6.7. *Headings*. The headings in this Agreement are for convenience of reference only and will not limit or otherwise affect the meaning hereof.

SECTION 6.8. *WAIVER OF JURY TRIAL*. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

SECTION 6.9. *GOVERNING LAW*. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE.

SECTION 6.10. *CONSENT TO JURISDICTION*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK OR ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF NEW YORK IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE SHARES OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

SECTION 6.11. *Severability*. If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof will not be in any way impaired, unless the provisions held invalid, illegal or unenforceable will substantially impair the benefits of the remaining provisions hereof.

SECTION 6.12. *Entire Agreement*. This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of

17

CONFIDENTIAL

CB040545

the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein. This Agreement supersedes all prior agreements and understandings among the parties with respect to such subject matter hereof.

SECTION 6.13. *Expenses.* Each party to this Agreement will each bear its or his or her own costs incurred in connection with the negotiation, execution and delivery and enforcement of this Agreement, including the fees and expenses of lawyers, financial advisors and accountants.

SECTION 6.14. *Certain Definitions and Rules of Interpretation.* Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "any" are not exclusive and "include" and "including" are not limiting; (iii) all currency is reflected in U.S. Dollars; (iv) a reference to any agreement or other contract includes permitted supplements and amendments; (v) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; (vi) a reference to a person includes its permitted successors and assigns; (vii) a reference to GAAP or generally accepted accounting principles refers to United States generally accepted accounting principles; and (viii) a reference in this Agreement to an Article, Section or Exhibit is to the Article, Section or Exhibit of this Agreement.

SECTION 6.15. *Remedies.* In the event of a breach by any party to this Agreement of its obligations under this Agreement, any party injured by such breach, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement. The parties agree that the provisions of this Agreement shall be specifically enforceable, it being agreed by the parties that the remedy at law, including monetary damages, for breach of any such provision will be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is hereby waived.

SECTION 6.16. *Not an Employment Contract.* Nothing in this Agreement or any other instrument executed pursuant hereto shall confer upon the Purchaser any right to continue in the employ or service of the Company or any Subsidiary or Affiliate thereof or limit the right of the Company or any Subsidiary or Affiliate thereof to terminate the employment or service of the Purchaser at any time with or without Cause.

SECTION 6.17. *Further Assurances.* Each party shall cooperate and take such action as may be reasonably requested by another party in order to carry out the provisions and purposes of this Agreement.

[Signature Page Follows]

18

CONFIDENTIAL

CB040546

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

THE COMPANY:

GSI HOLDINGS CORP.

By: _____
        Name:  William Branch
        Title:    Chairman

[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

CB040547

PURCHASER:

_____

Name:    Leonardo Segatt

Address:


Facsimile:

[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

CB040548

Accepted and agreed to for purposes of Sections 5.2, 5.4 and 5.5 only:

PRINCIPAL STOCKHOLDERS:

CHARLESBANK EQUITY FUND V, LIMITED PARTNERSHIP

By:  Charlesbank Equity Fund V GP,
     Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By:  _____
Name:
     Title:
          Address: 200 Clarendon Street
                   54th Floor
                   Boston, MA 02216
                   Fax No.:  (617) 619-5402


CB OFFSHORE EQUITY FUND V, L. P.

By:  Charlesbank Equity Fund V GP,
     Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By:  _____
Name:
     Title:
          Address: 200 Clarendon Street
                   54th Floor
                   Boston, MA 02216
                   Fax No.:  (617) 619-5402


[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

CHARLESBANK EQUITY COINVESTMENT FUND V, LIMITED PARTNERSHIP

By:  Charlesbank Equity Fund V GP,
     Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By: _____
Name:
    Title:
            Address: 200 Clarendon Street
                     54th Floor
                     Boston, MA 02216
                     Fax No.: (617) 619-5402


CHARLESBANK COINVESTMENT PARTNERS, LIMITED PARTNERSHIP

By:  Charlesbank Capital Partners, LLC,
     its General Partner

By: _____
Name:
    Title:
            Address: 200 Clarendon Street
                     54th Floor
                     Boston, MA 02210
                     Fax No.: (617) 619-5402


