9/5/2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LEONARDO SEGATT, | ) | |
| | ) | |
| Plaintiff, | ) | No.: *07 Civ. 1413 (WHP)(JCF)* |
| | ) | *ECF Case* |
| - against - | ) | |
| | ) | |
| GSI HOLDINGS CORP., WILLIAM J. BRANCH, | ) | *PROPOSED* AMENDED AND |
| CHARLESBANK EQUITY FUND V, LIMITED | ) | <u>SUPPLEMENTAL</u> COMPLAINT |
| PARTNERSHIP, CB OFFSHORE EQUITY FUND V, | ) | |
| L.P., CHARLESBANK EQUITY COINVEST- | ) | |
| MENT FUND V, LIMITED PARTNERSHIP, | ) | |
| CHARLESBANK COINVESTMENT PARTNERS, | ) | |
| LIMITED PARTNERSHIP, CHARLESBANK | ) | |
| EQUITY FUND V GP, LIMITED PARTNERSHIP | ) | |
| and CHARLESBANK CAPITAL PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### Introduction

1.      Defendants deceived Plaintiff into rescinding his purchase of 3,072 Shares[1] of

---

\*  *Deleted material is struck through and new material appears in italics, pleaded, except as to matters where Plaintiff's personal involvement is clear, upon information and belief, based on documents produced by Defendants, as more fully described in the filings in support of Plaintiff's Motion for Relief from Judgment, Reconsideration and Leave to Amend and Supplement his Complaint in this action.*

[1]Unless otherwise noted, capitalized terms have the meaning defined in either the Stock Purchase and Management Equity Agreement ("Stock Purchase Agreement") dated initially as of December __, 2006 and subsequently as of December 28, 2006 (a copy of which is attached as Exhibit C and the terms of which are incorporated by reference), or in the Agreement and Plan of Merger ("Merger Agreement") dated as of June 22, 2007 (a copy of which is attached as Exhibit F and the terms of which are incorporated by reference), as the context requires.

9/5/2008

the Common Stock of Defendant GSI Holdings, Corp. ("GSI Holdings") at $150 per share by misrepresenting to him that the Shares had not been issued, by not disclosing to him their plans and activities to sell GSI Holdings at a substantially higher price and by insinuating a threat that, if Plaintiff did not rescind his purchase of the 3,072 Shares, there would be "problems" with the business done by Plaintiff's companies with an affiliate of Defendant GSI Holdings. Plaintiff demands compensatory damages of not less than $1,689,590.50 plus interest and punitive damages of not less than an additional $5,068,771.50.

<u>The Parties</u>

2.       Plaintiff is a citizen of Brazil, residing in Marau, State of Rio Grande do Sul, Brazil.

3.       Upon information and belief, based on the Information Statement dated July 2, 2007, which is more fully described below, Defendant GSI Holdings is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1004 E. Illinois Street, Assumption, Illinois 62510.

4.       Upon information and belief, based on the Separation Agreement dated November 13, 2006[2], which is more fully described below, and on a recent internet search, Defendant William J. Branch is a citizen of the State of North Carolina, residing at 114 Old Camp Road, Wilmington, North Carolina 28409, and was at all relevant times a director, the Chairman and a controlling person of Defendant GSI Holdings. *He was also among the ten*

- 2 -

9/5/2008

*largest individual shareholders of Defendant GSI Holdings.*

5.      Upon information and belief, based on the Stock Purchase Agreement and the Merger Agreement, both of which agreements are more fully described below, and on public filings with the United States Securities and Exchange Commission, Defendant Charlesbank Equity Fund V, Limited Partnership is a limited partnership organized and existing under the laws of the State of Delaware with offices  in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston, Massachusetts 02116,  and was at all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

6.      Upon information and belief, based on the Stock Purchase Agreement, Defendant CB Offshore Equity Fund V, L.P. is a limited partnership with offices  in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was at all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

7.      Upon information and belief, based on the Stock Purchase Agreement and public filings in the Commonwealth of Massachusetts,  Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership is a domestic limited partnership under the laws of the Commonwealth of Massachusetts with offices in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

---

[2]A copy of the Separation Agreement is attached as Exhibit A and its terms are

9/5/2008

8.      Upon information and belief, based on the Stock Purchase Agreement and public filings in the Commonwealth of Massachusetts, Defendant Charlesbank Coinvestment Partners, Limited Partnership is a domestic limited partnership under the laws of the Commonwealth of Massachusetts with offices in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was at all relevant times a Principal Stockholder and controlling person of Defendant GSI Holdings.

9.      Upon information and belief, based on the Stock Purchase Agreement, Defendant Charlesbank Equity Fund V GP, Limited Partnership is a limited partnership with offices in care of Defendant Charlesbank Capital Partners, LLC at 200 Clarendon Street, Boston Massachusetts 02116, and was at all relevant times the General Partner and controlling person of Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund V, L.P. and Charlesbank Equity Coinvestment Fund V, Limited Partnership and, therefore, an Affiliate of such Defendants within the meaning of the Stock Purchase Agreement and itself a Principal Stockholder and controlling person of Defendant GSI Holdings.

10.     Upon information and belief, based on the Information Statement dated December 6, 2006 of Defendant GSI Holdings and The GSI Group, Inc.[3], the Stock Purchase

---

incorporated by reference.

[3]A copy of the Information Statement dated December 6, 2006 is attached as Exhibit B and its terms are incorporated by reference.

- 4 -

9/5/2008

Agreement, the Information Statement dated July 2, 2007[4], and the Merger Agreement, all of which are more fully described below, and on an internet search, Defendant Charlesbank Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware with offices at 200 Clarendon Street,  Boston, Massachusetts 02116, and at 70 East 55th Street, New York, New York 10022, and was at all relevant times the General Partner and controlling person of Defendant Charlesbank Coinvestment Partners, Limited Partnership and of Defendant Charlesbank Equity Fund V GP, Limited Partnership. Consequently, Defendant Charlesbank Capital Partners, LLC was an Affiliate of such Defendants and of Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund, V, L.P. and Charlesbank Equity Coinvestment Fund V, Limited Partnership within the meaning of the Stock Purchase Agreement and itself a Principal Stockholder and controlling person of Defendant GSI Holdings, which it formed and capitalized in 2005, *the five-member board of directors of which includes three members, Kim G. Davis, Andrew S. Janower and Michael W. Choe, all of whom are executives of Defendant Charlesbank Capital Partners, LLC.*  In addition, as General Partner of Defendants Charlesbank Coinvestment Partners, Limited Partnership and Charlesbank Equity Fund V GP, Limited Partnership, as manager of all Defendant Principal Stockholders of Defendant GSI Holdings, other than itself, and  as the Stockholders Representative under the Merger Agreement with the full authority to act on behalf of and bind stockholders of

---

[4]A copy of the Information Statement dated July 2, 2007 is attached as Exhibit G and

9/5/2008

Defendant GSI Holdings who so authorized it, Defendant Charlesbank Capital Partners, LLC is a controlling person of all other Defendant Principal Stockholders of Defendant GSI Holdings.  Collectively, Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund V, L.P., Charlesbank Equity Coinvestment Fund V, Limited Partnership, Charlesbank Coinvestment Partners, Limited Partnership, Charlesbank Equity Fund V GP, Limited Partnership and Charlesbank Capital Partners, LLC are referred to herein as the "Charlesbank Defendants".

<u>Jurisdiction</u>

11.    This Court has jurisdiction over the subject matter of this action as follows:

    a.    Pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, in that this is an action at law to enforce  liabilities and duties created by the Exchange Act and the rules and regulations thereunder;

    b.    Pursuant to 28 U.S.C. §1331 in that this action arises under the laws of the United States;

    c.    Pursuant to 28 U.S.C. §1367, in that all claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution; and

its terms are incorporated by reference.