[Signature Page To Stock Purchase and Management Equity Agreement]

CONFIDENTIAL

## Stockholders and Purchasers

| Stockholder or Purchaser | Number of Shares |
|---|---|
| Principal Stockholders | 486,250 |
| Investment funds not affiliated with the Principal Stockholders | 17,500 |
| Company executives and management (including board members not affiliated with the Principal Stockholders and excluding shares issuable upon exercise of options) | 56,206 |
| Other investors | 8,500 |
| **Total** | 568,456 |

CB040551

<u>EXHIBIT A</u>

### <u>Accredited Investor Questionnaire</u>

**REGULATION D**
**QUALIFICATION STATEMENT**

   The undersigned qualifies as an "accredited investor" pursuant to Regulation D under the Securities Act of 1933, as amended (the "1933 Act"), as a result of his, her or its status as (check the appropriate description(s)):

_____   1.   a natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1,000,000;

_____   2.   a natural person who had an individual income in excess of $200,000 in each of the two most recent years, or joint income with his or her spouse in excess of $300,000 in each of those years, and who reasonably expects an income of the same level in the current year;

_____   3.   a corporation or partnership with total assets in excess of $5,000,000 and not formed for the specific purpose of acquiring the securities offered;

_____   4.   a trust with total assets greater than $5,000,000 not formed for the purpose of acquiring the securities offered whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment;

_____   5.   an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if any of the following apply:

     (i)   the employee benefit plan has total assets in excess of $5,000,000;

     (ii)   the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser;

     (iii)   the plan is a self-directed plan in which the investment decisions are made solely by persons who are accredited investors. (Please put an "*" in the appropriate description(s) to indicate how the person(s) making investment decisions are "accredited"); or

_____   6.   an entity in which all of the equity owners are "accredited investors" under any one or more of the categories specified in subparagraphs 1 through 5 above.

Dated: _____, 2006

            _____
            **LEONARDO SEGATT**

            **By:**_____
            Name:
            Title (if applicable):

CONFIDENTIAL

CB040552

**TAB K**

<u>Schedule 2.8</u>

<u>Indemnifiable Claims</u>

"*Indemnifiable Claims*" shall mean the sum of (i) Tax Indemnifiable Claims (as defined below), (ii) Segatt Indemnifiable Claims (as defined below) and (iii) subject to the Surviving Corporation's compliance in all material respects with its obligations pursuant to Section 6.18 of the Merger Agreement, Flora Indemnifiable Claims (as defined below) incurred by the Surviving Corporation, in each case solely to the extent not (A) taken into account in the determination of Closing Net Working Capital or Final Merger Consideration or (B) otherwise paid to or recovered by the Surviving Corporation or any of its Affiliates; *provided* that (x) no Tax Indemnifiable Claim shall be an Indemnifiable Claim unless and until the aggregate amount of Tax Indemnifiable Claims exceeds $2,000,000 (the "*Tax Deductible*"); (y) no Segatt Indemnifiable Claim shall be an Indemnifiable Claim unless and until the aggregate amount of Segatt Indemnifiable Claims exceeds $500,000 (the "*Segatt Deductible*") and (z) no Flora Indemnifiable Claim shall be an Indemnifiable Claim unless and until the aggregate amount of Flora Indemnifiable Claims exceeds $500,000 (the "*Flora Deductible*"), in which event only the amount in excess of the Tax Deductible, Segatt Deductible or the Flora Deductible, respectively, shall be an Indemnifiable Claim and deducted from the Contingent Consideration, *provided further* that the right of the Surviving Corporation to deduct Indemnifiable Claims in the determination of the Contingent Consideration shall be the sole recourse available to the Surviving Corporation with respect to any Tax Indemnifiable Claim, Segatt Indemnifiable Claim and Flora Indemnifiable Claim.  To the extent the underlying claim giving rise to an Indemnifiable Claim gives rise to a deduction, amortization, exclusion from income or other Tax allowance to the Surviving Corporation or any of its Affiliates, the reduction in the Surviving Corporation's (and its Affiliates') income Tax liability resulting from any such Tax allowance shall be treated as a Special Tax Deduction Benefit subject to the Surviving Corporation's payment obligations to the Stockholders' Representative (on behalf of the Stockholders and Option Holders) set forth in Section 6.11(c).  For purposes of the foregoing sentence, the Surviving Corporation and its Affiliates shall be deemed to use all other deductions, amortizations, exclusions from income or other Tax allowances of the Surviving Corporation and its Affiliates (to the extent such deductions, amortizations, exclusions from income or other Tax allowances are entitled to be used under applicable Tax law) prior to the use of any deduction, amortization, exclusion from income or other Tax allowance that gives rise to a Special Tax Deduction Benefit for which the Surviving Corporation is required to pay to the Stockholders' Representative (on behalf of the Stockholders and Option Holders) pursuant to the preceding sentence.  The parties agree to treat any payment in respect of an Indemnifiable Claim pursuant to this Schedule 2.8 as an adjustment to the Final Merger Consideration for all applicable Tax purposes unless otherwise required by law.  To the extent any such payment is not treated as an adjustment to the Final Merger Consideration for applicable Tax purposes, the increase in the Surviving Corporation's Tax liability as a result of such payment shall be treated as a Tax Indemnifiable Claim for purposes of this Schedule 2.8.  To the extent any reduction in the amount of the Contingent Consideration is made for any Indemnifiable Claims, Stockholders' Representative shall be subrogated to any rights of the Surviving Corporation with respect to any insurance, indemnification or other claims arising out of the matters giving rise to such Indemnifiable Claim.