9/5/2008

    d.      Additionally, pursuant to 28 U.S.C. §1332(a)(2), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and if it is between citizens of a state and a citizen of a foreign state.

12.     This Court has jurisdiction over the person of each Defendant pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Rule 4 of the Federal Rules of Civil Procedure in that all Defendants transacted business in this district and Defendant Charlesbank Capital Partners, LLC is located in this district. In addition, the Court has jurisdiction over the person of Defendant GSI Holdings and each of the Charlesbank Defendants based on their consent to jurisdiction as more fully described below.

<u>Venue</u>

13.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, in that all Defendants transacted business in this district and Defendant Charlesbank Capital Partners, LLC is located in this district, and pursuant to 28 U.S.C. §1391, in that a substantial part of the events or omissions giving rise the claims occurred and, alternatively, Defendant Charlesbank Capital Partners, LLC is located, in this district. Venue in this district is also proper based on the consent of Defendant GSI Holdings and the Charlesbank Defendants as more fully described below.

9/5/2008

<u>The Facts</u>

14.     On May 17, 2006, Plaintiff, then the General Manager of Agromarau Indústria e Comercio Ltd. ("Agromarau"), a Brazilian limited liability agricultural supply company located in Marau, State of Rio Grande do Sul, Brazil, informed Defendant Branch by email of his decision to leave the company.  Upon information and belief, based on the Affirmative Pledge of Assignment of Quotas and Other Provisions dated January 1, 2002  and on the October 2005 Registration Rights Agreement dated as of October 6, 2005, The GSI Group, Inc. was then the majority owner of Agromarau, holding more than 90% of its capital stock (or quotas).  The GSI Group, Inc. was then wholly owned by Defendant GSI Holdings.  Upon information and belief, based on the October 2005 Registration Rights Agreement and on the Separation Agreement more fully described below, Defendant Branch was then a director and Chairman of both The GSI Group, Inc. and its parent company Defendant GSI Holdings.

15.     In connection with Plaintiff's announced departure from Agromarau, Plaintiff, Defendant GSI Holdings and others entered into, among other agreements, a Separation Agreement dated November 13, 2006, which provided, among other things, for certain payments to Plaintiff and for Plaintiff to exchange 661,725 quotas he owned in Agromarau, which the parties valued in the Separation Agreement at one million Brazilian Reals (R$), for 3,072 shares of the Common Stock of Defendant GSI Holdings.

16.     Also in November 2006, upon information and belief, based on the Information Statement more fully described below, Defendant GSI Holdings engaged UBS Securities LLC as financial advisor to assist its board in exploring a possible sale of

9/5/2008

Defendant GSI Holdings. Defendants never disclosed to Plaintiff the engagement of UBS Securities LLC.

17.    Among the other agreements entered into in connection with Plaintiff's departure from Agromarau was the Stock Purchase Agreement dated initially as of December __, 2006 and subsequently as of December 28, 2006, among Plaintiff, Defendant GSI Holdings and the Charlesbank Defendants, all Principal Stockholders of Defendant GSI Holdings.

18.    The Stock Purchase Agreement was prepared by or on behalf of Defendant GSI Holdings and the Defendant Principal Stockholders. Upon information and belief, base on its computer-generated document number " NY 529673-3," the Stock Purchase Agreement was prepared in New York. It was transmitted to Plaintiff by email from Agromarau's lawyer.

19.    The Stock Purchase Agreement provides in Sections 2.1 and 2.2, in relevant part:

> [Defendant GSI Holdings] hereby issues and sells to [Plaintiff], and [Plaintiff] hereby acquires from [Defendant GSI Holdings], on the date hereof, the Shares [3,072 shares of common stock of Defendant GSI Holdings] in exchange for delivery to [Defendant GSI Holdings] of original stock certificate(s) evidencing 661,725 quotas of Agromarau ....

> [Defendant GSI Holdings] is hereby issuing and selling the shares to [Plaintiff] by delivering to [Plaintiff] a duly executed certificate or certificates representing the Shares registered in the name of [Plaintiff], with appropriate issue stamps, if any, affixed at the expense of [Defendant GSI Holdings], free and clear....

- 9 -

9/5/2008

20.    The Stock Purchase Agreement also provides to Plaintiff so-called tag-along

rights described in Section 5.5, in relevant part, as follows:

In the event the Selling Principal Stockholders[5] propose

------------------------------------------------

[5]The Share Purchase Agreement provides in Article I that "'*Selling Principal Stockholders'* is defined in Section 5.4(a)." Section 5.4(a) provides as follows:

> If any Principal Stockholder, acting singly or in combination with any other Principal Stockholder (collectively, the "Selling Principal Stockholders"), proposes to enter into a transaction or series of related transactions (collectively, the "Drag Along Transaction") pursuant to which the Selling Principal Stockholders shall transfer to any transferee a Controlling Interest, then the Selling Principal Stockholders may require the Purchaser to sell, or cause to be sold, and the Purchaser shall be obligated to sell or cause to be sold, and Purchaser shall be obligated to sell or cause to be sold, which obligation shall be enforceable by the Company, to the proposed transferee in the Drag Along Transaction any or all Shares owned by the Purchaser for the same relative consideration received by the Selling Principal Stockholders in the Drag Along Transaction and otherwise on the same terms and conditions obtained by the Selling Principal Stockholders in the Drag Along Transaction. The Selling Principal Stockholders shall provide a written notice of such sale to the Purchaser not less than 10 calendar days prior to the closing of such sale.

The Share Purchase Agreement provides in Article I that the term"'*Principal Stockholders'* means the Persons executing this Agreement as 'Principal Stockholders' on or after the date hereof and their respective Affiliates and direct and indirect transferees."

The Share Purchase Agreement provides in Article I that "'*Affiliate'* means with respect to any specified person, a limited or general partner or member of such Person or another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified, and with respect to a natural Person shall include any Family Member of such Person."

9/5/2008

to enter into a transaction or series of related transactions (collectively, the "Tag Along Transaction"), pursuant to which the Selling Principal Stockholders shall transfer to any transferee shares of Common Stock[6] constituting more than 50% of the then outstanding shares of Capital Stock[7] held by all the Principal Stockholders[8], and the Selling Principal stockholders do not elect, or do not have the right to elect, to require the sale of the Shares[9] of the Purchaser[10] pursuant to Section 5.4(a),[11] such Selling Principal Stockholders shall notify the Purchaser in writing of such proposed Transfer and its terms and conditions: Within 10 calendar days after the date of such notice, the Purchaser shall notify the Selling Principal Stockholders in writing if the Purchaser elects to participate in such Transfer....If the Purchaser notifies the Selling Principal Stockholders that it intends to participate in the Tag Along Transaction, the Purchaser shall have the right to sell at the same price and on the same terms and conditions as the Selling Principal Stockholders, a number of shares of Common Stock equal to the shares of Common Stock the third party actually

---

[6]The Share Purchase Agreement provides in Article I that "*Common Stock*" is defined in the Share Purchase Agreement to mean Defendant GSI Holdings' Common Stock, $0.1 par value per share.

[7]The Share Purchase Agreement provides in Article I that "'*Capital Stock*' means all shares of common stock, preferred stock or other equity securities of the Company or securities, rights, options or warrants convertible into or exchangeable or exercisable therefor now held or hereafter acquired by the Stockholders, including without limitation upon the conversion, exercise or exchange of such securities or options or warrants or preemptive rights to acquire the same."

[8]The definition of "Principal Stockholders" is quoted in n. 5 above.

[9]"Shares" is defined in the Share Purchase Agreement Article I to mean the 3,072 shares of Common Stock acquired by Plaintiff.

[10]"Purchaser" is defined in the Share Purchase Agreement Article I to mean the Plaintiff.