NY: 551522-2

**CONFIDENTIAL**

**CB005074**

"*Tax Indemnifiable Claims*" means any and all loss, liability, damage or expense (including such reasonable costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Buyer or any of its Affiliates in connection with any claim, action, suit, proceeding, demand, assessment or judgment incident thereto) with respect to any of the following:

    (a) for Taxes with respect to any taxable period of the Company or any of its Subsidiaries (or any predecessors) ending on or before the Closing Date, and, with respect to any Straddle Period, for the portion of any such liability that is allocable to the portion of the taxable period ending on the Closing Date (based on a closing of the books at the close of business on the Closing Date);

    (b) (as a result of Treasury Regulation Section 1.1502-6 or otherwise) for Taxes of any Person (other than Company or any of its Subsidiaries) which is or has ever been affiliated with Company or any of its Subsidiaries or with whom Company or any of its Subsidiaries otherwise joins or has ever joined (or is or has ever been required to join) in filing any consolidated, combined, unitary or aggregate Tax Return, prior to the Closing Date;

    (c) attributable to any breach of (A) any representation or warranty contained in Section 3.13 or (B) any covenant set forth in Section 6.11;

    (d) for any payments required to be made after the Closing Date that relate to events occurring on or prior to the Closing Date under any Tax sharing, Tax indemnity, Tax allocation or similar contracts (whether or not written) to which the Company or any of its Subsidiaries was obligated, or was a party, on or prior to the Closing Date; and

    (e) for which the Buyer is already then entitled, at the time the amount of any Contingent Consideration is finally determined under Section 2.8(a), pursuant to Section 6.11(e).

"*Flora Indemnifiable Claim*" means any and all loss, liability, damage or expense (including such reasonable costs and expenses of investigation and defense, including reasonable attorneys' fees and disbursements, incurred by the Surviving Corporation or any of its Affiliates in connection with any claim, action, suit, proceeding, demand, assessment or judgment incident thereto) to the extent (i) arising out of or relating to the presence prior to the Closing, and any subsequent migration either prior to or after the Closing, into the soil, groundwater, surface water or environment, of any Hazardous Substance on, under or above the facilities and real property located at 1051 W. North Avenue, Flora, Illinois; and (ii) not recovered prior to the earlier of (x) the 180th day after a claim for indemnification from the "Sellers" (as defined in the 2005 Stock Purchase Agreement) is made by the Surviving Corporation pursuant to the 2005 Stock Purchase Agreement and (y) the date on which the Surviving Corporation delivers the Contingent Consideration Notice with respect to which the Surviving Corporation seeks to assert such Indemnifiable Claim.