[11]Section 5.4(a) of the Share Purchase Agreement describes the so-called "Drag Along Rights" and is quoted in n. 5 above.

9/5/2008

proposes to purchase from the Selling Principal Stockholders multiplied by the Proportionate Percentage....[12]

21.    The Stock Purchase Agreement provides in Section 6.3 for Notices to Defendant GSI Holdings and its Defendant Principal Stockholders to be sent to Defendant Charlesbank Capital Partners LLC in Boston, Massachusetts with copies to their New York attorneys in Manhattan.

22.    The Stock Purchase Agreement provides in Section 6.9 that it is governed by, and to be construed in accordance with, the substantive law of New York, and further provides in Section 6.10 as follows:

> *CONSENT TO JURISDICTION.*  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK OR ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF NEW YORK IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE SHARES OR THE TRANSACTIONS

---

[12]The Share Purchase Agreement provides in Article I that "'Proportionate Percentage' means with respect to the Purchaser, a percentage equal to the quotient of (a) the number of shares of Common Stock then owned by the Purchaser, including the Shares and any Option Shares (but excluding any unexercised vested or unvested stock options and the shares of Common Stock underlying such stock options) divided by (b) the sum of (i) the number of issued and outstanding shares of Common Stock plus (ii) the number of shares of Common Stock issuable upon conversion, exercise or exchange of all Capital Stock which is convertible into or exercisable or exchangeable for Common Stock held by all Stockholders, whether or not such Capital Stock is then convertible, exercisable or exchangeable, including any and all shares of Common Stock issuable upon the exercise of stock options granted under the 2005 Stock Plan."

- 12 -

9/5/2008

CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(Emphasis in original).

23.    In a First Amendment of Separation Agreement ("First Amendment") dated December __, 2006[13], drafted by or on behalf of Defendant GSI Holdings and its affiliated parties, Plaintiff, Defendant GSI Holdings and others agreed that, instead of Plaintiff exchanging his 661,725 quotas in Agromarau for 3,072 shares of Defendant GSI Holdings' Common Stock, Agromarau will pay him for his quotas and within three business days following receipt of that payment, "he shall have the option to reinvest ... in 3,072 shares of [Defendant GSI] Holdings at a purchase price of $150 (U.S.) per share...." Defendant Branch signed the First Amendment on behalf of Defendant GSI Holdings and affiliated parties.

24.    Plaintiff accepted the Stock Purchase Agreement by executing it on or about December 13, 2006 and returning it to be executed on behalf of the other parties.

25.    The Defendants that are parties to the Stock Purchase Agreement accepted ~~it possibly~~ by their execution of it, ~~if they did execute it, but certainly~~ (i) by their performance

_____

[13]A copy of the First Amendment is attached as Exhibit D and its terms are incorporated by reference.

9/5/2008

of it in issuing a certificate for Plaintiff's 3,072 shares and receiving and keeping for six months Plaintiff's payment for such Shares as more fully described below, and (ii) by their admission in a  subsequent signed written Second Amendment of  Separation Agreement ("Second Amendment")[14] that is more fully described below  that the Stock Purchase Agreement was, indeed, an agreement.

26.    On December 27, 2006, Plaintiff received payment for his Agromarau quotas.

27.    Plaintiff then caused a wire transfer to be made on December 28, 2006 in the amount of $460,829.50 to the account of Defendant GSI Holdings at Union Planters/Regions Bank in Taylorville, Illinois for 3,072 shares of Common Stock of Defendant GSI Holdings.

27.1    Plaintiff's purchase of 3,072 shares of Defendant GSI Holdings made him the largest individual shareholder at the operating subsidiary level..

28.    Thereafter, Plaintiff inquired a number of times of Defendant Branch and of Claudio Moretti, a lawyer for Agromarau, as to the whereabouts of his copy of the fully executed Stock Purchase Agreement and his GSI Holdings Share certificate(s).  Plaintiff made such inquiries to Defendant Branch by telephone on or about February 26, 2007 and by email on March 30, 2007 and on April 26, 2007.  He made such inquiries to Moretti by telephone at various times and by email on March 22 and 28, 2007 and on April 30, 2007.  Neither Defendant Branch, nor  Moretti nor anyone else on behalf of any Defendant informed Plaintiff as to what had happened to the Stock Purchase Agreement or Share

---

[14]A copy of the Second Amendment is attached as Exhibit E and its terms are

- 14 -

9/5/2008

certificate(s).

28.1    On or about December 28, 2006, unbeknownst to Plaintiff, Defendant Charlesbank Capital Partners LLC caused Defendant GSI Holdings to issue stock certificate no. 48 certifying Plaintiff as the owner of 3,072 shares of the common stock of Defendant GSI Holdings, but rather than deliver the certificate to Plaintiff, the general counsel of Defendant Charlesbank Capital Partners LLC sent the certificate on or about January 3, 2007 to DTC/New York Window, 55 Water Street, New York, New York 10041, to be "held in escrow." No other shareholder's shares of GSI Holdings were held in escrow.

28.2    On or about February 17, 2007, unbeknownst to Plaintiff, John Henderson, then chief financial officer of Defendant GSI Holdings, requested an audit of related-party transactions between Agromarau and companies in which he believed Plaintiff had an interest, which transactions he claimed to have discovered in negotiations with Plaintiff between July and November 2007 even though related-party transactions between Agromarau and companies owned by Plaintiff's family were by then well-known by Defendants and disclosed in a public filing with the Securities and Exchange Commission a year earlier in February 2006.

28.3    Unbeknownst to Plaintiff, Defendant Branch, other executives and lawyers for Defendant GSI Holdings and, on at least April 17, 2007 and May 4, 2007, lawyers for the Charlesbank Defendants, spoke and corresponded with each other on at least 25 occasions from March 12, 2007 to May 4, 2007 about the related-party transactions, the audit and the

incorporated by reference.

9/5/2008

*rescission of Plaintiff's purchase of 3,072 shares of GSI Holdings which they submit was justified because they concluded that, by the related-party transactions, Plaintiff had breached a Non-Competition and Consulting Agreement he had signed on November 13, 2006.*

29.    On May 3, 2007, Plaintiff went to see Ingo Erhardt who had succeeded Plaintiff as General Manager of Agromarau.  Erhardt had requested in a phone call that Plaintiff visit him to discuss markets, production and other subjects concerning Agromarau business.  They met at Erhardt's office at Agromarau.

30.    To Plaintiff's surprise, Erhardt, acting on behalf of Defendants at the request of Defendant Branch,  gave to Plaintiff and asked him to sign a Second Amendment drafted by or on behalf of Defendant GSI Holdings and its affiliated parties, which provides for rescission of Plaintiff's purchase of the 3,072 shares of Defendant GSI Holdings' Common Stock.  Erhardt said the following:

    a.    Branch wanted Plaintiff to sign the Second Amendment;

    b.    The funds transferred by Plaintiff were in a segregated account that Branch had forgotten about and that it would be a problem now to issue the shares;

    c.    Plaintiff had made a lot of money from his relationship with Agromarau; more than executives at comparable companies; and

    d.    Plaintiff's companies did business with Agromarau which Erhardt was sure Plaintiff wanted to continue without problems.

- 16 -

9/5/2008

31.    Plaintiff requested a copy of the Second Amendment so that he could consult his financial advisor about it.  Erhardt provided by email draft copies in Portugese and in English.

32.    Following his meeting with Erhardt, Plaintiff tried to reach his financial advisor, but the advisor was out of town.

33.    Plaintiff returned to Erhardt's office the next day, May 4, 2007, and told him that he had not had an opportunity to consult with his advisor.  Erhardt said that

    a.    Plaintiff must sign the Second Amendment;

    b.    He (Erhardt) was flying to the United States the next day and wanted to take the signed Second Amendment with him; and

    c.    Again, the business Plaintiff's companies did with Agromarau could be jeopardized if Plaintiff did not sign.