"*Segatt Indemnifiable Claim*" means any and all loss, liability, damage or expense (including such reasonable costs and expenses of investigation and defense, including reasonable attorneys' fees and disbursements, incurred by the Surviving Corporation or any of its Affiliates in connection with any claim, action, suit, proceeding, demand, assessment or judgment incident thereto) to the extent arising out of or related to the entry into, or the subsequent amendment or

- 2 -

termination of, the Stock Purchase and Management Equity Agreement dated as of December 28, 2006 between the Company and Leonardo Segatt.

- 3 -

**CONFIDENTIAL**

**CB005076**

**TAB L**

## Section 3.10

### Pending and threatened litigation:

| Name of party | Case / Docket Number | Court | Reserve as 12/31/2006 | Reserve as 3/31/2007 | Reserve as 5/30/2007 |
|---|---|---|---|---|---|
| Don Johnson | No. 23,058 | 25th Judicial District, Gonzales County, Texas. | $ 25,000 | $ 25,000 | $ 25,000 |
| SCEA Du Touch Co. | Roll No. 02/01/685 | Toulouse, France. | $ 250,000 | $ 250,000 | $ 250,000 |
| Cooperative Plus, Inc. | Civil No. 06-3264 | U.S.D.C., C.D. Illinois. | $ 25,000 | $ 25,000 | $ 25,000 |
| Pistachio Corp. of Arizona | Civil No. 2006-00710 | Superior Court, Maricopa County, Arizona. | $ 50,000 | $ 50,000 | $ 50,000 |
| B & E Ventures | No. 06-NW-CV-01570 | Newton County, Missouri. | $ 5,000 | $ 5,000 | $ 5,000 |
| Sukup Manufacturing Co. | Civil No. 05-3011 | U.S.D.C., C.D. Illinois. | $ - | $ - | $ - |
| Gail L. Williams | No. 3:06-cv-648 | U.S.D.C., S.D. Illinois. | $ 189,372 | $ 189,372 | $ 189,372 |
| Larry Diemcke | N/A | N/A | $ 10,000 | $ 10,000 | $ 10,000 |
| Sunterra Farms | N/A | N/A | $ 10,000 | $ 10,000 | $ 10,000 |
| Texas Farm | N/A | N/A | $ 10,000 | $ 10,000 | $ 10,000 |
| Grinnell | N/A | N/A | $ 7,500 | $ 7,500 | $ 7,500 |
| Mavin Rustan | N/A | N/A | $ - | $ - | $ - |
| Wisconsin Gas Hose Failure | N/A | N/A | $ 10,000 | $ 10,000 | $ 10,000 |
| Richard Farms | N/A | N/A | $ 11,474 | $ 11,474 | $ 11,474 |
| Paul Smoker | N/A | N/A | $ 100,000 | $ 100,000 | $ 100,000 |
| Rose Acre Farm | N/A | N/A | $ 4,636 | $ 4,636 | $ 4,636 |
| Rose Acre Farm | N/A | N/A | $ 25,000 | $ 25,000 | $ - |
| Deloche Fire Claim | N/A | N/A | $ 1,000 | $ 1,000 | $ 1,000 |
| Judy Digel | N/A | N/A | $ 25,000 | $ 25,000 | $ 20,000 |
| Don and Bill Decker Farms | N/A | N/A | $ | $ | $ 10,000 |
| John Kincade | N/A | N/A | $ | $ | $ 10,000 |
| Daniel Sethring | N/A | N/A | $ | $ | $ 10,000 |
| Charles Myers | N/A | N/A | $ | $ | $ |
| Total Product Liability Reserve | | | $ 758,982.28 | $ 758,982.28 | $ 758,982.28 |

36

CONFIDENTIAL

CB000369