34.    In reliance on what Erhardt had told him in their two meetings and on there being no other information material to his decision whether to sign the Second Amendment, Plaintiff signed the Second Amendment in Erhardt's office on May 4, 2007.

35.    Also on May 4, 2007, on information and belief, based on the notary's certificate to the Second Amendment, Erhardt signed the Second Amendment on behalf of Agromarau.  The other parties' execution of the Second Amendment is described below in paragraph 42.

36.    The Second Amendment provides in Section 2 as follows:

The parties have mutually determined that [Plaintiff]

- 17 -

9/5/2008

Segatt will not invest in any shares of [Defendant GSI] Holdings, and in furtherance thereof, the Stock Purchase and Management Equity Agreement between [Defendant GSI] Holdings and [Plaintiff] Segatt dated as of December 28, 2006, as amended by Amendment No. 1 thereto, dated December 28, 2006, between [Defendant GSI] Holdings and [Plaintiff] Segatt (the "Purchase Agreement"), together with any other documents or agreements entered into between them pursuant to such Purchase Agreement, including but not limited to the joinder by [Plaintiff] Segatt to the October 2005 Registration Rights Agreement, dated as of October 6, 2005, by and among [Defendant GSI] Holdings and the parties named therein, are hereby declared null, void, cancelled and without legal effect, and as if they have never been entered into, and the $460,800 (U.S.) which [Plaintiff] Segatt has deposited with [Defendant GSI] Holdings pursuant to the First Amendment and the Purchase Agreement will forthwith be promptly returned to [Plaintiff] Segatt in U.S. currency.   [Plaintiff] Segatt hereby agrees and authorizes the Company [Defendant GSI Holdings] to cancel stock certificate number 48, representing 3,072 shares of the Company [Defendant GSI Holdings].

37.    The Second Amendment further provides in Section 4 as follows:

SECTION 2 HERETO, RELATING TO THE PURCHASE AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE.

(Emphasis in original.)

37.1    *Following his meeting with Plaintiff, Erhardt reported to Defendant Branch that "I believe you should have a wonderful weekend, since I am bringing with me [to Illinois] the signed contract with [Plaintiff]. See you Monday."*

9/5/2008

37.2    *Defendant Branch replied to Erhardt, "You are my hero!" I plan to buy you the best fried pork cutlet sandwich Assumption [Illinois] has to offer."*

38.    Following his signing of the Second Amendment, Plaintiff consulted his financial advisor who pointed out to him that, contrary to what Erhardt had told him, the certificate for the 3,072 shares had in fact been issued; it was "stock certificate number 48, representing 3,072 shares of the Company [Defendant GSI Holdings]" as described in Section 2 of the Second Amendment.

39.    On the evening of May 4, 2007, Plaintiff sent an email message to Defendant Branch stating that he (Plaintiff) had "signed the cancellation of my Stock according to your request.  Ingo will be taking for you the document.  I was a little surprise [*sic*] with this, because I believed that this transaction had already been made." Plaintiff added  that he would have preferred to hold his GSI Holdings shares "because ... our Stock be worth much more than when of [*sic*] the sale of GSI." Branch never responded.

40.    Plaintiff sent an email message to Erhardt on May 8, 2007 pointing out that, contrary to what Erhardt had said, the Second Amendment indicated that a stock certificate had been issued.  He asked Erhardt to explain.  Erhardt, then in the U.S., responded by email that same day, stating that what he had told Plaintiff was correct and that (in Portuguese) "this is a horse that was played against the fence and you should look the ones that are in the pasture.  We will make much money with the other horses."

41.    On May 10, 2007, Plaintiff provided to Rafael Dalla Coleta at Agromarau the bank account details to arrange for the wire transfer back to his bank account of the funds he

9/5/2008

had transferred by wire to Defendant GSI Holdings on December 28, 2006.

42.    Upon information and belief, based on the notaries' certificates to the Second Amendment, on May 11, 2007, Defendant Branch signed the Second Amendment on behalf of The GSI Group, Inc., its majority and controlling shareholder  Defendant GSI Holdings Corp., and Assumption Leasing Company, Inc. which was then, on information and belief, based on the October 2005 Registration Rights Agreement,  the owner of .01% of the shares of Agromarau.

42.1    *On May 19, 2007, Defendant GSI Holdings' chief financial officer John Henderson, himself one of the ten largest individual shareholders of GSI Holdings, wrote to Andrew Janower that "Buying back his [Plaintiff's] 3,072 at the $150 per share helps all shareholders benefit from less dilution."*

43.    Plaintiff's payment was not promptly returned to him.

a.    On information and belief,  based on various bank wire transfer forms, on or about June 20, 2007, Defendant GSI Holdings wired to the Central Bank of Brazil to be credited to Plaintiff's bank $548,390.22, representing the amount Plaintiff had transferred by wire to Defendant GSI Holdings on December 28, 2006 plus interest and an additional amount due to an exchange rate fluctuation between U.S. Dollars and Brazilian Reals.  Plaintiff requested his bank to open a segregated account to receive these funds, informing it that receipt of the funds did not constitute his acceptance of the cancellation of his subscription

- 20 -

9/5/2008

for the Shares. However, Plaintiff's bank never received the $548,390.22. Neither Defendant GSI Holdings nor its subsidiary Agromarau provided to the Central Bank of Brazil the documents it required, and which Plaintiff requested, in order to credit the funds to Plaintiff's bank. As a result, on information and belief, based on information Plaintiff received from his bank, on or about September 20, 2007, the Central Bank transferred the funds by wire back to Defendant GSI Holdings' bank in the United States.

b.      Agromarau's attorney notified Plaintiff on or about November 7, 2007 that The GSI Group had ordered on October 26, 2007 that $460,809.50 be wired to Plaintiff's bank account. Plaintiff replied that receipt of the funds does not mean the renunciation of his rights against GSI. Plaintiff's bank received the funds and credited them to the segregated account on November 13, 2007.

*43.1    Contrary to what Erhardt had told him, Plaintiff's money had not been held by Defendants in a segregated account.*

44.     On June 25, 2007, The GSI Group announced that its parent company, Defendant GSI Holdings, controlled by Defendant Charlesbank Capital Partners, LLC had entered into an agreement by which affiliates of Centerbridge Partners, L.P. would acquire a majority stake in Defendant GSI Holdings. Defendant Branch is quoted in the announcement.

- 21 -

9/5/2008

45.    On June 29, 2007, The GSI Group announced a cash tender offer to repurchase its 12% Senior Notes Due 2013.    According to the announcement, the tender offer was made in connection with the sale to Centerbridge Partners.  The deal manager for the tender offer was UBS Securities LLC.  According to its web site, UBS Securities LLC has offices in Stamford, Connecticut and in New York City.  The information agent was Mackenzie Partners, Inc. of New York City.  A corresponding Form 8-K filed with the U.S. Securities and Exchange Commission was signed by Defendant Branch as Chairman and Chief Executive Officer of The GSI Group  and by John W. Henderson, Chief Financial Officer.

46.    An Information Statement dated July 2, 2007 and issued on behalf of the board of directors of Defendant GSI Holdings to the company's shareholders as of the close of business on June 29, 2007, disclosed that in November 2006, Defendant GSI Holdings had engaged UBS Securities as its financial advisor to assist its board of directors and senior management to explore a possible sale of the company.

47.    The Information Statement further disclosed that Defendant GSI Holdings had engaged in a staged auction process that culminated in the receipt on June 12, 2007 of final offers from the remaining potential acquirers, including the ultimate buyer, CB/GSI Holdings Inc. (the "Buyer"), a newly-formed Delaware Corporation controlled by Centerbridge Capital Partners, L.P.

- 22 -

9/5/2008

*47.1    Initial bids ranging from approximately $500 to $800 per share had been received by April 4, 2007. A second round of bids, higher than the initial bids, were received by May 8, 2007, four days after rescission of Plaintiff's share purchase.*

48.    The Information Statement also disclosed that a Merger Agreement  dated as of June 22, 2007 was entered into among the Buyer and Defendants GSI Holdings, Charlesbank Equity Fund V, Limited Partnership and Charlesbank Capital Partners, LLC to effect the sale of Defendant GSI Holdings.    The Information Statement describes Defendant Charlesbank Equity Fund V, Limited Partnership as the Principal Stockholder of Defendant GSI Holdings, owning approximately 74% of its outstanding Common Stock, and together with its affiliates, owning approximately 86% of Defendant GSI Holdings' outstanding Common Stock.

49.    A copy of the executed Merger Agreement is attached to the Information Statement, but, upon information and belief, based on a copy of the Information Statement obtained by Plaintiff, the Merger Agreement's Annexes are incomplete and its Exhibits and Schedules, including the so-called "Disclosure Schedule," are missing.

*49.1    The Charlesbank Defendants had prepared a draft of the Merger Agreement by March 19, 2007.*

- 23 -

9/5/2008

50.    In the Merger Agreement, Defendant GSI Holdings represented and warranted to the Buyer that, among other things, in Sections 3.5(b) and 3.8(a), respectively,

    a.    Neither it nor its subsidiaries had any undisclosed liabilities or obligations of any nature (whether absolute, accrued, contingent or otherwise, and whether due or to become due), which individually or in the aggregate exceed $100,000; and

    b.    It and its subsidiaries have no undisclosed agreement or commitment having a value in excess of $2 million or that is otherwise material to it and its subsidiaries, taken as a whole.

51.    The Merger Agreement provides that, among the conditions to the closing of the Merger, in Sections 6.12, 6.17 and 7.2(a), are the following:

    a.    Defendant GSI Holdings shall commence a cash tender offer to purchase its 12% Senior Notes Due 2013; and

    b.    Defendants GSI Holdings and Charlesbank Equity Fund V, Limited Partnership were obligated to obtain the termination of all Stock Purchase and Management Equity Agreements entered into between Defendant GSI Holdings and its employees, directors or Consultants since October 6, 2005.

52.    According to the Information Statement, the sale of Defendant GSI Holdings will be made at an estimated price (the "Estimated Merger Consideration") of approximately

9/5/2008

$700 per share of the common stock of Defendant GSI Holdings plus the following additional consideration:

a.   Adjustment Amount (if any) – the per share positive difference between the finally determined merger consideration, to be determined approximately 90 to 120 days after the closing of the merger of the Buyer with and into Defendant GSI Holdings (the "Merger"), and the Estimated Merger Consideration;

b.   Escrow Surplus Amount (if any) – the per share amount escrowed at the closing of the Merger that is not paid to the surviving corporation because the finally determined amount of merger consideration is less than the Estimated Merger Consideration;

c.   Special Tax Deduction Benefit (if any) – the per share amount of any income tax refund for the current or prior years and actually realized reduction in tax liability for any taxable period beginning after the closing of the Merger, which refund or liability is attributable to certain Merger costs and expenses; and

d.   Contingent Consideration (if any) – the per share value of any benefit received as a result of the resolution of a lawsuit pending in the United States District Court for the Central District of Illinois against the Sukup Manufacturing Company, less adjustments, if any, for certain taxes, after-tax costs and amounts owed on certain claims for

9/5/2008

indemnification.

52.1     In Schedule 3.3(d) of the Disclosure Statement to the Merger Agreement, Defendant GSI Holdings represented that "[n]o shares were ever issued" to Plaintiff.

52.2     Pursuant to Section 2.8 of the Merger Agreement and Schedule 2.8 of the Disclosure Schedule to the Merger Agreement, the Charlesbank Defendants agreed to indemnify the purchaser of Defendant GSI Holdings for any claims arising from or relating to the making or rescission of the Stock Purchase Agreement with Plaintiff.  The Charlesbank Defendants give no indemnity for pending lawsuits or other asserted claims against GSI Holdings and, at the time they agreed to indemnify claims arising from the rescission of Plaintiff's share purchase, Plaintiff had not asserted a claim.

53.     The Information Statement also disclosed that Defendant Charlesbank Equity Fund V, Limited Partnership and other investment funds managed by Defendant Charlesbank Capital Partners LLC will retain a portion of the shares they held of Defendant GSI Holdings' common stock having an aggregate value (based on the estimated per share merger consideration) of $30 million, subject to reduction pursuant to Section 6.16 of the Merger Agreement (providing for certain so-called tag-along rights).   In addition, members of Defendant GSI Holdings' management team will retain a portion of their shares of GSI Holdings' common stock and will reinvest a portion of the proceeds payable to them to cash out their options for such common stock, having an estimated aggregate value of $15 - $20 million.  None of the retained shares would entitle the holder thereof to receive the Estimated Merger Consideration, but such holders would nevertheless be entitled to receive the

9/5/2008

contingent payments described in subparagraphs 52a through 52d above. Also, certain unnamed executives of Defendant GSI Holdings will be entitled to receive cash bonuses upon closing or will be entitled to acquire restricted shares of Defendant GSI Holdings' Common Stock prior to the closing at a substantial discount to the Estimated Per Share Merger Consideration subject to the closing occurring before October 1, 2007 and to shareholder approval.

54.     On August 1, 2007, The GSI Group publicly announced that its parent company, Defendant GSI Holdings, completed its previously announced sale to affiliates of Centerbridge Partners, L.P. The announcement stated: "Terms of the transaction were not disclosed."

55.     The announcement quoted Defendant Branch as follows:

> The sale of GSI to Centerbridge marks the beginning of the next chapter for GSI and will be beneficial for all of GSI's stakeholders, including our shareholders, employees, and customers. We are excited about partnering with Centerbridge and we are eager to pursue the numerous growth opportunities that lie ahead for the company.

56.     Defendant Branch signed the Merger Agreement on behalf of Defendant GSI Holdings.

57.     Upon information and belief, the Merger was done in New York in this district. The signed Merger Agreement bears a computer generated document number "NY: 549881-14." It provides in Section 1.2  for the closing of the Merger to take place in Manhattan.  It provides in Section 10.3 for notices to the Buyer or to the surviving

- 27 -

9/5/2008

corporation to be sent to Centerbridge Capital Partners, L.P. at its offices in Manhattan with copies to its attorneys in Manhattan. It provides in Section 10.3 for notices to Defendants GSI Holdings, Charlesbank Equity Fund V, Limited Partnership and Charlesbank Capital Partners, LLC to be sent to the offices of Defendant Charlesbank Capital Partners, LLC in Boston with copies to their attorneys in Manhattan. Section 10.5 provides that the Merger Agreement is  governed by New York law (except that the consummation and effectiveness of the Merger is governed by Delaware law). And, Section 10.5 further provides that each party consents to the jurisdiction of this Court and of the Supreme Court of the State of New York as the only courts in which any action may be brought relating to the Merger Agreement or to the transactions contemplated by the Merger Agreement.

58.    Plaintiff had been told in early September 2006 by Richard Christman, then chief executive officer of The GSI Group *(but whose employment as chief executive officer was terminated in October 2006)*, that the company was doing well, that it was a good time to sell it and that Defendant Charlesbank Capital Partners might sell it in 2007.  However, Plaintiff was not informed as of May 4, 2007, and did not learn until after the Merger was publicly announced, of any of the information set forth in paragraphs 44 through 57 above, or that any of the Defendants had engaged a financial advisor to assist with an auction or  sale of Defendant GSI Holdings, or of any plans or activities to auction or sell Defendant GSI Holdings or of any contemplated or actual terms of an auction or sale, including a sales price. Upon information and belief, based on the timing of events that occurred shortly thereafter, as of May 4, 2007, such plans, activities and terms had advanced to the point at which they

- 28 -

9/5/2008

were material to Plaintiff's decision whether to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock.

First Claim Against
All Defendants for
Federal Securities Law
Fraud under Section 10(b)
Of the Exchange Act and
Rule 10b-5 Thereunder

59.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 58 above.

60.    In soliciting Plaintiff's agreement to rescind his purchase of 3,072 shares of its Common Stock, Defendant GSI Holdings, had a duty to disclose to Plaintiff all material information concerning the plans and activities to sell the company.

61.    In soliciting Plaintiff's agreement to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, Defendant Branch, had a duty to disclose to Plaintiff all material information concerning the plans and activities to sell the company.

62.    In soliciting Plaintiff's agreement to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, the Charlesbank Defendants, as Principal Stockholders of Defendant GSI Holdings, had a duty to disclose to Plaintiff all material information concerning the plans and activities to sell the company.

63.     Instead of disclosing to Plaintiff all material information concerning the plans and activities to sell Defendant GSI Holdings, Defendants withheld such information, misrepresented to him that his Shares had not been issued and implicitly threatened that, if Plaintiff did not agree to rescind his purchase of the 3,072 shares, his companies' business with Agromarau would be jeopardized.

64.     Defendants acted with fraudulent intent, or at least in    reckless disregard of the truth, which is manifestly evidenced by the following facts:

   a.    Defendant GSI Holdings kept Plaintiff's $460,829.50 for six months, but did not return to him the countersigned Stock Purchase Agreement or the certificate for his 3,072 shares;

   b.    In response to his repeated requests, Defendants did not explain why they had not returned to him the countersigned Stock Purchase Agreement and Share certificate;

   c.    Erhardt, acting on behalf of Defendants, misrepresented to Plaintiff that his Share certificate had not been issued, *that his payment had been held in a segregated account* and implicitly threatened that, if he did not sign the Second Amendment agreeing to rescind his purchase of Shares, his companies' continued business with Agromarau would be jeopardized; and

   d.    When Plaintiff wrote to Defendant Branch on May 4, 2007 expressing his surprise with the rescission of his purchase of

Shares "because I believed that this transaction has already been made," and stating his desire to continue to hold his Shares, Defendant Branch did not respond.    And when Plaintiff followed up with an email on May 8, 2007 to Erhardt who, on information and belief was then in the United States delivering the Second Amendment signed by Plaintiff, Erhardt replied with the fatuous response about a "horse ... played against the fence." Instead of giving Plaintiff any meaningful or informative response, Defendant Branch proceeded on May 11, 2007 to sign the Second Amendment to rescind Plaintiff's purchase.

64.1    *Defendants' fraudulent intent is further manifest by their contention that Plaintiff's supposed breach of his Non-Competition and Consulting Agreement entitled them to exercise self-help by deceiving him into rescinding his stock purchase.*

65.    Defendants' fraudulent intent, or a least their reckless disregard of the truth, is further evidenced by their motive and opportunity to profit from the rescission of Plaintiff's purchase of 3,072 shares of Defendant GSI Holdings Common Stock.

a.    As a condition to the closing of the Merger, Defendants GSI Holdings and Charlesbank Equity Fund V, Limited Partnership

-31-

were obligated to obtain the termination of all Stock Purchase and Management Equity Agreements entered into between Defendant GSI Holdings and its employees, directors or consultants since October 6, 2005.

b.  By inducing Plaintiff to agree to rescind the Stock Purchase Agreement, Defendant GSI Holdings benefitted in at least one or both of two ways. First, if it were obliged to honor Plaintiff's tag-along rights at a price of at least approximately $700 per share (without accounting for the additional consideration beyond the Estimated Merger Consideration), by inducing Plaintiff to agree instead to rescind his purchase of the Shares at $150 per share, Defendant GSI Holdings profited by at least $1,689,600. Second, it benefitted by being able to accomplish the Merger that, according to its board of directors and management, was in its best interests.

c.  Defendants Branch and the Charlesbank Defendants benefitted by the rescission of Plaintiff's Share purchase at $150 per share prior to the close of business on June 29, 2007 by being able to receive additional consideration for their respective shares. If Defendant GSI Holdings would have had to pay Plaintiff at least approximately $700 per share to honor his tag-along

rights, Defendant Branch and the Charlesbank Defendants were benefitted by the rescission in selling a company (Defendant GSI Holdings) with more cash on hand which, therefore, could command a higher price. If payment to Plaintiff in respect of his tag-along rights would have been made by the buyer of Defendant GSI Holdings instead of by Defendant GSI Holdings itself, still Defendant Branch and the Charlesbank Defendants profited by being able to keep for themselves the consideration that the buyer would otherwise have had to pay to Plaintiff for his Shares. And, either way, regardless whether it would have been Defendant GSI Holdings or its Buyer that would have had to pay Plaintiff in respect of his tag-along rights, by rescinding Plaintiff's purchase of Shares before the close of business on June 29, 2007, there were fewer shares among which to apportion the Merger consideration. Accordingly, Defendant Branch and the Charlesbank Defendants were paid more for their shares of Defendant GSI Holdings.

d.   Defendant Branch further benefitted by the rescission of the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger, if he received the above-described

bonus upon the closing of the Merger.

e.    Defendant Charlesbank Capital Partners also further benefitted by rescinding the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger in that, upon information and belief, it received fees in an amount undisclosed by the Merger Agreement attached to the Information Statement, but referenced in Section 3.16 and Annex 3 to the Merger Agreement.

66.    In signing the Second Amendment agreeing to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, Plaintiff relied on what he was told by Erhardt, on May 3 and 4, 2007 and on there being no other information material to his decision whether to sign the Second Amendment.

67.    As a result of their conduct by which Defendants defrauded Plaintiff through the means and instrumentalities of interstate commerce or the mails or both as described above, Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendants are jointly and severally liable pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder.

Second Claim Against
Defendant Branch for
Federal Securities Law
Fraud Under Section 20(a)
of the Exchange Act

68.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

69.     As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant Branch is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder of such controlled Defendant to the same extent as such controlled Defendant.

70.     As a result, Defendant Branch is liable for the damage caused to Plaintiff by such controlled Defendant in an amount not less than $1,689,590.50 plus interest.

Third Claim Against
Defendant Charlesbank Equity
Fund V, Limited Partnership for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

71.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

72.     As a controlling person of Defendant GSI Holdings, and based on the

above facts, Defendant Charlesbank Equity Fund V, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud  under Section 10(b) of the Exchange Act ,15 U.S.C. §78j(b), and Rule 10b-5 , 17 C.F.R. §240.10b-5,  thereunder of such controlled Defendant to the same extent as such controlled Defendant.

73.    As a result, Defendant Charlesbank Equity Fund V, Limited Partnership is liable for the damage caused to Plaintiff by such controlled Defendant in an amount  not less than $1,689,590.50 plus interest.

Fourth Claim Against
Defendant CB Offshore Equity Fund V, L.P. for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

74.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

75.    As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant CB OffShore Equity Fund V, L.P.  is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5,   thereunder of such controlled Defendant to the same extent as such controlled Defendant.

76.    As a result, Defendant CB Offshore Equity Fund V, L.P. is liable for

the damage caused to Plaintiff by such controlled Defendant in an amount not less than $1,689,590.50 plus interest.

Fifth Claim Against
Defendant Charlesbank Equity Coinvestment
Fund V, Limited Partnership for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

77.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

78.    As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5,  thereunder of such controlled Defendant to the same extent as such controlled Defendant.

79.    As a result, Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership is liable for the damage caused to Plaintiff by such controlled Defendant in an amount  not less than $1,689,590.50 plus interest.

Sixth Claim Against
Defendant Charlesbank Coinvestment
Partners, Limited Partnership for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

80.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

81.    As a controlling person of Defendant GSI Holdings, and based on the above facts, Defendant Charlesbank Coinvestment Partners, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a),  for the securities law fraud under Section 10(b) of the Exchange Act ,15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder of such controlled Defendant to the same extent as such controlled Defendant.

82.    As a result, Defendant Charlesbank Coinvestment Partners, Limited Partnership is liable for the damage caused to Plaintiff by such controlled Defendant in an amount  not less than $1,689,590.50 plus interest.

Seventh Claim Against
Defendant Charlesbank Equity
Fund V GP, Limited Partnership for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

83.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

-38-

84.     As a controlling person of Defendants Charlesbank Equity Fund V, Limited Partnership, CB Offshore Equity Fund V, L.P., Charlesbank Equity Coinvestment Fund V, Limited Partnership and GSI Holdings, and based on the above facts, Defendant Charlesbank Equity Fund V GP, Limited Partnership is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5,   thereunder of each such controlled Defendant to the same extent as each such controlled Defendant.

85.     As a result, Defendant Charlesbank Equity Fund V GP, Limited Partnership is liable for the damage caused to Plaintiff by each such controlled Defendant in an amount not less than $1,689,590.50 plus interest.

Eighth Claim Against
Defendant Charlesbank Capital Partners, LLC for
Federal Securities Law Fraud Under
Section 20(a) of the Exchange Act

86.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 above.

87.     As a controlling person of each other Charlesbank Defendant and of Defendant GSI Holdings, and based on the above facts, Defendant Charlesbank Capital Partners, LLC  is liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15

-39-

U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5,   thereunder of each such controlled Defendant to the same extent as each such controlled Defendant.

88.     As a result, Defendant Charlesbank Capital Partners, LLC is liable for the damage caused to Plaintiff by each such controlled Defendant in an amount  not less than $1,689,590.50 plus interest.

Ninth Claim Against
All Defendants for
Common Law Fraud

89.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 63 and 66 above.

90.     Defendants acted with fraudulent intent, which is manifestly evidenced by the following facts:

a.      Defendant GSI Holdings kept Plaintiff's $460,829.50 for six months, but did not return to him the countersigned Stock Purchase Agreement or the certificate for his 3,072 shares;

b.      In response to his repeated requests, Defendants did not explain why they had not returned to him the countersigned Stock Purchase Agreement and Share certificate;

c.      Erhardt, acting on behalf of Defendants, misrepresented to Plaintiff that his Share certificate had not been issued, *that his payment had been held in a segregated account* and implicitly

threatened that, if he did not sign the Second Amendment agreeing to rescind his purchase of Shares, his companies' continued business with Agromarau would be jeopardized; and

d.    When Plaintiff wrote to Defendant Branch on May 4, 2007 expressing his surprise with the rescission of his purchase of Shares "because I believed that this transaction has already been made," and stating his desire to continue to hold his shares, Defendant Branch did not respond.    And when Plaintiff followed up with an email on May 8, 2007 to Erhardt who, on information and belief was then in the United States delivering the Second Amendment signed by Plaintiff, Erhardt replied with the fatuous response about a "horse ... played against the fence." Instead of giving Plaintiff any meaningful or informative response, Defendant Branch proceeded on May 11, 2007 to sign the Second Amendment to rescind Plaintiff's purchase.

90.1    *Defendants' fraudulent intent is further manifest by their contention that Plaintiff's supposed breach of his Non-Competition and Consulting Agreement entitled them to exercise self-help by deceiving him into rescinding his stock purchase.*

91.    In fraudulently  inducing Plaintiff to rescind his purchase of Shares,

Defendants not only damaged Plaintiff, but did so to benefit themselves.

a.    As a condition to the closing of the Merger, Defendants GSI Holdings and Charlesbank Equity Fund V, Limited Partnership were obligated to obtain the termination of all Stock Purchase and Management Equity Agreements entered into between Defendant GSI Holdings and its employees, directors or consultants since October 6, 2005.

b.    By inducing Plaintiff to agree to rescind the Stock Purchase Agreement, Defendant GSI Holdings benefitted in at least one or both of two ways.    First, if it were obliged to honor Plaintiff's tag-along rights at a price of at least approximately $700 per share (without accounting for the additional consideration beyond the Estimated Merger Consideration), by inducing Plaintiff to  agree instead to rescind his purchase of the Shares at $150 per share, Defendant GSI Holdings profited by at least $1,689,600.    Second,  it benefitted by being able to accomplish the Merger that, according to its board of directors and management, was in its best interests.

c.    Defendants Branch and the Charlesbank Defendants benefitted by the rescission of Plaintiff's Share purchase at $150 per share prior to the close of business on June 29, 2007 by being able to

receive additional consideration for their respective shares. If Defendant GSI Holdings would have had to pay Plaintiff at least approximately $700 per share to honor his tag-along rights, Defendant Branch and the Charlesbank Defendants were benefitted by the rescission in selling a company (Defendant GSI Holdings) with more cash on hand which, therefore, could command a higher price. If payment to Plaintiff in respect of his tag-along rights would have been made by the buyer of Defendant GSI Holdings instead of by Defendant GSI Holdings itself, still Defendant Branch and the Charlesbank Defendants profited by being able to keep for themselves the consideration that the buyer would otherwise have had to pay to Plaintiff for his Shares. And, either way, regardless whether it would have been Defendant GSI Holdings or its Buyer that would have had to pay Plaintiff in respect of his tag-along rights, by rescinding Plaintiff's purchase of Shares before the close of business on June 29, 2007, there were fewer shares among which to apportion the Merger consideration. Accordingly, Defendant Branch and the Charlesbank Defendants were paid more for their shares of Defendant GSI Holdings.

     d.     Defendant Branch further benefitted by the rescission of the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger, if he received the above-described bonus upon the closing of the Merger.

     e.     Defendant Charlesbank Capital Partners also further benefitted by rescinding the Stock Purchase Agreement and thereby satisfying a condition to the closing of the Merger in that, upon information and belief, it received fees in an amount undisclosed by the Merger Agreement attached to the Information Statement, but referenced in Section 3.16 and Annex 3 to the Merger Agreement.

92.     As a result of their conduct, Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendants are jointly and severally liable.

93.     Defendants' misconduct was so grossly wanton and morally reprehensible as to demonstrate a criminal indifference to their obligations toward him for which they should be held liable, jointly and severally, for punitive damages in an amount not less than three times Plaintiff's actual losses, i.e., an additional amount not less than $5,068,771.50.

-44-

Tenth Claim Against
Defendant Branch for
Breach of Fiduciary Duty

94.            Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 and 89 through 93 above.

95.            As Chairman and a director of Defendant GSI Holdings, Defendant Branch owed fiduciary duties of care and loyalty to Plaintiff, a minority shareholder of Defendant GSI Holdings.

96.            Defendant Branch breached his fiduciary duties of care and loyalty to Plaintiff (i) by failing to disclose material information to Plaintiff about the plans and activities to sell Defendant GSI Holdings, (ii) by his calculated lack of response to Plaintiff's inquiries about the countersigned Stock Purchase Agreement and share certificate and about the reason for the Second Amendment rescinding Plaintiff's purchase and (iii) by his otherwise working through Erhardt to deceive Plaintiff into signing the Second Amendment.

97.            As a result of his breach of fiduciary duty, Defendant Branch not only damaged Plaintiff, but profited himself as described above.

98.            As a result of his conduct, Defendant Branch has caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendant Branch is liable.

99.            Defendant Branch's misconduct was so grossly wanton and morally reprehensible as to demonstrate a criminal indifference to his obligations toward

-45-

Plaintiff for which he should be held liable for punitive damages in an amount of not less than three times Plaintiff's actual losses, i.e., an additional amount not less than $5,068,771.50.

Eleventh Claim Against
the Charlesbank Defendants for
Breach of Fiduciary Duty

100.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 and 89 through 93 above.

101.    As controlling principal shareholders of Defendant GSI Holdings, the Charlesbank Defendants owed a fiduciary duty of disclosure to Plaintiff, a minority shareholder, when his agreement to rescind his purchase of shares was solicited.

102.    The Charlesbank Defendants were signatories to, the Stock Purchase Agreement.  Consequently, they knew about Plaintiff's purchase of 3,072 shares of Defendant GSI Holdings' Common Stock and his tag-along rights.

103.    Nevertheless, they withheld from Plaintiff, in breach of their fiduciary duty of disclosure, material information about the plans and activities to sell Defendant GSI Holdings.

104.    As a result of their breach of fiduciary duty, the Charlesbank Defendants not only damaged Plaintiff, but profited themselves as described above.

105.    As a result of their conduct, the Charlesbank Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for

which the Charlesbank Defendants are jointly and severally liable.

106.    The Charlesbank Defendants' misconduct was so grossly wanton and morally reprehensible as to demonstrate a criminal indifference to their obligation toward him for which each of them should be held liable, jointly and severally,  for punitive damages in an amount of not less than three times Plaintiff's actual losses, i.e., an additional amount not less than $5,068,771.50.


Twelfth Claim Against
Defendant GSI Holdings for
Breach of Contract

107.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67 and 89 through 93 above.

108.    Defendant GSI Holdings breached the Stock Purchase Agreement by not delivering to Plaintiff as required by Sections 2.1 and 2.2 the duly executed certificate or certificates representing the 3,072 shares Plaintiff purchased, registered in the name of Plaintiff, with appropriate issue stamps, if any, affixed at the expense of Defendant GSI Holdings, free and clear of all security interests, liens, pledges, charges, options, rights of first refusal, mortgages, indentures, security agreements or other claims, encumbrances, agreements, arrangements or commitments of any kind or character, other than the transfer and other restrictions set forth in the Stock Purchase Agreement and restrictions imposed by Federal and State securities laws.

109.    Defendant GSI Holdings further breached the Stock Purchase

-47-

Agreement by failing to make sufficient provision as required by Section 5.5(a) to permit Plaintiff to complete the sale of his Shares as provided in Section 5.5(a).

110.    Plaintiff had performed his own obligations to be performed under the Stock Purchase Agreement and all conditions precedent to Defendant GSI Holdings' performance had occurred.

111.    As a result of its conduct, Defendant GSI Holdings has caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which Defendant GSI Holdings is liable.

Thirteenth Claim Against
the Charlesbank Defendants for
Breach of Contract

112.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 67, 90 through 93 and 100 through 106 above.

113.    The Charlesbank Defendants breached the Stock Purchase Agreement by failing to give Plaintiff written notice as required by Section 5.5(a) of the proposed transfer of more than 50% of their shares of Defendant GSI Holdings' Common Stock and the terms and conditions of such transfer.

114.    The Charlesbank Defendants further breached the Stock Purchase Agreement by failing to make sufficient provision as required by Section 5.5(a) to permit Plaintiff to complete the sale of his Shares as provided in Section 5.5(a).

115.    Plaintiff had performed his own obligations to be performed under the

Stock Purchase Agreement and all conditions precedent to the Charlesbank Defendants' performance had occurred.

116.    As a result of their conduct, the Charlesbank Defendants have caused Plaintiff to be damaged by an amount not less than $1,689,590.50 plus interest for which the Charlesbank Defendants are jointly and severally liable.

Fourteen Claim Against
All Defendants for
<u>Unjust Enrichment</u>

117.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 116 above.

118.    Benefitting as they did by their misconduct in deceiving Plaintiff into agreeing to rescind his purchase of 3,072 shares of Defendant GSI Holdings' Common Stock, Defendants have been unjustly enriched at Plaintiff's expense for which they should be held liable, jointly and severally, to Plaintiff in an amount not less than $1,689,590.50 plus interest.

Fifteenth Claim Against
Defendant Charlesbank Equity
Fund V GP, Limited Partnership for
<u>Liability as a General Partner</u>

119.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 118 above.

120.    As General Partner of Defendants Charlesbank Equity Fund V,

Limited Partnership, CB Offshore Equity Fund V, L.P., and Charlesbank Equity Coinvestment Fund V, Limited Partnership, Defendant Charlesbank Equity Fund V GP, Limited Partnership is jointly and severally liable for the liabilities of each such Defendant.

121.    As a result, Defendant Charlesbank Equity Fund V GP, Limited Partnership is liable for the damage caused to Plaintiff by each such Defendant in an amount  not less than $1,689,590.50 plus interest and for such punitive damages for which each such Defendant may be liable of not less than an additional amount of $5,068.771.50.

Sixteenth Claim Against<br>
Defendant Charlesbank<br>
Capital Partners, LLC for<br>
Liability as a General Partner

122.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 121 above.

123.    As a General Partner of Defendants Charlesbank Coinvestment Partners, Limited Partnership and Charlesbank Equity Fund V GP, Limited Partnership, Defendant Charlesbank Capital Partners, LLC is jointly and severally liable for the liabilities of each such Defendant.

124.    As a result, Defendant Charlesbank Capital Partners LLC is liable for the damage caused to Plaintiff by each such Defendant in an amount not less than $1,689,590.50 plus interest and for such punitive damages for which each such

Defendant may be liable of not less than an additional amount of $5,068,771.50.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.    On the first claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest and costs;

2.    On the second claim against Defendant Branch for damages in an amount not less than $1,689,590.50 plus interest and costs;

3.    On the third claim against Defendant Charlesbank Equity Fund V, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

4.    On the fourth claim against Defendant CB Offshore Equity Fund V, L.P. for damages in an amount not less than $1,689,590.50 plus interest and costs;

5.    On the fifth claim against Defendant Charlesbank Equity Coinvestment Fund V, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

6.    On the sixth claim against Defendant Charlesbank Coinvestment Partners, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

7.    On the seventh claim against Defendant Charlesbank Equity Fund V GP, Limited Partnership for damages in an amount not less than $1,689,590.50 plus interest and costs;

8.    On the eighth claim against Defendant Charlesbank Capital Partners,

LLC

for damages in an amount not less than $1,689,590.50 plus interest and costs;

9.    On the ninth claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

10.    On the tenth claim against Defendant Branch for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

11.    On the eleventh claim against the Charlesbank Defendants for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

12.    On the twelfth claim against Defendant GSI Holdings for damages in an amount not less than $1,689,590.50 plus interest, punitive damages not less than an additional amount of $5,068,771.50 and costs;

13.    On the thirteenth claim against the Charlesbank Defendants for damages in an amount not less than $1,689,590.50 plus interest, punitive damages of not less than an additional amount of $5,068,771.50 and costs;

14.    On the fourteenth claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest and costs;

15.    On the fifteenth claim against all Defendants for damages in an amount not less than $1,689,590.50 plus interest, such punitive damages in an amount not less

than $5,068,771.50 as may be awarded and costs;

      16.    On the sixteenth claim against all Defendants for damages in an amount

not less than $1,689,590.50 plus interest, such punitive damages in an amount not less

than $5,068,771.50 as may be awarded and costs; and

 for such other and further relief as may be appropriate.

Dated: New York, New York
       ~~December 19, 2007~~
       _____, 2008

                              LAW OFFICES OF MARK P. ZIMMETT

                              By:_____
                                    Mark P. Zimmett (MZ 8735)

                              Attorneys for Plaintiff
                              126 East 56th Street
                              New York, New York 10022
                              (212) 755-0808